```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE MIDDLE DISTRICT OF TENNESSEE
 2                        AT NASHVILLE

 3
         UNITED STATES OF AMERICA        )
 4                                        )
                                          )
 5       v.                               )  Case No.
                                          )  3:18-cr-00144
 6       MARK BRYANT                       )
                                          )
 7

 8

 9
     - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
10
     BEFORE THE HONORABLE WAVERLY D. CRENSHAW, JR., DISTRICT JUDGE
11
                          TRANSCRIPT
12
                             OF
13
                         PROCEEDINGS
14
                      February 4, 2019
15
                      Trial Volume 1A
16
     - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
17

18

19
                 APPEARANCES ON THE FOLLOWING PAGE
20

21

22

23   PREPARED BY:
                    LISE S. MATTHEWS, RMR, CRR, CRC
24                      Official Court Reporter
                        801 Broadway, Room A839
25                      Nashville, TN 37203
                   lise_matthews@tnmd.uscourts.gov
```

```
 1          For the Government:  SARA E. MYERS
                                 U.S. Attorney's Office
 2                               (Nashville Office)
                                 Middle District of Tennessee
 3                               110 Ninth Avenue South
                                 Suite A961
 4                               Nashville, Tennessee 37203-3870

 5                               Michael J. Songer
                                 U.S. Department of Justice
 6                               Criminal Division
                                 950 Pennsylvania Avenue, NW
 7                               Washington, DC 20530

 8
            For the Defendant:   Peter J. Strianse
 9                               Tune, Entrekin & White, P.C.
                                 31 Deaderick Street
10                               Suite 1700
                                 Nashville, Tennessee 37238
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          I N D E X

2          Monday, February 4, 2019

3

4          INDEX OF PROCEEDINGS

5                                                          PAGE

6     GOVERNMENT'S OPENING STATEMENT                        72

7     DEFENDANTS' OPENING STATEMENT                         72

8

9

10         INDEX OF WITNESSES

11    WITNESSES:                                           PAGE

12

13    JOSH MARRIOTT
          DIRECT EXAMINATION BY MR. SONGER                 72
14

15

16         EXHIBITS

17                                   MARKED  RECEIVED  WITH-
      GOVERNMENT'S EXHIBIT           FOR I.D. IN EVD.  DRAWN
18
      4     Josh Marriott's Taser Training   72        72
19          Certificate

20    24    Restraint chair log from Nov.    72        72
            5, 2016
21

22

23

24

25

1          The above-styled cause came on to be heard on

2   February 4, 2019 before the Honorable Waverly D. Crenshaw,

3   Jr., District Judge, when the following proceedings were had,

4   to-wit:

5          THE COURT:  All right.  Be seated.  I think

6   they're still preparing the jury.  And I understand you all

7   had a couple of things you need to talk about, and I think I

8   have a couple of things.

9          So does the Government have something you wanted

10  to raise?

11         MS. MYERS:  Yes, Your Honor.  We submitted

12  another --

13         THE COURT:  Let's put on the lavaliere.

14         MS. MYERS:  It's on but I forgot to turn it on.

15         THE COURT:  Good.

16         MS. MYERS:  Is that better, Your Honor?

17         THE COURT:  I can actually hear you.

18         MS. MYERS:  Wonderful.  That's good.  We submitted

19  a written additional --

20         THE COURT:  Is this joint?

21         MS. MYERS:  It is.

22         THE COURT:  Well, I don't think we need -- I

23  gather part of the defense is going to be that the victim,

24  Mr. Norris, was under the control of drugs?  Right?

25         MR. STRIANSE:  Judge, at this point we don't

1  know -- we believe he was under the influence of some

2  intoxicant, according to the lay opinion of the officers that

3  we're going to hear this week.  But he obviously had some

4  altered mental state.  I don't have any objection to the

5  question that the Government has framed.

6            THE COURT:  Okay.  I guess I want to -- I don't

7  think we need to get into Mr. Norris's drug history, whether

8  he was an addict or not.  That's -- that's not necessary

9  here.

10           MR. STRIANSE:  I don't think they want to go

11  there.

12           MS. MYERS:  No.  It's just, Your Honor, that a lot

13  of people have very strong feelings about substance abuse.

14  And given that we are going to hear this lay opinion

15  testimony, potentially from witnesses who think that he might

16  have been, in their experience, under the influence of some

17  substance, there could be people who might -- that might sway

18  them one way or the only.  They would not be able to -- maybe

19  they lost a loved one.

20           THE COURT:  Okay.  Well, I'm going to let you all

21  do that.  But we shouldn't -- I'm not going to let you

22  suggest that Mr. Norris was a drug addict or that he had a

23  history of drug abuse, or that -- as I understand from the --

24  from the papers here, that he -- that his demise may have

25  been as a result of drugs.  That's not necessary.  So let's

1  stay away from that in your openings and in voir dire.

2          Is that clear?

3          MR. STRIANSE:  That's fine, Your Honor.

4          THE COURT:  Okay.  Any objection to that?

5          MS. MYERS:  No, Your Honor.

6          THE COURT:  All right.  Anything else?

7          MR. STRIANSE:  Yes, Your Honor.

8          THE COURT:  All right.

9          MR. STRIANSE:  Just very briefly.  And I need to

10 apologize to the Court.  You know, I tried a case in here at

11 the end of October, early November, and when you had the

12 discussion about these -- filing these voir dire questions --

13         THE COURT:  You're still going to get 20 minutes

14 to ask whatever you want.

15         MR. STRIANSE:  Okay.  Thank you.

16         THE COURT:  Okay?  But I may not cover

17 everything -- and in fact, go ahead and address that.

18         Now, the Government did provide me some -- I'm

19 going to touch on that.  I may not touch on it the way you

20 all want, but you can follow up as necessary.  But I am

21 troubled and concerned that several of the Government's

22 questions asked about -- yeah, "Do you have any strong

23 feelings?"  That's a phrase you all used.  I don't want to --

24 "strong feeling."  You know, you can -- I don't think that

25 "feelings" is appropriate.

1          And we just checked, and I think there's law out
2     there.  You shouldn't use "feelings."  Now, you can ask, "Do
3     you have any opinions?"  That's okay.  But they shouldn't be
4     required to disclose those feelings.
5          And the one that bothers me the most that I want
6     to stay away from now, anyone have any -- do you have strong
7     feelings -- but you really just say, "Does anyone have any
8     opinions, good or bad, about the U.S. Justice Department or
9     the federal government?"
10          You can ask that question, but I don't want them
11     having to reveal -- they're entitled to whatever opinion they
12     have.  The question is, can you set that aside and follow the
13     law as the government -- so I don't want to get into their --
14     you know, they're entitled to whatever opinion they have,
15     good, bad, or indifferent.  But they shouldn't be made to
16     disclose that here in open court for all the public.  That's
17     their private opinions.  And I don't want to embarrass or
18     humiliate or subject them to ridicule because of their
19     opinions.
20          Is that -- can you all live with that?  Does the
21     Government have any objection to that?
22          MS. MYERS:  Yes, Your Honor.  So changing
23     "feelings" to any --
24          THE COURT:  Let's not use "feelings."
25          MS. MYERS:  -- any strong "opinions."

 1          THE COURT:  "Do you have any opinion, strong, weak

 2    or otherwise?"

 3          MS. MYERS:  We have no objection to that.

 4          THE COURT:  Okay.  Then you can -- but let's not

 5    ask them what that opinion is.  So they may have strong

 6    feelings about -- we don't -- can you set aside that opinion

 7    and follow the law based on what the Court tells you and make

 8    a decision solely on evidence presented in this courtroom.

 9          And if they can't -- and sometimes they say they

10    can't -- then we'll address it at the bench.  But I want to

11    avoid any juror having to be -- being required to disclose

12    their personal opinions about the justice department or

13    federal government.  Whatever it is, they're entitled to it.

14          MS. MYERS:  Understood, Your Honor.

15          THE COURT:  Okay.  Okay.

16          I got your joint stipulation.  Are you all going

17    to read that?  Do you want me to read that before the first

18    witness is called?  When is that going to be presented?

19          MS. MYERS:  Your Honor, we are fine with having

20    you read that if the defense is as well.

21          THE COURT:  When?

22          MS. MYERS:  Prior to calling the first witness.

23          THE COURT:  Mr. Strianse?

24          MR. STRIANSE:  That's fine, Your Honor.

25          THE COURT:  All right.  Now, if I forget --

1  because I'll have a lot of things on my mind -- you all need

2  to remind me.  Okay.

3          At what point -- well, we need to discuss, when

4  did you want me to tell the juror -- jury that Mr. Norris is

5  deceased?  I need to mention his name when I talk about names

6  you're going to hear or witnesses.  I don't attribute that to

7  either side.  I just say you may hear from these and you may

8  notice that Mr. Norris -- I mean, how do you want me to tell

9  them that?  When do you all propose I do that?

10          MR. STRIANSE:  Your Honor, I think when you're

11  talking about all the witnesses that may appear in the case,

12  it may be appropriate at that point.

13          THE COURT:  What does the Government think?

14          MS. MYERS:  We agree.  That's fine, Your Honor.

15          THE COURT:  All right.  So I'm going bring him up

16  or shift to that when we talk about the witnesses.  All

17  right.

18          And if I didn't say it at the pretrial conference,

19  I'll tell you now, your agreed statement of the case,

20  Document 32 -- I'm not going to read the indictment, but I'm

21  going to use that to transition from the general questions to

22  the more specific case questions.  Okay?

23          Do you all have the pool information?  Looks like

24  you're reading it there, Mr. Strianse.

25          MR. STRIANSE:  Yes, sir.

1           THE COURT:  Okay.  Good.

2           MS. MYERS:  Yes, Your Honor.

3           THE COURT:  Okay.  And you've got your challenge

4  sheet?

