```
1              IN THE UNITED STATES DISTRICT COURT
              FOR THE MIDDLE DISTRICT OF TENNESSEE
2                        AT NASHVILLE

3       UNITED STATES OF AMERICA       )
                                       )
4                                      )
                                       )
5       v.                             )   Case No.
                                       )   3:18-cr-00144
6       MARK BRYANT                    )

7

8

9   - - - - - - - - - - - - - - - - - - - - - - - - - - - -

10  BEFORE THE HONORABLE WAVERLY D. CRENSHAW, JR., DISTRICT JUDGE

11                        TRANSCRIPT

12                           OF

13                       PROCEEDINGS

14                    February 6, 2019

15                    Trial Volume 3

16  - - - - - - - - - - - - - - - - - - - - - - - - - - - -

17

18

19             APPEARANCES ON THE FOLLOWING PAGE

20

21

22

    PREPARED BY:
23              LISE S. MATTHEWS, RMR, CRR, CRC
                   Official Court Reporter
24                 801 Broadway, Room A839
                    Nashville, TN 37203
25              lise_matthews@tnmd.uscourts.gov
```

```
 1              For the Government:  Sara E. Myers
                                    U.S. Attorney's Office
 2                                  (Nashville Office)
                                    Middle District of Tennessee
 3                                  110 Ninth Avenue South
                                    Suite A961
 4                                  Nashville, Tennessee 37203-3870

 5                                  Michael J. Songer
                                    U.S. Department of Justice
 6                                  Criminal Division
                                    950 Pennsylvania Avenue, NW
 7                                  Washington, DC 20530

 8
                For the Defendant:  Peter J. Strianse
 9                                  Tune, Entrekin & White, P.C.
                                    31 Deaderick Street
10                                  Suite 1700
                                    Nashville, Tennessee 37238
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                          I N D E X

2                   Wednesday, February 6, 2019

3

4                      INDEX OF WITNESSES

5
   WITNESSES:                                      PAGE
6

7  JJ HANNAH
       DIRECT EXAMINATION BY MR. STRIANSE           37
8      CROSS-EXAMINATION BY MS. MYERS               42
       REDIRECT EXAMINATION BY MR. STRIANSE         57
9
   REBECCA LYNN BURNEY
10     DIRECT EXAMINATION BY MR. STRIANSE           59
       CROSS-EXAMINATION BY MS. MYERS               66
11
   DR. ARTHUR HAMILTON SMALL
12     DIRECT EXAMINATION BY MR. STRIANSE           82
       CROSS-EXAMINATION BY MS. MYERS               90
13     REDIRECT EXAMINATION BY MR. STRIANSE         92

14 MARK MITCHELL BRYANT
       DIRECT EXAMINATION BY MR. STRIANSE           92
15

16

17                        EXHIBITS

18                        (None)

19

20

21

22

23

24

25
```

1           The above-styled cause came on to be heard on

2   February 6, 2019 before the Honorable Waverly D. Crenshaw,

3   Jr., District Judge, when the following proceedings were had,

4   to-wit:

5

6           (Jury not present.)

7           THE COURT:  All right.  Be seated.

8           I think we're waiting on one juror; is that right?

9   Okay.  They're here now.

10          And I wanted to take up something -- I understand

11  the Government had something to raise?

12          MS. MYERS:  Yes, Your Honor.

13          Your Honor, we had filed a motion in limine to

14  exclude post hoc issues regarding the victim, what happened

15  with the victim after he was transported, what happened

16  basically involving the victim regarding any testimony on

17  determinations that were made about the victim later or any

18  incidents that he might have had later that had no bearing on

19  the elements of the conduct at issue here.

20          THE COURT:  Okay.

21          MS. MYERS:  And just wanted to make sure that that

22  is clarified regarding the testimony that is planned, to make

23  sure that we understand the bounds of what is going to be

24  elicited and to make sure that some of that irrelevant

25  testimony --

```
 1          THE COURT:  Do you think there's proof that we've
 2  gone too far?  Is there proof after the incident on November
 3  the 5th that talks about the victim?
 4          MS. MYERS:  There actually might be.
 5          THE COURT:  No.  Is there proof currently?  I
 6  don't recall any proof now in the record about that.
 7          MS. MYERS:  I don't believe so.
 8          THE COURT:  Okay.  I didn't either.
 9          MS. MYERS:  We're just anticipating if that is
10  brought up today, we just want to make sure we're not going
11  to go in any information that people learned about the
12  victim --
13          THE COURT:  Okay.
14          MS. MYERS:  -- after these incidents occurred.
15          THE COURT:  Do you anticipate that, Mr. Strianse?
16          MR. STRIANSE:  Yes, Your Honor.
17          THE COURT:  Go ahead.
18          MR. STRIANSE:  Good morning, Your Honor.
19          THE COURT:  Good morning.
20          MR. STRIANSE:  My first witness this morning is a
21  sergeant from the Cheatham County jail who was a correctional
22  officer back at the relevant time.  His testimony will be
23  that he first came into contact with Mr. Norris before the
24  events of November 5th, found him to be highly intoxicated,
25  believed him to be under the influence of either PCP,
```

1  methamphetamine, or bath salts.  And then he will talk about
2  two events from November the 7th of 2016.
3          The first event occurred at about 3:30 a.m. on
4  November the 7th, which was the Monday after the Saturday
5  night, November 5, where he was working in the booking
6  office.  They had Mr. Norris in a cell, Cell 2, that has bars
7  instead of a solid door, because they wanted to keep a
8  careful watch on him, have a direct line of sight from the
9  booking office.
10         They saw Mr. Norris walk to the back of Cell 2,
11  reach down to grab one inmate, and then ended up assaulting
12  another inmate by picking that inmate up off the floor,
13  slamming him to the floor several times, knocking out the
14  front tooth of that inmate.  That was at 3:30 a.m.
15         And at 3:50 a.m., when the decision was made to
16  transport Mr. Norris to the Middle Tennessee Mental Health
17  Institute, there was another incident in the cell.  They had
18  to struggle with him, took him out to the car.  Once they got
19  him in the car and he was shackled at that point in time, his
20  legs were shackled, he kicked out the window of the vehicle.
21  Road officers were there assisting.  He had to be put to the
22  ground forcefully at that point in time.
23         I think that this information, Your Honor, is
24  relevant to the jury's consideration of this case for a
25  couple of reasons.  One, I think it will help the jury in

deciding whether the force that was used on November the 5th by Mr. Bryant and other officers was reasonable or was it excessive. There is also an element of the offense that the government has not really put on much proof about. And that is the proof of bodily injury.

Given the activities of Mr. Norris at the jail, as combative as he was, how many fights and altercations he got into, particularly after he kicked out the back window of the patrol car, I think the jury could conclude that this bodily injury to his knee that the government will insist in closing argument was caused by a Taser could have been caused by any number of events that were befalling Mr. Norris at his time in the jail.

So, based on that, that would be my reason for calling Sgt. Schaeffer.

THE COURT: Okay. So just maybe to help the analysis, we're all looking at 404(a)(2)(B) (as read):

> Subject to limitations in Rule 412, a defendant
> may offer evidence of an alleged victim's
> pertinent trait, and if that evidence is admitted,
> the prosecutor may offer evidence to rebut it and
> to offer evidence of defendant's same trait.

All right. Let me hear from the government.

MS. MYERS: Your Honor, under that analysis, it is simply not a pertinent trait of the victim as to whether or

1   not his civil rights were violated, which is what we're here

2   about.

3           The opinion of a person who was not there at the

4   time bears no relationship in terms of what someone perceived

5   beforehand when they didn't perceive the conduct that was

6   actually occurring at the time.

7           And anything that occurred two days after the

8   event, after the relevant conduct would also not be relevant

9   and highly prejudicial.  And it would risk going into a mini

10  trial on whether or not these incidents occurred, whether or

11  not people were there to witness those incidents, and what

12  they thought of those incidents on November 7th, after the

13  fact.

14          We are here about conduct that occurred in a

15  relevant time period and what people knew during that time

16  period and how people behaved has the bearing on the

17  willfulness, on the defendant's willfulness at that time.

18  That is what we're looking at, not what people learned after

19  the fact.  And if the defendant didn't know things beforehand

20  in that universe of information that he knew at the time,

21  then it has no bearing on his willfulness.

22          And, Your Honor, we have outlined this issue in

23  Document 47 that we filed in our supplement brief in support

24  of our motion in limine.

25          THE COURT:  Right.  And I think I shared sort of

1    where my research had led me, and the analysis goes back to
2    404.  And I think, for purposes of resolving it, what they're
3    raising here, what Defendant's raising here is covered by
4    404, which generally says that evidence of a person's
5    character or character trait is not admissible to prove that
6    on a particular occasion the person acted in accordance with
7    the character or trait.
8             So generally, under 404, you would not -- general
9    rule that it's excluded.
10            But 404(2) gives the exceptions to that rule.  And
11   under the exceptions in 404(2)(B) is (as read):
12                 Subject to the limitations in Rule 412,
13                 Mr. Bryant may offer evidence of Mr. Norris's
14                 pertinent trait, and if that evidence is admitted,
15                 the prosecutor -- the government -- can offer
16                 evidence to rebut it and offer evidence of the
17                 defendant's same trait.
18            And if you look at the cases that have construed
19   that provision, one of the cases is specifically under
20   404(a)(B), permits the defendant to offer evidence of an
21   alleged victim's pertinent character trait as circumstantial
22   proof that the victim acted in accordance with that character
23   trait, citing *U.S. v. Smith*, 230 F.3d 300 at 307, 7th
24   Circuit, 2000.  Quote (as read):
25                 Evidence of the violent character of the victim

1          is specifically the type of material that falls
2          within the exception of 404(a)(2).
3          So, just so I understand the argument, what
4    Mr. Bryant is saying, that under 404, while there's a general
5    rule, he wants to present evidence of Mr. Norris's pertinent
6    character trait as described by Mr. Strianse as
7    circumstantial proof that the victim acted in accordance with
8    that character trait.
9          MS. MYERS:  Well, Your Honor, that would be let in
10   under 404(B) only for the purpose to show motive,
11   identification --
12         THE COURT:  We're not at 404(B).  I'm at 404 --
13   again, I'm at 404(a) -- 404(a)(2)(B).
14         MS. MYERS:  Well, Your Honor, it's not a pertinent
15   trait of the victim that is being argued here as it relates
16   to these specific elements.  It can only be offered if
17   there's a self-defense --
18         THE COURT:  Let's deal with -- you've got to help
19   me deal with the argument.
20         So Mr. Strianse is arguing it is relevant to a
21   pertinent trait, and essentially the pertinent trait is how
22   Mr. Norris reacts in a violent, combative way when -- when he
23   is in the custody of law enforcement.
24         MS. MYERS:  Even so, it must be limited to the
25   form of reputation and opinion testimony.  And that's under

405, reading all of these together, Your Honor.  Reading all
of these together --

          THE COURT:  Well, then let's -- before we move
from 404(a)(2)(B), help me understand where I'm missing the
analysis in your opinion.

          MS. MYERS:  A pertinent character trait to prove
conformity therewith under 404(a)(2) --

          THE COURT:  Right.  And we have a 7th Circuit case
that specifically talks about evidence of the violent
character of the victim.  It's specifically the type of
material that falls within the exception.

          MS. MYERS:  But that is a -- that is a
self-defense case.

          THE COURT:  Identified as a self-defense case
because later on here, it talks about self-defense cases, and
this case isn't under that rubric.

          MS. MYERS:  I would need to --

          THE COURT:  But we need to look at the case maybe.

          MS. MYERS:  Your Honor, I would be happy to go
back and read that case and be able to determine -- if that
is the controlling case that Your Honor is citing for this,
then I would like to be familiar with it so that I can speak
intelligently about that particular point.

          THE COURT:  I think I raised it at the pretrial
conference.  And I was hoping that everybody would do your

```
 1   own research and that would help the Court --
 2           MS. MYERS:  Well, and we did, Your Honor.  And we
 3   filed Document 47.
 4           THE COURT:  Right.
 5           MS. MYERS:  And we have a number of cases, Sixth
 6   Circuit and otherwise, analyzing this particular issue.
 7           THE COURT:  But, again, I think 404(a)(2)(B) is
 8   the pertinent rule of evidence that I've got to determine.
 9           MS. MYERS:  But, Your Honor, that must also be
10   read in conjunction --
11           THE COURT:  We'll get there.
12           MS. MYERS:  Thank you.
13           THE COURT:  404(a)(2)(B), it goes on to say that
14   (as read):
15               When the evidence of a victim's character for
16               violence is offered to prove that the victim acted
17               in accord with that character trait in support of
18               a claim -- now it says self-defense -- it is not
19               necessary that the defendant show he or she was
20               aware of the alleged victim's character trait in
21               question.
22               If the defendant were aware of it, then certainly
23   it -- it's admissible.
24               So you're going to have -- what's the witness's
25   name?
```

```
 1              MR. STRIANSE:  Jason Schaeffer.
 2              THE COURT:  Is he a deputy sheriff?
 3              MR. STRIANSE:  Yes, he is.  He's now a sergeant.
 4    He was a correctional officer back at the relevant time, but
 5    he's now been sergeant in the jail.
 6              THE COURT:  The problem, I guess, with your --
 7    this comes after the event, right?  After November the 5th?
 8              MR. STRIANSE:  It does.  It comes on November the
 9    7th.
10              THE COURT:  So help me understand -- you sort of
11    stopped at November 5th.  So Mr. Norris was arrested, right,
12    on the 5th?
13              MS. MYERS:  On November 3rd.
14              THE COURT:  On November 3rd.  He was still there
15    on the 5th.
16              Did he subsequently get out?
17              MR. STRIANSE:  No, he didn't get out.  On the --
18    late on --
19              THE COURT:  Oh, he was still there on the 7th?
20              MR. STRIANSE:  Late on the night of November 5th,
21    he was transported to the local hospital in Ashland City,
22    stayed there about a day or so, returned to the jail.
23              THE COURT:  Oh.
24              MR. STRIANSE:  Then on November -- Monday,
25    November the 7th, there was this incident.  Transported to
```

1   Middle Tennessee Mental Health.  They sent him to Summit in
2   Nashville, back to Middle Tennessee Mental Health, back to
3   the Cheatham County jail.
4           THE COURT:  Okay.  And that's where Mr. Schaeffer,
5   your witness --
6           MR. STRIANSE:  Mr. Schaeffer was --
7           THE COURT:  -- there when he came back.
8           MR. STRIANSE:  -- at that moment in time when they
9   were transporting him on Monday, November the 7th, to the
10  Middle Tennessee Mental Health Institute.
11          MS. MYERS:  And, Your Honor, he was not tased.
12  There was no tasing that occurred involving the defendant or
13  Jordan Norris on November 7th.
14          THE COURT:  And I don't think he's offering it for
15  tasing evidence.  He's offering it that --
16          MR. STRIANSE:  No.
17          THE COURT:  -- Mr. Norris has the character trait
18  of responding -- being difficult with law enforcement.  And
19  that was evidenced on the 5th, and here is another incident
20  it was evidenced.
21          I guess, in some way, is this really character
22  evidence or is it habit evidence?
23          MS. MYERS:  Your Honor, I would characterize it --
24  and I think it falls under the propensity evidence, because
25  he did something one time; he is most likely to have done it

1  this time. And that is --

2          THE COURT: Now, that sort of supports the

3  defendant's argument, because they're trying to show that

4  that is one of his character traits.

5          MS. MYERS: Precisely what the rule prohibits,

6  though, Your Honor.

7          THE COURT: But not 404(a)(2)(B).

8          MS. MYERS: But then it has to be analyzed under

9  405 and 403.

10          THE COURT: And we will. But I'm -- it sounds

11  like we're -- it sounds like you're conceding it falls under

12  404(a)(2)(B). I need to hear why you think that's not the

13  case. It does seem to fit.

14          MS. MYERS: I don't think that it fits.

15          THE COURT: Because?

16          MS. MYERS: Because, in terms of the relevant

17  conduct in this case, unless you can show motive,

18  preparation, plan, evidence --

19          THE COURT: No. No. You're going under 404(b)

20  now. We need to stick with 404 -- we'll get to 404(b) and

21  403. But right now it does seem like the evidence he's

22  offering fits under 404(2) -- 2(B) -- (a)(2)(B).

