3

        UNITED STATES OF AMERICA        )
4                                       )
                                        )
5                                       )
        v.                              ) Case No.
6                                       ) 3:18-CR-00144
                                        )
7        MARK BRYANT                    )

8

9
    ------------------------------------------------------------
10
    BEFORE THE HONORABLE WAVERLY D. CRENSHAW, JR., DISTRICT JUDGE
11
                            TRANSCRIPT
12
                               OF
13
                           PROCEEDINGS
14
                        February 7, 2019
15
                        Trial Volume 4B
16
    ------------------------------------------------------------
17

18

19
                  APPEARANCES ON THE FOLLOWING PAGE
20

21

22

23  PREPARED BY:
                    DEBORAH K. WATSON, RPR, CRR, LCR
24                      Official Court Reporter
                        801 Broadway, Room A839
25                       Nashville, TN 37203
                  debbie_watson@tnmd.uscourts.gov

```
 1   For the Government:    SARA E. MYERS
                           U.S. Attorney's Office
 2                         (Nashville Office)
                           Middle District of Tennessee
 3                         110 Ninth Avenue South
                           Suite A961
 4                         Nashville, Tennessee 37203-3870

 5                         MICHAEL J. SONGER
                           U.S. Department of Justice
 6                         Criminal Division
                           950 Pennsylvania Avenue, NW
 7                         Washington, DC 20530

 8
     For the Defendant:    PETER J. STRIANSE
 9                         Tune, Entrekin & White, P.C.
                           315 Deaderick Street
10                         Suite 1700
                           Nashville, Tennessee 37238
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                        I N D E X

2                 Thursday, February 7, 2019

3

4                    INDEX OF PROCEEDINGS

5                                                    PAGE

6    GOVERNMENT'S CLOSING ARGUMENTS                    4

7    DEFENDANT'S CLOSING ARGUMENTS                    23

8    GOVERNMENT'S CLOSING ARGUMENTS                   37

9

10   JURY CHARGE                                      40

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          The above-styled cause came on to be heard on

2    February 7, 2019, before the Honorable Waverly D. Crenshaw,

3    Jr., District Judge, when the following proceedings were had,

4    to-wit:

5          (Jury present.)

6          THE COURT:  Ladies and gentlemen, we'll start with

7    closing arguments, first from the Government, then the

8    Defendant, and then the Government will have the last word.

9    I'll remind the Court security officers that when the lawyers

10   start their argument, no one will enter or leave.

11         All right.

12         MR. SONGER:  Thank you, Your Honor.

13         "You don't like it, do you?  I'll keep going until

14   I run out of batteries."

15         That's how the Defendant taunted a defenseless

16   teenager while he tortured him.  That's how the Defendant

17   taunted Jordan Norris as he sent electricity pulsing through

18   Jordan's body causing him to seize up in pain.  That's how

19   the Defendant taunted Jordan while he tased him four times

20   for 50 seconds.

21         At 8:00 p.m., on October 5th, 2016, most of Jordan

22   Norris's body was tied down in a restraint chair.  Three

23   large officers stood over him.  He was not a threat.  He

24   couldn't escape.  He was completely defenseless.  Jordan was

25   a skinny 18-year-old.  The Defendant was almost twice

1    Jordan's size.  He was a former wrestler.  He was a

2    supervisor in the jail that night, and he'd worked in

3    corrections for years.  He had been trained on how to deal

4    with people like Jordan.  But that night, he chose to ignore

5    his training.

6            As Jordan was tied down and defenseless, the

7    Defendant tased him repeatedly for 50 seconds, the longest

8    tases that officers who worked at the Cheatham County Jail

9    had ever seen.  The Defendant kept the trigger pulled down to

10   tase Jordan for those 50 seconds even though he had been

11   trained that a taser can cause terrible pain after just a

12   second or two, and had been instructed never to tase someone

13   for more than three 5-second bursts in a single incident.

14           The Defendant had been trained that if he did tase

15   someone for a prolonged period, it would have serious health

16   risks.  It would burn the flesh.  It could damage internal

17   organs.  It could even cause death.  But as Jordan screamed

18   that night, the Defendant kept the trigger pulled down.

19           Then two hours later, Defendant did it again.  He

20   tased Jordan while he was handcuffed and shackled and sitting

21   in a chair just waiting to go to the hospital.

22           Again, the skinny teenager was completely

23   defenseless.  Every part of his body was restrained.  But

24   once again, the Defendant held the trigger down to keep the

25   cycle going beyond what was normally cut off, beyond what he

1  was trained to do, for 11 more seconds.  1, 2, 3, 4, 5, 6, 7,

2  8, 9, 10, 11 seconds of the Defendant shocking Jordan with a

3  taser for no reason.

4         The Defendant kept tasing Jordan until his flesh

5  looked like raw hamburger meat that had been ground up.

6  That's what it looked like to Officer Caitlin Marriott.

7  Caitlin told you that watching the Defendant assault Jordan

8  with a taser was so traumatic that just hearing the sound of

9  the taser still today makes her cry; so traumatic that she

10 can't even be around other officers when they test a taser.

11 She asks them to walk outside where she can't hear it so

12 she's not taken back to that night when she witnessed the

13 Defendant torture a defenseless teenager.

14        Now, Jordan had been acting out that night and the

15 Defendant didn't like it, so he punished him with electric

16 shock and pain.  That is a crime.  The Defendant knew he was

17 wrong, so he filed false reports to try to cover it up.

18 That's a crime, too.  Over the last four days, you've heard

19 from officers who were present both times the Defendant

20 inflicted punishment on Jordan with the taser.  You've seen

21 the videos, and you've heard the Defendant's own words on

22 those videos.  You know that Jordan was being disruptive that

23 night.  No one in this courtroom will tell you different.

24        Officers on the scene told you that they had to

25 pull Jordan out of the cell, that he -- they had to strap him

into a restraint chair.  And then when Jordan fought and resisted being put in that chair, that they had to tase him several times with those brief 5-second bursts that they had been taught to use, and that that was fully justified and appropriate.  But those officers also told you that there was no justification for what happened later, when the Defendant came back an hour later when Jordan was restrained and in the chair and had been calm, and tased him for 50 seconds.

And there was no justification for what the Defendant did two hours after that when he tased him again for 11 more seconds when Jordan was just waiting to go to the hospital in handcuffs and shackles and a belly chain and a leg band and everything else.

You can see all of that just by watching the videos.  Common sense tells you that it's wrong for an officer to use a taser to punish someone who is restrained and not a threat.  The Defendant's own training told him just that.  It is unlawful to use a taser to punish someone.  It's unlawful to use more force than is necessary, much less to do it for 50 seconds and then again for another 11 seconds.

After hearing all the evidence in the case, you know what the Defendant did was wrong, and you know that the Defendant knew it was wrong, too.  You heard the Defendant's own words taunting Jordan, showing that he didn't have any legitimate law enforcement purpose.  He was using a taser to

1    inflict pain on a restrained teenager.

2            It's also clear the Defendant knew he was wrong

3    because after he tased, he went to the other officers on his

4    shift and he told them not to file their own reports.  Then

5    the Defendant submitted reports that left out virtually all

6    the details about what happened.  The Defendant knew he

7    couldn't justify what happened, so he filed false reports to

8    try to cover it up.

9            The Defendant thought he could cover his tracks

10   with those false reports and get away with it because he was

11   wearing a badge, because he was the supervisor in charge of

12   the jail that night.  By trying to cover up the crimes that

13   he committed in uniform and on duty, he tried to put himself

14   above the law.  He did a disservice to all the law

15   enforcement officers who put on their own uniforms every day

16   to protect and serve, not punish and torture.  Officers who

17   know that in this country, in our Constitution, justice

18   happens in a courtroom, not in a restraint chair.

19           I'd like to take a minute now to talk to you about

20   how the evidence you've heard fits together with the law that

21   Judge Crenshaw will instruct you on in just a bit.

22           As you've heard, the Defendant is charged with

23   four different crimes in the indictment.  Each of those

24   crimes is made up of elements or just parts, and the

25   Government has the burden to prove each of those elements

beyond a reasonable doubt.  We embrace that burden.  The
evidence in this case overwhelmingly proves the Defendant is
guilty of each of the four crimes.

Let's talk first about Counts 1 and 2, the two
assaults on Jordan at 8:00 and 10:30.  Those counts share the
same elements.  There are four elements that you have to find
for each count.  Number one, that the Defendant acted under
color of law; two, that the Defendant deprived the victim of
a right protected by the United States Constitution; three,
that the Defendant acted willfully; and four, that the
Defendant caused Jordan bodily injury or that the Defendant
used a dangerous weapon.

So let's start with the first element, color of
law.  That just means that the Defendant either used or
misused his official authority, and there's no question about
that here.  At the time of both assaults, the Defendant was
on duty, in uniform, working as a corrections officer inside
the Cheatham County Jail.  So that element is satisfied
beyond a reasonable doubt.

The second element that you must find is that the
Defendant deprived Jordan of a right protected by the
Constitution.  And the right at issue here is based on
Jordan's status inside of the jail.  He was a pretrial
detainee which means he hadn't been convicted of a crime; he
was waiting to get his day in court.

1    And as a pretrial detainee, Jordan had a right to

2    be free from excessive force that amounts to punishment.

3    That just means that an officer can't use physical force to

4    punish somebody like Jordan.  To use force, an officer has to

5    have a legitimate law enforcement reason.

6    Now, corrections officers have a tough job.  They

7    have to deal with difficult and even dangerous inmates.  As

8    you've heard, there are situations where force is necessary.

9    That's why they're given weapons to carry, including tasers.

10    When Jordan was being disruptive on November 5th,

11    officers could lawfully pull him out of his cell and strap

12    him into a restraint chair.  When he fought and struggled

13    getting into the chair, officers could lawfully use those

14    short bursts of a taser, just as they've been trained to do,

15    to get him under control and restrained.

16    But the power to use force is a tremendous power,

17    and it's a serious responsibility.  And that's why officers

18    like the Defendant are trained on what types of force are

19    lawful and what type of force is not.  They're trained so

20    they don't abuse their power and don't abuse the men and

21    women who are in their custody.

22    You didn't hear any of the law enforcement

23    officers who testified in this case say that it's okay to use

24    force to punish someone, to retaliate against somebody who is

25    acting out, or to take out of your frustration by lighting

somebody up with a taser.  No officer said that because using force to punish is a crime.

Now, you've seen the videos.  You've heard the testimony of officers who are present, who had the same training as the Defendant.  And they told you that Jordan was difficult, he was belligerent at times that night, but that there was no threat that justified tasing him when the Defendant did at 8:00 and at 10:30, certainly not for anywhere near as long as the Defendant tased him.

