```
 1                IN THE UNITED STATES DISTRICT COURT
              FOR THE MIDDLE DISTRICT OF TENNESSEE
 2                          AT NASHVILLE

 3       UNITED STATES OF AMERICA,      )
                                        )
 4                 Plaintiff,           )
                                        )
 5       v.                             )    Case No.
                                        )    3:18-cr-00144
 6       MARK BRYANT,                   )
                                        )
 7                 Defendant.           )

 8

 9    - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

10    BEFORE THE HONORABLE WAVERLY D. CRENSHAW, JR., DISTRICT JUDGE

11                            TRANSCRIPT

12                               OF

13                          PROCEEDINGS

14                        January 7, 2020

15                        Trial Volume 1B

16    - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

17

18

19               APPEARANCES ON THE FOLLOWING PAGE

20

21

22
      PREPARED BY:
23                  LISE S. MATTHEWS, RMR, CRR, CRC
                       Official Court Reporter
24                    801 Broadway, Room A839
                        Nashville, TN 37203
25                lise_matthews@tnmd.uscourts.gov
```

APPEARANCES:

        For the Plaintiff:  Peter J. Strianse
                             Tune, Entrekin & White, P.C.
                             315 Deaderick Street
                             Suite 1700
                             Nashville, Tennessee 37238

        For the Defendant:  Sara E. Myers
                             U.S. Attorney's Office
                             (Nashville Office)
                             Middle District of Tennessee
                             110 Ninth Avenue, S
                             Suite A961
                             Nashville, Tennessee 37203-3870

                             Michael J. Songer
                             U.S. Department of Justice
                             Criminal Division
                             950 Pennsylvania Avenue, N.W.
                             Washington, DC 20530

1                I N D E X

2             Tuesday, January 7, 2020

3

4           INDEX OF PROCEEDINGS

5                                   PAGE

6 PLAINTIFF'S OPENING STATEMENT              18

7 DEFENDANTS' OPENING STATEMENT              24

8

9

10           INDEX OF WITNESSES

11

WITNESSES:                              PAGE

12

13 JOSH MARRIOTT
     DIRECT EXAMINATION BY MR. SONGER        37
14      CROSS-EXAMINATION BY MR. STRIANSE       72
     REDIRECT EXAMINATION BY MR. SONGER       90
15      RECROSS-EXAMINATION BY MR. STRIANSE     98

16

17

18

19

20

21

22

23

24

25

1                            EXHIBITS

| PLAINTIFF'S EXHIBIT | | MARKED FOR I.D. | RECEIVED IN EVD. | WITH-DRAWN |
|---|---|---|---|---|
| 4 | Josh Marriott's Taser Training Academy Certificate | 43 | 43 | |
| 11 | Combined Surveillance and Taser Video from 11/5/16 (8:00 p.m.) | 58 | 58 | |
| 25 | Cheatham County Sheriff's Office report signed by Mark Bryant on 11/5/16 (1855) | 68 | 68 | |
| 37 | Restraint Chair Log – 11/5/16 | 54 | 54 | |

| DEFENDANT'S EXHIBIT | | MARKED FOR I.D. | RECEIVED IN EVD. | WITH-DRAWN |
|---|---|---|---|---|
| 1 | Cheatham County Sherriff's Office – 11/5/16 (1855) | 82 | 82 | |
| 2 | Use of Force Report signed by Josh Marriott on 11/5/16 at 2156 (1855) | 87 | 87 | |

The above-styled cause came on to be heard on January 7, 2020, before the Honorable Waverly D. Crenshaw, Jr., District Judge, when the following proceedings were had, to-wit:

(Voir Dire filed as Trial Volume IA)

THE COURT:  All right.  Be seated.  So we're going to take our lunch break.  We're going to break from 1:10 until 2:00.  Your options are few.  You can go to the first floor, and the cafeteria is still open.  Is it still open?  It's open until 1:30.  It's not good food, but it will -- you will not starve.

If you want something a little bit better, you can go across to the Frist and they've got sandwiches and salads there.  And you'll be on your own at lunch.

But do come back to the jury assembly room.  The court officers here will meet you there, escort you over, and then we'll start the case.

Now, when I break, I need you all to be careful -- and I'll give you more instructions -- but in the meantime, do not let anyone talk to you about this case.  If anyone tries to talk to you about this case, you should tell them to stop, and go away from them.  And then you need to let me know who tried to talk to you.

The lawyers and the parties you may see in the hallway here, but they won't acknowledge you and they won't

1  say anything to you.  And that's because I've told them not
2  to say anything to you and not to acknowledge you.  So don't
3  think they're being rude or ill mannered, but they're
4  following my orders because it would be inappropriate for
5  them to have any contact with you, communication.  In fact,
6  if they see you, they will probably walk the other way.  It's
7  not personal.  So don't hold that against any of the lawyers.
8          Second, I know that we're all connected to our
9  phones.  And I suspect for some of you, the first thing
10 you're going to do is go to the jury room and ask the jury
11 administrator for your phone.  And that's okay.  But you
12 cannot get on your phone and do any research about this case.
13 That would be improper.  You must make your decision solely
14 what you hear and you see in the four walls of this
15 courthouse -- courtroom and nothing else.
16          So please -- and I'll give you more direction --
17 don't do any kind of internet searches of any kind at all.
18 And if you inadvertently -- because sometimes you can be on
19 your phone -- at least I can -- and things start popping up.
20 If you inadvertently -- something pops up, discard it
21 immediately and stop looking at it.  Don't read it.
22          Secondly, you may run across some hard media, you
23 know, print media.  And it may have something to do with this
24 case.  And you may inadvertently look at it.  So, once you
25 recognize that, look away.  Don't read it.  Anything about

1   the case.

2            Again, it's important to the process, to the

3   fairness of the trial, that you make your decision solely

4   based on what you hear here in the courtroom.  So no one can

5   talk to you and you can't read or do any research.

6            And, finally, you can't talk about the case.  You

7   can't talk about the case even with each other.  The only

8   time you'll be allowed to talk about this case with each

9   other is after I charge you at the end of the case and you

10  retire to your room and start your deliberations in secret.

11  That's when you can talk about the case.

12           So you can't let anyone talk to you about the

13  case; you can't talk to anyone else about the case; and you

14  can't do any research about the case or read anything about

15  the case during the next -- well, now, 45 minutes, while

16  we're at lunch.

17           So when we come back, I'm going to give you more

18  instructions about how the trial -- things you can do and not

19  do during the trial, and some information.  Then you're going

20  to hear what we call opening statements from the lawyers.

21  The government will start and the defendant may or may not.

22  He is not required to give an opening statement.  And I'll

23  explain that to you.

24           The opening statements are not evidence.  The

25  opening statement is just what the parties believe the facts

 1  are going to be.  It's a narrative, preview of what this
 2  trial is about and what the parties think is important.  And
 3  they just want to emphasize some things for you to look for
 4  as it pertains to the evidence.
 5          They're not going to talk about the law.  The only
 6  person here who is going to talk about the law is me, and
 7  that will be at the end of the trial when I give you the law,
 8  which you've just taken an oath to follow whether you like
 9  the law that I give you or not.
10          So those are your preliminary -- very preliminary
11  instructions.  That should get you through the lunch break.
12  And I'm going to excuse you all now to get on the elevator
13  and get you some lunch.
14          Thank you.  All right.  And then we'll resume back
15  at 2:00.
16          (Whereupon a lunch break was observed.)
17          THE COURT:  All right.  Be seated.
18          MS. MYERS:  Excuse me, Your Honor.
19          THE COURT:  Approach the bench.
20          (Bench conference outside the hearing of the
21          jury.)
22          MS. MYERS:  We had discussed having an instruction
23  that Jordan Norris is deceased for reasons unrelated to this
24  case.
25          THE COURT:  I haven't forgotten.

1          MS. MYERS:  Thank you.  And also that the Taser

2     that I'm using is not armed so that people don't get scared.

3          THE COURT:  Well, I think they'll know that I'm

4     not going to kill them.

5          MS. MYERS:  Right.  I just didn't want to make

6     anybody jump.

7          THE COURT:  I think saying that just creates more

8     issues.

9          MS. MYERS:  And then the other thing would be just

10    to make sure that in the openings we don't reference anything

11    from the motions in limine that have been held in abeyance.

12          THE COURT:  I think she's talking to you.

13          MR. STRIANSE:  That's on the civil lawsuit?

14          Is that what you're referring to?

15          MS. MYERS:  The civil lawsuit, the defendant's

16    character evidence, the victim's bad character evidence,

17    like, all of that that's been held in abeyance pursuant to

18    motions in limine, just can't be discussed in opening.

19          MR. STRIANSE:  We're talking about him being under

20    the influence.  You're not talking about that?

21          MS. MYERS:  No.

22          THE COURT:  Okay.  Okay.  These are all things you

23    all should have talked about at lunch.  Let's get started.

24          MS. MYERS:  Okay.  Thank you, Your Honor.

25          (Jury present.)

1          THE COURT:  All right.  Ladies and gentlemen, now

2     that you've been charged, and as I promised before the lunch

3     break, I'm going to give you a few more instructions about

4     the case and how we'll conduct the proceedings here.

5          Now that you've been sworn, I'll give you some

6     preliminary instructions to guide your performance in the --

7     in the trial.  It will be your duty to find from the evidence

8     what the facts are.  You and you alone are the judges of the

9     facts.  You will then have to apply those facts to the law

10    that I'll give you, and you must follow that law whether you

11    agree with it or not.

12          Nothing I may say or do during the course of the

13    trial is intended to indicate, nor should be it taken by you

14    as indicating, what your verdict should be.

15          The evidence from which you will find the facts

16    will consist of the testimony of witnesses, documents, and

17    other things received into the record as exhibits and any

18    facts the lawyers agree or stipulate to or that I may

19    instruct you to find.

20          Certain things are not evidence and must not be

21    considered by you.  Among those thing are statements,

22    arguments, and questions by the lawyers.  These are not

23    evidence.

24          Objections to questions are not evidence.  Lawyers

25    have an obligation to their client to make an objection when

they believe evidence being offered is improper under the rules of evidence. You should not be influenced by the objection or by my ruling on it. If an objection is sustained, ignore the question. If it is overruled, treat the answer like any other answer. If you are instructed that some item of evidence is received for a limited purpose only, you must follow that instruction.

Testimony that I've excluded or told you to disregard is not evidence and must not be considered by you.

Anything you may have seen or heard outside the courtroom is not evidence and must be disregarded. You are to decide the case based solely on the evidence presented here in this courtroom.

There are two kinds of evidence, direct and circumstantial. Direct evidence is direct proof of the fact, such as testimony of an eyewitness. Circumstantial evidence is proof of facts from which you may infer or conclude that other facts exist. I'll give you more instructions on these as well as other matters at the end of the case. But keep in mind you may consider both kinds of evidence.

It will be up to you to decide which witnesses to believe, which witnesses not to believe, or how much of any witness's testimony to accept or reject. I will give you some guidelines for determining the credibility of the witnesses at the end of the case.

1          As you know, this is a criminal case.  There are

2   three basic rules about a criminal case which you must keep

3   in mind.

4          First, the defendant is presumed innocent until

5   proven guilty.  The indictment against the defendant brought

6   by the government is only an accusation, nothing more.  It is

7   not proof of guilt or anything else.  The defendant therefore

8   starts out with a clean slate.

9          Second, the burden of proof is on the government.

10   The defendant has no burden to prove his innocence or to

11   present any evidence or to testify.  Since the defendant has

12   the right to remain silent, the law prohibits you in arriving

13   at your verdict from considering that the defendant may not

14   have testified.

15          Third, the government must prove the defendant's

16   guilt beyond a reasonable doubt.  I will give you further

17   instructions on this point later, but bear in mind that it is

18   in this respect a criminal case is different from a civil

19   case.

20          Now, I have a few words about your conduct as

21   jurors.  These instructions are necessary for a fair trial

22   and are very important.

23          First, during the trial, you are to avoid contact

24   with any witnesses, the parties, any lawyer, or anyone else

25   who may have an interest in the outcome of this case.  Do not

1  talk or have any other communication with them.  Because you
2  may not know whether a particular person in the courthouse
3  falls into one of these categories, during breaks you should
4  not speak to anyone in the courthouse you do not know.  If
5  anyone tries to talk to you about the case, bring it to my
6  attention promptly.
7              Second, during the trial, you are not to discuss
8  the case with anyone or permit anyone to discuss it with you.
9  This prohibition includes your family, your friends, your
10 coworkers.  It also includes any form of communication
11 whatsoever, whether over the internet, such as email, instant
12 messaging, tweeting, Facebook, or other social media posts,
13 websites and blogs, the use of cell phones for text messages
14 or audio or video recording, or the use of any other
15 recording or transmitting device.
16             People who aren't in the courtroom and haven't
17 heard the evidence may yet and still express opinions about
18 the case.  And your verdict is not to be based on what others
19 say about the case, only on what the evidence is.  So don't
20 post or email or tweet or text anything about this case, and
21 don't read anything anyone else might post, email, tweet, or
22 text about the case.
23             And, of course, don't talk about the case and
24 don't listen to anyone else talk about the case.  The
25 prohibition even includes your fellow jurors.  You should

refrain from case-related discussions with one another until all the evidence is received, final instructions are given, and you retire to the jury room to deliberate on your verdict.  One of the main reasons for this is that discussing the case can lead to forming an opinion, and that is not a good idea before you have heard all of the evidence.  Even after deliberations begin, you may talk about the case among your fellow jurors only when all are present.