5           MS. MYERS:  I don't believe we have that.  We

6  also --

7           THE COURT:  That should be on your desk.  Your

8  peremptory and for cause -- peremptory and for cause -- it

9  should be on your desk.

10          MS. MYERS:  We have the judge's list and then we

11 have the jury voir dire list, the voir dire report --

12          THE COURT:  Kelly, do they have that?

13          Okay.  This, I thought that was -- it's supposed

14 to be own your desk when you walk in.

15          MS. MYERS:  And does that -- Your Honor, does that

16 include the giant piece of paper with the divisions?

17          THE COURT:  You should have that, too.

18          MS. MYERS:  We do not have that.

19          THE COURT:  Okay.  That's not ready yet.  You will

20 get the same thing that I have.

21          MS. MYERS:  Thank you.

22          THE COURT:  Is Marsha about ready?  All right.

23 We're working on the master list that you'll have a copy of

24 what I have.  So give us a few minutes and I think they may

25 be close to being ready.  So we can get started on time.

1    Any other questions before we -- we'll bring the
2    panel in and then we'll get started with jury selection.  All
3    right?  Thanks.
4         (Respite.)
5         (Voir Dire filed in Volume IB.)
6         (Jury sworn.)
7         THE COURT:  All right.  Be seated.  Members of the
8    jury, now that you've been sworn, I'll give you some
9    preliminary instructions to guide you in your performance in
10   the trial.
11        It will be your duty to find from the evidence
12   what the facts are.  You and you alone are judges of the
13   facts.  You will then have to apply those facts to the law
14   that I will give you.  You must follow that law whether you
15   agree it with it or not.
16        Nothing I may say or do during the course of the
17   trial is intended to indicate, nor should it be taken by you
18   as indicating, what your verdict should be.
19        The evidence from which you will find the facts
20   will consist of the testimony of witnesses, documents, and
21   other things received into the record as exhibits.  And any
22   facts the lawyers agree or stipulate to.  Or that I may
23   instruct you to find.
24        Certain things are not evidence and must not be
25   considered by you.  Among these things are statements,

1 arguments, and questions by lawyers.  These are not evidence.
2 Objections to questions are not evidence.  Lawyers have an
3 obligation to their client to make an objection when they
4 believe evidence being offered is improper under the rules of
5 evidence.  You should not be influenced by the objection or
6 by my ruling on it.  If an objection is sustained, ignore the
7 question.  If it is overruled, treat the answer like any
8 other answer.

9          If you are instructed that some item of evidence
10 is received for a limit purpose only, you must follow that
11 instruction.

12          Testimony that I have excluded or told you to
13 disregard is not evidence and must not be considered.
14 Anything you may have seen or heard outside the courtroom is
15 not evidence and must be disregarded.  You're to decide the
16 case solely on the evidence presented here in the courtroom.

17          There are two kinds of evidence, direct and
18 circumstantial.  Direct evidence is direct proof of the fact,
19 such as testimony of an eyewitness.  Circumstantial evidence
20 is proof of facts from which you may infer or conclude that
21 other facts exist.  I will give you further instructions on
22 these, as well as other matters, at the end of the case.  But
23 keep in mind that you may consider both kinds of evidence.

24          It will be up to you to decide which witnesses to
25 believe, which witnesses not to believe, or how much of any

witness's testimony to accept or reject.  I will give you
some guidelines for determining the credibility of witnesses
at the end of the case.

As you know, this is a criminal case.  There are
three basic rules about a criminal case that you must keep in
mind.  First, the defendant is presumed innocent until proven
guilty.  The indictment against the defendant brought by the
Government is only an accusation, nothing more.  It is not
proof of guilt or anything else.  The defendant therefore
starts out with a clean slate.

Second, the burden of proof is on the Government.
The defendant has no burden to prove his innocence or to
present any evidence or to testify.  Since the defendant has
the right to remain silent, the law prohibits you in arriving
at your verdict from considering that the defendant may not
have testified.

Third, the Government must prove the defendant's
guilt beyond a reasonable doubt.  I will give you further
instructions on this point later, but bear in mind that in
this respect a criminal case is different from a civil case.

I now have a few words about your conduct as
jurors.  These instructions are necessary for a fair trial
and are very important.

First, during the trial, you're -- you are to
avoid contact with any witness, the parties, any lawyer, or

1  anyone else who may have an interest in the outcome of this
2  case.  Do not talk and -- or have any other communication
3  with them.
4          Because you may not know whether a particular
5  person in the courthouse falls into one of these categories
6  during breaks, you should not speak to anyone in the
7  courthouse you do not know.  If anyone tries to talk to you
8  about the case, bring it to my attention promptly.
9          Second, during the trial, you are not to discuss
10 the case with anyone or permit anyone to discuss it with you.
11 This prohibition includes your family, friends, and
12 coworkers.  It also includes any form of communication
13 whatsoever, whether over the internet, such as email, instant
14 messaging, tweeting, Facebook, or other social media posts,
15 websites, and blogs, the use of cell phones for text
16 messaging or video or audio recording or the use of any other
17 recording or transmitting device.
18         People who aren't in the courtroom and haven't
19 heard the evidence may yet still express opinions about the
20 case.  And your verdict is not to be based on what others say
21 about the case, only on what with the evidence is.  So don't
22 post or email or tweet or text anything about this case, and
23 don't read anything anyone else might post, email, tweet, or
24 text about this case.
25         And of course, don't talk about the case and don't

1    listen to anyone else talk about the case.

2             The prohibition even includes your fellow jurors.

3    You should refrain from case-related discussions with one

4    another until all the evidence is received, final

5    instructions are given, and you retire to the jury room to

6    deliberate on your verdict.

7             One of the main reasons for this is that

8    discussing the case can lead to forming an opinion.  And that

9    is not a good idea before you've heard all the evidence.

10   Even after deliberations begin, you may talk about the case

11   among your fellow jurors only when all are present.

12            Third, during the trial, you are not to gather

13   information, investigate, or do anything else to learn about

14   the case outside the properly admitted evidence.  For

15   example, do not attempt to investigate the case on the

16   internet or travel to a particular location that may be of

17   interest in the trial.

18            You should also avoid exposure to media coverage

19   of the charges or trial, if there is any, until you have

20   rendered your verdict.  So don't read or listen to any news

21   or internet reports about the case if there are any.  Just

22   like tweets and internet posts, things on the internet and in

23   the media are often inaccurate or incomplete, and is

24   certainly not given under oath with all the parties present,

25   nor is it subject to cross-examination and close scrutiny

like the evidence you will hear in the courtroom.

During the trial, you will receive all evidence which may be formally considered in reaching your verdict. I know you may be used to looking things up online, but doing any type of research is unfair to the parties, can lead to a bad decision, and it can cause major problems and require us to start all over.

Finally, do not form any opinion until all the evidence is in. The last witness is often just as important as the first witness. So keep an open mind until I instruct you to start deliberations at the end of the case.

These rules are necessary for a fair trial, and violation of these instructions does subject you to punishment as allowed by law for contempt. I will repeat or summarize these instructions for you regularly throughout the trial, not because I don't think you're paying attention, but because in my experience jurors find some of these instructions difficult to follow.

I know of no other situation in our culture where we ask strangers to sit together, watching and listening to something, then go into a little room together and not talk about the one thing you have in common, what they just watched and -- watched together.

We are almost all wired into the digital world and used to looking stuff up online and talking or posting about

1   our lives.  So please remember the reasons I gave you about
2   why these rules are in place in the context of this trial.
3   Let me know if there are any problems with following the
4   rule -- these instructions, either on your part or by your
5   fellow jurors.
6           If at any time during the trial you have any
7   personal needs that must be taken care of, raise your hand or
8   let the court security officer know.  Your comfort is
9   important to the Court, and I want to accommodate you in any
10  way we can.
11          So, toward that goal, it's going to be permissible
12  if you want to bring in a bottle of water and -- and -- but
13  it is limited to water.  Nothing else.  And certainly
14  permissible if you need to bring in cough drops or anything
15  of that sort for your personal comfort.
16          The trial is about to begin.  First the Government
17  will make an opening statement, which is simply an outline to
18  help you understand evidence as it comes in.  Next, the
19  defendant's attorney may but does not have to make an opening
20  statement.  Opening statements are neither evidence nor
21  arguments.
22          The Government will then examine its witnesses and
23  counsel for the defendant will cross-examine those witnesses,
24  followed by any rebuttal questions from the Government.
25  Following the Government's case, the defendant may, if he

wishes, present witnesses whom the Government may cross-examine, and then the defendant will be allowed to ask questions at the end.

This Court only allows one round.  We'll have direct, cross-examination, and then redirect.  That's all.

As I advised you before, the defendant has no burden of proof and has no obligation to present evidence, and he might or might not choose to do so.

After all the evidence is in, the attorneys will present their closing arguments to summarize and interpret the evidence for you, and I will instruct you on the law.

After that, you will retire to deliberate on your own.  At the end of the trial, you must make your decision based on what you recall of the evidence.  You will not have a written transcript to consult.  So you must pay close attention to the testimony as it's given.  If you wish, you may take notes to help you remember what witnesses said.

So at this time I'll pass out the notebooks and a pen.  If you do take notes, please keep them to yourself until you and your fellow jurors go to the jury room to decide the case.  And do not let note-taking distract you so you do not hear other answers by the witness.

At the end of each day, just leave your notebooks and pen in your seats, and they'll be very secure here until we return.

1          Also, you might have noticed already, it gets a

2   little warm in here sometimes.  So if that becomes an issue

3   for somebody, let the court security officer know and we'll

4   do the best we can to adjust the temperature.

5          One more thing you need to know is generally we

6   will typically start about 9:00 and end the day around 5:00

7   or maybe a little bit later.  We'll take a morning break for

8   a few minutes.  We'll take a lunch break around noon.  And

9   then we'll take an afternoon break.