23          I read the briefs and they were helpful to an

24  extent, but obviously the Court felt like I needed more

25  analysis. And that's why we did our own sort of analysis, or

1    I did my own analysis to try to figure through this.

2            All right.  What else do you say about -- now that

3    we've -- I think we've dealt with 404(a)(2)(B).

4            I guess you also argue that under 403 it's too

5    prejudicial, correct?

6            MS. MYERS:  That's correct.

7            THE COURT:  Okay.

8            MS. MYERS:  To encourage nullification.  It

9    outweighs any probative value that would relate in any way to

10   any of the elements regarding the events that we're here

11   about on November 5th of 2016.  We're here regarding the

12   defendant's tasing of Jordan Norris on November 5th and the

13   four charges that resulted from that time period.

14           THE COURT:  Now, one of those charges is Counts

15   One and Two, and I'm going to charge the jury in Count One

16   and Two, fourth, that defendant's conduct resulted in bodily

17   injury to Jordan Norris or that the defendant used a

18   dangerous weapon -- or that the defendant used a dangerous

19   weapon.

20           MS. MYERS:  That's --

21           THE COURT:  Fourth, that the defendant's conduct

22   resulted -- so he's arguing the bodily injury part.  But I

23   guess, Mr. Strianse, Element 4 could be satisfied if the jury

24   found he used the Taser as a dangerous weapon.

25           MR. STRIANSE:  But this does not relieve the

1   government of the obligation to prove bodily injury.  They're

2   giving -- they're giving the jury alternative theories and

3   they've asked for a unanimity instruction on whether it's

4   bodily injury or whether it's the use of a dangerous weapon.

5   That doesn't relieve them of the obligation.

6           And I think it's fair to put on proof that, given

7   the violent, erratic behavior of Mr. Norris over these series

8   of a few days, that he could have received this injury to his

9   knee in a way other than tasing.  There's been no pictures of

10  any injury.  There's been no real specific proof regarding

11  the injury.

12          THE COURT:  Well, we've got the person -- the

13  direct proof from the female at the jail --

14          MS. MYERS:  Mrs. Marriott, Officer Marriott.

15          THE COURT:  -- who testified that she, on the day

16  of the event, saw his injury and described in gruesome detail

17  what it appeared like to her.

18          So, from there, if the jury believed what that

19  officer said, that would be proof from which they could

20  conclude that Mr. Norris had bodily injury.

21          MR. STRIANSE:  She --

22          THE COURT:  And then you've got the other proof

23  from --

24          MS. MYERS:  Special Agent Joy Wright.

25          THE COURT:  -- Joy Wright, whose name I keep

1  forgetting.

2          MR. STRIANSE:  But that was 17 months after the

3  fact.

4          THE COURT:  That's right.  And that -- her proof

5  then would -- if you go with her proof then -- then proof of

6  other injuries that he said becomes very relevant, because

7  when Ms. Wright looked at it, she doesn't know if it came

8  from November 5th or came sometime between November 5th and

9  when she saw it.

10          MR. STRIANSE:  And I --

11          THE COURT:  So proof that it could have come from

12  another angle would be --

13          MR. STRIANSE:  Fair comment that, given the

14  cross-examination of Ms. Marriott, she had not seen

15  Mr. Norris when he was admitted to the jail on November 3rd

16  to see if he had that injury on his knee on November 3rd.  I

17  think that was her testimony on cross-examination.

18          THE COURT:  I think that's right.

19          MS. MYERS:  Well, Your Honor, it is important to

20  note, though, that it doesn't have to be a visible physical

21  bodily injury:  The only requirement is that pain occurred.

22  Pain was inflicted.  And so that is an analysis that we will

23  be walking through.  That's a requirement.

24          So bodily injury is also satisfied by pain, which

25  we've heard several people testify about the pain of tasing,

and the most important evidence that we have in this case is
the video itself.  The actual video of the events as they
occurred, as the people -- as the jury members can witness
with their own eyes, as they watched how the victim
experienced those tasings for such long periods of time, how
he physically reacted.

THE COURT:  Let's go back to your first thing
because y'all have all gotten a copy of the chart.  And we
define (as read):

Bodily injury means injury to the body, no
matter how minor and temporary.  It includes any
cut, abrasion, bruise, burn, disfigurement,
illness, physical pain, or impairment of a bodily
member or mental faculty.  The government need not
prove that the defendant intended to cause bodily
injury.  The government also need not prove that a
defendant's acts were the sole cause of bodily
injury.  But the government must prove -- the
government must simply prove the offense resulted
in bodily injury to Jordan Norris.

So bodily injury is more than pain.  It's all
those things.  And Ms. Wright's testimony could be -- could
be -- the jury may very well want to weigh Ms. Wright's
testimony and put that in perspective if he had incurred
physical injury between November 5th and the time he met with

1  Ms. Wright.

2         All right.  Go ahead.

3         MS. MYERS:  Well, so, Your Honor, as that charge

4  demonstrates, pain, though, is enough.

5         THE COURT:  It's one of enough.

6         MS. MYERS:  It's one.  Yes.

7         THE COURT:  It's not the only.

8         MS. MYERS:  Yes.  But it's very important to know

9  that there doesn't have to be a visible injury.

10         THE COURT:  Right.  But Mr. Bryant -- Mr. Bryant

11  wants to put on proof as to these others, that there may have

12  been another reason that he had a physical -- he had a cut,

13  abrasion, bruise, disfigurement, et cetera, in order to

14  counter the testimony of Ms. Wright, who saw him several

15  months later.

16         MS. MYERS:  The relevance in terms of what those

17  injuries looked like -- because Taser wounds are very

18  specific:  They're round, they're burns.  As we heard that

19  testimony, they were all over his --

20         THE COURT:  Yes.  Sorry.  Go ahead.

21         MS. MYERS:  Oh.  Sorry.  They're very specific

22  injuries.  And the testimony that we have heard here was

23  directly related to that.

24         THE COURT:  Yeah.

25         MS. MYERS:  So --

1          THE COURT:  But it's going to be up to the jury to

2    give that whatever weight they want.  All Mr. Bryant is

3    saying is let me present some proof for the jury to consider

4    on the issue of his injury, the extent of his injury.

5          MS. MYERS:  As opposed to his character for

6    violence.  And that's what resulted in the injury.

7          THE COURT:  Well, I think it's -- well, now,

8    Mr. Strianse you make your argument.  I'm not going to make

9    it for you.  Maybe I'm misunderstanding.

10         MR. STRIANSE:  Your Honor, I didn't hear the last

11   thing that she said.

12         MS. MYERS:  Well, there is a difference between

13   showing an alternative for how someone might have received an

14   injury and someone's character for violence.

15         THE COURT:  Well, I agree.  And I raised that

16   issue.  I raised that second.

17         I think the proof that Mr. -- so we've got two

18   issues.  The one is under 404(a)(2)(B).  And then I raised

19   separately, looking at the elements here of Counts One and

20   Two, the proof that Mr. Strianse is trying to offer or wants

21   to offer on behalf of Mr. Bryant, is that what occurred

22   between November the 5th and when Ms. Wright saw him, proof

23   that might in his view give -- give -- at least give the jury

24   something to weigh and consider on whether or not Mr. --

25   Mr. Jordan had bodily injury.

1          MS. MYERS:  Well, I think --

2          THE COURT:  In other words, maybe an intervening

3   cause to it, to whatever Ms. Wright saw on that day.

4          Go ahead.  I didn't mean to cut you off.

5          MS. MYERS:  And not getting into the specifics of

6   those acts, but whether or not somebody saw injuries on him

7   can absolutely --

8          THE COURT:  Yeah.

9          MS. MYERS:  I would concede that point.  Whether

10  or not someone saw injuries.

11         But how that person might have known about a

12  specific act, a specific piece of conduct that we're looking

13  at after the fact and to whether or not that was the cause of

14  a specific injury would not be permissible.

15         THE COURT:  Well, that's going to be up to the

16  jury.  Now you want me to weigh the evidence.  The jury can

17  decide how much weight it wants to give to Ms. Marriott's

18  testimony, Ms. Wright's testimony, or whatever proof.

19  They'll weigh and balance that and give proof that -- the

20  weight they think is appropriate.

21         All right.  What else on this issue?

22         MS. MYERS:  Other than reading it in conjunction,

23  Your Honor, with 405, regarding this character evidence, if

24  it is admissible at all, it must be limited in form to

25  reputation and opinion, which someone broadly might testify

today -- I don't know -- that, you know, he had a reputation
for being an unruly inmate.  For causing disturbances.  He
had a reputation for those things.

        But, even so, we have the video.  And under 403, I
think that's a very important analysis.  We're looking at
what happened that night.  They're able to watch what
happened that night.

        THE COURT:  Right.  But they're free -- and, you
know, we all saw the video.  But I'm sure you know as well as
the Court knows, the jury's free to give that video whatever
weight they want to.

        MS. MYERS:  Absolutely.

        THE COURT:  They're free to do that.

        MS. MYERS:  And it is the basis -- that conduct in
the video is the basis for the charges in this case.

        THE COURT:  Okay.  And it's in evidence.  And
they're going to have a computer back there.  They can watch
it fast, slow, or however they will -- want to.

        All right.  Anything else on this?

        MS. MYERS:  No, Your Honor.

        THE COURT:  Mr. Strianse, why don't you have the
last word on this.

        MR. STRIANSE:  Your Honor, I think the Court
understands the analysis.  Even if you don't get into the
weeds on 404 or 405, 403, I think it is relevant and

admissible on the issue of the injury.  The government really
emphasized in their case in chief the gruesome nature of this
injury.  Now they're trying to say, well, pain could be a
circumstance that would satisfy that element.

            That doesn't alter the fact that I should have the
opportunity to present a complete defense to provide the jury
with at least some facts to support an argument that, given
this riotous behavior at the jail from November 5th through
November 7th, this injury could have occurred when he kicked
the window out, when he was fighting with other inmates in
the jail.  I think on that reason alone, it's admissible.

            THE COURT:  Okay.  All right.  Let me give you
another issue that the Court is concerned about.  Yesterday
we admitted Government's Exhibit 3 without objection, and
it's in the record.  But I am concerned that we may need --
and I want you all to think and talk about this -- I think we
need some kind of limiting instruction.

            Because, going through Exhibit 3, it cites cases.
It attempts to summarize cases in other excessive force
cases.  And I think I need to make clear to the jury that the
instructions they are to follow are the instructions that the
Court gives them.  And I don't want them looking at Exhibit 3
and trying to discern legal principles and apply those legal
principles in this case.  So that's my first concern.

            Exhibit 3 is in without objection, but I think I

need to tell them we need to -- we need to give them some
limiting instruction.  And don't hold me to this, but what --
what we've come up with is that (as read):

> This exhibit, Exhibit 3, contained in part some
> discussion of legal issues regarding excessive
> force.  It is important for you to understand that
> you are to consider Exhibit 3 with all the other
> evidence in the case and use Exhibit 3 for the
> limited purpose of considering what information
> had been presented to the defendant in his
> training and the defendant's state of mind on
> November 5th, 2016.  You -- you shall not -- you
> shall not consider Exhibit 3 for the purpose of
> defining the law that you will apply in this case.
> Only I will instruct you on the legal standards
> relevant to the charges in this case that you will
> apply to the defendant's conduct.

And I guess I would propose, since Exhibit 3 is in
and occurred yesterday, that we include this limiting
instruction in the -- in the final instruction.

MR. STRIANSE:  Your Honor, I have no objection to
that at all.

THE COURT:  All right.  But I'm going to -- I want
you all to see -- I read it slowly.  So give me your reaction
to that.

1          MS. MYERS:  We also have no objection.

2          THE COURT:  All right.  Well, I wish you all had

3     prepared the limiting instruction then.  So we're going to

4     try to finalize that instruction and include it in the

5     charge.

6          All right.  I'm going to take a break, and then

7     I'll come back and rule on this testimony pertaining to what

8     occurred after November 5th.

9          (Brief recess.)

10          THE COURT:  All right.  Be seated.

11          All right.  Before the Court is the motion of the

12     government as well as the motion of the defendant regarding

13     presentation of evidence from a witness who had interaction

14     with Mr. Norris, the victim, after November the 5th,

15     specifically, I believe, a couple days later on November the

16     7th.

17          As I understand the defendant, Mr. Bryant argues

18     that he wants to present this evidence in order to show

19     Mr. Norris's trait, specifically his reaction, his combative

20     reaction when he's in the custody of law enforcement; two,

21     permit the jury to infer that on November the 5th he acted in

22     a similar manner and thereby justify or at least give the

23     jury grounds -- proof from which the jury may find that

24     Mr. Bryant's actions on November the 5th were appropriate and

25     not in violation of Mr. Norris's constitutional rights.

 1          In reviewing -- based on the arguments presented,
 2     the Court believes that under Rule 404 that evidence
 3     appeared -- the Court finds falls within the exception in
 4     Rule 404(a)(2)(B), which specifically instructs the Court
 5     that evidence of a victim in a criminal case subject to the
 6     limitations in 412, a defendant, Mr. Bryant, may offer
 7     evidence of alleged victim's pertinent trait.  And if that
 8     evidence is admitted, the government may offer evidence to
 9     rebut it and offer evidence of the defendant's same trait.
10          So it appears that the evidence that Mr. Bryant
11     wants to offer falls within the literal text -- textural
12     language in 404(a)(2)(B).  And I do think the argument --
13     there's a good basis for that argument.
14          Here, the witness, Mr. -- the witness that
15     Mr. Bryant wants to present, Mr. Schaeffer --
16          MR. STRIANSE:  Schaeffer.
17          THE COURT:  -- was a law enforcement officer for
18     the Cheatham County Sheriff's Department on November the 7th
19     and had dealings with Mr. Norris after the 5th, specifically
20     having to do with maintaining Mr. Norris's custody while in
21     the sheriff department's -- subject to the sheriff
22     department's control.
23          Mr. Schaeffer would present specific instances on
24     November the 7th of Mr. Norris's alleged combative behavior
25     while in custody of the Cheatham County Sheriff's Department.

1           The Court goes to Rule 405, which talks about the

2   methods of proving character.  And as the parties have

3   recognized, a reputation or opinion evidence is the preferred

4   means of proving such character traits.  However, Rule 405(b)

5   does address this situation where Mr. Bryant wants to present

6   through Mr. Schaeffer specific instances of conduct,

7   specifically, the conduct of Mr. Norris and the reaction of

8   the Cheatham County Sheriff's Department to Mr. Norris's

9   conduct on November the 7th.

10          Specifically, rule 405(b) says that (as read):

11              When a person's character or character trait is

12              an essential element of a charge, claim, or

13              defense, the character or trait may also be proved

14              by relevant specific instances of the person's

15              conduct.

16          So the literal terms of 405(b) would appear to

17   allow Mr. Bryant to present that evidence, because here,

18   one -- one of his defense appears to be that the force that

19   he used, regarding Mr. Norris on the 5th, was reasonably

20   necessary because of Mr. Norris's reaction, combative

21   reaction, specifically, on the 5th.

22          The analysis this -- on a time frame gives the

23   Court pause, because if I allow the evidence in, it

24   necessarily means that the jury may be asked to infer that on

25   November the 7th, Mr. Norris's character trait for being

combative in law enforcement custody was the same as it was
on November 5th.  That's got to be the logical linchpin of
Mr. Bryant's argument.

And the Court's unwilling to do that because this
witness is not going to be able to address what occurred to
Mr. Norris on the 6th or -- or even on the 7th before he
returned to -- when this witness came to be involved with
him.

In other words, there's no proof for the jury to
make that logical -- to make that inference because we don't
know what occurred to Mr. Norris in the intervening time.
And to allow the jury to make an inference based on specific
conduct that occurred on the 7th, I think is logically and
factually too much of a leap.