So let's focus for a moment on Count 1.  This is the assault that happened at 8:00.  When you get back to the jury room, you look at this video and ask yourself:  What kind of threat existed here?

There is none.  Jordan had been in the restraint chair for over an hour.  Most of the time, he had been calm. There are straps over his shoulders and around his waist and across his legs.  His left arm and hand is fully strapped in. Officer Key is using the full weight of his body to control Jordan's right hand and right arm.  Officer Marriott is holding his head all the way back.  He's swearing a spit mask.

Officer Josh Marriott and Officer Caitlin Marriott, who you can see just on the edge of the screen, both testified that in this posture, Jordan simply was not a threat, that there was no justification for what the

1    Defendant did next.

2              (Playing video.)

3              MR. SONGER:  Now, you heard that a standard taser

4    cycle lasts 5 seconds.  That's one pull of the trigger.  But

5    you saw on the taser logs and you heard testimony that those

6    four tases lasted 50 seconds.  And later that night, the

7    Defendant tased Jordan 6 more times for 47 more seconds for a

8    total of 97 seconds within just a couple of hours.

9              You heard from officer after officer, the officers

10   who work in the Cheatham County Jail every day who deal with

11   difficult and sometimes dangerous inmates, none of them had

12   ever seen or even heard of tases that long.

13             Now, Officer Josh Marriott told you that the

14   Defendant's tases were unjustified and they were wrong.

15   Officer Josh Marriott was standing right there.  He was put

16   in the difficult position of having to watch his supervisor

17   use force that he knew was wrong.  And Defendant Bryant was

18   not just Marriott's supervisor.  They were friends.  They

19   used to be roommates.  But despite that friendship, Officer

20   Marriott knew there was no justification for what he'd seen,

21   and he told you that in court.

22             So now let's focus for a moment on Count 2.  This

23   is the assault at 10:30.  You heard and saw that Jordan had

24   been fighting with officers a few moments before this when

25   they were trying to get him restrained and prepared to be

moved to the hospital.  And during that sequence, the

Defendant tased Jordan several times, and those tases are not

charged as crimes in the indictment.  But then Jordan calmed

down.

        The officers got him fully restrained.  He was put

in handcuffs and shackles and a belly chain and leg

restraints.  And he was just sitting there ready to go to the

hospital.  He's not trying to get away or to threaten anyone.

He's not even saying anything mean to any of the officers.

He's just waiting to go to the hospital, and that's when the

Defendant used his taser again for 11 seconds when it was

totally unnecessary.

        Now, two officers . . .

        (Playing video.)

        MR. SONGER:  Now, two officers who were at the

jail that night, who you can see in the video, told you that

there was no reason for what Defendant Bryant did, that there

was no reason to tase Jordan in that situation at all, much

less for 11 more seconds, more than twice the normal taser

cycle.

        That's what Sergeant Ola told you.  Sergeant Ola

was also carrying a taser that night.  He was the taser

instructor at the jail.  And he testified that if there had

been any reason to tase Jordan, he would have done it.  But

he never even thought about using his taser because there was

1  no legitimate reason.

2          Now, Sergeant Ola was shocked when the Defendant

3  started tasing Jordan for no reason.  And afterwards, he

4  realized it was wrong, but he didn't report it.  He told you

5  that he feared that he would be retaliated against if he

6  turned in a fellow officer.  He told you that he feels like

7  he failed Jordan that night by not standing up for him, that

8  he's ashamed of it, and that it's shame he will have to live

9  with for the rest of his life.

10          Because he was ashamed an officer that he had

11  trained did that to someone, first time he met with the FBI,

12  he lied and he told them that he wasn't there; he had walked

13  away, and he didn't see the Defendant tase Jordan for those

14  11 seconds while he was in handcuffs.

15          Sergeant Ola later admitted what you can all see

16  for yourself on the video, that he was standing right there

17  and he did see the Defendant tase Jordan for no reason for 11

18  seconds, and that he lied about it because he was ashamed.

19  He admitted that to you in court and he pleaded guilty.

20          Officer Montgomery also told you that he was there

21  and he saw the Defendant tase Jordan for no reason at 10:30.

22  Like Sergeant Ola, Officer Montgomery told you that there was

23  just no threat whatsoever that justified what the Defendant

24  did.  Of course, there wasn't.  You can see that for yourself

25  on the video.  Common sense tells you that there's no

justification for the Defendant to tase a handcuffed and
restrained person who is just sitting in a restraint chair.

The Defendant retaliated against Jordan because he
had been acting crazy earlier that night and the Defendant
didn't like it, so he came back and he punished him with a
taser.  That violates the Constitution.  And that's been
proven beyond a reasonable doubt.

The next element requires you to find that the
Defendant acted willfully.  That just means that the
Defendant knew what he was doing was wrong, but he did it
anyway.  And here the Defendant absolutely knew that he was
wrong.  His training, his experience, and his own words prove
it.  The Defendant admitted to the FBI that he kept holding
the trigger down to keep those taser cycles going beyond the
5-second limit.  His hand didn't slip.  It wasn't an
accident.  The Defendant knew that he had tased Jordan longer
than his training allowed.

After the incident was over, the Defendant
confided in Officer Josh Marriott that he was afraid he was
going to get in trouble because he knew he had gone too long.
And during that 8:00 tase when the Defendant tased Jordan
four times for 50 seconds, you can hear the Defendant's own
words taunting Jordan, removing any doubt about whether he
had a legitimate purpose or if he was using that force to
punish.  He told Jordan, "You don't like it, do you?  I will

keep going until I run out of batteries."

Ladies and gentlemen, you can also apply common sense. The Defendant knew, just like any person trained or untrained would know, that if a teenager is in a restraint chair with seven officers or four officers standing around, fully restrained, it's wrong to tase him. It's wrong to keep Jordan in pain when there was no justification for doing it for even 1 second, much less for 11 seconds or 50 seconds. Applying common sense to this evidence tells you all you need to know. This was obviously wrong, and the Defendant knew it.

It's also clear the Defendant knew he was wrong because he ignored his own training about how he was supposed to act. You heard from officers who went through the exact same training course that the Defendant did. And they were crystal clear: You can never use a taser to punish someone. You cannot use a taser to tase someone who is in handcuffs. You cannot tase someone for more than 5 seconds at a time or for more than 15 seconds in a single incident.

The Defendant violated every one of those standards. Every one of them. The other officers knew it was wrong. They had the same training as the Defendant. The Defendant knew it was wrong. That's more than enough evidence to prove the Defendant knew what he was doing wrong, but he did it anyway.

1          But there's more.  Consider what the Defendant
2    himself did after he tased Jordan.  He filed false reports
3    that left out what he had done, that didn't disclose how many
4    times he tased Jordan or for how long.  In fact, he went one
5    step further.  He went to the other officers on his shift and
6    he told them not to submit reports.  The Defendant just
7    didn't want there to be a record of what had happened because
8    he knew he couldn't justify what he had done.

9          That's why nine months later, when the FBI
10   interviewed him about how he used force that night, he told
11   them that it didn't even happen, that he never tased Jordan
12   at 10:30 after he was restrained.  He admitted today that
13   what he told the FBI was wrong, was not accurate.

14          Now, the final element that the Government has to
15   prove for Count 1 and Count 2 is that the Defendant caused
16   Jordan bodily injury or that the Defendant used a dangerous
17   weapon.  Now, to find the Defendant guilty, you don't have to
18   find both of those things.  One or the other is enough so
19   long as you all agree on that one.

20          But here the evidence overwhelmingly proves both.
21   Let's talk first about bodily injury.  It has a specific
22   definition under the law.  It doesn't have to be a serious
23   injury.  It includes any injury to the body.  A bruise, a
24   cut, even just physical pain satisfies this element.

25          So you can ask yourself:  When the Defendant was

repeatedly assaulting Jordan with the taser, did it hurt? Of course, it did. You saw the video; you can see Jordan's eyes as he's being tased. You heard from Officer Caitlin Marriott who saw Jordan's wounds a couple of days later and described them as raw, ground-up hamburger meat. You heard from Special Agent Joy Wright who told you that even almost a year later, scars consistent with taser burns were still visible on Jordan's body.

So that element has been satisfied beyond a reasonable doubt.

The Defendant, to be clear, also used a dangerous weapon. You heard testimony that a taser causes intense pain, burns the skin, can damage internal organs, can even lead to death. So there's no doubt that when the Defendant repeatedly used a taser on Jordan, he was using a dangerous weapon. That's a separate way that the Government has also proven that last element.

So now let's consider Counts 3 and 4. These are the counts that relate to the Defendant obstructing justice by filing false reports about these assaults. Count 3 relates to the false report the Defendant filed about the 8:00 assault, and Count 4 relates to the false report the Defendant filed about the 10:30 assault.

There are three elements that you have to find for each of those two counts. One, that the Defendant knowingly

falsified a document, and here, that document is just the
false report the Defendant filed about each assault; two,
that the Defendant falsified the report with the intent to
impede, obstruct, or influence an investigation; and three,
that the false report related to a matter within the
jurisdiction of some federal agency.

So I'll start with the last element because it's
not really in dispute here.  The Government does not need to
prove that the Defendant knew that a federal agency had
jurisdiction to investigate this case, only that, in fact,
the federal government did have the authority to investigate.
And there's no question about that.

You heard from Special Agent Wright that the FBI
has the authority to investigate Civil Rights crimes like
this one and that, of course, the FBI is an agency of the
federal government.  So that element has been proven.

So let's turn to the next element, that the
reports are false.  Now, a report can be false because a
Defendant put false information in it.  It can also be false
because the Defendant left out information that's material.
And that just means information that's important or
significant such that leaving it out of the report makes the
report misleading.

Here, with both reports, the Defendant purposely
left out almost every important fact about these incidents.

What's left in those reports conflicts with the video that you all saw and the eyewitness testimony that you heard.

So let's look at the reports one at a time. First, Count 3. This is the false report about the 8:00 tasing. Now, the Defendant left out almost every important fact about this incident. He left out that when he tased Jordan, Jordan's legs, body, and left arm were strapped into the restraint chair, that his right arm was held by Officer Key. He left out that Jordan was already wearing a spit mask. He left out that he tased Jordan four different times, which violated the jail's policy. And he left out that those four tases lasted 50 seconds which not only violated the jail's policy, but were the longest tases anyone had ever seen in the jail.

Without those facts, read this report. You have no idea what really happened. Think about how this report compares to the video you watched. A supervisor looking at that report would have no idea that they would need to go to the video and investigate to see if this was appropriate. And that is exactly what the Defendant wanted. That makes his report false and misleading.

But there's another reason the report is false. Look at the time at the top of the report. 1855 or 6:55 p.m. That's significant because you know from the video and the taser logs and all the witnesses who testified that the

Defendant did not tase Jordan at 6:55 p.m.