Third, during the trial, you are not to gather information, investigate, or do anything else to learn about the case outside the properly admitted evidence.  For example, do not attempt to investigate the case on the internet or travel to a particular location that may be of interest in the trial.  You should also avoid exposure to media coverage of the charges or trial, if there is any, until after you render your verdict.

So don't read or listen to any news or internet reports about the case, if there are any.  Just like tweets and internet posts, things on the internet and in the media are often inaccurate or incomplete, and it is certainly not given under oath with all the parties present, nor is it subject to cross-examination and close scrutiny like the evidence you will hear in the courtroom.

During the trial you will receive all evidence which may be properly considered in reaching your verdict.  I

know you may be used to looking things up online, but doing any type of research is unfair to the parties, can lead to bad decisions, and can cause major problems and require us to start all over.

Finally, do not form any opinion until all the evidence is in. The last witness is often just as important as the first witness. So keep an open mind until I instruct you to start deliberations at the end of the case. These rules are necessary for a fair trial, and violation of these instructions does subject you to punishment as allowed by law for contempt.

I will repeat or summarize these instructions for you regularly throughout the trial, not because I think you aren't paying attention, but because in my experience jurors find some of these instructions difficult to follow. I know of no other situation in our culture where we ask strangers to sit together, watching and listening to something, then go into a little room together and not talk about the one thing they have in common, what they just watched together.

We are almost all wired into the digital world and used to looking stuff up online and talking or posting about our lives. So please remember the reasons I gave you about why there are rules against this in the context of this trial, and let me know if there are any problems with following the instructions, either on your own part or by

1    your fellow jurors.

2            If at any time during the trial you have a
3    personal need that must be taken care of, raise your hand or
4    otherwise notify the court security officer, who will always
5    be seated there to your right.  Your comfort is important to
6    me and we want to -- and I want to accommodate you in any way
7    I can.  So don't hesitate to let me know if there's something
8    that deals with your personal comfort.

9            So the trial is now about to begin.  First the
10   government will make an opening statement, which is simply an
11   outline to help you understand the evidence as it comes in.
12   Next, the defendant's attorney may, but does not have to,
13   make an opening statement.  Opening statements are neither
14   evidence nor arguments.

15           The government will then examine its witnesses and
16   counsel for the defendant will be allowed to cross-examine
17   them.  Following the government's case, the defendant may, if
18   he wishes, present witnesses whom the government may
19   cross-examine.  As I advised you before, the defendant has no
20   burden of proof and has no obligation to present evidence,
21   and might, or might not, choose not to do so.

22           After all the evidence is in, the attorneys will
23   present their closing arguments to summarize and interpret
24   the evidence for you.  I will instruct you on the law, and
25   after that, you will retire to deliberate on your own.

1          At the end of the trial, you must make your
2    decision based on what you recall of the evidence here in the
3    courtroom.  So it is very important that you pay close
4    attention to the testimony as it's given.  You will not have
5    a written transcript to consult once you start your
6    deliberations.
7          If you wish, you may take notes to help you
8    remember what witnesses said.  If you do take notes, please
9    keep them to yourself until you and your fellow jurors go
10   into the jury room to decide the case.  And do not let
11   note-taking distract you that you do not hear other answers
12   by the witness.
13         When you came in, you should have had on your
14   chair a folder, a brown folder.  Inside of that should have
15   been a pen and a notepad.  That's yours to use throughout the
16   trial.  The parties may or may not pass to you some documents
17   that have been admitted into exhibits -- as exhibits and you
18   can keep your copy of those documents in that -- that
19   Redweld.  And when you leave at night, you can put your pen
20   and notepad and any documents back into your Redweld, then
21   place them on your seat, and they'll be very safe in here
22   until we resume the next morning and you can use it again.
23         So, at this point, the lawyers are going to give
24   their opening statement.  And we'll first hear from the
25   government, and then we'll hear from Mr. Bryant's attorney.

1          Now, the parties have asked me to share with you

2   one stipulation -- and there will be others.  But one

3   stipulation that will be helpful to the parties as they give

4   their opening statement, and that is, as you've heard, the

5   name of Jordan Norris -- you'll hear his name throughout the

6   trial.  Mr. Norris is deceased.  And the parties want you to

7   know that his passing away has no relation or connection

8   whatsoever to this case.

9          So, with that, I'll turn it over to Ms. Myers.

10                PLAINTIFF'S OPENING STATEMENT

11          MS. MYERS:  Thank you, Your Honor.

12          The defendant firing a Taser, a teenager's burned

13   flesh, and a coverup.

14          For two years Caitlin Marriott could not bring

15   herself to carry a Taser when she went to work as a

16   corrections officer at the Cheatham County Jail.  She

17   couldn't even be around her fellow officers when they tested

18   the Tasers because just the sound of electricity humming sent

19   her back to the night of November 5th, 2016, when she saw the

20   defendant, Mark Bryant, use a Taser to assault a teenager

21   named Jordan Norris while he was strapped into a chair.

22          And that night she saw the defendant use a Taser

23   to shoot painful electricity into Jordan Norris for a total

24   of 50 seconds, ten times the length of a standard Taser

25   cycle.  And all the while that Jordan was strapped to that

chair and held down by officers and being tased by the
defendant, the defendant taunted him. "You don't like it, do
you? I'll keep doing it until I run out of batteries." And
at the end of that 50-second tasing, you will hear Officer
Marriott describe that Jordan's flesh looked like raw
hamburger meat pulled through a meat grinder.

You will see two separate videos of the
defendant's assaults on Jordan. And then you will hear what
the defendant did to try and cover it all up.

Law enforcement officers have a very difficult
job. They encounter dangerous and unstable people every
single day. But their job is clear: To serve and protect.
They're also trained that the United States Constitution
protects everyone in our country, even people who are inmates
in jail. You will hear from Cheatham County correction
officers who will tell you that they encounter dangerous and
unstable people every single day. These officers will tell
you that the defendant's assaults on Jordan Norris were
wrong.

On the night of November 5th, 2016, Jordan Norris
was 18 years old. He was an inmate in the Cheatham County
Jail, and he had a drug addiction problem. The defendant was
in charge of the jail on that night, and around 7:00 p.m.
that night, Jordan became upset in his cell. He began
banging his head against the wall. And Officer Caitlin

1   Marriott called for other officers to come and assist her

2   with Jordan.

3           Four officers arrived, including the defendant.

4   And when the officers came, they got Jordan out of his cell

5   to move him.  And, as they were moving him, one of the

6   officers used a Taser to get Jordan out of the cell and into

7   the restraint chair.

8           The restraint chair has straps across the

9   shoulders, across the arms, across the lap, and across the

10  legs.  And once Jordan was in the chair, he calmed down.  But

11  about an hour later, Jordan became agitated again.  And he

12  struggled in the chair.  He managed to loosen one of his

13  hands from the straps.

14          Three of the officers came back.  One of the

15  officers held down Jordan's head.  Another officer held down

16  Jordan's loose hand, and the defendant ordered Officer

17  Caitlin Marriott to go and get the Taser.  The defendant used

18  the Taser as he kneeled in front of Jordan Norris.  And while

19  Jordan Norris was held down by officers and strapped into the

20  restraint chair, the defendant tased Jordan Norris for a

21  total of 50 seconds, burning his flesh, shooting painful

22  electricity into his body, and punishing him.  He was

23  frustrated.  And all the while, as he was doing that, he

24  said, "I'll keep doing it until I run out of batteries.  You

25  don't like it, do you?"

1          Later that night, a few hours later, Jordan was

2    being prepared to go to the hospital.  And the defendant

3    stayed late, past his 10:00 shift.  At that time, when

4    officers were preparing Jordan to be transported, Jordan

5    began struggling against the officers.  He became agitated

6    again.  And the defendant tased him several more times.  But

7    finally, when Jordan was calm, compliant, sitting in the

8    restraint chair, handcuffed, shackled and wearing a belly

9    chain, the defendant shot electricity into Jordan Norris's

10   body for an additional 11 seconds for no reason.

11          These officers will tell you that the defendant's

12   assaults on Jordan Norris were wrong.  And the defendant knew

13   that they were wrong, too.  Later that night he told one of

14   his fellow officers that he thought he was going to get in

15   trouble for what he had done to Jordan.  So he decided to

16   cover it up.  After the 50-second tase, at 8:00, he told the

17   other officers who were there not to write a report; that he

18   would take care of it.  And he did take care of it.  He wrote

19   a false report, a false account of what had happened,

20   completely leaving out the fact that he tased Jordan four

21   times for a total of 50 seconds.

22          And after he wrote that false report, he wrote

23   another false report about the 10:30 p.m. tasing of Jordan.

24   In that report he left out the crucial information that he

25   had tased Jordan for 11-seconds while he was compliant,

1  handcuffed, and in a belly chain.  This is while he was
2  waiting to go to the hospital.

3          These two reports were so misleading that his own
4  boss, Lt. Hannah, signed off on these reports when he read
5  them.  Because he didn't see any information in the reports
6  that indicated that the defendant had done anything wrong.
7  It wasn't until several months later, when these incidents
8  became public, that the administration went back, pulled all
9  the video, pulled all the audio, and were able to see the
10 defendant's assaults on Jordan and that there was no
11 justification for those assaults.  These officers will tell
12 you that the defendant's assaults on Jordan Norris were
13 wrong.

14          But that wasn't the end of the defendant's
15 coverup.  Several months later, when the defendant was
16 interviewed by the FBI, he told agents that he had never
17 tased Jordan Norris when he was handcuffed and in a belly
18 chain.  He covered up what he had done because he knew that
19 there was no justification, no reason for what he had done,
20 based on his own training and experience.

21          And the defendant had been Taser trained and
22 certified.  And he learned in that Taser training that an
23 officer could only tase a person for three five-second
24 bursts.  Nothing more.  Or there would be a serious risk of
25 bodily injury, including severe burns and/or organ damage.

He also learned that you could only tase a person to stop a threat and never to punish.

You will hear from Officer Caitlin Marriott, from other officers who were there that night and from supervisors in the jail who will tell you that the defendant's assaults were not justified, let alone for 50 seconds and 11 seconds.

You will also get to hear from Gary Ola, who was the Taser trainer in the jail. He trained the defendant and many others in the jail over the years. You will hear that Gary Ola was there that night and witnessed the defendant's 11-second assault when he shot electricity into Jordan for those 11 seconds. He was standing next to him. He saw it. And then he lied to federal agents. He lied and said that he had never seen the defendant tase him for 11 seconds. He lied, but then he pleaded guilty to lying to FBI agents. You will hear Gary Ola admit that he lied and that he was ashamed, ashamed that he did nothing to stop the defendant that night, and ashamed that he didn't report it.

Gary Ola and the other officers will tell you that the defendant's assaults on Jordan Norris were wrong. You will get to see the video of both of the defendant's assaults on Jordan. You will get to read the false reports that he wrote. And you will get to hear about the false statements that he made to the FBI.

The defendant firing a Taser, a teenager's burned

1  flesh, and a coverup.

2          And at the conclusion of the evidence, you will

3  understand why Officer Caitlin Marriott could not bring

4  herself to carry a Taser for two years after she witnessed

5  the defendant's assaults on Jordan.  And after you've seen

6  and heard the evidence in this case, I'm confident that you

7  will find the defendant guilty on all five counts.

8          THE COURT:  All right.  Mr. Strianse.

9          MR. STRIANSE:  Thank you, Your Honor.

10              DEFENDANTS' OPENING STATEMENT

11         MR. STRIANSE:  Good afternoon.  The front door of

12 the Cheatham County Jail is exactly 20 miles from this

13 courtroom.  What happens behind that door might as well be a

14 million miles away from the calm surroundings that we all

15 enjoy this afternoon in this very quiet, serene courtroom.

16         What you're going to hear over the next week or so

17 is a -- an example of the stark difference that exists from a

18 jailhouse, the storms that occur inside a jailhouse, and the

19 usual order that we're used to in our daily lives.

20         On November 5th, 2016, Mark Bryant was a

21 correctional officer, a corporal, a shift supervisor at the

22 Cheatham County Jail in Ashland City, 20 miles up the road.

23 That jail was built 40 years ago to house 120 inmates.  In

24 2016, when this event happened, it routinely housed about 150

25 or more.  There were six correctional officers per shift on

duty at any given time to guard the jail and secure the
safety of the employees and the inmates of the jail and to
try to preserve some semblance of order at the Cheatham
County Jail.

Now, as of Saturday, November 5th, Mark Bryant had
worked at the Cheatham County Jail for about 14 months.
You'll hear him testify. He'll tell you that he rose through
the ranks quickly. He had been hired in August of 2015.
Shortly thereafter, in the fall of '15, he was appointed to
be a field training officer. And by November 15, just a few
months after he started work there, he was supervising his
first shift. And by June of 2016, he was elevated to
corporal and shift supervisor.

On November 5, 2016, which is the date you're
going to be hearing a lot about over this next week, it was a
Saturday; Mark Bryant was working as the corporal shift
supervisor for the second shift. That's 2:00 p.m. to
10:00 p.m. You all might imagine that that would be a pretty
busy shift, the second shift on a Saturday night, between
2:00 and 10:00. You might imagine that a lot of people are
getting arrested and a lot of people are getting booked in
the jail, and these correctional officers -- remember, six of
them responsible for running the jail and keeping an eye on
150 people -- would be very busy.