10          I'm going to have to adjust that schedule because

11   on Wednesday the Court has an unavoidable obligation I've got

12   to attend to that takes me away from the courthouse for

13   several hours.  So on Wednesday, we'll probably -- I might

14   inquire of you all about starting a little bit earlier on

15   Wednesday.

16          In fact, I'll go ahead and tell you, if -- if at

17   all possible, I would like to start Wednesday at 8:00.  And

18   we'll go from 8:00 until 10:30.  And then I have to leave at

19   10:30.  And I think I can be back here by 1:30.  And then

20   we'll resume the testimony.  And if -- if possible, I may

21   need you to stay a little bit late on Wednesday.  Depending

22   on how the proof is coming in.  But I'll have a better idea

23   once we -- once we conclude on Tuesday.

24          But we will have to take a break on Wednesday that

25   I -- I can't avoid.  All right.

1           So now we're ready for opening statements.  I want
2    to give the lawyers a little time to gather their thoughts
3    and prepare.  So you can go now into your jury room.  There
4    should be refreshments and whatnot back there that -- as well
5    as water.  And refresh yourselves.  And then we'll come back
6    about 3:05.  Thank you.
7           (Recess.)
8           (Jury not present.)
9           THE COURT:  All right.  Be seated.  We're ready.
10   Is the Government ready to proceed?
11          MS. MYERS:  Yes, Your Honor.
12          MR. STRIANSE:  Yes, Your Honor.
13          THE COURT:  Okay.  Bring in the jury.
14          (Jury present.)
15          THE COURT:  All right.  Be seated.  All right.
16   We're now going to have opening statements.
17          Ms. Myers.
18
19              GOVERNMENT'S OPENING STATEMENT
20          MS. MYERS:  "I'll keep doing it until I run out of
21   batteries."  That's what the defendant told Jordan Norris
22   while Norris was an inmate in the Cheatham County jail,
23   strapped to a chair, while the defendant tased him for 50
24   seconds.
25          You will see two videos in this case of two

separate incidents in which the defendant tased Jordan Norris

excessively and then wrote false reports about each incident.

Now, the United States Constitution protects all

people in our country, even inmates in jail.  Law enforcement

officers have a very difficult job.  They handle and are

trained to handle people who are dangerous and people who are

unstable every single day, but their duty is clear:  To

protect and serve.

In this case, there is a clear line between

appropriate use of force and excessive force.  And the

defendant crossed the line again and again.

On the night of November 5th, 2016, Jordan Norris

was an inmate in the Cheatham County jail.  He was 18 years

old.  He had been arrested.  He had been booked.  But he had

not had his first court appearance.

The defendant was a corrections officer in the

Cheatham County jail.  He was in charge of the jail that

night.  Around 7:00 p.m., Jordan Norris became distressed in

his cell.  He was agitated and he was banging his head

against the cell door.  One of the corrections officers

noticed this and called for additional officers to come help

with the situation.

Four officers arrived.  Those other officers were

Daniel Bratton, Jeff Key, Josh Marriott, and the defendant.

When the officers went into the cell, Jordan Norris was

1   struggling.  He was struggling, still agitated, and the
2   officers were moving him from that cell into a restraint
3   chair.  One of the officers had to tase him to get him into
4   the chair.

5          The restraint chair has several straps.  It has
6   straps across the shoulders, straps across the lap, straps
7   across the arms, and a strap across the legs.  Jordan Norris
8   calmed down after he was in the chair for a period of time.
9   He was calm and -- until about an hour later he started
10  struggling again.  He was struggling against the straps and
11  managed to loosen one of the straps over one of his hands.

12         Some of the officers came back, some of the same
13  officers.  Jeff Key was at his hand.  Josh Marriott was at
14  his head, and directly in front of Jordan Norris with a Taser
15  stood the defendant.  And while Jordan Norris was strapped
16  into that chair, the defendant tased Jordan Norris
17  repeatedly, sending painful electrical shocks throughout his
18  body, burning his flesh.  He did this for a total of 50
19  seconds.  All the while, the defendant taunted Jordan Norris,
20  "I'll keep doing it until I run out of batteries."  "You
21  don't like it, do you?"

22         The defendant crossed the line.

23         Now, the defendant had been Taser certified.  And
24  he was Taser certified before this incident with Jordan
25  Norris.  And in that training he learned that you could tase

1   a person three times in five second bursts, nothing more.

2          He was also taught that you could not tase a

3   restrained person or a person in handcuffs.  And after that

4   50-second tasing, the defendant told the other officers who

5   were there for the incident not to write a use of force

6   report against policy.  He said he would take care of it, and

7   he did take care of it.  He deliberately wrote a false

8   sequence of events, and completely left out the fact that he

9   had tased Jordan Norris four times for a total of 50 seconds.

10         Now, later that evening, the second shift ended.

11   And another shift of officers arrived.  But the defendant

12   stayed back with the third shift.  And while those officers

13   were preparing Jordan Norris to be transported to the

14   hospital, Jordan Norris began struggling again.  He was

15   agitated.  However, he was still in the chair, and when he

16   was handcuffed, when his feet were in shackles, when there

17   were at least six officers standing around him and while he

18   was still strapped in the chair, the defendant tased Jordan

19   Norris for an additional 11 seconds, holding down on the

20   trigger, sending that pain shooting through his body again.

21         The defendant crossed the line.

22         Now, you will hear from the Taser instructor who

23   taught the defendant in this case, the one who taught his

24   Taser certification class.  His name is Gary Ola.  And he

25   will testify he had been the Taser trainer in the jail for

1   years.  He trained him and the other people who were Taser

2   certified there in the jail that night.  He had worked in

3   Cheatham County, and he was present for that 11-second tase.

4          And even though he was there and he witnessed how

5   excessive it was, at that time he did not tell anyone about

6   it or do anything.  You will hear him testify that he is

7   ashamed.  He lied to federal agents about what he saw.  And

8   he pled guilty to lying to those federal agents.  You will

9   hear him testify that he is ashamed that he did nothing that

10   night.

11          You will also hear from a number of other

12   witnesses, law enforcement witnesses, who were there that

13   night.  And that even though Jordan Norris was difficult, the

14   defendant crossed the line when he tased Jordan for as long

15   as he did, when he did.

16          You will also get to see the video -- videos of

17   the tasings.  You will get to read the false reports that the

18   defendant wrote to cover up what he had done.

19          Unfortunately, as the judge mentioned, you will

20   not get to hear from the victim.  He passed away several

21   months ago in a manner unrelated to this case.  But you will

22   get to hear the words of the defendant in the video.  "I'll

23   keep doing it until I run out of batteries."  "You don't like

24   it, do you?"

25          And at the conclusion of the evidence, I am

confident that you will find the defendant guilty on all four

counts.  Thank you.

        THE COURT:  Mr. Strianse.

        MR. STRIANSE:  Thank you, Your Honor.


        DEFENDANTS' OPENING STATEMENT

        MR. STRIANSE:  Good afternoon, ladies and

gentlemen.  The front door of the Cheatham County jail is

exactly 20 miles from this courtroom.  What happens behind

that door might as well be a million miles away from our

usual, relatively comfortable, orderly, day-to-day

experiences.

        This case that you're going to hear over the next

four or five days presents a stark example of the distance

between the calm of this setting, in this courtroom, and the

sudden unpredictable storms of a jailhouse.

        On November 5, 2016, Mark Bryant was a

correctional officer.  He was a corporal.  He was a shift

supervisor at the Cheatham County jail in Ashland City.  That

jail was built 40 years ago to house 120 inmates.  In 2016 it

routinely housed 150 or more.

        There were six correctional officers per shift to

safeguard the security of those 150 and themselves, and to

preserve some semblance of order and discipline in that local

jail.

As of Saturday, November 5th, 2016, Mark Bryant
had worked at the Cheatham County jail for about 14 months.
I think you'll hear in his testimony he rose through the
ranks quickly.  He was hired August 20th of 2015, and he was
appointed -- he didn't run for it or ask for it -- and he was
appointed and tapped by his superiors to be a field training
officer just a couple of months later, October of 2015.  By
November of 2015, he was supervising his own shift.  By June
of 2016, he was elevated to the rank of corporal and shift
supervisor.

You're going to be hearing a lot about Saturday,
November 5th, 2016.  Mark Bryant was working the second
shift -- that's the 2:00 p.m. until 10:00 p.m. shift -- as a
corporal and as the shift supervisor.

As you might imagine, in a small town, local jail,
Saturday night is a very busy night at the jail.  They're
booking a lot of people in and the correctional officers are
extremely busy.  Around 6:45 or so on that Saturday evening,
November 5, 2016, Mark Bryant was at his desk in the booking
room, in the booking office, and he's able to watch the
actual live camera feed from the cells.

And at that point in time, at about 6:45 or so, he
sees Jordan Norris, who's in Cell 4 in the booking area.
Mr. Norris had been lodged into the jail a couple of days
before, November 3rd, 2015, and he was still being held in

the booking area without bond.  And Mr. Bryant looks up at
the screen and sees Jordan Norris banging his head on the
solid steel door for Cell 4.

Mr. Bryant gets up, he walks the 25 feet or so
from the booking office to Cell 4 and asks Mr. Norris to stop
what he's doing.  Mr. Norris doesn't stop what he's doing.
At that point, Mark Bryant gets a key and opens up the door
to Cell 4 and again asks, "Stop what you're doing or you're
going to be hurting yourself."

For a moment Mr. Norris composes himself, returns
to his bunk, and Mr. Bryant returns to the booking office.
No sooner does Mark Bryant get back to the booking office and
raise his eyes up again to look at the screen, there goes
Mr. Norris, banging his head on the door again.

At that point Mark Bryant and another correctional
officer, a man by the name of Jeff Key, who will testify in
this case, go to Cell 4 together.  And they escort Mr. Norris
out of Cell 4, and that's when everything begins.  That's
when the lives of four correctional officers at the Cheatham
County jail and Mr. Norris intersect on that Saturday night.

Because at that time Mr. Norris decided, for
whatever reason, that he was going to fight and resist the
officers any way that he could.  You will hear over the next
few days Mr. Norris described variously by the correctional
officers as -- and these are their words -- "possessed," "out

1  of his mind," "drugged," "aggressive," "possessed of
2  extremely unnatural strength."