Specifically, the Court notes of the three methods
of proving character provided in Rule 405, evidence of
specific instances of conduct is the most convincing.  At the
same time, quoting (as read):

It possesses the greatest capacity to arouse
prejudice, to confuse, to surprise, and to consume
time.  Consequently, the rule confines the use of
evidence of this kind to cases in which the
character is in a strict sense an issue and is
deserving of a searching inquiry.  When character
is used circumstantially and hence occupies a

1          lesser status in the case, proof may be only by

2          reputation or opinion.

3          Based on that, I think allowing Mr. Schaeffer to

4     testify about specific instances does create possible

5     confusion, prejudice, and -- and should not be allowed, and

6     I'm not going to allow it under 404 or 405.

7          However, as we discussed, the charge here that the

8     Court is going to give, especially as it has to do with

9     Counts One and Two, require the jury to make a factual

10    finding regarding whether Mr. Norris incurred bodily injury.

11         And the Government argues -- well, it's -- will

12    argue to the jury that he incurred pain, and, indeed, pain is

13    one of the ways that bodily injury can be proved.  Of course,

14    it's up to the jury to decide if it accepts or rejects or how

15    much weight it gives that.  But pain is not the only way that

16    bodily injury can be.

17         So here Mr. Bryant wants to present proof as part

18    of his defense that the physical injuries that Mr. Norris had

19    could have been the result of something other than the tasing

20    which is at issue here in the case.  Indeed, we've had proof

21    from the Special Agent of the FBI, when she observed

22    Mr. Norris's body -- of what she observed on Mr. Norris's

23    body several months afterwards.  That's not the only proof,

24    but again, it's not the rule and function of the Court to

25    weigh the evidence.  That's up to the jury to determine.

1          Mr. Bryant wants to present proof that the
2    bodily -- the bodily injuries testified to by Agent Wright
3    could have been as a result of some other event.  So I am
4    going to allow limited proof by Mr. Schaeffer only for that
5    purpose.
6          So what I envision, you can put Mr. Schaeffer on.
7    "My name is Mr. Schaeffer.  I work for the Cheatham County
8    Sheriff's Department.  I was a deputy sheriff for the
9    Cheatham County sheriff in November of 2016.  And as a result
10   of my performance of my duties, I came in contact with
11   Mr. Norris, Jordan Norris.  After November the 5th, on
12   November the 7th, while Mr. Norris was in my custody, he
13   sustained injury."  I don't think we need to go into how he
14   sustained the injury.  But he sustained bodily injury.
15         Mr. Schaeffer:  "What was the nature -- describe
16   the bodily injury he sustained?"
17         "While he was in my custody, he hurt his arm, hurt
18   his leg," whatever it was.  "And as a result, I guess, of
19   that" -- I don't know -- you know, "I made sure he received
20   medical treatment" or whatever the ending part of that is.
21         But Mr. Schaeffer can testify that while
22   Mr. Norris was in his custody, he sustained physical injury.
23         I'm assuming -- I've heard something about he --
24   he -- I guess he used his leg to burst through a window or
25   something like that?

1          MR. STRIANSE:  He -- Your Honor, he kicked out the
2    window of the patrol car when they were trying to load him in
3    to take him to Middle Tennessee Mental Health.  But in the
4    proffer of evidence that I gave the Court when we started
5    this morning, I don't think it's -- it's in the capacity of
6    this witness to say that Mr. Norris sustained a bodily
7    injury.
8          THE COURT:  Oh.
9          MR. STRIANSE:  I was very precise in what I --
10   tried to be precise in what I told the Court.  He was here to
11   tell the jury about the events of this man kicking the window
12   out, the fact that the road officers had to forcibly put him
13   down on the ground, and that would be something that I would
14   argue to the jury that they could infer from that incident --
15         THE COURT:  Right.
16         MR. STRIANSE:  -- that that, among other
17   incidents, could have caused the bodily injury.
18         But I don't have a factual predicate to ask this
19   witness if he knew that Mr. Norris sustained a bodily injury.
20   I don't think he's going to be able to answer that question.
21         THE COURT:  Okay.  Well, I misunderstood.  I guess
22   for the reasons stated, as well as your argument, I don't
23   think the jury -- I think it would cause -- it's too far of a
24   logical and factual leap for the jury to infer that on
25   November the 7th, when he reacted as he did, he did the same

1  on the 5th.

2       As I understand the proffer and information, he

3  may have gone to a medical facility to get physical medical

4  care.  He may have been sent for a mental evaluation.  And

5  without -- based -- without some evidence to tie all that

6  together, it's just too much to assume --

7       I say by way of example, I don't know -- the jury

8  won't know that if between November 5th and November 7th he

9  was given some medication that may have caused him to react

10  that way on the 7th, or he was reacting to mental treatment

11  or whatnot that could have happened.

12       It's too far of an inference for the jury -- which

13  they necessarily will have to do.  They will have to infer

14  that on November 7th, what he did there occurred in some

15  portion on the 5th.  And for the reasons stated, I think

16  that's -- that evidence of specific instances of that conduct

17  is not permitted under 405.

18       MR. STRIANSE:  Your Honor, just so the record's

19  complete --

20       THE COURT:  Sure.  Sure.

21       MR. STRIANSE:  -- should there be any review of

22  this matter, on January 27th, I filed my response at Docket

23  Entry 31 to the Government's omnibus motion in limine.  And

24  not only do I discuss 405 that the Court was discussing

25  today, I also discussed 404(b) and cited to the Court a case

1  out of the Middle District of Tennessee, *Cummins v. Phillips*,
2  which cites a Tennessee Supreme Court case.
3          And *Cummins v. Phillips* used this language in
4  regard to 404(b) -- and I'm reading from my filing at page ID
5  Number 180.
6          THE COURT:  I'm with you.
7          MR. STRIANSE:  (As read):
8              "Evidence of other crimes, wrongs or acts" is
9              admissible if presented to the Court for
10             nonpropensity purposes, such as "to establish
11             motive, intent, identity, absence of mistake, or
12             common plan or scheme or contextual background."
13         And that was the reason why I cited *Cummins* to the
14  Court.  And I wanted to make sure that the record is clear if
15  there is any review of this.  I didn't want --
16         THE COURT:  Do you have any cases that explain
17  what is meant by "contextual background"?
18         MR. STRIANSE:  Nothing other than I've cited,
19  *Cummins* and then *State v. Little*, which is a Tennessee
20  Supreme Court case that the District Court here in the Middle
21  District of Tennessee borrowed from.
22         THE COURT:  All right.  And do they give any
23  definition of what "contextual background" means?
24         MR. STRIANSE:  Your Honor, I -- I'm going to give
25  it its common meaning.  I think that this evidence would give

```
1   contextual background to the incident on November the 5th,
2   2016.  So the jury's not looking at that in a vacuum.
3           I think it's -- the probative value is certainly
4   not outweighed by any danger of unfair prejudice, which is
5   the 403 analysis that the Court would engage in in applying
6   404(b).
7           MR. SONGER:  Your Honor, if I could briefly
8   address the last point, I could discuss what the *Cummins* case
9   is about.
10          THE COURT:  Hold on just a second.
11          All right.  Go ahead.
12          MR. SONGER:  Your Honor, I just want to point out
13  that the language that Mr. Strianse just mentioned from the
14  *Cummins* case was just a phrase the Court used in dicta.  That
15  case dealt with whether evidence was properly admitted under
16  Rule 404(b) to prove motive.  The victim in that case was
17  involved in methamphetamine dealing.
18          THE COURT:  Do you have a copy?
19          MR. SONGER:  I don't have a copy of the case with
20  me.  I apologize.  But --
21          THE COURT:  But I think we would all agree that
22  404(b) does not -- I don't find it explicitly contains
23  contextual background.
24          Do you, Mr. Strianse?
25          MR. STRIANSE:  The text of the --
```

1          THE COURT:  404(b) doesn't include that, does it?

2          MR. SONGER:  It does not.

3          THE COURT:  Does not.

4          MR. SONGER:  And in fact, it explicitly excludes

5    evidence of just general acts that can be used for

6    propensity.

7          In *Cummins*, while that language was used in dicta,

8    dealt with a victim who was involved in methamphetamine

9    dealing, and the allegation was that that involvement in that

10   drug dealing was the specific motive for the homicide at

11   issue in that case.

12         So it was admitted under one of the express terms

13   of Rule 404(b), which is evidence that could be used for

14   another purpose, like motive.  So it's not applicable here.

15         THE COURT:  All right.  Okay.

16         All right.  So based on that, is the defense ready

17   to proceed?

18         MR. STRIANSE:  Yes, Your Honor.

19         THE COURT:  Okay.  Bring in the jury.

20         (Jury present.)

21         THE COURT:  All right.  Be seated.

22         All right.  Ladies and gentlemen, I apologize.  I

23   had to take care of some matters and we got a later start

24   than anticipated.

25         Yesterday the government closed its case, and now

1  the defendant will present its case.

2          Are you ready to call your first witness?

3          MR. STRIANSE:  Yes, Your Honor.  Call JJ Hannah.

4          THE COURT:  All right.  If you'll stop there,

5  we'll swear you in.

6          COURT DEPUTY:  Please raise your right hand.

7

8                      JJ HANNAH,

9  called as a witness by Defendant, was duly sworn and

10 testified as follows:

11

12         COURT DEPUTY:  Please be seated.

13         Please pull the microphone close and state and

14 spell your full name for the court reporter.

15         THE WITNESS:  JJ Hannah, J-J, H-a-n-n-a-h.

16

17                  DIRECT EXAMINATION

18 BY MR. STRIANSE:

19 Q.   Good morning, Mr. Hannah.

20 A.   Good morning.

21 Q.   How are you employed, sir?

22 A.   I work for the Cheatham County sheriff's office.

23 Q.   And how long have you worked for the Cheatham County

24 sheriff's office?

25 A.   Since August of 2000.

1  Q.   August of 2000.  What is your title at the Cheatham
2  County sheriff's office?
3  A.   I'm the jail administrator.
4  Q.   And how long have you been the jail administrator?
5  A.   About five or six years, I believe.
6  Q.   To give the jury some idea of the hierarchy at the jail,
7  who's in charge of the jail?
8  A.   The sheriff is the ultimate power of the jail.
9  Q.   And then who is right below the sheriff?
10 A.   The chief deputy.
11 Q.   And then where do you fall in the pecking order?
12 A.   I'm below the chief deputy.
13 Q.   Okay.  And are you sort of the hands-on day-to-day
14 operator of the jail?
15 A.   Yes, sir.
16 Q.   Okay.  And do you know the defendant in this case, Mark
17 Bryant?
18 A.   I do, yes, sir.
19 Q.   And was he employed at your office at some point in
20 time?
21 A.   He was, yes, sir.
22 Q.   I think you're familiar with the Jordan Norris case; is
23 that right?
24 A.   Yes, sir, I am.
25 Q.   And I believe you were interviewed by both the FBI and

1   the TBI in connection with that case; is that right?
2   A.    Yes, sir.
3   Q.    And do you recall being interviewed back in August of
4   2017?
5   A.    I recall being interviewed.  I don't know exactly what
6   date it was.
7   Q.    Okay.  Do you remember a civil lawsuit being filed
8   against the jail back then?
9   A.    Yes, sir, I remember.  I don't remember the exact date,
10  but I do remember a lawsuit being filed.
11  Q.    And was your interview by law enforcement, the FBI and
12  the TBI, shortly after that?
13  A.    I believe so.
14  Q.    I want to direct your attention back to November 5 of
15  2016 when this incident with Jordan Norris occurred at the
16  Cheatham County jail.
17            You were not working that night; is that right?
18  A.    No, sir.
19  Q.    If you would, tell the jury what was your understanding
20  of the Taser policy that was in effect as of November 5,
21  2016.
22  A.    I don't know the whole policy.  I can't quote the whole
23  policy, but I can tell you the high points.  The policy that
24  we had at the time stated that you should use the minimum
25  amount of tases to get the person immobilized as you need it.

1  I don't know the exact verbiage, but that was basically how
2  it goes.
3  Q.   Was there any specific number or duration of tases that
4  was prescribed by the policy at that time?
5  A.   No, sir, not in the policy.
6  Q.   And was there anything in the policy about not tasing an
7  individual who was restrained?
8  A.   No, sir, it wasn't in the policy.
9  Q.   Was there anything in the policy at that time in
10 November of 2016 about a correctional officer not using any
11 inappropriate language?
12 A.   Not in the Taser policy, no, sir.
13 Q.   Okay.  You and I have discussed the policy that was in
14 effect at the time in November of 2016; is that right?
15 A.   Yes, sir.
16 Q.   And how did you characterize the old policy that was in
17 effect at the time?
18 A.   I had made a statement to the TBI and FBI that the Taser
19 policy wasn't very strong at the time of the incident.
20 Q.   That you all didn't have much of a policy at that time?
21 A.   Yes, sir.
22 Q.   And was there any limitation on drive stun tasing at the
23 time, November of 2016?
24 A.   Not in the Taser policy, no, sir.
25           THE COURT:  Hold on, Mr. Strianse.

```
 1              All right.  Go ahead.
 2   BY MR. STRIANSE:
 3   Q.    Lt. Hannah, are illegal drugs smuggled into the jail?
 4   A.    On a regular basis there's stuff smuggled in and out of
 5   the jail.
 6   Q.    And you said it happens on a regular basis?
 7   A.    Semi-regular basis.
 8   Q.    Okay.  So it's something that you all deal with all the
 9   time?
10   A.    It's an ongoing problem, yes, sir.
11   Q.    And I assume once the drugs are smuggled in that inmates
12   use the drugs?
13   A.    They use them.  Sometimes they get caught with them and
14   they get charged with a crime inside the jail.
15              MR. STRIANSE:  Your Honor, may I have one moment?
16              THE COURT:  Sure.
17   BY MR. STRIANSE:
18   Q.    Do you remember how long Mark Bryant worked with you all
19   at the Cheatham County sheriff's office?
20   A.    I don't know the exact time.  It was -- I want to say
21   two or three years, at least.
22   Q.    And do you remember what rank he had risen to by -- at
23   the time that he was placed on administrative leave?
24   A.    I know he was a corporal or sergeant.  I'm not 100
25   percent sure.  I would have to look back at the files.
```

Q.   And did you work with him on a regular basis?

A.   No, sir.  He worked on -- I mean, I was his direct
supervisor, but he worked on -- I believe he worked on the
2:00 to 10:00 shift and I worked 8:00 to 4:00.

Q.   In your role as his supervisor, did you feel like you
came to know him?

A.   In a work manner, yes, sir.

Q.   And you evaluated his job performance?

A.   I did.

Q.   Would you have an opinion as to his character for being
a law-abiding citizen?

A.   I -- I know of no other incident other than this that --
that he had a negative outcome on.

         MR. STRIANSE:  Thank you.

         THE COURT:  All right.  Cross-examination.


                    CROSS-EXAMINATION

BY MS. MYERS:

Q.   Good morning, Mr. Hannah.

A.   Good morning.

Q.   So you relied on Gary Ola to conduct the Taser training
at the jail; is that right?

A.   Yes, ma'am.

Q.   And there was no person at the jail who knew more than
Gary Ola?

```
 1   A.    Yes, ma'am.  He was the only one certified to train on
 2   the Taser.
 3   Q.    And you yourself were trained by Gary Ola?
 4   A.    Yes, ma'am.
 5   Q.    And you require your employees to follow the training
 6   that Ola prescribes in the jail?
 7   A.    Yes, ma'am.
 8   Q.    And you spoke in each Taser training session as well?
 9   A.    Yes, ma'am.
10   Q.    And you told the officers to use good judgment?
11   A.    Yes, ma'am.
12   Q.    And you always told the officers to use common sense?
13   A.    Yes, ma'am.
14   Q.    And other than those appearances in the Taser training
15   classes, you haven't given officers any other advice about
16   Tasers?
17   A.    No, ma'am.
18   Q.    And you've never told your officers not to follow Taser
19   training or policies?
20   A.    No, ma'am.
21   Q.    And officers should only use a Taser when they're in
22   immediate danger or someone else is in immediate danger?
23   A.    Yes, ma'am.
24   Q.    And officers should use the least amount of force, as
25   you said earlier, to resolve threats?
```

1  A.    Yes, ma'am.

2  Q.    You've never told officers that they can tase someone

3  for more than 15 seconds total per incident?