That's when Officer Bratton tased him, before Jordan was restrained in the restraint chair.  The Defendant wrote "Bratton and I tased."  That's deeply misleading.  The Defendant wrote a report that made it seem like he tased Jordan when he was unrestrained at 6:55 when it was appropriate to tase him, not at 8:00 when Jordan was fully strapped into the chair when it was not appropriate.

Now let's look at Count 4, the report relating to the 10:30 assault.  Once again, the Defendant purposely left out virtually all the facts that show what really happened here, the facts that show that the Defendant committed a crime.  He left out the fact that Jordan was in handcuffs, that his feet were shackled, that he was wearing a belly chain, that his legs were restrained with a belt.  The report leaves out that there were seven officers present to control the situation.  He only put one other officer's name on this report.

He also left out how many times he tased Jordan and that that final tase, the one where Jordan is handcuffed and shackled and just sitting there waiting to go to the hospital, lasted 11 seconds where he had to keep the trigger down more than twice as long as a normal cycle.

Those are precisely the type of facts that the Defendant himself included in the other reports he did when

he tased someone at the jail, both before and after this incident. You saw those reports today. He just didn't include those facts in the reports about this incident. You're in the jury box; ask yourself, why would he do that.

Now, the final element that has to be proven for Counts 3 and 4 is that the Defendant intended to impede, obstruct, or influence the administration of justice. Now, that element is proven by most of the same evidence that we've already discussed. The Defendant told other officers not to submit reports. Then he submitted his reports that left out almost all the key facts. He left them out. He left out key facts about the 10:30 incident again when he talked to the FBI when he claimed it didn't even happen.

He did all that because he didn't want there to be an accurate and complete and truthful record of what happened because he knew he couldn't justify it. So he submitted false reports to try to cover up what he did.

People in the community count on law enforcement officers to be honest, to uphold the law. The Defendant banked on that trust and then he exploited it. He abused his power, he abused Jordan, and he abused that public trust.

The Defendant thought he could keep the trigger pulled down, could repeatedly assault Jordan, and then just write false reports and get away with it. But he was wrong. You know that it's wrong for an officer to torture a young

man who was troubled but was not a threat.  You know that no
one is above the law.

And now it's up to you.  Hold the Defendant
accountable for what he did to reach the conclusion demanded
by the evidence in this case:  The Defendant is guilty.

THE COURT:  All right.

MR. STRIANSE:  Thank you.

Good afternoon, ladies and gentlemen.

Mark Bryant risked his life every day at the
Cheatham County Jail for $13.25 an hour, and his superiors
gave him about $2 worth of training.  After sitting here for
most of this week, I respectfully suggest to you that one
thing is painfully clear:  Prior to the civil lawsuit being
filed in connection with this incident in July of 2017 and
the Channel 5 News exposé that followed, there was simply no
consistent, clear taser policy in place at the Cheatham
County Jail on November 5, 2016.

You heard from JJ Hannah.  We called JJ Hannah in
our case.  He is the jail administrator.  He is the man that
was in charge of the jail on November 5, 2016.  He admitted
to the FBI and to the TBI, when he was interviewed back in
August of 2017 shortly after the civil lawsuit was filed and
that he reiterated here in open court, that at the time of
this Jordan Norris incident, November 5, 2016, we didn't have
much of a policy on tasers.  There was no limit on drive

stun.  Absolutely nothing about three 5-second bursts being a limit on the number of tases that could be administered.

Also in the policy at that time, there was no prohibition against tasing someone who was restrained if they were still resisting.

If you were too flabbergasted by JJ Hannah's testimony and you need to look at something to confirm what he told you, when you get back there, take a look at Exhibit 1, Government's Exhibit 1.  That's the Cheatham County Sheriff's Office general order.  It's the taser policy that was in effect February 4, 2015.  That was the policy that was in effect at the time of this November 2016 incident.

And as you thumb through Government's Exhibit 1 in your looseleaf, it's the second document in.  And I would ask you to take a look at 6.2.2 which is on page 2 and read it for yourself.  And then you can judge that what Hannah was telling you is absolutely true.  No drive-stun limits, no mention of this three 5-second bursts that you kept hearing over and over again this week.

I'd also ask you, when you go to retire to deliberate on this case, take a look at Government's Exhibit 3.  That is the taser training -- taser academy -- excuse me -- certification test.  That is the 20-question test that they wanted all the correctional officers to get

1    100 percent on.  You look at that in Government's Exhibit 3.

2    See if there is one question on that test that addresses

3    itself to the length of any stun or the number of any stun.

4              That was the test that Mark Bryant took on

5    October 23rd, 2015.  That was the eight-hour class, supposed

6    to be an eight-hour class that was over in three hours.  And

7    he told you that he was never recertified.

8              Now, JJ Hannah confirmed for you-all that the old

9    policy, the pre-lawsuit policy, had none of the limits that

10   you heard about from the Government this week.  You got to

11   hear the Government's proof this week, and probably one of

12   the biggest ironies in this case is that the guy that the

13   Government selects to carry the ball for them on what the

14   taser policy was in November of 2016, which is a critical

15   issue in your consideration of this case, is Gary Ola.

16   That's the individual that they want you to rely on as to

17   what the policy was in effect in November of 2016.

18             And, of course, the irony is, this is the same guy

19   that was prosecuted by these people for lying twice to the

20   FBI and the TBI.  Once up in Ashland City in August of 2017

21   when he said, "I wasn't there, I didn't see these tasing

22   incidents," and then nine months later right across the hall,

23   right outside of these doors, he lied to an FBI agent when he

24   was here in the federal building.

25             This is probably the only building in America

where you can be convicted for lying to the federal

government about 10 feet outside that door and then the same

federal government puts him on the witness stand and expects

you to give him the full faith and credit on his oath.

The Government doesn't even believe him. They've

prosecuted him as a liar, as a perjurer, but they want you to

believe him beyond a reasonable doubt. And listen to what

the Judge tells you about reasonable doubt. Proof of such a

convincing character that you would act upon it and rely upon

it in the most important of all of your affairs. Would you

act and rely upon anything important in your lives based on

what Gary Ola told you?

So it's against this backdrop, ladies and

gentlemen, that on November 5th, 2016, two worlds collide.

You have the collectively untrained from the second shift

that encounter the uncontrollable.

And, ladies and gentlemen, this is not a Lifetime

channel movie. The Government wants you to believe that

Jordan Norris was just a skinny teenager acting out. Is that

really what you heard? Is that really a fair

characterization of what happened on November 5th, 2016?

Whoever has the best story wins? We don't have to worry

about what really the facts are in the case?

You heard proof in this case this was a profoundly

troubled young man possessed, according to the correctional

officers, of unnatural strength.  We called the doctor from
Middle Tennessee Mental Health Institute, Dr. Small, who
testified yesterday, diagnosed him with severe major
depressive disorder with acute psychotic features.  And I
said, "Well, Doctor, what is a psychotic feature?  What does
that piece mean?"

It means that he was having auditory and visual
hallucinations.  He was assaulting people in the jail.  He
was suffering from delirium, and he told you what delirium
was; that he was labile.

And I said, "What does labile mean?"

That he was emotionally unstable, unpredictable,
and violent.

You heard the testimony of Mr. Montgomery, the guy
that used to be a jailer, now he's a 911 dispatcher, the big
man that sat in front of you.  Someone his size told you it
took all that they could do, the collective strength of these
correctional officers, I think he said to control one arm at
a time of Jordan Norris.

Josh Marriott testified for the Government.  And
he described in his interview with the FBI and the TBI back
in August of 2017.  And, remember, that was five days after
he had gotten placed on administrative leave for his role in
this incident.  And then he reiterated on the witness stand
the same thing, that in his encounter with Jordan Norris on

1  that night, November 5, 2016, he was possessed.  He was out

2  of his mind.  He was the craziest incident that Marriott had

3  ever experienced in his role as a correctional officer, that

4  he thought he was on drugs or having a mental breakdown, that

5  Jordan Norris presented to him the most difficult inmate he

6  had ever dealt with in trying to place into a restraint

7  chair.

8          And then he punctuated his comments, both in the

9  interview and in his testimony before you on Tuesday, that

10  "everything we did was necessary," meaning everything that

11  they did on the second shift to control Jordan Norris was

12  necessary.

13         Now, remember those candid and unvarnished

14  statements were made right after he was placed on

15  administrative leave.  Well, evidently that was then and this

16  is now.  Now and his wife -- now he and his wife are back

17  working full time for Cheatham County.  He's been elevated to

18  a road officer.  His wife is working back in the jail.  And

19  he's put a little bit different spin on it.  He told you that

20  after this incident, he stopped carrying a taser.  I don't

21  know why he told you that.  I don't know if he wanted to

22  convey that this incident had such a profound effect on him

23  that he could no longer carry a taser.

24         On cross-examination, I said, "Well, didn't you

25  continue to carry a taser from November 5, 2016, until

July 28 of 2017 when you were placed on administrative
leave?"  And he admitted, "Well, yeah, I did continue to
carry a taser."

You may be wondering, well, how does all of this
relate to the charges in the indictment, your consideration
of the proof against Mark Bryant, and the ultimate question
whether the Government has proven beyond a reasonable doubt
that he has committed these four offenses in the indictment.
I think the Judge is going to tell you, when he reads you the
instructions as to what the law is, that in order to convict
Mark Bryant of depriving Jordan Norris of his Constitutional
rights on November 5th, 2016, the Government has to prove
every element of the offense, not just one.  They have to
prove every element of the offense.

And one of the essential elements, probably the
most essential element that the Government has to prove, is
that he acted willfully, that he -- and read that when you
get back to the jury room -- that Mark Bryant acted with
specific intent or the specific purpose to do something that
the law forbids.  That's the definition of willfulness, that
he basically acted in open defiance and reckless disregard of
his training and the law.

Ask yourselves, when you get back there to discuss
the issues in this case, as you're evaluating Mark Bryant's
interactions with Jordan Norris on November 5, 2016, ask

these kinds of questions:  Did Mark Bryant intentionally do
something that was forbidden by his taser training?

And look at the taser training.  No limitations on
the amount of tases, no limitations on the duration of the
tases.  And then remember what Hannah told you: the fact that
they really didn't have much of a taser policy in place at
the time of this incident.

Then ask yourselves, did Mark Bryant intentionally
do something in open defiance of his taser training?  Well,
this is the same taser training that Hannah said there wasn't
much to it and there were no limits.

Did Mark Bryant intentionally do something in
reckless disregard of his taser training?  You read the taser
training and you'll see no limitations whatsoever.

Then ultimately, engaging the willfulness element
in this case, did Mark Bryant act with a bad purpose or, in
reality, did Mark Bryant act on bad or simply insufficient
information?