Around 6:45 or so on Saturday, November the 5th,

right after dinner, Mark Bryant was where he was supposed to
be.  He was in his office at his desk looking at the live
camera feed from the cells in the booking area.  And Jordan
Norris, a young man that you're going to hear a lot about
over the next week, was in Cell Number 4.  He had come to the
jail on November the 3rd, which I think was a Thursday,
charged with some felony criminal offenses, logged in at the
jail.  But he was still in the booking area.  He was still in
Cell 4.

And Mark Bryant's able to see through the camera
what's going on in Cell 4.  And he's banging his head on the
door in Cell 4.  So you'll hear Mark Bryant testify in this
case, he leaves his office, walks the 25 feet or so from his
office to Cell 4, unlocks the door, goes in, and tells
Mr. Norris to stop banging his head on the door, that he's
going to hurt himself or he's going to hurt somebody else.

Well, no sooner does Mark Bryant walk back the 25
feet to his office, he sees Mr. Norris again on the camera
and he's doing it again.  So something has to be done to try
get him under control.

Mark Bryant and Jeff Key, another correctional
officer, go to Cell 4 together.  And they both go in and
escort Mr. Norris out of the cell.  And he is fighting and
resisting.

Now, the government has prepared a composite video

of the events of that night that were captured on the jail
camera.  And if they don't play that first interval of the
extraction from the cell, then you'll see that later when we
put on our case.  But you'll see what's going on when they're
trying to get Jordan Norris out of Cell 4.  He's fighting.
He's resisting.  And it's at this point in time that the
lives of four correctional officers intersect with the life
of Jordan Norris.

You're going to hear some of these correctional
officers testify as the government has told you.  And you're
going to hear Jordan Norris being described as acting on
November 5th, 2016, as someone who was possessed, someone who
was out of his mind, someone who was drugged, someone who was
aggressive, someone that was possessed of unnatural, extreme
strength.

The officers could not control him.  You're going
to see four officers, when they're trying to extract him to
the cell, four very big officers, collectively a thousand
pounds of officers, unable to control someone that is roughly
my size, five feet-ten, 170 pounds.

Now, a correctional officer by the name of Daniel
Bratton, when they're trying to extract Mr. Norris from the
cell, tases him four times to get him into the restraint
chair that you've heard a little bit about already.  He's
actively resisting.  He's stiffening.  He's flailing his arms

1   as they're trying to get him out of Cell 4.

2           Now, one thing that is extremely significant --

3   and I'll ask you to pay particularly close attention to --

4   once they get Jordan Norris out of Cell 4 and Officer Bratton

5   has to tase him four times to get him into this old, beat-up

6   restraint chair, at about 7:00 or so, about 11 minutes after

7   7:00, a decision is made -- he had been in the chair for

8   about 20 minutes -- a decision is made by Mark Bryant, who

9   was in charge that night, that it was time to get Jordan

10  Norris out of the uncomfortable position of being in a

11  restraint chair with cuffs behind your back.

12          And I think, ladies and gentlemen, when we get to

13  the end of this case, you're going to see that as the most

14  significant decision that was made.  And with the benefit of

15  20/20 hindsight, it wasn't a good decision.  Because what

16  happened after they tried to do sort of a humanitarian

17  gesture to get his hands in front of him, to get him out of

18  the cuffs, the metal cuffs, and put soft restraints on him,

19  is when they lost control of this situation.

20          They lost control because this was an old

21  restraint chair.  The Velcro soft restraints around the

22  wrists were old, frayed, defective.  And what you're going to

23  see is the largesse that was shown by the correctional

24  officers to make him more comfortable turned out to be the

25  worst decision that could have been made.  Because at that

point in time, Jordan Norris, who was obviously in some
altered mental state, obviously under the influence of
something, gets his right arm loose.  They not only did not
have control over Jordan Norris, the correctional officers no
longer had control over the situation.

        And what they spent going on after 11 minutes
after 7:00 was this Herculean effort to try to get him back
under control.  And that resulted in these additional tasings
that you've heard about.  And it was the catalyst for all the
events that followed.

        He was in the restraint chair at about 8:00.  And
still struggling against the chair, strong enough to take
this heavy metal restraint chair and literally, through the
force of his body, buck that chair across the concrete floor
there in the booking area.  And he was tased four times
during that period when he's in the restraint chair.  And
remember, his right arm is not fully restrained at that time.

        Now, you are going to learn through the course of
this case that Mr. Bryant, before he tased Jordan Norris --
before he tased Jordan Norris -- is talking to him, before he
ever activates that Taser, and saying, "Are you ready?  Are
you ready to comply?"

        Mr. Norris was not ready to comply.  So after --
so he's tased.

        Then, after the first tase, Mr. Bryant says, "Are

1  you done?"  Meaning can this end?  Will you comply?  No.

2           After the second tase, "Please stop resisting."

3           This is all documented in the investigation that

4  was done by the Tennessee Bureau of Investigation and the

5  Federal Bureau of Investigation.

6           You heard about another tasing incident that

7  occurred later in the evening, at about 10:20 or so.  And

8  this was at the booking counter.  And you'll see this video.

9  They had developed another plan to try to transport him to

10 the hospital in Ashland City so he could have a medical

11 evaluation.  But they had to figure out, how are we going to

12 get him out of this $2 defective restraint chair with his arm

13 still free?

14          So you've got all these correctional officers --

15 and you'll see it on the video -- trying to figure out a way

16 that they could get one arm, cuff it to a bar in the booking

17 room, and they get the other arm and cuff it to a bar in the

18 booking room.  So you'll see the efforts that they made.

19          And then he was tased at that booking counter.

20          Now, the government would like you to believe that

21 this young man was just gratuitously and sadistically tased

22 by Mark Bryant and other correctional officers.  I'm going to

23 ask you, ladies and gentlemen, to carefully review the

24 evidence, carefully look at these videos, and see if that's

25 what Mr. Bryant and his colleagues were about on the evening

and night of November the 5th, 2016, if this is what they wanted to be doing, to be gratuitously inflicting pain and violence on Jordan Norris.

I think any reasonable construction on what happened that night will give you the completely opposite conclusion.

Now, the government has suggested to you in its opening statement that something Mark Bryant did on the night of November 5th, 2016, was contrary to the policy of the Cheatham County Sheriff's Office and the Cheatham County Jail as of November 5, 2016. And this is going to become a critical issue in your consideration of this case. The government has to prove to you that Mr. Bryant set about to willfully violate the constitutional rights of Mr. Norris. And part of that equation will be, well, what sort of training did he receive? Was he following his training? Was he ignoring his training?

I think, ladies and gentlemen, that after you hear all of this testimony, you are going to conclude that there was absolutely no coherent Taser policy in effect as of November 5, 2016.

The person that ran the jail, JJ Hannah, the jail administrator, I believe he still holds that job up in Cheatham County. When he was interviewed in connection with the case -- and I know I've got him on my list; I think the

government may have him on their list as well -- he said,
"Candidly, at the time of the incident, we didn't have much
of a policy on Tasers."

And be careful about these things that you're
hearing.  Well, that there was a policy that there could only
be three tases, five seconds each in duration.  They sort of
throw that out there.  See if that really was the policy
after you hear the testimony of the people that ran the jail.

They did have a three-second -- I'm sorry -- a
three-application, five-second-each policy, but it related to
the Taser when -- and you may have seen it on television --
when they're shooting it and the prongs shoot out from me to
one of the jurors, and the prongs would shoot out and
literally connect with somebody's body.

But as far as the tase that you're going to be
hearing about over this next week or so, these are not
prongs.  This is where it's a contact with the Taser itself.

So what happens in the immediate aftermath of this
event on November 5th, 2016?  And you'll have to decide
whether Mark Bryant had tried to lie to his superiors in
these reports that he wrote.  I think, ladies and gentlemen,
that any fair reading of these reports will show that there
was no intent on his part to mislead anybody.

Now, about a week after the incident, still in
November of 2016, Mark Bryant was asked to come and talk to

JJ Hannah, the jail administrator, and Bob Whitt, his
assistant.  And Mr. Bryant complied and went and spoke with
them.  He met with Mr. Hannah, Mr. Whitt, and another
administrator by the name of David Isherwood in the
administration office.  They showed the video.

They want to make you believe that all of this was
shrouded in some mystery for many months.  We're talking
about a week or so after the event, Mark Bryant was in his
superior's office looking at the video with him.

They asked Mark Bryant for his version of the
story.  And he gave them his version of the story as to what
happened that night.

He didn't hear back from them.  So in February of
2017, he asked his supervisors -- he isn't trying to cover
anything up and hide.  He proactively asks his supervisors in
February of 2017, "Where do I stand on this?  Have you all
taken a look at the events of November 5, 2016?"

And they said, "Yes, we've looked at it.  We've
reviewed it.  It was justified.  You're clear."

Well, that was the order of the day in February of
2017 and that continued to be the order of the day and the
conclusion of the Cheatham County Sheriff's Office until, in
July of 2017, Channel 5 news, the CBS affiliate here in
Tennessee, Middle Tennessee, carried a story on it.  And the
video somehow was in the hands of the Channel 5 news team.

And suddenly it wasn't okay anymore.  Suddenly Mark Bryant
had not been cleared anymore.

Despite the fact that they didn't have any real
Taser policy that covered this situation, certainly no
coherent Taser policy, Mark Bryant becomes expendable in all
of this.  Because they don't like the heat of seeing a video
on Channel 5.  And he, ladies and gentlemen, very much became
the fall guy for the Cheatham County Sheriff's Office.

Now, the judge has told you in the preliminary
instructions that he's given you this afternoon that you all
are the judges of the facts.  Which means that you've got the
heavy lifting to do in this case.  You're going to have to
sift through all of the videos, all of the oral testimony,
all of the evidence to try to decide what happened on
November 5, 2016, and, more importantly, did Mark Bryant
violate any policy of the Cheatham County Sheriff's Office.

Or, when you get right down to it, was Mark Bryant
and the other officers that were with him that night -- you
know, not been a lot said about the other officers that were
working hand in hand with him that night.  What were they
doing?  Were they reacting to a very fluid, dangerous,
quickly evolving situation with Jordan Norris, or was this
just some thing that they wanted to do because they wanted to
inflict pain on Jordan Norris?

Now, remember, when you look at the conduct of

1   Mark Bryant and the other officers, you know, I would ask you
2   not to look at it with the benefit of 20/20 hindsight.
3   Mr. Bryant and these other officers certainly didn't have the
4   luxury of sitting back and reflecting on everything that they
5   were doing that evening.  They were reacting.

6           I think it's also going to be clear to you that
7   Mark Bryant was not indifferent to Jordan Norris.  He was not
8   indifferent to his colleagues and the situation that evening.
9   He called the mobile crisis center.  He called the nurse.
10  They started and maintained a restraint chair log from the
11  moment that they put Mr. Norris in that restraint chair.  As
12  I told you, Mr. Bryant pleaded with Mr. Norris, "Stop
13  resisting.  Relax.  Please."  And warned him.  "I'm going to
14  tase you if you don't obey."

15          In the end, ladies and gentlemen, it's going to be
16  your job to decide, was Mark Bryant, somebody who you're
17  going to hear testify, somebody who had a spotless employment
18  record at the Cheatham County Sheriff's Office, who had been
19  cleared by his supervisors until Channel 5 did their story in
20  July of 2017, was he acting maliciously?  Was he acting
21  sadistically, for the sole purpose of inflicting harm on
22  Jordan Norris?  Or was he acting in good faith, in a
23  good-faith effort to maintain and restore order in the jail
24  that night?

25          They certainly didn't ask for this situation to be

foisted upon them.  And they had to react to the situation any way that they could.

And, ladies and gentlemen, I think when you fully evaluate this situation, you will see that they reacted to it in a reasonable fashion.  And it will be your duty to acquit.

Now, remember, this is a criminal case.  Mark Bryant is not being sued civilly for excessive force.  This is a criminal case.  And I would ask you to give it your utmost serious attention.  Thank you.

THE COURT:  All right.  Is the government ready to call its first witness?

MR. SONGER:  We are, Your Honor.

THE COURT:  Do the parties invoke the rule?

MR. STRIANSE:  Yes, sir.

THE COURT:  Okay.  If you're going to be a witness in this case, then you need to step outside until you're called to testify.

All right.  Who is your first witness?

MR. SONGER:  The United States calls Josh Marriott.

COURT DEPUTY:  Please raise your right hand.

JOSH MARRIOTT,
called as a witness by Plaintiff, was duly sworn and testified as follows:

1
2          COURT DEPUTY:  Please be seated.
3          Please be sure to speak into the microphone.
4   State your name and spell your last name.
5          THE WITNESS:  Josh Marriott, M-a-r-r-i-o-t-t.
6
7                    DIRECT EXAMINATION
8   BY MR. SONGER:
9   Q.   Good afternoon, Officer Marriott.  How are you?
10  A.   Good.  How are you?
11  Q.   To introduce yourself to the jury, can you tell us where
12  you're from?
13  A.   Cheatham County, Pleasant View, Tennessee.
14  Q.   And what do you do for work, sir?
15  A.   I work for the Cheatham County Sheriff's Department.
16  Q.   How long have you worked with the Cheatham County
17  Sheriff's Office?
18  A.   A little over four years.
19  Q.   And what's your role at Cheatham County?
20  A.   Patrol deputy.
21  Q.   Now, at some point did you work inside the Cheatham
22  County Jail?
23  A.   I did.
24  Q.   When was that?
25  A.   October 15th, 2015 to November 15th, 2018.