3       I don't think you're going to hear in the lexicon
4  of the officers the word "difficult" that the Government used
5  in its opening statement.  The officers simply could not
6  control him and they could not cuff him.
7       There is video that you will see that will show
8  his removal from Cell 4.  You'll hear testimony about
9  Mr. Norris banging his head on the door.  You'll hear
10  testimony about Mr. Norris being combative with other inmates
11  in Cell 4.  And that was the reason why he had to be removed.
12  He had to be removed for his own safety and the safety of the
13  correctional officers.  He simply refused to comply with any
14  verbal commands.
15       You'll also see four officers with an aggregate
16  weight of about 1,000 pounds trying to extract and control
17  Mr. Norris, who is a person that's -- was a person probably
18  about my size, 5-9, 5-10, 170 pounds.  That group of officers
19  was unable to get him into a restraint chair without an
20  officer by the name of Daniel Bratton, who will testify
21  having to tase him four times.  Because he was actively
22  resisting, stiffening, flailing his arms against the
23  officers.
24       Another interval that you'll see video of is when
25  he is in the restraint chair at about 7:59 p.m. on that

Saturday night.  You're going to see him struggling against
the chair.  And like everything prior to November 5, 2016, at
the Cheatham County jail, it was old and it was worn out.
Particularly this restraint chair.  It may have been there as
long as the jail had been open, since 1978.

          And you heard the Government talk about the
different restraints and ties that it had.  Well, one of
those ties had gotten old and very defective and no longer
worked.  It was the restraint that would go around an
inmate's right hand, a Velcro restraint that was simply worn
out.

          You'll also see in the video that Mr. Norris, who
the officers described as having an unusual amount of
strength for somebody his size, was able to physically move
his chair along the floor as he was fighting against the
officers.  And he was also able to get his right hand free.
And I think when we get to the end of this case, you're going
to be satisfied that Mr. Norris was never -- was never tased
when he was fully restrained.

          The third interval is what happens at 10:20 p.m.
on the evening of Saturday, November the 16th, when he's
being readied by correctional officers to transport him to a
local hospital in Ashland City.  He again continues to fight
and had to be tased again.  But again, significantly, this
man was never fully restrained at any time that he was tased.

1          Now, the Government has just told you that what
2    Mr. Bryant did was contrary to the training that he received
3    and contrary to the policy of the Cheatham County Sheriff's
4    Office and jail that was in place at the time of this event,
5    November 5th, 2016.  The policy in place at the time of the
6    Norris incident was aptly described by the jail
7    administrator, the number one man in charge, the top, a man
8    by the name of JJ Hannah.  He was interviewed in August of
9    2017 by the Federal Bureau of Investigation, by the Tennessee
10   Bureau of Investigation in tandem.
11          And listen to what he said about the policy that
12   was in place as of November 5, 2016.  (As read):
13               At the time of the incident, we didn't have
14               much of a policy on Tasers.  There was a five-
15               second rule with prongs.
16          What you're going to hear about over the next week
17   is these Tasers are what is called a drive stun.  They
18   weren't the ones where -- you may have seen on television
19   where these two barbed prongs go expelling out of the Taser.
20   This is basically a contact tase that you're going to be
21   hearing about and seeing over the next few days.
22          But the only five-second rule that was in place at
23   the time, November 5, 2016, was if somebody was going to
24   shoot that Taser and shoot those prongs at somebody in an
25   effort to connect them to the person that was the target.

1   That's simply not what happened to Mr. Norris in this case.

2           And significantly, Jail Administrator Hannah, the

3   number one man in charge of the jail, said there was no time

4   limit on the drive stun, the Taser stuns that you're going to

5   see over the next few days.

6           So what happened in the immediate aftermath of

7   this event on November 5, 2016?  Approximately one week after

8   the event, JJ Hannah, who is the jail administrator, Bob

9   Whitt, the assistant jail administrator, asked Mark Bryant to

10  come upstairs to the second floor where the sheriff's office

11  is, where the administrator offices are.

12          He met with Mr. Hannah.  He met with Mr. Whitt.

13  He met with another supervisory officer by the name of David

14  Isherwood in the administrative office.  They show him the

15  video, the events of November 5, 2016, and they want his side

16  of the story.  And Mark explained exactly what he did and why

17  he did it.

18          Now, Mark didn't hear back for a while.  So in

19  February of 2017, he goes back upstairs and he asks for an

20  update.  "Well, what's going on with this review of my

21  conduct on November 5, 2016?"

22          And they tell him at that time that the

23  administration people had looked at it, they reviewed it, and

24  found that his actions were justified on November 5, 2016.

25  And they told him, "You're clear.  You didn't violate any

1  policy."

2          And that was the order of the day until July of

3  2017, when a civil lawsuit was filed, and there was Channel

4  4 -- or Channel 5, excuse me -- carrying the story and

5  showing some video of the incident.  And suddenly it wasn't

6  okay.  Despite the fact that there was no coherent Taser

7  policy in place at the time that Mark Bryant was forced to do

8  the acts that he did on November 5, 2016, because of the

9  conduct of an out-of-control inmate, at that point, Mark

10  Bryant, I guess, becomes expendable.  Because the sheriff is

11  running for cover, the administration is running for cover,

12  and Mr. Bryant becomes the fall guy for this incident.

13          I think the judge has probably already told you in

14  your preliminary instructions that you are the judges of the

15  facts in this case.  And I respectfully suggest to you,

16  ladies and gentlemen, that it will be your job over the next

17  three or four days to sift through all of these facts and

18  sift through this incident and decide the ultimate question

19  in the case, which is, on November 5, 2016 -- and I would ask

20  you to make this determination without the benefit of 20/20

21  hindsight, without the benefit of Monday morning

22  quarterbacking, but in the moment, November 5, 2016, based on

23  the totality of everything you're going to see over the next

24  few days, you're going to have to ask yourselves as you sit

25  around that table in the deliberation room, did Mark Bryant

1  set about to willfully violate the civil rights of Jordan

2  Norris on November 5, 2016, or was Mark Bryant -- and, for

3  that matter, all the other correctional officers that are

4  going to be marched in here over the next few days -- simply

5  reacting to a series of extremely dangerous situations that

6  Mr. Norris created on that evening?

7          I thank you for your service and I thank you for

8  your attention this afternoon.

9          THE COURT:  All right.  Does any party want to

10  invoke the rule?

11          MS. MYERS:  Yes, Your Honor.

12          MR. STRIANSE:  Yes, Your Honor.

13          THE COURT:  All right.  So you know who your

14  witnesses are.  If they are in the courtroom or come into the

15  courtroom, it's your responsibility to make sure they are

16  told to leave.  All right.

17          Okay.  Ladies and gentlemen, we're about to start

18  the proof in the case.  And the parties have asked that I

19  read to you three stipulations that they have agreed to.  And

20  they are as follows:

21          One, on November 5, 2016, Defendant Mark Bryant

22  was employed as a corporal in the Cheatham County jail in

23  Ashland City, Tennessee.

24          Two, on November 5, 2016, Defendant Mark Bryant

25  was on duty, working at the Cheatham County jail from

1   2:00 p.m. until at least 10:30 p.m. Central Standard Time.

2          And three, Defendant submitted two incident

3   reports relating to events at the Cheatham County jail on

4   November 5, 2016.  The time listed on one report is 1855, and

5   the time listed on the second report is 2220.

6          All right.  The Government should call its first

7   witness.

8          MR. SONGER:  Your Honor, may we approach before we

9   call the first witness?

10          THE COURT:  Sure.

11          (Bench conference outside the hearing of the

12          jury.)

13          THE COURT:  Okay.

14          MS. MYERS:  So in Mr. Strianse's opening

15   statement, he referenced the lawsuit, which was one of the

16   subjects of a motion in limine that you had granted.  In

17   order to address that appropriately with the witnesses and

18   not leave an impression that -- it appears part of

19   Mr. Strianse's argument is going to be that he was basically

20   a sacrifice for politics and for PR, we're going to need to

21   be able to address the lawsuit, what was pulled when, which

22   officer.  We can ask questions about what they actually

23   viewed.  And we're going to --

24          MR. STRIANSE:  The motion in limine went to the

25   state prosecution.

1    MS. MYERS:  And the lawsuit.

2    MR. SONGER:  He instructed our witnesses not to

3    reference the civil litigation.

4    THE COURT:  Let me get clarified.  Your omnibus

5    motion said "excluding a reference to Defendant's prosecution

6    of a local Tennessee District Attorney General.  And that was

7    granted as unopposed.

8    It doesn't say -- it doesn't refer to the civil --

9    MR. STRIANSE:  It didn't say anything about the

10   civil lawsuit.

11   MR. SONGER:  Your Honor, we have instructed our

12   witnesses not to address the civil lawsuit --

13   THE COURT:  Okay.

14   MR. SONGER:  -- to avoid the appearance of any

15   bias.  But given now the door's been open, we would suggest

16   that we need to get some context to that lawsuit and how it

17   was resolved and what steps were taken in response to it so

18   we don't leave a miss impression with the jury.

19   MR. STRIANSE:  I haven't left any misimpression.

20   There was no motion in limine to keep me from saying anything

21   about a civil lawsuit being filed.

22   MR. SONGER:  I'm not accusing you of filing a

23   motion in limine.  I just want clarity.

24   THE COURT:  Do we need to do this now?  Can we do

25   it later?  Can you call your first witness?

1    MS. MYERS:  I think we will need to address it.

2    THE COURT:  Who is your first witness?

3    MR. SONGER:  Josh Marriott.

4    MS. MYERS:  Josh Marriott.

5    THE COURT:  Okay.  So do you want to talk about --

6 was he in the civil lawsuit?  I'm not following.

7    MS. MYERS:  He was.  He was a party.

8    MR. SONGER:  He was a defendant.

9    THE COURT:  All right.  So what do you want to

10 present?