4  A.    No, ma'am.

5  Q.    And that's in three five-second bursts?

6  A.    I've never told them anything about how long they can

7  tase somebody.

8  Q.    And you reviewed the videos in this case; is that right?

9  A.    Yes, ma'am.

10  Q.   And when the defendant was tasing Jordan Norris, you

11  heard the defendant tell Jordan, "I'll keep doing it until I

12  run out of batteries"?

13  A.   Some kind of statement like that, yes, ma'am.

14  Q.   And "You don't like it, do you?"

15  A.   I don't remember hearing that part of it.  I do remember

16  the other statement.

17  Q.   But you agree that officers shouldn't taunt people who

18  are in Jordan's situation?

19  A.   Yes, ma'am.  That's not ideal.

20  Q.   And do you agree that the defendant's actions at the

21  8:00 p.m. tasing of Jordan were not consistent with the

22  policy in the jail at the time?

23  A.   I don't know exactly the time, but the totality of the

24  situation was not -- not an appropriate situation, no, ma'am.

25  Q.   Now, you testified previously before a grand jury in

1  this case; is that correct?

2  A.   Yes, ma'am.

3  Q.   And there was a court reporter there?

4  A.   Yes, ma'am.

5  Q.   And you were sworn to take an oath and be truthful in

6  that proceeding?

7  A.   Yes, ma'am.

8  Q.   And do you have any reason to believe that your

9  testimony was incorrect?

10  A.   Not to my knowledge, no, ma'am.

11  Q.   So in your testimony, when you were asked, "Were Officer

12  Bryant's actions tasing Mr. Norris for this long consistent

13  with the policy of the jail at the time" --

14              MR. STRIANSE:  Your Honor, I object.  There's been

15  no --

16              THE COURT:  All right.  Why don't you all

17  approach.  Why don't you bring that with you.

18              (Bench conference outside the hearing of the

19              jury.)

20              THE COURT:  All right.  Go ahead.

21              MR. STRIANSE:  My objection is -- I'm sorry.  Your

22  Honor, my objection is that there's been no proper foundation

23  laid with the predicate question that he's somehow made some

24  inconsistent statement that now the government seeks to

25  impeach him with his prior grand jury testimony.  I object

1  this reading of the grand jury testimony.

2          THE COURT:  All right.  And I had the same point.

3  I wasn't sure what you were trying to impeach him on.

4          MS. MYERS:  The issue of the policy.  He

5  specifically said that he didn't know what the specific

6  policy was at the time.  And he said right there that he did

7  not violate --

8          THE COURT:  Part of --

9          MS. MYERS:  That's correct.

10          THE COURT:  Okay.

11          Not quite what you said.  He knows about the

12  policy.  He's not -- he's saying here -- your question was,

13  "Was Bryant's action tasing. . . for this long consistent

14  with the policy?"

15          "No, sir, they weren't."

16          MS. MYERS:  At the time.  I'm referring to the

17  policy at the time.

18          THE COURT:  Right.  And he said "No, sir."

19          MS. MYERS:  Right.

20          THE COURT:  All right.

21          MS. MYERS:  He didn't say that here yet, at the

22  time.

23          THE COURT:  I mean, your question was (as read):

24              And do you agree that the defendant's actions

25              at the 8:00 p.m. tasing of Jordan were not

```
 1              consistent with the policy in the jail at that
 2              time?
 3                  Answer:  I don't know exactly the time.  But
 4              the totality of the situation was not -- not an
 5              appropriate situation, no, ma'am.
 6          MS. MYERS:  I'm asking specifically about the
 7    policy, though.  He's saying the totality of the
 8    circumstances.  I want -- I want him to say -- because he
 9    said previously in his testimony that it was not consistent
10    with the policy at the time.  Not just the totality of the
11    circumstances.
12          This is the point that they are specifically
13    trying to make, was that the policy was in some way
14    ambiguous.  And he says specifically that this was not in
15    line with the policy at the time.
16          MR. STRIANSE:  I don't know what she's impeaching
17    him on.
18          THE COURT:  I'm not sure I do either.  I mean, you
19    could -- I'm not -- I'm not an Assistant U.S. Attorney.
20          MS. MYERS:  I can rephrase the question.  Would
21    you like me to do that?
22          THE COURT:  I'm not sure -- yeah -- I think -- I
23    think all you need to ask him is, sir -- and this is not my
24    role.  But you should -- when I say "at the time," I mean on
25    November the 5th, 2016.
```

1          MS. MYERS:  I can do that.  I can just ask the

2     grand jury question again and see if he gives the same

3     answer.

4          MR. STRIANSE:  That was my objection.

5          THE COURT:  Yeah.

6          MR. STRIANSE:  Just reading his grand jury

7     testimony.

8          THE COURT:  It's not inconsistent.  The

9     substantive answer today is not inconsistent with the

10    substance of the answer at the grand jury.

11         MS. MYERS:  The way that I understood was he was

12    saying the totality of the circumstances, not specifically.

13         THE COURT:  You said at the time.  I think you

14    just need to ask him, "When I ask you at the time, I'm

15    referring to November 6th, 2016."

16         MS. MYERS:  I can do that.

17         THE COURT:  I think that will clarify that.

18         MS. MYERS:  I appreciate that.  Thank you.

19         (Jury present.)

20    BY MS. MYERS:

21    Q.   Now, Mr. Hannah, my previous question was you agree the

22    Defendant's actions at the 8:00 p.m. tasing of Jordan Norris

23    on November 5th of 2016 were not consistent with your jail

24    policy that you had on November 5th of 2016?

25    A.   I misunderstood you.  No, ma'am, I didn't find any

1  policy that he violated.

2  Q.   And there's nothing in his report about the lengthy

3  tases at 8:00 p.m., is there?

4  A.   Not that I seen, no, ma'am.

5         THE COURT:  Okay.  You've got to speak up.

6         THE WITNESS:  I'm sorry.  Not that I seen.

7  BY MS. MYERS:

8  Q.   And leaving out the longest tase in the jail's history

9  was not consistent with your policy?

10  A.   I mean, it should be a truthful account of what happened

11  in any report you write.

12  Q.   So if, say, 50 seconds' worth of tasing was left out of

13  a report, that would not be consistent with policy?

14  A.   In that case, no, ma'am, it wouldn't.

15  Q.   And in fact, you use and rely on incident reports to go

16  back and look at video to review the incidents?

17  A.   Yes, ma'am, we do.

18  Q.   And each incident should have its own report per policy?

19  A.   For everybody that's involved, yes, ma'am.

20  Q.   For everyone that's involved?

21  A.   Yes, ma'am.

22  Q.   And the defendant didn't do a report for the 8:00 p.m.

23  tasings?

24  A.   I would have to look back through, but I don't think so.

25  Q.   You don't recall --

1  A.   I don't recall who all did reports.  There's been so
2  much paperwork looked through and everything.
3  Q.   You provided all of the reports in this case; is that
4  correct, when you were subpoenaed?
5  A.   I did.  Yes, ma'am.
6  Q.   And do you remember providing all of the reports that
7  the defendant had written that night?
8  A.   We provided everything that had anything to do with this
9  situation at all.
10 Q.   And if there was not a report that discussed tasings at
11 8:00 p.m., that would be inconsistent, as you know that there
12 were tasings at 8:00 p.m. done by the defendant?
13 A.   Yes, ma'am.
14 Q.   And so the reports clue you in to look for specific
15 times on the video; is that right?
16 A.   Yes, ma'am.
17 Q.   And in fact, if Jordan's family hadn't called to
18 question you about Jordan's treatment in the jail a few days
19 later, you would not have known about the 8:00 p.m. tasings
20 based on the reports that you had?
21 A.   The phone call from the family is definitely what led us
22 down the path of looking closer into it.
23 Q.   So not the reports?
24 A.   Not solely the reports, no, ma'am.
25 Q.   And when you started pulling videos as a result of that

1   phone call -- is that correct?

2   A.    Yes, ma'am.

3   Q.    -- you only reviewed the jail footage?

4   A.    That's only -- that's all I had access to myself.

5   Q.    Because you didn't have access to the Taser camera

6   video?

7   A.    Yes, ma'am.

8   Q.    And in the jail surveillance video you reviewed, it

9   didn't have sound?

10  A.    It didn't, no, ma'am.

11  Q.    So you couldn't hear any of the tases?

12  A.    No, ma'am.

13  Q.    You couldn't hear what the defendant said to Jordan when

14  he tased him?

15  A.    No, ma'am.

16  Q.    And you couldn't tell how long those tases were?

17  A.    There was no way of knowing if he had activated it or if

18  he was just holding it up against him without it going.

19  Q.    And you didn't have the Taser logs at that time either?

20  A.    No, ma'am.

21  Q.    But even without all of this information, you were still

22  concerned?

23  A.    I mean, it's -- it was something that needed to be

24  forwarded up and let somebody higher than me look at.

25  Q.    And the most times prior to this incident that someone

1  had been tased was two or three times?

2  A.   There was only a few times before that anybody had been

3  tased.

4  Q.   And you passed this information along to your

5  supervisors?

6  A.   Yes, ma'am.

7  Q.   But this was incomplete information at the time?

8  A.   It was incomplete, unfortunately.

9  Q.   And so no action was taken at that time?

10 A.   No, ma'am.

11 Q.   And then you met with the Defendant to ask him about his

12 justification for the tases?

13 A.   I did.

14 Q.   And this was several days after the tases?

15 A.   It was.

16 Q.   And the defendant told you that he tased Jordan because

17 he had an arm out of the restraint; is that right?

18 A.   Yes, ma'am.

19 Q.   And he wanted to get his arm back in?

20 A.   He was trying to regain control of his arm, yes, ma'am.

21 Q.   But he didn't say that the defendant was trying to harm

22 any of the officers?

23 A.   He didn't specifically, not that I remember.

24 Q.   He didn't say that Jordan could get away?

25 A.   I think that was implied, that he was going to be able

1  to get out of the chair with one arm loose.

2  Q.   That he was not going to be able to get out of the

3  chair?

4  A.   That he was going to be able to.

5  Q.   Oh, that that was implied?

6  A.   I think so.

7  Q.   So that's what he was implying to you?

8  A.   Yeah, that's the way I understood it.  I mean, it is

9  possible to get out of that chair with one arm loose, the

10 chair we had at the time.

11 Q.   At the time was someone holding his head?

12 A.   Well, not with somebody holding on to him, no, ma'am.

13 Q.   And an officer at his arm, holding his arm as well?

14 A.   I meant, if he was just in the chair by hisself, he

15 could have possibly got out of it without anybody holding --

16 Q.   I see.  So not in --

17          THE COURT:  Hold on.  Let him finish.

18          Are you finished?

19          THE WITNESS:  Yes, sir.

20 BY MS. MYERS:

21 Q.   So you're speaking just broadly, not in relation to this

22 incident?

23 A.   Not in relation to this incident, no, ma'am.

24 Q.   And he didn't say why he tased Jordan for 50 seconds

25 during that incident?

A. He -- any -- any tasing, he told me he was trying to get compliance from the inmate.

Q. But he had no justification for the 50 seconds?

A. Not at that time, no, ma'am.

Q. Not at that time?

A. Or I mean, not -- we didn't even talk about the 50 seconds at that time.

Q. In fact, the defendant expressed no concern to you about the tasings?

A. He -- the way he -- when he we talked, I got the feeling that he thought he did the reasonable thing to try to control the situation.

Q. But no regret?

A. No, ma'am.

Q. And he wasn't worried that he might have injured Jordan?

A. No, ma'am. He went to the hospital shortly after that.

Q. And about nine months later, there was a lawsuit filed, as you mentioned?

A. Yes, ma'am.

Q. And then the video of the jail surveillance was combined with that Taser audio and it was aired over the media?

A. Yes, ma'am.

Q. And that was the first time that you saw and you heard the full picture of the defendant's tasing of Jordan that night?

1    A.   And seen all the video, yes, ma'am.

2    Q.   And only then did Gary Ola pull those Taser logs?

3    A.   I think that's when he pulled them, yes, ma'am.

4    Q.   And then you were able to see just how long the

5    defendant's tases were?

6    A.   Yes, ma'am.  How long it was activated.

7    Q.   I'm sorry?

8    A.   How long the Taser was activated from the logs.

9    Q.   Right.  And you talked to the chief deputy and the

10   sheriff about the incident again?

11   A.   Yes, ma'am.

12   Q.   And that's when you decided to have the TBI come and

13   investigate?

14   A.   Yes, ma'am.  We decided it would be better to have

15   somebody from the outside agency investigate it.

16   Q.   And in your career at the sheriff's office, you've never

17   had to pull an outside agency in to investigate before?

18   A.   Occasionally we use them -- I mean, they come down if

19   there's any kind of death in the jail.  Or occasionally we'll

20   use them if there's drugs or something like that.

21   Q.   If you had testified earlier that you had never done it

22   before that incident, would that have been incorrect?

23   A.   Maybe at that time when I -- when I testified to that,

24   we hadn't.  But since then we've used the TBI on a couple

25   things.

1  Q.    Since November 5th of 2016?

2  A.    Yes, ma'am.

3  Q.    So this was a significant event for you?

4  A.    Yes, ma'am, it was.

5  Q.    And you were concerned?

6  A.    Yes, ma'am, I was concerned that. . .

7  Q.    And the sheriff was concerned?

8  A.    Yes, ma'am.

9  Q.    And after -- oh, and if you reviewed all of the

10 materials that you have access to now at the time that you

11 were first made aware of the defendant's tasings, you would

12 have determined that your policy had been violated?

13 A.    Had I seen everything at once, yes, ma'am, it probably

14 would have violated at least one of our policies.

15 Q.    Because the defendant did violate your existing policy

16 at the time?

17 A.    Yes, ma'am, looking back, he did.

18 Q.    And after all of this came to light as a result of the

19 lawsuit and the media coverage, your office decided to

20 clarify the policy on Taser usage later?

21 A.    Yes, ma'am.  We changed our policy to reflect -- to give

22 better instruction on how to use it.

23 Q.    So you clarified it?

24 A.    Yes, ma'am.

25 Q.    And that was to ensure that tasings like this never

1  happened again?

2  A.    Absolutely.

3           MS. MYERS:  I have no further questions.  Thank

4  you.

5           THE COURT:  All right.  Redirect.

6           MR. STRIANSE:  Just a couple questions.

7

8                    REDIRECT EXAMINATION

9  BY MR. STRIANSE:

10  Q.   Lt. Hannah, I want to make sure I understand your

11  testimony this morning.

12           Early in the cross-examination by the government,

13  I thought you told the jury that you found no policy that

14  Mark Bryant violated on November 5, 2016?

15  A.    He didn't violate any of the Taser policies that I could

16  see.

17  Q.    Okay.  Do you remember in the days after this incident

18  calling Mark Bryant up to the administration office on the

19  second floor?

20  A.    I mean, I talked to him on a regular basis, the

21  employees, all the employees on a regular basis.

22  Q.    Do you remember reviewing the Taser video with him?

23  A.    The Taser video?

24  Q.    Not the Taser video, the video of the incident?

25  A.    In the booking room?

Q.    In --

A.    It's probably -- I don't remember specifically, but that sounds like something we would do.

Q.    And do you remember discussing specifically the 20-second tase?

A.    I do not remember.  I mean, it could have happened, but I don't remember it.

Q.    Do you remember that there was Officer Isherwood, Officer Whitt, and you reviewing this with Mr. Bryant?

A.    That could be very possible.  I don't remember -- I don't remember who all was there, but that was my administrative team at the time.

Q.    And your purpose was to get his version of events?

            MS. MYERS:  Objection.  Leading.

BY MR. STRIANSE:

Q.    What was your purpose of calling him upstairs?

            THE COURT:  All right.

            THE WITNESS:  It would have been to get his version of the events and to see his justification for whatever he may have done.