In determining if Mark Bryant acted willfully --
and again, willfulness is an essential element of Counts 1
and 2 -- the Judge will tell you that you must consider
whether Mark Bryant knew through his training that his
actions on that night were unlawful.  Given the state of the
taser training on November 5, 2016, how could you ever answer
that question yes, that he knew that his actions were

unlawful, when he was interacting with Jordan Norris on that night?  You must also consider whether he knew that he was violating any department policy.

Well, you read the department policy and see if he was violating it.

And then there's something that I think is even more significant when you're weighing this issue of willfulness, and I would ask you to factor it into your discussions.  It's sort of an unusual circumstance.  So many times when somebody violates the law, there may not be any witnesses to it.  You don't know exactly what's going on. Here, everything that Mark did on November 5, 2016, was in the immediate presence of the entire second shift and the entire third shift, his coworkers, who were actively assisting him in trying to quell the disturbance that was caused by Jordan Norris.

And ask yourselves when you get back there.  I think it's remarkable; I don't know if you think it's remarkable:  Not one coworker objected in any way.  Not one told him, "Hey, Mark, you are violating the policy by what you're doing with that taser."  No one interceded.  No one stopped him.  Gary Ola, the person in charge of training the taser at the jail is standing right there at 10:20 when it's going on.  And he's assisting the officers, says absolutely nothing to Mark.

1    No one wrote a report.  They didn't have to run up

2    to Mark and say -- and embarrass themselves and get in a

3    conflict with Mark Bryant.  They knew where the box was that

4    had JJ Hannah's name on it.  They could have put a report

5    anonymously or put their name on it and said, "We object to

6    what happened."  It never happened.

7    I think, ladies and gentlemen, that is the best

8    evidence that there was really no taser policy on November 5,

9    2016, because none of the officers that were operating under

10   the taser policy objected one whit to what Mark Bryant had

11   done that evening.

12   And then ask yourselves, how were they applying

13   the taser policy?  Think about Daniel Bratton who came to the

14   aid of Key and Bryant at the door outside of Cell 4 at about

15   6:55.  You have Bratton who tases Jordan Norris to get him

16   subdued four times.  He thought it was three, but the

17   official record says four times outside the door of Cell 4.

18   Part of that time, he's cuffed.  At least one of those tases,

19   Jordan Norris is cussed.

20   So over a period of 50 seconds, Daniel Bratton

21   tased Jordan Norris four times for a total of 20 seconds.

22   Nobody said boo about that.  Nobody said that that violated

23   the policy.  I think I know why nobody said anything about

24   it, because Daniel Bratton's picture was not plastered on

25   Channel 5 News after this lawsuit was filed in July of 2017.

1          What did Mark Bryant do after he filed those

2     reports?  And what did the jail do after he filed those

3     reports in November?  About a week later, the reports went to

4     Hannah.  Hannah acted on those reports.  These are the same

5     reports that the Government's trying to convince you are made

6     out of whole cloth and have no details in them.

7          Well, Hannah got him, he read them, called Mark up

8     to the office.  Mark Bryant meets with JJ Hannah, he meet --

9     all the administrative guys.  Mr. Isherwood, Mr. Whitt.  They

10    discussed the incident, they discussed the fact of this

11    20-second tase that happened at 8:00.  Mark Bryant gives his

12    version, gives his justification.  Never hears anything back.

13         Mark, the person that they're trying to convince

14    you is willfully violating the law and scoffs at the law and

15    is an assaultive person, what does he do?  Does he forget

16    about it?  Does he bury it?  No.  In February of 2017, he

17    goes back up to the second floor and knocks on the door.

18    What's the status of the investigation, the internal

19    investigation that was being conducted by Hannah and the guys

20    on the second floor?  What do they tell him?  Sheriff tells

21    him, "You're clear.  It was justified.  Don't worry about

22    it."

23         Everything is fine until July 21st of 2017 when a

24    civil lawsuit is filed.  Then all of a sudden, it's not okay

25    anymore.  All of a sudden, the jail is embarrassed.  All of a

sudden, Sheriff Breedlove is embarrassed. People are asking
questions about the training.

I just want to talk very briefly about these
reports that the Government insists are lies that were
intended to mislead investigators. When you get back there,
take a look at Government's Exhibit 19. Government's
Exhibit 19 corresponds to Count 3 in the indictment, this
false statement, this obstruction of justice that he's
charged with.

A few minutes ago, the Government was telling you,
left out all the details. No details in this at all.

You can read it. You've heard the proof. You ask
yourselves what was left out? What else could have been in
there? How could this have in any way impeded anyone's
investigation? And I'm not going to read it to you, but it's
a summary from 6:55 through 9:22. And it takes you through
every relevant event and every person that was involved that
night. The -- what happened in Cell 4, how they have to go
to Cell 4 to extract Jordan Norris because he's threatening
another inmate, the fact that he didn't comply, the fact that
they had this confrontation with him outside of Cell 4, what
happened in terms of the drive stuns when he was in the
restraint chair, additional drive stun applications.
Everything is in this report.

But they want you to believe that this somehow

impeded an investigation when within one week, Hannah got it in his box and was calling downstairs to talk to Mark.

And then a second shift officer puts together Government's Exhibit 20. Mark Bryant finished up his shift, and he told you the reasons why he thought it was important to stay around and help the people on third shift. And he writes a report for third shift to describe what happened at 10:20 p.m.

And again, the Government wants you to believe that this summary of what happened somehow had the intent that he was intending to impede or stop an investigation. All evidence to the contrary. It gave them all the information that they needed to know: the date, the time, the event. It wasn't filed two weeks after the event. It was filed that night and went to the right place.

Ladies and gentlemen, I want to thank you on behalf of Mark Bryant and his family for your attention and your participation this week. We know how difficult it is to serve on a jury, to drive downtown, to be away from your families and your work.

I want to leave you with one thought. There is a chasm between the presumption of innocence and proof beyond a reasonable doubt. And the Government, in presenting a case to you, has to build a bridge strong enough to carry each one of you across from the presumption of innocence to proof

beyond a reasonable doubt.  It's a very heavy burden.  It's a
very strict burden.  Proof of such a convincing character
that you would be willing to act upon it, rely upon it in the
most important of all of your affairs.

I respectfully suggest to you, ladies and gentlemen,
that the Government does not build a bridge strong enough to
bring all 12 of you over with a taser policy in effect on
November 5, 2016, that sets no limits; that we have a
situation where we bring JJ Hannah in who tells you, "We
didn't have much of a taser policy in November of 2016."

The Government doesn't build that bridge by giving you
Gary Ola as the source of information as to what the taser
policy was at the time.  The man convicted of making false
statements is the one they rely on and want you to rely on to
take his word as to what the policy is.  They don't build
that bridge strong enough to get all 12 of you over with no
proof that Mark Bryant acted willfully.

If you read that willfulness instruction, and you
consider the things that we've talked about this afternoon,
that is an essential element, given what the taser policy
was, that cannot be proven.  And, ladies and gentlemen, they
also don't do it with any proof of bodily injury.  This was
handled in the most casual way by the Government.  You heard
no competent proof of any bodily injury.  They presented no
medical proof.  We were the only ones that presented any

medical proof:  Dr. Small from Middle Tennessee Mental Health
Institute.  Not even a photograph of any injuries that
supposedly were associated with the tasing incident.

They put Special Agent Joy Wright on the witness stand
to say that she met with him in 2017.  Don't you think the
FBI has the ability to gather the records from the Ashland
City hospital, to ask Jordan Norris, "Well, you complain
about a wound to your knee.  Where were you treated?  Did you
take a picture of it?"

No, they just want to come in here and say inflammatory
things like, "Well, it looked like hamburger meat or ground
meat."  And you've not seen any sort of demonstrative
evidence to back that up.

Ladies and gentlemen, thank you for your time and
attention.  I think if you consider the facts of this case,
if you read Judge Crenshaw's instructions very carefully,
particularly on willfulness, there's really only one verdict
in this case: that the Government has failed to prove this
case beyond a reasonable doubt, and Mark Bryant should be
acquitted of all four counts.

THE COURT:  All right.  I calculate you've got
about four minutes.

MS. MYERS:  Thank you, Your Honor.

This is not a case about training or policies.
This is a case about the difference between right and wrong,

appropriate use of force and excessive force, and when the
Defendant crossed the line.  You saw and you heard evidence
again and again in this case demonstrating when the Defendant
crossed the line.  You even had the benefit of hearing, in
the Defendant's own words, that his voice commands respect in
the jail.  And when he did not get that respect on the night
of November 5th, 2016, when he did not get the respect that
he wanted from Jordan Norris, he punished him.  He punished
him by tasing him repeatedly to excess by any standard, even
by the Defendant's own standard.

　　　　　"The least amount of force necessary."  Ask
yourself:  How many times did the Defendant make that
statement, "the least amount of force necessary"?  And when
you watch those videos, you've seen them so many times
already, you ask yourself:  Was that the least amount of
force necessary to combat a threat?  There was no threat.
No.  To get him to put his arm down because he didn't like
where it was even when it was restrained?  No.  That is
excessive force.  That is violating someone's Constitutional
right.

　　　　　And if you listen to the defense, he would have
you believe that it's the Wild West in the Cheatham County
Jail, that they can tase anybody for as long as they want for
as many times as they want.  And that is simply not true.
That is simply not common sense.  You are not asked to check

your common sense at the door.  There are limits.  You heard
about those limits.  You heard about them from Josh Marriott
who was in the same training class with the Defendant who
learned that you could tase someone for three, 5-second
bursts.  And that was clear to him.  He understood the rules.
He didn't have any trouble understanding what that meant.

In addition to that, to what we heard testimony
about, about the limits in the training, which he knew about,
he knew about and violated.  And when you look at Officer
Bratton's use of force and the Defendant's use of force, it
is clear.  Bratton pulled the taser off of him, less than
5-second bursts.  That's what we heard from him.  That is not
what we heard from the Defendant.

What we heard from the Defendant was that he held
the trigger down again and again for a total of 97 seconds
that night.  97 seconds of excruciating pain.  You heard
people testify what it's liked to be tased.  You heard the
Defendant state that he did not want to volunteer to be tased
again because he knew what that pain felt like.  But he held
the trigger down with no reason, no justification, and then
he lied about it in the reports.

And when you go back to the jury room and you
start deliberating, one of you can take out your clock and
you can sit there for 97 seconds.

THE COURT:  Okay.  If -- you need to wrap up, you

1  should -- you can wrap up.

2          MS. MYERS:  Thank you, Your Honor.

3          Look at the reports.  But most importantly, look

4  at the ones that he filed before and after.  The details that

5  he included, the material facts he included, and the ones

6  that he did before this incident and the ones he did after.

7  That is his intent, right there: to cover this up.  "I'll

8  keep doing it until I run out of batteries."