1  Q.    2015 to 2018?

2  A.    Right.

3  Q.    And what was your position inside the jail?

4  A.    Was a corrections deputy.

5  Q.    And thinking back now to around November of 2016, was

6  there a shift that you typically worked?

7  A.    Thinking back to 2016, I worked second, which was 2:00

8  to 10:00.

9  Q.    2:00 to 10:00 p.m.?

10 A.    Yeah.

11 Q.    Who was your supervisor on that shift?

12 A.    Sgt. Roger Temple and Cpl. Mark Bryant.

13 Q.    And which one of those officers would usually be running

14 the shift and supervising you?

15 A.    Both of them.  I mean, just depends.

16 Q.    If the sergeant wasn't there, would Cpl. Bryant be in

17 charge?

18 A.    Right.

19 Q.    And what was your relationship like with Officer Bryant?

20 A.    Good friends outside of work and, you know, we worked

21 well together inside the jail.

22 Q.    Were you roommates at one point?

23 A.    At one point we were, yes.

24 Q.    Was that back in 2016 when you were roommates?

25 A.    It was after that.  It was somewhere -- I don't remember

1  the exact dates, but we did live together.  Yeah.

2  Q.    And why did you move out?  Why did you stop living

3  together?

4  A.    Got married.

5  Q.    Do you still consider Mark Bryant to be a friend?

6  A.    I do.

7  Q.    Now, do officers inside the Cheatham County Jail carry

8  Tasers?

9  A.    We do.

10  Q.    Can you just describe for us in general terms, what is a

11  Taser?

12  A.    It's an intermediate weapon system.  It's an electronic

13  device basically that's used to neutralize a threat.

14  Q.    And is there more than one mode or one way to use a

15  Taser?

16  A.    There is.  There's one mode you can actually -- it will

17  shoot out two prongs, and then there's another -- excuse

18  me -- another mode that will -- it's called a drive-stun.

19  Q.    If you need any water, there's some right next to you,

20  too.  Feel free to pull a glass.

21           And so, of those two, so the prong mode that would

22  shoot out and the stun mode, which was the one that was more

23  commonly used inside the jail?

24  A.    Drive-stun was more commonly used.

25  Q.    And can you tell us what happens when an officer tases

1   someone in drive-stun mode?  What does it do?

2   A.   To the person?

3   Q.   Yes.

4   A.   I mean, it -- it just locks everything up.  You know,

5   you -- you can't move once you're being tased.

6   Q.   And how long does one cycle of the Taser last?

7   A.   One burst is five seconds.

8   Q.   Is it possible for an officer to keep the Taser going

9   longer than five seconds?

10  A.   Yes.

11  Q.   How does that work?

12  A.   As long as you're holding the trigger, you know, the

13  Taser, it will continuously tase.

14  Q.   Do you have to keep holding the trigger down to keep the

15  Taser going?

16  A.   If you pull the trigger once and let off the trigger, it

17  will run for five seconds regardless.  But if you continue to

18  hold the trigger, it will just continue to operate.

19  Q.   Now, sir, have you yourself ever been tased?

20  A.   I have.

21  Q.   Which of the modes was that in?

22  A.   Both.

23  Q.   And how long were you tased in the drive-stun mode, the

24  more common one?

25  A.   Five seconds.

1  Q.   Did you make it the full five seconds?

2  A.   I did.

3  Q.   How did it feel?

4  A.   It's not fun.

5  Q.   Can you compare that feeling to anything else you've

6  felt?

7  A.   I mean, best way that I can describe it is being hit

8  with a metal chair, is how it -- hot it feels.  It's just

9  a -- it's a constant pain for five seconds.

10  Q.   Now, did you, yourself, carry a Taser when you worked in

11  the jail?

12  A.   I did.

13  Q.   And did you ever have to use it?

14  A.   One time.

15  Q.   Can you briefly just tell us about the circumstances of

16  that time.

17  A.   We were trying to put an inmate into the restraint

18  chair, and we had him cuffed behind the back.  And as we were

19  uncuffing him, he got one of his hands free and took the

20  other cuff and put it around his knuckles, like a -- kind of

21  like a brass knuckle, and he hit me in the side.

22       And we were trying to get him restrained to get

23  him under control, and I pulled the Taser, told him that I

24  would tase him, and tased him for maybe two seconds, two or

25  three seconds.

1  Q.   So he physically hit you with the cuff?

2  A.   Yes.

3  Q.   With the metal cuff?

4  A.   Yes.

5  Q.   And what happened after you tased him for those two or

6  three seconds?

7  A.   We got control of the situation.

8  Q.   You didn't need to tase him any longer than that?

9  A.   No, sir.

10  Q.   Is there any other time when you worked in the jail that

11  you had to use a Taser?

12  A.   That's the only time.

13  Q.   Now, before you started or -- being able to carry a

14  Taser in the jail, did you have to complete any training or

15  certification?

16  A.   Yes.

17  Q.   Who taught your training course?

18  A.   Sgt. Gary Ola.

19  Q.   Did he teach other officers as well or just you?

20  A.   He did.

21  Q.   And were you responsible for understanding the material

22  that Sgt. Ola taught you?

23  A.   Yes.

24  Q.   Were you obligated to follow what you were taught in

25  training?

1  A.    Yes.

2  Q.    Now, after you completed the training, did you get any

3  kind of a certificate or proof that you had been certified?

4  A.    I did.

5  Q.    If you would, please, sir, turn to Tab Number 4 in the

6  binder that's in front of you.  That's what's been marked as

7  Government's Exhibit Number 4.

8  A.    (Witness complies.)

9  Q.    Do you recognize that?

10  A.    I do.

11  Q.    And what is it?

12  A.    It's a certificate for my Taser training.

13  Q.    Does it appear to be an accurate copy of the certificate

14  you received?

15  A.    Yes.

16          MR. SONGER:  The government would move to admit

17  Exhibit Number 4.

18          MR. STRIANSE:  No objection.

19          THE COURT:  Admitted.

20          (Whereupon Plaintiff Exhibit 4 was marked for

21          identification and received in evidence.)

22          MR. SONGER:  May we publish it for the jury?

23          THE COURT:  Yes.

24  BY MR. SONGER:

25  Q.    What's the date of your training on the certificate?

1  A.    October 23rd, 2015.

2  Q.    Is that the date that you completed the training?

3  A.    Yes.

4  Q.    Do you remember any other officers who were in your

5  training class?

6  A.    There were several of us.  I mean, I started with eight

7  people, and all those eight people were in that class with

8  me.

9  Q.    Do you remember specifically any of the people that were

10  in there?

11  A.    Judy King, Eric Prosignate [phonetic], Becka -- I can't

12  remember her last name -- Brandon Reasonover, Eric Walker.

13  There was several of us.  Yeah, I can't remember them all.

14  Q.    Was Mark Bryant in your training class?

15  A.    He was.

16  Q.    All right.  You can take that down.  Thank you.

17         Do all officers in the same training class receive

18  the same training?

19  A.    Yes.

20  Q.    In other words, you don't split up into different groups

21  or anything like that?

22  A.    No.

23  Q.    So I would like to go over just some of the basic core

24  principles that you were taught in that training with Mark

25  Bryant.

1  A.    Okay.

2  Q.    So, based on the training, were you told when -- when

3  were officers allowed to use a Taser, in what situations?

4  A.    To neutralize a threat.

5  Q.    To neutralize a threat?

6  A.    Uh-huh.

7  Q.    Any other situation?

8  A.    To neutralize a threat.

9  Q.    Based on that training that you and Mark Bryant took,

10 were officers allowed to use a Taser to punish someone?

11 A.    No.

12 Q.    And were they allowed to use a Taser after a threat was

13 already under control?

14 A.    No.

15 Q.    And did the same standards apply to the drive-stun mode

16 that we've been talking about and the other mode, the probes?

17 A.    Yes.

18 Q.    Now, if there was a threat that would cause an officer

19 to use a Taser, were there limits on how long you were

20 allowed to tase someone?

21 A.    No more than 15 seconds.

22 Q.    So what does that mean in practice?

23 A.    So each burst -- like I said, you hit the trigger, pull

24 your finger off the trigger, it's a five-second burst -- no

25 more than three times.

```
 1  Q.    No more than three times of five seconds each?
 2  A.    Right.
 3  Q.    And you were told that in the training that you took
 4  with Mark Bryant?
 5  A.    Right.
 6  Q.    Were you also taught to use the least amount of force as
 7  necessary to stop a threat?
 8  A.    Right.
 9  Q.    And were you told why officers were not permitted to
10  tase someone for more than those three five-second bursts?
11  A.    It can cause, you know, heart palpitations.  You know,
12  it's been medically proven, if you have a heart condition,
13  that it can, you know, affect your heart.
14  Q.    And I'm sorry.  I'm having a little trouble hearing you.
15          Did you say "heart palpitations"?
16  A.    Yes.
17  Q.    That if you tase someone beyond that, it can cause heart
18  problems?
19  A.    Right.
20  Q.    Now, in that time, was there any specific policy or
21  training in the jail about whether officers were allowed to
22  tase someone who had already been put in a restraint chair?
23  A.    I mean, if they were -- they're not supposed to be
24  restrained -- or excuse me -- they're not supposed to be
25  tased if they're fully restrained.
```

```
 1    Q.    They're not supposed to be --
 2    A.    Right.
 3    Q.    -- tased if they --
 4    A.    If they're fully restrained.
 5              THE COURT:  Yeah.  Don't talk over each other.
 6    Start over.
 7              MR. SONGER:  I'm sorry, Your Honor.
 8    Q.    Can you repeat what are your restrictions on tasing
 9    someone who had been placed in a restraint chair?
10    A.    Someone is not supposed to be tased if they are
11    physically restrained, fully restrained in a restraint chair.
12    Q.    And did all the other standards that we talked about
13    apply to people who were in restraint chairs?
14    A.    Repeat the question.  I'm sorry.
15    Q.    Sure.  The other standards for using a Taser that we've
16    been discussing, did those also apply to people who had been
17    put in restraint chairs?  Such as not tasing more than three
18    times at five seconds each?
19    A.    Right.  Yes.
20    Q.    Using the least amount of force necessary?
21    A.    Right.
22    Q.    Only tasing to stop a threat?
23    A.    Right.
24    Q.    All those standards applied?
25    A.    (No response.)
```

1            THE COURT:  You need to answer the question.

2            THE WITNESS:  Yes.  They still apply.

3    BY MR. SONGER:

4    Q.    So I think you told us you worked in a jail for about

5    three years; is that right?

6    A.    A little over three years, yes.

7    Q.    During your time in the jail, is it common for you to

8    encounter inmates who are unstable?

9    A.    Yes.

10   Q.    How often did you encounter inmates who had some kind of

11   substance abuse problems?

12   A.    Every day.

13   Q.    How often did you encounter inmates who had some kind of

14   mental disturbance?

15   A.    Every day.

16   Q.    Did you encounter inmates who were aggressive sometimes?

17   A.    Every day.

18   Q.    Were you allowed to use Tasers to punish those inmates?

19   A.    Not to punish them, no.

20   Q.    Were you expected to treat those inmates appropriately?

21   A.    Yes.

22   Q.    Sir, I would now like to direct your attention to the

23   night of November 5th of 2016.

24            Do you remember that night?

25   A.    I do.

```
1   Q.   Were you working at the jail that night?
2   A.   I was.
3   Q.   And which shift were you working?
4   A.   The second shift, 2:00 to 10:00.
5   Q.   And who was your supervisor that night?
6   A.   Cpl. Mark Bryant.
7   Q.   Was there a sergeant or anyone else higher than him on
8   duty that night?
9   A.   No, sir.
10  Q.   He was the top person at the jail then?
11  A.   Yes.
12  Q.   And did you encounter an inmate named Jordan Norris?
13  A.   We did.
14  Q.   How old was Jordan?
15  A.   Eighteen or 19.
16  Q.   And can you describe him for us?  About how big was he?
17  A.   Not real tall.  You know, five-six, something like that,
18  possibly, and 150 pounds, roughly.
19  Q.   Now, at some point did you or other officers have to
20  remove Mr. Norris from his cell?
21  A.   Yes.
22  Q.   And why was that?
23  A.   He was becoming aggressive in the cell, aggressive
24  towards other inmates, screaming, yelling, belligerent.
25  Q.   What officers were involved in that process of taking
```

1  Jordan Norris out of his cell?

2  A.    Mark Bryant, Jeff Key, and myself.  Mark Bryant and Jeff

3  pulled Jordan Norris out of the cell.  And Mark told me to

4  grab the restraint chair, to get it ready.

5  Q.    Was there any other officer involved?

6  A.    Caitlin was in the -- in the booking area as well.  And

7  at one point in time we called Dan -- excuse me -- Daniel

8  Bratton from the sally port up to booking.

9  Q.    And just to be clear, when you say Caitlin, who are you

10 talking about?

11 A.    My wife, Caitlin Johnson.

12 Q.    Is her name Caitlin Marriott now?

13 A.    It is Caitlin Marriott, yes.

14 Q.    So what happened as officers were taking Jordan out of

15 his cell?