11    MR. SONGER:  My understanding from the witnesses

12 is they became aware of certain parts of this incident after

13 the lawsuit was filed.  They had conversations with people

14 after the lawsuit was filed.

15    THE COURT:  What was the result of the civil

16 lawsuit?

17    MS. MYERS:  There was a settlement with the county

18 for, I believe, $700,000, finding fault against Cheatham

19 County.

20    THE COURT:  So we're not going to bring that in,

21 are we?  You're not trying to bring that in.  I mean, all

22 that he said -- I don't think we need to get too deep in the

23 civil.  But I don't know if we can resolve this now.  There

24 was no violation of the motion in limine.  So I appreciate

25 that clarification.  So the civil lawsuit was fair game on

1  opening.  It remains fair game now.

2          So what are you now -- now, as to the settlement

3  of it and that, that -- I do want to control that.  I don't

4  know if -- I don't know if it was mentioned, but the fact

5  there was a civil lawsuit doesn't mean we need to try it

6  again or try it for the first time.

7          MS. MYERS:  No.  And we would agree about that.

8  But we want to ensure -- we have witnesses who were called to

9  speak about it later with administration only after the civil

10  lawsuit.

11          THE COURT:  Okay.

12          MS. MYERS:  Sometimes they were called directly

13  after the incident, but then there were additional meetings,

14  and additional evidence was pulled following the filing of

15  that civil -- of that civil lawsuit.

16          THE COURT:  Okay.

17          MS. MYERS:  So that time frame will now be --

18  we'll just have to instruct our witnesses --

19          THE COURT:  Yeah.  I think the -- the motions in

20  limine we've discussed so far had to do on the date of the

21  event, on November the 5th, and what occurred before that.

22  So -- didn't touch on that in the pretrial, so that's fair

23  game.

24          But I will say, until we have further

25  discussion -- you can change my mind -- we don't need to talk

1   about the settlement of the -- of the civil lawsuit or

2   certainly not the amount involved.  You can say there was a

3   civil lawsuit.  I guess you can say it was resolved.

4           MS. MYERS:  And the reason that there was media

5   attention was as a result of the civil lawsuit.

6           THE COURT:  Okay.

7           MS. MYERS:  So some of the witnesses saw the full

8   incident for the first time in the media.

9           THE COURT:  Okay.

10          MS. MYERS:  And that would be how -- they will

11  need to explain how they saw --

12          THE COURT:  Do you have enough guidance that now

13  we can put on the first witness?

14          MS. MYERS:  Yes.

15          MR. SONGER:  Just one other housekeeping matter,

16  Your Honor, of how we want to proceed with evidence.  I

17  understand in some cases, when there haven't been objections

18  to authenticity, and there aren't here, we've announced what

19  exhibits we want to use at the outset of the testimony, just

20  admit them, so -- or we can go through and admit them through

21  the testimony.

22          THE COURT:  Well, I hope y'all have talked to

23  Mr. Strianse so if you know there are objections, you can say

24  that.  I will turn to him and you will say "is that correct?"

25          MR. STRIANSE:  I've made it very clear that I

don't have an objection to authenticy, but I do have

objection to admissibility.  They have a Taser training

exhibit that is dated after Mr. Bryant received his training

on October 23rd, 2015.  So I have an admissibility objection

to that exhibit.  I have no question that it's an authentic

document.

THE COURT:  Okay.  So we can take that up.

MR. SONGER:  We can deal with it at another time.

THE COURT:  Okay.

MS. MYERS:  Thank you.

THE COURT:  Now, do I have your exhibits?  Are

these them?

MS. MYERS:  Yes, Your Honor.  Yes.

THE COURT:  Do you want to test it?

COURT DEPUTY:  Do you want her to test?

THE COURT:  I don't care who tests it.

(Jury present.)

THE COURT:  All right.  Call your first witness.

MR. SONGER:  Your Honor, the Government calls

Officer Josh Marriott.


JOSH MARRIOTT,

called as a witness by the Government, was duly sworn and

testified as follows:

COURT DEPUTY:  Please be seated.  Please state

1  your full name and spell your last name.

2          THE WITNESS:  Josh Marriott, M-a-r-r-i-o-t-t.

3          THE COURT:  All right.  You can proceed.

4

5                    DIRECT EXAMINATION

6  BY MR. SONGER:

7  Q.    Good afternoon, sir.

8  A.    Good afternoon.

9  Q.    Can you introduce yourself to the jury by telling us how

10 you're currently employed?

11 A.    I work for the Cheatham County Sheriff's Department.

12 Q.    And what do you do with the Cheatham County Sheriff's

13 Department?

14 A.    I now work on patrol.

15 Q.    Do you have -- do you have a title for your position

16 there?

17 A.    I'm a deputy.

18 Q.    How long have you been working on patrol for the

19 Cheatham County Sheriff's Office?

20 A.    Since November of 2018.

21 Q.    And where did you work before that?

22 A.    Cheatham County jail.

23 Q.    How long did you work at the Cheatham County jail?

24 A.    I started October 15th, 2015, until I went to patrol in

25 November.

1  Q.    So you've been there all told with the jail or on patrol
2  about three and a half years?
3  A.    Yes.
4  Q.    Do you have any other law enforcement experience other
5  than your time in Cheatham County?
6  A.    No, sir.
7          THE COURT:  Okay.  Go ahead and pull that
8  microphone closer to you.  There you go.
9          THE WITNESS:  Okay.
10         MR. SONGER:  Thank you.
11 Q.    What was your position when you started at Cheatham
12 County in the jail back in 2015?
13 A.    I was a corrections officer.
14 Q.    And what were your basic responsibilities as a
15 corrections officer?
16 A.    Safety and security of the facility, you know, fed
17 inmates, changed the laundry.  I mean, that's pretty much
18 your basics.
19 Q.    When you started at the facility, did you get a copy of
20 their policies and procedures?
21 A.    Yes, sir.
22 Q.    Did you read those?
23 A.    Yes.
24 Q.    To the best of your knowledge, do all officers get those
25 policies?

1   A.    To the best of my knowledge, yes.

2   Q.    Did you work a particular shift at the Cheatham County

3   jail?

4   A.    I've actually worked all three, but I started on the

5   second, which is from 2:00 in the afternoon until 10:00 at

6   night.

7   Q.    And who was your supervisor when you worked on second

8   shift?

9   A.    Roger Temple, Sergeant Roger Temple, and Corporal Mark

10  Bryant.

11  Q.    Was that the shift that you were working in November of

12  2016?

13  A.    Yes.

14  Q.    So you mentioned the defendant, Mark Bryant.

15        What's your relationship with him?

16  A.    He's a friend of mine.

17  Q.    At one point did you live -- did you guys live together?

18  A.    Yes, at one point we did.

19  Q.    Do you still live together?

20  A.    No, sir.

21  Q.    Why not?

22  A.    I got married.

23  Q.    Did you move in with your wife?

24  A.    Yes.

25  Q.    Are you still friends with Mark Bryant?

1    A.    Yes.

2    Q.    Do officers in the Cheatham County jail carry Tasers?

3    A.    Yes.

4    Q.    And can you explain to us basically what is a Taser?

5    A.    It's an electric device that has two prongs.  You pull

6    the trigger.  It will send out the prongs and it will

7    electrocute somebody.

8    Q.    Is there more than one mode or more than one way you can

9    use a Taser?

10   A.    Yeah.  The prongs, and then you can take the prongs out

11   of the cartridges and it's what they call a drive stun.

12   Q.    And prongs -- what does that mean?  If you use it in

13   prongs mode, what happens?

14   A.    The prongs will actually shoot out a certain amount of

15   feet and enter the subject's body and send voltage through

16   the body.

17   Q.    And what about the other -- the drive stun mode?

18   A.    Basically, it's a -- it's got two points of contact and

19   it would arc.  And when you touch the person, it will then

20   shock them that way.

21   Q.    Okay.  So what happens to a person when you apply a

22   Taser in drive stun mode?

23   A.    For the most part, it locks them up.

24   Q.    Is the Taser physically touching the person that you're

25   using it on?

```
 1   A.    It depends on what mode you're in.
 2   Q.    I'm sorry.  In drive stun mode?
 3   A.    Yes.
 4   Q.    Okay.  And how long does a Taser cycle last?
 5   A.    One cycle lasts five seconds.
 6   Q.    Is that one pull of the trigger?
 7   A.    One pull of the trigger.
 8   Q.    Now, is it possible to keep a Taser going beyond that
 9   five-second cycle that's one pull of the trigger?
10   A.    Yes, there is.
11   Q.    How do you do that?
12   A.    Keep holding the trigger.
13   Q.    If you don't keep holding the trigger, what happens?
14   A.    It would shut off by itself.
15   Q.    It automatically shuts off after five seconds unless you
16   keep holding?
17   A.    Yes.
18   Q.    And how long will the Taser go if you keep holding that
19   trigger down?
20   A.    Unfortunately, it will go as long as you hold your
21   finger on your trigger.
22   Q.    Now, have you personally been tased?
23   A.    I have.
24   Q.    In which mode, prongs or drive stun?
25   A.    Both.
```

Q.    And let's focus for a minute on the actual drive stun.
When you were tased in drive stun mode, how long was the
Taser on you?

A.    Five seconds.

Q.    What part of your body?

A.    The bottom of -- or underneath I guess what you call the
hamstring.

Q.    And so what did it feel like for five seconds?

A.    It hurts.  It doesn't feel good.

Q.    On a pain scale of 1 to 10, where would you put it?

A.    Probably an 8.

Q.    Is there any other, you know, pain you've experienced in
your life that you can compare this to?

A.    It's a different kind of pain.  Because once it's over,
it's over.  Like, you don't feel nothing after that.  You
know, they said you might get muscle cramps, you know, but I
never got any muscle cramps.