BY MR. STRIANSE:

Q.    And you were satisfied with his justification?

A.    I had no reason not to believe anything he told me.

Q.    And there was no administrative action taken against him?

```
 1   A.    No, sir.
 2            THE COURT:  Anything else?  Mr. Strianse?
 3            MR. STRIANSE:  Oh, nothing further.
 4            THE COURT:  All right.  You can step down.
 5                     (Witness excused.)
 6            THE COURT:  All right.  Call your next witness.
 7            MR. STRIANSE:  Call Rebecca Burney.
 8            THE COURT:  Okay.  If you'll stop there, we'll
 9   swear you in.
10            COURT DEPUTY:  Please raise your right hand.
11
12                     REBECCA LYNN BURNEY,
13   called as a witness by Defendant, was duly sworn and
14   testified as follows:
15
16            COURT DEPUTY:  Please be seated.
17            Please pull the microphone close and state your
18   full name and spell your last name.
19            THE WITNESS:  Rebecca Lynn Burney, B-u-r-n-e-y.
20
21                     DIRECT EXAMINATION
22   BY MR. STRIANSE:
23   Q.    Good morning, Ms. Burney.
24   A.    Good morning.
25   Q.    And where do you live, ma'am?
```

```
 1   A.    Clarksville, Tennessee.
 2   Q.    And how are you currently employed?
 3   A.    I work for G4S.
 4   Q.    And what is G4S?
 5   A.    It's a security, private security.
 6   Q.    Was there a point in time in your career where you were
 7   employed by the Cheatham County sheriff's office?
 8   A.    Yes, there was.
 9   Q.    And did you work in the jail in Cheatham County?
10   A.    Yes, I did.
11   Q.    And tell the jury when you worked in the jail in
12   Cheatham County.
13   A.    August 2015 to 2017, April.
14   Q.    And do you know Mark Bryant?
15   A.    Yes, I do.
16   Q.    And how did you come to know Mark?
17   A.    When I first met Mark, we worked in corrections together
18   at Charles Bass.  And then, when I transferred from the
19   prison to Cheatham County, he was working there at the time.
20   Q.    And when you say Charles Bass, you're talking about the
21   now closed Charles Bass Correctional Complex?
22   A.    Yes, sir.
23   Q.    A Tennessee Department of Corrections facility?
24   A.    Yes, sir.
25   Q.    And when you came to work in Cheatham County, how were
```

1  you employed initially?

2  A.    As just a regular deputy for the jail.

3  Q.    You were a correctional officer?

4  A.    Yes.

5  Q.    I want to direct your attention to November the 5th of

6  2016.

7        What shift were you working in the jail that day?

8  A.    Third shift, FTO, field training officer.

9  Q.    And we've heard a little bit about that.  What are the

10 duties of a field training officer?

11 A.    You teach the new officers the job, how to do head

12 count, how to book inmates, the booking process.  It's been a

13 while.  Just how to run the shift daily.  Just what goes on

14 in a correctional setting.

15 Q.    And since you were a third-shift employee, what time did

16 you arrive that night?

17 A.    10:00 at night.

18 Q.    And when you arrived on 10:00 -- at 10:00 on November

19 the 5th, did you encounter an inmate by the name of the

20 Jordan Norris?

21 A.    Yes, I did.

22 Q.    And explain to the jury what you observed when you came

23 to the jail that night.

24 A.    When I walked through the booking doors, he was in a

25 restraint chair facing the wall.  He was being very irate,

1  making statements that we were going to blow him up, we were
2  going to shoot him, we were going to kill him, and he was
3  just all over the place.
4  Q.   And how long have you worked in corrections?
5  A.   I worked in corrections for over eight years.
6  Q.   When you saw Mr. Norris that night, what sort of a
7  judgment did you form about what sort of distress he was in?
8  A.   Well, my first impression was, well, let me go check his
9  booking card, see how old he is.  Maybe he has some PTSD from
10 military, 'cause I know it's a military --
11            THE COURT:  Okay.  You've got to talk a little
12 slower for the court reporter.  Just take your time.
13            THE WITNESS:  Sorry.
14            THE COURT:  Don't rush.
15            THE WITNESS:  I talk fast.
16            So I went and checked his booking card, and he --
17 he was 18.  So I was like, there is no way it could be any
18 PTSD from, like, trauma from the military.
19            And so I went and I talked to him and I tried to
20 get him to calm down.  And as I was trying to get him to calm
21 down, we had other inmates getting him to go even more.
22 "Don't let her get you calm.  Keep going."
23            I got him to calm down.  He answered a couple
24 questions for me.  He said -- I asked him, "Are you on any
25 drugs?  You know, have you done anything?"

1    He told me he drunk liquid acid.  First time I

2  ever heard of it.  I let the other officers know that's what

3  he said, and we just took it from there.

4  BY MR. STRIANSE:

5  Q.   Now, were you trying to calm him down?

6  A.   Yes.

7  Q.   Were you trying to calm him down that evening?

8  A.   Oh, yes.  Trying to build like a trust -- you know, a

9  trust between me and him.  Because he was just -- his eyes

10  were, like, wide open.  He was all over the place.  Wouldn't

11  sit -- wouldn't stay still.  Like, he was just constantly

12  trying to get out the chair, trying to hurt himself.

13  Q.   So you told us that you arrived for third shift, what, a

14  little bit before 10:00?

15  A.   Yes, probably around 9:45, 9:50.

16  Q.   And were you briefed on the events that had occurred

17  earlier in the evening?

18  A.   Yes.

19  Q.   And what were you told had happened with Mr. Norris?

20  A.   That he was in the booking cell --

21        MS. MYERS:  I'm going to object unless we get a

22  foundation for the hearsay there.

23        THE COURT:  Do you want to rephrase?

24  BY MR. STRIANSE:

25  Q.   Just trying to -- to establish that she was aware of

1   what had happened earlier in the day.
2           THE COURT:  And all of that occurred -- were you
3   briefed in the normal course of your duties?
4           THE WITNESS:  Yes.  Every shift, you get a
5   briefing before you go in.
6   BY MR. STRIANSE:
7   Q.   And as a result of that briefing, were you discussing a
8   plan with the other correctional officers to take Mr. Norris
9   to the hospital?
10  A.   Yes, we did.
11  Q.   And tell the jury, what was the plan that you all were
12  going to try to implement that night?
13  A.   Our plan was we were going to pull the restraint chair
14  over to the bar on the countertop.
15  Q.   And where is that bar?
16  A.   It's in the booking office.
17          And we were going to undo one hand at a time and
18  book it to the -- handcuff him to the bar so we could get him
19  to stand up out of the chair.
20          THE COURT:  Again, slower.
21          THE WITNESS:  Sorry.  So used to talking fast.
22          So when we were trying to attempt to do that, he
23  was not being cooperative.  He was yelling, screaming, being
24  violent.  He -- at one time he had had my hand and almost
25  broke it.  I had to have help getting it loose.

1          So that did not work at all.  So we just ended up

2   sticking -- leaving him in the chair and wheeling him out

3   that way.

4   BY MR. STRIANSE:

5   Q.   What was the idea behind the plan of needing to get him

6   out of the chair?

7   A.   So we could get him to the car to get him to the

8   hospital.

9   Q.   And typically that would be done how, if you were

10  successful in getting him out of the chair?

11  A.   Once we would have got him out, we would have handcuffed

12  him, shackled him, and belly chained him, and walked him

13  right out to the car.

14  Q.   During that interval when you were trying to get him out

15  of the chair, was there any tasing that was done of

16  Mr. Norris?

17  A.   Yes, there was.

18  Q.   And tell the jury what you observed about the tasing.

19  A.   He was tased, I know, one time when he had my hand and I

20  couldn't get it free.  And it was only in the leg at the

21  time.

22  Q.   Did you see any other tasing incidents?

23  A.   Just in the leg.

24  Q.   And who was doing the tasing?

25  A.   Mark Bryant.

1  Q.   And given your understanding of the tasing policy that

2  was in place at that time, did you feel like that was an

3  appropriate use of the Taser?

4  A.   Yes, I do.

5           MR. STRIANSE:  Your Honor, may I have one moment?

6           THE COURT:  Sure.

7           MR. STRIANSE:  Those are my questions.  Thank you.

8           THE COURT:  All right.  Cross.

9

10                  CROSS-EXAMINATION

11  BY MS. MYERS:

12  Q.   Good morning, Ms. Burney.

13  A.   Good morning.

14  Q.   So on November 5th of 2016, you had only been at the

15  jail for about seven months; is that right?

16  A.   Yes.

17  Q.   And you're friends with the defendant?

18  A.   Yes.

19  Q.   Close friends?

20  A.   We're just friends.

21  Q.   You helped him move, right?

22  A.   Yes.

23  Q.   And until that night, you hadn't met Jordan until you

24  arrived at your shift, right, at 10:00 p.m.?

25  A.   Yes.

1  Q.    And you weren't there at 8:00 p.m.?

2  A.    No.

3  Q.    And when you arrived around 10:00 p.m., Jordan was

4  already in the restraint chair?

5  A.    Yes.

6  Q.    And at that time you helped prepare him for transport?

7  A.    Yes, ma'am.

8  Q.    And that was for transport to the hospital?

9  A.    Yes, ma'am.

10  Q.    And you were able to talk to him?

11  A.    Yes, ma'am.

12  Q.    You were able to calm him?

13  A.    To some degree, yes.

14  Q.    And when you did that, you were right in front of him?

15  A.    Yes, ma'am.

16  Q.    And you were talking to him face to face?

17  A.    Yes, ma'am.

18  Q.    And you were close to him when you spoke to him?

19  A.    Yes, ma'am.

20  Q.    And you didn't feel threatened when you spoke to him?

21  A.    Not at the time, no.

22  Q.    And you had had Taser training at that time; is that

23  right?

24  A.    Yes, ma'am.

25  Q.    And you learned that, in order to tase someone, the

1  person has to be actively posing a threat?

2  A.    Yes, ma'am.

3  Q.    And at one point, when Jordan was not cuffed, you said

4  that Jordan had your hand?

5  A.    Yes, ma'am.

6  Q.    And that he was tased while he was in the process of

7  being restrained?

8  A.    While we were trying to unrestrain him to take him to

9  the hospital, yes.

10 Q.    Right.  For transport?

11 A.    Yes.

12 Q.    And it was the defendant who tased him?

13 A.    Yes.

14 Q.    And the defendant was the only one carrying the Taser at

15 the time?

16 A.    Yes, ma'am.

17 Q.    And then Jordan was successfully restrained after that?

18 A.    Yes, ma'am.

19 Q.    And he was ready to be transported?

20 A.    Yes, ma'am.

21 Q.    I mean, physically ready to be transported.

22           And he had a belly chain on?

23 A.    No, ma'am.  Not that I can recall.

24 Q.    You don't remember a belly chain?

25 A.    Huh-uh.  No, ma'am.

1  Q.    And handcuffs attached to a belly chain?

2  A.    He was still handcuffed to the chair when we wheeled the

3  chair out to the car.

4  Q.    And what about shackles around his feet?  You do

5  remember that?

6  A.    We did get the shackles around his feet, yes, ma'am.

7  Q.    And he was still secured in the chair?

8  A.    Yes, ma'am.

9  Q.    Now, if other people talked about there being a belly

10 chain, would you disagree?

11 A.    I can't recall.

12 Q.    But he was cuffed at the time?

13 A.    Yes, ma'am.

14 Q.    And you didn't feel like you were in danger at that

15 time?

16 A.    No, ma'am.

17 Q.    And that's when the defendant tased him again?

18 A.    When he had my hand, crushing it, that's when I felt

19 threatened, and that's when I could recall Mark tasing him in

20 the leg, yes, ma'am.

21 Q.    Well, I'm not referring to that time.  I'm talking about

22 this later time when he's ready for transport and he's about

23 to be wheeled out.

24        Do you remember watching the video in this?

25 A.    I can't recall.  It's been a long time.

Q.   All right.  Could we please show the video, Exhibit 15.

          THE COURT:  Do you all want to approach.

          (Bench conference outside the hearing of the
          jury.)

          THE COURT:  So essentially you're going to try to
refresh her recollection.

          MS. MYERS:  That's correct.

          THE COURT:  It's already in evidence.

          MR. STRIANSE:  Yes, sir.

          THE COURT:  Okay.  So the other reason, you know,
we've got -- the chief justice is coming.  And apparently he
is delayed.  So we -- all the judges need to be there by
12:15.  So I told you 10:30.

          Do you have enough witnesses to keep going?

          MR. STRIANSE:  Probably.  I could move Mr. Bryant
up.

          THE COURT:  Oh.  Okay.  All right.  And we can --
I guess y'all might want to, you know, take a quick break and
then -- I just wanted to alert y'all.  I'm going to tell the
jury, too.

          MR. STRIANSE:  Okay.

          THE COURT:  Okay.  And then -- all right.  We're
supposed to be there at 12:15.  And he's going to -- Roberts
is going to talk from 1:45 to 2:30.

          MS. MYERS:  That's very precise.

         THE COURT:  And then at 2:30 the district judges

have got to meet with him.

         So if we've got -- we'll see him from 2:30 until

3:00.  It's at Belmont.  I'll be back between 3:00 and 3:30.

         What do you want to do?

         MR. STRIANSE:  It's ambitious to get back at 3:30.

         THE COURT:  Well, I think he's pretty limited.  I

think we're only going to see him from maybe 2:30 to -- from

2:30 to 2:45.  I don't think we're going to engage in long

talk.  So I think I'll be -- I think I can be on the road

back from Belmont at 3:00 and probably back here no later

than 3:30.

         But then they're going to have to wait from --

they're going to have to wait from 11:45 --

         MR. STRIANSE:  You're going to leave at 11:45?

         THE COURT:  Yeah, I need to leave at 11:45 so we

can get over there.  I don't know.  They told us -- 11:45.

Yeah.  Maybe -- I might be able to push it to noon, depends

on if. . .

         This is a mess.  So I guess it's your case.  Tell

me what you want to do.

         MR. STRIANSE:  How do you all feel about them

sitting around these hours?

         MR. SONGER:  Yeah, that's my concern.  That's a

long time.

```
 1              THE COURT:  There's nothing for them to do.
 2              MR. SONGER:  Right.
 3              MS. MYERS:  Should we get as far as we can get?
 4              MR. SONGER:  That would be my instinct.  Pick it
 5    up in the morning.
 6              MR. STRIANSE:  Go until 11:45.
 7              THE COURT:  I'll see if we can do it at noon.  I'm
 8    thinking we probably need to leave at 11:45 and then just
 9    send them home for the day, and then tomorrow we'll start
10    back at 8:30.
11              And I'll tell them it's all my fault.  It's all
12    the chief justice.  Okay.
13              So you want to -- how much longer do you have with
14    her?
15              MS. MYERS:  Not long at all.
16              THE COURT:  Okay.  Do you want to take a break
17    after that?
18              MR. STRIANSE:  Sure.
19              THE COURT:  All right.  Thanks.
20              (Jury present.)
21    BY MS. MYERS:
22    Q.   Do we have Exhibit 15 pulled up?  Thank you.
23              Ms. Burney, do you recognize this scene?
24    A.   Yes.
25    Q.   Have you, in fact, seen this surveillance footage
```

1  before?

2  A.   Yes, ma'am.

3  Q.   Okay.  Now, at this point, we're just going to show you

4  the clip and you can let us know if this does, in fact,

5  refresh your recollection of that evening.

6           (Video played.)

7  BY MS. MYERS:

8  Q.   All right.  Do you remember that at this time?

9  A.   We were trying to get his leg -- shackles on, ma'am.

10 Q.   So he didn't have your hand at that time?

11 A.   No.  That was another incident where he was kicking

12 towards my face, because I was down there with the leg

13 shackles, trying to get them on.

14 Q.   With your face right --

15 A.   Well, down there where his legs are, with his knees, I

16 was bent over, trying to fight with leg shackles.

17 Q.   So something you're saying is not visible in the video?

18 A.   Yes, ma'am.

19 Q.   But you said you didn't feel like you were in danger at

20 that time.

21 A.   At the time you were telling me that, I didn't know what

22 scene you were talking about.  And now that I recall, I was.