9          You've seen the evidence.  You know what needs to

10  happen.  The evidence demands that you find him guilty on all

11  four counts.  Hold him responsible.

12          THE COURT:  All right.  Ladies and gentlemen, the

13  court officer is now going to pass to you a copy of the

14  instructions so you can follow along.

15          All right.  Again, the courtroom doors will be

16  held secure until I complete the charge.

17          Members of the jury, now that you've heard the

18  evidence and the argument, it becomes my duty to give you the

19  instructions of the Court as to the law applicable to this

20  case.

21          It is your duty as jurors to follow the law as I

22  shall state it to you and to apply the law to the facts as

23  you find them from the evidence in this case.  You are not to

24  single out one instruction alone as stated in the law, but

25  must consider the instructions as a whole.  Neither are you

to be concerned with the wisdom of any rule of law as stated by me.

The lawyers may have referred to some of the governing rules of law in their arguments.  If, however, there is any difference between the law as stated by the lawyers and that stated in these instructions, you are, of course, to follow these instructions.

Nothing I say in these instructions is to be taken as an indication that I have any opinion about the facts of the case or what that opinion is.  It is not my function to determine the facts, but yours.

You have two main duties as jurors.  First, one is to decide what the facts are from the evidence that you saw and heard here in the courtroom.  Deciding what the facts are is your job, not mine, and nothing that I've said or done during this trial was meant to influence your decision about the facts in any way.

Your second duty is to take the law that I give you, apply it to the facts, and decide if the Government has proved the Defendant guilty beyond a reasonable doubt.  It is my job to instruct you about the law, and you are bound by the oath you took at the beginning of the trial to follow the instructions that I give you, even if you personally disagree with them.  This includes the instructions that I gave you before and during the trial and these instructions.  All of

1  the instructions are important and you should consider them
2  together as a whole.

3          Perform these duties fairly.  Do not let bias,
4  sympathy, or prejudice that you may feel toward one side or
5  the other influence your decision in any way.

6          You must make your decision based only on the
7  evidence that you saw and heard here in court.  Do not let
8  rumors, suspicions, or anything else that you may have seen
9  or heard outside of court influence your decision in any way.

10         The evidence in this case includes only what the
11  witnesses said while they were testifying under oath, the
12  exhibits that I allowed into evidence, the stipulations that
13  the lawyers agreed to, and any facts that I have judicially
14  noticed.

15         Nothing else is evidence.  The lawyers' statements
16  and arguments are not evidence.  Their questions and
17  objections are not evidence.  My legal rulings are not
18  evidence.  And my comments and questions are not evidence.

19         During the trial, I did not let you hear the
20  answers to some of the questions that the lawyers asked.  I
21  also ruled that you could not see some of the exhibits that
22  the lawyers wanted you to see.  And sometimes I ordered you
23  to disregard things that you saw or heard, or I struck things
24  from the record.

25         You must completely ignore all of these things.

Do not even think about them.  Do not speculate about what a witness might have said or what an exhibit might have shown. These things are not evidence, and you are bound by your oath not to let them influence your decision in any way.  Make your decision based only on the evidence as I have defined it here, and nothing else.

Now, some of you may have heard the terms "direct evidence" and "circumstantial evidence."  Direct evidence is simply evidence like the testimony of an eyewitness which, if you believe it, directly proves a fact.  If a witness testified that he saw it raining outside and you believed him, that would be direct evidence that it was raining.

Circumstantial evidence is simply a chain of circumstances that indirectly proves a fact.  If someone walked into the courtroom wearing a raincoat covered with drops of water and carrying a wet umbrella, that would be circumstantial evidence from which you could conclude that it was raining.

It is your job to decide how much weight to give the direct and circumstantial evidence.  The law makes no distinction between the weight that you should give to either one or say that one is any better evidence than the other. You should consider all of the evidence, both direct and circumstantial, and give it whatever weight you believe it deserves.

1    Another part of your job as jurors is to decide

2 how credible or believable each witness was.  This is your

3 job, not mine.  It is up to you to decide if a witness's

4 testimony was believable and how much weight you think it

5 deserves.  You are free to believe everything that a witness

6 said or only part of it or none of it at all.  But you should

7 act reasonably and carefully in making these decisions.

8    Let me suggest some things for you to consider in

9 evaluating each witness's testimony.

10    Ask yourself if the witness was able to clearly

11 see or hear the events.  Sometimes even an honest witness may

12 not have been able to see or hear what was happening and may

13 make a mistake.

14    Ask yourself how good the witness's memory seemed

15 to be.  Did the witness seem able to accurately remember what

16 happened?  Ask yourself if there was anything else that may

17 have interfered with the witness's ability to perceive or

18 remember the events.

19    Ask yourself how the witness acted while

20 testifying.  Did the witness appear honest, or did the

21 witness appear to be lying?

22    Ask yourself if the witness had any relationship

23 to the Government or the Defendant or anything to gain or

24 lose from the case that might influence the witness's

25 testimony.  Ask yourself if the witness had any bias or

prejudice or reason for testifying that might cause the witness to lie or to slant the testimony in favor of one side or the other.

Ask yourself if the witness testified inconsistently while on the witness stand, or if the witness said or did something or failed to say or do something at any other time that is inconsistent with what the witness said while testifying.  If you believe that the witness was inconsistent, ask yourself if this makes the witness's testimony less believable.  Sometimes it may; other times it may not.  Consider whether the inconsistency was about something important or about something unimportant in detail. Ask yourself if it seemed like an innocent mistake or if it seemed deliberate.

Ask yourself how believable the witness's testimony was in light of all the other evidence.  Was the witness's testimony supported or contradicted by other evidence that you have found believable?  If you believe that a witness's testimony was contradicted by other evidence, remember that people sometimes forget things, and that even two honest people who witnessed the same event may not describe it exactly the same way.

These are only some of the things that you may consider in deciding how believable each witness was.  You may also consider other things that you think shed some light

on the witness's believability.  Use your common sense and
your everyday experience in dealing with other people, and
then decide what testimony you believe and how much weight
you think it deserves.

You should use your common sense in weighing the
evidence.  Consider it in light of your everyday experience
with people and events, and give it whatever weight you
believe it deserves.  If your experience tells you that
certain evidence reasonably leads to a conclusion, you are
free to reach that conclusion.

As you know, the Defendant has pled not guilty to
the crimes charged in the indictment.  The indictment is not
evidence at all of guilt.  It is just the formal way that the
Government tells the Defendant what crimes he is accused of
committing.  It does not even raise any suspicion of guilt.

Instead, the Defendant starts the trial with a
clean slate with no evidence at all against him, and the law
presumes that he is innocent.  This presumption of innocence
stays with him unless the Government presents evidence here
in court that overcomes the presumption and convinces you,
beyond a reasonable doubt, that he is guilty.

This means that the Defendant has no obligation to
present any evidence at all or to prove to you in any way
that he is innocent.  It is up to the Government to prove
that he is guilty, and this burden stays on the Government

from start to finish.  You must find the Defendant not guilty
unless the Government convinces you beyond a reasonable doubt
that he is guilty.

The Government must prove every element of the
crimes charged beyond a reasonable doubt.  Proof beyond a
reasonable doubt does not mean proof beyond all possible
doubt.  Possible doubts or doubts based purely on speculation
are not reasonable doubts.  A reasonable doubt is a doubt
based on reason and common sense.  It may arise from the
evidence, the lack of evidence, or the nature of the
evidence.

Proof beyond a reasonable doubt means proof which
is so convincing that you would not hesitate to rely and act
on it in making the most important decisions in your own
lives.

If you are convinced that the Government has
proved the Defendant guilty beyond a reasonable doubt, say so
by returning a guilty verdict.  If you are not convinced, say
so by returning a not guilty verdict.

One more point about witnesses.  Sometimes jurors
wonder if the number of witnesses who testified makes any
difference.  Do not make any decisions based only on the
number of witnesses who testify.  What is more important is
how believable the witnesses were, how much weight you think
their testimony deserves.  Concentrate on that, not the

1  numbers.

2          There is one more general subject that I want to

3  talk to you about before I begin explaining the elements of

4  the crimes charged.

5          The lawyers for both sides objected to some of the

6  things that were said or done during the trial.  Do not hold

7  that against either side.  The lawyers have a duty to object

8  whenever they think that something is not permitted by the

9  Rules of Evidence.  Those Rules are designed to make sure

10  that both sides receive a fair trial.

11          And do not interpret my rulings on their

12  objections as any indication of how I think the case should

13  be decided.  My rulings were based on the Rules of Evidence,

14  not on how I feel about the case.  Remember that your

15  decision must be based only on the evidence that you saw and

16  heard here in court.

17          The Government and the Defendant have agreed or

18  stipulated to certain facts.  Therefore, you must accept the

19  following stipulated facts as proved:

20          1:  On November 5, 2016, Defendant Mark Bryant was

21  employed as a corporal in the Cheatham County Jail in Ashland

22  City, Tennessee.

23          2:  On November 5, 2016, Defendant Mark Bryant was

24  on duty working at the Cheatham County Jail from 2:00 p.m.

25  until at least 10:30 p.m., Central Standard Time.

1          3:  Defendant submitted two incident reports

2    relating to events at the Cheatham County Jail on November 5,

3    2016.  The time listed on one report is 1855, and the time

4    listed on the second report is 2220.

5          That concludes the part of my instructions

6    explaining your duties and the general rules that apply in

7    every criminal case.  In a moment, I will explain the

8    elements of the crimes that the Defendant is accused of

9    committing.

10          But before I do that, I want to emphasize that the

11   Defendant is only on trial for the particular crimes charged

12   in the indictment.  Your job is limited to deciding whether

13   the Government has proved the crimes charged.

14          Also keep in mind that whether anyone else should

15   be prosecuted and convicted for these crimes is not a proper

16   matter for you to consider.  The possible guilt of others is

17   no defense to a criminal charge.  Your job is to decide if

18   the Government has proved this Defendant guilty.  Do not let

19   the possible guilt of others influence your decision in any

20   way.

21          The Defendant has been charged with several

22   crimes.  The number of charges is not evidence of guilt, and

23   this should not influence your decision in any way.  It is

24   your duty to separately consider the evidence that relates to

25   each charge and to return a separate verdict for each one.

1  For each charge, you must decide whether the Government has

2  presented proof beyond a reasonable doubt that the Defendant

3  is guilty of that particular charge.

4          Your decision on one charge, whether it is guilty

5  or not guilty, should not influence your decision on any of

6  the other charges.

7          As I previously told you, the indictment is not

8  any evidence at all of guilt.  It is just the formal way that

9  the Government tells the Defendant what crimes he is accused

10 of committing.  It does not even raise any suspicion of

11 guilt.