16 A.    Jordan began to fight, and we were trying to get him

17 cuffed.  I was getting the chair ready.  Mark and Jeff pulled

18 him out of the cell, were trying to get him cuffed behind the

19 back.  And he continued to resist.  He continued to fight.

20 Q.    At some point did officers have to use a Taser?

21 A.    We called someone -- I'm not -- I'm not aware who

22 called, but Daniel Bratton was called up to the booking

23 office.  And he did use the Taser -- the drive-stun at one

24 point in time to try to get him to be able to get cuffed

25 behind his back.  Jordan Norris cuffed behind his back.

1  Q.    And at the time that Officer Bratton drive-stun tased
2  Jordan, had he already been handcuffed?
3  A.    No, not yet.
4  Q.    Was he still fighting?
5  A.    Yes.
6  Q.    And about how long did those tases from Officer Bratton
7  last?
8  A.    More than a couple seconds -- I know more than a couple
9  seconds.  It wasn't a very long tase.
10  Q.    But five seconds or less?
11  A.    Right.
12  Q.    And how would you describe Jordan Norris sort of at that
13  moment, how he was acting?
14  A.    He was belligerent, very belligerent, very -- just hard
15  to handle.  He's a smaller guy.  I, myself, Jeff, and Mark
16  were bigger guys, and we had a hard time getting control of
17  him.
18  Q.    How would you compare him to other inmates that you
19  encountered at the jail?
20  A.    He was definitely -- he was harder to handle than --
21  than most.
22  Q.    But were you able to get him under control after those
23  brief, five-second-or-less tases?
24  A.    Eventually, yes.
25  Q.    And were you and the other officers able to get him into

1  the restraint chair?

2  A.   We were.

3  Q.   And once you placed Jordan in the restraint chair, then

4  what did you do?

5  A.   We placed him in the restraint chair, and then you

6  have -- to restrain him with the restraints.  So seatbelts is

7  kind of what they're like.  You have some that come over the

8  shoulders, one that goes across the lap, two on his wrists,

9  and then two on his ankles.

10        At this point in time when we first put him in

11  there, his hands were still behind his back in handcuffs.

12  Q.   And at some point did you take his hands out of the

13  handcuffs?

14  A.   Yeah, eventually we did.

15  Q.   Why did you do that?

16  A.   It is to -- you know, to be able to stretch his arms.  I

17  mean, the restraint chairs are not built for comfort, you

18  know.  And you have to -- I mean, if your hands are in a

19  certain position for so long, your hands go to sleep, you can

20  lose blood supply, you know.  Hands start turning purple.

21  Q.   Was this standard practice, to uncuff an inmate's hands

22  in a restraint chair?

23  A.   Yes.

24  Q.   So it wasn't anything special that you did for Jordan

25  that night?

```
 1   A.    No.
 2   Q.    It wasn't like some offer of charity to him?
 3   A.    Right.
 4   Q.    Now, when officers place a person in a restraint chair,
 5   is there any kind of record or documentation they have to
 6   complete?
 7   A.    There is.
 8   Q.    And what is that?
 9   A.    It's a restraint chair log.  And we log -- we check
10   every 15 minutes, you know, check their restraints, make sure
11   they're not too tight, or tight enough, you know, that they
12   can't slip them.  You know, we offer them water.  You know,
13   whatever we need to do.
14   Q.    Okay.  Could you please turn to Tab 37 in the binder
15   that's in front of you.
16             Do you recognize that document?
17   A.    I do.
18   Q.    What is that?
19   A.    That is the restraint chair log.
20   Q.    And is that a standard form that you complete every time
21   you put somebody in the chair?
22   A.    Yes.
23             MR. SONGER:  The government would move to admit
24   Exhibit 37.
25             MR. STRIANSE:  No objection.
```

```
 1              THE COURT:  Admitted.
 2              (Whereupon Plaintiff Exhibit 37 was marked for
 3              identification and received in evidence.)
 4              MR. SONGER:  May we publish it for the jury?
 5              THE COURT:  Yes.
 6    BY MR. SONGER:
 7    Q.   And if we could please zoom in on the top half on the
 8    document.
 9              Is this the restraint chair log that you filled
10    out that night?
11    A.   Yes.
12    Q.   So, just reading across at the top line, it says 1858 --
13    or that's 6:58 p.m., right?
14    A.   Yes.
15    Q.   It says placed in the chair?
16    A.   Uh-huh.
17    Q.   With hands cuffed behind?
18    A.   (No response.)
19              THE COURT:  Okay.  You need to verbalize.  Don't
20    say "uh-huh," "huh-uh".
21              THE WITNESS:  Yes.
22    BY MR. SONGER:
23    Q.   Did I read that correctly?
24    A.   Yes.
25    Q.   And which officer's initials are at the end of that
```

1  line?

2  A.    Mark Bryant's.

3  Q.    Is that when you remember Jordan Norris being placed in

4  the restraint chair that night --

5  A.    Yes.

6  Q.    -- about 7:00?

7        And then it looks like 12 minutes later, about

8  7:10 p.m., the form indicates that cuffs were removed; is

9  that right?

10 A.    Yes.

11 Q.    Is that consistent with what you remember?

12 A.    Yes.

13 Q.    And then it looks like at 7:26 and again 7:38, the

14 status of Jordan Norris is listed as calm; is that right?

15 A.    Yes.

16 Q.    And which officer initialed both of those lines?

17 A.    Mark Bryant.

18 Q.    So was it right that Jordan Norris was calm for a while

19 after you put him in the restraint chair?

20 A.    Yes.

21 Q.    And then the next line, 1955, or 7:55 p.m., almost 8:00,

22 it says that he was very combative.

23        Do you remember that?  Do you remember Jordan

24 getting combative again?

25 A.    Yes.

1  Q.   At that point did you have to go deal with Jordan in the
2  restraint chair again?
3  A.   Yes.
4           MR. SONGER:  Thank you, Ms. Aroner.  You can take
5  that down.
6  Q.   So tell us, why did you go back over and deal with
7  Jordan Norris in the chair at that point?
8  A.   I believe at this time Jordan got free of -- one of his
9  restraints, on his right hand.
10 Q.   And which restraint was loose or free?
11 A.   His right hand.
12 Q.   Okay.  Were any of the other restraints you described a
13 moment ago free?
14 A.   No.
15 Q.   He was still on those?
16 A.   Yes.
17 Q.   And so what did you do?
18 A.   I believe Jeff Key went over first and grabbed his arm,
19 trying to get it in the restraint.  At that point in time
20 Jordan Norris started thrashing, trying to head butt, trying
21 to spit.  So we put a spit mask, which it is a mesh net that
22 goes over the face so the spit cannot be projected.
23           Anyways, and he was still trying to thrash and
24 head butt.  Mark and I came over.  And I grabbed Jordan
25 Norris's head -- underneath the jaw, there's pressure

1  points -- underneath the jawline.  And I grabbed underneath

2  the jaw to keep him from, you know, head butting Mark or Jeff

3  Key.

4          And at that point in time we tried to get his arm

5  in the restraint and he was still being combative.

6  Q.   Okay.  Will you now turn please to Tab 11?

7  A.   Tab 11?

8  Q.   Yes.  And are there surveillance videos in the jail?

9  A.   There are.

10 Q.   And where in the jail was this happening, this incident

11 that you were describing right now?

12 A.   In booking.

13 Q.   Do the cameras in the jail show the booking area?

14 A.   Yes.

15 Q.   Now, there's a CD behind that tab?

16 A.   There is.

17 Q.   Do you know what it shows?

18 A.   The video of this incident.

19 Q.   And how do you know that's what it is?

20 A.   I've reviewed this.  And my signature is on it.

21 Q.   Is that video an accurate depiction of what happened at

22 this time in the jail?

23 A.   Yes.

24          MR. SONGER:  The government would move to admit

25 Exhibit 11.

```
 1              MR. STRIANSE:  No objection.
 2              THE COURT:  Admitted.
 3              (Whereupon Plaintiff Exhibit 11 was marked for
 4              identification and received in evidence.)
 5              MR. SONGER:  May we publish it for the jury?
 6              THE COURT:  Yes.
 7              MR. SONGER:  Ms. Aroner, if we could please bring
 8    up -- we'll start at 2 minutes and 38 seconds into this
 9    video.
10    Q.   And before we play it, Officer Marriott, I would just
11    like to identify the people that we can see here.
12              First of all, who is the individual in the black
13    who is sitting in the chair?
14    A.   That would be Jordan Norris.
15    Q.   And who is standing behind him, holding on to his head?
16    A.   That would be me.
17    Q.   All right.  And the officer on Jordan's right -- so on
18    the left side of the screen, who is kneeling down -- who is
19    that?
20              THE COURT:  Do you have a pointer?
21              MR. SONGER:  I don't, Your Honor.  I'm sorry.
22              THE COURT:  Okay.  Go ahead.
23              THE WITNESS:  That would be Jeff Key.
24    BY MR. SONGER:
25    Q.   Wearing the black hat?
```

1  A.    Yes.

2  Q.    That's Jeff Key?

3  A.    Yes.

4  Q.    And who is the individual kneeling in front of Jordan

5  Norris?

6  A.    Mark Bryant.

7  Q.    And what are the three of you trying to accomplish right

8  now?

9  A.    Getting his hand back into the restraint.

10  Q.    And just remind us, which hand is not fully restrained

11  right now?

12  A.    His right hand.

13              MR. SONGER:  Can we play the first clip, please.

14              (Exhibit played.)

15  BY MR. SONGER:

16  Q.    Now, near the end of that clip it looked like another

17  officer walked over and handed something to Officer Bryant;

18  is that right?

19  A.    Yes.

20  Q.    Who was that officer that came over?

21  A.    Caitlin Johnson.

22  Q.    Do you know why she came over?

23  A.    I believe Mark Bryant asked her to bring the Taser.

24  Q.    And is that what she brought to him?

25  A.    Yes.

1  Q.   And is that Officer Bryant holding the Taser against

2  Jordan's chest right now?

3  A.   Yes.

4  Q.   Okay.  At this point, you're still holding Jordan's

5  head; right?

6  A.   Yes.

7  Q.   In that posture, can Jordan hurt the other officers with

8  his head?

9  A.   No.

10  Q.   All right.  Are his shoulders or upper body restrained?

11  A.   Not the way they're supposed to be, but, yes, they are

12  restrained.

13  Q.   Are there straps across his shoulders?

14  A.   Yes.

15  Q.   Where is his left arm?

16  A.   Restrained.

17  Q.   Is it tied down on the chair?

18  A.   Yes.

19  Q.   Are there any restraints on his feet?

20  A.   There are.

21  Q.   What restraints are on his feet?

22  A.   He's got two ankle restraints on both ankles.

23  Q.   Can he kick officers right now?

24  A.   No.

25  Q.   And you said that his -- it's his right arm that was

1  loose from the restraints, correct?

2  A.   Correct.

3  Q.   And what's happening with his right arm at the moment?

4  A.   Jeff and Mark have ahold of it.

5  Q.   They're both holding it?

6  A.   Yes.

7  Q.   With those officers holding it, was he able to hit

8  anyone or threaten officers?

9  A.   No.

10 Q.   All right.  In this posture, do you see any threat that

11 justifies tasing Jordan?

12 A.   No.

13 Q.   Not for any amount of time at all?

14 A.   Right.

15 Q.   Now, when a Taser in the drive-stun mode is activated,

16 when it's actually fired and used on someone, does it make

17 any sound?

18 A.   It makes a popping sound.

19          MR. SONGER:  Play the next portion, please.

20          (Exhibit played.)

21 BY MR. SONGER:

22 Q.   What just happened in that video that we watched?

23 A.   What just happened?

24 Q.   Yeah.

25 A.   Mark Bryant tased Jordan Norris.

1  Q.   Was it in the drive-stun mode that you were talking
2  about?
3  A.   Yes.
4  Q.   How many times did he tase him?
5  A.   Roughly four or five, I think.
6  Q.   How long did those tases last?
7  A.   Too long.
8  Q.   How long did it feel like to you?
9  A.   At the time?  Are you talking about during right now or
10 are you talking about at the time?
11 Q.   Well, first tell me right now, do you know how long
12 those were?
13 A.   Had to be -- it was more than 15 seconds.
14 Q.   And during -- through all four times that he was tased,
15 did -- were you able to keep control of Jordan's head?
16 A.   I was.
17 Q.   Was he ever able to head butt anybody while he was being
18 tased?
19 A.   No.
20 Q.   Was Officer Key able to keep control of Jordan's one arm
21 that's loose?
22 A.   Yes.
23 Q.   Did Jordan ever get that arm up or hit and threaten
24 anyone?
25 A.   No.

1  Q.  Throughout the entire time he was tased, did he ever get
2  his feet free at all and be able to try to kick anyone?
3  A.  No.
4  Q.  Did he do anything to threaten anyone during the entire
5  time that he was being tased?
6  A.  Not physically, no.
7  Q.  All right.  And, based on your training which you've
8  been taught at the jail, is that appropriate?
9  A.  No.
10  Q.  Why not?
11  A.  It was overdone.
12  Q.  And leaving aside the specific rules that you were
13  trained on, just based on your personal common sense and your
14  experience as a law enforcement officer, did you see any
15  reason to tase Jordan that long?
16  A.  No.
17  Q.  Now, did Mark Bryant make any statements to Jordan while
18  he was tasing him?
19  A.  Yes.
20  Q.  What did he say?
21  A.  He said, "I can do this until the batteries run out."
22  Q.  Did you also hear him say, "You don't like it, do you?"
23  A.  It was hard to hear in that video, but, yes, he did say
24  that.
25  Q.  You're familiar with his voice, right?