Q.    But in terms of when it's going, is the pain that you
feel when it's going, is there anything to compare that to?

A.    Best way to describe it that I've always described is
like being hit in the back with a metal chair, maybe.  You
know, that's kind of -- that's the best way to describe it.
I've never actually been hit with a metal chair, so I don't
know equivalent -- or how accurate that is, but that's just
how I describe it.  So. . .

1  Q.   When you worked in the jail back in 2015 and 2016, did
2  you carry a Taser?
3  A.   Yeah, after I was trained with the Taser.
4  Q.   And by the time that you left the jail to go out on the
5  road on patrol where you are now, did you still carry a Taser
6  then?
7  A.   I do carry a Taser now.  Yeah.  I have to carry one now.
8  Q.   You have to carry one when you're out on patrol?
9  A.   Yeah.
10 Q.   And why is that?
11 A.   It's a nonlethal, you know, threat -- a nonlethal
12 threat -- I'm trying to think of the word.  Versus taking
13 your gun and firing on somebody, you can use a Taser to
14 nonlethally end the threat, I guess you could say, would be a
15 better way to put it.
16 Q.   And are there times when you're out on the road that you
17 don't have backup?
18 A.   Yes.
19 Q.   And do you interact with people who are not restrained?
20 A.   Yes.
21 Q.   And so -- so going back to when you were in the jail,
22 though, by the end of the time that you were in the jail, did
23 you still carry a Taser?
24 A.   I did not.
25 Q.   Why did you stop carrying one while you were at the

1    jail?

2    A.   Well, there's -- there's been a lot of repercussion from

3    carrying a Taser.  I would say -- you know, I mean, after the

4    whole Jordan Norris incident, lots of repercussion.  And in

5    my mind, I feel like it should never go that far to use a

6    Taser, you know.

7    Q.   Okay.  You mentioned Jordan Norris.  Was there an

8    incident with Mr. Norris?

9    A.   Yes.

10   Q.   And was it after that incident that you stopped carrying

11   a Taser?

12   A.   Yes.

13   Q.   And did you stop carrying it because of what happened in

14   that incident?

15   A.   Just because of the repercussions of it.  You know,

16   there was -- this -- there's a lot of headaches with a Taser.

17   Q.   Okay.  You said just a moment ago that "It should never

18   have gone that far."

19              What did you mean by that?

20   A.   I mean any hands-on situation -- you know, I was trained

21   if you can use your words, use your words.  You know, try to

22   use your words before going hands on with somebody.

23   Q.   And in that -- that incident that you're talking

24   about -- and we'll talk about more later -- but is that not

25   what happened?  It wasn't just words that were used?

1   A.    Are you talking about with Jordan Norris?

2   Q.    Yes.

3   A.    Or no, not just hands on -- or not just words were

4   available, I guess you could say, at that time.

5   Q.    And you stopped carrying a Taser because you were

6   disturbed about how that incident progressed?

7   A.    In a sense.

8   Q.    Is there anything else that's ever happened at the jail

9   that made you stop carrying a Taser?

10  A.    Not before that incident, no.

11  Q.    Okay.  Now, during the -- I think you said you started

12  in October of 2015 and left in 2018.  So during the three,

13  three and a half years that you worked in the jail, how many

14  times did you see an officer have to tase someone?

15  A.    Maybe, eight, nine times total.

16  Q.    For the whole time you were in the jail?

17  A.    Yes.

18  Q.    And did you, yourself, ever have to use a Taser?

19  A.    One time.

20  Q.    Can you briefly describe the circumstances of that time?

21  A.    We went -- ended up having to go hands on with a guy and

22  we had him restrained.  Got him cuffed.  Excuse me.  We went

23  to go put him in the restraint chair, and on these -- this

24  restraint chair that we're using now, there's a quick clasp

25  that you would actually put on the cuffs while they're behind

1  their back.  And that was not put on correctly by an officer.

2          And as we're trying to put his -- I believe it was

3  his left arm into the restraint chair, he got his right hand

4  loose and had the cuff around his knuckle, and he swung and

5  hit me in the abdomen.  And he was tased at that point in

6  time to be able to comply, to get him restrained.

7  Q.    Okay.  So at the time he hit you and you tased him, he

8  had both of his hands out of restraints?

9  A.    Yeah.  Well, he had one hand out of restraints.

10  Q.    And he had a metal --

11  A.    The other one, they were holding, trying to get his hand

12  into the restrains, but somebody had ahold of it.

13  Q.    Was either hand strapped down?

14  A.    No, sir.

15  Q.    Was either hand in handcuffs?

16  A.    One had the handcuff around his wrist, and he had the

17  other almost like a brass knuckle.

18  Q.    Was the arm that was in the cuff, was it connected to

19  anything?

20  A.    No.

21  Q.    So it was just free?

22  A.    Yes.

23  Q.    And he used it like a brass knuckle to hit you?

24  A.    Right.

25  Q.    So in response to that, what did you do?

1   A.    Got hit, and then I pulled the Taser and let him know if

2   he did not comply that he would be tased.  He still did not

3   comply.  And so he was tased for maybe three seconds, if

4   that.  And then he complied.  We got him fully restrained the

5   rest of the way in the chair.

6   Q.    Okay.  So with him -- with holding a cuff like a brass

7   knuckle, you were able to tase him for three seconds and then

8   get him under control?

9   A.    Yes.

10   Q.    Now, before you started carrying a Taser, did you have

11   to get certified or take any training?

12   A.    Yes.

13   Q.    And when did you complete that training?

14   A.    About the first or second week I was hired there.  I

15   don't remember.  I think we maybe went maybe a week and a

16   half basic training course, you know, just kind of give us

17   the rundown on paperwork in the jail and a few other things,

18   and we took a Taser training class at that point in time as

19   well.

20   Q.    Who taught your Taser training class?

21   A.    Sergeant Gary Ola.

22   Q.    To the best of your knowledge, did he train all the

23   officers at the jail about Tasers?

24   A.    At that time, yes.

25   Q.    And can you describe sort of what that training

1  consisted of, what the class was like?

2  A.   We did it in our general sessions courtroom.  And we

3  went through -- maybe three- or four-hour presentation, where

4  we -- you know, he did a PowerPoint slide and we watched

5  different videos and we had paperwork and we took a written

6  test.  And then after that we went to where people would

7  actually get hit with a Taser, you know, whether it be the

8  prongs or drive stun.

9  Q.   Did they take volunteers or just call people out?

10 A.   Most of them were volunteers, yeah.

11 Q.   Did you volunteer?

12 A.   Yes, I did volunteer.

13 Q.   And is that when you were tased that we were talking

14 about earlier?

15 A.   Yes.

16 Q.   So -- and you mentioned there's a test at the end of the

17 course?

18 A.   Yes.

19 Q.   So are you responsible for knowing the material that was

20 presented during the course?

21 A.   Yes.

22 Q.   And were you told that you were obligated to apply what

23 you've been taught when you were working in the jail?

24 A.   Yes.

25 Q.   Now, when you completed the course, was there any

1  certifications given to you --

2  A.   Yeah, we had a certificate that was given to us.

3  Q.   Okay.  Sir, I would ask you to please turn in that

4  exhibit book that's right in front of you to Tab Number 4.

5  It's been marked as Government's Exhibit 4.

6           Do you recognize what that document is?

7  A.   Yes.

8  Q.   What is it?

9  A.   It's the certificate for the Taser training class.

10  Q.   Is that the certificate that was given to you for your

11  Taser training?

12  A.   This is not the exact one, but yes, it is a copy of it,

13  yeah.

14  Q.   It's a copy?

15  A.   Yeah.

16  Q.   Does it appear to be a true and accurate copy?

17  A.   Yes.

18           MR. SONGER:  Your Honor, we move to admit

19  Government Exhibit 4.

20           MR. STRIANSE:  No objection.

21           THE COURT:  Admitted.

22           (Whereupon Plaintiff Exhibit 4 was marked for

23           identification and received in evidence.)

24           MR. SONGER:  May we publish it to the jury?

25           THE COURT:  Yes.

1  BY MR. SONGER:

2  Q.    Okay.  So that's Sergeant -- Corporal Gary Ola -- he's

3  the instructor listed, correct?

4  A.    He might have been a corporal at the time.  I know later

5  on he was a sergeant.

6  Q.    And what's the date for the training certificate?

7  A.    October 23rd, 2015.

8  Q.    Is that the date that you took the training course?

9  A.    I believe so, yes.

10  Q.   Now, was Defendant Bryant in your same training class?

11  A.   Yes.

12  Q.   And do all officers who are in the same class get the

13  same training?

14  A.   Yeah.

15  Q.   You don't divide up into different groups or something?

16  A.   No.

17  Q.   Take it down.

18          During that training, were you trained on when

19  it's permissible for an officer to use a Taser?

20  A.   Yes.

21  Q.   And based on the policy and that training, when is it --

22  when are officers allowed to use a Taser?

23  A.   If there's bodily harm to myself or another.

24  Q.   If there's a threat of bodily harm to yourself or

25  another person?

1  A.    Yes.

2  Q.    Any other situation where it's allowed to be used?

3  A.    Just off a threat.  That's what it's made for, is to

4  stop a threat.

5  Q.    Are officers ever allowed to use Tasers to punish

6  someone?

7  A.    No.

8  Q.    Now, in -- if it's necessary to tase someone to stop a

9  threat, how much force can officers use?

10 A.    The -- as far as with a Taser or --

11 Q.    Well, let me ask this:  Do officers -- are you trained

12 to use the least amount of force necessary to stop a threat?

13 A.    Yes.

14 Q.    Not to use more force than would have been necessary?

15 A.    Right.

16 Q.    Now, are you given guidance in that Taser training about

17 how long officers are permitted to tase someone during an

18 incident?