23 Q.   Okay.  All right.

24           So at this time, I would like to play Exhibit 13.

25           (Video played.)

1  BY MS. MYERS:

2  Q.   Does that refresh your recollection of the incident?

3  A.   I mean, I only see ground and feet, so I'm not sure what

4  I'm looking at.

5  Q.   In relation to where your head was at the time, did you

6  see any kicking?  Did you see Jordan Norris kicking during

7  that time?

8  A.   No.

9  Q.   And you testified previously before a Grand Jury in that

10  case -- in this case; is that correct?

11  A.   Yes, ma'am.

12  Q.   And you testified truthfully?

13  A.   Yes, ma'am.

14  Q.   There was a court reporter taking down what you said?

15  A.   Yes, ma'am.

16  Q.   And you were asked (as read):

17           As it relates to you, again, in reference to

18        this time, were you not in danger at that time?

19        And your answer was, "Yes, I was not in danger."

20        Do you remember that?

21  A.   I can't recall.

22  Q.   But if that is what is represented as your testimony,

23  would that be correct?

24  A.   If that's what I said, then yes.

25  Q.   And you didn't feel like someone around you was about to

```
 1  be harmed?
 2  A.    Like I said, from what I could recall from the video, he
 3  was being combative at the time.
 4  Q.    But you didn't feel -- that wasn't my question.
 5        You didn't feel that someone around you was about
 6  to be harmed?
 7  A.    No.
 8              MS. MYERS:  Thank you.
 9              THE COURT:  Redirect?
10              MR. STRIANSE:  No redirect.  Thank you.
11              THE COURT:  All right.  You can step down.
12              All right.  Ladies and gentlemen of the jury, I
13  think on Day 1 I anticipated -- I shared with you that I
14  anticipated that today was not going to be a normal day
15  because I had to be away from the courthouse.  And I'll share
16  with you, the reason for all this is that the Chief Justice
17  of our Supreme Court in Washington is visiting the Middle
18  District of Tennessee.
19              So, in the scheme of things, I sort of need to be
20  there.  He was supposed to be here by 11:00; hence, we were
21  going to stop at 10:30.  Well, his plane did not take off
22  when it was supposed to.  So everything's gotten changed.
23              So, what I've asked the lawyers to do, we're going
24  to go until at least 11:45.  I'm going to see if we can go to
25  noon before I have to leave.  But at least 11:45.  And then I
```

```
 1   think the best thing is to release you for the day, because
 2   it will be -- it will be 3:30 before I can get back.
 3              Now, everything's changed.  They've got a luncheon
 4   then a conversation, then the district judges are going to be
 5   meeting with the chief justice.  And while I think all that
 6   will go quickly, I could be wrong.  And I just -- I really
 7   don't want you all to have to sit here until 3:30.
 8              So whether we finish either at 11:45 or noon,
 9   we'll be done for the day.  You'll be done for the day.  And
10   you're free to leave and enjoy the day.  It seems like it's a
11   nice day out there.  And then we'll start back in the
12   morning, though, at 8:30, if that works for everybody.
13              Okay?  I apologize.  This is really beyond my
14   control.  But I hope you at least know why the schedule keeps
15   changing.
16              So we're going to take a quick break so the
17   lawyers can get ready and we'll proceed.  Thanks.
18              (Jury not present.)
19              THE COURT:  All right.  Be seated.  Before we
20   bring the jury in, I think we've played Exhibit 13 before it
21   was in evidence.
22              Do you have any objection?
23              MR. STRIANSE:  I'm sorry, Your Honor?
24              THE COURT:  I think we played Exhibit 13 before it
25   was in evidence.  That last thing we -- do you have any
```

1    objection to Exhibit 13?

2              MR. STRIANSE:  You -- I'm having a little trouble

3    hearing the Court.  Did you say it was in evidence or not in

4    evidence?

5              THE COURT:  It was not in evidence when it was

6    played to the jury.

7              MR. STRIANSE:  Then I would object to it.

8              MS. MYERS:  And, Your Honor, we just played that

9    to refresh her recollection.

10             THE COURT:  Yeah, but we did it in front of the

11   jury.

12             MS. MYERS:  That's. . .  Yes.  And that's --

13   that's correct.  Perhaps a --

14             THE COURT:  You've got to talk louder.

15             MS. MYERS:  Perhaps an instruction.  Here's the

16   thing, though, Your Honor.  That is just another angle of the

17   same event.

18             THE COURT:  But no one knew it.  When I saw it, I

19   actually thought it was at the van, going to the hospital.

20   My law clerk thought it was in the jail.  So we don't know

21   where it was without that.

22             I think I can cure this through a limiting -- tell

23   them -- so you're objecting to the introduction of 13?

24             MR. STRIANSE:  I assumed it had been received as

25   evidence.

```
 1              THE COURT:  Yeah.  I --
 2              MR. STRIANSE:  And I don't know the time or the
 3    place of that clip.
 4              MS. MYERS:  It was in the context of her
 5    testimony.  It was another angle of the same event.  It was
 6    just the Taser itself for that same surveillance.
 7              MR. STRIANSE:  She never said it was the same
 8    event.
 9              MS. MYERS:  That's what her questioning was about.
10    That event.  That's the only thing --
11              THE COURT:  Yeah, but the problem is it wasn't in
12    evidence.  It wasn't -- we didn't identify what this was a
13    scene of.
14              I think you played it, and just does this -- "I'm
15    going to play this to refresh your recollection."  But the --
16    the fundamental problem is it was not in evidence when it was
17    shown to the jury.
18              MS. MYERS:  It was also for impeachment, Your
19    Honor, in that she had made a different statement.
20              THE COURT:  You said, "I'm showing you this to
21    refresh your recollection."
22              MS. MYERS:  I did.
23              THE COURT:  Yeah.
24              MS. MYERS:  But to refresh it and also to impeach
25    her, which it did.
```

1          THE COURT:  But had it been a document, we show

2    them the document, and then they turn it over or give it

3    back.  Now you testify from your recollection having been

4    refreshed.  We didn't do that.

5          I think I have to tell them to -- I hereby order

6    them to -- I strike that testimony.  I strike the viewing of

7    the -- of the video, tell them to ignore it and all testimony

8    regarding it.  Because it was not in evidence.

9          MS. MYERS:  I think that that's fine, Your Honor.

10          THE COURT:  Oh.  Okay.

11          Mr. Strianse, do you -- do you agree that's the

12    proper --

13          MR. STRIANSE:  That's fine, Your Honor.

14          THE COURT:  -- proper --

15          MS. MYERS:  Your Honor, as long as the last two

16    questions regarding, "You didn't feel like you were in danger

17    at that time?"  Because that's in reference to the video

18    surveillance which she had seen which was in evidence.

19          "And you didn't feel like someone around you was

20    about to be harmed?"

21          THE COURT:  Mr. Strianse?

22          MR. STRIANSE:  I don't know what video she's

23    talking about now.  I'm going to address my remarks to the

24    video that you brought to our attention.

25          THE COURT:  Exhibit 13.

1          MR. STRIANSE:  Exhibit 13.  She never identified

2     that video.  She said, "All I see is feet and floor."  I

3     don't know what that is.

4          MS. MYERS:  Yes, Your Honor.  I think --

5          THE COURT:  All right.  Here's what she said.  You

6     said (as read):

7               Does that refresh your recollection of the

8               incident?

9               Answer:  I mean, I only see ground and feet.

10              So I'm not sure what I'm looking at.

11         MS. MYERS:  So I think that could be stricken

12    regarding that point, but the last two questions were

13    regarding whether or not she felt like she was in danger at

14    the time that he was cuffed and shackled and prepared for

15    transport.

16         And she was also impeached with her previous Grand

17    Jury testimony on those two points after that video was

18    shown.

19         THE COURT:  Then you asked (as read):

20              In relation to where your head was at the time,

21              did you see any kicking?

22              Answer:  I -- it -- I did see Jordan Norris

23              kicking during that time.

24         I'm sorry.  Then your question was (as read):

25              Did you see Jordan Norris kicking at that time?

```
 1              Answer:  No.

 2          And then you go into the Grand Jury.  So I think

 3   her -- her -- their viewing of Exhibit 13, they shall not --

 4   you shall not consider anything you saw in that video in your

 5   deliberations or the testimony related thereto of this

 6   witness, Ms. Burney.

 7              MS. MYERS:  I think that that's fine, Your Honor.

 8              THE COURT:  Mr. Strianse, does that cover it?

 9              MR. STRIANSE:  Yes, Your Honor.

10              THE COURT:  All right.  Bring them in.

11              (Jury present.)

12              THE COURT:  All right.  Be seated.

13          Ladies and gentlemen of the jury, prior to our

14   break you viewed Exhibit 13 and there was testimony related

15   to Exhibit 13, that videotape, from the witness, Rebecca

16   Burney.  And I hereby instruct you that you're not to

17   consider in your deliberations what you saw on the video or

18   any testimony from Ms. Burney related to that video.  I'm

19   ordering that stricken from this record, and you shall not

20   consider it in any fashion when you begin your deliberations.

21          All right.  Call your next witness.

22              MR. STRIANSE:  Call Hamilton Small.

23              COURT OFFICER:  Right up here.

24              THE COURT:  All right.  Come forward.  And if

25   you'll stop there, we'll administer the oath.
```

```
1              COURT DEPUTY:  Please raise your right hand.
2                    DR. ARTHUR HAMILTON SMALL,
3    called as a witness by Defendant, was duly sworn and
4    testified as follows:
5
6              COURT DEPUTY:  Please be seated.
7              COURT OFFICER:  Right here, please.  Right here.
8              COURT DEPUTY:  Please pull the microphone close
9    and state your full name.
10             THE WITNESS:  Author Hamilton Small.
11             COURT DEPUTY:  I'm sorry?
12             THE WITNESS:  Author Hamilton Small.
13             COURT DEPUTY:  Can you spell your first name?
14   A-r-t-h-u-r.
15             THE COURT:  All right.
16
17                    DIRECT EXAMINATION
18   BY MR. STRIANSE:
19   Q.   Good morning, Dr. Small.
20   A.   Good morning.
21   Q.   How are you employed?
22   A.   Oh, I'm doing fine.
23   Q.   How are you employed?  How are you employed?
24   A.   Oh, I'm employed at Middle Tennessee Mental Health
25   Institute here in Nashville, Tennessee.
```

1  Q.   And in what capacity are you employed at Middle
2  Tennessee Mental Health Institute?
3  A.   Staff psychiatrist.
4  Q.   And are you a medical doctor?
5  A.   Yes, I am.
6  Q.   And are you a psychiatrist?
7  A.   Yes, I am.
8  Q.   And how long have you been practicing as a medical
9  doctor/psychiatrist?
10 A.   I've been practicing since 2004.
11 Q.   And how long have you been working at Middle Tennessee
12 Mental Health Institute?
13 A.   From 2004, I worked as the medical officer of the day,
14 where we admit people overnight, and starting in 2013, I have
15 been working there full time since then.
16 Q.   And where is Middle Tennessee Mental Health Institute
17 located?
18 A.   It's located on 221 Stewarts Ferry Pike in Donelson,
19 Tennessee.
20 Q.   And what is Middle Tennessee Mental Health Institute?
21 A.   It's a state-associated psychiatric hospital --
22 hospital.
23 Q.   Did you treat a patient named Jordan Norris in November
24 of 2016?
25 A.   Yes, I did.

```
 1   Q.   And what date was he admitted to the Middle Tennessee
 2   Mental Health Institute?
 3   A.   He was admitted on November the 11th, 2016, at 5:30 a.m.
 4   Q.   And were you his attending physician?
 5   A.   Yes, I was.
 6   Q.   And what brought Mr. Norris to the Middle Tennessee
 7   Mental Health Institute?
 8   A.   Mr. Norris was referred to our hospital from the jail
 9   after he was reportedly being --
10            MS. MYERS:  Objection.  Hearsay.
11            MR. STRIANSE:  This is --
12            THE COURT:  Why don't you rephrase your question
13   and limit it.
14   BY MR. STRIANSE:
15   Q.   He was brought there from the jail; is that right?
16   A.   That's correct.
17            THE COURT:  Okay.
18   BY MR. STRIANSE:
19   Q.   And did you perform any sort of a medical evaluation or
20   a psychiatric evaluation on Mr. Norris when he was in your
21   care and custody?
22   A.   I did on that -- on that day.
23   Q.   Okay.
24   A.   Later on --
25   Q.   Forgive me.
```

1  A.   What I was going to say is, initially --

2          THE COURT:  Hold on.  I'm going to let him ask the

3  question and give you some limited leading --

4          MR. STRIANSE:  All right.

5          THE COURT:  -- if you'd like to control the

6  witness.

7          Go ahead.

8  BY MR. STRIANSE:

9  Q.   Dr. Small, you told us that Mr. Norris was admitted on

10 November the 7th; is that right?

11 A.   That's correct.

12 Q.   On or about that date, in your role as a psychiatrist

13 and his attending physician, did you perform any sort of a

14 mental evaluation of Mr. Norris?

15 A.   That is correct.

16 Q.   And what were the findings that you came up with?

17 A.   On that day Mr. Norris was actually -- he was delirious.

18 He had some difficulty answering certain questions regarding

19 orientation.  And also he was very preoccupied about his

20 possessions, where they were, and -- where they were.

21 Q.   And I think you used the word delirium?

22 A.   Yes.

23 Q.   And what is delirium?

24 A.   Delirium is a state in which people have -- fluctuate in

25 and out of consciousness, reality.  At some times they are

1  lucid and other times they are not.

2  Q.   And how was this delirium state manifesting itself with

3  Mr. Norris?

4  A.   He had difficulty at times answering questions regarding

5  orientation, and at other times he was spot on about his

6  possessions and stuff like -- possessions.

7  Q.   Now, did you note that there were any sort of auditory

8  or visual hallucinations?

9  A.   I did.  Also, the admitting physician wrote that he had

10  auditory and visual hallucinations.

11  Q.   And I think we probably know what that means, but tell

12  the jury, what are auditory and visual hallucinations?

13  A.   Auditory hallucinations are voices that people hear that

14  are not real.  At times they will hear people talking to

15  them, and if they look around, there's nobody there.

16          Or they'll see things -- visual hallucinations

17  occur when people see things that actually are not present in

18  the environment.

19  Q.   Based on your evaluation of Mr. Norris when he was in

20  your care and custody, did you make any sort of a diagnosis?

21  A.   At that time the diagnosis was major depressive disorder

22  with psychotic features and cannabis use disorder.

23  Q.   And let me make sure I'm hearing you.

24  A.   Major depressive disorder, psychotic features, and

25  cannabis use disorder.

Q.    And what does the psychotic features piece of this mean?

A.    The psychotic features was he was actually hearing things and seeing things.  That's -- that's part of what we diagnose as psychotic features.

Q.    Now, as a result of this diagnosis, was he prescribed any particular medicines?

A.    He was initially prescribed Haldol, ativan, and Depakote.

Q.    And let's talk about those.

Upon presentation at Middle Tennessee Mental Health, was he given ativan?

A.    He was given ativan because he was agitated at that time --

Q.    And --

A.    -- when he first presented.

Q.    And would that be called ativan, and then the condition being stat?

A.    Pardon me?

Q.    Stat, s-t-a-t?

A.    Yeah.  Yeah.

Q.    And what is ativan?

A.    Ativan is a benzodiazapine that's used to help with anxiety or agitation.

Q.    And once the diagnosis was made, what was the Haldol prescribed for?

A.    Sometimes severe agitation, we'll give a combination of
Haldol, ativan, and Benadryl to help calm down someone.

Q.    And what is indicated for a physician to prescribe
Haldol?

A.    Most of the times, if there's aggression or -- most of
the time, if there's aggression or destructive behavior, we
will prescribe Haldol.

Q.    What about the prescription drug known as Depakote?
What is that for?

            MS. MYERS:  I'm going to object to relevance at
this point.

            THE COURT:  Do you want to explain?

            MS. MYERS:  Right.  We're going through all these
medications that were on November 7th, which is two days
after --

            MR. STRIANSE:  Is this an objection or a speech?

            THE COURT:  Okay.