12         The indictment alleges that:

13         Count 1:  On or about November 5, 2016, in the

14 Middle District of Tennessee, Mark Bryant, while acting under

15 color of law, willfully deprived Jordan Norris, a person

16 known to the Grand Jury, of the right, secured and protected

17 by the Constitution and laws of the United States, to be free

18 from the deprivation of liberty without due process of law,

19 which includes the right to be free from the use of

20 unreasonable force amounting to punishment.

21         Specifically, Mark Bryant used a Taser on Jordan

22 Norris multiple times without legal justification while

23 Jordan Norris was in a restraint chair and surrounded by

24 multiple officers.  One of these Taser cycles lasted

25 approximately 25 minutes, and a second cycle lasted

approximately 15 seconds -- 25 seconds, and a second cycle
lasted approximately 15 seconds.

The offense resulted in bodily injury to Jordan
Norris and the offense included the use of a dangerous
weapon, all in violation of Title 18, United States Code,
Section 242.

Count 2:  On or about November 5, 2016, in the
Middle District of Tennessee, Mark Bryant, while acting under
color of law, willfully deprived Jordan Norris, a person
known to the Grand Jury, of the right, secured and protected
by the Constitution and the laws of the United States, to be
free from the deprivation of liberty without due process of
law, which includes the right to be free from the use of
unreasonable force amounting to punishment.

Specifically, as officers prepared to transport
Jordan Norris to a medical facility, Mark Bryant used a Taser
on Jordan Norris without legal justification after Jordan
Norris was placed in handcuffs and was surrounded by multiple
officers.  The Taser cycle lasted for approximately 11
seconds.  The offense resulted in bodily injury to Jordan
Norris, and the offense included the use of a dangerous
weapon, all in violation of Title 18, United States Code,
Section 242.

Count 3:  On or about November 5, 2016, in the
Middle District of Tennessee, Mark Bryant, in relation to and

1   in contemplation of a matter within the jurisdiction of the

2   Federal Bureau of Investigation, an agency of the United

3   States, knowingly falsified a document with the intent to

4   impede, obstruct, and influence the investigation and proper

5   administration of the matter within the jurisdiction of a

6   federal agency.

7           Specifically, Mark Bryant falsified a Cheatham

8   County Sheriff's Department report dated November 5, 2016,

9   for a use of force incident involving detainee Jordan Norris

10  by omitting the material information that Mark Bryant tased

11  Jordan Norris multiple times for a total of approximately 50

12  seconds at approximately 8:00 p.m., and by falsely reporting

13  the sequence of events related to Mark Bryant's use of a

14  Taser on Jordan Norris at approximately 8:00 p.m., under

15  different circumstances from Officer --

16          Remind me.  Who's D.B.?

17          MR. SONGER:  Your Honor, Daniel Bratton.

18          THE COURT:  -- Daniel Bratton's use of a Taser at

19  6:55 p.m., all in violation of Title 18, United States Code,

20  Section 1519.

21          Count 4:  On or about November 5, 2016, in the

22  Middle District of Tennessee, Mark Bryant, in relation to and

23  in contemplation of a matter within the jurisdiction of the

24  Federal Bureau of Investigation, an agency of the United

25  States, knowingly falsified a document with the intent to

1    impede, obstruct, and influence the investigation and proper

2    administration of the matter within the jurisdiction of a

3    federal agency.

4         Specifically, Mark Bryant falsified a Cheatham

5    County Sheriff's Department report dated November 5, 2016,

6    for a use of force incident involving detainee Jordan Norris

7    by omitting the material information that Mark Bryant tased

8    Jordan Norris for approximately 11 seconds at approximately

9    10:30 p.m. while Jordan Norris was compliant, all in

10   violation of Title 18, United States Code, Section 1519.

11        Next, I want to say a word about the date

12   mentioned in the indictment.  The indictment charges that the

13   crimes happened on or about November 5, 2016.  The Government

14   does not have to prove that the crimes happened on that exact

15   date, but the Government must prove that the crimes happened

16   reasonably close to that date.

17        I will now explain to you the elements of each of

18   the charges in the indictment.

19        Counts 1 and 2 of the indictment accuse the

20   Defendant of, while acting under color of law, willfully

21   depriving someone else of a right secured and protected by

22   the Constitution and laws of the United States, in violation

23   of Title 18, United States Code, Section 242.  For you to

24   find the Defendant guilty of Count 1 or 2, you must be

25   convinced that the Government has proved each and every one

of the following elements beyond a reasonable doubt:

First, that the Defendant has acted under color of state law;

Second, that the Defendant deprived the victim, Jordan Norris, of a right which is secured by the Constitution or laws of the United States.  Here, the right at issue is Jordan Norris's right to be free from the deprivation of liberty without due process of law.  This right includes the right to be free from an officer's use of objectively unreasonable force while awaiting trial;

Third, that the Defendant acted willfully;

And fourth, that the Defendant's conduct resulted in bodily injury to Jordan Norris or that the Defendant used a dangerous weapon.

If you are convinced that the Government has proved all of these elements of the charge, say so by returning a guilty verdict on the charge.  If you have a reasonable doubt about any one of these elements for the charge, then you must find that -- the Defendant not guilty of the charge.

I will now provide you with additional instructions regarding some of these elements.

A person acts under color of law if he is an official or employee of a government, and he uses or abuses power he possesses because of his official position.  A

1  Government official, such as a police officer, acts under

2  color of law if he is performing his official duties, even if

3  he misuses or abuses his official authority by doing

4  something the law forbids.  Whether a Government official

5  acts under color of law depends on the nature of his actions,

6  not merely whether he is on duty or in uniform.

7          I instruct you that if you find that the Defendant

8  was an officer in the Cheatham County Jail, and that he acted

9  or gave the appearance of acting as a jail officer at the

10  time of the charged incident, then you may find that he acted

11  under color of law and that this first element is satisfied.

12          The second element that the Government must prove

13  with respect to Counts 1 and 2 is that the Defendant deprived

14  Jordan Norris of his right not to be deprived of liberty

15  without due process of law.  A pretrial detainee; that is,

16  someone who has been arrested for violating the law but is

17  presumed innocent because they have not been convicted of the

18  crime for which they have been arrested, is presumed

19  innocent.  Therefore, he may not be punished while awaiting

20  trial.  This means that the pretrial detainee may not be

21  subjected to an officer's use of objectively unreasonable

22  force while he is awaiting trial.

23          Not every use of force by a law enforcement

24  officer against a pretrial detainee is unconstitutional.  An

25  officer may use force to maintain the safety of himself and

other officers, to prevent a riot, to similarly maintain
discipline, or restore order in a jail or prison facility, or
to accomplish other legitimate law enforcement goals, even
when some force is objectively necessary to carry out a
legitimate law enforcement objective; however, officers may
not use more force than objectively reasonable to achieve
that goal.

An officer may not use force merely because an
arrestee questioned an officer's authority, insults the
officer, uses profanity, or otherwise engages in verbal
provocation unless the force was otherwise objectively
reasonable at the time it was used.  An officer may not use
force solely to punish, retaliate against, or seek
retribution against another person.

If you determine that the Defendant used physical
force against Jordan Norris, you must then decide whether
that force was objectively unreasonable.  You should evaluate
the reasonableness from the point of view of an ordinary and
reasonable officer on the scene and at the moment the force
was used.  In making your determination, you should consider
all of the facts and circumstances, including the amount of
the force used; the relationship between the need for the use
of force and the amount of force used; the extent of Jordan
Norris's injury, if any; any effort made by the Defendant to
temper or to limit the amount of force; the severity of any

1    security problem at issue; the threat, if any, reasonably

2    perceived by the Defendant; and whether Jordan Norris was

3    actively attempting to escape or resisting orders given by

4    the Defendant or other law enforcement authorities.

5            In determining whether the force used was

6    reasonable under all of the facts and circumstances, keep in

7    mind that force that is objectively reasonable at the

8    beginning of an encounter may not be justified, even seconds

9    later, if the objective justification for the use of force

10   has been eliminated.

11           A person acts willfully if he acts voluntarily and

12   intentionally with a specific intent to do something the law

13   forbids.  Here, that means that you may find the Defendant

14   acted willfully if you find that he acted in open defiance or

15   reckless disregard of a pretrial detainee's right to be free

16   from a law enforcement officer's use of objectively

17   unreasonable force.

18           It is not necessary for the Government to prove

19   that the Defendant was thinking in legalistic terms at the

20   time of the incident or that he had an appreciation that his

21   conduct was prohibited by a particular provision of the

22   criminal code or by the Constitution.  You must, however,

23   find that the Defendant acted with the bad purpose of doing

24   what the Constitution forbids.  In this context, you must

25   find that the Defendant intended to use more force than was

1    reasonable under the circumstances.

2            In determining whether the Defendant acted

3    willfully, you may consider any facts or circumstances you

4    deem relevant to shed light on what was in the Defendant's

5    mind.  For example, you may consider the manner in which any

6    constitutional violation was carried out and the duration of

7    any constitutional violation.  You may also consider what the

8    Defendant said; what the Defendant did or failed to do; how

9    the Defendant acted; and whether the Defendant knew, through

10   training or experience, that his actions were unlawful and

11   whether he knew that they violated department policy or his

12   own training.

13           Intent is a state of mind.  Ordinarily, there is

14   no way that a Defendant's state of mind can be proved

15   directly, because no one can read another person's mind and

16   tell what that person is thinking.  But a Defendant's state

17   of mind can be proved indirectly from the surrounding

18   circumstances.  This includes things like what the Defendant

19   said, what the Defendant did, how the Defendant acted, and

20   any other facts or circumstances in evidence that show what

21   was in the Defendant's mind.

22           You may also consider the natural and probable

23   results of any acts that the Defendant knowingly did, and

24   whether it is reasonable to conclude that the Defendant

25   intended those results.

1    It is not a defense that the Defendant may also

2  have been motivated by greed, anger, or some other emotion,

3  provided that the intent that I have described to you was

4  present.  You may, however, consider such motivations, as

5  well as any malice displayed by the Defendant, in determining

6  whether the Defendant acted willfully, as I have described

7  that term to you.  This, of course, is all for you to decide.

8    The Government has introduced evidence of policies

9  and training the Defendant received at the Cheatham County

10  Jail.  This evidence has been admitted for a limited purpose.

11  You may use it only to determine whether the Defendant acted

12  willfully, as I have just described that state of mind to

13  you.

14    It is, of course, wholly up to you to determine

15  whether the Defendant violated any rule or acted in

16  contravention of his training.  If you find that he acted in

17  contravention of policies or training, then I caution you

18  that not every instance of inappropriate behavior on the part

19  of a Government employee rises to the level of a federal

20  constitutional violation.