1   A.   Yes.

2   Q.   And he said that?

3   A.   Yes.

4   Q.   Is there any context where it's appropriate to say that

5   while you're tasing someone?

6   A.   No.

7   Q.   Now, after this happened, did you talk to Mark Bryant

8   about what he had done?

9   A.   Yes.

10  Q.   What did he say to you?

11  A.   I mean, he was concerned.

12  Q.   What was he concerned about?

13  A.   Just that -- you know, the whole situation.  I mean, it

14  wasn't good.  You know, he was concerned.  Said he was going

15  to speak to administration about it.

16  Q.   Did he say what he was concerned about was going to

17  happen?

18  A.   Not to my recollection he did, but he did -- you know,

19  he just said that he was concerned about it and wanted to

20  talk to admin.

21  Q.   Did he say why he was concerned?

22  A.   Maybe that he overdone it.

23  Q.   Did he say he thought he had gone too far?

24  A.   What's that?

25  Q.   Did he say he thought he had gone too far?

1   A.    Potentially, yes.

2   Q.    Is that what you remember?

3   A.    Yeah.

4   Q.    Now, when an officer uses -- excuse me -- uses a Taser,

5   what type of documentation is required?

6   A.    A use of force and an incident report.

7   Q.    And what information are officers required to put in

8   those reports?  What information are you required to put in

9   those reports?

10   A.    Just the -- so, if it's an incident report, the incident

11   that occurred.  So, of course, you would -- we would have to

12   document what happened, why we put him in the chair; you

13   know, that we tased him, so on and so forth.

14          And use of force is what kind of use of force that

15   we used, you know, whether it's hands on, whether it's

16   tasing, you know, strikes, grappling.

17   Q.    Are officers required to document each time they use a

18   Taser?

19   A.    Yes.

20   Q.    Explain what the justification for using the Taser each

21   time is?

22   A.    Yes.

23   Q.    Now -- scratch that.

24          Are you also required to use reports -- excuse

25   me -- required to submit reports when you use other types of

1  force?

2  A.    Yes.

3  Q.    Does that include using hands-on force?

4  A.    Yes.  Hands-on, grappling.

5  Q.    So the type of force you were using in this incident

6  when you're holding Jordan's head, would that require you to

7  fill out a report?

8  A.    Yes.

9  Q.    Now, did you fill out a report for this incident?

10  A.    No, I did not.  I did an incident report, but I didn't

11  do a use of force report.

12  Q.    Why didn't you do a use of force report for this

13  incident?

14  A.    Because Mark Bryant told me that he would take care of

15  it.

16  Q.    Is there any other time when you've worked at the jail

17  when Mark Bryant's ever told you not to report something?

18  A.    Not that I'm aware of, no.

19  Q.    Did you file a report for the incident earlier in the

20  night when you guys had to take Jordan out of his cell?

21  A.    Did we file a use of force?  I don't think that I did.

22  No.  Not for -- are you saying taking him out of the cell?

23  Q.    Uh-huh.

24  A.    Is that your question?

25  Q.    Yes.

1  A.    Yes, I did do a use of force, I'm sorry.  Or an incident
2  report.
3  Q.    Let me ask you this:  What if there's more than one
4  incident on the same shift?  Are you required to do just one
5  report that has everything or a separate report for each time
6  you use force?
7  A.    Separate -- excuse me.  Separate incidences, separate
8  reports.
9  Q.    So -- and you took Jordan out of the cell at -- what? --
10  about 7:00 tonight?
11  A.    Right.
12  Q.    That night?
13  A.    (Indicating affirmatively.)
14  Q.    And this happened about an hour later, right?
15  A.    Right.
16  Q.    So did the policy require you to do two separate
17  reports?
18  A.    Right.
19  Q.    And did you do a report for that first incident when you
20  took him out of the cell?
21  A.    Yes.
22  Q.    But did you do a report for the second incident right
23  here where he was tased by Mark Bryant?
24  A.    No.
25  Q.    And why didn't you do that report?

```
 1   A.   Because Mark said that he would take care of it.
 2   Q.   All right.  Would you please turn now to Tab Number 25.
 3             What is that document?
 4   A.   That is an incident report.
 5   Q.   And what's the date on that report?
 6   A.   November 5th, 2016.
 7   Q.   Is that the date that this happened?
 8   A.   Yes.
 9   Q.   And which officer submitted that report?
10   A.   Mark Bryant.
11   Q.   Are you listed as one of the officers who was involved?
12   A.   I am.
13             MR. SONGER:  The government would move to admit
14   Exhibit Number 25.
15             MR. STRIANSE:  No objection.
16             THE COURT:  Admitted.
17             (Whereupon Plaintiff Exhibit 25 was marked for
18             identification and received in evidence.)
19             MR. SONGER:  May we publish it?
20             THE COURT:  Yes.
21   BY MR. SONGER:
22   Q.   So, just to be clear, who submitted this report?
23   A.   Mark Bryant did.
24   Q.   Is that Mark Bryant's signature at the bottom?
25   A.   It is.
```

1  Q.  And then, focusing on the top half of the report, what

2  time is indicated?

3  A.  1855.

4  Q.  6:55 p.m.?

5  A.  Yes.

6  Q.  Is that the time that you took Jordan Norris out of the

7  cell originally?

8  A.  Yes.

9  Q.  Where we talked about where he had to be briefly tased

10  by Officer Bratton?

11  A.  (Witness moves head up and down.)

12  Q.  And then you got him into the cell; is that right?

13  A.  Yes.

14  Q.  That was at 6:55?

15  A.  Right.

16  Q.  Sorry.  Can we show the entire narrative.

17         And if you would look about two-thirds of the way

18  down.  And we'll blow out the language.

19         Do you see the sentence that says "Deputy Bratton

20  and I tased"?

21  A.  Yes.

22  Q.  Now, did -- this is Mark Bryant's report.

23         Did Mark Bryant and Deputy Bratton tase Jordan at

24  the same time?

25  A.  No.

1  Q.   Did -- how far apart were those two incidents when they
2  tased?
3  A.   About an hour apart, roughly, I think.
4  Q.   An hour apart.
5       Bratton tased in the first incident; Mark Bryant
6  tased in the second incident?
7  A.   Yes.
8  Q.   And in the time that Bratton tased, is that at 6:55,
9  which is the time on this report?
10 A.   Yes.
11 Q.   Is there anything in this report that indicates that
12 Mark Bryant tased Jordan Norris at 8:00, an hour later?
13 A.   No.
14 Q.   All right.  Now, if you look down at the very bottom, at
15 the last line of the report, it says that mobile crisis
16 arrived at 2122, or 9:22 p.m.; is that right?
17 A.   Yes.
18 Q.   So, if we just assume this was a report that Mark Bryant
19 did that was supposed to describe both incidents, I just want
20 to be clear, is there anything in this report that says how
21 many times Mark Bryant tased Jordan at 8:00?
22 A.   No.
23 Q.   Is there anything in this report about how long Mark
24 Bryant tased Jordan for?
25 A.   No.

Q.   Does the report say that at the time Mark Bryant tased
Jordan, most of Jordan's body was in the restraint chair and
tied down?
A.   No.
Q.   Does the report indicate that Officer Jeff Key was
holding Jordan's arm at the time that Mark Bryant tased him?
A.   No.
Q.   None of that information is here?
A.   No.
Q.   You were there for this incident.
     Does this report give you an accurate picture of
what happened at 8:00 when Mark Bryant tased Jordan?
A.   No.
Q.   Okay.  Take that down.  Thank you.
     So going back now to the 8:00, when Mark Bryant
tased Jordan four times, those long tases of video we just
watched.  Was Mark Bryant your supervisor at that time?
A.   He was.
Q.   Did you try to stop him while he was tasing?
A.   No.
Q.   Why not?
A.   In the heat of the moment, didn't know, you know, how
long it was going on.  I was focused on holding Jordan
Norris's head.  I didn't know, you know, how long he was
tasing him.  You know, so I didn't stop.

1  Q.   Now that you've had time to reflect on what actually
2  happened, how do you feel about this?
3  A.   It was definitely overdone.
4  Q.   Do you wish you had done anything differently that
5  night?
6  A.   If I could have, yeah.
7       MR. SONGER:  Just one moment, Your Honor.
8  Q.   And just to be crystal clear, sir, did what Mark Bryant
9  did violate the policies and training that you had at that
10 time?
11 A.   Yes.
12       MR. SONGER:  Nothing further right now.  Thank
13 you.
14       THE COURT:  All right.  Cross-examination.
15
16                      CROSS-EXAMINATION
17 BY MR. STRIANSE:
18 Q.   Good afternoon, Officer Marriott.
19 A.   How are you, sir?
20 Q.   Do you remember being interviewed in connection with
21 this case by the TBI and the FBI on August the 2nd of 2017?
22 A.   I do.
23 Q.   I think you had been placed on administrative leave by
24 that point in time; is that right?
25 A.   I had.

1  Q.   And do you remember talking -- I think it was Special

2  Agent Atkins with TBI?

3  A.   Yes.

4  Q.   And was Joy Wright there, present at the time --

5  A.   She was.

6  Q.   -- a special agent with the FBI?

7  A.   She was.

8  Q.   And in advance of your testimony here today, did you

9  listen to that pretty lengthy audio interview?

10 A.   Did I listen to it?

11 Q.   Yes, sir.  Have you listened to it?

12 A.   No, sir.

13 Q.   When was the last time that you actually listened to

14 your August 2nd, 2017, audio interview?

15 A.   I haven't listened to it.

16 Q.   I'm sorry?

17 A.   I have not listened to it.

18 Q.   Okay.  Do you remember describing what you characterized

19 as the "hard hand" technique of putting your -- I think we

20 just saw it in the video, putting your hands or your fingers

21 up under your jawline?

22            THE COURT:  I don't think your microphone -- I'm

23 sorry.  Your microphone is not on.

24            MR. STRIANSE:  I'm sorry.  Forgive me, Judge.

25 Q.   Putting your fingers up under the jawline of Jordan

1  Norris; is that right?

2  A.    Yes.

3  Q.    And I think we saw that in the video that was just shown

4  to the jury a few minutes ago?

5  A.    We did.

6  Q.    And you did that because you believed that he was trying

7  to head butt someone; is that right?

8  A.    He was.

9  Q.    And in terms of the force continuum that you've been

10 trained on as a correctional officer when you used to work in

11 the jail, it's sort of a stair-stepped approach from lightest

12 to heaviest in terms of force; is that right?

13 A.    Correct.

14 Q.    Least amount of force up to the most amount of force; is

15 that correct?

16 A.    Correct.

17 Q.    And I think on the continuum, the least amount is to

18 talk to somebody --

19 A.    Correct.

20 Q.    -- correct?  See if you can get that individual to see

21 reason and follow instructions?

22 A.    Correct.

23 Q.    The next level up would be, I think, a soft hand, maybe

24 an escort or something like that; is that right?

25 A.    Correct.

1    Q.    And then above that would be the Taser; is that correct?

2    A.    Correct.

3    Q.    And above that would be what they call the hard hand

4    technique --

5    A.    Correct.

6    Q.    -- correct?

7        What you were doing when you were trying to gain

8    control of Mr. Norris?

9    A.    Correct.

10    Q.    Now, you certainly were not doing that to punish

11    Mr. Norris?

12    A.    Absolutely not.

13    Q.    You were not doing that to be sadistic to Mr. Norris?

14    A.    Absolutely not.

15    Q.    You were not trying to be malicious to him?

16    A.    Absolutely not.

17    Q.    Then and there, on November 5, 2016, after he had been

18    extracted from the cell, you had grave concerns about him

19    trying to head butt you?

20    A.    Yes.

21    Q.    Head butt other officers?

22    A.    Correct.

23    Q.    I think you described this to investigators as you had

24    never seen anybody this impaired; is that right?

25    A.    That is correct.

1  Q.   I think you may have used language like he was
2  possessed?
3  A.   Yeah, I did.  Yes.
4  Q.   And seemed to be basically out of his mind; is that
5  right?
6  A.   Yes.
7  Q.   Now, in the course of that interview on August the 2nd
8  of 2017, you were asked about this restraint chair that we
9  saw in the video; is that right?
10 A.   Yes.
11 Q.   And you candidly told the agents that that was an old
12 chair?
13 A.   It is, yeah.
14 Q.   And it was worn out?
15 A.   (Witness moves head up and down.)
16 Q.   Is that right?
17 A.   Yes.
18 Q.   I think it had been in the jail for a number of years;
19 is that right?
20 A.   Yes.
21 Q.   And I think the Velcro straps had begun to wear out?
22 A.   They had.
23 Q.   Is that right?
24 A.   Yes.
25 Q.   I think you indicated in response to one of Mr. Songer's

1   questions a few minutes ago that although the shoulder straps
2   were on the chair, they were not properly on Mr. Norris; is
3   that right?  Correct?
4   A.   Correct.
5   Q.   I think they can be seen in the video sort of falling
6   off of his shoulders; is that right?
7   A.   Yes.
8   Q.   And you made the decision to put that so-called spit
9   mask over Jordan Norris's head; is that right?
10  A.   I don't think that I did.  But it was -- it was made.
11  Yeah, the decision was made, and it was put on his head, yes.
12  Q.   Do you remember who actually put it over his --
13  A.   I want to say Jeff Key did, but I'm not 100 percent sure
14  on that.
15  Q.   And, again, that wasn't done to make fun of Jordan
16  Norris?
17  A.   No.
18  Q.   The reason was that he was spitting?
19  A.   Right.
20  Q.   And yelling?
21  A.   Right.
22  Q.   And screaming?
23  A.   (Witness moves head up and down.)
24  Q.   And you all couldn't get control of him?
25  A.   Right.