19 A.    The Taser has a recommendation of no more than 15

20 seconds, which would be three five-second bursts.

21 Q.    Three five-second bursts?

22 A.    Right.

23 Q.    Against one person for one entire incident?

24 A.    For one incident, right.

25 Q.    And do you know why you were trained not to tase people

1  for more than three five-second bursts?

2  A.   It can cause, you know, heart palpitations.  And there's

3  a long list of reasons why.  Heart -- you know, heart

4  palpitations is a big one.  You know, especially if somebody

5  is already irate and under the influence of narcotics or even

6  alcohol, you know, it can cause heart palpations or raise the

7  blood pressure or so on, so forth.

8  Q.   You were told that in your training?

9  A.   Yes.

10 Q.   That going more than three five-second cycles creates

11 heart risks?

12 A.   (Witness moves head up and down.)

13 Q.   And that's especially true of someone who appears to be

14 under the influence?

15 A.   Right.

16 Q.   And that's the training you took with Mark Bryant,

17 correct?

18 A.   Yes.

19 Q.   Now, when an officer uses a Taser, what kind of

20 documentation at the jail is required for them to fill out?

21 A.   If we use a Taser, there's an incident report that has

22 to be done.  That's -- based on the incident itself.  And

23 then, as far as the use of force, whether it be Taser or

24 grappling or even restraint chair, you know, you have to use

25 a use of force form as well.

1  Q.    Are those forms that are at the jail?

2  A.    Yes.

3  Q.    That officers fill out?

4  A.    Yeah.

5  Q.    All right.  And what information are officers trained

6  that they have to include in those reports?

7  A.    Why, who, what, when, where.

8  Q.    So when someone -- when an officer uses a Taser, would

9  that information include how many times the Taser was used?

10 A.    You would -- yeah.  I mean, you would think.  Yeah.

11 Q.    Was that your understanding based on your training?

12 A.    Yeah.  I mean -- if you use a Taser, how many times it

13 was either deployed or, you know, why it was deployed, who it

14 was deployed on, when, where.

15 Q.    Why it's deployed, what the justification was?

16 A.    Right.

17 Q.    So would that mean what the threat was that caused it to

18 be used?

19 A.    Right.

20 Q.    That would be in the report?

21 A.    Yes.

22 Q.    And how long the Taser was used?

23 A.    Yeah.  I would say that probably be a vital piece of

24 information.

25 Q.    Okay.  Now, were you required -- was it a requirement

1  that that information was accurate and truthful?

2  A.    I would hope so.  Yeah.  I mean, you know, if I was to

3  document something, I would want it to be truthful.

4  Q.    So that was probably a dumb question.

5          But why does that matter?  Why is it important

6  that the information on the report is truthful?

7  A.    Because it can be held in a court of law.

8  Q.    What types of force in addition to Tasers is it required

9  for you to file records?

10  A.    We didn't carry pepper spray in the jail, so that's out

11  of the question.  But you know, any time you had to even

12  grapple with somebody, if you had to use strikes, soft or,

13  you know, firm hand strikes, if -- like I said, put them in

14  the restraint chair, that was a type of use of force you use.

15  Q.    And when you say a report is required when you grapple

16  with somebody, is that like hands-on force?

17  A.    Yeah, takedown.  Let's say two inmates are fighting and

18  you have to pull one off and maybe you take them to the

19  ground, you know, just to keep them under control, you know.

20  Q.    Now, working in the jail, did you encounter inmates who

21  were disruptive?

22  A.    Yes.

23  Q.    Inmates who were belligerent?

24  A.    Yes.

25  Q.    Inmates who had mental illness?

1  A.    Yes.

2  Q.    Inmates who were suffering from substance abuse?

3  A.    Yes.

4  Q.    Inmates who seemed crazy because they were suffering

5  from various ailments?

6  A.    Yes.

7  Q.    And were you trained to deal with those inmates?

8  A.    For the most part, you know.  As far as hands-on

9  training, you know, we've -- we've talked about it, different

10  restraints.  But as far as, like, an actual training for

11  being -- going hands on, we never had one at the Cheatham

12  County jail.

13  Q.    But was it expected as part of the job that you would

14  have to deal with people who are belligerent or might have

15  drug issues or --

16  A.    Yes.

17  Q.    And were you ever allowed to use force to just punish

18  those people who were being belligerent?

19  A.    No.

20  Q.    I want to turn now and talk about November 5th, 2016.

21         Were you working at the jail that night?

22  A.    I was.

23  Q.    And what shift were you on?

24  A.    Second.

25  Q.    That's a 2:00 to 10:00 p.m.?

```
1   A.   Right.
2   Q.   And you remember an incident involving Jordan Norris
3   that night, right?
4   A.   Yes.
5   Q.   Can you tell us, do you remember how old Jordan Norris
6   was?
7   A.   Eighteen, 19, something like that, I believe.
8   Q.   And how much did he weigh?
9   A.   A buck fifty.
10  Q.   He was a pretty small guy?
11  A.   Yeah.
12  Q.   Now, at some point that night during your shift, did
13  officers have to remove Jordan from his cell?
14  A.   Yes.
15  Q.   All right.  Do you know why?
16  A.   He was being belligerent, you know, screaming, yelling,
17  cussing.
18  Q.   What officers were involved in taking him out of his
19  cell?
20  A.   Mark Bryant and Jeff Key.  And myself.  Mark and Jeff
21  had went to the cell to extract him, and Mark had told me to
22  get the restraint chair ready.
23  Q.   Okay.  Was anyone else involved other than you and
24  Defendant Bryant and Jeff Key?
25  A.   Caitlin Johnson was there.  And then Daniel Bratton also
```

1   came up to assist later on.

2   Q.   And can you just describe what happened as officers took

3   him out of the cell?

4   A.   He was fighting.  I mean, like I said, screaming,

5   carrying on.  He appeared to be under the influence of

6   something.  You know, he was -- he was hard to handle.  He

7   wasn't a very big guy, but he was hard to handle.

8          Jeff and Mark were trying to get him cuffed.  Like

9   I said, I was getting the restraint chair ready.  Got the

10   restraint chair set up and I went over there and -- I don't

11   remember who it was, it was somebody had called for Daniel

12   Bratton to come up from the sally port to assist as well.

13   And we were just trying to get him cuffed.

14          And once Daniel got up there, still fighting to

15   get him cuffed, getting his arm behind his back.  And Daniel

16   had tased him to get his cuff -- you know, to get his cuffs

17   on.

18   Q.   Okay.  Do you know how many times Daniel Bratton tased

19   him?

20   A.   I don't know how many times it was.  I know it wasn't

21   very long.  You know, I remember the one time because it

22   ended up actually going through me as well, and Jeff Key.

23   So. . .

24   Q.   So, to the best you remember, how long did those tases

25   last that Officer Batton had to use?

1  A.   They were short.  I don't think they were maybe two or
2  three seconds, if I remember right.
3  Q.   And when Officer Batton had to tase Jordan, was he
4  already handcuffed?
5  A.   No.  Not that I -- not that I recall anyways.  He was
6  not -- that's why he was tased, to get the cuffs on, to try
7  to get him to comply.
8  Q.   He didn't have leg shackles or any kind of leg
9  restraints on?
10 A.   No.
11 Q.   He wasn't strapped into the chair?
12 A.   Not yet.
13 Q.   So he was free and actively fighting you?
14 A.   Yeah.
15 Q.   And when Officer Batton used a few of those brief tases,
16 were you able to -- were you officers able to get Jordan
17 under control enough to get him into the chair?
18 A.   Yeah -- once -- we got him cuffed and he was still
19 fighting, and we did put him in the chair.
20 Q.   All right.  But you did get him secured in the chair; is
21 that right?
22 A.   What's that?
23 Q.   You did get him secured and tied to the chair?
24 A.   Eventually, yes.
25 Q.   And then, after Jordan was placed into the chair, what

1  happened next?

2  A.   He was -- you know, he went through little spurts where

3  he would be calm for a little bit, and then he would start

4  screaming out the top of his lungs, vulgar things.  And you

5  know, Mark and Jeff and I would -- Caitlin, we would go check

6  on him and see if he needed water, you know.

7         And then he would get violent again and start

8  thrashing around and trying to get out of his restraints

9  and. . .

10 Q.   Okay.  And where were you during that time when he was

11 alternating between being calm and irritated?

12 A.   I'm pretty sure I was working in booking.  I'm not sure.

13 I may have been kind of all over the place, I don't

14 remember -- it's been a long time ago -- exactly.  I know I

15 was in booking a lot that night.  But, you know, like I said,

16 I kept an eye on him.  Jeff had kept an eye on him, as I

17 recall, had been watching him.

18 Q.   But he was strapped into the chair and you guys were

19 keeping an eye on him?

20 A.   Yes.

21 Q.   Now, when officers put someone in the restraint chair,

22 is there any documentation they fill out for that?

23 A.   There is a restraint chair log, yes.

24 Q.   And what information is on the restraint chair log?

25 A.   What they're doing in the restraint chair.  You know,

1    how often you're checking them.  You know, times, dates,
2    names.
3    Q.    Is that something that you have to fill out anytime
4    someone is in the chair?
5    A.    That's a requirement, yes.
6    Q.    So that's done routinely?
7    A.    (Witness moves head up and down.)
8    Q.    I'm sorry.  I think I broke the microphone.
9          Okay.  Could you turn now in the exhibit book
10   that's in front of you, please, and look at Tab Number 24.
11   A.    Maybe.
12   Q.    Okay.  Do you recognize that document?
13   A.    I do.
14   Q.    What is it?
15   A.    It's restraint chair log.
16   Q.    The restraint chair log for November 5th, 2016, with
17   Mr. Norris?
18   A.    Right.
19   Q.    Does that appear to you to be a true and accurate and
20   correct version of that log?