            MS. MYERS:  He asked me for my foundation for my
objection.

            THE COURT:  I just wanted to better understand it.

            Overruled.

BY MR. STRIANSE:

Q.    Was there a point in time that Mr. Norris was taken from
Middle Tennessee Mental Health and sent to another hospital?

A.    Yeah.  Within 12 hours of being admitted to the

1  hospital, he was transferred from Middle Tennessee to Summit
2  Hospital.
3  Q.   And what was the purpose in sending him to Summit
4  Hospital?
5  A.   The reason he was sent to Summit Hospital is because he
6  was -- not only was he delirious, we had done stat labs when
7  he came into the hospital.  And what we found is that his
8  creatinine kinase and white blood cells and kidney function
9  were elevated.
10          That being the case -- elevated creatinine kinase,
11 we know that there's some muscle damage.  So what we'll do
12 also is to -- you try to rule out any kind of cardiac-related
13 damage.  So since our facility is merely a psychiatric
14 hospital, we'll send them to the medical hospital to actually
15 rule out any type of cardiac event.
16 Q.   And then he was returned to Middle Tennessee Mental
17 Health Institute?
18 A.   Yes, he came back to us on November the 10th.
19 Q.   Was there any sort of a drug screen done on him?
20 A.   Before he came -- before he came to the hospital, he had
21 been to -- I believe Cheatham -- let me be sure -- Centennial
22 Ashland City, and at that time the urine drug screen showed
23 presence of cannabis and benzodiazepines.
24 Q.   And what would be an example of a benzodiazepine?
25 A.   Ativan, Xanax, and Valium or Clonopin.

Q.    In your diagnosis, did you use the descriptive term
"labile"?

A.    Labile is used to determine -- labile is used to define
very quick changes in a person's behavior.

Q.    So make sure that I hear you.

A.    They don't have -- meaning they don't have one
consistent behavior over a period of time.  Most people, you
know -- most people will be calm for a period of time.  When
someone is labile, it's like they'll be calm for a few
minutes and then they'll probably erupt and then, you know,
they might go to crying or they might go to laughing, then
they probably come back to being calm.  So it's not a
consistent behavior over a period of time.

            MR. STRIANSE:  Thank you, Dr. Small.

            THE COURT:  All right.  Cross.


                        CROSS-EXAMINATION

BY MS. MYERS:

Q.    Good afternoon, Dr. Small.

A.    Hi.  Hello.

Q.    So trauma can alter the mental state of someone,
correct?

A.    That's correct.

Q.    And being shocked repeatedly with electricity could
alter someone's mental state?

1  A.    That's correct.

2  Q.    And you mentioned that you were concerned about damage

3  to Jordan's organs?

4  A.    Given the labs that we found -- given the lab readings

5  that we found, we wanted him to -- we were concerned about

6  that, so we sent him to the medical hospital.

7  Q.    And you mentioned cardiac issues as well?

8  A.    Yeah.  I mean, a lot -- with elevated CPK, you can see

9  that in both skeletal muscle and cardiac muscle injury.

10          So, in order to make sure that we rule out any

11  kind of cardiac injury, we sent the patient off so that he

12  can get further testing to rule that out.

13  Q.    And could being shocked repeatedly with electricity

14  cause damage to the heart?

15  A.    Theoretically, it could -- it could.  But from -- that's

16  part of the reason we sent him out, to make sure that there

17  was no damage to that there.

18  Q.    So you're saying electricity can damage the heart,

19  repeated exposure?

20  A.    That's correct.

21  Q.    And you didn't examine Jordan Norris on November 5th of

22  2016, did you?

23  A.    No.  He came to our hospital on November the 7th.

24  Q.    So you don't know what happened to Jordan Norris in the

25  Cheatham County jail on November 5th?

A.   I do not know, but what I could say is that Mobile

Crisis, who saw him, reported that he had been tasered.

          MS. MYERS:  Thank you very much.

          THE COURT:  All right.  Redirect.


                    REDIRECT EXAMINATION

BY MR. STRIANSE:

Q.   By sending Mr. Norris to Summit, you were able to rule

out any of the physical concerns that you had; is that right?

A.   That's correct.

          THE COURT:  All right.  You can step down.

                    (Witness excused.)

          THE COURT:  All right.  Call your next witness.

          MR. STRIANSE:  Call Mark Bryant.

          COURT DEPUTY:  Please raise your right hand.

                    MARK MITCHELL BRYANT,

called as a witness by Defendant, was duly sworn and

testified as follows:

          COURT DEPUTY:  Please be seated.

          Please pull the microphone close and please state

your full name and spell your last name.

          THE WITNESS:  Mark Mitchell Bryant, B-r-y-a-n-t.

                    DIRECT EXAMINATION

BY MR. STRIANSE:

Q.   Good morning, Mr. Bryant.

1   A.    Good morning.

2   Q.    How old are you, sir?

3   A.    Forty.

4   Q.    And where do you live?

5   A.    Clarksville, Tennessee.

6   Q.    And where did you grow up?

7   A.    Clarksville, Tennessee.

8   Q.    Tell the jury a little bit about how far did you go in

9   school?

10  A.    I just graduated high school, 1996.

11  Q.    And did you work as a correctional officer for the

12  Cheatham County Sheriff's Office?

13  A.    Yes, sir.

14  Q.    And when did you work for the Cheatham County Sheriff's

15  Office?

16  A.    August of '15 until September of '17.

17  Q.    And how were you employed when you worked at the

18  sheriff's office?

19  A.    Correctional officer.

20  Q.    And how long did you function as a correctional officer?

21  A.    Approximately two years.

22  Q.    And what were your duties as a correctional officer?

23  A.    Provide safety and security for all the inmates and

24  staff and take care of all the needs of the inmates, laundry,

25  food, phone calls.

1    Q.    Give the jury some idea of the -- the career trajectory
2    you were on there at the Cheatham County Sheriff's Office.
3    A.    I started August 22nd, 2015.  Two months later I was
4    appointed FTO of second shift.  June 10th, I interviewed for
5    corporal and got that position and was a shift supervisor.
6    Q.    You said you were appointed to field training officer.
7    What's the distinction of being appointed for that position?
8    A.    It wasn't posted as a job.  There was no interviews.
9    Q.    And what are the duties of a field training officer?
10   A.    Training the staff on day-to-day operations.
11   Q.    Give the jury some idea of how much you were paid for
12   your work at the jail in Cheatham County.
13   A.    I think I started around 13, maybe 13.25, an hour.
14   Q.    Did you like your job as a correctional officer?
15   A.    I do.
16   Q.    Why did you like your job as a correctional officer?
17   A.    It was -- it was an opportunity to do something good, I
18   thought.
19   Q.    Did you enjoy the comradery of working with the other
20   correctional officers?
21   A.    Yes, sir.
22   Q.    How would you characterize the relationship that you had
23   with your coworkers there at the jail?
24   A.    They were my family.
25   Q.    And how did you feel that you interacted with the

inmates at the Cheatham County Sheriff's Office?

A.    I always gave them respect and I -- they reciprocated. They always respected me back.

Q.    Tell the jury about -- a little bit about your style in dealing with inmates at the jail.

A.    I was always calm, respectful, ask first, tell later if you have to, make, is the last -- last resort.

Q.    In terms of discipline, tell the jury what your philosophy was when you worked as a correctional officer. And, of course, I mean discipline issues that arose with inmates.

A.    I mean, we were required to serve disciplinaries to inmates if they broke the rules.  Is that the question?

Q.    No.  Just how you interacted with inmates and if there was any corrective action that you had to take that might not -- might not rise to a -- a real disciplinary action, but. . .

A.    You know, you just talk to somebody.  You can come to an agreement.  There was plenty of times where an inmate or an officer would have some issue, and you could always talk your way through it.

Q.    Okay.  Were you the kind of correctional officer that did not want to go hands on with an inmate?

A.    Absolutely not.

Q.    And what does hands on with an inmate mean?

1   A.    Being physical.

2   Q.    And what would you try to do in lieu of getting

3   physical?

4   A.    Use my words.

5   Q.    You were -- you worked there for approximately two

6   years; is that right?

7   A.    Yes, sir.

8   Q.    Over that period of time, were there any grievances or

9   complaints filed against you by inmates?

10  A.    Not to my knowledge.

11  Q.    I'll ask you a little bit about the place that you

12  worked.  How old was the Cheatham County jail?

13  A.    I believe it was an addition to the courthouse in 1978.

14  I don't know anything more about it than that.

15  Q.    Describe just very generally for the jury the physical

16  plant there at the Cheatham County jail.

17  A.    Layout?  Is that what you're asking?

18  Q.    Yes, sir.

19  A.    Well, where I came into work is the same place -- the

20  door that we walked in was the same place anybody off the

21  street that was being booked would come in.  It's a metal

22  door on a brick building that comes into a vehicle sally port

23  where there is a pedestrian door that walks into the booking

24  office.  And then the booking office would be to the right of

25  that door, cells would be to the left, one, two, three, four,

1  hang a right, and then hang a left and you're going back to
2  the general population dorms.
3  Q.    How many dorms were there?
4  A.    Six male dorms.  Approximately 96 beds.  I think 16
5  times 6 is 96.  Two -- three female dorms.  Two of them had
6  eight, one of them had four bunks.
7  Q.    How many inmates was the jail designed to hold?
8  A.    I want to say I did the math one time.  It was 122,
9  including the bunks available in booking.
10  Q.    In the two years that you worked at the jail how many
11  inmates would you all typically have?
12  A.    Regularly 150-plus.  I remember being very close to 200
13  at one point.
14  Q.    Were the conditions pretty crowded?
15  A.    Yes.
16  Q.    You came to work -- I think it was in August of '15; is
17  that right?
18  A.    Yes, sir.
19  Q.    Tell the jury what type of general training you received
20  when you first started there.
21  A.    We discussed -- when I say we, JJ Hannah and I during my
22  interview -- which basically I got hired on the spot right
23  then -- discussed what I knew from my experience at TDOC.
24  Q.    Let's talk about your experience at TDOC.  When were you
25  employed by TDOC?

1  A.    August of '13 is when I started the training.  You have

2  a four-week training at the Correctional Academy before you

3  go on the job.

4  Q.    And TDOC, we're talking, of course, about the Tennessee

5  Department of Corrections?

6  A.    Yes, sir.

7  Q.    And how long did you work for the Tennessee Department

8  of Corrections?

9  A.    Approximately two years.

10  Q.    And what facility were you assigned to?

11  A.    Charles Bass Correctional Complex, and when it closed I

12  was transferred to Riverbend Maximum Security.

13  Q.    I assume your duties at the state prison were different

14  than your duties at the sheriff's office; is that right?

15  A.    Yeah, very different.

16  Q.    But back to your initial taking the job in August of

17  2015 at the Cheatham County jail, tell the jury what kind of

18  general training you received.

19  A.    There wasn't anything really other than on-the-job

20  training.  It -- it started off -- I was just working with

21  another deputy.  And then the second day I worked with an

22  FTO.  And by the third day I was on my own.

23  Q.    Did you receive any use of force training?

24  A.    The policy and procedure was given to me.

25  Q.    And did you receive any training on what the force

1  continuum --
2  A.    It was in the policy and procedure, yes, sir.
3  Q.    What was your understanding of that force continuum?
4  A.    Words, then pepper spray, which wasn't even an option
5  but it was still in the policy, then empty soft hand control
6  techniques, Taser, then hard empty hand control techniques.
7  Q.    Give the jury an example of what an empty soft hand
8  technique might be.
9  A.    It would just be an escort, you know, somebody didn't
10 want to go somewhere, just put a hand on their back and guide
11 them, just give them a little direction.
12 Q.    And then on the force continuum the next step up is the
13 Taser, correct?
14 A.    Correct.
15 Q.    And above the Taser what's the next step?
16 A.    Hard hand.
17 Q.    Hard hand.  And what would be an example of a hard hand
18 technique?
19 A.    Grappling, striking, you know taking somebody to the
20 ground, that sort of thing.
21 Q.    And then on the force continuum above a hard hand would
22 be what?
23 A.    I guess lethal, which was not an option in the jail.
24 Q.    Did you receive any Taser training?
25 A.    Yes, sir.

1  Q.   And tell the jury about the Taser training you received.

2  A.   It was on October 23rd, 2015.  And I probably wouldn't

3  remember that except for seeing my certificate, but it was

4  about three maybe four hours long.  We watched some video,

5  went over the test a couple of times before we took the test,

6  and then had demonstrations of how the Taser worked and used

7  it on -- the FTC, field training coordinator, David Isherwood

8  was in charge of actually deploying the Taser into the

9  volunteers.  I did not volunteer.  I had plenty of experience

10  with it with the TDOC, and I didn't need to feel it again.  I

11  was already very well aware of how it felt.

12  Q.   You said that you did the course for how many hours that

13  day?

14  A.   Three or four, best of my recollection.

15  Q.   Is this the course that was supposed to be the

16  eight-hour course?

17  A.   I guess so.  I think so.

18  Q.   Okay.  And you have a recollection that it was three or

19  four hours that you were working at the course?

20  A.   (Witness moves head up and down.)

21  Q.   Is that right?

22  A.   Yes, sir.  I'm sorry.

23  Q.   Okay.  And were you also sworn in that day?

24  A.   Yes, sir.

25  Q.   Okay.  What did you understand the Taser policy to be

1  after your training and up until the time of this event,
2  November 5, 2016?
3  A.    You know, I don't really have any recollection of
4  durations or application limits.  In the policy there wasn't
5  anything about it.  The policy was readily available to me
6  all the time.  That class was, you know, for the couple hours
7  it was, and didn't really have anything to take away from
8  that course to study to refresh my memory as I continued my
9  service.
10  Q.    When you took the course, was there sort of a premium
11  placed on taking the test and answering all those questions?
12  A.    Yes, sir.
13  Q.    And in those questions was there any question that dealt
14  with the duration of a tase?
15  A.    No, sir.
16  Q.    Or the number of tases?
17  A.    No, sir.
18  Q.    How did you understand the policy generally to be
19  implemented there?
20  A.    Least amount of force necessary.
21  Q.    What were you to do in your role as a correctional
22  officer using that policy, least amount of force, if you had
23  to break up a fight or deal with a disruptive inmate?
24  A.    In my experience a loud command generally worked.  I
25  have a bit of a booming voice that kind of calls for respect,

1  and I got that a lot.
2  Q.   Now, you took the course October 23rd of 2015; is that
3  right?
4  A.   Yes, sir.
5  Q.   Were you supposed to be recertified for the course?
6  A.   As I understood, yes, sir, annually.
7  Q.   Which would have been on or about October 23 of '16; is
8  that right?
9  A.   Yes, sir.
10 Q.   Had you been recertified?
11 A.   No, sir.
12 Q.   Did you receive any training regarding the use of the
13 restraint chair?
14 A.   Yes, sir.
15 Q.   And tell the jury what your understanding was of the
16 training that you received regarding that.
17 A.   The -- the training was, you know, about an hour long, I
18 think, maybe two, at most.  Because we did some
19 demonstration.  And they just showed us how to strap people
20 into it.  And there was one specific instance I remember --
21 again Sgt. Isherwood was the facility training coordinator --
22 showed a pressure point lock -- or grip under the jaw to
23 control the head.  Other than that it was just showing us how
24 to use the straps.
25 Q.   And what condition was the restraint chair at the

```
1   Cheatham County jail in in November of 2015?
2   A.    It was old.
3   Q.    2016.  Excuse me.
4   A.    It was old.  We hadn't ever had any issues per se until
5   the night with Mr. Norris.
6   Q.    And let's talk about Mr. Norris.  When did you first
7   come in contact with inmate Jordan Norris?
8   A.    I want to say I met him on the 3rd of November briefly,
9   just in passing.  I think he was getting fingerprinted and --
10  I wasn't working in booking so I was just passing by.
11  Q.    Now, as of November 5, 2016, what shift were you
12  working?
13  A.    Second shift.
14  Q.    And what was your title at the time?
15  A.    I was Corporal in November of '16.
16  Q.    Were you also the shift supervisor?
17  A.    I was assistant shift supervisor.  I was shift
18  supervisor that day.  It was the Sergeant's regular day off.
19  Q.    As an assistant shift supervisor what were your duties?
20  A.    Run the shift, make sure nobody died and everybody was
21  accounted for.
22  Q.    And that was basically your role that day, which was
23  Saturday, November the 5th, 2016?
24  A.    That was my role every day.
25  Q.    And how many correctional officers were on duty for
```

1  second shift?