21    It is possible for a Government employee to

22  violate department policy or act contrary to his training

23  without violating the United States Constitution, just as it

24  is possible for a Government employee to violate the

25  Constitution without violating a specific policy.  For this

1   reason, proof that a Defendant violated policy or acted

2   contrary to training is relevant to your determination of

3   willfulness, but it is not relevant to your determination

4   that the Defendant violated Jordan Norris's constitutional

5   rights.

6           In other words, if you determine that the

7   Defendant violated a policy of the Cheatham County Jail or

8   acted contrary to his training, you should consider that

9   evidence only in determining whether the Defendant acted

10  willfully.  You should not consider that evidence in

11  determining whether the Defendant's actions violated the

12  Constitution in the first instance.

13          Bodily injury means any injury to the body, no

14  matter how minor or temporary; and it includes any cut,

15  abrasion, bruise, burn, disfigurement, illness, physical

16  pain, or impairment of a bodily member -- of a body member or

17  mental faculty.

18          The Government need not prove that the Defendant

19  intended to cause bodily injury.  The Government also need

20  not prove that a Defendant's acts were the sole cause of

21  bodily injury.  The Government must simply prove that the

22  offense resulted in bodily injury to Jordan Norris.

23          A dangerous weapon is any instrument capable of

24  inflicting death or serious bodily injury, including extreme

25  physical pain.

1          Counts 1 and 2 of the indictment charge both that

2     the offense resulted in bodily injury to Jordan Norris and

3     that the offense involved the use of a dangerous weapon.

4     However, the Government does not have to prove both that the

5     offense resulted in bodily injury and that a dangerous weapon

6     was used.  Proof beyond a reasonable doubt of one of these

7     factors is enough to prove this element.

8          But in order to return a guilty verdict, all 12 of

9     you must agree that the same factor has been proved.  That

10    is, all of you must agree that the Government proved, beyond

11    a reasonable doubt, that the offense resulted in bodily

12    injury, or all of you must agree that the Government proved,

13    beyond a reasonable doubt, that the offense involved the use

14    of a dangerous weapon.  If all of you unanimously agree that

15    the Government has proven one or both of these factors beyond

16    a reasonable doubt, then this element has been satisfied.

17         Counts 3 and 4 of the indictment accuse the

18    Defendant of knowingly falsifying a document with the intent

19    to impede, obstruct, or influence the investigation or proper

20    administration of a matter within the jurisdiction of a

21    department or agency of the United States, in violation of

22    Title 18, United States Code, Section 1519.

23         For you to find the Defendant guilty of Counts 3

24    or 4, the Government must prove each and every one of the

25    following elements beyond a reasonable doubt:

First, that the Defendant knowingly falsified a document;

Second, that the Defendant, acting in relation to or in contemplation of the investigation or proper administration of a matter, intended to impede, obstruct, or influence the investigation or proper administration of that matter;

And third, that the matter was within the jurisdiction of an agency of the United States, here, the Federal Bureau of Investigation or FBI.

If you're convinced that the Government has proved all of these elements for a charge, say so by returning a guilty verdict on the charge. If you have a reasonable doubt about any one of these elements for a charge, then you must find the Defendant not guilty of the charge.

I will now provide you with additional instructions regarding some of these elements.

A Defendant falsifies a document by including within that document any untrue statement or by omitting from that document or record any material fact.

A Defendant acts knowingly if his act is done voluntarily and intentionally, not because of mistake or accident.

To prove that the Defendant, acting in relation to or in contemplation of the investigation or proper

administration of a matter, intended to impede, obstruct, or
influence the investigation or proper administration of that
matter, the Government does not need to show that a federal
investigation was underway at the time the Defendant engaged
in obstructive conduct.

There is no requirement that the matter or
investigation have been pending or imminent at the time of
the obstruction, but only that the acts were taken in
relation to or in contemplation of any such matter or
investigation.  There is also no requirement that the
falsification would naturally or probably result in
obstruction of the investigation.

In determining whether the Defendant had the
required intent, you may consider all the circumstances of
the case, including, among other things, any statements made
or omitted, any acts done or omitted by that person, and any
other circumstances you deem relevant and reliable.  You may
also consider the natural and probable results of any acts
that the Defendant knowingly did, and whether it is
reasonable to conclude that he intended those results.

The Government is not required to prove that the
Defendant knew that the FBI's an agency of the United States,
or that he knew that a federal investigation was underway or
would occur in the future.  Nor must the Government prove
that there was any actual delay or withholding of truthful

information from federal authorities.  The issue for you to determine is whether the matter the Defendant allegedly sought to obstruct was, in fact, within the jurisdiction of the FBI.

That concludes the part of my instructions explaining the elements of the charged crimes.  Next, I will explain some additional rules that you must use in considering some of the testimony and evidence.

You have heard the Defendant testify.  Earlier, I talked to you about the credibility or the believability of the witnesses.  And I suggested some things for you to consider in evaluating each witness's testimony.  You should consider those same things in evaluating the Defendant's testimony.

You have heard the testimony of witnesses who testified to both facts and opinions.  Each of these types of testimony should be given the proper weight.

As to the testimony on facts, consider the factors discussed earlier in these instructions for weighing the credibility of witnesses.

As to the testimony on opinions, you do not have to accept their opinions.  In deciding how much weight to give the opinion of each witness, you should consider the witness's qualifications and how he or she reached his or her conclusions.  You should also consider the other factors

discussed in these instructions for weighing the credibility of witnesses.  Remember that you alone decide how much of a witness's testimony to believe and how much weight it deserves.

You have heard the testimony of Gary Ola.  You have also heard that the Government has promised Mr. Ola that he may receive a recommendation to the Court for a reduced sentence in exchange for his cooperation.

It is permissible for the Government to make such a promise, but you should consider Mr. Ola's testimony with more caution than the testimony of other witnesses.  Consider whether his testimony may have been influenced by the Government's promise.

Do not convict the Defendant based on the unsupported testimony of such a witness, standing alone, unless you believe his testimony beyond a reasonable doubt.

Exhibit 3 was received into evidence containing certain information that was distributed to Cheatham County Taser trainees.  That exhibit contains discussion of legal issues regarding excessive force.  It is important for you to remember that you are to consider Exhibit 3 only for the limited purpose of evaluating what information was presented during Taser training and the Defendant's state of mind on November 5, 2016.  You must not consider that exhibit for any other purpose.  Use only these instructions as given to you

by the Court to apply the facts -- to apply to the facts that
you find to render a decision in this case.

You've heard the testimony of various witnesses,
and you have also heard that before this trial, some
witnesses made statements that may be different from their
testimony here in court.  These earlier statements were
brought to your attention only to help you decide how
believable their testimony was.  You cannot use them as proof
of anything else.  You can only use them as one way of
evaluating the witnesses' testimony here in court.

You have heard the testimony of Gary Ola.  You
have also heard that before this trial, he was convicted of a
crime.  This earlier conviction was brought to your attention
only as one way of helping you decide how believable his
testimony was.  Do not use it for any other purpose.  It is
not evidence of anything else.

You have heard the testimony about the Defendant's
good character.  You should consider this testimony, along
with all the other evidence, in deciding if the Government
has proved beyond a reasonable doubt that he committed the
crime charged.

During the trial, you have seen counsel use
certain summaries, charts, calculations, or similar material
which were offered to assist in the presentation and
understanding of the evidence.  If not admitted into

1   evidence, this material is not itself evidence and must not

2   be considered as proof of any facts.

3          If you decide that the Government has proved the

4   Defendant guilty, then it will be my job to determine what

5   the appropriate punishment should be.

6          Deciding what the punishment should be is my job,

7   not yours.  It would violate your oaths as jurors to even

8   consider the possible punishment in deciding your verdict.

9   Your job is to look at the evidence and decide if the

10  Government has proved the Defendant guilty beyond a

11  reasonable doubt.

12         That concludes the part of my instructions

13  explaining the rules for considering some of the testimony

14  and evidence.  Now let me finish up by explaining some things

15  about your deliberations in the jury room and your possible

16  verdicts.

17         In reaching your verdict, you are to consider only

18  the evidence in this case.  However, you are not required to

19  set aside your common sense, and you have the right to weigh

20  the evidence in the light of your own observations and

21  experiences.  Do not decide the case based on implicit

22  biases, which are hidden thoughts that can impact what we see

23  and hear, how we remember what we see and hear, and how we

24  make important decisions.

25         As we discussed in jury selection, everyone,

including me, has feelings, assumptions, perceptions, fears, and stereotypes, that is, implicit biases, and we may not be aware of them.

Because you are making very important decisions in this case, I strongly encourage you to evaluate the evidence carefully and to resist jumping to conclusions based on personal likes or dislikes, generalizations, gut feelings, prejudices, sympathies, stereotypes, or biases. The law demands that you return a just verdict based solely on the evidence, your individual evaluation of that evidence, your reason and common sense, and these instructions. Our system of justice is counting on you to render a fair decision based on the evidence, not biases.

The verdict must represent the considered judgment of each juror. In order to return a verdict, it is necessary that each juror agree. Your verdict must be unanimous as to each count. To find the Defendant guilty of a particular count, every one of you must agree that the Government has overcome the presumption of innocence with evidence that proves his guilt beyond a reasonable doubt. To find him not guilty of a particular count, every one of you must agree that the Government has failed to convince you beyond a reasonable doubt. Either way, guilty or not guilty, your verdict must be unanimous as to each count.

Now that all the evidence is in and the arguments

are completed, you're free to talk about the case in the jury room.  In fact, it is your duty to talk with each other about the evidence and to make every reasonable effort you can to reach unanimous agreement.  Talk with each other, listen carefully and respectfully to each other's views, and keep an open mind as you listen to what your fellow jurors have to say.

Try your best to work out your differences.  Do not hesitate to change your mind if you're convinced that other jurors are right and that your original position was wrong.  But do not ever change your mind just because other jurors see things differently, or just to get the case over with.  In the end, your vote must be exactly that: your own vote.  It is important for you to reach unanimous agreement, but only if you can do so honestly and in good conscience.

No one will be allowed to hear your discussions in the jury room, and no record will be made of what you say. So you should all feel free to speak your minds.  Listen carefully to what the other jurors have to say and then decide for yourself if the Government has proved the Defendant guilty beyond a reasonable doubt.

The attitude and conduct of jurors at the beginning of their deliberations are very important.  It is rarely productive or good for a juror, upon entering the jury room, to make an emphatic expression of his or her opinion on

the case or to announce a determination to stand for a
certain verdict.  When a juror does this, his or her sense of
pride may be aroused, and he or she may hesitate to recede
from an announced position if shown that it is wrong.
Remember, you are not partisans or advocates in this matter,
but judges.

Some of you may have taken notes during the trial.