1  Q.   And the 8:00 p.m. incident that the jury just saw,

2  wasn't that Jeff Key, who is a large man, that was struggling

3  with the right arm that had become free from the soft

4  restraint?

5  A.   Right.

6  Q.   I think the -- the chair record that you identified

7  before -- the restraint chair log, is what I'm struggling to

8  say -- shows that he gets into the chair at about 6:58; is

9  that right?

10 A.   Something like that.

11 Q.   Something like that, 1858.  And then, within about 20

12 minutes, a decision is made -- because at that point when

13 he's put in the chair he's got his arms behind his back; is

14 that right?

15 A.   Correct.

16 Q.   And he's got the metal cuffs behind his back?

17 A.   Correct.

18 Q.   And I think you told the jury that that chair is not

19 built for comfort?

20 A.   Correct.

21 Q.   So there comes a point in time that a decision is

22 made -- I assume in conjunction with Mr. Bryant -- to move

23 his hands to the front?

24 A.   Correct.

25 Q.   And to put him in those soft restraints; is that right?

1  A.    Correct.

2  Q.    Is that when, quite frankly, things sort of came off the

3  rails?

4  A.    I don't remember if it was before that -- excuse me --

5  after that or if it was during this point in time when we

6  went to go, you know, take the cuffs off, put him in

7  restraints.  I don't know if it was at that point in time or

8  if it was a little later on when -- you know what I'm saying?

9  I don't know if he went combative as soon as we took the

10 cuffs or -- I mean, he was in restraints already, if that

11 makes sense.

12 Q.    But he became combative again when he had the freedom of

13 his hands in front of him?

14 A.    Correct.

15 Q.    In the soft restraints?

16 A.    Correct.

17 Q.    And he was able to actually move his right arm six,

18 eight, ten inches away from his body; is that right?

19 A.    Somewhere in that line, yeah.

20 Q.    And that's why Jeff Key is holding on to him so

21 desperately; is that right?

22 A.    Correct.

23 Q.    And Mark Bryant is talking to him before he administers

24 these tases; is that right?

25 A.    Correct.

1  Q.   Okay.  Now, you just told the jury that you felt like
2  the tases in hindsight were inappropriate --
3  A.   Yes.
4  Q.   -- is that right?
5  A.   Correct.
6  Q.   Is that what you're telling the jury?
7  A.   Yes.
8  Q.   Well, you certainly didn't say that to Mark Bryant on
9  November 5th, 2016; is that right?
10 A.   At the time, you know, it didn't seem like it was that
11 bad.  I felt we had to do what we had to do.  After watching
12 the video at a later date, it seemed, you know -- it -- you
13 know, it looks way worse than what I remember it being,
14 watching the video.
15 Q.   And you -- and we talk about the video.
16          It was no shock to you that you all were always
17 under the cameras there?
18 A.   Right.
19 Q.   And you memorialized what you did in at least two
20 reports that night; is that right?
21 A.   I believe so.
22 Q.   And I'm not sure that they're government exhibits, but
23 let me ask you about them.
24          I have exhibit tabs on this one but not on this
25 one.

1    THE COURT:  Okay.

2    MR. STRIANSE:  May I borrow one?  Thank you.

3  Q.  Do you remember authoring a use of force report with the

4  event dated November 5, 2016, at 1855?

5  A.  I don't think that I did a use of force.  I think I did

6  an incident report.

7  Q.  Well, let me show it to you and see if this refreshes

8  your recollection.

9  A.  Okay.

10  Q.  And 1855 would be 6:55; is that right?

11  A.  That is correct.

12    MR. STRIANSE:  May I approach the witness, Your

13  Honor?

14    THE COURT:  The court officer can help you.

15  BY MR. STRIANSE:

16  Q.  Take a look at that, Officer Marriott, and see if that

17  refreshes your recollection of doing a report on November 5.

18  A.  (Reviews document.)  Yes.

19  Q.  You recognize that report?

20  A.  I do.

21  Q.  That's your report?

22  A.  Yes.

23    MR. STRIANSE:  Your Honor, we would offer that as

24  Defendant's 1.

25    THE COURT:  And this is his use of force report on

```
 1  November 5 --
 2            MR. STRIANSE:  November 5, 2016, at 1855, or
 3  6:55 p.m., on Saturday, November 5.
 4            THE COURT:  Exhibit number what?
 5            MR. STRIANSE:  1, Your Honor.
 6            THE COURT:  All right.  Any objection?
 7            MR. SONGER:  No objection.
 8            THE COURT:  It will be admitted.
 9            MR. STRIANSE:  Thank you, Judge.
10            (Whereupon Defense Exhibit 1 was marked for
11            identification and received in evidence.)
12  BY MR. STRIANSE:
13  Q.   It's a short report.  Can you read the narrative
14  section?
15  A.   I can.
16            THE COURT:  Do you have another copy?
17            MR. STRIANSE:  I'm sorry, Your Honor?
18            THE COURT:  Another copy?
19            MR. STRIANSE:  Yes, sir.
20            THE WITNESS:  Would you like me to read?
21  BY MR. STRIANSE:
22  Q.   Please.
23  A.   (As read):
24                While in booking, Jordan Norris looked like he
25                was going to have a physical alteration with
```

1             another inmate in Cell 4. So we went to pull him

2             out of the cell, Cell 4, and he was not willing to

3             comply. We escorted him out of the cell and he

4             was still resisting. Cpl. Mark Bryant and Jeff

5             Key went to cuff him behind his back. He still

6             resisted. I, Josh Marriott, went over and grabbed

7             his hand so they could get him cuffed. He was

8             still resisting. Daniel Bratton came over, put

9             the Taser to his back and warned him to stop

10            resisting. Norris still did not comply. Bratton

11            drive-stunned him with the Taser. We took him to

12            the restraint chair and started to buckle him into

13            the chair, and he kept resisting. Bratton stunned

14            him with the Taser again. We got him put in the

15            restraint chair. He stopped resisting and

16            complied as we put him in the chair.

17 Q.   Now, that's your report of the events of 6:55; is that

18 right?

19 A.   Yes.

20 Q.   Is that report accurate?

21 A.   I believe so. Yeah.

22 Q.   Okay. Now, anywhere in the four corners of Defendants'

23 Exhibit 1 do you offer the opinion that you offer now that

24 the actions of Mark Bryant were inconsistent with any policy

25 on -- that was in effect on November 5, 2016?

```
 1   A.   What do you mean by that, sir?
 2   Q.   Yeah.  Do you actually write or type in this report that
 3   anything that Mark Bryant did was in violation of any jail
 4   policy?
 5   A.   This is the 6:55 point where we put him in the restraint
 6   chair.  At that point in time Mark did not tase him.
 7              Is that what you're asking?
 8   Q.   Yes, sir.
 9   A.   Okay.
10   Q.   Now, you generated another report; is that right?
11   A.   If I remember -- I don't remember.
12   Q.   Well, do you remember --
13   A.   I don't remember.
14   Q.   You don't remember?
15   A.   No, sir.
16   Q.   Do you remember -- I'm going to show it to you and see
17   if it refreshes your recollection.
18   A.   Okay.
19   Q.   Let me show you what we're going to mark for
20   identification as Defendants' Exhibit Number 2.  And if you
21   could take a look at it, read it to yourself, see if you
22   recognize it.
23              THE COURT:  Do you have another copy?
24              MR. STRIANSE:  Yes, sir.
25              THE WITNESS:  (Reviews document.)  Okay.
```

1  BY MR. STRIANSE:

2  Q.   Do you recognize that report?

3  A.   I do.

4  Q.   That is a report that at the top says "Date and Time of

5  Incident:  1855"; is that right?

6  A.   It does.

7  Q.   And then you sign off on this when?  When do you sign

8  off on it?

9  A.   After it's been approved by a supervisor.

10 Q.   Yes, sir.  Is that when you do it?

11 A.   Yes.

12 Q.   Take a look at the writing, date and time.

13      Is that your writing in the bottom right-hand

14 corn?

15 A.   On line 1, where it says "13"?

16 Q.   Yes.

17 A.   Yes, that's my signature.

18 Q.   So date and time, 2156.

19      That would be 9:56 p.m., correct?

20 A.   Yes.

21 Q.   That's your writing?

22 A.   Yes.

23 Q.   For the time and the date.

24      Is there anything in this report that you're

25 filing at almost 10:00 p.m. that is not accurate?

```
 1   A.    No.
 2   Q.    Your answer is "no"?
 3   A.    Right.
 4   Q.    Okay.  Anywhere -- now -- so this is a couple of hours
 5   after the event, correct?
 6   A.    Yes.
 7   Q.    So you had the opportunity by that point in time to
 8   include any of your observations, any of your conclusions in
 9   Defendants' Exhibit Number 2, this use of force report,
10   correct?
11   A.    Yes.
12   Q.    And anywhere in this report that you prepared, you
13   authored and you signed, do you suggest to anyone that
14   anything that Mark Bryant did on November 5, 2016, was
15   against policy?
16   A.    Can you repeat that?  I'm sorry.
17   Q.    Do you say anywhere in this document that what Mark
18   Bryant did was in violation of some then-existing policy?
19   A.    In this report, no.
20   Q.    Okay.
21            THE COURT:  Are you moving that into evidence?
22            MR. STRIANSE:  Yes, Your Honor.  We would offer
23   Defendant's 2.
24            THE COURT:  Any objection?
25            MR. SONGER:  No objection.
```

```
1              THE COURT:  Admitted.
2              (Whereupon Defense Exhibit 2 was marked for
3              identification and received in evidence.)
4  BY MR. STRIANSE:
5  Q.   Do you remember telling the interviewing officers on
6  August 2nd, 2017, during the course of that audio interview
7  that this was one of the craziest incidents that you had ever
8  had to deal with as a correctional officer?
9  A.   I do remember that.
10             THE COURT:  I'm sorry.  You need to speak into
11 microphone and louder.
12             THE WITNESS:  Yes, sir.  I do remember that.
13 BY MR. STRIANSE:
14 Q.   Do you recall telling Ms. Wright and Mr. Atkins that you
15 had seen a lot of people messed up on drugs?
16 A.   I have.  Yes.  I do.  Yeah.
17 Q.   Do you remember telling the investigating officers that
18 Jordan Norris was out of his mind on drugs?
19 A.   Yes.
20 Q.   That Jordan Norris was having a mental breakdown?
21 A.   Yes.
22 Q.   That Jordan Norris was possessed?
23 A.   Yes.
24 Q.   That he was not in the right state of mind?
25 A.   Yes.
```

1  Q.    And then they asked you the $64,000 question -- and I

2  know I'm dating myself with that reference -- when they asked

3  about the use of force against Jordan Norris on the evening

4  of November 5, 2016.

5           Do you remember telling them, quote, Everything we

6  did was necessary?

7  A.    I do remember saying that.

8  Q.    Okay.  That was August of 2017.  So we are two years

9  plus removed from that.

10           But now you've come in and told this jury that it

11  was excessive?

12  A.    Yes, sir.

13  Q.    Correct?

14  A.    Yes, sir.

15  Q.    And it was not called for?

16  A.    Yes, sir.

17  Q.    Okay.  Now, you are off duty at this point in time?  You

18  were not -- you are on some sort of leave with the Sheriff;

19  is that right?

20  A.    Right.

21  Q.    There came a point in time that you were returned to

22  work at the sheriff's department; is that right?

23  A.    Yes.

24  Q.    And do you remember when you returned to work?

25  A.    I don't remember the exact day.  It was -- I was on

1  leave for seven weeks.

2  Q.   Do you remember it might have been in September of 2017?

3  A.   That sounds right.

4  Q.   And do you remember working out regularly at a gym that

5  was located across the street from the jail there in downtown

6  Ashland City?

7  A.   Yes.

8  Q.   Do you remember running into Mark Bryant in September of

9  2017 at that gym?