21   A.    Yes.
22          MR. SONGER:  Your Honor, the Government would move
23   Exhibit Number 24 into evidence.
24          MR. STRIANSE:  No objection.
25          THE COURT:  Admitted.

1              (Whereupon Plaintiff Exhibit 24 was marked for
2              identification and received in evidence.)
3              MR. SONGER:  May we publish it to the jury?
4              THE COURT:  Yes.
5    BY MR. SONGER:
6    Q.    So we see the date at the top, November 5th, '16.  Time
7    in:  1858.
8              That's 6:58 p.m., right?
9    A.    Right.
10   Q.    Okay.  And can you just read the first entry for us?
11   A.    The first entry is, I believe, "1858 placed in chair,
12   handcuffed behind."  And there's an initial there.
13   Q.    And do you know whose initials those are?
14   A.    Mark Bryant's.
15   Q.    So that's when he was placed in the chair, 1858?
16   A.    Yes.
17   Q.    And then the next couple entries?
18   A.    1910, which is 7:10, "started check and removed cuffs.
19   Mark Bryant."
20   Q.    Okay.  And what does that mean, "started check and
21   removed cuffs"?
22   A.    So we went to go check on him and remove his cuffs,
23   because his hands at that time were behind his back.  And
24   that -- you know, we took his hands out of the handcuffs and
25   put them in the arm restraints of the restraint chair.

```
 1  Q.    Okay.  And the next entry, 7:17, it says "Completed
 2  transition to soft restraints"?
 3  A.    Yes.
 4  Q.    What does that mean?
 5  A.    That means we got him restrained into -- soft
 6  restraints -- got his cuffs off.
 7  Q.    So at that point you've taken the cuffs off, and was he
 8  fully strapped into the chair?
 9  A.    Yes.
10  Q.    And then the next two entries, at 7:26 and 7:38 p.m.,
11  what do those say?
12  A.    "Calm.  Gave water."  "Calm.  Gave water."
13  Q.    And are those both initialed by Mark Bryant too?
14  A.    Yes.
15  Q.    So for the next little while, he was calm in the chair.
16        Is that consistent with what you remember?
17  A.    Yeah.
18  Q.    And then the next entry at 7:55 says that he was very
19  combative; is that right?
20  A.    Yes.
21  Q.    Now, around 8:00, do you remember having to go back over
22  to the restraint chair to deal with Jordan?
23  A.    Yes.
24  Q.    Do you know why you had to go back over?
25  A.    He got his right hand out of the restraints.
```

1  Q.   All right.  And which officers came over to deal with
2  that?
3  A.   Jeff, Mark, and myself.
4  Q.   So what did you do first when you saw that he had gotten
5  an arm out?
6  A.   Well, Jeff grabbed his arm, was attempting to put it
7  back in the restraint.  And he was flailing his head back and
8  forth, trying to head butt.  And I grabbed his head.  There
9  are pressure points underneath your jawline that they teach
10 us to hold his head back.  That way he cannot, you know,
11 spit, you know, thrash his head around to try to head butt us
12 and so on and so forth.
13 Q.   Okay.  Did you do that to try to keep his head out of
14 the way so Jeff could get his arm back in?
15 A.   Right.
16 Q.   And did you also put a spit mask on Mr. Norris?
17 A.   Well, Jeff Key did before we started, you know, trying
18 to put his hands in the restraint.
19 Q.   Okay.  And can you tell us, what is a spit mask?
20 A.   A spit mask, it's a mesh, like, almost kind of like a
21 stocking or a sock that you would put over the face, and it's
22 mesh.  Very easy, breathable, but that way the spit cannot
23 project.
24 Q.   When someone's wearing a spit mask, can they spit on
25 officers?

```
1   A.    No.
2   Q.    All right.  Are there surveillance cameras in the jail?
3   A.    Yes.
4   Q.    And where are they located?
5   A.    All over.  There's some coming in the door.  There's one
6   in each cell.  There's one in the booking office.  I think
7   there's three or four in, like, the booking area.
8             THE COURT:  All right.  Let me have the lawyers
9   approach.
10            MR. SONGER:  Sure.
11            (Bench conference outside the hearing of the
12            jury.)
13            THE COURT:  I gather you've got a lot more to go?
14            MR. SONGER:  A decent amount, but not. . .
15  Certainly no more than 30 minutes.
16            THE COURT:  Okay.  Well, we're going to stop for
17  the day because I've got three sentencings to do.
18            MR. SONGER:  I understand.
19            THE COURT:  What I forgot was -- I forgot -- I
20  knew. . .  I forgot to let ///////////, the independent
21  contractor.  Remember, that's why we brought /////////// back?
22  And /////////// is still there.  That's why I have that off
23  number.
24            MR. SONGER:  Oh, I thought --
25            THE COURT:  But I think it sounds like it would be
```

| | |
|---|---|
| 1 | a hardship if he's an independent contractor.  Everyone gets |
| 2 | paid and he doesn't.  You know, I hate to have somebody -- |
| 3 | any objection to letting him go? |
| 4 | MS. MYERS:  No. |
| 5 | MR. SONGER:  No. |
| 6 | MR. STRIANSE:  No objection. |
| 7 | THE COURT:  I think he should. |
| 8 | All right. |
| 9 | MR. SONGER:  Going to defer to the Court's |
| 10 | schedule, but I will be in a logical stopping place in about |
| 11 | ten minutes. |
| 12 | THE COURT:  We're going to stop now so I can get |
| 13 | ready for the next thing. |
| 14 | I'm trying to think how to let ///////////// go. |
| 15 | MR. STRIANSE:  That's fine. |
| 16 | THE COURT:  All right. |
| 17 | MR. SONGER:  Thank you. |
| 18 | THE COURT:  And unless they object, we're going to |
| 19 | start at 8:30. |
| 20 | MS. MYERS:  8:30.  Perfect. |
| 21 | THE COURT:  Okay. |
| 22 | MR. STRIANSE:  Do you know what the lineup looks |
| 23 | like tomorrow? |
| 24 | MS. MYERS:  The lineup will be Mr. Bratton and |
| 25 | Ms. -- Mrs. Marriott, who is Caitlin Johnson.  Now it's |

Caitlin Marriott.  And then --

    MR. STRIANSE:  We may have to confer.

    MS. MYERS:  We'll send you an email.

    THE COURT:  Y'all let him know.  And when it's his
turn, you'll know.

    MR. SONGER:  We'll let you know.

    MR. STRIANSE:  All right.  Thank you.

    MS. MYERS:  Thank you.

    (Jury present.)

    THE COURT:  All right, ladies and gentlemen, we're
going to stop here for the day because I know that you all
probably have been here since at least 7:30 or 7:45.  You
were here working while we were still sipping on our coffee.
So I want to let you go a little bit earlier today.
Typically we would go -- go a little bit longer than we are.

    I notice that -- I'm sensitive the traffic is very
difficult.  And some of you have to come a ways, maybe
Clarksville and Rockville.  I don't remember, where is
Rockville?

    JUROR:  Just on the other side of Murfreesboro.

    THE COURT:  Okay.  That's not too bad.

    So, nevertheless, I would like us to get started
tomorrow if we can at 8:30.  So that means you all need to
take into account there's going to be traffic, take it into
account again.  And then we can't start until everyone is

1  here.  So please do your best to be here no later than 8:15,
2  and we'll start promptly at 8:30.
3          Can everyone do that?  Anyone think they can't,
4  let -- raise your hand.  All right.
5          And then, //////////////, okay, I'm going to excuse
6  you from any further service for the reasons you stated
7  earlier.
8          JUROR:  I can be free tomorrow.
9          THE COURT:  No.  That -- you'll need to be here
10 for the entire trial.  And I appreciate you've got some
11 hardships.  So you don't have to return.
12         JUROR:  Thank you.
13         THE COURT:  And then that will make my jury box
14 all even again.  All right.
15         Now, remember, you cannot talk about the case to
16 anybody.  You can't go home and tell your family anything
17 about today.  And they're going to want to know what
18 happened, and tell them you're under orders from the Court
19 that you simply cannot talk about the case.
20         Remember that if anyone tries to talk to you about
21 the case, you need to tell them not to and let me know who
22 that is.  If you run into the lawyers or others in the
23 hallway and they don't speak to you, they're not being rude,
24 they're not being discourteous.  They're under instructions
25 not to speak to you, as you can't speak to them.

1          And then, when you get your cell phones and you
2     get on the internet tonight, you can't do any investigation
3     about anything having -- touching upon this case in any
4     manner.  So no investigation.  In other words, you need to
5     put this case out of your mind until 8:15 tomorrow, and we'll
6     get started promptly at 8:30.
7               Okay.  All right.  You're excused.
8               (Jury not present.)
9               THE COURT:  All right.  Be seated.
10              Now, Mr. Marriott, you're on the witness stand,
11     and you're not to have any conversation with anyone until we
12     come back in the morning.
13              THE WITNESS:  Sounds good.
14              THE COURT:  Be back about 8:15.
15              THE WITNESS:  All right.
16              THE COURT:  If anyone tries to talk to you about
17     the case, you need to let me know first thing in the morning.
18              THE WITNESS:  Absolutely.
19              THE COURT:  Anything else?
20              MR. SONGER:  No, Your Honor.
21              THE COURT:  All right.  Thanks.
22              (Court adjourned.)
23

24

25

1  REPORTER'S CERTIFICATE

2

3          I, Lise S. Matthews, Official Court Reporter for

4  the United States District Court for the Middle District of

5  Tennessee, with offices at Nashville, do hereby certify:

6          That I reported on the Stenograph machine the

7  proceedings held in open court on February 4, 2019, in the

8  matter of UNITED STATES OF AMERICA v. MARK BRYANT, Case

9  No. 3:18-cr-00144; that said proceedings in connection with

10 the hearing were reduced to typewritten form by me; and that

11 the foregoing transcript (pages 1 through 72) is a true and

12 accurate record of said proceedings.

13          This the 24th day of March, 2019.

14

15                              /s/ Lise S. Matthews
                                LISE S. MATTHEWS, RMR, CRR, CRC
16                              Official Court Reporter

17

18

19

20

21

22

23

24

25