2  A.    Six.

3  Q.    And I know we've heard this many times, but the time of

4  the second shift is from when to when?

5  A.    2 p.m. to 10 p.m.

6  Q.    And do you remember roughly how many inmates were housed

7  at the jail back at that time?

8  A.    I would guess 150.

9  Q.    I would like to direct your attention to 6:45 p.m. on

10  Saturday, November 5th, 2016.  Tell the jury where you were

11  and what you were doing and what you saw.

12  A.    I was in the booking office just watching the video.  We

13  have a screen that has, I don't know, maybe 20 different

14  camera angles, and I noticed there was a bit of a disturbance

15  in cell 4.

16  Q.    And describe for the jury what you saw in cell 4.

17  A.    I went and -- well, what I saw on the video?

18  Q.    Yes, sir.

19  A.    I'm sorry.

20          I saw -- and I don't remember exactly if it was an

21  aggressive posture towards another inmate or if it was this

22  head banging that everybody else has talked about.  But it

23  must have been some -- some combination of that or I wouldn't

24  have gone to talk to him, and I certainly wouldn't have taken

25  him out of the cell.

1  Q.    When you say "him" who are you referring to?

2  A.    I'm sorry.  Mr. Norris.

3  Q.    And tell the jury what you physically did.

4  A.    I went into the cell and asked him to stop doing

5  whatever he was doing, went back to the booking office and

6  kept on reviewing video, had to go back out again because he

7  continued the behavior that was questionable.

8  Q.    When you first went into cell 4 and gave the verbal

9  instruction to tell Mr. Norris to stop, how did he react to

10  that?

11  A.    He didn't even seem to know that I was there.

12  Q.    And then you left and went back to the booking office?

13  A.    Yes, sir.

14  Q.    What happened when you went back to the booking office?

15  A.    Just a few minutes later he continued his activity that

16  was unsafe in my eyes.

17  Q.    And what was he doing in cell 4 that you found to be

18  unsafe?

19  A.    Like I say, I couldn't remember exactly.  I never got to

20  review any footage of inside that cell, but to the best of my

21  recollection he was either hurting himself or trying to hurt

22  somebody.

23  Q.    And when you back to cell 4 the second time what did you

24  do?

25  A.    Asked him to come back talk to me and he fused.  I asked

1  him to step out of the cell and come talk to me and he
2  refused.
3  Q.   When he refused to step out of the cell, what was the
4  next step that you took?
5  A.   I escorted him out of the cell.
6  Q.   And did you have any assistance in escorting him out?
7  A.   Yes.  Deputy Jeff Key.  He walked in right in front of
8  me.  And -- we -- and totally intended to go soft hand, but
9  he wasn't willing to comply at all.
10 Q.   Well, explain to the jury in some detail -- when you and
11 Officer Key went into it cell 4, describe your interaction
12 with Mr. Norris.
13 A.   I just gave him a verbal command to step out and talk to
14 me, and he refused.  He actually sat down on the bunk,
15 wouldn't -- wouldn't get up.  So we went in and we got him
16 up.
17 Q.   And what -- what were you experiencing when you and
18 Detective Key put your hands on him --
19 A.   Deputy Key.
20 Q.   I'm sorry.  Deputy Key.
21 A.   Go ahead.  Sorry.
22 Q.   Tell the jury how Mr. Norris was behaving when you and
23 Detective Key -- I'm sorry -- Officer Key were going to
24 escort him out of the cell.
25 A.   He did not want to come.  He was -- he started fighting

1  with us instantly.

2  Q.   And did you notice anything about Jordan Norris?

3  A.   At that point, you know -- while we're still in the

4  cell?

5  Q.   Yes, sir.

6  A.   Nothing in particular, but when we got out cell, tried

7  to put some cuffs on him, he fought back hard.  And when I

8  say hard, I mean just unbelievably strong.  Had no idea that

9  that was coming.  Took me aback a little bit.  You may have

10 seen on the video that I lost my balance and he about, you

11 know, took us down, too.  So. . .

12 Q.   And so it's clear for the record, how tall are you?

13 A.   6'2".

14 Q.   And how much did you weigh at that time?

15 A.   320.

16 Q.   And how about Officer Key?

17 A.   6', about 200, probably.

18 Q.   And were you surprised at the amount of strength that

19 Mr. Norris was exhibiting?

20 A.   Absolutely.

21 Q.   And what size of a man was Mr. Norris?

22 A.   Approximately 5'8", 160, 170 maybe.

23 Q.   Describe for the jury what happened outside of cell 4

24 when you and Officer Key were dealing with --

25 A.   We were trying to get him cuffed up behind his back.  He

1  didn't want to do that.  I instructed -- or Jeff may have
2  instructed Josh to get the chair ready because we knew he was
3  going to be a problem.  Deputy Bratton showed up at some
4  point.  I don't remember if I called him or if he just
5  happened to be there.  And he tased him in the back while we
6  were trying to fight him, get the cuffs on.  He ended up
7  tasing all three of us and Mr. Norris.  But eventually we got
8  his cuffs on and got him over to the chair.
9  Q.   And you told the jury that everybody ended up getting
10 tased.  Describe that in a little bit more detail.
11 A.   It was just an accidental thing.  You know, it was a
12 struggle, a very fierce struggle.  So Mr. Bratton tried to
13 place it on Mr. Norris and it just wouldn't stay where it
14 needed to be.
15 Q.   Do you remember how many times Deputy Bratton tased
16 Mr. Norris?
17 A.   At the time I had no idea, but, you know, we've looked
18 over everything now and I know he tased him four times.
19 Q.   And that was in the -- some of those tases were in the
20 process of trying to get Mr. Norris in handcuffs; is that
21 right?
22 A.   Correct.
23 Q.   And do you remember which correctional officer applied
24 the handcuffs?
25 A.   Jeff Key was the one that had the right hand done for

1  sure.  I don't know if it was me or Jeff Key got the left
2  hand.  Because Jeff was on the right side and he pulled his
3  cuffs out.  So I know he got the right hand for sure.  I'm
4  not sure about who got the left hand.  But it got done
5  eventually.
6  Q.    And do you remember at what point in the process that
7  you all were able to get cuffs onto Mr. Norris?
8  A.    After fighting with him for a couple of minutes -- you
9  know, I don't know specifically anything that -- it wasn't
10 because we asked him to.  We made him do it.  I don't know if
11 it was when Mr. Bratton had gotten a Taser on him and he
12 complied or if it was just we finally just got the strength
13 to get his arms where we needed them.
14 Q.    Was he cuffed before he was placed in the restraint
15 chair?
16 A.    That's right.
17 Q.    And was there any more tasing to get him into the
18 restraint chair?
19 A.    After we got him to the chair, he kind of straightened
20 out, and there was one more application to his abdomen that
21 made his butt sit down in the seat.
22 Q.    And who did that tase?
23 A.    Mr. Bratton.
24 Q.    And tell -- tell the jury what happened after you got
25 him placed in the restraint chair.

A.   He seemed to be cooperative.  I mean, when your hands
are behind your back, there's not a whole lot of fighting you
can do.  And we got his legs secured pretty quickly, and the
lap belt put on pretty quickly.  And that -- that was it for
the moment.

Q.   And did he seem to be under the influence of anything in
your interaction with him?

A.   In my experience the way he was acting, yes.  He was
talking a little crazy, gibberish you might say.  I don't
remember exactly all the details of what he had to say, but
it didn't have anything to do with what we were saying to
him.  He wasn't -- he wasn't actively saying, no, I'm not
going to do anything.  He was just talking just out of his
head.  I really don't remember.

Q.   When he was first placed in the restraint chair, was he
cuffed behind his back?

A.   Yes, sir.

Q.   Did there come a point in time that you decided that you
wanted to move his hands from the back to the front?

A.   Yes, sir, about 15 minutes later.  He had been very
calm, no issue.  And that's just standard practice, to move
from the back to the soft restraints, mainly because he could
be hurting his hands.  And it's -- it's a comfort issue, when
you have your hands behind your back, sitting on that hard
plastic chair.  I just wanted to get his hands out in front

1    of him so he would be more comfortable.

2    Q.   When you made the decision to move his hands from the

3    back to the front, tell the jury what happened.

4    A.   At that point -- you know, in my -- in my report, I

5    didn't remember it.  You know, even that day, I didn't

6    remember it in the right order.  The restraints going from

7    the back -- the handcuffs from the back to the front, there

8    was never any tasing that happened during that period.  It

9    took us about seven minutes to talk to him, get him to agree.

10   Mr. Bratton came up with a Taser and put it on him but never

11   activated it or -- or pulled the trigger.  And he finally

12   complied with getting his hands into the soft restraint.

13   Q.   And what happened after his hands were placed in those

14   soft restraints?

15   A.   We just did our normal checks for a while.  There wasn't

16   any issue until about 8:00 p.m. when I guess Jeff Key had

17   gone over and saw that one of his hands had become very

18   loose.  There's a strap -- there's a cuff that goes on the

19   hand --

20   Q.   And you're indicating your right hand; is that right?

21   A.   Yes.  But it works the same way for either hand.

22   There's a cuff, and then a strap is connected to that that

23   you pull to get it right to where you -- it's supposed to be,

24   sitting in the chair.  And that strap had come loose by a

25   foot.  He was able to reach up to his face.  I don't know

1   exactly what Jeff Key saw that made him realize that was

2   going on, but he's the one that saw it and alerted us to it,

3   and we went to go remedy that situation.

4   Q.   And why would it be a concern for a correctional officer

5   if an inmate in a restraint chair was able to get his arm

6   free?

7   A.   Well, you can do all the hypotheticals you want, but

8   mainly he wasn't secured like he should have been.  So that

9   was what the goal was, to get him secured like he should have

10  been.

11  Q.   So I understand it completely, the cuff was around his

12  right wrist; is that right?

13  A.   That's right.

14  Q.   There was nothing defective with the cuff?

15  A.   I wouldn't say nothing.  It was frayed.  The Velcro

16  was -- I guess -- the integrity of the Velcro had

17  deteriorated.

18  Q.   But what about the strap that's attached to the cuff?

19  A.   The strap was also deteriorated.  It wasn't broken.  It

20  wasn't cut.  The main problem wasn't the actual strap.  It

21  was the locking mechanism that keeps that strap in place.

22  And it's kind of like a -- like a -- not a ratchet strap, but

23  there's another kind of tie-down that you just pull, and it's

24  kind of spring loaded, and it's got some little teeth on it

25  that when you pull something tight it stays in place.  And I

1    guess those teeth maybe were wore out.  But he was able to
2    pull a good foot of slack out of that strap.
3    Q.   And pull in what direction?
4    A.   I don't know how he did it, if he went up or out or
5    down.  But the problem we were having is he was holding his
6    arm down to the side.  And it needed to be up here in the
7    location that the chair was designed for it to be.
8    Q.   And you said that Officer Key noticed that?
9    A.   Yes.
10   Q.   And how did he react do that?
11   A.   We need to get it fixed.
12   Q.   And tell the jury what happened.
13   A.   We went to go put the strap back to where it needed to
14   be, gave verbal commands.  It doesn't show on any videos that
15   anybody's exhibited, that we're there talking to him for a
16   while trying to get him to do what we want.  And he just
17   won't.  And --
18   Q.   And what --
19            Go ahead.  I'm sorry.
20   A.   And he's telling us he won't.
21   Q.   What sort of conversation are you having with
22   Mr. Norris?
23   A.   That he needs to do what I say.
24   Q.   And what were you asking him to do?
25   A.   To put his arm where it was supposed to be so we could

1    tighten the strap.

2    Q.    And how did he react to those questions?

3    A.    He just fought us.

4    Q.    When you say fought, fought verbally or fought

5    physically?

6    A.    Physically.  He was not going to let Jeff Key have that

7    arm.

8    Q.    Did there come a point in time that the Taser was used?

9    A.    Absolutely.

10   Q.    And how was that decision made to use that Taser force?

11   A.    It's just the next step in the force continuum.

12   Q.    Consistent with the training that you received?

13   A.    Yes, sir.

14   Q.    As you were interacting with Mr. Norris on November 5,

15   2016, were you aware of any Taser policy that limited the

16   number of tases?

17   A.    No, sir.

18   Q.    Were you aware of any policy that limited the duration

19   of any tases?

20   A.    No, sir.

21   Q.    What were operating under in your mind at that point in

22   time?

23   A.    Least amount of force necessary.

24   Q.    So describe for the jury what happened in terms of the

25   use of the Taser.

1    A.    I gave him verbal commands.   I asked Deputy Johnson to

2    bring me the Taser.

3    Q.    Would that be Caitlin Johnson?

4    A.    That's correct.

5    Q.    Now known as Mrs. Marriott?

6    A.    That's correct.   She brought it to me.   I activated it.

7    I put it on his probably mid -- right between his abdomen and

8    chest, right here, area, and told him that if he didn't

9    comply that I was going to tase him.   And I did for five

10   seconds.   Not sure if I told him I was going to do it again,

11   but I did it again for five seconds on his same area.   That

12   was ineffective, so I moved to his leg, told him I was going

13   to do it again.   And that's when I tased for approximately 20

14   seconds.

15   Q.    When you said it was ineffective, what about it was

16   ineffective?

17   A.    He wasn't complying.

18   Q.    And how was he evidencing to you all that he was not

19   complying?

20   A.    By keeping his arm down to the side, fighting with all

21   of his might to not let Jeff Key put it where it needed to

22   be.

23   Q.    And at that point in time had Officer Key grabbed that

24   loose right arm?

25   A.    Yes.   He had a hand -- probably two hands, yes.

1  Q.    And what was he trying to do with Mr. Norris' right arm?

2  A.    He was adjusting something on the cuff.  I wasn't

3  really -- I wasn't really looking at that part.  I was just

4  trying to talk to Mr. Norris.  And Josh was behind him

5  controlling his -- his head.  And I'm just waiting for Jeff

6  to be done because he should be done.  This should be over

7  with.

8  Q.    The 20-second tase that you described to the members of

9  the jury, where on the leg was it?

10  A.    About mid thigh.  We were trained to hit the largest

11  possible muscle group.

12  Q.    Did you ever tase Mr. Norris on his knee?

13  A.    No, sir.

14  Q.    The front of the knee?

15  A.    No, sir.

16  Q.    The side of the knee?

17  A.    No, sir.

18  Q.    The kneecap?

19  A.    There's no muscles there, and I would not have.

20          THE COURT:  All right.  Ladies and gentlemen, as I

21  previously explained, we're going to stop here for the day,

22  resume in the morning at 8:30.  Again, I appreciate you all's

23  patience and understanding.  Remember you can't talk about

24  the case, you can't let anyone talk to you about the case.

25  You're not to do any research or anything about the case.  So

1    until about 8:15 tomorrow just put the case out of your mind.

2    We'll come back then and resume the testimony.  So have a

3    safe afternoon.  Thanks.

4              (Court adjourned.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    REPORTER'S CERTIFICATE

2

3           I, Lise S. Matthews, Official Court Reporter for

4    the United States District Court for the Middle District of

5    Tennessee, with offices at Nashville, do hereby certify:

6           That I reported on the Stenograph machine the

7    proceedings held in open court on February 6, 2019, in the

8    matter of UNITED STATES OF AMERICA v. MARK BRYANT, Case

9    No. 3:18-cr-00144; that said proceedings in connection with

10   the hearing were reduced to typewritten form by me; and that

11   the foregoing transcript (pages 1 through 117) is a true and

12   accurate record of said proceedings.

13          This the 24th day of March, 2019.

14

15                              /s/ Lise S. Matthews
                                LISE S. MATTHEWS, RMR, CRR, CRC
16                              Official Court Reporter

17

18

19

20

21

22

23

24

25