Once you retire to the jury room, you may refer to your notes
but only to refresh your own memory.  Your notes are not
evidence.  You may not read from your notes to your fellow
jurors or otherwise inform them of what you have written.
The notes may contain errors or they may be misunderstood or
taken out of context.  The notes may only pertain to part of
the testimony and may not be an exact account of what was
said by a witness.

You are free to discuss the testimony of the
witnesses with your fellow jurors, but each juror must rely
on his or her own memory as to what a witness did or did not
say.

If it becomes necessary during your deliberations
to communicate with the Court, you may send me a note by the
court security officer, signed by your foreperson or by one
or more members of the jury.  No member of the jury should
even attempt to communicate with the Court by any means other
than a signed writing, and the Court will never communicate

1  with any member of the jury on any subject touching the

2  merits of the case otherwise than in writing or orally here

3  in open court.

4          Bear in mind also that you are never to reveal to

5  any person, not even to the Court, how the jury stands,

6  numerically or otherwise, on the questions before you until

7  after you have reached a unanimous verdict.

8          Remember that you must make your decision based

9  only on the evidence that you saw and heard here in court.

10  During your deliberations, you must not communicate with or

11  provide any information to anyone by any means about this

12  case.  You may not use any electronic device or media, such

13  as telephone, cell phone, smartphone, iPhone, BlackBerry, or

14  computer, the Internet, any Internet service, or any text or

15  instant messaging service, or any Internet chat room, blog,

16  or website such as Facebook, MySpace, LinkedIn, YouTube, or

17  Twitter, or to communicate to anyone any information about

18  this case or to conduct any research about this case until I

19  accept your verdict.

20          Upon retiring to the jury room, you may select one

21  of your number to act as your foreperson.  The foreperson

22  will preside over your deliberations and will be your

23  spokesperson here in court.

24          A verdict form has been prepared for your

25  convenience.  It reads as follows.

1          "We the jury, unanimously find the following.

2    Count 1.

3          1:  With respect to Count 1 of the indictment,

4    deprivation of rights under color of law, we the jury find

5    the Defendant, Mark Bryant, guilty or not guilty.

6          2:  With respect to Count 2 of the indictment,

7    deprivation of rights under color of law, we the jury find

8    the Defendant, Mark Bryant, guilty or not guilty.

9          3:  With respect to Count 3 of the indictment,

10   knowingly falsifying a document with the intent to impede,

11   obstruct, or influence the investigation and proper

12   administration of a matter within the jurisdiction of a

13   federal agency, we the jury find the Defendant, Mark Bryant,

14   guilty or not guilty.

15         4:  With respect to Count 4 of the indictment,

16   knowingly falsifying a document with the intent to impede,

17   obstruct, or influence the investigation and proper

18   administration of a matter within the jurisdiction of a

19   federal agency, we the jury find the Defendant, Mark Bryant,

20   guilty, not guilty.

21         Sign and date the verdict form below and notify

22   the court officer.  It should be signed by your foreperson

23   and dated.

24         You will take this form to the jury room, and when

25   you have reached unanimous agreement as to your verdict, you

1 will have the foreperson fill in the date and sign the form

2 which sets forth the verdict upon which you unanimously

3 agree.  You will then return with your verdict to the

4 courtroom.

5       Remember, the Defendant is only on trial for the

6 particular crimes charged in the indictment.  Your job is

7 limited to deciding whether the Government has proved the

8 crimes charged.

9       Also remember that whether anyone else should be

10 prosecuted and convicted for these crimes is not a proper

11 matter for you to consider.  The possible guilt of others is

12 no defense to a criminal charge.  Your job is to decide if

13 the Government has proved this defendant guilty.  Do not let

14 the possible guilt of others influence your decision in any

15 way.

16       Let me finish up by repeating something I said to

17 you earlier.  Nothing that I have said or done during the

18 trial was meant to influence your decision in any way.  You

19 decide for yourselves if the Government has proved the

20 Defendant guilty beyond a reasonable doubt.

21       So, ladies and gentlemen, you may now retire to

22 the jury room.  You do need to give us a minute to have the

23 exhibits delivered to you.  You recall that some of the

24 exhibits are on a CD, and you will find in the jury room a

25 computer has been set up.  So if you-all choose to view the

1  CD, you can do so on that computer.

2  Also, previously we determined that two of you

3  will serve as alternates.  I'm going to ask you-all to go to

4  the jury assembly room, have no discussion about the case,

5  and let no one discuss it with you or any investigation in

6  case we need to use you.  And the two alternates are Fahad

7  Chaudhary and Sharon Miller.

8  So the remainder should now proceed into the jury

9  room.

10  (Jury retires to deliberate.)

11  THE COURT:  All right.  Be seated.

12  Does the Government have any objection to the

13  charge?

14  MS. MYERS:  No, Your Honor.

15  THE COURT:  Does the Defendant have any objection?

16  MR. STRIANSE:  No, Your Honor.

17  THE COURT:  Okay.  Have you-all delivered your

18  cell phone numbers to the courtroom deputy?  Yes?

19  IN UNISON:  Yes, Your Honor.

20  THE COURT:  Okay.  Thank you.

21  (Recess.)

22  THE COURT:  All right.  Ms. Myers and Mr. Songer

23  and Mr. Strianse, we're on the record now in Case No. 18-144,

24  "United States of America vs. Mark Bryant."

25  Where is Mr. Bryant?

1          MR. STRIANSE:  He's right here, Your Honor.

2          THE COURT:  All right.  We've got a message from

3   the jury, okay, and it says:  Third and fourth counts.  How

4   do we determine if his short details represent, quote,

5   impending investigation, end quote, question mark.

6          Next, it says:  Can lack of details represent

7   intent, question mark.

8          And it appears to be signed by Richard Stora who

9   would be Juror No. 5.  I say it appears to be because I only

10  have initials here, R.S.C., and Mr. Stora is the only juror

11  whose first name starts with an R, so I think it must be him.

12         So "How do we determine if his short details

13  represent impending investigation?"  I think what they're

14  trying to say -- well, what does the Government think they're

15  trying to say?

16         MR. STRIANSE:  Judge, I think they're saying

17  "impeding" probably.  Maybe bad penmanship, but it's probably

18  impeding.

19         THE COURT:  It could be impeding.  Impeding.

20  Well, nevertheless, what do you -- okay.  "How do we

21  determine if his short details represent impeding,"

22  I-M-P-E-D-I-N-G?

23         MR. STRIANSE:  I would just tell them to rely on

24  the evidence and reread the instructions.

25         MR. SONGER:  I agree with that, Your Honor.  In

1  addition, I would suggest that it might be worth pointing

2  them to the applicable instructions on this element.

3            THE COURT:  Which one would that be?

4            MS. MYERS:  Page 44 is Counts 3 and 4, second

5  element, intent to impede, obstruct, or influence.

6            THE COURT:  Go ahead.

7            MS. MYERS:  So the second paragraph, Your Honor,

8  in that says:  In determining whether the Defendant had the

9  required intent, you may consider all the circumstances of

10 the case including, among other things, any statement made or

11 omitted, any acts done or omitted by that person, and any

12 other circumstances you deem relevant and reliable.

13           THE COURT:  Okay.

14           MS. MYERS:  So I think pointing them to that

15 instruction might be helpful.

16           THE COURT:  Mr. Strianse?

17           MR. STRIANSE:  Your Honor, I have no objection to

18 pointing them to that instruction.

19           THE COURT:  Okay.  I want to be careful not to --

20 of course, the Court is not to single out any part of the

21 instructions for more emphasis.  They need to look at it all

22 together, so . . .

23           MS. MYERS:  Well, Your Honor, may I propose that

24 they could look at Counts 3 and 4 elements which are pages 43

25 through 46?

1            THE COURT:  Okay.  When I -- I think here's what I

2   want to do, which I think is close to what everyone is

3   saying.  I think the response back to them is:  You need to

4   rely upon your own recollection of the evidence presented at

5   trial.  The Court would, for your -- as you remember at

6   trial, period.  The jury instructions on page 41 began --

7   address -- 41 and thereafter address Counts 3 and 4.

8            Is that acceptable to the Government?

9            MR. SONGER:  I think that's fine with the

10  Government, Your Honor.

11            MR. STRIANSE:  That's fine, Your Honor.

12            THE COURT:  All right.

13            All right.  If you-all could come up and inspect

14  the note and sign it, please.

15            Okay.  And have everybody sign it.

16            All right.  Thank you.

17            (Recess.)

18            THE COURT:  The jury has sent a note saying the

19  jury would like to conclude for the day and reconvene

20  tomorrow at 9:00 a.m., signed by Richard Stora at 5:30.

21  Bring in the jury.

22            (Jury present.)

23            THE COURT:  Ladies and gentlemen of the jury, the

24  Court has received your message.  So we're going to conclude

25  for the day and have you come back tomorrow at 9:00.  Remind

 1   you once again, because this is very important:  You can't

 2   have any discussions about any part of the case with friends,

 3   family, or others.  That includes -- that especially includes

 4   your deliberations to this point in time cannot be discussed

 5   in any fashion whatsoever, with no exceptions at all.  You

 6   can't talk to anyone about the case.  You can't let anyone

 7   talk to you.  If anyone should try to talk to you, you need

 8   to let me know first thing in the morning.  And certainly no

 9   research by any means whatsoever.

10           So again, until about 8:55 tomorrow, put the case

11   out of your mind.

12           Remember, we can't start -- we cannot resume

13   deliberations until everyone is here.  We should -- I think

14   you should meet in the jury assembly room, and then you'll be

15   escorted over to your room, and you'll begin your

16   deliberations.

17           So have a safe evening.  Take care.

18           (Court adjourned.)

19

20

21

22

23

24

25

1    REPORTER'S CERTIFICATE

2

3            I, Deborah K. Watson, Official Court Reporter for

4    the United States District Court for the Middle District of

5    Tennessee, with offices at Nashville, do hereby certify:

6            That I reported on the Stenograph machine the

7    proceedings held in open court on February 7, 2019, in the

8    matter of UNITED STATES OF AMERICA v. MARK BRYANT, Case No.

9    3:18-cr-00144; that said proceedings in connection with the

10   hearing were reduced to typewritten form by me; and that the

11   foregoing transcript (pages 1 through 78) is a true and

12   accurate record of said proceedings.

13            This the 25th day of March, 2019.

14

15                        /s/ Deborah K. Watson
                         DEBORAH K. WATSON, RPR, CRR, LCR
16                        Official Court Reporter

17

18

19

20

21

22

23

24

25