10  A.   Potentially.  I don't remember offhand.

11  Q.   Well, let's see if this refreshes your recollection.

12  A.   Okay.

13  Q.   Do you remember coming into the work out area and giving

14  Mark a copy of the new policy that had been implemented by

15  Sheriff Breedlove --

16  A.   Yes.

17  Q.   -- after the events of November 5, 2016?

18  A.   Yes, I do remember that.

19  Q.   And after all this became public in July of 2017 --

20  A.   Yes.

21  Q.   -- correct?

22  A.   Yes.

23  Q.   And you said, "Here's the new policy"?

24  A.   Yes.

25  Q.   Correct?

```
 1   A.    Yes.
 2   Q.    And the new policy became in September of 2017 or July
 3   of 2017 this no more than three applications and no more than
 4   five seconds?
 5   A.    Okay.
 6   Q.    Is that right?
 7   A.    Yes.
 8              MR. STRIANSE:  Your Honor, may I have one moment?
 9              THE COURT:  Sure.
10   BY MR. STRIANSE:
11   Q.    Just a couple more questions.
12              I had asked you about this restraint chair that
13   was being used --
14   A.    Uh-huh.
15   Q.    -- back in November of 2016; is that right?
16   A.    Yes.
17   Q.    Was it shortly after that November 2016 incident that
18   the jail went out and got new restraint chairs?
19   A.    Yes.
20              MR. STRIANSE:  That's all.
21              THE COURT:  All right.  Redirect.
22
23                     REDIRECT EXAMINATION
24   BY MR. SONGER:
25   Q.    Officer Marriott, you were asked a number of questions
```

1  there.  And I just want to make sure the timing is clear for
2  your answers.
3          You and Mark Bryant were involved in two different
4  incidents the night of November 5th that involved Jordan
5  Norris; is that right?
6  A.   Correct.
7  Q.   At 7:00, he was taken out of his cell.
8          And did Mark Bryant tase him at 7:00?
9  A.   No.
10 Q.   Do you feel that the force and tactics --
11          MR. STRIANSE:  I'm going to object to the leading.
12          THE COURT:  Sustained.
13 BY MR. SONGER:
14 Q.   In that first incident, do you believe that -- officers'
15 force was justified?
16 A.   Yes.
17 Q.   Were you also involved in another incident at 8:00?
18 A.   I was.
19 Q.   Did Mark Bryant tase Jordan at 8:00?
20 A.   He did.
21 Q.   Was the force that was used at 8:00 justified?
22 A.   No, it was not.
23 Q.   You were also shown two reports, reports that you filled
24 out from that night?
25 A.   Yes.

1  Q.    Which of the incidents were those reports referencing?

2  A.    Referencing the 8:00 -- or excuse me -- the 6:00

3  incident, the 1855.

4  Q.    The first incident?

5  A.    Yes.

6  Q.    When Jordan was taken out of his cell?

7  A.    Right.

8  Q.    Did Mark Bryant tase anyone during that first incident?

9  A.    No.

10 Q.    Did you write a report about the second incident where

11 Mark Bryant did tase?

12 A.    No.  This was about the first -- the first -- or the

13 first incident.

14 Q.    And why didn't you write a report about the second

15 incident where Mark Bryant tased someone?

16 A.    He told me that he would take care of it.

17 Q.    You were also asked a number of questions about how

18 combative Jordan was at different times that night --

19 A.    Yes.

20 Q.    -- do you remember that?

21        At the time that Mark Bryant tased him at 8:00,

22 was Jordan a threat that justified tasing him?

23 A.    Because he was restrained, no.

24 Q.    Are officers allowed to use a Taser to punish someone

25 for acting out earlier?

```
 1  A.   No.
 2  Q.   You were also asked questions about the policy of not
 3  tasing someone three times for five seconds.
 4            Do you remember that?
 5  A.   Yes.
 6  Q.   And you said you learned about that in your training,
 7  right?
 8  A.   Yes.
 9  Q.   And when did you take that training?
10  A.   2015.
11  Q.   Before this incident happened?
12  A.   Right.
13  Q.   And Mark Bryant was in that training class?
14  A.   Yes.
15            MR. SONGER:  Nothing further.
16            THE COURT:  All right.  You can step down.
17            MR. STRIANSE:  Your Honor, may I ask him --
18            THE COURT:  Why don't you approach.
19            MR. STRIANSE:  I just have two questions.
20            (Bench conference outside the hearing of the
21            jury.)
22            MR. STRIANSE:  Judge, there's just sort of this
23  half a question that's asked and an implication about you're
24  not supposed to use a Taser to punish somebody.  And this
25  one, they never -- they never ask the follow-up question.
```

They want to leave the impression that Mark Bryant was
punishing.  I want to be able to ask him a question about
that.

THE COURT:  What question?

MR. STRIANSE:  The question is, is he trying to
tell this jury that Mark Bryant's use of the Taser on that
evening was to punish Jordan Norris?  The implication is out
there.  It's been reenforced on redirect.  I should be able
to question that.

MR. SONGER:  He said on direct and there is
nothing -- he said it on direct and there was nothing brought
up on cross-examination --

MR. STRIANSE:  Redirect.

THE COURT:  Well, if it wasn't brought up on
cross-examination, then you shouldn't have brought it up now.

And what question do you want to ask him?

MR. STRIANSE:  Your Honor, I didn't do a good job
of explaining.  But the implication in the question, "You're
not supposed to use a Taser to punish someone," is leaving
the jury with the impression that Mark Bryant was punishing
Norris without asking the question directly.

THE COURT:  And what question do you want to ask?

MR. STRIANSE:  I'm going to ask him if that's what
he's trying to tell the jury.

THE COURT:  So what are you going to ask him?

1   Tell me.

2              MR. STRIANSE:  Basically that --

3              MS. MYERS:  Are you going to ask, do you think --

4              THE COURT:  Hold on.

5              Anything else further than that?

6              MR. STRIANSE:  It depends on what his answer is.

7   There may be something else.  I mean, that's just not --

8              THE COURT:  I'll permit you to ask just that one

9   question.

10             MR. STRIANSE:  I can't ask him if that's

11  consistent with Mark Bryant's management style and what he

12  interacted with --

13             THE COURT:  No.  We didn't get into that on direct

14  or cross.

15             MR. STRIANSE:  Yeah, but I mean, I don't think

16  they should be left with this impression of punishment

17  either.

18             THE COURT:  Well, I asked what question do you

19  want to ask about that.

20             MR. STRIANSE:  Those two questions.

21             THE COURT:  And what's the -- the second being

22  what?

23             MR. STRIANSE:  That's inconsistent with Mark

24  Bryant's interaction with inmates in the jail when he worked

25  there.

1          MR. SONGER:  That's improper character evidence.

2          THE COURT:  That -- I think that goes beyond the

3    scope of direct and cross now.  You can ask the first

4    question.

5          MR. SONGER:  And, Your Honor, I did not ask

6    whether he thought Mark Bryant was punishing.

7          MR. STRIANSE:  Then it's even worse.  It leaves

8    the impression that it's punishment without asking the

9    question.  "You're not supposed to use a Taser to punish an

10   inmate."  And then never ask the follow-up question.

11         MR. SONGER:  He was asked what principles he was

12   trained on.  That was what --

13         THE COURT:  All right.  I've ruled.  You can ask

14   that one question.  Unless you've got another natural

15   follow-up to that question, but I don't think --

16         MR. SONGER:  Your Honor, I suspect I will have

17   follow-ups from that.

18         THE COURT:  Well, if you suspect, you need to tell

19   me what that is now.

20         MR. SONGER:  Well -- depends on his answer, but I

21   suspect I would like to ask him --

22         THE COURT:  We're not going to reopen where you

23   are.  Go ahead ask the question.  We'll see if we go any

24   further.

25         All right.

```
 1              MS. MYERS:  And --
 2              THE COURT:  I've ruled.
 3              MS. MYERS:  No --
 4              THE COURT:  I've ruled.
 5              MS. MYERS:  -- it's not related to that, Your
 6    Honor.
 7              THE COURT:  Well, you can't talk to me
 8    without him.
 9              MS. MYERS:  I know.  I know.
10              MR. STRIANSE:  I'm sorry.  I thought we were done.
11              THE COURT:  I thought we were, too.
12              MS. MYERS:  And it's not related to that.
13              I'm sorry.  I do need to use the restroom.  It's
14    kind of embarrassing.  But I didn't know if you were planning
15    on having another witness --
16              THE COURT:  No.
17              MS. MYERS:  -- after this one.
18              THE COURT:  They're ready to go.  They've had a
19    long day.  I hate to -- I need to let him ask -- I need to
20    let you ask his last set.  And that's probably it.
21              MR. STRIANSE:  I'm happy for you to have a break.
22              MS. MYERS:  No.  I don't need it now.
23              THE COURT:  Okay.
24              MS. MYERS:  Thank you.
25              THE COURT:  Okay.
```

```
 1              (Jury present.)
 2              THE COURT:  All right.  Ladies and gentlemen, the
 3    Court's going to permit a limited recross.
 4
 5                          RECROSS-EXAMINATION
 6    BY MR. STRIANSE:
 7    Q.   You were asked a question on direct examination,
 8    redirect examination, about, sort of open ended, a
 9    correctional officer's not supposed to use a Taser to punish
10    an inmate?
11    A.   Right.
12    Q.   Are you suggesting in any way that Mark Bryant was
13    punishing Jordan Norris with the Taser?
14    A.   I don't think that was his intent, no.
15    Q.   That's not his style in the way he interacted with
16    inmates --
17              THE COURT:  Sustained.  Sustained.
18              I think you've gotten your answer.  That was not
19    his intent.
20              MR. STRIANSE:  Okay.  I didn't hear an objection.
21    Okay.
22              THE COURT:  Anything further?
23              MR. SONGER:  Just one question.
24              THE COURT:  What's the question?
25              MR. SONGER:  I would like to ask whether you know
```

1  what is in Mark Bryant's head.

2           THE COURT:  Oh, of course not.

3           All right.  You're done, Mr. -- of course not --

4  Mr. Marriott.

5           So, ladies and gentlemen, that's going to conclude

6  our proof for today.  And you can put your notes in your

7  Redweld.  And your pen.

8           So a couple of things.  I don't want to repeat

9  again the three -- I'll just say the three things you must

10 remember:  You don't talk; you don't let anybody talk to you;

11 and you don't do any investigation.

12          Are we all -- anyone want me -- any further

13 clarification of that?  Okay.  Good.

14          Second, I don't think I shared with you the

15 Court's schedule.  So we'll start up early in the morning at

16 9:00.  That's really not that early.  So you need to be here

17 by 8:50, ready to go.  That's because we cannot start the

18 trial until everybody is here.  I know traffic is horrible in

19 Nashville, and things happen.  So if you get delayed because

20 of traffic, please, please, please call the number that

21 you'll get from the jury administrator when you go back over

22 there and let us know, "I'm stuck in traffic, and it's going

23 to be 30 minutes."  Just so we'll know that you're okay and

24 that you're en route.

25          But, again, please plan your morning so you get up

and ready to go.  I think the farthest person may be Hendersonville, which isn't -- which is -- it may be further than that.  Maybe a little bit closer.

Do we have somebody further than Hendersonville?

Maybe Murfreesboro.  But in any case, just plan on getting up so that you can get through the traffic and get here as anticipated in the morning.

So we'll start at 9:00.  We will take a morning break, which we didn't do today.  But we will for about 15 minutes.  When you return to the jury room, you'll find there's water, coffee, snacks, and things for you to refresh yourself.  Plenty of restrooms.  And we'll come back in and we'll hear testimony until about the lunch hour, around noon or so.  Then at noon we'll take another break for lunch.  And that will go for an hour.  No more than an hour.  We'll come back and resume testimony and take a break in the afternoon for another 15 minutes.  And then we'll conclude the day around 4:30 to 5:00, depending on where our testimony is.

So you can plan your day.  You can plan on picking up your children, plan on cooking dinner.  You'll have an idea when you finish working here today.

Finally, I would request on Thursday, if we could start at 8:30.  And I know that's different from 9:00.  But see if you can arrange your schedule.  And you may have to drop off children, whatnot, so you can be here by about 8:20

1   or so, so we can start promptly at 8:30.

2           On Thursday we'll go from 8:30 to 10:00, 90

3   minutes, and we won't -- we won't take a break.  And that's

4   because I need to take a break for the Court at 10:00 to

5   10:30 to take care of another matter.  So that will be a

6   little late break.  Then we'll go from 10:30 until noon and

7   we'll take our lunch break at noon.  And while you're at

8   lunch, I'm going to take care of another matter, and then

9   we'll come back at 1:00 and we'll proceed as scheduled.

10          So, if at all possible, I will impose upon you to

11  be here and ready to go Thursday at 8:30.  And then on

12  Friday, we'll come back to our regular time of 9:00,

13  depending on how the proof is going.

14          So, again, thank you for being here.  This has

15  been a long day for you, because you've been here early,

16  getting your orientation, filling out your paperwork.  So the

17  court officer is going to escort you back over to -- we're

18  going to escort them back over to the jury assembly room.

19  You can get your cell phones, whatnot, and then -- and any

20  paperwork you need to do.  And you have safe travels.  And

21  I'll see you all in the morning.

22          Question?

23          JUROR:  I was just wondering, is it just these

24  three days and that's it?

25          THE COURT:  I anticipate us going this week.  It

could bleed over to Monday, but we're going to work hard
Wednesday, Thursday, and Friday and try to get it done this
week.

        //////////, was that your question?  That was a
good question.  All right.  Y'all be safe.

        (Court adjourned.)

1    REPORTER'S CERTIFICATE

2

3           I, Lise S. Matthews, Official Court Reporter for

4    the United States District Court for the Middle District of

5    Tennessee, with offices at Nashville, do hereby certify:

6           That I reported on the Stenograph machine the

7    proceedings held in open court on January 7, 2020, in the

8    matter of UNITED STATES OF AMERICA v. MARK BRYANT, Case No.

9    3:18-cr-00144; that said proceedings in connection with the

10   hearing were reduced to typewritten form by me; and that the

11   foregoing transcript (pages 1 through 102) is a true and

12   accurate record of said proceedings.

13          This the 18th day of September, 2020.

14

15                              /s/ Lise S. Matthews
                                LISE S. MATTHEWS, RMR, CRR, CRC
16                              Official Court Reporter

17

18

19

20

21

22

23

24

25