```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE MIDDLE DISTRICT OF TENNESSEE
 2                       AT NASHVILLE

 3      UNITED STATES OF AMERICA,      )
                                       )
 4                 Plaintiff,          )
                                       )
 5      v.                             )   Case No.
                                       )   3:18-cr-00144
 6      MARK BRYANT,                   )
                                       )
 7                 Defendant.          )

 8

 9    - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

10    BEFORE THE HONORABLE WAVERLY D. CRENSHAW, JR., DISTRICT JUDGE

11                          TRANSCRIPT

12                             OF

13                        PROCEEDINGS

14                      January 8, 2020

15                      Trial Volume 2

16    - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

17

18

19              APPEARANCES ON THE FOLLOWING PAGE

20

21

22
      PREPARED BY:
23              LISE S. MATTHEWS, RMR, CRR, CRC
                     Official Court Reporter
24                   801 Broadway, Room A839
                     Nashville, TN 37203
25              lise_matthews@tnmd.uscourts.gov
```

```
 1   APPEARANCES:

 2           For the Plaintiff:   Peter J. Strianse
                                  Tune, Entrekin & White, P.C.
 3                                315 Deaderick Street
                                  Suite 1700
 4                                Nashville, Tennessee 37238

 5
                 For the Defendant:   Sara E. Myers
 6                                    U.S. Attorney's Office
                                      (Nashville Office)
 7                                    Middle District of Tennessee
                                      110 Ninth Avenue, S
 8                                    Suite A961
                                      Nashville, Tennessee 37203-3870
 9
                                      Michael J. Songer
10                                    U.S. Department of Justice
                                      Criminal Division
11                                    950 Pennsylvania Avenue, N.W.
                                      Washington, DC 20530
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          **I N D E X**

2          Wednesday, January 8, 2020

3

4              INDEX OF WITNESSES

5
   WITNESSES:                                           PAGE
6

7  DANIEL BRATTON
        DIRECT EXAMINATION BY MS. MYERS                   7
8       CROSS-EXAMINATION BY MR. STRIANSE                 34
        REDIRECT EXAMINATION BY MS. MYERS                 40
9
   STEVEN MICHAEL MONTGOMERY
10      DIRECT EXAMINATION BY MR. SONGER                  46
        CROSS-EXAMINATION BY MR. STRIANSE                 73
11      REDIRECT EXAMINATION BY MR. SONGER                85

12 JOHNNY JEDIDIAH HANNAH
        DIRECT EXAMINATION BY MR. SONGER                  93
13      CROSS-EXAMINATION BY MR. STRIANSE                129
        REDIRECT EXAMINATION BY MR. SONGER               149
14
   JOY CHRISTINE WRIGHT
15      DIRECT EXAMINATION BY MS. MYERS                  156
        CROSS-EXAMINATION BY MR. STRIANSE                184
16      REDIRECT EXAMINATION BY MS. MYERS                211

17 GARY OLA
        DIRECT EXAMINATION BY MR. SONGER                 218
18      CROSS-EXAMINATION BY MR. STRIANSE                265
        REDIRECT EXAMINATION BY MR. SONGER               286
19

20

21

22

23

24

25

| 1 | | EXHIBITS | | | |
|---|---|---|---|---|---|
| 2 | PLAINTIFF'S EXHIBIT | | MARKED FOR I.D. | RECEIVED IN EVD. | WITH-DRAWN |
| 3 | | | | | |
| 4 | 1 | March 12, 2015 Use of Force Policy | 104 | 104 | |
| 5 | 2 | Taser training slides | 232 | 232 | |
| 6 | 3 | Taser training legal materials 11/09 | 233 | 233 | |
| 7 8 | 5 | Mark Bryant's Taser Training Academy Certificate | 227 | 227 | |
| 9 10 | 6 | Jail Surveillance Video from 11/5/16, (6:55) | 18 | 18 | |
| 11 | 13 | Photograph of Jordan Norris in chair | 62 | 62 | |
| 12 13 | 17 | Photograph of Jordan Norris handcuffed to bar | 55 | 55 | |
| 14 | 19 | Photograph of legs | 61 | 61 | |
| 15 16 | 21 | Combined Surveillance and Taser Video from 11/5/16 (10:20 p.m.) | 58 | 58 | |
| 17 18 | 22 | Cheatham County Sheriff's Office report signed by Daniel Bratton (1855) | 26 | 26 | |
| 19 20 | 26 | Cheatham County Sheriff's Office report signed by Mark Bryant on 11/5/16 (2220) | 70 | 70 | |
| 21 22 | 29 | Cheatham County Sheriff's Office Use of Force Report signed by Michael Montgomery on 11/5/16 at 2327 | 67 | 67 | |
| 23 24 25 | 30 | Cheatham County Sheriff's Office Use of Force Report signed by Mark Bryant on 6/1/16 | 112 | 112 | |

EXHIBITS (Continued)

| PLAINTIFF'S EXHIBIT | | MARKED FOR I.D. | RECEIVED IN EVD. | WITH-DRAWN |
|---|---|---|---|---|
| 31 | Cheatham County Sheriff's Office report signed by Mark Bryant on 6/29/16 | 114 | 114 | |
| 34 | Cheatham County Sheriff's Office report signed by Mark Bryant (dated 7/13/17) | 117 | 117 | |
| 36 | Taser logs | 249 | 249 | |
| 38 | Mark Bryant recorded TBI interview Clip (August 2, 2017) – Clip 1 | 182 | 182 | |
| 39 | Photograph of thigh | 169 | 169 | |
| 40 | Mark Bryant recorded TBI interview Clip (August 2, 2017) – Clip 2 | 175 | 175 | |
| 41 | February 4, 2015 Electronic Immobilization Device: Taser Policy | 107 | 107 | |

| DEFENDANT'S EXHIBIT | | MARKED FOR I.D. | RECEIVED IN EVD. | WITH-DRAWN |
|---|---|---|---|---|
| 3 | Cheatham County Sheriff's Office report signed by Michael Montgomery on 11/5/16, 2235 | 75 | 75 | |
| 4 | July 30, 2017, letter from Sheriff Mike Breedlove of Cheatham County Sheriff's Office | 138 | 138 | |
| 5 | Jordan Norris' 11/5/16 medical record from Centennial Hospital Ashland City | 205 | 205 | |

1       The above-styled cause came on to be heard on

2  January 8, 2020, before the Honorable Waverly D. Crenshaw,

3  Jr., District Judge, when the following proceedings were had,

4  to-wit:

5

6       THE COURT:  All right.  Be seated.

7       Good morning.  Are we ready to proceed?  From the

8  government?

9       MS. MYERS:  Yes, Your Honor.

10      THE COURT:  Mr. Strianse?

11      MR. STRIANSE:  Yes, Your Honor.  Good morning.

12      THE COURT:  All right.  Bring in the jury.

13      (Jury present.)

14      THE COURT:  All right.  Be seated.  Good morning.

15      The government call its next witness.

16      MS. MYERS:  The United States calls Daniel

17  Bratton.

18      COURT DEPUTY:  Please raise your right hand.

19

20               DANIEL BRATTON,

21  called as a witness by Plaintiff, was duly sworn and

22  testified as follows:

23

24      COURT DEPUTY:  Please be seated.

25      Please be sure to speak into the microphone.

1    State your name and spell your last name.

2            THE WITNESS:  It's Daniel Bratton, B-r-a-t-t-o-n.

3

4                        DIRECT EXAMINATION

5    BY MS. MYERS:

6    Q.    Good morning, Mr. Bratton.

7    A.    Good morning.

8    Q.    Where did you work on November 5th of 2016?

9    A.    I was in the Cheatham County Jail.

10   Q.    And what was your job title there?

11   A.    I was a correctional deputy.

12   Q.    Did you work in law enforcement at all before that?

13   A.    Yes, ma'am.

14   Q.    And where was that?

15   A.    In Louisiana.

16   Q.    What did you do in Louisiana?

17   A.    I was a police officer.

18   Q.    And when were you hired at the Cheatham County Sheriff's

19   Office?

20   A.    September 22nd of 2016.

21   Q.    And how long did you work there?

22   A.    Just under three years.

23   Q.    And what did your job entail when you worked at the

24   Cheatham County Sheriff's Office?

25   A.    Basically, I made sure that the facility was safe, the

```
 1  inmates were safe, and my fellow deputies were safe.
 2  Q.   Did you work in a specific part of the jail?
 3  A.   Yes, ma'am.  I usually worked in the male sally port.
 4  Q.   What's the male sally port?
 5  A.   It's where all of the male dorms are.
 6  Q.   And where is that in relation to booking?
 7  A.   It's on the opposite side of the jail.
 8  Q.   And are there doors separating those particular areas?
 9  A.   Yes, ma'am.
10  Q.   Could you hear what was going on in booking from the
11  sally port area?
12  A.   No, ma'am.
13  Q.   And did you typically stay in one area of the jail?
14  A.   Usually.  Yes, ma'am.
15  Q.   And which area was that?
16  A.   In the male sally port.
17  Q.   Did you receive any Taser training in conjunction with
18  your job?
19  A.   Yes, ma'am.
20  Q.   And who trained you?
21  A.   Sgt. Gary Ola.
22  Q.   And what did you learn the maximum amount of time an
23  officer could tase someone?
24           MR. STRIANSE:  Your Honor, can we approach?
25           THE COURT:  Yes.
```

```
1              (Bench conference outside the hearing of the
2          jury.)
3              MR. STRIANSE:  This issue came up at the last
4    trial, and I objected to -- I mean -- this issue came up at
5    the last trial, and I made the same objection, which the
6    Court sustained.  This man was trained in a different job
7    than Mr. Bryant was.  So it's the same basis of my objection.
8              MS. MYERS:  The key issue here and what is
9    different is that we know from the last trial that
10   Mr. Strianse is really hitting on the fact that there was no
11   policy in place and no clear policy, at least, in place at
12   the time prior to the November 5th, 2016, tasings.  It's
13   important to note that he was trained and trained under the
14   policy prior to November 5th of 2016.  It's extremely
15   relevant to show that there was a policy in place; that he
16   understood it; and it was prior to November 5th of 2016.
17   That cuts against the defendant's argument that there was no
18   policy.  He understood it very clearly, as did everyone else.
19   There was a policy.  And I just need to make sure that he can
20   at least state a couple of things about what he learned
21   regarding that.
22             THE COURT:  You get the last word.
23             MR. STRIANSE:  These are the same arguments made
24   last time and the Court sustained the objection.
25             THE COURT:  Sustained.
```

1              (Jury present.)

2    BY MS. MYERS:

3    Q.   Were there any fellow students in that Taser training

4    class with you?

5    A.   Yes, ma'am.

6    Q.   Do you remember any of their names?

7    A.   I remember one of their names -- two of their names,

8    actually.  Caitlin Johnson at the time and Jason Schaeffer.

9    Q.   Did Caitlin Johnson eventually get married?

10   A.   Yes, ma'am.

11   Q.   And what did her name become?

12   A.   Marriott.

13   Q.   Did she marry Josh Marriott?

14   A.   Yes.

15   Q.   Who also works in the jail?

16   A.   Worked in the jail, yes, ma'am.

17   Q.   Now, have you ever personally been tased?

18   A.   Yes, ma'am.

19   Q.   And was that a part of your Taser training?

20   A.   Yes, ma'am.

21   Q.   And can you -- do you know how long during that training

22   you were personally tased?

23   A.   I know it was less than the five seconds.

24   Q.   Okay.  How do you know that it was less than five

25   seconds?

1  A.    I used my safe word to let them know that I wanted them

2  to turn it off.

3  Q.    Okay.  And why did you use your safe word?

4  A.    It hurts.

5  Q.    What did it feel like?

6  A.    Really, I would compare it to holding on to an electric

7  fence line and just holding on.

8  Q.    What was the standard Taser cycle?

9  A.    Five seconds.

10  Q.    Were you permitted to go beyond that five seconds?

11  A.    No, ma'am.

12  Q.    Now, on November 5th of 2016, you mentioned you were

13  working at the jail that night?

14  A.    Yes, ma'am.

15  Q.    What shift did you work?

16  A.    I was on second shift.

17  Q.    And what are the timeframes for the second shift?

18  A.    It started at 2:00 p.m. and we got off at 10:00.

19  Q.    And who was your supervisor on that night?

20  A.    Mark Bryant.

21  Q.    Do you remember meeting an inmate named Jordan Norris on

22  that night?

23  A.    Yes, ma'am.

24  Q.    And how did you first meet him?

25  A.    When I was called up to booking to assist officers is

1  the first time that I saw him.
2  Q.   You said you were called up to assist?
3  A.   Yes, ma'am.  After reviewing my report, I was called up
4  to booking to help them detain Jordan Norris.
5  Q.   Where were you when you were called up?
6  A.   I was in the male sally port.
7  Q.   And at that time when you arrived in the booking area,
8  could you tell anything that had happened that started the
9  issue?
10  A.   No, ma'am.  Not prior to me getting up there.
11  Q.   And was Norris handcuffed when you arrived?
12  A.   Not fully, no, ma'am.
13  Q.   Not fully?
14  A.   Yes, ma'am.
15  Q.   What do you remember from that?
16  A.   From what I could see, when I first arrived, he had one
17  hand in a pair of handcuffs; the other hand was not
18  restrained in the handcuffs.
19  Q.   And where was Jordan Norris at that time?
20  A.   When I arrived, they were at the Cell Number 4 door.
21  Q.   And who else was there with you?
22  A.   Jeff Key, Mark Bryant, and Josh Marriott.
23  Q.   And at that time that you arrived, were you concerned
24  for anyone's safety?
25  A.   Yes, ma'am.

1  Q.    And so what did you do?

2  A.    When I first arrived, I took the Taser out of the

3  holster, took the cartridges off of it and approached the

4  officers and Jordan Norris.  I issued a verbal command for

5  him to stop resisting.  When he did not, I applied the first

6  tase.

7  Q.    And at that time were Jordan Norris's feet restrained in

8  any way?

9  A.    No, ma'am.

10  Q.    Was any other part of him restrained?

11  A.    No, ma'am.

12  Q.    And you said that you tased him for the first time?

13  A.    Yes, ma'am.

14  Q.    Okay.  Where on his body do you remember tasing him?

15  A.    I believe it was his left shoulder blade the first time.

16  Q.    And was that tase effective?

17  A.    No, ma'am.

18  Q.    What happened?

19  A.    He stopped resisting for less than a second and then

20  once he, I guess, gained control of his body, he began to

21  resist again.

22  Q.    Okay.  And how long was that tase again?

23  A.    It was less than five seconds.

24  Q.    How do you know that?

25  A.    I pulled the Taser off of him.

1    Q.    Okay.  How do you pull the Taser off?

2    A.    I just pulled it off of him.

3    Q.    Now, when you pull it off, will it continue to cycle?

4    A.    Yes, ma'am.  Until the five seconds is complete.

5    Q.    And how do you achieve the full five-second tase?

6    A.    You would pull the trigger and release it.

7    Q.    And how would you go longer than five second?

8    A.    You would hold the trigger down.

9    Q.    Did you hold the trigger down?

10   A.    No, ma'am.

11   Q.    So what happened after that?

12   A.    After that, after he began resisting again, that's when

13   I applied the second tase.

14   Q.    Okay.  And what happened with the second tase?

15   A.    I did not make good contact.  One of the deputies tried

16   to grab the Taser and move it to get better contact on

17   Mr. Norris.

18   Q.    Is that dangerous?

19   A.    Yes, ma'am.

20   Q.    What happened when he tried to move it?

21   A.    You can tase yourself or you can end up tasing other

22   deputies.

23   Q.    And did anyone else get tased?

24   A.    Yes, ma'am.

25   Q.    Do you remember who all got tased?

1  A.   I want to say it was all of us that were -- because we
2  were all touching.
3  Q.   Did that include yourself?
4  A.   Yes, ma'am.
5  Q.   How did that feel?
6  A.   Not good.
7  Q.   So what happened at that point?
8  A.   After that, they were able to get his free hand into the
9  handcuffs and we escorted him over to the chair.
10 Q.   And was the chair already out at that time?
11 A.   Yes, ma'am.
12 Q.   Do you know who brought it out?
13 A.   I believe it was Josh.
14 Q.   And so, when you were walking by, when you arrived, do
15 you know if the chair was already out?
16 A.   I believe so.
17 Q.   And what happened when you got him over to the chair?
18 A.   Once we got him to the chair, we went to sit him down.
19 At that point he arched his back, trying to get out of the
20 chair, and that is when I applied the third and final tase.
21 Q.   And so, for that third and final tase, do you remember
22 where that was on his body?
23 A.   I believe it was on his stomach.
24 Q.   Do you remember how long that tase lasted?
25 A.   Less than five seconds.

1    Q.    How do you know that?

2    A.    Because I again pulled the Taser off of him.

3    Q.    And when you tased him that third time, was any part of

4    him strapped into the chair?

5    A.    No, ma'am.

6    Q.    His feet?

7    A.    No, ma'am.

8    Q.    Were they restrained in any way?

9    A.    No, ma'am.

10   Q.    His arms?

11   A.    His hands were handcuffed.  That was it.

12   Q.    What about his shoulders?

13   A.    No, ma'am.

14   Q.    And what was he doing at the time that you tased him?

15   A.    He was resisting us getting him restrained in the chair.

16   He was also kicking his legs.

17   Q.    Did that pose a threat to officers?

18   A.    Yes, ma'am.

19   Q.    And you said the final tase was two to three seconds as

20   well?

21   A.    Yes, ma'am.

22   Q.    And do you remember ever -- the Taser ever making

23   contact with him again while you were taking him out of the

24   cell?

25   A.    No, ma'am.

1  Q.    Do you remember ever pulling the trigger again?

2  A.    No, ma'am.

3  Q.    And after that last tase, were the officers able to

4  secure him in the chair?

5  A.    Yes, ma'am.

6  Q.    Were they able to get the straps across his shoulders?

7  A.    Yes, ma'am.

8  Q.    And across his arms?

9  A.    Yes, ma'am.

10 Q.    And across his lap?

11 A.    Yes, ma'am.

12 Q.    And across his feet?

13 A.    Yes, ma'am.

14 Q.    And did those brief tases ultimately allow you to get

15 him to the chair?

16 A.    I do believe so, yes, ma'am.

17 Q.    Well, he ended up in the chair; is that right?

18 A.    Right.

19 Q.    And during this time when you were helping him, did

20 anyone else tase Jordan Norris while you were there?

21 A.    No, ma'am.

22 Q.    Did you ever see the defendant tase Jordan Norris during

23 this time?

24 A.    No, ma'am.

25 Q.    And what did you do once Jordan Norris was restrained in

1   the chair?

2   A.   I went about doing my job.  I went back to the male

3   sally port.

4   Q.   So you left booking?

5   A.   Yes, ma'am.

6   Q.   And I'm going to ask you -- there's a binder right up

7   next to you.  Could you please open it and turn to Tab 6.

8        Do you recognize this?

9   A.   Yes, ma'am.

10  Q.   And what is that?

11  A.   It's a video of the incident that occurred.

12  Q.   Are your initials on that?

13  A.   Yes, ma'am.

14  Q.   And does that video accurately depict the events that

15  occurred that we just talked about?

16  A.   Yes, ma'am.

17            MS. MYERS:  At this time, I would like to ask that

18  Exhibit 6 be admitted.

19            THE COURT:  Any objection?

20            MR. STRIANSE:  No objection.

21            THE COURT:  Admitted.

22            (Whereupon Plaintiff Exhibit 6 was marked for

23            identification and received in evidence.)

24            MS. MYERS:  May I publish it to the jury?

25            THE COURT:  Yes.

1          Now, ladies and gentlemen, you'll notice that
2    there are a number -- you're going to see come into evidence
3    a number of videos.  Some may be played in part or in total
4    here.  But when you retire to deliberate and begin making a
5    decision, you'll have in the jury room a laptop, and you'll
6    have all the exhibits, and you'll be able to look at all
7    these videos as much as you want.
8          Go ahead.
9          MS. MYERS:  Ms. Aroner, could you please start the
10   video.
11         (Exhibit played.)
12         MS. MYERS:  Could we pause for just one second.
13   Q.   All right.  Mr. Bratton, can you describe who these
14   people are in the video?  And I'm going to grab a pointer.
15         Could I have a pointer, please?  Thank you.
16         All right.  So let's start over here on the right.
17         Who is this person right here?
18   A.   I believe that's Jeff Key.
19   Q.   Okay.  So that's on the far right.
20         And who is the person there in the middle?  I know
21   we can see a leg and a black shirt.
22   A.   That is Jordan Norris.
23   Q.   And who is the other officer here on the left?
24   A.   That is Mark Bryant.
25   Q.   And then who is this officer right here?

1   A.    That's Josh Marriott.

2   Q.    With the restraint chair?

3   A.    Yes, ma'am.

4   Q.    And then, finally, here on the left, do you know who

5   that is?

6   A.    I want to say that's Caitlin, but I can't really see it.

7   Q.    We may pause it again and see if you get a better look

8   at that person.

9   A.    Okay.

10          MS. MYERS:  Can you please continue the video.

11          (Exhibit played.)

12  BY MS. MYERS:

13  Q.    And is that Cell 4 right there?

14  A.    Yes, ma'am, on the far right.

15  Q.    And right there, who is this person right here who just

16  arrived?

17  A.    That is -- that's me.

18          (Exhibit played.)

19  BY MS. MYERS:

20  Q.    How many times had you tased him at this point?

21  A.    Twice.

22  Q.    It looks like 1852 and 52 seconds.

23          All right.  So does this video accurately depict

24  what we just talked about?

25  A.    Yes, ma'am.

1  Q.    And is that the Jordan Norris removal from Cell 4?

2  A.    Yes, ma'am.

3            MS. MYERS:  You can take that down.  Thank you.

4  Q.    And so were you, in fact, able to control Jordan to the

5  chair with those short Taser bursts?

6  A.    Yes, ma'am.

7  Q.    Had you ever used a Taser before that night?

8  A.    No, ma'am.

9  Q.    And what did you do once Jordan Norris was fully

10 restrained?

11 A.    I went back to the male sally port.

12 Q.    Did you hear anything else go on inside the jail while

13 you were outside in the sally port?

14 A.    No, ma'am.

15 Q.    Did anyone come out with you?

16 A.    When we left?

17 Q.    Yes.

18 A.    Yes, ma'am.  Everybody that was on shift left at the

19 same time that night.

20 Q.    Oh, I meant after you had secured him in the chair and

21 you went back to the sally port.

22            Did anybody come back to the sally port with you?

23 A.    Oh.  Not that I can remember.  No, ma'am.

24 Q.    And when you came back, did you ever see Jordan Norris

25 again that night?

```
1   A.   I did not see him until I went to go home.
2   Q.   And what time did you go home?
3   A.   It was either right at 10:00 or shortly after.
4   Q.   And where was he when you went to go home at 10:00?
5   A.   He was still in the restraint chair.
6   Q.   Was he secured at that time?
7   A.   Yes, ma'am.
8   Q.   Did he have any part of him loose that you saw?
9   A.   No, ma'am.
10  Q.   Was there any other time that you encountered Jordan
11  Norris and saw that he had a part of him loose?
12  A.   No, ma'am.  Not that I can recall.
13  Q.   And do you ever remember seeing one of his arms loose?
14  A.   His arm might have been loose when I came back from
15  break, but I'm -- I'm not 100 percent sure.
16  Q.   It's been a while?
17  A.   Yes, ma'am.
18  Q.   But you think one of his arms might have been loose at
19  one point?
20  A.   Yes, ma'am.
21  Q.   When you came back from break?
22  A.   Yes, ma'am.
23  Q.   Was anybody able to restrain him --
24  A.   Yes, ma'am.
25  Q.   So you do remember that?
```

1  A.    Yes, ma'am.

2  Q.    Okay.

3  A.    I do remember coming back in and they were working on

4  the restraint chair.

5  Q.    Okay.  Did anybody tase him that time that you saw?

6  A.    No, ma'am.

7  Q.    And were they able to successfully get his arm back

8  restrained?

9  A.    Yes, ma'am.

10 Q.    And that was without using a Taser?

11 A.    Correct.

12 Q.    That you saw?

13 A.    Right.

14 Q.    Do you know about what time that was?

15 A.    No, ma'am.  I do not.  Not right off the top of my head.

16 Q.    Do you think it was closer to the removal of the cell,

17 or closer to the time you left?

18 A.    I want to say it was closer to the time that I left.

19 Q.    Do you remember clearly, though?

20 A.    No, ma'am.

21 Q.    And did anyone else -- did you ever at any point see

22 anyone use a Taser?

23 A.    No, ma'am.

24 Q.    So you're back in the sally port.

25              And you said the last time you saw Jordan was at

1   10:00?

2   A.   Yes, ma'am.

3   Q.   And between the time that you helped the other officers

4   transfer Jordan from the cell into the restraint chair until

5   you left at 10:00, did anyone call you for any help?

6   A.   No, ma'am.

7   Q.   Were you available to help if anyone needed you?

8   A.   Yes, ma'am.

9   Q.   And were you aware of any other tasings during your

10   shift involving Jordan Norris?

11   A.   No, ma'am.

12   Q.   And now I'm going to have you turn in just a moment --

13   I'm going to have you get ready.  But have you ever used a

14   Taser?  You mentioned you hadn't before that night; is that

15   right?

16   A.   Yes.

17   Q.   Is using a Taser considered to be force?

18   A.   Yes, ma'am.

19   Q.   And are you required to write reports following a use of

20   force?

21   A.   Yes, ma'am.

22   Q.   What reports are you required to write?

23   A.   Usually you would write a use of force and an incident

24   report.

25   Q.   And is that the jail policy?

1    A.    Yes, ma'am.

2    Q.    And who taught you how to write a report?

3    A.    I learned it going through the academy.

4    Q.    Did that teach you what to include in a report?

5    A.    Yes, ma'am.

6    Q.    And what kind of details are you supposed to include

7    when an incident occurs?

8    A.    Basically you would describe the events that you

9    witnessed, who all was involved, and what all happened.

10   Q.    And what about when a Taser is used?

11   A.    You would use -- you would do a use of force report.

12   Q.    Would there be any specifics in that?

13   A.    Yes, ma'am.

14   Q.    For example, would you ask how many times -- would you

15   include how many times you tased somebody?

16   A.    Yes, ma'am.  You would also include that in your

17   incident report.

18   Q.    And how about the length of the tases?

19   A.    Yes, ma'am.

20   Q.    And are the use of force and incident reports different?

21   A.    Yes, ma'am.

22   Q.    And would you have to write an incident report when you

23   use a Taser?

24   A.    Yes, ma'am.

25   Q.    And did you write an incident report?

1    A.   Yes, ma'am.

2    Q.   And I would like for you to turn in the binder to

3    Exhibit 22, Tab 22.

4              Do you recognize this?

5    A.   Yes, ma'am.

6    Q.   And what is it?

7    A.   That is my incident report of what occurred.

8    Q.   And that's from November 5th of 2016?

9    A.   Yes, ma'am.

10   Q.   Does that refer to what we saw in the video, the cell

11   extraction of Jordan?

12   A.   Yes, ma'am.

13             MS. MYERS:  And at this time I would like to ask

14   that it be moved into evidence.

15             THE COURT:  Any objection?

16             MR. STRIANSE:  No objection.

17             THE COURT:  Admitted.

18             (Whereupon Plaintiff Exhibit 22 was marked for

19             identification and received in evidence.)

20             MS. MYERS:  Could I publish it to the jury, Your

21   Honor?

22             THE COURT:  Yes.

23   BY MS. MYERS:

24   Q.   All right.  We're going to start by looking at the top

25   of the form.

1          So if you could please enlarge that top portion a
2    little bit.  All right.
3               So let's start with the date.  Did you prepare
4    this on a computer?
5    A.   Yes, ma'am.
6    Q.   Okay.  And so did you enter in all of these details --
7    A.   Yes, ma'am.
8    Q.   -- yourself?
9    A.   Yes, ma'am.
10   Q.   Okay.  So what time do we have reflected on the incident
11   report that you wrote?
12   A.   1855.
13   Q.   Okay.  And what does that translate to?
14   A.   6:55 p.m.
15   Q.   And is it all right with you if I just refer to that as
16   "the 7:00 p.m. incident"?
17   A.   Yes, ma'am.
18   Q.   Really close to 7:00?
19   A.   (Witness moves head up and down.)
20   Q.   And then here, the location, you have that in booking;
21   is that right?
22   A.   Yes, ma'am.
23   Q.   And that's the area that we saw in the video?
24   A.   Correct.
25   Q.   And then who is the reporting officer?

1   A.   Myself.

2   Q.   And then you have the nature of the incident?

3   A.   Yes, ma'am.

4   Q.   And what do you have included there?

5   A.   "Resisting" and "Taser used."

6   Q.   And then you have the inmate involved?

7   A.   Yes, ma'am.

8   Q.   And then you have the officers involved?

9   A.   Yes, ma'am.

10  Q.   And who are the officers you listed as the officers

11  being involved?

12  A.   Cpl. Mike Bryant -- Mark Bryant, Josh Marriott, Jeff

13  Key, and myself.

14  Q.   And how soon after an incident are you supposed to write

15  a report?

16  A.   Usually you would do it as soon as -- as soon as you

17  could, but you would make sure it was completed before you

18  left.

19  Q.   So I'm going to have us go to the very bottom of the

20  report now, if we could zoom in on that portion.

21           All right.  So there are a couple of signatures

22  here.  Could you please describe the signatures for us?

23  A.   The first one is mine.  The second one is Mark's, and

24  the date and time received is when he was handed the report.

25  Q.   And is that time 2205?

1  A.    Yes, ma'am.

2  Q.    Okay.  And what time does that translate to?

3  A.    10:05 p.m.

4  Q.    And is that the end of your shift?

5  A.    The end of shift is usually at 2200, but I believe

6  that's when I -- I believe that's when I left.

7  Q.    And now I would like to go to the narrative section of

8  the incident report.  Thank you.

9            All right.  Does this look familiar?

10           THE WITNESS:  Yes, ma'am.

11 BY MS. MYERS:

12 Q.    And did you write this narrative?

13 A.    Yes, ma'am.

14 Q.    And could you walk us through it?  So, for example,

15 let's just start at the beginning, and I'll stop you when I

16 need to.  But can you go on ahead and read it for us, please?

17 A.    Yes, ma'am.  (As read):

18            While working in the sally port I was asked by

19            Deputy Marriott to report to booking.  Once I

20            arrived, I saw Cpl. Bryant and J. Key attempting

21            to place inmate Jordan Norris in handcuffs in

22            front of Cell 4.  I also saw that inmate Norris

23            was refusing to comply.  Once I walked through the

24            door, I took the issued Taser out of the holster

25            and took the deployment -- the deployable

1          cartridge off and turned it on.  I then issued
2          inmate Norris a command to stop fighting or he
3          would be tased.
4  Q.    I'm going to stop you right there.
5          So was that part of your training, that you're
6  supposed to issue a command?
7  A.    Yes, ma'am.
8  Q.    Okay.  And what specifically do you remember saying?
9  A.    I told him to stop resisting or fighting and that I was
10  going to tase him if he did not comply.
11  Q.    So the next sentence?
12  A.    It says (as read):
13          Inmate Key -- it's supposed to say "Deputy
14          Key" -- also stated that he would be tased if he
15          did not comply.  I then placed the Taser on the
16          mid of inmate Norris's back and drive-stunned him.
17          Inmate Norris continued to resist, and I issued
18          another verbal order to stop resisting.
19  Q.    So I'll stop you there.
20          So that was the first tase right there --
21  A.    Yes, ma'am.
22  Q.    -- that you had discussed?
23  A.    Right.
24  Q.    Okay.
25  A.    I had said that it was on his shoulder blade, but after

1  reviewing the report, it was obviously his lower back.

2  Q.   And this was closer in time to the incident; is that

3  right?

4  A.   Yes, ma'am.

5  Q.   Okay.  In fact, the same night?

6  A.   Right.

7  Q.   And you can keep reading.

8  A.   (As read):

9           When he did not, I placed the Taser on his

10          upper shoulder blade on inmate Norris's left side

11          and deployed again, after which he was placed in

12          cuffs and escorted to the restraint chair.  Once

13          at the restraint chair, he arched his back and

14          refused to comply with verbal commands to sit, at

15          which time I drive-stunned him in his stomach.  He

16          was then able to be placed in a restraint chair.

17 Q.   So, in this report, is this an accurate statement of

18 what happened that night?

19 A.   Yes, ma'am.

20 Q.   Of what you personally witnessed?

21 A.   Yes, ma'am.

22 Q.   And the use of force that you used?

23 A.   Yes, ma'am.

24 Q.   And did there include in this report a justification for

25 each time that you tased him?

1  A.    Yes, ma'am.

2  Q.    And how many times was that?

3  A.    Three.

4  Q.    And is that consistent with what you were taught about

5  how to write incident reports?

6  A.    Yes, ma'am.

7  Q.    Did you mention Mark Bryant tasing Jordan Norris at any

8  point in this report?

9  A.    No, ma'am.

10  Q.    Why not?

11  A.    I did not witness Mark Bryant tasing him.

12  Q.    Did you write a use of force report about this incident?

13  A.    No, ma'am.

14        MS. MYERS:  And I'll have you take that down.

15  Thank you.

16  Q.    When you use a Taser, you mentioned before that you're

17  required to write a use of force report; is that right?

18  A.    Yes, ma'am.

19  Q.    And in fact, didn't you tell us it's policy to write

20  one?

21  A.    Yes, ma'am.

22  Q.    And does a use of force report -- you mentioned

23  earlier -- call for different information?

24  A.    Yes, ma'am.

25  Q.    Does it include the specific type of force used?

1   A.    Yes, ma'am.

2   Q.    And in this case, what would it have been?

3   A.    It would have been that the Taser had been used.

4   Q.    Do you also have to check a justification for why you

5   tased?

6   A.    Yes, ma'am.

7   Q.    So why didn't you write a use of force report that

8   night?

9   A.    I was told not to worry about it and that it would be

10  taken care of.

11  Q.    Who told you that?

12  A.    Mark.

13  Q.    What was his position in relation to yours?

14  A.    He was my corporal, which is my immediate supervisor.

15  Q.    So Mark Bryant was your boss?

16  A.    Yes, ma'am.

17  Q.    And when the defendant told you not to write a report,

18  about what time was that?

19  A.    I want to say it was closer to when we left, but I'm

20  not -- I'm not 100 percent sure exactly what time he told me.

21  Q.    And were you aware at that time that the defendant had

22  tased Jordan Norris after your interaction with him at

23  7:00 p.m.?

24  A.    No, ma'am.

25  Q.    And what did you think about the defendant asking you

```
 1  not to do a use of force report?
 2  A.    I didn't really think about it.  I wasn't going to argue
 3  with my commanding officer.
 4  Q.    Do you know if the defendant ever wrote a use of force
 5  report regarding the times that you tased --
 6  A.    I do not --
 7  Q.    -- Jordan Norris?
 8  A.    -- no, ma'am.
 9  Q.    Did you see any report that the defendant wrote
10  regarding anything related to the 7:00 p.m. incident?
11  A.    Not that I can recall, no, ma'am.
12  Q.    And if the defendant hadn't told you not to write a
13  report, would you have completed a use of force report?
14  A.    Yes, ma'am.
15            MS. MYERS:  One moment, please.
16            I have no further questions at this time.
17            THE COURT:  All right.  Cross.
18            MR. STRIANSE:  Thank you, Your Honor.
19
20                      CROSS-EXAMINATION
21  BY MR. STRIANSE:
22  Q.    Good morning, Mr. Bratton.
23  A.    Good morning, sir.
24  Q.    I just have a couple of questions for you this morning.
25            I know that it is your clear recollection that
```

1  during that extraction process outside of the door of Cell 4

2  where the four officers were trying to gain control of

3  Mr. Norris that you believe that you only activated your

4  Taser three times?

5  A.    Correct.

6  Q.    Now, you were aware that there was an investigation

7  conducted by the Tennessee Bureau of Investigation and the

8  Federal Bureau of Investigation?

9  A.    Yes, sir.

10 Q.    And were you aware that they were able to get the Taser

11 logs for the Taser that you were using on the night of the

12 November 5, 2016?

13 A.    I'm sure they were able to get it.

14 Q.    Were you aware that the official Taser log shows that

15 you activated the device four times for five seconds and not

16 three times?

17 A.    No, sir, I was not aware of that.

18 Q.    Okay.  I know that there was a lot happening outside

19 that door, trying to get this man under control.  What did

20 you think about the strength that he was exhibiting,

21 Mr. Norris was exhibiting, pushing against you and your three

22 colleagues?

23 A.    He had incredible strength.

24 Q.    And he was not a big man?

25 A.    Correct.

Q.    He was probably somebody that was five-nine, five-ten or

so; is that about right?

A.    Give or take, yes, sir.

Q.    About 170 pounds?

A.    I'm not sure about how much he weighed.

Q.    Somebody about maybe my size?

A.    I would say so, yes, sir.

Q.    Did you think that he was under the influence of some

kind of intoxicant at the time?

A.    I had assumed, yes, sir, but I was not 100 percent sure.

Q.    And do you remember telling the grand jury when you

appeared in this building some time ago that he seemed to

have empty eyes?

A.    Yes.  Yes, sir.

Q.    And that he was having either some sort of a mental

issue or was under the influence of something?

A.    Yes, sir.

Q.    Okay.  Now, you told the jury that your corporal that

night was Mark Bryant; is that correct?

A.    Yes, sir.

Q.    On second shift.  And he offered to write the use of

force report; is that correct?

A.    Yes, sir.

Q.    You all had had a long shift that -- that night; is that

right?

1    A.    Yes, sir.

2    Q.    I mean, the other officers were dealing with Mr. Norris;

3    is that right?

4    A.    Correct.

5    Q.    And you were doing whatever duties you had to do over in

6    the male sally port; is that right?

7    A.    Yes, sir.

8    Q.    And I think at that point in time you all may have had

9    150 to 200 inmates that needed to be taken care of on that

10   shift; is that right?

11   A.    That sounds about right.  Yes, sir.

12   Q.    And with all the other officers being deflected dealing

13   with Mr. Norris, it sort of fell on you to hand out

14   medication and do all those things that a correctional

15   officer does in interacting with the inmates; is that right?

16   A.    Yes, sir.  It was myself and another deputy that was

17   back there.

18   Q.    Did you think that Mr. Bryant was trying to do anything

19   sinister or cover anything --

20           MS. MYERS:  Objection.  May we approach?

21           THE COURT:  Sure.

22           (Bench conference outside the hearing of the

23           jury.)

24           MS. MYERS:  The characterization of whether or not

25   anybody was doing anything sinister actually leaves a

misimpression.  He can't get inside, obviously, of the mind
of the person while they were doing it.

             I just want to make sure there aren't any
follow-up questions.  You know, "How did you take that
statement?"  Like, "What did you take that statement to
mean?"  But not planting, you know, "Was it sinister?  Did
you think that he was a sinister person?  Did you think that
he was a malicious person?"  Or going into the character of
the defendant at all.

             MR. STRIANSE:  I'm going into this report.

             THE COURT:  Overruled.

             (Jury present.)

BY MR. STRIANSE:

Q.   Mr. Bratton, I was asking you before, did you think that
Mr. Bryant was trying to cover anything up by saying that he
would take care of writing this use of force report?

A.   No, I did -- I did not think that.

Q.   Okay.  Was it -- he was going to stay over for the third
shift; is that right?

A.   He was going to -- from what I understood, he was going
to stay to make sure that the report was written, yes, sir.

Q.   And he didn't want to dump this Norris situation on the
third shift people that were coming in at around 10:00; is
that right?

A.   That is correct.

```
 1              MS. MYERS:  Objection.
 2              THE COURT:  On what basis?
 3              MS. MYERS:  Speculation.
 4              THE COURT:  Overruled.
 5              Go ahead.
 6  BY MR. STRIANSE:
 7  Q.    You were shown a moment ago Government's Exhibit 22 and
 8  you identified that; is that right?
 9  A.    Yes, sir.
10  Q.    And you've got the book open --
11  A.    Yes, sir.
12  Q.    -- to that?
13              And in that you give a pretty detailed account of
14  what you were dealing with that night; is that right?
15  A.    Yes, sir.
16  Q.    And you write that (as read):
17                    After Mr. Norris was placed in cuffs and
18                    escorted to the restraint chair, once at the
19                    restraint chair, he arched his back and refused to
20                    comply?
21  A.    Yes, sir.
22  Q.    Do you remember writing that?
23  A.    Yes, sir.
24  Q.    So, even though he was cuffed -- his hands were cuffed
25  at that point in time; is that right?
```

```
 1   A.   Yes, sir.
 2   Q.   And I believe at that point in time they were cuffed
 3   behind his back?
 4   A.   Yes, sir.
 5   Q.   You still had to tase him to get him under control, to
 6   get him into that chair; is that right?
 7   A.   That is correct.
 8   Q.   And you certainly didn't do that because you enjoy doing
 9   it?
10   A.   No, sir.
11   Q.   You were not trying to be mean or malicious to
12   Mr. Norris?
13   A.   No, sir.
14   Q.   You felt like you had to do that to get control over
15   him?
16   A.   Yes, sir.
17   Q.   Even though he was cuffed?
18   A.   Yes, sir.  His feet were still free at that time.
19              MR. STRIANSE:  Thank you, Mr. Bratton.
20              THE COURT:  All right.  Redirect.
21              MS. MYERS:  Yes, Your Honor.
22                      REDIRECT EXAMINATION
23   BY MS. MYERS:
24   Q.   So, Mr. Bratton, how long did your tases last?
25              THE COURT:  Counsel approach.
```

```
 1              (Bench conference outside the hearing of the
 2         jury.)
 3              THE COURT:  So I think you need to stay on cross.
 4    We didn't have any testimony about the length of the tases on
 5    cross-examination.
 6              MS. MYERS:  Sure.  That's fine.  I'll skip through
 7    that.  Thank you.
 8              (Jury present.)
 9    BY MS. MYERS:
10    Q.    So were you able to control Jordan Norris with your
11    brief tases?
12    A.    I do believe so.  The first one wasn't as effective as I
13    thought it would be, but eventually we were able to get him
14    fully restrained.
15    Q.    And that was even though he had incredible strength?
16    A.    Yes, ma'am.
17    Q.    And those tases were less than five seconds?
18    A.    Yes, ma'am.
19    Q.    And you mentioned before that the defendant said he
20    would take care of the report?
21    A.    Yes, ma'am.
22    Q.    And that you didn't think anything of it on cross?
23    A.    Right.  I didn't think anything that -- I just thought
24    he was going to take care of it because he saw it happen.
25    Q.    But at that point, did you know that Mark Bryant had
```

```
 1  tased anyone after your initial tases at 7:00 p.m.?
 2           THE COURT:  All right.  That's beyond the scope of
 3  cross.  You need to stay within the scope of cross.  Next
 4  question.
 5  BY MS. MYERS:
 6  Q.    And, as a law enforcement officer, do you encounter
 7  people who are on drugs?
 8  A.    Yes, ma'am.
 9  Q.    Regularly?
10  A.    I would say so.  Yes, ma'am.
11  Q.    How about people who have mental illness?
12  A.    Yes, ma'am.
13  Q.    So are you accustom to handling those issues?
14  A.    Yes, ma'am.
15  Q.    And is it consistent to tase someone for 50 seconds?
16  A.    Not -- not at once, no, ma'am.
17  Q.    Not in one incident?
18  A.    Correct.
19  Q.    Would that have been consistent with the policy at the
20  time?
21  A.    No, ma'am.
22           MS. MYERS:  Thank you.
23           THE COURT:  Okay.  Counsel approach.
24           (Bench conference outside the hearing of the
25             jury.)
```

1          THE COURT:  So again you went beyond the scope of
2    cross.
3          MS. MYERS:  Your Honor, I don't believe that I
4    did.
5          THE COURT:  Well, certainly you did.  There was no
6    proof out there about the 50 seconds.  That was Mr. Bryant.
7    That's not this guy.
8          MS. MYERS:  So when he talked about that he would
9    take care of it, and that he thought he was doing --
10          THE COURT:  No.  No.  No, we didn't get into that.
11          MS. MYERS:  But he did, Your Honor.  He got into
12    the magnanimous gesture that he was making to draft the
13    report for him --
14          THE COURT:  But that had nothing to do with 50-
15    second tase.
16          MS. MYERS:  It did, because the 50-second tase
17    occurred afterwards.  He didn't know about it --
18          THE COURT:  But he didn't testify about that.  In
19    fact, he said he didn't know anything about it.  So why would
20    you ask him about it?
21          MS. MYERS:  Exactly.  So when he is asking him
22    about the magnanimity of whether or not he was being -- that
23    he had been given an opportunity --
24          THE COURT:  To do the report.
25          MS. MYERS:  -- to do the report, yes, he didn't

1   know that Mark Bryant had tased him.  In fact, after he had
2   tased him.  So he thought it could have been magnanimous,
3   when in fact he learned later that he was tased for 50
4   seconds.
5               THE COURT:  I think I have to instruct the jury
6   to -- I'm going to strike from the record the question
7   regarding the 50-second tase.  This witness didn't testify --
8               MR. SONGER:  Your Honor, if I could just
9   briefly --
10              THE COURT:  No, we're not going to have two people
11  here.  She's talking; that's it.  And when you're talking,
12  she doesn't do it.  And in fact, I don't even know why you're
13  here.
14              All right.  Go ahead.  I'm going to instruct the
15  jury I'm going to strike that from the record.
16              (Jury present.)
17              THE COURT:  All right.  Ladies and gentlemen, you
18  heard a question and answer regarding a 50-second tase, and
19  I'm going to order you to ignore it and I'm going to strike
20  that testimony from the record.
21              All right.  Call your next witness.  You can step
22  down.
23              THE WITNESS:  Thank you, sir.
24                      (Witness excused.)
25              MR. SONGER:  The United States calls Michael

```
1   Montgomery.
2           THE COURT:  All right.  Do we need to take a quick
3   break for him?
4           MR. SONGER:  Yes.
5           THE COURT:  Five minutes or less.
6           All right.  Ladies and gentlemen, I just need you
7   to step out.  We're going to make an accommodation here and
8   it will be five minutes or less.
9           (Jury not present.)
10          THE COURT:  All right.  Can you get
11  Mr. Montgomery?
12          Mr. Montgomery.  All right.  Get the jury.  All
13  right.
14          If you'll hold there, Mr. Montgomery, we'll swear
15  you in.  Wait until the jury comes in.
16          MS. MYERS:  And, Your Honor, he needs the
17  lavalier.
18          THE COURT:  Oh, that's right.
19          COURT DEPUTY:  We have it.
20          I don't know if you remember how to use this.
21          MR. MONTGOMERY:  Yeah.
22          (Jury present.)
23          THE COURT:  All right.  Be seated.  Call your next
24  witness.
25          MR. SONGER:  The United States calls Michael
```

```
 1   Montgomery.
 2           THE COURT:  All right.  We'll swear you in.
 3           COURT DEPUTY:  Please raise your right hand.
 4
 5                 STEVEN MICHAEL MONTGOMERY,
 6   called as a witness by Plaintiff, was duly sworn and
 7   testified as follows:
 8
 9           COURT DEPUTY:  Please state your full name and
10   spell your last name.
11           THE WITNESS:  Steven Michael Montgomery.  Last
12   name is spelled M-o-n-t-g-o-m-e-r-y.
13           COURT DEPUTY:  Please have a seat.
14
15                   DIRECT EXAMINATION
16   BY MR. SONGER:
17   Q.   Good morning, Mr. Montgomery.
18   A.   Good morning.
19   Q.   How are you currently employed, sir?
20   A.   I currently work for Cheatham County 911.
21   Q.   How long have you worked for 911?
22   A.   A little over two years.
23   Q.   What did you do before that?
24   A.   I was a corporal for the Cheatham County Sheriff's
25   Office in the jail.
```

1  Q.    And how long did you work in the Cheatham County Jail?

2  A.    A little over ten years.

3  Q.    Did you say ten years?

4  A.    Yes.

5  Q.    Now, you said you were a corporal.

6              What does that mean?

7  A.    I was basically like an assistant supervisor.

8  Q.    Supervisor for a shift?

9  A.    Whenever the sergeant wasn't there, yes.

10 Q.    And now, thinking back to November of 2016, you were

11 working at the jail then, right?

12 A.    I was.

13 Q.    And what shift did you typically work at that time?

14 A.    10:00 p.m. to 6:00 a.m.

15 Q.    Is that the third shift?

16 A.    It is.

17 Q.    Now, Mr. Montgomery, have you, yourself, ever been tased

18 with --

19 A.    I've been drive-stunned.

20 Q.    That's one of the ways to use a Taser, the drive-stun

21 mode?

22 A.    Correct.

23 Q.    And what did it feel like to be tased in drive-stun

24 mode?

25 A.    Just an intense pain.

1  Q.    How long were you tased for?

2  A.    I would say probably about three to five seconds.

3  Q.    And what did it feel like during those three to five

4  seconds?

5  A.    Just pain in that general area.

6  Q.    Could you compare that pain to anything else that you

7  might experience in life?

8  A.    I can't.  I would just say it's a pretty extensive pain.

9  Q.    Did you, yourself, carry a Taser when you worked at the

10  Cheatham County Jail?

11  A.    I did.

12  Q.    Did you have to be trained and certified before you

13  carried a Taser?

14  A.    I did.

15  Q.    Who taught that training?

16  A.    Sgt. Gary Ola.

17  Q.    Did he also work at the jail?

18  A.    He was on the patrol.

19  Q.    At the Sheriff's Office?

20  A.    Yes.

21  Q.    Did he train all the officers at that time?

22  A.    Yes.

23  Q.    And did that training cover when it's appropriate for

24  officers to use a Taser?

25  A.    Yes.

1   Q.    So, based on your training, when was it permitted for an
2   officer to tase someone?
3   A.    In order to capture a subject or to control and stop
4   violence.
5   Q.    Other than capturing a suspect or stopping violence, was
6   there any other situation where it was permitted to use a
7   Taser?
8   A.    Pain compliance.
9   Q.    Well, tell us, what is pain compliance?
10  A.    Pain compliance is basically when you use something to
11  cause pain to an individual in order to get them to do what
12  you need them to do.  So, if you're trying to get them to
13  be -- you know, put their hands behind their back to cuff
14  them, you can apply pain to them and then you stop, give them
15  a chance to comply, and then, if they don't, then you can
16  give them more.
17  Q.    Are officers taught to stop using the Taser to give the
18  person a chance to comply?
19  A.    Yes.
20  Q.    And what was the maximum amount of time that officers
21  were allowed to use a Taser in that pain compliance mode?
22  A.    Under normal circumstances, five to seven seconds, up to
23  three times in one incident.
24  Q.    How long is one standard cycle of the Taser?
25  A.    Five to seven seconds, depending on the model.

1  Q.    Okay.  What model did you carry at the jail back in
2  2016?
3  A.    It was the X26C.
4  Q.    And how long was a cycle on that Taser?
5  A.    Five seconds.
6  Q.    Five seconds.  So you were taught not to use more than
7  three of those five-second cycles?
8  A.    Correct.
9  Q.    Were you told in your training any situation where
10 officers could use more than three five-second cycles?
11 A.    There are extenuating circumstances where you could use
12 more than that.
13 Q.    What type of circumstances would those be?
14 A.    It would have to be, like, to prevent loss of life or
15 serious bodily injury.
16 Q.    The most critical lethal situations?
17 A.    Correct.
18 Q.    What were officers supposed to do if they were using a
19 Taser and it just wasn't effective?
20 A.    I mean, if you're trying to use a technique and it's not
21 effective, I would personally switch to another method, try
22 something else.
23 Q.    Why is that?
24 A.    Well, because obviously it's not working.
25 Q.    Just common sense?

```
1    A.    I mean, that -- in my mind.
2    Q.    Now, you said you worked in the Cheatham County Jail for
3    ten years; is that right?
4    A.    A little over ten, yes.
5    Q.    In those ten years, how many times did you personally
6    have to use a Taser?
7    A.    I used it three times.
8    Q.    Would you briefly tell us about the circumstances of
9    each of those three times?
10   A.    The first -- or not in chronological order, but the
11   first one, I was trying to move an inmate from --
12             MR. STRIANSE:  Your Honor, I'm not sure there's
13   any relevance to these three prior incidents.
14             THE COURT:  Go ahead.  Respond.
15             MR. SONGER:  These demonstrate what the practice
16   was at the jail at the time, which is -- and what types of
17   threats officers face, which is relevant to the defendant's,
18   you know, mental state and intent.
19             THE COURT:  Sustained.  Under 401, you've not
20   established a foundation of relevancy.  So move on unless you
21   can establish relevancy here.
22   BY MR. SONGER:
23   Q.    Are you familiar with an inmate named Jordan Norris?
24   A.    I am.
25   Q.    Did one of those incidents you're referring to, those
```

1    three incidents, involve Mr. Norris?

2    A.    Yes.

3    Q.    And can you describe briefly the circumstances of that

4    incident?

5    A.    We were trying to get Mr. Norris into the back of a

6    patrol car, and we had got part of his body in.  We had

7    gotten one leg in, and he had tensed up and, like, basically

8    wedged himself using his foot and his shoulders in the, like,

9    door jamb.

10           And Sgt. Ola instructed me to apply a drive-stun

11   to the back of his calf to cause him -- he -- whenever the

12   pain hit him, he knew he would lift his leg.  So I applied it

13   to the back of his calf, pulled the trigger, and then he

14   pulled his leg away and we were able to get him in the car.

15   Q.    And how long did you tase Jordan Norris before you

16   pulled the Taser away?

17   A.    Maybe a second.

18   Q.    One second?

19   A.    Maybe.

20   Q.    And were you able to accomplish your objective after

21   that?

22   A.    Yes.

23   Q.    After one second?

24   A.    Yes.

25   Q.    What's the longest you've ever had to tase someone in

1  any situation?

2  A.    I personally, just one cycle.

3  Q.    The five seconds?

4  A.    Roughly, yes.

5  Q.    When you arrived for your shift and you were supervisor,

6  do you generally receive information or briefing from the

7  officers in the prior shift about things that happened?

8  A.    You do.

9  Q.    Would the officers typically tell you if there were any

10  serious incidents that happened on the prior shift?

11  A.    Normally.

12  Q.    Would they tell you if an inmate that you might have to

13  deal with had been injured on the prior shift?

14  A.    Yes.

15  Q.    Is that information important for you to know?

16  A.    Yes.

17  Q.    Okay.  Now, I would like to ask you a few questions

18  about November 5th, 2016.

19              Do you remember that night?

20  A.    Yes.

21  Q.    Now, did you work the third shift that night?

22  A.    I did.

23  Q.    So is that the shift that starts at 10:00?

24  A.    It is.

25  Q.    Who was the supervisor on the earlier shift, the second

1  shift that night?

2  A.   Mark Bryant.

3  Q.   Now, when you arrived for your shift at 10:00, did Mark

4  Bryant tell you that Jordan Norris had been tased in the

5  prior shift?

6  A.   Not at the time we started, no.

7  Q.   Did he tell you that Jordan Norris might have been

8  injured?

9  A.   No.

10 Q.   What was happening when you arrived at 10:00?

11 A.   They had been dealing with Mr. Norris.  Whenever I

12 arrived, he was sitting in the restraint chair, handcuffed to

13 a metal bar in the front of our booking area.

14 Q.   If you could, sir, please pick up the binder that's

15 there next to you.  And turn to Tab Number 17.

16 A.   (Witness complies.)

17 Q.   Do you recognize what that is?

18 A.   I do.

19 Q.   What is it?

20 A.   That's where he was sitting whenever we come in.

21 Q.   Is it a picture showing the scene that you just

22 described with Mr. Norris?

23 A.   Yes.

24          MR. SONGER:  The government moves to admit Exhibit

25 Number 17.

1          MR. STRIANSE:  No objection.

2          THE COURT:  Admitted.

3          (Whereupon Plaintiff Exhibit 17 was marked for

4          identification and received in evidence.)

5          MR. SONGER:  May we publish it for the jury?

6          THE COURT:  Yes.

7    BY MR. SONGER:

8    Q.    Is the individual in this picture, is that Jordan?

9    A.    Yes.

10   Q.    Is that how he was cuffed to the bar at booking when you

11   arrived?

12   A.    Yes.

13         MR. SONGER:  Thank you, Ms. Aroner.  We can take

14   that down.

15   Q.    So from that position, what did you do and the other

16   officers do next?

17   A.    They had -- originally, we were going to take him and

18   walk him out to the vehicle.  However, we realized that we

19   could not do that due to him not obeying any kind of

20   commands.

21         So at that time they were resecuring him back into

22   the chair for the way we could take him and the entire chair

23   out to the patrol vehicle.

24   Q.    And why were the officers trying to take Jordan out to a

25   vehicle?

A.    To be sent to the emergency room for an evaluation.

Q.    So what happens?  What happened next?  Walk us through it.

A.    Excuse me.  After that, we basically had many officers trying to control him and talk to him, get him to calm himself so that we could move him from the hard restraints into the soft restraints from the chair.

Q.    And did Mr. Norris, you know, immediately cooperate and let officers do that?

A.    No.

Q.    Did he fight with officers at first?

A.    He struggled, yes.

Q.    And when he was struggling, was a Taser used at all?

A.    Yes.

Q.    Which officer used the Taser?

A.    Mark Bryant.

Q.    Do you remember how many times Mark Bryant tased him while Jordan was struggling?

A.    I do not.

Q.    Now -- excuse me.

      At some point were you able to get -- well, let me back up, actually.

      Would you turn to -- pick up the binder again and turn to Exhibit 21.

      And there's a CD there, right?

```
1   A.   There is.

2   Q.   Do you know what that is?

3   A.   I do.  It's video from that incident.

4   Q.   The video from the incident of this night with Jordan

5   Norris?

6   A.   Correct.

7   Q.   Is it an accurate depiction of what happened?

8   A.   Yes.

9            THE COURT:  So the record's clear, he needs to

10  identify that as the video at the particular time.  We've got

11  multiple videos.  We need to make sure the record's clear

12  when someone reads this.

13           MR. SONGER:  Sure.

14  Q.   The incident we've just been describing, what time did

15  this incident happen?

16  A.   About 10:00, 10:30, something like that, p.m.

17  Q.   Is this the video showing what happened at around 10:00

18  or 10:30?

19  A.   Yes.

20           THE COURT:  So the record's clear, it's the 10:20

21  incident.

22           MR. SONGER:  That's correct.

23           THE COURT:  So no one thinks we've got multiple --

24           MR. STRIANSE:  No objection.

25           THE COURT:  All right.  Admitted.
```

1          (Whereupon Plaintiff Exhibit 21 was marked for

2          identification and received in evidence.)

3          MR. SONGER:  And, Ms. Aroner, if we could bring up

4    the first clip, please.

5          (Exhibit played.)

6          THE COURT:  And, again, ladies and gentlemen, I

7    notice, as you notice, the sound quality is quite poor.

8    You're going to get to listen to it when you deliberate.

9          Go ahead.

10   BY MR. SONGER:

11   Q.   Does that video show what you just described of officers

12   trying to get Jordan uncuffed from that bar and then

13   resecured in the chair?

14   A.   Correct.

15   Q.   And that's where you described he was tased several

16   times?

17   A.   Correct.

18   Q.   Did you see anything wrong with those tases based on

19   what Jordan was doing?

20   A.   No.

21   Q.   Now, after those tases, were officers able to get Jordan

22   under control?

23   A.   Yes.  Eventually.

24   Q.   And was Jordan then restrained at that point?

25   A.   He was.

1  Q.    What restraints did he have on?

2  A.    He had on shackles.  There's a -- like a belt that goes

3  across midway between the knee and the ankle, a belly chain,

4  handcuffs, and I think they had the lap belt.

5  Q.    Okay.  And I just want to break that down a little bit.

6        You said there was a belt around his legs, between

7  his knees and his ankles?

8  A.    Right.

9  Q.    And you said he had shackles on?

10 A.    Right.

11 Q.    What are shackles?

12 A.    They're basically handcuffs for your feet.  It makes it

13 so an inmate can walk.  But they don't have enough room in

14 between them to actually run.

15 Q.    And he had those and the belt on?

16 A.    Yes.

17 Q.    And he also had handcuffs on?

18 A.    Yes.

19 Q.    And you mentioned that he had a belly chain?

20 A.    Yes.

21 Q.    What is a belly chain?

22 A.    A belly chain is a chain in which it wraps around a

23 subject's waist.  The handcuffs are then put through that,

24 and then you cuff the subject, and it basically restricts

25 their ability to move their hands away from their body.

1  Q.   And did you say he also had a belt belting him into the
2  chair?
3  A.   Yes.
4            MR. SONGER:  Ms. Aroner, can we play the next
5  clip, please.
6            (Exhibit played.)
7  BY MR. SONGER:
8  Q.   Okay.  We just watched the next minute and 20 seconds or
9  so, right?
10 A.   Correct.
11 Q.   Is that correct?
12 A.   (Witness moves head up and down.)
13 Q.   During those minute and 20 seconds, was Jordan still
14 fighting with officers?
15 A.   No.
16 Q.   Had he calmed down?
17 A.   Yes.
18 Q.   And is he in all the restraints that we talked about
19 just a minute ago?
20 A.   Yes.
21 Q.   Who is the female officer who's talking to him?
22 A.   Rebecca Burney.
23 Q.   Do you know what she's talking to him about?
24 A.   Just trying to explain to him, you know, we're taking
25 him to the hospital to get him checked out and try to get him

1   some help.
2   Q.   And if you would, please, sir, turn to Tab 19 now.
3   A.   (Witness complies.)
4   Q.   Do you recognize that picture?
5   A.   I do.
6   Q.   Does that picture show the restraints that Jordan is in
7   at this point in time?
8   A.   Yes.
9         MR. SONGER:  Your Honor, we would move to admit
10  Exhibit 19.
11        MR. STRIANSE:  No objection.
12        THE COURT:  Admitted.
13        (Whereupon Plaintiff Exhibit 19 was marked for
14        identification and received in evidence.)
15        MR. SONGER:  May I publish it to the jury?
16        THE COURT:  Yes.
17  BY MR. SONGER:
18  Q.   Right above his ankles, do you see this black belt?
19  A.   Yes.
20  Q.   Do you see that?  Is that this leg strap you were
21  describing earlier?
22  A.   Yes.
23  Q.   Do you also see the metal shackles on his feet?
24  A.   Yes.
25  Q.   And do you see handcuffs?

```
 1   A.   Yes.
 2   Q.   And can you tell that he's wearing the belly chain?
 3   A.   I can't by that picture, no.
 4   Q.   Okay.  About where would the belly chain connect?
 5   A.   It would be -- it's hidden by the cuffs and where his
 6   arms are.
 7              MR. SONGER:  All right.  Thank you, Ms. Aroner.
 8   You can take that down.
 9   BY MR. SONGER:
10   Q.   Would you now please turn to Tab 13, sir.
11   A.   I'm there.
12   Q.   Do you recognize that?
13   A.   I do.
14   Q.   And what is that document?
15   A.   It's a picture of what we basically just watched.
16   Q.   The scene we were just looking at?
17   A.   Yes.
18   Q.   Is it an accurate picture of that scene?
19   A.   Yes.
20              MR. SONGER:  The government would move to admit
21   Exhibit 13.
22              MR. STRIANSE:  No objection.
23              THE COURT:  Admitted.
24              (Whereupon Plaintiff Exhibit 13 was marked for
25              identification and received in evidence.)
```

```
 1              MR. SONGER:  May we publish it, please?
 2              THE COURT:  Yes.
 3   BY MR. SONGER:
 4   Q.   This is the scene we were just looking at where Jordan
 5   had been calm for the last minute and 20 seconds?
 6   A.   Correct.
 7   Q.   How many officers are surrounding Jordan right now?
 8   A.   Seven.
 9   Q.   Do you see any threat that justifies tasing Jordan right
10   now?
11   A.   No.
12   Q.   Not even for one second?
13   A.   No.
14              MR. SONGER:  Ms. Aroner, if we could now please go
15   to Exhibit 21 and play the next portion of the video.
16              (Exhibit played.)
17   BY MR. SONGER:
18   Q.   That clicking or popping sound we heard in the video,
19   what is that?
20   A.   It's the Taser running its cycles.
21   Q.   It's the sound the Taser makes when it's being used?
22   A.   Correct.
23   Q.   And which officer was tasing Jordan in that video?
24   A.   Mark Bryant.
25   Q.   Do you know how long that tase lasted?
```

1  A.    Approximately 11 seconds.

2  Q.    More than twice as long as the standard five-second

3  cycle?

4  A.    Correct.

5  Q.    Based on what you saw, did you see any reason to tase

6  Jordan for 11 seconds in that situation?

7  A.    From what I saw, no.

8  Q.    Did that violate your policy that existed at the time?

9  A.    Yes.

10  Q.    And leaving aside policy, just based on your common

11  sense, your experience as a corrections officer, do you see

12  any reason for someone to tase someone for 11 seconds there?

13  A.    In my opinion, no.

14  Q.    When that tasing started -- well, would you just point

15  out where you were standing?

16  A.    I was standing right about where I am right now.

17  Q.    Off on the left side of the screen there?

18  A.    Correct.

19         MR. SONGER:  We can take that down.  Thank you.

20  Q.    And once Mark Bryant started tasing Jordan, what did you

21  focus on then?

22  A.    At that time I noticed that Rebecca Burney was having

23  trouble controlling his other leg.  So all my attention went

24  to helping control that other leg.

25  Q.    Did you have a -- did you fully understand what was

1  happening at that time, given what you were focused on?
2  A.    No.
3  Q.    If you had realized at the time that Mark Bryant was
4  just tasing Jordan for 11 seconds while he's restrained,
5  would you have tried to stop him?
6  A.    I would have said something.
7  Q.    And at that point, did you know that Jordan had already
8  been tased earlier in the night?
9  A.    No.
10 Q.    Would that have affected your perception of this
11 incident, too?
12 A.    Could, yes.
13 Q.    And then you told us earlier about a time when you tased
14 Jordan for that one second to get him into a car?
15 A.    Correct.
16 Q.    When did that happen?
17 A.    It has after we got him -- it was after what we just
18 watched, whenever he was out in the -- it was, like, the back
19 parking lot where we were trying to get him in the car.
20 Q.    Okay.  It was right after this?
21 A.    Correct.
22 Q.    And you were able to get him to the car after tasing for
23 the one second?
24 A.    Not -- I mean, it wasn't just me.  It was a bunch of us,
25 but yes.

1  Q.    Sure.  And how did you get -- did you -- how did you get

2  the Taser that you used to tase him for that one second?

3  A.    At the time Mark Bryant was trying to get the subject in

4  the vehicle, and I said, "Mark, hand me your Taser," because

5  that way he had another hand that he could use.  So that's

6  how I acquired the Taser.

7  Q.    So when you tased him for one second, did you use the

8  same Taser that Mark Bryant had just used?

9  A.    I did.

10 Q.    Now, when officers use a Taser, are they required to

11 fill out any reports or documentation?

12 A.    Yes.  You should fill out an incident report and a use

13 of force report.

14 Q.    And what information are officers required to put in

15 those reports?

16 A.    I mean, it varies from officer to officer.

17 Q.    What were the basics that were required?

18 A.    For me personally, I put -- of course, the date, inmates

19 involved, other officers that are involved, what type of

20 force was used, why it was used, and when it comes to, like,

21 a Taser or something like that, I always put the serial

22 number of the Taser and how long it -- I exposed the inmate

23 to the tasing.

24 Q.    Do you include how long you tase someone for?

25 A.    Correct.

Q.   Do you include how many times you tase someone?

A.   Correct.

Q.   Do you include the justification for each one of those tases?

A.   I do.

Q.   Now, did you complete reports for your encounter with Mr. Norris that night when you used the Taser?

A.   I did.

Q.   Would you please turn to Exhibit Number 29.

A.   I'm there.

Q.   Do you recognize that?

A.   I do.

Q.   What is that document?

A.   That is my use of force report.

Q.   Does that appear to be an accurate version of your use of force report?

A.   It does.

        MR. SONGER:  The government would move to admit Exhibit 29.

        MR. STRIANSE:  No objection.

        THE COURT:  Admitted.

        (Whereupon Plaintiff Exhibit 29 was marked for
        identification and received in evidence.)

        MR. SONGER:  May we publish it?

        THE COURT:  Yes.

1    MR. SONGER:  And, Ms. Aroner, if we could please
2  just blow up the narrative section.
3  Q.   The last line, you listed the serial number for the
4  Taser that you used; is that right?
5  A.   I did.
6  Q.   And, just for the record, that's X12002342, right?
7  A.   Yes.
8  Q.   Why do you put the serial number of the Taser in your
9  report?
10  A.   So that way they can pull the video from the incident,
11  administration can, for their investigations.
12  Q.   If somebody wanted to investigate and review it, they
13  could easily identify the video?
14  A.   Correct.
15  Q.   And just to be clear, that serial number, that's the
16  same Taser that Mark Bryant used that night?
17  A.   Correct.
18  Q.   Now, does your report also include how long you tased
19  Jordan for that night?
20  A.   It does.
21  Q.   It says one second, right?
22  A.   Approximately, yes.
23  Q.   Does it say what part of Jordan's body you tased?
24  A.   It does.
25  Q.   And does it explain the justification of why you tased

1  him one second for one time?

2  A.   It does.

3  Q.   Why do you put so much information in your reports?

4  A.   Because I want all the information to be available

5  for -- I mean, I want everything in there that I can possibly

6  put in there, so that way, whenever they go to do their

7  investigations later on, that they know exactly what I did

8  and why I did it and exactly where they can find the footage

9  that they need to brief -- to, you know, look at it.

10 Q.   When you say so "they" know what you did and "they" can

11 find the footage, who are you referring to?

12 A.   Any investigators, whether it be jail administration or

13 later on if it's taken up to, you know, higher on that

14 they'll be able to pull the information.

15 Q.   Thank you.

16             If you would now please turn to Exhibit Number 26.

17             What type of document is that?

18 A.   It's an incident report.

19 Q.   And which officer submitted that report?

20 A.   Mark Bryant.

21 Q.   What's the time on the report?

22 A.   2220.

23 Q.   10:20 p.m.?

24 A.   Correct.

25 Q.   Does that appear to be the report that Mark Bryant

1  submitted for this incident at 10:20 p.m. that we just
2  watched video of?
3  A.   It does.
4           MR. SONGER:  The government moves to admit Exhibit
5  Number 26.
6           MR. STRIANSE:  No objection.
7           THE COURT:  Admitted.
8           (Whereupon Plaintiff Exhibit 26 was marked for
9           identification and received in evidence.)
10          MR. SONGER:  May we publish it for the jury?
11          THE COURT:  Yes.
12          MR. SONGER:  And, Ms. Aroner, if we could please
13 blow up the top half of the report, please.
14 Q.   And we can see here the date is November 5th, 2016,
15 right?
16 A.   Yes.
17 Q.   The time is 10:20 p.m.?
18 A.   Yes.
19 Q.   And the officer who submitted this report is "Bryant"?
20 A.   Yes.
21 Q.   Does this report say how many times Officer Bryant tased
22 Jordan that night?
23 A.   It does not.
24 Q.   Does it say how long the defendant tased Jordan for?
25 A.   It does not.

1  Q.   Does it say that the last time that he was tased, that
2  the defendant tased Jordan, Jordan was handcuffed?
3  A.   It does not.
4  Q.   Does it say that when the defendant tased Jordan, Jordan
5  was in leg shackles?
6  A.   It does not.
7  Q.   Does it say that Jordan was belted into a restraint
8  chair?
9  A.   It does not.
10 Q.   I think you mentioned earlier that there were seven
11 officers surrounding Jordan at the time he was tased?
12 A.   Correct.
13 Q.   How many officers are listed on this report as being
14 involved?
15 A.   Two.
16 Q.   Is it fair to say that the amount of force that's
17 necessary depends in part on how many officers are there to
18 help control the situation?
19 A.   It does.
20 Q.   Now, what's the justification for the tases that's given
21 in Defendant Bryant's report?
22 A.   For -- because he did not comply.
23 Q.   Regarding that last 11-second tase we've been talking
24 about, is that justification accurate?
25 A.   Not that I could see.

1  Q.    You're a supervisor at the jail where you work.

2            As a supervisor, does this report give you an

3  accurate picture of what happened with that 11-second tase?

4  A.    Not in my opinion.

5  Q.    Would you have any idea that an inmate had been tased

6  for 11 seconds in handcuffs and shackles looking at this

7  report?

8  A.    No.

9  Q.    During the ten years you worked at the Cheatham County

10 Jail, what's the longest you ever saw any officer tase anyone

11 other than Defendant Bryant that night?

12 A.    One cycle.

13 Q.    Five seconds?

14 A.    Correct.

15 Q.    Did you ever see any other officer tase someone who was

16 in handcuffs?

17 A.    No.

18 Q.    Did you ever see any other officer tase someone who was

19 in leg shackles?

20 A.    No.

21 Q.    You certainly didn't see any other officer do all those

22 things at the same time, did you?

23 A.    No.

24            MR. SONGER:  Thank you.

25            THE COURT:  All right.  Cross-examination.

```
 1              Are you done?
 2              MR. SONGER:  Oh, yes.  I'm sorry.
 3              THE COURT:  All right.  Cross-examination.
 4              MR. SONGER:  I'm sorry, Your Honor.  Those are all
 5     my questions.
 6
 7                         CROSS-EXAMINATION
 8     BY MR. STRIANSE:
 9     Q.   Good morning, Mr. Montgomery.
10     A.   Good morning, sir.
11     Q.   We were just taking a look -- the government had -- I
12     think it was Exhibit 26 on the screen, which was the report
13     that had been prepared by Mark Bryant.
14     A.   Yes, sir.
15     Q.   And that is a use of force report, correct?
16     A.   It's an incident report.
17     Q.   Okay.  It says "Nature of Incident:  Use of force"?
18     A.   Correct.
19     Q.   Now, you prepared a nature of incident/use of force
20     report yourself that involved your activities in regard to
21     Mr. Norris; is that right?
22     A.   Yes, sir.
23     Q.   Okay.  And you've not been shown that one, correct?
24     A.   The incident report?
25     Q.   Right.
```

1  A.    Correct.  I have not been shown that.

2  Q.    That's not been offered in evidence by the government,

3  correct?

4  A.    No.

5          MR. STRIANSE:  I think we are up to Defendant's 3;

6  is that right?

7          THE COURT:  3.

8  BY MR. STRIANSE:

9  Q.    I'm going to hand you, Mr. Montgomery, what's been

10  marked for identification as Defendant's 3 and see if you

11  recognize that report.

12          THE COURT:  Do you have another copy,

13  Mr. Strianse?

14          MR. STRIANSE:  Yes, Your Honor, I do.

15  Q.    Please take a look at that and see if you recognize

16  that.

17          And here's the extra copy for the judge.

18  A.    I do.  It's my incident report.

19  Q.    That is your incident report, correct?

20  A.    It is.

21  Q.    Of the events of November 5, 2016, at approximately 2235

22  or 10:35 p.m., correct?

23  A.    Correct.

24          MR. STRIANSE:  Your Honor, may I publish that to

25  the jury?

```
 1              THE COURT:  Why don't you move --
 2              MR. STRIANSE:  We would offer it as Defendant's
 3  Exhibit 3.
 4              MR. SONGER:  No objection.
 5              THE COURT:  Admitted.
 6              (Whereupon Defense Exhibit 3 was marked for
 7              identification and received in evidence.)
 8  BY MR. STRIANSE:
 9  Q.   Take a look at the screen, if you would.  And, again,
10  this is Defendant's 3.  This is the nature of incident/use of
11  force report that you prepared to memorialize your
12  interaction with Jordan Norris that night; is that right?
13  A.   Correct.
14  Q.   And it's very short.  Go ahead and read the narrative
15  section to the jury.
16  A.   (As read):
17              While moving inmate Norris from -- from booking
18              restraint chair to the jail transport vehicle,
19              inmate Norris became very --
20              THE COURT:  That's way too fast.
21              THE WITNESS:  I'll start over.
22              (As read):
23              While moving inmate Norris from booking
24              restraint chair to jail transport vehicle, inmate
25              Norris became very aggressive and did not comply
```

```
 1              with lawful commands.  I drive-stun tased him in
 2              the calf for approximately one second to get him
 3              in the vehicle.
 4  BY MR. STRIANSE:
 5  Q.   And you were trying to be accurate and honest in
 6  reporting what you saw and what you did; is that right?
 7  A.   Correct.
 8  Q.   Now, take a look at the narrative section.  You don't
 9  mention -- I'm not being critical of you in any way, but you
10  do not mention that at the time that you had to tase him that
11  he was fully shackled?
12  A.   Correct.
13  Q.   You don't mention that.  You don't mention that he had
14  the belly chain on him?
15  A.   Correct.
16  Q.   You don't mention that he had the cuffs on, handcuffs?
17  A.   Correct.
18  Q.   Correct?  And this was all to get him into the car,
19  correct?
20  A.   Correct.
21  Q.   And I think you were trying to get him to the Centennial
22  Ashland City Hospital; is that right?
23  A.   That is correct.
24  Q.   Because the big plan was to get him to the Middle
25  Tennessee Mental Health Institute; is that right?
```

A.    Depending on what the doctors -- you know, after their
evaluation.

Q.    But you know from your experience that the Middle
Tennessee Mental Health Institute is not going to accept a
patient until they've been seen by a medical doctor; is that
right?

A.    Correct.

Q.    So you weren't taking Jordan Norris to the Centennial
Ashland City Hospital believing that he had sustained any
physical injuries?

A.    No.

Q.    You all were trying to check that box so he could later
be admitted to the Middle Tennessee Mental Health Institute;
is that right?

A.    Correct.

Q.    And I think you said you worked in the jail for about
ten years?

A.    Yes, sir.

Q.    And you were a very conscientious officer --

A.    Yes, sir.

Q.    -- correct?

      You were not trying to mislead your supervisors in
the way you wrote that narrative?

A.    Absolutely not.

Q.    Okay.  You knew that they could pull the video and pull

1  the Taser video as well from the incident?

2  A.    Correct.

3  Q.    Based on the information that you had put in that

4  report?

5  A.    This one and my other one, which were attached together.

6  Q.    Right.  So there was no intent on your part to mislead

7  them or hoodoo them in any way to make them believe that he

8  was not in a restraint chair and didn't have a belly chain

9  and all the other things, correct?

10  A.    Correct.

11  Q.    Okay.  Now, you were shown the video of that 10:20

12  incident; is that right?

13  A.    Correct.

14  Q.    And there were -- I think you told the jury -- six or

15  seven officers that were around Mr. Norris; is that right?

16  A.    Correct.

17  Q.    And based on what we saw on the video, even though he

18  was in that restraint chair, he was still fighting; is that

19  right?

20  A.    Correct.  He was still struggling.

21  Q.    And that's why all these officers were converged around

22  him; is that right?

23  A.    Correct.

24  Q.    And you all had the added benefit that night of having

25  the Taser instructor among that group of seven individuals;

1    is that right?

2    A.    Correct.

3    Q.    It was Sgt. Gary Ola, correct?

4    A.    That is correct.

5    Q.    And he was there and he was a resource to you all in

6    terms of how to tase or how not to tase; is that correct?

7    A.    That is correct.

8    Q.    In fact, he gave you the advice when you were trying to

9    get Mr. Norris into the vehicle so he could be taken to the

10   hospital to go ahead and tase him; is that right?

11   A.    Correct.

12   Q.    So Sgt. Ola would have been fully aware of the fact that

13   he had the belly chain and was -- was fully restrained at

14   that point in time?

15   A.    Correct.

16   Q.    But seeing all of that, Sgt. Ola gave you that advice?

17   A.    Correct.

18   Q.    Okay.  I know your recollection is that it was

19   approximately one second that you applied that tase; is that

20   right?

21   A.    Correct.

22   Q.    And I think you're well aware that the TBI and the FBI

23   have conducted an investigation of all these events?

24   A.    Correct.

25   Q.    And they would have gotten the Taser video for every

1  administration of the Taser that night; is that right?

2  A.    Correct.

3  Q.    Okay.  Were you aware that it shows that for your tase

4  it was the full five-second tase?

5  A.    The tase will run its cycle.  Once you pull the trigger,

6  unless you power it off, it will run the full five seconds.

7  However, in the video, you can see that after I applied the

8  one second, I moved it away from the individual, and you can

9  see part -- you could see in the video that it was not making

10 contact with any subject.

11 Q.    Now, you were asked about that last 11-second tase; is

12 that right?

13 A.    Correct.

14 Q.    And I want to -- I don't want to mischaracterize your

15 testimony.

16        Did you tell the jury that you were not exactly

17 focused on what was going on with Rebecca Burney's

18 interaction with Mr. Norris?

19 A.    No.  What I said was my -- I was focused on helping

20 Rebecca Burney because she was having trouble controlling the

21 other leg.

22 Q.    Okay.  And that was my question.

23        She was having trouble controlling the -- the

24 other leg; is that right?

25 A.    Correct.

1  Q.   Why was one leg under control and the other leg wasn't?

2  A.   Because Mark Bryant was powerful enough to keep that one

3  under control.

4  Q.   Okay.  Do you remember Rebecca Burney being in the line

5  of fire of a kick by Mr. Norris before that Taser was applied

6  by Mr. Bryant?

7  A.   I did not see that, no.

8  Q.   Okay.  Are you saying that didn't happen?

9  A.   I'm not saying that didn't happen; I'm saying I didn't

10 see it.

11 Q.   And if Rebecca Burney says that he was kicking at her,

12 would that be inconsistent with what you know?

13 A.   Inconsistent with what I saw, yes.

14 Q.   Okay.  So you were actually looking at the legs at that

15 point?

16 A.   No.  I didn't start looking at the legs until after

17 everybody was already trying to restrain him.

18 Q.   Okay.  Was it your sense of things that this was a

19 gratuitous act of violence by Mark Bryant in applying that

20 11-second tase?

21          MR. SONGER:  Objection, Your Honor.  Can't speak

22 to what was in Mark Bryant's head.

23          THE COURT:  Overruled.  It's cross-examination.

24          He can answer if he knows.

25          THE WITNESS:  I don't think he had any malicious

1  intent, no.

2  BY MR. STRIANSE:

3  Q.    Do you remember being interviewed at the district

4  attorney's office in Ashland City by the TBI -- and let me

5  see if the FBI was with them that day.

6  A.    They were there.

7  Q.    And Joy Wright.

8        And this is the typewritten statement that you

9  gave; is that right?

10  A.    Correct.

11  Q.    And have you had a chance to read that in --

12  A.    Not recently.

13  Q.    -- in a while?

14        Okay.  I'm going to ask you just a couple of

15  questions, and obviously I've got an extra copy if you need

16  to refresh your recollection about anything, okay?

17  A.    Okay.

18  Q.    And, by the way, it says "Typewritten Statement."

19        How did they get this typewritten statement from

20  you at the district attorney's office?  Did you sit down at a

21  typewriter and bang this thing out, or did somebody else do

22  that?

23  A.    To my recollection, I think they recorded the audio and

24  then went back and typed it out.

25  Q.    And then they gave you a chance, I think, to initial

1  each page; is that right?

2  A.    Correct.

3  Q.    Okay.  Do you remember in the course of that audio

4  interview that was being -- that was subsequently typed up

5  saying that you did help -- this is at the 10:20 incident --

6  with Mr. Norris, hold down his leg because he was trying to

7  kick?

8          Let me give you a copy of your statement just so

9  you can refresh your recollection.

10          MR. STRIANSE:  May I approach Mr. Montgomery?

11          THE COURT:  Yes.

12  BY MR. STRIANSE:

13  Q.    Mr. Montgomery, if you would, take a look -- take a look

14  at anything you want to.  But take a look at the fourth full

15  paragraph.  And if you could read that paragraph just to

16  yourself.  And tell me when you're -- you're done.

17  A.    (Reviews document.)  Okay.

18  Q.    Does that help refresh your recollection?

19  A.    It does.

20  Q.    Do you remember telling the investigators about helping

21  to hold down Mr. Norris's leg because he was trying to kick?

22  A.    I do remember telling them that he was kicking at the

23  time.  But I -- it wasn't at an officer, to the best of my

24  recollection.

25  Q.    And then there's the information in that same paragraph

1  about the advice Sgt. Ola gave you?

2  A.    Correct.

3  Q.    Do you remember being interviewed about your training --

4  A.    I do.

5  Q.    -- at the jail and the Taser?

6  A.    I do.

7  Q.    Do you remember saying that prior to the policy changing

8  in July of 2017 that you thought -- you said that you didn't

9  think that there was any policy about how long you could tase

10  someone or the number of times?

11  A.    Correct.  There was not a policy.

12  Q.    Okay.  And if you need to refresh your recollection,

13  that's on page 2 of your statement.

14  A.    No.  I remember.

15  Q.    And do you remember telling the investigators that for

16  what you were involved with in dealing with Mr. Norris that

17  night, that, quote, What we did -- we did what we needed to

18  do?

19  A.    I do.

20            MR. STRIANSE:  Okay.

21            Your Honor, may I have one moment?

22            THE COURT:  Sure.

23  BY MR. STRIANSE:

24  Q.    Just one other question.

25            You were asked by the government if typically,

1  when the second shift is handing something off to the third
2  shift, there might be a briefing by the second shift
3  officers; is that right?
4  A.    Correct.
5  Q.    And on that night, Cpl. Mark Bryant was in charge of the
6  second shift; is that right?
7  A.    Correct.
8  Q.    Do you remember Mr. Bryant staying over to the third
9  shift?
10 A.    I do.
11 Q.    Okay.  And do you remember having some discussion with
12 him about what the officers had been dealing with with
13 Mr. Norris on the second shift?
14 A.    Correct.
15 Q.    So that was an appropriate pass-off to the third shift?
16 A.    Correct.  It just didn't happen until after the
17 incident.  And that's not uncommon.
18         MR. STRIANSE:  Those are my questions.  Thank you.
19         THE COURT:  All right.  Redirect.
20
21                    REDIRECT EXAMINATION
22 BY MR. SONGER:
23 Q.    Mr. Montgomery, you were just asked whether there was
24 anything actually written in your policy about not being able
25 to tase someone for more than three times, five seconds each?

```
1   A.   Correct.
2   Q.   Was that something you learned in your training?
3   A.   It was recommended in the training.
4   Q.   And are officers required to follow their training?
5   A.   Yes.
6   Q.   You also talked about how much Jordan was struggling
7   with officers at some point, right?
8   A.   Correct.
9   Q.   And you said he might have been trying to kick at some
10  point?
11  A.   He was.
12  Q.   And we watched two different segments of this incident,
13  one where he was being, I guess, transferred from the bar and
14  put in restraints, and then one about a minute and a half
15  later, right?  Do you remember that?
16  A.   Correct.
17  Q.   At the end of that incident, when Mark Bryant tased
18  Jordan for 11 seconds while he was handcuffed, was Jordan
19  still struggling then?
20  A.   Not at the beginning, no.
21  Q.   Now, at the time that the defendant started tasing him,
22  was he kicking anyone?
23  A.   Not that I could see.
24  Q.   Was there any threat at that time that justified tasing
25  him?
```

1  A.  Not that I could see.

2  Q.  All right.  And do you know what was in Mark Bryant's

3  head at the time that he tased him?

4  A.  I do not.

5  Q.  You just know what you could see?

6  A.  Correct.

7  Q.  And did you see any reason to do it?

8  A.  I personally did not.

9  Q.  You were also asked a few questions about Sgt. Gary Ola,

10 the officer who trained officers?

11 A.  Correct.

12 Q.  You said that Officer Ola had told you to use that

13 one-second tase out on the sidewalk to help get Jordan into

14 the car?

15 A.  Correct.

16 Q.  Okay.  Was Sgt. Ola also standing next to Jordan when

17 the defendant tased him for 11 seconds in handcuffs?

18 A.  Yes.

19 Q.  Did Sgt. Ola tell the defendant to tase him at that

20 time?

21 A.  No.

22 Q.  You were also shown a copy of the incident report that

23 you filed in addition to the use of force report that night?

24 A.  Correct.

25 Q.  Right?

1    Do you still have that in front of you?
2  A.   I do.
3  Q.   Did you list the officers who were --
4         THE COURT:  So our record's clear, are you
5  referring to Defendant's Exhibit Number 3?
6         MR. SONGER:  Defendant's Exhibit 3, Your Honor.
7  I'm sorry.
8         THE COURT:  So the record's clear.
9  BY MR. SONGER:
10 Q.   And this is the incident report that you filed for the
11 10:30 p.m. -- at 10:30 p.m. on November 5th, 2016?
12 A.   Correct.
13 Q.   And the defense attorney just asked you a few questions
14 about what information you put in that report?
15 A.   Correct.
16 Q.   How many officers did you list being involved?
17 A.   Six.
18 Q.   Were those all the officers who were involved?
19 A.   Correct.
20 Q.   So you listed everyone who was involved?
21 A.   Correct.
22 Q.   Did that report also say how many times you tased
23 Jordan?
24 A.   It doesn't.
25 Q.   It indicates you tased him the one time?

```
1   A.    Correct.
2   Q.    And does it say how many seconds you tased Jordan for?
3   A.    It does.
4   Q.    All that information is in the report?
5   A.    Yes.
6   Q.    Does it have the justification for why you had to tase
7   him for one second?
8   A.    Yes.
9   Q.    Is that justification accurate?
10  A.    Yes.
11  Q.    All of those things, how many times, how long they
12  lasted, accurate justification -- were those things in the
13  report the defendant filed about this incident?
14  A.    No.
15            MR. SONGER:  Nothing further.  Thank you.
16            THE COURT:  All right.  You may leave.
17            THE WITNESS:  Thank you.
18            MR. STRIANSE:  Your Honor, I think he needs to
19  turn that exhibit in.
20            THE COURT:  He does.
21            THE WITNESS:  Everything's right there, Judge.
22                     (Witness excused.)
23            THE COURT:  All right.  Ladies and gentlemen, this
24  is a good time for our morning break, and we'll come back at
25  11:00.  Thanks.
```

1              (Jury not present.)

2              THE COURT:  All right.  Let the record reflect the

3     jury stepped out.  You can sit down.  Be seated.

4              All right.  During the break, I want to recommend

5     strongly -- and I'll order if necessary -- that I would like

6     for Ms. Myers and Mr. Songer to go and visit with Phil Wehby.

7     And we've contacted him.  And he's going to be -- he awaits

8     you, because I'm concerned -- it's not my job to make sure

9     you all create this record right.  And I'm very concerned

10    with the way these videos are coming in.  And Mr. Wehby does

11    an outstanding job at it.  And I want you all just to visit

12    with him for just a minute so as these videos are being shown

13    to the jury it's accurately reflected in the record so

14    when -- so when anyone -- the Sixth Circuit reads this

15    record -- unless you do it right, when they read the record

16    they'll have no idea what this jury was looking at.  It's

17    not -- and Mr. Wehby does a wonderful job at it.  And so he

18    awaits you all during this break to go and visit with him.

19             Secondly, I just want to let you all know that I

20    want to revisit -- although I don't know if it's going to

21    change much, but I want to revisit the civil lawsuit.  And

22    the concern I have is that -- in the briefing -- I pulled the

23    actual civil lawsuit.  And it's against *Jordan Norris v. Mark*

24    *Bryant, Josh Marriott, and Jeff Key*.  Sheriff Breedlove is

25    not a defendant in this case, and neither, of course, is the

1  Cheatham County Sheriff's Department.  And neither is

2  JJ Hannah.

3          And in the briefing and argument -- my fault, my

4  error -- I somewhere got the impression that Mr. Norris's

5  lawsuit was against Mr. Bryant, Mr. Hannah, and Breedlove.

6  And part of my ruling was -- was -- was based on that.

7          I know Mr. Marriott has already testified, and I

8  know Mr. Key is on the witness list.  But I think the Court

9  wants to discuss it.  I think I erred.

10         To the extent that you want to use the civil

11  lawsuit to show any possible bias against -- by Marriott and

12  Key, that's probably appropriate.  And we -- and I want to

13  give the defendant the option after we talk about it a little

14  bit more of maybe recalling Marriott.  So I wanted to put you

15  on notice of that.

16         Of course, Jeff Key hasn't testified yet.  Now, if

17  I allow it, though, it's only to show that, "Mr. Key, were

18  you sued in a civil matter?"

19         "Yes."

20         "Has that matter been resolved?"

21         "Yes."

22         We don't get into how it was resolved.

23         "And was that matter arising from the events of

24  November 5?"

25         "Yes."

1           I think, to that limited extent, based on further
2    research and based upon the parties' opening statements, I
3    think I need to correct that error.  But since Mr. Key's not
4    on your lineup right now, I just want to give you all notice
5    that at some point I do want to revisit that.
6           All right.  Let's take our break.  Thank you.
7           (Recess.)
8           THE COURT:  All right.  Be seated.  Are we ready
9    to proceed?  From the government?
10          MR. SONGER:  Yes, sir, we are.
11          THE COURT:  All right.  Mr. Strianse?
12          MR. STRIANSE:  Yes, sir.
13          THE COURT:  All right.  Bring in the jury.
14          (Jury present.)
15          THE COURT:  All right.  Be seated.
16          Call your next witness.
17          MR. SONGER:  The United States calls JJ Hannah.
18
19                JOHNNY JEDIDIAH HANNAH,
20   called as a witness by Plaintiff, was duly sworn and
21   testified as follows:
22
23          COURT DEPUTY:  Please be seated.
24          Please be sure to speak into the microphone.
25   State your full name and spell your last name.

1        THE WITNESS:  Johnny Jedidiah Hannah, H-a-n-n-a-h.

2        COURT DEPUTY:  Would you spell your middle name.

3        THE WITNESS:  J-e-d-i-d-i-a-h.

4

5                    DIRECT EXAMINATION

6    BY MR. SONGER:

7    Q.    Good morning, Mr. Hannah.

8    A.    Good morning.

9    Q.    How are you employed, sir?

10   A.    I'm the jail administrator for the Cheatham County

11   Sheriff's Office.

12   Q.    How long have you worked at the Cheatham County

13   Sheriff's Office?

14   A.    Since August of 2000.

15   Q.    In all, 20 years now?

16   A.    Yes, sir.

17   Q.    And what does it mean that you're the jail

18   administrator?

19   A.    I'm responsible for making sure the day-to-day

20   operations run smooth inside the jail.

21   Q.    Are you the top supervisor inside the jail?

22   A.    Yes, sir.

23   Q.    Everybody who works there reports to you?

24   A.    Yes, sir.

25   Q.    What are your basic duties as jail administrator?

A.   I review all the reports, I turn in the information to the State for state inmates.  There's various tasks that I do from day to day.

Q.   So in the 19, almost 20 years that you've worked at the jail, how often do you encounter inmates who appear to be high on some kind of drugs or illicit substance?

A.   On a pretty regular basis.

Q.   What about inmates who seem to have some kind of mental problem?

A.   On a pretty regular basis.

Q.   Do you encounter inmates who are aggressive and difficult sometimes?

A.   On a regular basis, they're coming in off the streets, yes, sir.

Q.   Do you expect your officers to treat those inmates fairly and appropriately?

A.   Yes, sir.

Q.   Do officers in the jail carry Tasers?

A.   Yes, sir.

Q.   Now, are you familiar with an incident involving a Taser that happened on November 5th, 2016?

A.   Yes, sir.

Q.   Okay.  Leaving that aside for just a minute, I'll ask you some questions about that in a bit, but putting that aside right now, what is the longest that you've ever seen an

1  officer in the Cheatham County Jail use a Taser for?
2  A.    Three or four seconds.
3  Q.    Three or four seconds max?
4  A.    Yes, sir.
5  Q.    Are you familiar with the policies and procedures that
6  are in place at the Cheatham County Jail?
7  A.    Yes, sir.
8  Q.    And are you familiar with the policies that were in
9  place back in November of 2016?
10  A.    Yes, sir.
11  Q.    What's the purpose of the jail's use of force policies
12  and other policies?
13  A.    It's to give them guidelines on how things should be
14  done and to protect inmates and guards alike.
15  Q.    Do those policies set out the basic principles that
16  officers are supposed to follow?
17  A.    Yes, sir.
18  Q.    Do the policies themselves lay out every specific detail
19  of how officers are supposed to act in different situations?
20  A.    No, sir.
21  Q.    Now, is some of that more detailed information provided
22  in training?
23  A.    Yes, sir, it should be.
24  Q.    Are officers required to follow their training, too?
25  A.    Yes, sir.

1    Q.    Now, did the use of force policy and training that was

2    in place at the jail back in 2016, did it allow officers to

3    use force to punish someone?

4    A.    No, sir.

5    Q.    Did it allow officers to use force to retaliate against

6    an inmate for something that had happened earlier?

7    A.    No, sir.

8    Q.    Did it allow officers to use force on an inmate after a

9    threat had already been brought under control?

10   A.    No, sir.

11   Q.    All right.  If you would, sir, please turn -- pick up

12   the binder that's right there next to you.  And turn to the

13   first tab, Tab Number 1.

14          Do you recognize that document?

15   A.    Yes, sir.

16   Q.    What is it?

17   A.    It's our use of force policy.

18   Q.    And what's the date on that use of force policy?

19   A.    March 12th, 2015.

20   Q.    Was that the policy that was in place in November of

21   2016?

22   A.    Yes, sir.

23              MR. STRIANSE:  Your Honor, may we approach?

24              THE COURT:  Sure.

25              (Bench conference outside the hearing of the

1          jury.)

2          MR. STRIANSE:  Your Honor, you may remember that I

3     subpoenaed Lt. Hannah at the first trial.  And in response

4     to -- in response to a subpoena duces tecum last February, he

5     produced for me the policy that was in effect at the time of

6     this incident.  And it sure is not this policy.  This is what

7     he produced pursuant to the subpoena.

8          THE COURT:  Okay.

9          MR. STRIANSE:  So I don't know what's happened in

10    the last year.  I had him under subpoena again for this

11    trial.  So I object to the -- we need to have a 104 hearing

12    out of the presence of the jury.  I'll leave that to the

13    Court's discretion.  But this is certainly not the policy

14    that he responded by subpoena.

15         THE COURT:  What was the date on your subpoena?

16         MR. STRIANSE:  This was the subpoena that was

17    issued --

18         THE COURT:  For trial?

19         MR. STRIANSE:  For trial.

20         THE COURT:  And the trial was -- well --

21         MR. STRIANSE:  Yeah.  And it was a subpoena duces

22    tecum.

23         THE COURT:  February.  Yeah.  In February.

24         MR. STRIANSE:  Yes, sir.

25         Now, the trial subpoena I issued for this trial of

1  course didn't have a subpoena duces tecum because I had the
2  records already.  So this is -- this is the record.  That is
3  the policy.
4              THE COURT:  Okay.
5              MR. SONGER:  I mean, he's testifying what the
6  policy is.  If he thinks there's a different policy that's
7  relevant, he can certainly ask him about that on
8  cross-examination.
9              MR. STRIANSE:  We're supposed to be getting this
10 right.
11             THE COURT:  Well, you can bring it up in
12 cross-examination, but I guess --
13             MR. STRIANSE:  It's a little late then.
14             THE COURT:  Well, if you issued your subpoena
15 duces tecum in February of 2019, then this would have been
16 accurate.  But then, if they changed it after the subpoena --
17             MR. STRIANSE:  No, no.  The question put to him,
18 Your Honor, respectfully, was the policy at the time.
19             THE COURT:  Oh, at the time.  Oh.
20             MR. STRIANSE:  That's the issue that I have, and
21 now they're going to be putting something in front of the
22 jury that's not the policy.
23             THE COURT:  Amended.
24             They do seem to be different here.  This says the
25 number is different and the amended history is different.

1   Look like it ought to be the same.

2          MR. SONGER:  Again, I think these are things you

3   could ask the witness about.  I -- I mean, I haven't looked

4   at this document he just handed.  But I can't -- I would

5   suspect there are not material differences between the two

6   policies.

7          THE COURT:  But we don't know.  I guess why can we

8   not do it during cross?

9          MR. STRIANSE:  I guess we can do it during cross,

10  but I think it's an appropriate objection given the

11  circumstances --

12         THE COURT:  Well, yeah.

13         MR. STRIANSE:  -- that the person in charge of

14  this at the jail pursuant to subpoena produces the policy

15  that was in effect at the time, and now he's identifying

16  another one.

17         THE COURT:  Right.  But he -- he -- he gave you

18  what was in effect in February of 2019.

19         MR. STRIANSE:  No, sir.

20         THE COURT:  No?  What was the date on your

21  subpoena?

22         MR. STRIANSE:  He gave us what was in effect

23  November 5.  My subpoena requested the policy --

24         THE COURT:  Do you have your subpoena?

25         MR. STRIANSE:  I do.

1          THE COURT:  I'll ask him.

2          MR. STRIANSE:  Shall I get it?

3          (Jury present.)

4          THE COURT:  All right.  Ladies -- all right.

5    Ladies and gentlemen, I'm going to ask you to step out for

6    just a minute.

7          And I'm going to ask you to step out of the

8    courtroom.

9          THE WITNESS:  Okay.

10         (Jury not present.)

11         (Witness exits courtroom.)

12         THE COURT:  All right.  Let the record reflect

13   that the jury has stepped out.

14         Mr. Strianse, do you have a copy of your February

15   2019 subpoena?

16         MR. STRIANSE:  Yes, Your Honor, I should, in my

17   subpoena file.  Your Honor, I have the subpoena, but it's got

18   a list of things that I asked for, but he handed this to me

19   when I was interviewing him; so it's not on the list.  But he

20   can certainly identify it because it's got his writing on it.

21         THE COURT:  All right.  Why don't you pass it up.

22         MR. STRIANSE:  But, again, it's not the list -- he

23   gave it to me when I was interviewing him.

24         THE COURT:  But he gave it to you pursuant to the

25   subpoena?

1          MR. STRIANSE:  Yes.

2          THE COURT:  Okay.  So you issued it in January of

3    2019.  Apparently you met with him and he gave you the

4    February 2015 version of the use of force policy.

5          MR. STRIANSE:  Yes.  And said that was the one in

6    effect for the November 5, 2016, incident that we're here

7    about this week.

8          THE COURT:  Although, as you point out, that

9    doesn't appear to be specifically covered by the attachment

10   description.

11         MR. STRIANSE:  It doesn't.  And I think he can

12   identify it because he wrote the word "old" on top of it when

13   he gave it to me.

14         THE COURT:  Where is that?

15         MR. STRIANSE:  Where is that?

16         THE COURT:  Yeah.  Where is the "old"?

17         MR. STRIANSE:  It's in my hand.

18         THE COURT:  Do I have a copy of --

19         MR. STRIANSE:  No, you don't have it with

20   Sgt. Hannah's -- or Lt. Hannah's writing on it.

21         THE COURT:  Got you.  Okay.  Here you go.

22         All right.  So, pursuant to your -- somewhat

23   pursuant to your subpoena and your meeting, he told you that

24   the February one was in effect.  Now he's testified that the

25   March -- so, obviously, we didn't use the March version at

1    the February.

2              MR. SONGER:  Your Honor, we just confirmed that

3    the March version, the version that was just shown to him, is

4    the version that was introduced and admitted in the first

5    trial, and that officers testified was the version that was

6    in place at the time of this incident.

7              THE COURT:  It is.  This is the first one we used

8    in the first trial.

9              MR. STRIANSE:  Right.  And I guess I didn't notice

10   it, but I'm certainly noticing it now.

11             THE COURT:  Okay.  I think it's fair grounds for

12   cross-examination.

13             MR. STRIANSE:  Okay.

14             THE COURT:  All right.  Bring the jury in.

15             MR. SONGER:  Your Honor, just one --

16             THE COURT:  Hold on for the jury.

17             MR. SONGER:  I don't believe we have a copy of

18   this policy.  Mr. Strianse obtained it from the State.  I

19   would like it produced to us.

20             THE COURT:  Do you have an extra copy?

21             MR. STRIANSE:  I didn't obtain it from the State;

22   I obtained it from Mr. Hannah.

23             THE COURT:  Right.

24             MR. SONGER:  Either way.

25             THE COURT:  Yeah.  Do you have an extra copy for

1  the government?

2          MR. STRIANSE:  I do.

3          THE COURT:  All right.  Are we ready for the jury

4  now?

5          MR. SONGER:  Yes, Your Honor.  Thank you.

6          THE COURT:  We're ready for the jury.

7          (Jury present.)

8          THE COURT:  All right.  Where is Mr. Hannah?  Get

9  him.

10          (Witness returns.)

11          THE COURT:  All right.  Be seated.

12          All right.  Go ahead.

13          MR. SONGER:  Thank you, Your Honor.

14  Q.   Mr. Hannah, picking up where we left off, I just asked

15  you to look at what was marked as Document Number 1, the

16  first exhibit in that binder.

17  A.   Yes, sir.

18  Q.   And can you please tell us again what is that document?

19  A.   It is the use of force policy, it looks like, or the

20  general order.

21  Q.   And what's the date?

22  A.   March 12th, 2015.

23  Q.   And was that the policy that was in place in November of

24  2016?

25  A.   Yes, sir, I believe so.

1 Q.   Could you please, on that first page of the policy --

2         Actually, I'm sorry -- the government moves to

3 admit Exhibit 1.

4         THE COURT:  Any objection?

5         MR. STRIANSE:  Same objection.

6         THE COURT:  All right.  Admitted.

7         (Whereupon Plaintiff Exhibit 1 was marked for

8         identification and received in evidence.)

9         MR. SONGER:  May we publish it for the jury?

10         THE COURT:  Yes.

11 BY MR. SONGER:

12 Q.   Now, Mr. Hannah, would you look, please, on the first

13 page at paragraph 3.2.

14         Do you see that?

15 A.   Yes, sir.

16 Q.   Would you please read that first sentence?

17 A.   (As read):

18         Officers shall use only the minimum amount of

19         force necessary to control a person or situation.

20 Q.   And was it the policy of the jail in November of 2016

21 that officers shall use only the minimum amount of force

22 necessary?

23 A.   Yes, sir.

24 Q.   All right.  Would you now please look at the fifth page

25 of that document.

```
 1   A.    I'm sorry.
 2             THE COURT:  My document doesn't have a fifth page.
 3             THE WITNESS:  Mine doesn't have a fifth page
 4   either.
 5   BY MR. SONGER:
 6   Q.    I don't believe the pages are numbered, but turning
 7   them, the fifth page you get to.
 8             THE COURT:  They are numbered.
 9             MR. SONGER:  May I approach and look at what's in
10   the --
11             THE COURT:  In mine, too.
12             MR. SONGER:  -- the binder?
13             The fifth page in, Exhibit 1.
14             THE COURT:  Right.  I don't have a fifth page.
15             THE WITNESS:  It's got page numbers at the bottom.
16   That's what's confusing.
17             MR. SONGER:  The page number on the bottom is page
18   number 1.  It's the fifth page of the exhibit.  I'm happy to
19   look.
20             THE COURT:  Mine only has four pages.
21             MR. SONGER:  It's the document you're looking at
22   that's right in front of you.
23             THE COURT:  That's a different document.
24             MR. SONGER:  It's part of the same exhibit.  It's
25   a different policy, which we're about to spell out.
```

1          THE COURT:  All right.  So, before he starts
2   talking about this different policy, we need to get it
3   properly admitted into evidence.
4          MR. SONGER:  Would you like us to mark it as a
5   different exhibit, Your Honor?
6          THE COURT:  Yes.
7          MR. SONGER:  Okay.
8          All right.  Then we'll mark this as -- with
9   Government's Exhibit 41.  That's the next one in sequence.
10          MR. STRIANSE:  Your Honor, is 1 now being called
11   41?
12          THE COURT:  No.  1 is still 1, and the second part
13   of 1 is now Exhibit 44.
14          COURT DEPUTY:  41.
15          THE COURT:  41.  There are two policies in
16   Exhibit 1.  We need to break them out so the record's clear.
17   BY MR. SONGER:
18   Q.   So, Mr. Hannah, is it right that the page is page
19   number 1 on the bottom of that document?
20   A.   Yes, sir.
21   Q.   And what document is this?  What policy are we looking
22   at that we're now calling Government's Exhibit Number 41?
23   A.   "Electronic Mobilization Device Taser."
24   Q.   Is this the Taser policy?
25   A.   Yes, sir.

```
1   Q.   What's the date on this policy?
2   A.   February 4th, 2015.
3   Q.   Is this the Taser policy that was in place in November
4   of 2016?
5   A.   Yes, sir.
6   Q.   Does it appear to be an accurate version of the Taser
7   policy that was in place at that time?
8   A.   Yes, sir.
9            MR. SONGER:  Okay.  The government moves to admit
10  Exhibit Number 41.
11           MR. STRIANSE:  No objection.
12           THE COURT:  Admitted.
13           MR. SONGER:  May we publish it for the jury,
14  please?
15           THE COURT:  Yes.
16           (Whereupon Plaintiff Exhibit 41 was marked for
17           identification and received in evidence.)
18  BY MR. SONGER:
19  Q.   Now, Mr. Hannah, does this Taser, like the use of force
20  policy, also set forth the basic guidelines officers are
21  supposed to follow?
22  A.   Yes, sir.
23  Q.   Does the Taser policy set forth every situation and
24  every guideline that officers might need or might encounter?
25  A.   No, sir.
```

1    Q.    Is that information set out in training?

2    A.    Yes, sir.

3    Q.    And are officers also expected to follow their Taser

4    training?

5    A.    Yes, sir.

6    Q.    Now, if you would please look at the second page of this

7    document, 41.  Paragraph 6.2.2.  And could you read the first

8    sentence, please.

9    A.    (As read):

10                 Deploy the Taser consistent with

11             departmental -- department-approved training.

12   Q.    That was required back in November of 2016?

13   A.    Yes, sir.

14   Q.    And could you now read the second sentence for us,

15   please?

16   A.    (As read):

17                 Use only the minimum number of bursts and

18             minimum duration reasonably necessary to achieve

19             the desired effect of temporarily immobilizing the

20             individual.

21   Q.    So in November 2016, was it the policy of the Cheatham

22   County Sheriff's Office that officers should use the minimum

23   number of bursts and the minimum duration reasonably

24   necessary in a situation?

25   A.    Yes, sir.

1  Q.    Now, before officers can carry a Taser at the Cheatham
2  County Jail, are they required to get specialized training
3  and get certified?
4  A.    Yes, sir.
5  Q.    And back in November 2016 and the time period before
6  that, who trained officers?
7  A.    Would have been Gary Ola.
8  Q.    Did you take Mr. Ola's training?
9  A.    I did, yes, sir.
10 Q.    And in other classes, even the ones that you weren't
11 actually in, did you ever go by and attend any part of the
12 training?
13 A.    I typically go by at the beginning of every training.
14 Q.    Why do you do that?
15 A.    To give just an opening statement and to encourage
16 people to use good judgment and common sense and just give
17 them more or less the outline of what I expect from them.
18 Q.    Do you stop by all the training sessions and do that?
19 A.    I tried to, yes, sir.
20 Q.    And remind officers to use good judgment and use their
21 common sense?
22 A.    Yes, sir.
23 Q.    I believe you testified also you reviewed use of force
24 incidents after they happen; is that right?
25 A.    Yes, sir, I did at the time.

1 Q.   But when a Taser is used at the time, what documentation
2 were officers required to fill out?
3 A.   They should fill out a use of force report and an
4 incident report.
5 Q.   Now, does the jail have video surveillance cameras?
6 A.   We do.
7 Q.   Do those cameras capture most of what happens at the
8 jail?
9 A.   Yes.
10 Q.   So why are officers still required to fill out reports
11 if everything's on video?
12 A.   That's -- that's typically the only way I know to look
13 back and review -- review issues or incidents.
14 Q.   That's the only way you know to check the video?
15 A.   Yes, sir.
16 Q.   Is the report also the jail's official record of what
17 happened?
18 A.   Yes, sir.
19 Q.   Now, what information are officers required to put in a
20 report when they use a Taser?
21 A.   They should put the amount of times they tased someone,
22 duration of the tase, and the justification for using the
23 Taser.
24 Q.   And if you would look again at Exhibit 41, which is the
25 Taser policy, at the last page, paragraph 8.3, it says (as

1    read):

2              As with any application of force, multiple

3              applications or bursts of the Taser in any mode is

4              a separate application of force within the overall

5              force incident and the justification for each must

6              be clearly articulated.

7              Is that right?

8    A.    Yes, sir.

9    Q.    That's the policy that was in place in November 2016?

10   A.    Yes, sir.

11   Q.    Okay.  Required officers to spell out and justify each

12   time they pulled the trigger?

13   A.    Yes, sir.

14   Q.    And it's even in bold and underlined in your policy,

15   right?

16   A.    Yes, sir.

17   Q.    Now, if an officer was involved in more than one

18   incident on the same shift, how was that required to be

19   documented?

20   A.    If -- each incident should be separate if there's any

21   significant time separating the two incidents.

22   Q.    So, if an officer used force and then an hour later used

23   force again, how many reports would they be required to fill

24   out?

25   A.    Should be two.

1   Q.    Two separate sets of reports?

2   A.    Yes.

3   Q.    And, again, that was the policy back in November of

4   2016?

5   A.    Yes, sir.

6           MR. SONGER:  Thank you, Ms. Aroner.

7   Q.    I would now like to show you some reports.  Could you

8   turn first, please, to Tab Number 30.

9           What type of report is that?

10  A.    It is a use of force report.

11  Q.    And which officer submitted it?

12  A.    Mark Bryant.

13  Q.    Does it appear to be an accurate version of the reports

14  that are used at the jail?

15  A.    Yes, sir.

16          MR. SONGER:  The government moves to admit

17  Exhibit 30.

18          MR. STRIANSE:  No objection.

19          THE COURT:  Admitted.

20          (Whereupon Plaintiff Exhibit 30 was marked for

21          identification and received in evidence.)

22          MR. SONGER:  May we publish it for the jury?

23          THE COURT:  Yes.

24          MR. SONGER:  Ms. Aroner, if we could -- show the

25  top half of that.

BY MR. SONGER:

Q.   You can see the name of the officer at the top left, right?  Mark Bryant?

A.   Yes, sir.

Q.   And what's the date of this incident in this report?

A.   June 1st, 2016.

Q.   This is five months before the November 2016 incident, right?

A.   Yes, sir.

Q.   Thank you.

        MR. SONGER:  Ms. Aroner, if we could now show the narrative in the bottom half of the report.

BY MR. SONGER:

Q.   And so you can take as much time as you like to read this, but my first question is, does the defendant's report from five months before the November incident, does it show that he used a Taser?  Was this a Taser incident?

A.   It is.  Yes, sir.

Q.   And does the report indicate how many times the defendant had to use a Taser?

A.   It does.

Q.   Does it indicate how long, how many seconds, he used that Taser for?

A.   It does.

Q.   And it does -- does it explain the justification for why

```
 1  he had to use that Taser for five seconds?
 2  A.   It does.
 3  Q.   So does this report from five months before the November
 4  incident contain the information that was supposed to be in
 5  reports?
 6  A.   Yes, sir, it was.
 7            MR. SONGER:  Take that down, please.
 8  BY MR. SONGER:
 9  Q.   Would you turn now to the next exhibit, Tab Number 31.
10            And what is this document?
11  A.   It's a -- one of our Cheatham County Jail incident
12  reports.
13  Q.   Who is the officer who submitted that report?
14  A.   Mark Bryant.
15  Q.   Does that appear to be an accurate version of the
16  incident report?
17  A.   It does, yes, sir.
18            MR. SONGER:  The government moves to admit
19  Government's Exhibit 31.
20            MR. STRIANSE:  No objection.
21            THE COURT:  Admitted.
22            (Whereupon Plaintiff Exhibit 31 was marked for
23            identification and received in evidence.)
24            MR. SONGER:  May we publish it?
25            THE COURT:  Yes.
```

1  BY MR. SONGER:

2  Q.   And, again, if we can look at the very top, what's the

3  date on this report?

4  A.   June 29th, 2016.

5  Q.   So this report is a little over four months before the

6  November 2016 incident?

7  A.   Yes, sir.

8  Q.   And if we can now show the bottom half of the report,

9  please.

10          Is this also a tasing incident?

11  A.   Yes, sir, it was.

12  Q.   And was Defendant Bryant the one who used the Taser?

13  A.   Yes, sir.

14  Q.   Does Defendant Bryant's report indicate how many times

15  he had to use the Taser?

16  A.   Yes, sir.

17  Q.   Does the report indicate how long each one of those

18  tases lasted?

19  A.   Yes, sir.

20  Q.   And how long did they last?

21  A.   Approximately five seconds.

22  Q.   Five seconds each?

23  A.   Yes, sir.

24  Q.   Does the report indicate what part of the body he tased

25  each time?

```
1    A.   Yes, sir.
2    Q.   And does the report explain the justification for why he
3    had to use the Taser for each of those five-second bursts?
4    A.   Yes, sir.
5    Q.   So does this report from four months before the November
6    2016 incident contain the information that officers were
7    required to put in reports?
8    A.   Yes, sir.
9              MR. SONGER:  All right.  Thank you, Ms. Aroner.
10   BY MR. SONGER:
11   Q.   Mr. Hannah, would you now please turn over to Tab
12   Number 34.
13             And do you recognize that document?
14   A.   It's a Cheatham County incident report.
15   Q.   And who is the officer who submitted that report?
16   A.   Mark Bryant.
17   Q.   Does that appear to be an accurate version of the
18   report?
19   A.   Yes, sir.
20             MR. SONGER:  The government moves to admit Exhibit
21   Number 34.
22             MR. STRIANSE:  Objection.
23             THE COURT:  All right.  Why don't you approach.
24             (Bench conference outside the hearing of the
25             jury.)
```

1          THE COURT:  Go ahead.

2          MR. STRIANSE:  Your Honor, I was going to handle

3    it on cross-examination.  This officer wrote a thousand

4    reports over a two-year period.  So I hope we're not going to

5    go through a thousand.

6          THE COURT:  I don't -- I don't -- I saw these on

7    the -- how many more do you have?

8          MR. SONGER:  This is the last one.

9          THE COURT:  Okay.

10         (Jury present.)

11         MR. SONGER:  Move to admit Exhibit Number 34.

12         THE COURT:  Admitted.

13         (Whereupon Plaintiff Exhibit 34 was marked for

14             identification and received in evidence.)

15         MR. SONGER:  May we publish it for the jury?

16         THE COURT:  Yes.

17   BY MR. SONGER:

18   Q.   Lt. Hannah, what is the date on this report?

19   A.   July 13th, 2017.

20   Q.   So this is seven or eight months after the November 2016

21   incident?

22   A.   Yes, sir.

23   Q.   And now can we please show the bottom half of the

24   report.

25         Does this report also document a tasing incident?

1  A.   Yes, sir.

2  Q.   And was Officer Bryant the one who used the Taser?

3  A.   Yes, sir.

4  Q.   Does this report indicate how many times Officer Bryant

5  had to use a Taser for?

6  A.   Yes, sir.

7  Q.   And does it indicate how long that tase lasted?

8  A.   Yes, sir.

9  Q.   How long was the tase in this incident?

10  A.   Five seconds.

11  Q.   Does this report explain why Officer Bryant had to use a

12  Taser for five seconds?

13  A.   Yes, sir.

14  Q.   Does this report contain other information that officers

15  were required to put in reports?

16  A.   Yes, sir.

17  Q.   Now, leaving aside the November 5th, 2016, incident, are

18  you aware of any other incident where -- in the jail where

19  Officer Bryant used a Taser other than these we just looked

20  at?

21  A.   I mean, I don't remember any specifics.  No.  I don't

22  remember anything specific.

23  Q.   All right.  Now I would like to focus on November 5th,

24  2016.

25           You remember what happened on that night, right?

1  A.   Yes, sir.

2  Q.   Were you working at the jail on November 5th?

3  A.   No, sir.

4  Q.   So when did you first learn that Jordan Norris had been

5  tased that night?

6  A.   I came back from vacation; probably a couple days after

7  I got back from vacation, I got a phone call from somebody

8  indicating that he was Mr. Norris's uncle.

9  Q.   A couple days after you got back, you got a call from

10  Mr. Norris's uncle?

11  A.   I believe so, yes, sir.

12  Q.   And, generally speaking, what did that person tell you

13  had happened?

14          MR. STRIANSE:  Object to what the uncle told him.

15          MR. SONGER:  I'm just going through his notice of

16  why he took investigative steps.

17          THE COURT:  I'll sustain the objection.

18          You can rephrase it though.

19          MR. SONGER:  We can move on.

20  Q.   After -- after you got that phone call, what did you do

21  next?

22  A.   I looked into the incident reports and had my assistant

23  pull the incident reports and any videos that went along with

24  it.

25  Q.   So you pulled the incident reports to see what happened?

```
1    A.    Yes, sir.

2    Q.    Sir, would you now look at Tab Number 25?

3              And this exhibit has already been admitted.

4              MR. SONGER:  Ms. Aroner, would you please put it

5    up on the screen.

6    BY MR. SONGER:

7    Q.    Lt. Hannah, what's the date on this report?

8    A.    November 5th, 2016.

9    Q.    And is it a report from Defendant Bryant?

10   A.    Yes, sir.

11   Q.    Is this one of the reports that you looked at --

12   A.    Yes, sir.

13   Q.    -- to find out what happened that night?

14   A.    Yes, sir.

15             MR. SONGER:  And if we could please blow up the

16   narrative.

17   BY MR. SONGER:

18   Q.    Now, after you read this report, which officer did you

19   think had tased Jordan Norris?

20   A.    Deputy Bratton.

21   Q.    You thought it was Deputy Bratton, not Defendant Bryant?

22   A.    Yes, sir.

23   Q.    And if you would look about three-fourths of the way

24   down on the report, do you see the sentence that says,

25   "Deputy Bratton and I tased"?
```

1  A.   Yes, sir, I do.

2  Q.   Is there -- and -- could you just tell us what is the

3  time that is listed on the top of the report?

4  A.   6:55 p.m.

5  Q.   Is there anything in this report that said that

6  Defendant Bryant tased Jordan at 8:00?

7  A.   No, sir.

8  Q.   Anything in this report that indicates that Defendant

9  Bryant tased Jordan four times?

10 A.   No, sir.

11 Q.   Anything in this report that indicates that those four

12 tases lasted 50 seconds?

13 A.   No, sir.

14 Q.   Anything in this report at all about how long any tases

15 from Defendant Bryant lasted?

16 A.   No, sir.

17 Q.   And then, as part of your investigation into what

18 happened --

19            MR. SONGER:  I'm going to take this down.  Thank

20 you, Ms. Aroner.

21 BY MR. SONGER:

22 Q.   Did you also pull video at some point?

23 A.   I had my assistant pull video, yes, sir.

24 Q.   And which video did your assistant pull?

25 A.   He pulled the one with Deputy Bratton drive-stunning

1  Mr. Norris.

2  Q.    What time was -- did you pull the video for?

3  A.    I'm -- I'm not 100 percent sure of the time on the

4  video.  The videos and the clocks were a little off from each

5  other.

6  Q.    So when you go to find a video, what do you look at?

7  A.    We read the incident report and we find the video that

8  matches up with the incident report.

9  Q.    And what time was on this incident report from Defendant

10  Bryant?

11  A.    6:55 p.m.

12  Q.    Okay.  Is this when you pulled the video for?

13  A.    It would have been the corresponding video, yes, sir.

14  Q.    Is there anything in the report to give you notice that

15  you should pull video for 8:00?

16  A.    No, sir.

17  Q.    So, when you pulled that video for 6:55 p.m. or

18  thereabouts, what did you see?

19  A.    We seen a -- they had a struggle in Cell 4 with inmate

20  Norris and some other inmate, and they were extracting him

21  from the cell, trying to gain control of him.

22  Q.    You saw officers pulling Jordan Norris out of his cell?

23  A.    Yes, sir.

24  Q.    And did you see any officers tase Jordan during that

25  sequence?

1    A.    We seen Officer Bratton drive-stun him.

2    Q.    Did you see Defendant Bryant tase Jordan while they were

3    pulling him out of the cell?

4    A.    Not on that video, no, sir.

5    Q.    Now, as part of looking into this, did you talk to

6    Officer Bratton or Defendant Bryant?

7    A.    I don't remember a specific conversation that I had with

8    them, no, sir.

9    Q.    Did Defendant Bryant ever come to you and say that he

10   tased Jordan several times around when this happened?

11   A.    No, sir.

12   Q.    Did he ever tell you that he tased him for almost 50

13   seconds?

14   A.    No, sir.

15             THE COURT:  The court reporter reminds me that

16   your microphone is not on.

17             MR. SONGER:  I'm sorry, Your Honor.  I must have

18   hit it off with my hand gestures.

19   Q.    Lt. Hannah, after you reviewed the reports and the video

20   that you pulled, did you reach a conclusion about whether the

21   force that was used was justified?

22   A.    I did.

23   Q.    And what was that conclusion?

24   A.    That that incident was justified.

25   Q.    And what incident was that conclusion about?

A.    The one where Daniel Bratton used the Taser to
drive-stun inmate Norris.
Q.    Did you sign off on -- at that point on Defendant Bryant
tasing Jordan multiple times?
A.    No, sir.
Q.    Did you even know that Defendant Bryant had tased Jordan
several times at 8:00 when you made that decision?
A.    No, sir.
Q.    Now, at some point later, did you learn that Defendant
Bryant had tased Jordan at 8:00?
A.    Yes, sir.
Q.    And how did you -- how did you learn about that?
A.    From the Taser logs.
Q.    And what is a Taser log?
A.    The Taser keeps track of every time that the device is
activated and the trigger is pulled and all that stuff.
Q.    Is that information that's automatically recorded by the
Taser?
A.    Yes, sir, it is.
Q.    And did you -- when you made this first decision
thinking that this incident was justified, had you seen those
Taser logs?
A.    No, sir.
Q.    How much later was it that you finally saw them?
A.    I'm not sure of the exact length of time.

1  Q.   Can you give us a ball park?

2  A.   It was a significant amount of time between it, I

3  believe.

4  Q.   At least several months?

5  A.   Yes, sir.

6  Q.   And what did those Taser logs show?

7  A.   It showed that the -- it showed it had been activated

8  several times that I didn't know about.

9  Q.   Do you remember how long those logs showed that he had

10 been tased for?

11 A.   I believe there was a couple for five seconds, one for

12 15 seconds, and one for maybe 25 seconds.

13 Q.   25, 15, and two five-seconds?

14 A.   Yes, sir.

15 Q.   A total of 50 seconds?

16 A.   Yes, sir.

17 Q.   Around that time did you also see video that had the

18 audio and video of the -- excuse me -- the video and the

19 sound for this 8:00 incident where those four tases had

20 happened?

21 A.   I did.

22 Q.   And did that video also appear to show four long tases

23 from Defendant Bryant?

24 A.   It did, yes, sir.

25 Q.   And just to be clear about which incident we're talking

1  about, where was Jordan Norris when those four tases

2  happened?

3  A.    He was in the booking room in a restraint chair.

4  Q.    So what was your reaction when you realized that

5  Defendant Bryant had tased Jordan four times for 50 seconds

6  in a restraint chair?

7  A.    I felt like it was something I needed to forward up to

8  the command staff.

9  Q.    And why did you want to forward it up to the command

10  staff?

11  A.    Because it looked like it violated some of our policies.

12  Q.    Was it consistent with your policy at the time to tase

13  someone four times for 50 seconds in a restraint chair?

14  A.    No, sir.

15  Q.    Based on what you saw in your review on the video, did

16  you see any justification for tasing Jordan like that?

17  A.    No, sir.

18  Q.    Okay.  And if you would look back again at Tab 25, which

19  is Defendant Bryant's report dated November 5th, 2016, the

20  one you said you looked at.

21  A.    Yes, sir.

22  Q.    Did that report give you any idea of what he really did?

23  A.    No, sir.

24  Q.    So, looking back on this now, how do you feel about how

25  this was investigated?

```
 1  A.   I feel it was investigated --
 2           MR. STRIANSE:  Object to them now looking back on
 3  it and offering an opinion.  He's already stated directly --
 4           THE COURT:  Yeah.  I understand --
 5           MR. SONGER:  I understand.  I'm happy to rephrase,
 6  Your Honor.
 7           THE COURT:  Okay.
 8  BY MR. SONGER:
 9  Q.   When you initially looked into this incident, did you
10  have the information you needed to make an accurate judgment
11  as a supervisor?
12  A.   No, sir.
13  Q.   Do you wish you had?
14  A.   Yes, sir.
15  Q.   Would you look now, please, at Exhibit Number 26 in that
16  binder.
17           MR. SONGER:  This document has also been admitted.
18  Can we please put it up on the screen?
19  BY MR. SONGER:
20  Q.   And this report's also dated November 5th, 2016, right?
21  A.   Yes, sir.
22  Q.   And which officer submitted this report?
23  A.   Mark Bryant.
24  Q.   And this is for 10:20 p.m.
25           That's the time on the top of the report, correct?
```

1  A.   Yes, sir.

2  Q.   Now, does this report indicate how many times defendant

3  tased Jordan Norris?

4  A.   Not the exact amount, no, sir.

5  Q.   Does it say how long those tases lasted?

6  A.   No, sir.

7  Q.   Does it say that Jordan was in handcuffs during one of

8  those tases?

9  A.   No, sir.

10  Q.   Does it say that Jordan was in shackles during one of

11  the tases?

12  A.   No, sir.

13  Q.   Does it say that Jordan was in a restraint chair during

14  one of the tases?

15  A.   No, sir.

16  Q.   Is that information that's important to you as a

17  supervisor in reviewing what actually happened?

18  A.   Yes, sir.

19  Q.   Have you ever reviewed video of the defendant tasing

20  Jordan at 10:20 that night?

21  A.   Not that I'm remembering, no, sir.

22  Q.   If you had known that one of your officers tased someone

23  after they were in handcuffs and shackles in a restraint

24  chair, is that a video that you would have made sure that you

25  looked at?

```
 1   A.    Yes.
 2              MR. SONGER:  Nothing further at this time.
 3              THE COURT:  Okay.  Cross.
 4
 5                        CROSS-EXAMINATION
 6   BY MR. STRIANSE:
 7   Q.    Good morning, Lt. Hannah.
 8   A.    Good morning, sir.
 9   Q.    You remember me, don't you?
10   A.    Yes, sir, I do.
11   Q.    My name is Peter Strianse.  I think we met over a year
12   ago; is that right?
13   A.    Yes, sir.  About that time.
14   Q.    And I had issued a subpoena to you in connection with
15   this case; is that right?
16   A.    Yes, sir.
17   Q.    I believe we met and we discussed this case before; is
18   that correct?
19   A.    Yes, sir.
20   Q.    And you were subpoenaed by me for this trial; is that
21   right?
22   A.    I was subpoenaed by both sides, yes, sir.
23   Q.    Okay.  Do you remember after this incident in November
24   of 2016, about a week after the incident, calling Mark Bryant
25   to a meeting with you and Officer Whitt and Officer Isherwood
```

1  to discuss this situation?

2  A.   I don't remember specifically, no, sir.

3  Q.   Okay.  You don't remember meeting with Mark Bryant

4  within a short time after this incident?

5  A.   I don't remember specifically, no, sir.

6  Q.   And reviewing the video, all the video with him?

7  A.   Not that I remember, no, sir.

8  Q.   Okay.  You have no independent recollection of that at

9  all?

10  A.   No, sir.

11  Q.   Okay.  And do you remember him coming back a short time

12  afterward, concerned about what the consensus was among the

13  administration about his conduct on November 5, 2016?

14  A.   Not specifically, no, sir.

15  Q.   Okay.  You don't remember telling him that you had

16  reviewed the incident?  As a group?

17  A.   Not specifically, no, sir.

18  Q.   Okay.  When you say "not specifically," what is it that

19  you don't remember?  Is this a figment of my imagination, or

20  do you have some independent recollection of this at all?

21  A.   I don't remember a specific conversation with him.  But

22  I would almost say there had to be one because I would

23  typically talk to somebody.

24  Q.   And now you're taking the position that when you

25  indicated to Mr. Bryant and others that he was justified in

1  what he did, you didn't have all the facts?

2  A.   I don't know that I ever told Mr. Bryant that he was

3  justified in what he did.

4  Q.   Okay.  Do you remember being interviewed by the TBI and

5  the FBI on August 4th of 2017?

6  A.   I don't know the exact date, but, yes, sir, I remember

7  being --

8  Q.   And it was Ms. Joy Wright with the FBI and Mr. Atkins

9  with the TBI; is that right?

10  A.   Yes, sir.

11  Q.   And you realize they were recording that interview

12  electronically --

13  A.   Yes, sir.

14  Q.   -- and taking down electronically everything that you

15  said.

16        Do you remember telling the FBI and the TBI that

17  you did meet with Mr. Bryant about the incident?

18  A.   I don't specifically remember that, no, sir.

19  Q.   Do you remember telling them that Mark gave his side of

20  the story and justified his actions?

21  A.   I don't specifically remember that, no, sir.  It's been

22  a long time ago.

23  Q.   And that since Mr. Norris was not fully restrained and

24  he was threatening and evidencing this unusual strength, that

25  you didn't see any malicious intent in what Mark Bryant had

1  done?

2  A.    I think that there were -- I do remember somewhat that,

3  but I think there were -- we were talking about two different

4  things there.

5  Q.    Well, what are the two things we're talking about?

6  A.    I think this was well after we knew about the incident,

7  when we spoke with the TBI and the FBI.

8  Q.    Well, after you knew about the incident where you had

9  the benefit of looking at all the video; is that right?

10  A.    Yes, sir.

11  Q.    Now, do you remember telling the FBI and the TBI that

12  you were satisfied with Mark Bryant's explanation of what had

13  happened?

14  A.    I don't specifically remember that, no, sir.

15  Q.    And this was after you had the opportunity to look at

16  the -- all of the video?

17  A.    I don't specifically remember that, but. . .

18  Q.    Do you remember telling them that you saw what happened

19  and that Mark's explanation was legitimate to you?

20  A.    I don't specifically remember exactly what I told them.

21  Q.    Well, maybe you remember this:  Do you remember being

22  asked questions about the Taser policy that was in effect on

23  November 5, 2016?

24  A.    I do remember being asked about that, yes, sir.

25  Q.    Okay.  And you've testified in connection with another

1  hearing in this case; is that right?

2  A.    I don't -- what hearing are you talking about?

3  Q.    February of 2019.  Do you remember --

4  A.    Oh, yes, sir.

5  Q.    Okay.  And you were asked some specific questions about

6  the Taser policy; is that right?

7  A.    Yes, sir.

8  Q.    And do you remember saying that at that time in November

9  of 2016 that you all didn't have much of a Taser policy at

10  that time?

11  A.    I do remember saying that, yes, sir.

12  Q.    And that it was a vague policy?

13  A.    That was my opinion, yes, sir.

14  Q.    And that the only five-second rule dealt with when those

15  prongs are shot out of the device and actually attach to

16  somebody's body?

17  A.    I do remember saying that, yes, sir.

18  Q.    And that there was absolutely no time limit on this

19  so-called drive-stun or contact use of the Taser?

20  A.    I think I would have said that I didn't know of the time

21  limit.  I'm not the Taser instructor, so I couldn't

22  definitely give you a definite answer.

23  Q.    Do you remember telling Ms. Wright and Mr. Atkins that

24  back in November of 2016 that there was never any discussion

25  about time limits on drive-stuns?

1  A.   I told them I didn't remember any discussions on it.

2  Q.   And do you remember telling those agents candidly that

3  the ball was dropped on drive-stun training?

4  A.   I don't remember specifically saying that, no, sir.

5  Q.   And do you remember -- and this is in August of 2017 --

6  so that's a number of months removed from the November

7  incident --

8  A.   Yes, sir.

9  Q.   -- is that right?

10  A.   Yes, sir.

11  Q.   So, by that point in time you certainly had seen all of

12  the video that was associated with this incident?

13  A.   Should have, yes, sir.

14  Q.   Because there were six or seven of your officers that

15  were directly involved in it?

16  A.   There was quite a few of them, yes, sir.

17  Q.   So you had the full benefit of seeing all of that, and

18  you told Ms. Wright and Mr. Atkins that it was justified?

19  A.   I don't remember telling them that.  But I think at the

20  time I thought -- I was under the -- that I thought it was

21  justified.

22  Q.   Okay.  So you do remember telling them that in that

23  interview?

24  A.   I don't remember specifically telling them that, no,

25  sir.

1  Q.    Oh.

2  A.    But I remember thinking it back then.

3  Q.    Do you remember when they asked you the question in the

4  August interview about, based on your review of the incident,

5  what you thought had happened?  Do you remember those kinds

6  of questions from Ms. Wright and from Mr. Atkins?

7  A.    I don't remember specifically, no, sir.

8  Q.    Okay.  You said that they were dealing with an inmate

9  that was out of control; do you recall that?

10  A.    I do recall mentioning that he was out of control, that

11  we had several problems with him throughout the time.

12  Q.    Who was threatening inmates and your staff; is that

13  right?

14  A.    Seems like it was, yes, sir.

15  Q.    And do you remember -- and these are your words -- that

16  you saw no malicious intent in Mark Bryant or any of your

17  officers' interaction with Mr. Norris?

18  A.    I do remember giving my opinion of that, yes, sir.

19  Q.    And then they asked you about this "going to tase until

20  the batteries run out" comment.

21        Do you remember that?

22  A.    I do remember that, yes, sir.

23  Q.    And do you remember telling the investigating agents

24  that Mark Bryant is a calm guy, c-a-l-m, a calm guy?

25  A.    He was a very calm guy, yes, sir.

1  Q.   And that the way you construed that comment, that he was
2  not angry when he said that?
3  A.   As far as I can remember, he did not appear to be angry
4  when he said it.
5  Q.   And you told the agents he was not being mean, in your
6  estimation?
7  A.   He seemed to be calm when he was doing it.
8  Q.   And that he was just trying to get this guy to calm
9  down?
10 A.   I -- I believe he thought he was doing the right thing.
11 Q.   Now, the policy of the Cheatham County Sheriff's Office
12 with regard to tasing changed abruptly in July of 2017; is
13 that right?
14 A.   The core -- the core policy stayed the same.  There was
15 just more of a clarification and update.
16 Q.   Okay.  Do you remember your sheriff, Sheriff Breedlove,
17 writing a letter to the staff that outlined in particularity
18 the, quote, changes that will take place effective July 30,
19 2017?
20 A.   I know he put out a memo, but I don't remember what it
21 said.
22 Q.   Would you be able to recognize the memo?
23 A.   I should be able to, yes, sir.
24          MR. STRIANSE:  I think we're up to 4.
25          THE COURT:  4.

BY MR. STRIANSE:

Q.   Mr. Hannah, let's me show you what's been marked for identification as Defendant's Exhibit 4 and see if you recognize that.

THE COURT:  Can you pass the Court a copy of it, too?

MR. STRIANSE:  I'm sorry?  I do, Your Honor.

THE COURT:  Can I have a copy?

MR. STRIANSE:  Yes, sir.

MR. SONGER:  Your Honor, may we approach?

THE COURT:  Sure.

(Bench conference outside the hearing of the jury.)

MR. SONGER:  We object to this being offered. It's an after-the-fact policy change.  It wouldn't bear on what the defendant's intent was at the time that he took these actions that are subject to this case.

MR. STRIANSE:  This is the best evidence that there was no Taser policy regarding these three applications, and five seconds per, that they've been jumping up and down about in this case.

MR. SONGER:  The best evidence is the policy that existed at the time and the officers' testimony about what the policy was at the time, not an after-the-fact document.

THE COURT:  All right.  He gets the last word.

```
 1              Overruled.  Let's proceed.
 2              (Jury present.)
 3   BY MR. STRIANSE:
 4   Q.   Lt. Hannah, I was, I think, asking you if you recognize
 5   Defendant's Exhibit 4?
 6   A.   I do, yes, sir.
 7   Q.   And what is it, sir?
 8   A.   It looks like a memo from the sheriff.
 9              MR. STRIANSE:  Your Honor, we would offer
10   Defendant's 4 as evidence.
11              THE COURT:  Admitted.
12              (Whereupon Defense Exhibit 4 was marked for
13              identification and received in evidence.)
14              MR. STRIANSE:  May I have permission to publish it
15   to the jury?
16              THE COURT:  Yes.
17   BY MR. STRIANSE:
18   Q.   If you would, take a look at the screen.
19              Is this Defendant's Exhibit 4 that you've just
20   identified?
21   A.   Yes, sir, it is.
22   Q.   And if you -- it's a short letter.  If you would read it
23   to the members of the jury.
24   A.   It's dated July 30th, 2017.  (As read):
25                   Ladies and gentlemen:  Please know that your
```

1          job is one of the most difficult -- please know

2          your job is one of the most difficult occupations

3          anyone can have and I am supportive and proud of

4          each of you.  You have the tools to defend

5          yourself, including the use of the Taser.  Because

6          of the event that occurred and went viral

7          throughout the world, I want you to be even more

8          vigilant and keep your spirits high.

9              You are supported by the citizens -- county

10         citizens and we will make the -- this dark moment

11         into a bright --

12    BY MR. STRIANSE:

13    Q.   Let me stop you right there.

14         "This dark moment" was a reference to all the

15    media attention that had been generated in July of 2017 as a

16    result of this incident?

17    A.   You would have to ask the sheriff what he meant by that,

18    sir.  I didn't write it.

19    Q.   Well, you all were under a lot of scrutiny in July of

20    2017; is that right?

21    A.   Yes, sir.

22    Q.   Okay.  This is when it all sort of broke in the media?

23    A.   Yes, sir.

24    Q.   Is that a fair characterization?

25    A.   Yes, sir.

1    Q.   Go ahead.

2    A.   (As read):

3              With that said, there are a few changes that

4         will take place effective this date.  These

5         changes are for the protection and the ability to

6         keep your professionalism intact.

7              Taser directive.

8              1.   Any inmate who is strapped to the restraint

9         chair will not be tased, pepper sprayed, or other

10        force that is not reasonable in controlling the

11        individual.

12             2.   The Taser and/or drive-stun will not be

13        deployed for more than five seconds.

14             3.   The Taser/drive-stun will not be deployed

15        more than three times on any combative individual

16        unless unique circumstances happen and the

17        officers articulate why.

18             4.   While deploying the Taser, you will give

19        voice commands before and during ordering the

20        person to stop resisting.  Example:  "Stop

21        resisting.  Get on the ground.  Show me your

22        hands."

23             5.   No individual who is tased is to be

24        taunted, threatened, or made fun of in any manner.

25        We cannot control what inmates yell, but any

1          inappropriate statements by officers will not be
2          tolerated.
3  Q.   And this was effective July 30, 2017?
4  A.   Yes, sir.
5  Q.   And this was the first statement issued by the sheriff
6  regarding the number and duration and time of tases; is that
7  right?
8  A.   By the sheriff, as far as I know, yes, sir.
9  Q.   Okay.  Well, there's certainly nothing in the policy
10  that you identified for the jury earlier in your direct
11  examination about five seconds, no more than --
12          THE COURT:  Is your microphone on?  It really
13  makes a difference for the court reporter.
14          MR. STRIANSE:  I'm sorry, Judge.
15          THE WITNESS:  Would you re- --
16  BY MR. STRIANSE:
17  Q.   You had identified Government's Exhibit 1 and Exhibit 41
18  earlier in your testimony?
19  A.   Yes, sir.
20  Q.   The general order, the policy regarding Taser; is that
21  right?
22  A.   Yes, sir.
23  Q.   Those documents that you identified in no way specify
24  three administrations of the Taser, five seconds each,
25  correct?

```
 1    A.    No, sir.
 2    Q.    And this is the first time it was ever codified or put
 3    in writing by the Cheatham County Sheriff's Department; is
 4    that right?
 5    A.    At least by the sheriff, I know, yes, sir.
 6    Q.    Well, I mean, you say "by the sheriff."  You were -- you
 7    told me earlier in your testimony that you all really had no
 8    policy regarding Tasers.
 9    A.    Yes, sir.  As far as the five-second bursts.
10    Q.    Right.  That in your understanding of the policy -- and
11    this is before we had the edict of July the 30th, 2017 --
12    there was this sort of general idea that if you were going to
13    shoot the prongs at somebody, well, that would be a five-
14    second application, correct?
15    A.    Yes, sir.
16    Q.    But you were very clear that there was never any sort of
17    limitation on the drive-stun or the contact Taser?
18    A.    I think I would have said I don't remember there being
19    anything.  But yes, sir.
20    Q.    Now you're saying you don't remember that.
21    A.    No, I remember us talking about it.
22    Q.    Okay.  You do remember testifying in connection with
23    another matter related to this case; is that right?
24    A.    Yes, sir.
25    Q.    Do you remember being asked, was there any specific
```

number or duration of tases that was prescribed by the policy
at that time?  Meaning, November 5, 2016.

     Do you remember that question?

A.    I do, yes, sir.

Q.    And do you remember saying, "No, sir, not in the
policy"?

A.    I do, yes, sir.

Q.    Was there anything in the policy about not tasing an
individual who was restrained?  Do you remember that
question?

A.    I do, yes, sir.

Q.    Do you remember answering, "No, sir, it wasn't in the
policy"?

A.    I do, yes, sir.

Q.    Do you remember being asked the question how did you
characterize the old policy to the TBI and the FBI that was
in effect at the time?  Do you remember that?

A.    I believe that's where I --

Q.    "I had made a statement to the TBI and FBI that the
Taser policy wasn't very strong at the time of the incident"?

A.    I do remember that, yes, sir.

Q.    And do you remember being asked the question that you
all didn't have much of a policy at that time?

A.    I'm sorry.  That's confusing me.  That part is.

Q.    Yeah.  Do you remember being asked at a prior hearing in

1  connection with this matter, this question, that "You all
2  didn't have much of a policy at that time?"
3  A.   I do remember making that statement, yes, sir.
4  Q.   And do you remember saying "Yes, sir"?
5  A.   Yes, sir.
6  Q.   You were asked questions about deficiencies in incident
7  reports that officers prepare.  Do you remember that during
8  your direct examination today by the government?
9  A.   Yes, sir.
10 Q.   Let me show you a report that was prepared --
11        Officer Montgomery was one of the officers that
12 was involved in this incident; is that correct?
13 A.   I'm not 100 percent sure.  I don't remember him being --
14 which incident you're talking about?
15 Q.   I'm talking about the incident with Jordan Norris.
16 A.   I'm sure he was involved at some point in time.  I'm not
17 100 percent sure which areas he was involved in.
18 Q.   Let me show you what has been received as evidence as
19 Defendant's Exhibit 3.  And if you would take a look at the
20 screen.
21        Do you remember from your review of the incident
22 that there were some events at around 10:20 p.m. on
23 November 5, 2016?
24 A.   Is there any way I can get a copy of that?  I can't
25 really see it that well.

```
 1   Q.    You can't see it that well?
 2              THE COURT:  Why don't you blow it up.  Enlarge it.
 3   BY MR. STRIANSE:
 4   Q.    Is that better?
 5   A.    That's better.  Thank you, sir.
 6   Q.    Let me be sure you can see the top.
 7              The reporting officer is Cpl. Montgomery.
 8              And you know Cpl. Montgomery; is that right?
 9   A.    I do know Cpl. Montgomery, yes, sir.
10   Q.    And then this is involving Jordan Norris.
11              Do you see that?
12   A.    Yes, sir, it does appear.
13   Q.    And the date is November 5, 2016?
14   A.    Yes, sir.
15   Q.    The time is 2135 or 10:35; is that right?
16   A.    That's 10:35 p.m., yes, sir.
17   Q.    So this is all the series of events that is occurring
18   with Mr. Norris on November 5th and culminating sometime
19   after 10:30 on the 5th of November 2016?
20   A.    Yes, sir.
21   Q.    Okay.  Now, take a look at the narrative section that
22   Cpl. Montgomery wrote.
23              Do you see that?
24   A.    Yes, sir.
25   Q.    (As read):
```

```
 1              While moving inmate Norris from booking
 2              restraint chair to jail transport vehicle, inmate
 3              Norris became very aggressive and did not comply
 4              with lawful commands.  I drive-stun tased him in
 5              the calf for approximately one second to get him
 6              in the vehicle.
 7              Do you see that?
 8   A.    I do see that, yes, sir.
 9   Q.    Now, with no disrespect to Cpl. Montgomery, he makes no
10   mention of the fact that at the time that he tased him that
11   Jordan Norris was shackled on his legs, that his hands were
12   cuffed, and that he had a belly chain around his midsection.
13              Now, you, as the reader of that, would you have
14   been left with the impression that you didn't have all the
15   information?
16   A.    From reading that report, yes, sir.
17   Q.    Okay.  So there -- you would have been disappointed in
18   Cpl. Montgomery's drafting skills on this report?
19   A.    Yes, sir.
20   Q.    Now, what was the policy at the jail if there was a
21   deficiency in how an officer wrote up a report?
22   A.    I'm -- I'm not 100 percent sure what the policy is on
23   that.  I can tell you what the best practice would be.
24   Q.    I mean, it's not something you were disciplining
25   officers for, if their reports were somewhat deficient?
```

A.    No, sir.  I think what would happen would be that their
supervisor, their immediate supervisor would maybe give them
a coaching session and try to tell them what they'd done
wrong.
Q.    It was handled in a more informal way?
A.    Yes, sir.
Q.    That we read your report; you either need to improve
your grammar, you need to improve the information, that sort
of thing?
A.    Yes, sir.  That's how it should be handled.
Q.    Okay.  But Cpl. Montgomery was not trying to mislead the
jail in preparing this report, was he?
A.    I wouldn't think so.  But I can't speak to what
Cpl. Montgomery was trying to do.
Q.    Right.  But you didn't view it that way?
A.    No, sir, I wouldn't have viewed it that way.
Q.    Now, when you had the opportunity to look at all the
videos and look at all the reports, you didn't -- you weren't
critical of Cpl. Montgomery or Mr. Bryant about, hey, your
report was not written exactly the way that we would have
liked it?
A.    At that point, no, sir.
Q.    Okay.  And you all were not impeded in any way from
fully investigating this by using these reports and looking
at the Taser video and then the jail video?

```
 1   A.    No, sir.
 2   Q.    Okay.  So you were able to conduct your own thorough
 3   investigation, correct?
 4   A.    Once we -- yes, sir.
 5   Q.    Just as the TBI and the FBI were able to go to the jail,
 6   pull all of this information, and conduct their
 7   investigation?
 8   A.    Yes, sir.
 9          MR. STRIANSE:  Your Honor, may I have one moment?
10          THE COURT:  Yes.
11   BY MR. STRIANSE:
12   Q.    You were asked some general questions at the beginning
13   of your direct examination by the government today that a
14   Taser is not to be used to punish someone?
15   A.    Yes, sir.
16   Q.    Do you remember those questions?  Or retaliate against
17   somebody or used after a threat was under control?
18   A.    Yes, sir.
19   Q.    They never asked you if your officers were tasing
20   Mr. Norris on November 5, 2016 to punish him in some way?
21          MR. SONGER:  Objection.  He wasn't present for the
22   event.  He can't speak to what their mind -- mental state was
23   at the time.
24          THE COURT:  I'll sustain.  He can answer it --
25   overruled.
```

```
 1            You can answer if you know.
 2  BY MR. STRIANSE:
 3  Q.   Do you remember them asking you that sort of open-ended
 4  question about you're not supposed to use a Taser to punish
 5  or retaliate?
 6  A.   I do remember the question, yes, sir.
 7  Q.   After you conducted your evaluation of the incident, you
 8  certainly didn't conclude that Mr. Bryant and the other
 9  officers were trying to punish or retaliate against Jordan
10  Norris, did you?
11  A.   That was my opinion, yes, sir.
12  Q.   That they were not trying to punish or retaliate?
13  A.   Yes, sir.
14            MR. STRIANSE:  Those are my questions.
15            THE COURT:  All right.  Redirect.
16
17                    REDIRECT EXAMINATION
18  BY MR. SONGER:
19  Q.   Lt. Hannah, you were just asked whether you knew if
20  Defendant Bryant was trying to punish or trying to retaliate.
21            Do you know what Defendant Bryant was thinking at
22  the time he was using a Taser that night?
23  A.   No, sir.
24  Q.   You watched the video of at least the 8:00 incident, the
25  four tases in the restraint chair, right?
```

1  A.    Yes, sir.

2  Q.    And eventually you saw a video of that incident that had

3  sound, right?

4  A.    Yes, sir.

5  Q.    And you're familiar with Defendant Bryant's voice,

6  right?

7  A.    Yes, sir.

8  Q.    Did you hear him say in that video, "I'll keep going

9  until I run out of batteries"?

10  A.    Something along those lines, yes, sir.

11  Q.    And did you hear in him that video say, "You don't like

12  it, do you?"

13  A.    Something along those lines, yes, sir.

14  Q.    I want to clear up a few things about timing.  You were

15  asked a number of questions about what you said about these

16  incidents at different points in time.  I just want to be

17  clear.

18            When you approved of the use of force of this

19  incident, these incidents with Jordan Norris on the night of

20  November 5th, 2016, at that time did you know that Defendant

21  Bryant had tased Jordan four times for 50 seconds in a

22  restraint chair?

23  A.    No, sir.

24  Q.    And you were asked a number of questions about whether

25  your policy itself had a time limit in it, about how long

officers, the maximum amount of time that officers would be allowed to tase someone.

                Do you remember those questions?

A.    Yes, sir.

Q.    And earlier you said that at the time this incident happened there wasn't anything written specifically into your policy that said you can't tase more than three five-second bursts in your policy itself, right?

A.    Yes, sir.

Q.    Right?

A.    Yes, sir.

Q.    Now, at the time this happened, were officers still required to follow what they were taught in their training?

A.    Yes, sir.

Q.    And we looked at the policy that was in place at the time this happened, correct?

A.    Yes, sir.

Q.    And did that policy mandate that officers used only the minimum number of tases and length of tases that was necessary?

A.    Yes, sir.

Q.    And were officers also instructed at that time to use good judgment and common sense?

A.    Yes, sir.

Q.    Okay.  So, applying only those standards that were in

1   the policy at the time, minimum number that were necessary
2   and judgment and common sense, was tasing Jordan for 50
3   seconds in a restraint chair justified?
4   A.   No, sir.
5   Q.   You were also asked about whether various reports
6   impeded your investigation.  I want to be clear about that,
7   too.  When you looked at the report that Defendant Bryant did
8   for the first part of this night, did you know that he had
9   tased Jordan four times for 50 seconds?
10  A.   No, sir.
11  Q.   And in that second report we looked at that dealt with
12  what happened at 10:30 at night, the one that didn't say how
13  many times he tased or how long or that Jordan was handcuffed
14  or shackled, any of that information?
15  A.   Yes, sir.
16  Q.   You said you never watched the video of that incident,
17  right?
18  A.   Not at that time, no.
19  Q.   And still today, have you watched it?
20  A.   I'm not 100 percent sure, I've seen so much stuff, what
21  all I've watched.
22  Q.   You didn't fully investigate that incident at the time,
23  did you?
24  A.   No, sir.
25  Q.   And you were shown this memo that the sheriff put out I

```
1  guess after what had actually happened with the defendant and
2  Jordan Norris came to light.  And fair to say that jail
3  leadership, including yourself, wanted to make sure nothing
4  like this ever happened again?
5  A.    Absolutely.
6             MR. SONGER:  Thank you.  Nothing further.
7             MR. STRIANSE:  Your Honor, may I ask him one
8  question?
9             THE COURT:  Why don't you approach.
10            (Bench conference outside the hearing of the
11            jury.)
12            MR. STRIANSE:  At the time he was interviewed on
13 August 4th, 2017, by the FBI and the TBI and he said it was
14 justified, he had seen all of the videos and was aware of all
15 of the tasing.
16            MR. SONGER:  We've already covered that on
17 cross-examination.
18            MR. STRIANSE:  But he's left with this --
19            THE COURT:  Yeah.  I think it's been adequately
20 covered.
21            MR. STRIANSE:  Okay.
22            (Jury present.)
23            THE COURT:  All right.  You can step down.
24            THE WITNESS:  Thank you.
25                  (Witness excused.)
```

1          THE COURT:  All right.  Ladies and gentlemen,
2    we're going to take our lunch break.  Before we do so, I want
3    to remind you or understand -- acknowledge my understanding.
4    Many of you may not have served on a jury.  And you may have
5    a lot of questions.  And the court officer has reported that
6    you're asking a lot of questions.  That's perfectly normal.

7          Just be aware, we -- the process requires that you
8    pay attention to the witnesses and the documents and the
9    examination here in the courtroom.  So you very well may not
10   know a lot of things and may be wondering about things in
11   this process.  But we don't share that with you so you can
12   focus on the evidence here in the courtroom.

13         So just, respectfully, don't worry about those
14   things.  If it's a question that pertains to the case, you
15   might want to jot it down for when you start your
16   deliberations.  But as to all the other procedural and
17   process and -- and the aura here of what we're doing, don't
18   worry about that.  Just focus on the testimony being given
19   from the witnesses on the witness stand and the documents
20   coming into evidence, and just trust that you -- that's your
21   main role as judges of the facts.

22         And what you don't know, trust me, you don't need
23   to know right now.  And I say that very respectfully because
24   we want you to focus on the evidence here.

25         So we're going to take our break now and come back

and be ready to start promptly at 1:30.  Let me remind you
just again -- not that you've forgotten -- don't let anyone
talk to you.  If somebody tries to talk to you, you tell me.
Don't you talk to anyone, including yourselves, about the
case.  And don't do any investigation on your cell phones
when you look at them.  All right.  Now take care.

(Whereupon a lunch break was observed.)

THE COURT:  All right.  Be seated.  Are we
ready -- is the government ready for the jury?

MS. MYERS:  We are, Your Honor.

THE COURT:  Is the defense ready for the jury?

MR. STRIANSE:  Yes, Your Honor.

THE COURT:  All right.  Bring them in.

(Jury present.)

THE COURT:  All right.  Be seated.

Call your next witness.

MS. MYERS:  The United States calls Special Agent
Joy Wright.

JOY CHRISTINE WRIGHT,
called as a witness by Plaintiff, was duly sworn and
testified as follows:

COURT DEPUTY:  Please be seated.

Please be sure to speak into the microphone, state

your full name and spell your last name.

THE WITNESS:  It's Joy Christine Wright,
W-r-i-g-h-t.


DIRECT EXAMINATION

BY MS. MYERS:

Q.    And Special Agent Wright, who is your current employer?

A.    The Federal Bureau of Investigation.

Q.    And how long have you been with the FBI?

A.    Fourteen years.

Q.    Is that an agency of the federal government?

A.    Yes, it is.

Q.    And do you investigate cases involving excessive force?

A.    I do.

Q.    And are the charges in this case within the jurisdiction of the FBI?

A.    Yes, they are.

Q.    Did you investigate this case?

A.    I did.

Q.    And did you speak to the defendant as part of the investigation?

A.    I did.

Q.    And when did you speak to the defendant?

A.    On August 2nd -- excuse me.  I'm messing up the date.
But early August of 2017.

1   Q.   And can you describe the circumstances of the interview
2   with the defendant?
3   A.   Yes.  He came in to talk to us.  It was a voluntary
4   interview.
5   Q.   Did you give the defendant any warnings before you
6   started the interview?
7   A.   Yes, we did.  We told him that he wasn't compelled to
8   talk to us, that it was voluntary.
9           THE COURT:  I'm going to get you to slow down for
10  the court reporter.
11          THE WITNESS:  Sure.  Sorry.
12          I also advised him that there was a federal
13  statute, which was 1001, that would get him in trouble if he
14  didn't tell us the truth during that interview.
15  BY MS. MYERS:
16  Q.   And is 1001, is that a federal statute you're referring
17  to?
18  A.   Yes.  It's 1001.  It's a federal statute that's false
19  statements to a government agent.
20  Q.   And even after that warning did he still choose to speak
21  to you?
22  A.   Yes, he did.
23  Q.   And how long did the defendant tell you that he had
24  worked at the Cheatham County Jail?
25  A.   He said he started there in 2015.

Q.    Had he been in corrections before he worked at the jail?

A.    Yes.  He had started in corrections in 2013.

Q.    Did the defendant tell you that he was given the Taser policy when he started working at the Cheatham County Jail?

A.    Yes.

Q.    Did he know that policy?

A.    Yes.

Q.    And what did he tell you about the policy on Tasers?

A.    He said it was the same -- basically under the same as a use of force policy.

Q.    And that was?

A.    And that was the minimum amount of force necessary to get done what you needed to get done.

Q.    And did he actually read a copy of the use of force policy?

A.    Yes.

Q.    And was the defendant Taser certified at the time that he tased Jordan Norris?

A.    Yes, he was.

Q.    Did the defendant say who taught his Taser certification class?

A.    Yes, he did.  He said it was taught by Sgt. Gary Ola.

Q.    And what did the defendant tell you in that interview that he knew from his Taser training about how the Taser trigger worked?

A.   He explained that he knew that if he pulled one time on the trigger it would cycle five seconds.  And then he said if you hold down the trigger it would continuously run.

Q.   And did the defendant remember the events of November 5th of 2016?

A.   Yes.

Q.   And did he tell you how he interacted with Jordan Norris that night?

A.   Yes.  So he explained that he came into contact with Mr. Norris kind of earlier that evening, and then he kind of went into explaining how they had to extract Mr. Norris from Cell 4 and bring him out into the general booking area to go into the restraint chair.

Q.   And how did the defendant describe Jordan Norris physically in comparison to himself?

A.   He said that he was -- Mr. Bryant was two times the size of Mr. Norris and that Mr. Norris, he said, was a smaller gentleman.

Q.   And that issue that you were just describing, when he was telling you about moving Jordan Norris from the cell --

A.   Uh-huh.

Q.   -- do you remember from your investigation what time that occurred?

A.   Yes.  The removal of Jordan Norris from Cell 4 to the restraint chair occurred at 6:55 p.m.  So approximately 7:00

1  that night.

2  Q.    And were there other officers there with the defendant

3  that night?

4  A.    Yes.

5  Q.    Who did he tell you was there?

6  A.    He explained that there was Jeff Key, Josh Marriott, and

7  Daniel Bratton.

8  Q.    And did he say that anyone had tased Jordan during that

9  7:00 p.m. transfer out of the cell?

10  A.    Yes.  He said Daniel Bratton had tased Jordan.

11  Q.    Did the defendant say that he tased Jordan at that

12  7:00 p.m. incident?

13  A.    No.

14  Q.    Was there another use of force incident later that also

15  involved Jordan Norris?

16  A.    Yes.  So there was a -- this was at 7:00, we had

17  discussed, and then there was a second incident that had

18  occurred an hour later, at 8:00 p.m., approximately 8:00 p.m.

19  Q.    And for that second incident, what did the defendant say

20  that he did involving Jordan?

21  A.    He was talking about the 8:00 p.m. incident.  He said

22  that he tased Jordan multiple times.

23  Q.    And was that while he was in the restraint chair?

24  A.    Yes.

25  Q.    And from your investigation, did you learn how long the

1  defendant used a Taser on Jordan at that 8:00 p.m. incident?

2  A.   Yes.  At the 8:00 p.m. incident, the defendant used the

3  Taser four times for a total of 50 seconds.

4  Q.   And during that interview with the defendant, did you

5  ask whether he tased Jordan for more than the five-second

6  standard cycle?

7  A.   Yes.

8  Q.   And what did he say?

9  A.   "I guarantee it."

10 Q.   Did you watch the video from the 8:00 p.m. incident as

11 part of this investigation?

12 A.   I did.

13 Q.   And did you ask the defendant specifically about other

14 comments that you heard him say on the video?

15 A.   I did.

16 Q.   What did you hear the defendant say on the video as he

17 tased Jordan?

18 A.   He says things like, "You don't like this, do you?  I

19 can go until I run out of batteries."

20 Q.   Are you familiar with the defendant's voice?

21 A.   I am.

22 Q.   And was that the voice on the -- on that recording

23 making those statements?

24 A.   Yes.

25 Q.   Did you request any reports or documentation from the

1  jail for the night of November 5th of 2016 as part of your

2  investigation?

3  A.    Yes.  We requested a multitude of documents.  We

4  requested incident reports, use of force reports, Taser logs,

5  personnel files, policy information, videos.

6  Q.    Were all those documents isolated to the events of

7  November 5th, 2016?

8  A.    No.

9  Q.    Did they, in fact, provide documents from other time

10 periods?

11 A.    They did.

12 Q.    And what about the Taser logs?  What was the time period

13 provided for the Taser logs?

14 A.    So the Taser logs that were provided, they essentially

15 gave us the -- all of the logs that had been done since the

16 first time they started using the Taser in the jail until

17 that time we requested it or shortly thereafter.  And that

18 time period was, like, October 2014 through July of 2017.

19 Q.    And were those current through the period that you

20 requested?

21 A.    Yes.

22 Q.    And were those the Taser logs for everyone in the jail,

23 for every Taser?

24 A.    Yes.  They were the logs for all the Tasers that they

25 had used in the jail.

Q.   And based on the entirety of your investigation in this
case, what was the longest tase in looking at those records?
A.   The longest tase was 25 seconds.
Q.   And how about the second longest tase?
A.   The second longest tase was 15 seconds.
Q.   When were those tases from?
A.   Those tases were from the incident where Mr. Bryant
tased Jordan Norris the night of November 5th, 2016.
Q.   Was that related to the 8:00 p.m. tasings?
A.   Yes.  That 8:00 p.m. tasings.
Q.   And how long were the approximate -- how long were the
tases for that 8:00 p.m. tasing, total?
A.   Total they were 50 seconds.  So there was five, five, 25
and 15.  And the -- that I'm talking about are the last two,
the 25 seconds and the 15 seconds.  And they were done back
to back.
Q.   I'm sorry.  The 25 and the 15 --
A.   Yes.
Q.   -- were done back to back?
     And what length in your review of all of those
records were the majority of the tases?
A.   Excuse me.  Five seconds or less.
Q.   And that's from your review of the entire period?
A.   Yes.
Q.   Did you ever meet Jordan Norris?

1   A.   I did.

2   Q.   When was that?

3   A.   That was August of 2017, early August.

4   Q.   And did Jordan Norris have any injuries from the

5   tasings?

6   A.   He did.

7   Q.   And even though you met him -- it would be approximately

8   nine months later, after November 5th of 2016, were you able

9   to observe any of Jordan's injuries from those tasings back

10  in November?

11  A.   Yes.  So Jordan pointed out areas on his body where

12  there was scarring from the tasings.  And there were scars on

13  his legs and there were scars on his abdomen in different

14  areas on his body.

15  Q.   Can you describe what those scars looked like?

16  A.   So they were round scars and they were in pairs.  And

17  they were about two inches apart, kind of circular.  They

18  were all different -- they were different sizes.  Some were

19  the size of kind of dimes and then some were smaller.  But

20  they were in pairs in different areas on his body.

21  Q.   About how far apart were those dime-sized injuries

22  you're mentioning?

23  A.   They were about two inches.

24  Q.   And have you handled an XP26 Taser?

25  A.   I have.

Q.   And what is the distance between the prongs on the
Taser?

A.   About two inches.

Q.   And are the locations of those scars that you saw
consistent with the locations of the Taser burns that you
viewed from the investigation?

A.   Yes.

Q.   Did Jordan also provide you with additional information
when you met with him?

A.   Yes.  He provided me with a CD and hard copies of
photos.

Q.   And did you recognize Jordan Norris in those photos?

A.   I did.

Q.   Could you please -- there's a binder up there, as you
know.  Please flip to Tab 39.

            And Special Agent Wright, do you recognize that?

A.   I do.

Q.   What is it?

A.   This is one of the photos that Jordan provided to me.

Q.   And does that photo depict the injuries that you just
described?

A.   Yes.

            MS. MYERS:  Your Honor, at this time I would like
to ask that Exhibit 39 be moved into evidence.

            MR. STRIANSE:  Your Honor, may we approach?

1          THE COURT:  Yes.

2          (Bench conference outside the hearing of the

3          jury.)

4          MR. STRIANSE:  I'm not sure there's been a proper

5    foundation laid for this photograph.  That appears to be a

6    photograph that was attached to the civil lawsuit.  It was my

7    understanding that the FBI, this agent, took a series of

8    photographs of Mr. Norris.

9          THE COURT:  Uh-huh.

10          MR. STRIANSE:  I don't know why she's not been

11   asked about those photographs.

12          MS. MYERS:  She has just explained about how she

13   received the photographs directly from Jordan Norris.  I'm

14   about to go into how she got the timestamp off the photos

15   from the CD.  She's described the injuries and how they match

16   the Taser.  And she can discuss her personal observations.

17   She did not receive these as a result of the civil lawsuit

18   but she was handed these photos on a CD from Jordan.  I'm

19   just asking about her observations.

20          THE COURT:  It's from the civil lawsuit?

21          MS. MYERS:  It was contained in the civil lawsuit.

22          THE COURT:  Yeah.

23          MS. MYERS:  She testified how she received these

24   images --

25          THE COURT:  Well, actually, this helps you.

1     (Reporter interruption for clarification.)

2     THE COURT:  I said actually, this helps the

3  government because the gap that Jordan Norris gave her a CD

4  of photos that he says are me.  And we don't have anyone here

5  to confirm what he, in fact, gave her.

6     MS. MYERS:  Well, she said that she recognized

7  Jordan Norris in the photographs that he provided, and

8  additionally she saw him in person show the scars nine months

9  after these were taken.

10     THE COURT:  But that doesn't prove that the

11  pictures that he gave her on the CD were him.

12     MS. MYERS:  She said that she personally observed

13  his own injuries, his scars from nine months later.  And they

14  were in the same locations as these scars.

15     THE COURT:  It's the pictures from his lawsuit.

16     MS. MYERS:  But she did not get these in

17  conjunction with the lawsuit.  She got these personally from

18  Jordan Norris in August of 2017.  He handed them to her.

19     I didn't ask what he told her they were.  I didn't

20  elicit hearsay.  She observed the injuries on him, the scars

21  that match the locations of these pictures that were handed

22  to her from Jordan Norris.  He gave them to her.  And then

23  she was able to look back at the metadata on the photograph

24  and see that it was taken on November 16th of 2016.

25     That's independent knowledge that she got through

the course of the investigation.  It's not based on hearsay.
It's not based on anything that's in the civil suit.  It's
part of this criminal investigation and which she received
from Jordan Norris.

MR. STRIANSE:  So based on hearsay from Jordan
Norris.

MS. MYERS:  It's not.  There is no hearsay here.
She's only testifying to her own personal observations and
what she received from someone.  She observed him.  She
observed his injuries.  And then these pictures match what
she observed when she was there and saw him, the scars
match --

THE COURT:  Just the one picture.

MS. MYERS:  Just the one picture.

THE COURT:  I think it's a weak foundation, but
she did testify that "This is one of the photos that Jordan
provided me," and then the question was, "And does that photo
depict the injuries that you just described," that she saw,
and she said yes.

MR. STRIANSE:  We don't even know when she
interviewed Jordan Norris.

THE COURT:  No, I agree.

MS. MYERS:  I did lay that foundation.  She met
him in early August 2017, and that's when he gave her this
disc.

```
 1              THE COURT:  August of '17?
 2              MS. MYERS:  (Indicating affirmatively.)
 3              THE COURT:  So it's just this one photo.
 4              MS. MYERS:  It is just the one photo, Your Honor.
 5              THE COURT:  And let the record reflect that the
 6    Court has a copy of Mr. Norris's lawsuit filed in the Middle
 7    District.  And the same photo was attached to -- in
 8    Mr. Norris's complaint.  It defies reason that he would
 9    attach a photo of somebody other than himself.  So I'm going
10    to admit it.  Okay.
11              MS. MYERS:  Thank you, Your Honor.
12              (Jury present.)
13              THE COURT:  All right.  39 is admitted.
14              (Whereupon Plaintiff Exhibit 39 was marked for
15              identification and received in evidence.)
16              MS. MYERS:  May I publish it to the jury, Your
17    Honor?
18              THE COURT:  Yes.
19    BY MS. MYERS:
20    Q.   And Special Agent Wright, what does this photo depict
21    from your observations?
22    A.   That photo is the -- well, it's the upper thigh of
23    Mr. Norris.  It's his left upper thigh.  And it depicts burn
24    marks consistent with the scars that I saw when I met
25    Mr. Norris.
```

median

1  Q.   Were there marks, scars in the same location as what are
2  depicted in this image?
3  A.   Yes.
4  Q.   And were you able to view the metadata for the photo
5  from this CD?
6  A.   Yes.
7  Q.   And was there a timestamp that showed when this
8  photograph was taken?
9  A.   Yes.  The timestamp on these photographs -- this
10 photograph -- was November 16th -- excuse me.  It was 11 days
11 after the incident, so November 16th of 2016.
12            MS. MYERS:  And you can take that down.  Thank
13 you.
14 Q.   And, Special Agent Wright, you mentioned earlier that
15 you received materials from the jail that night.  Did you
16 receive incident and use of force reports for November 5th,
17 2016?
18 A.   Yes.
19 Q.   And if we could go to Exhibit 25.  It's already been
20 admitted.
21            And, Special Agent Wright, do you recognize this
22 report?
23 A.   Yes, I do.
24 Q.   Can you explain what it is and who authored it?
25 A.   Yes.  It's an incident report.  It's dated November 5th,

1  2016.  The time is 1855.  And it's authored by Officer

2  Bryant.

3  Q.   And did you read this report as part of your

4  investigation?

5  A.   I did.

6  Q.   And based on your investigation in its entirety, did you

7  find the information in this report to be accurate?

8  A.   I did not.

9       MR. STRIANSE:  Your Honor, I'm going to object to

10  that conclusion.  This is a specific charge in the indictment

11  that the jury's going to have to consider.  They'll need to

12  draw their own conclusion from all the facts and the

13  evidence.

14       MS. MYERS:  She has the benefit of having all of

15  the materials for the entire investigation, and she's only

16  testifying from her own personal knowledge of the events in

17  this.  And based on the entirety of her investigation, that's

18  what I'm asking her to testify about.

19       THE COURT:  As to the last question asked -- as to

20  your last question, the objection is sustained.

21  BY MS. MYERS:

22  Q.   So I would like to enlarge the narrative, if we could,

23  and walk through the narrative.

24       All right?  Is this familiar to you?

25  A.   Yes, it is.

Q.   And in walking through the information, if you could go
down to the point where the sentence says "Deputy Bratton and
I tased."

         You said earlier that based on this report at
6:55 p.m. -- so around 7:00 incident -- did that actually
happen?

A.   No.

Q.   Why not?  What did you learn from your investigation?

A.   The author of this report is Mr. Bryant, which would
mean that "I" was -- the "I" would be Mr. Bryant.  And
"Deputy Bratton and I" did not tase at that point.

         Deputy Bratton did tase at the 7:00 p.m. incident.
Officer Bryant did not tase anyone at the time of this report
was written, which would have been at 7:00 p.m.  Officer
Bryant's tases came at an 8:00 incident, which is an hour
later.

Q.   And are those tases described in any detail in this
report?

A.   No.  There's no detail.  There's no number of times that
he tased.  There's no time -- seconds on how long the tase
went for.

Q.   So did the defendant include any justification for the
tases here?

A.   No.  There's no justification for the tases.

Q.   Is this consistent with what happened at 7:00 p.m. based

1  on your viewing of that 7:00 p.m. video?

2  A.    No.  Officer Bryant didn't tase anyone at 7:00 p.m.  He

3  tased Jordan at 8:00 p.m.

4  Q.    And you can take that down.  Thank you.

5            Did you ask the defendant when he was supposed to

6  do a use of force report, just generally?

7  A.    Yes.

8  Q.    And what did he tell you?

9  A.    He explained that he would need to do a use of force

10  report any time he went hands on with someone.

11  Q.    And did you ask the defendant why he didn't do a

12  separate report for the 8:00 p.m. tasings for 50 seconds?

13  A.    Yes.

14  Q.    What did he say?

15  A.    He said he should have done a second report.

16  Q.    One for the 7:00 p.m. incident?

17  A.    Yes.  There should have been two separate reports, one

18  for the 7:00 p.m. incident and one for the 8:00 p.m.

19  incident.

20  Q.    Based on your investigation, were those two incidents,

21  the 7:00 p.m. incident and the 8:00 p.m. incident,

22  distinguishable?

23  A.    Yes.  Very distinguishable.

24  Q.    How so?

25  A.    They're completely different situations.  So the

1    7:00 p.m. incident is the officers going in to Cell 4 to get
2    Jordan out, bring him out and put him in the restraint chair.
3    So they do that at the 7:00 p.m.  A whole hour goes by before
4    they have to reinitiate when the tasings happen.
5            So, yes, it's -- a significant time period passes
6    until the 8:00 incident.  And so there should have been two
7    different reports, one that went and told you what happened
8    at 7:00 and then one that would tell you what happened at
9    8:00.  They're two different incidents.
10   Q.   And you obtained all of the reports from that night,
11   right?
12   A.   Yes.
13   Q.   And did any of the reports mention the defendant's
14   50-second tases of Jordan at 8:00 p.m.?
15   A.   No.
16   Q.   What did the defendant say about how his own supervisor
17   responded to the information in the 7:00 p.m. incident
18   report?
19   A.   He explained that even the sergeant in the jail was
20   confused because the time wasn't correct.
21   Q.   And I'm going to ask you to flip to 40 in the binder.
22           And can you tell us what that is?
23   A.   Yes.  This is an audio recording of the interview that I
24   conducted of Mr. Bryant.
25   Q.   And does that specifically have the defendant's

```
 1   statements regarding the statement he made about his
 2   supervisor?
 3   A.   It does.
 4            MS. MYERS:  Your Honor, I would ask that
 5   Exhibit 40 be admitted.
 6            MR. STRIANSE:  No objection.
 7            THE COURT:  Admitted.
 8            (Whereupon Plaintiff Exhibit 40 was marked for
 9            identification and received in evidence.)
10            MS. MYERS:  Can we play it for the jury, Your
11   Honor?
12            THE COURT:  Okay.  Yes.
13            (Exhibit 40 played.)
14            THE COURT:  All right.  Let me interrupt.  Okay.
15   Again, we need to identify on the record so the Court -- any
16   other court or anyone reading the record will know what we're
17   playing to the jury.
18   BY MS. MYERS:
19   Q.   Yes.  Can you describe --
20            THE COURT:  You can do it.  Just read it from the
21   screen where we're starting the tape.
22            MS. MYERS:  Well, it's an audio recording, Your
23   Honor.
24            THE COURT:  It has a timestamp, does it not?
25            MS. MYERS:  Well, it may have a timestamp, Your
```

```
1   Honor, but this is it actually, because it's audio, being
2   read into the record so there will be an accurate record of
3   the audio recording.
4              THE COURT:  No.  But it doesn't tell them -- it
5   doesn't tell the reader what the jury's hearing it from.
6   You've got to give them the timestamp.  Do you have a
7   timestamp?
8              MS. MYERS:  Your Honor, this is the entire of
9   Exhibit 40.  I won't be pausing at all.
10             THE COURT:  Oh, you're going to play it through?
11             MS. MYERS:  Entirely through, yes.
12             THE COURT:  All right.
13             MS. MYERS:  Thank you.
14             Could we restart that.  Thank you.
15             (Exhibit 40 played.)
16  BY MS. MYERS:
17  Q.   And was this the defendant's voice that you recognized
18  earlier?
19  A.   Yes.  So in that clip, the first voice that you hear is
20  the TBI agent that was interviewing with me.  And then the
21  second voice that you hear is Mr. Bryant's voice.
22  Q.   And at this time I would like you to flip to Exhibit 26.
23  It's already been admitted.
24             Do you recognize this?
25  A.   Yes.
```

1   Q.   And can you explain what it is and who authored it?

2   A.   Yes.  This is an incident report, Cheatham County --

3   excuse me -- Cheatham County Sheriff's Office dated

4   November 5th of 2016.  And the time is 10:20.  And the

5   reporting officer and the author of it, it would be

6   Mr. Bryant.

7   Q.   Did you read and review this report as part of your

8   investigation?

9   A.   Yes, I did.

10  Q.   And I would like to walk through the narrative here.  If

11  we could enlarge that, please.  All right.  And you've

12  reviewed the videos for the 10:20 incident; is that right?

13  A.   Yes, I have.

14  Q.   And based on your review of those videos, is this

15  statement consistent with what occurred in the videos?

16  A.   No.

17  Q.   Can you tell us how?

18  A.   Yes.  So, reading through this, you can see that it says

19  (as read):

20              Inmate Norris did not comply with commands, and

21          I drive-stunned him multiple times.  The last

22          tase, he was complying with commands.

23              MR. STRIANSE:  Your Honor, that's for the judge to

24  decide -- that's going to be for the jury to decide, whether

25  he was complying or not.  There's been testimony about that.

1        MS. MYERS:  And she's testifying from her viewing

2  of the videos and her interviewing of the other witnesses.

3  This is from the culmination of her investigation as to

4  whether or not this statement is consistent with what she

5  reviewed in the investigation.

6        MR. STRIANSE:  She wasn't there.  And we have

7  witnesses that have described what was going on in the jail

8  at that moment.

9        THE COURT:  Okay.  I'm going to permit her to

10 express her opinion based on her investigation.

11        And the jury, at the end of the case, you'll get

12 the instructions.  And, ladies and gentlemen of the jury, you

13 alone will determine how much weight to give any witness's

14 testimony based on what you've seen and heard here in the

15 courtroom and based upon the instructions that I'll give you

16 at the end of the case.

17        Go ahead.

18 BY MS. MYERS:

19 Q.   So this statement, "I drive-stun tased him multiple

20 times to gain compliance," based on your review of everything

21 in this case, was that report consistent with what you

22 actually saw?

23 A.   No.

24 Q.   And why not?

25 A.   Because during the last tase of the six tases that he

1  did, at that point, the last tase, Jordan was complying.  He

2  wasn't fighting.  He was sitting in a chair, strapped in,

3  handcuffed, belly chained, shackled, waiting to be

4  transported.

5  Q.    Is there any justification in this report for that tase

6  while he was compliant?

7  A.    No.

8  Q.    And what is the length of that tase?  That final tase.

9  A.    The final tase, the length was 11 seconds.

10  Q.    And does this report recognize that there are other

11  officers around?

12  A.    It recognizes that there's one officer listed.  But this

13  isn't accurate on how many were actually around during that

14  particular incident.

15  Q.    And I believe that's up under the officers involved.  If

16  we could enlarge that.  Thank you.

17        And based on your knowledge and review of the

18  materials and the investigation, do you recall -- do you

19  remember some of the other people who were also around as

20  witnesses that night?

21  A.    Yes.  So, during this time period, there was Jude King,

22  Dwayne Jones, Rebecca Burney, Michael Montgomery, Gary Ola.

23  There was another road deputy there.  That's, I think, six

24  that I can recall.  Just from the video.

25  Q.    Did the defendant list any of those other people?

1  A.   No.

2  Q.   And based on the information in this report, could you

3  tell if there was any issue with Bryant using excessive force

4  that you would need to investigate?

5  A.   No, you can't tell because you don't know how many times

6  he actually tased him for.  Just says "multiple."  It's not

7  specific.  It also doesn't tell you how long those tases were

8  for.  And it doesn't tell you that Norris is in a belly

9  chain, handcuffs and shackles, and in a restraint chair.

10          So, no, I wouldn't look at this and say that there

11  would be an excessive force issue unless I knew more

12  information.

13  Q.   And at the time that you were talking to the defendant

14  on August 2nd of 2017, in that interview had you reviewed any

15  video other than the 8:00 p.m. incident?

16  A.   No.

17  Q.   The 50-second tasing video?

18  A.   Yes.  I saw the 50-second tasing video at 8:00 p.m.  I

19  had reviewed that.  I had not reviewed in detail all of the

20  other videos that were -- there were others.

21  Q.   And at the time that you were interviewing the

22  defendant, was that the beginning of your investigation?

23  A.   Yes.

24  Q.   Did you know any of the circumstances of the tasings

25  after 8:00 p.m.?

1  A.    No.

2  Q.    Did you ask the defendant about what happened with

3  Jordan later that night after he tased Jordan for the 50

4  seconds?

5  A.    Yes.  We walked him through pretty much the chronology

6  of that night during the interview and everything that he

7  could remember.

8  Q.    And how did he say they prepared him for transport out

9  of the jail?

10 A.    So they explained that, yes, they were getting him ready

11 for transport to the hospital.  And he was describing them

12 getting him ready in the restraint chair and kind of moving

13 him out of the restraint chair into the transport.

14 Q.    Did you ask him whether he used additional force on

15 Jordan after he was placed in handcuffs and a belly chain?

16 A.    Yes.  We asked, "Did you use additional force on your

17 way out of the jail or jail to transport?"

18         And he said, "No.  After you put the belly chain,

19 there was no additional force."

20 Q.    And if you can turn to Tab 38 in the exhibit binder.

21         What is in Tab 38?

22 A.    Tab 38 is an audio recording of the interview that I did

23 of the defendant.

24         MS. MYERS:  And, Your Honor, at this time I would

25 move Exhibit 38 into evidence.

1          THE COURT:  Any objection?

2          MR. STRIANSE:  No objection.

3          THE COURT:  Admitted.

4          (Whereupon Plaintiff Exhibit 38 was marked for

5          identification and received in evidence.)

6          MS. MYERS:  May I publish it, Your Honor?

7          THE COURT:  Yes.

8          MS. MYERS:  And I will not pause during this clip

9    either.  It's just an audio clip.

10          (Exhibit 38 played.)

11   BY MS. MYERS:

12   Q.   So that last statement that you just discussed, did you

13   hear that on the recording?

14   A.   I did.

15   Q.   And was this during the defendant's interview?

16   A.   Yes, it was.

17   Q.   And did you later learn whether that statement was

18   consistent with everything else you knew about the

19   investigation?

20   A.   Yes.  That statement was not consistent with what we

21   learned in the investigation.

22   Q.   And why is that?

23   A.   Because it's not -- it's not accurate.  There was a tase

24   done after he was in belly chain with the handcuffs and the

25   shackles and fully restrained.

1    Q.    And during that interview or at any other point, did the
2    defendant ever disclose to you the 11-second tase while he
3    was belly chained and handcuffed?
4    A.    No.
5    Q.    And when the defendant told you that he had not tased
6    him, when Jordan Norris was in handcuffs and a belly chain,
7    did that affect your investigation?
8    A.    That did.
9    Q.    How did it affect your investigation?
10   A.    When he told us that, we -- you know, as you're doing
11   your investigation, you build on information that you learn
12   during interviews.  And so, when we talked to him and he
13   answered that question, we took him to be truthful and -- and
14   we didn't delve -- first of all, we didn't ask him more
15   specific questions about that because we weren't aware he had
16   tased someone when he was handcuffed.
17            If he had been truthful and told me that, we would
18   have asked him more questions.  Like, why would you tase
19   someone that's handcuffed?  Follow-up questions to that.  Get
20   into more of the policy regards to someone being tased when
21   they're handcuffed.
22            And then the follow-up of the investigation is,
23   when we were asking more people questions, interviewing more
24   people, we didn't focus on asking specifically if they had
25   seen him tase anyone in handcuffs or any further questions on

1    that because we weren't aware it even happened.

2              MS. MYERS:  One moment.

3              I have no further questions at this time.

4              THE COURT:  All right.  Cross.

5

6                        CROSS-EXAMINATION

7    BY MR. STRIANSE:

8    Q.    Good afternoon, Ms. Wright.

9    A.    Good afternoon.

10   Q.    I think you interviewed Mark Bryant on August the 2nd of

11   2017; is that right?

12   A.    Yes.

13   Q.    And you were with Special Agent Shawn Atkins with the

14   Tennessee Bureau of Investigation; is that right?

15   A.    Yes.

16   Q.    And you and all -- you and Special Agent Atkins worked

17   jointly on this investigation; is that right?

18   A.    Yes.  Partially.

19   Q.    You conducted many interviews together; is that right?

20   A.    Yes.

21   Q.    Many of the -- in fact most, if not all, of these audio

22   interviews that you conducted?

23   A.    Yes.

24   Q.    And the TBI was basically the scrivener on most of those

25   reports, meaning that Shawn Atkins typed up those reports; is

1  that right?

2  A.    Yes.

3  Q.    Okay.  When you went to -- where did you interview Mark

4  Bryant?  Was that at the district attorney's office?

5  A.    It was at the district attorney's office in Ashland City

6  in a conference room.

7  Q.    In Ashland City.  And by August the 2nd, 2017, you and

8  Special Agent Atkins had the benefit of seeing the video; is

9  that right?

10  A.    The video that I saw was the 8:00 p.m. incident with

11  Jordan Norris.

12  Q.    So you had not seen the video from 6:58 p.m.?

13  A.    I don't think I had, no.

14  Q.    And you had not seen the video from 10:20 that same

15  evening?

16  A.    I had not reviewed those videos.

17  Q.    Okay.  Now, you were aware that JJ Hannah in July of

18  2017, after this became public in the media, asked Gary Ola

19  to pull the Taser video?

20  A.    I don't know when he asked him to pull the Taser videos.

21  Q.    You interviewed Gary Ola, didn't you?

22  A.    Yes.

23  Q.    And you did an FBI FD302 report of that interview?

24  A.    I interviewed him a couple different times.  So I'm not

25  sure which one you're referring to.

1   Q.   All right.  Well, in one of those interviews didn't Gary
2   Ola tell you that he was directed by JJ Hannah to pull those
3   videos?
4   A.   I'm sure he was.  I just don't recall the timing that he
5   was directed to pull them on.
6   Q.   And how about Shawn Atkins?  He had seen the full series
7   of videos before August 2nd, 2017; is that right?
8   A.   I can't speak to what Shawn saw before that interview.
9   Q.   Well, I mean, you were working with him, you were
10  collaborating on this?
11  A.   I believe that I came into the interview a few days
12  before that.  I'm not sure what Shaun had reviewed prior to
13  that interview.  I had not reviewed it.
14  Q.   Okay.  Shaun was in the case -- the TBI was in the case
15  shortly before you all got involved; is that right?
16  A.   Yes.
17  Q.   JJ Hannah, I think, made the decision and Sheriff
18  Breedlove made the decision to reach out to the Tennessee --
19           MS. MYERS:  Objection.  Can we approach?
20           THE COURT:  Sure.
21           (Bench conference outside the hearing of the
22           jury.)
23           THE COURT:  I'm not sure what the question is.
24           MS. MYERS:  Well, I'm worried that we're heading
25  into the state prosecution land.  We've got the state

```
 1   district attorney's office.  We've got the TBI investigation.
 2              MR. STRIANSE:  I'm going to leave it alone.
 3              THE COURT:  Okay.
 4              MS. MYERS:  Okay.  I just wanted to make sure,
 5   because it's the subject of a motion in limine, and so I
 6   wanted to make sure --
 7              THE COURT:  He said he's not going there.
 8              MS. MYERS:  Okay.  Thank you.
 9              (Jury present.)
10   BY MR. STRIANSE:
11   Q.   Special Agent Wright, I was asking you about the TBI
12   being involved slightly before you all got involved.
13   A.   Yes.
14   Q.   Okay.  And as you sit there right now, you don't know if
15   Shawn Atkins had looked at the full series of the videos?
16   A.   I couldn't tell you if he did, no.
17   Q.   Now, you identified some of the reports that were
18   prepared by Mr. Bryant --
19   A.   Yes.
20   Q.   -- earlier in your testimony.  Why don't we take them in
21   chronological order.
22              For the record, in a moment we're going to be
23   looking at Defendant -- Government's Exhibit 25.
24              Do you remember that exhibit that you just
25   identified?
```

```
1    A.    Yes.
2    Q.    This is the report of November 5, 2016; is that right?
3    A.    It's one of the reports from that date, yes.
4    Q.    One of the reports that you've identified?
5    A.    Yes.
6    Q.    And it's been received as evidence as Government's
7    Exhibit 25.  It begins with a timestamp of 1855, which is
8    6:55; is that right?
9    A.    Yes.
10   Q.    And then it ends at 2122 here at the end of the
11   paragraph; is that correct?
12   A.    It says "Mobile crisis arrived at 2122."  That's the end
13   of the report.
14   Q.    So Officer Bryant is describing what's occurring between
15   the inception point of 6:55 and the ending of 9:22; is that
16   right?
17   A.    Yes.  He looks like he's summarizing for the full
18   amount.  Although he told me he should have done two reports.
19   Q.    Okay.  I mean, there's no law that he's violated by not
20   doing two reports?
21   A.    I would suspect he violated standard practice in the
22   jail for how they document reporting, but, no, I don't know
23   specifically.
24   Q.    So he has combined two events in one report, correct?
25   A.    I don't believe that's what he was doing, but if that's
```

1  your interpretation.

2  Q.   Well, I'm not trying to give you my interpretation.  I'm

3  asking you a question.

4        There are separate events in one report?

5  A.   I think he's combining more than two.  I think he's

6  combining multiple.

7  Q.   Okay.  Well, let's walk through it.  Just -- first of

8  all, you said there was no justification for any of the Taser

9  use; is that right?  In your earlier testimony, in your

10 direct examination?

11 A.   I don't believe I said that about this report.

12 Q.   I'm sorry?

13 A.   I don't believe I said that about this report.

14 Q.   I think you did.  You were asked directly if Officer

15 Bryant had provided a justification for his Taser use and you

16 said no?

17 A.   His Taser use didn't occur during this time period.

18 So --

19 Q.   Okay.

20 A.   But -- it says "to achieve compliance."

21 Q.   The third line I've highlighted threatening inmate

22 Hefner, that's an explanation why Bratton used the Taser; is

23 that right?

24 A.   I don't know if he can speak to what Mr. Bratton's

25 reason for using the Taser was when this wasn't Mr. Bratton's

1  report.

2  Q.   Well, he's trying to explain what -- what happened in

3  the extraction at Cell 4, correct?

4  A.   Yes.  Mr. Bryant is explaining at the top what was

5  happening, yes.

6  Q.   And he's telling the reader that they're having the

7  incident because of the conduct of inmate Norris, among other

8  things, threatening inmate Hefner with physical violence?

9  A.   He's explaining that that is going on.  Yes, he is.

10 Q.   And that Mr. Norris did not comply with their commands;

11 is that right?

12 A.   At 7:00, no.  He did not comply.  That's what it says.

13 Q.   And that (as read):

14          Deputy Key and I escorted him out of the cell

15          and placed him against the wall outside the cell.

16          We saw that video this morning; is that right?

17 A.   Yes.

18 Q.   That is accurately describing the conduct; is that

19 right?

20 A.   Yes.

21 Q.   Then he goes on to say that (as read):

22          Placed him against the wall outside the cell

23          and instructed him to put his hands behind his

24          back.  He resisted.

25          Correct?

1  A.   Yes.

2  Q.   And then he gives the justification for what he does.

3  (As read):

4         FTO Marriott arrived.  We forced him to comply

5         with joint locks and drive-stun Taser applied by

6         Deputy Bratton upon his arrival.

7         Correct?

8  A.   Yes.

9  Q.   (As read):

10        We then placed him, Mr. Norris, in the

11        restraint chair with handcuffs still applied.

12        Inmate Norris resisted.  Pressure points and

13        additional drive-stun Taser applications were

14        utilized.

15        So he is telling the reader that Bratton tased,

16  correct?

17  A.   Yes.

18  Q.   And then he says "I tased"?

19  A.   He says that in the report that's for 7:00, not for

20  8:00.  Yes.

21  Q.   Well, how do you know?

22  A.   I'm looking at the timestamp on the top of the report.

23  Q.   6:55 is the beginning of the incident.  2122 is the end

24  of the incident.

25  A.   I don't read it that way.  Go ahead.

1  Q.    Well, you told the jury that Mr. Bryant admitted to you
2  in the interview on August 2nd, 2017, that it would have been
3  the better practice to do two reports?
4  A.    Yes.
5  Q.    So you were agreeing that he's describing two separate
6  events?
7  A.    I agree that he's describing more than two separate
8  events, but not accurately.
9  Q.    And then you identified Government's Exhibit 26?
10  A.    Yes.
11  Q.    And this is a use of force report, correct?
12  A.    This is an incident report.  A use of force report
13  actually looks much different than this.
14  Q.    It's an incident report regarding a use of force; is
15  that right?
16  A.    Yes.
17  Q.    And you were critical of the fact that not every officer
18  that was involved at 10:20 was listed in the box "Officers
19  Involved"?
20  A.    Yes.
21  Q.    Now, you're familiar with this incident at 10:20,
22  correct?
23  A.    Yes.
24  Q.    And there were a series of tases, some by Officer Bryant
25  and one by Officer Montgomery, correct?

1    A.    Yes.

2    Q.    There were seven tases, six by Bryant, one by

3    Montgomery?

4    A.    Yes, there were six by Bryant inside of the jail and

5    there was one tase outside of the jail a few -- a little bit

6    later to tase him to get into the vehicle.

7    Q.    And here's my point:  Bryant and Montgomery were the

8    ones involved in using the force, correct?

9    A.    They were at that point.  Although I would say that if

10   anyone puts hands on, like Mr. Bryant said, that they would

11   have also been involved in use of force, and those were --

12   other officers in the jail at the time were putting their

13   hands on Mr. Norris.

14   Q.    Okay.  But Bryant tased and Montgomery tased and they

15   used force?

16   A.    Yes.  As did the other officers.

17   Q.    But in your view of the world, that is a misleading

18   caption because the other four or five hangers-on are not

19   mentioned in the box?

20   A.    Yes.  I think that's because -- generally you want to

21   include all of the officers that are present, because part of

22   the decision to make using force takes into account how many

23   officers are present.  So, yes, I think it would be something

24   that you should include.

25   Q.    Based on this information, Sgt. Ola was able to gather

1  all the Taser video; is that right?

2  A.   I don't know if it was based on information that was

3  provided on the -- on these reports or how he came up with

4  what he needed to pull what Taser logs or Taser video.

5  Q.   You've seen the video and Sgt. Ola was there present at

6  10:20, correct?

7  A.   Yes.

8  Q.   And he was participating?

9  A.   He was standing there.  Yes, he was.

10  Q.   So there was no danger that anybody at the Cheatham

11  County Jail would have been misled or hoodooed into who was

12  there; is that right?

13  A.   Based on this, if you were looking at the report?  No.

14  I don't think they review videos unless the report indicates

15  there should be a reason to review the videos.  This would

16  mislead me if all I was doing was reading the report.

17  Q.   Well, the report says that Norris did not comply and

18  that "I," being Bryant, "drive-stun tased him multiple times

19  to gain compliance"?

20  A.   Yes.  But I'm referring to the fact that there are

21  not -- not all of the officers are listed.

22  Q.   Right.  Well, here's my point:  If somebody did what

23  they did in this case, picked up the phone and called the

24  Cheatham County Jail and said there was an incident on

25  November 5, 2016, where Jordan Norris was tased, the jail

1  could immediately go to this report and find the exact time

2  and date and pull the video?

3  A.    Yes.

4  Q.    You told us that you worked with Shawn Atkins on this

5  case; is that right?

6  A.    Yes.

7  Q.    And you heard the testimony this morning from Daniel

8  Bratton about his use of the Taser earlier on the evening of

9  November the 5th, 2016?

10  A.    I did.

11  Q.    And I'm not suggesting in any way he's not being as

12  accurate as he's trying to be, but his recollection was that

13  he did three tases that were recorded, five second in

14  duration; is that right?

15  A.    Yes, it is.

16  Q.    Okay.  Well, when Shawn Atkins actually pulled the Taser

17  records, it was really four; is that right?

18  A.    Yes.  I've seen the Taser records.  There were four.

19  Q.    And that's in the actual report that he put together; is

20  that right?

21  A.    I'm not sure what report you're referring to.

22  Q.    I'm referring to his timeline.

23  A.    I've seen the Taser logs, so I can speak to that.  There

24  were four.

25  Q.    There were four?

A.    Uh-huh.

Q.    And you have been privy to the investigation that Shawn
Atkins has done because you were working in conjunction with
him; is that right?

A.    Yes.  I can't speak to every single thing he did, but
yes.

Q.    You're familiar with his timeline?

A.    I have seen the timeline.

Q.    And you're familiar with his serialized reports; is that
right?

A.    You would have to show me the report that you're talking
about, but I could say yes.

Q.    Well, there's a bunch of reports.

A.    Okay.

Q.    But the way that the TBI does it is they have a number
for each one of the reports that they did.

A.    Okay.

Q.    And have you seen that report?

A.    Again, I don't know which report you're talking about.
I've seen a number of reports.

Q.    I'm talking about --

              MS. MYERS:  Your Honor, may we approach?

              THE COURT:  Sure.

              (Bench conference outside the hearing of the

              jury.)

1          MS. MYERS:  Your Honor, these appear to be

2    statements that were drafted by another agent as part of the

3    investigation that she did not draft.  And I don't believe he

4    has laid a foundation that she even knows what he's talking

5    about in terms of what the TBI investigation --

6          THE COURT:  What's the objection?

7          MS. MYERS:  Well, this is hearsay.  And there's no

8    foundation for her knowledge of any of these statements.  She

9    hasn't even -- we don't even know what he's talking about at

10   this point.  Just a report.  If he's going to be referring to

11   a series of reports that another agent drafted, then that

12   would -- that's something that would be improper.  Those are

13   his statements.

14         THE COURT:  Go ahead.

15         MR. STRIANSE:  Your Honor, I just was asking her

16   if she was familiar with the content of this file that they

17   worked on together.

18         THE COURT:  Okay.  You get the last word.

19         MS. MYERS:  Okay.  Thank you.

20         THE COURT:  Withdraw the objection?

21         MS. MYERS:  I do not withdraw the objection.

22         THE COURT:  Well, it's overruled.

23         MS. MYERS:  Okay.  Thank you.

24         (Jury present.)

25

1  BY MR. STRIANSE:

2  Q.   I was just merely trying to ask you if you were familiar

3  with the report that had been prepared by Special Agent Shawn

4  Atkins on behalf of the TBI that memorialized his

5  investigation?

6  A.   I don't know if I've seen it or not.  I don't think so.

7  Q.   Okay.  Why don't you take a look at the table of

8  contents.

9  A.   Sure.

10 Q.   You all did a number of audio interviews together; is

11 that right?

12 A.   Yes.

13 Q.   And those were done at the district attorney's office in

14 Ashland City; is that right?

15 A.   Yes.

16 Q.   Okay.  Let me show you the table of contents just to see

17 if it refreshes your recollection as to whether Special Agent

18 Atkins shared this information with you?

19 A.   (Reviews document.)

20          Do you want me to say if I've seen this report?

21 This particular report?

22 Q.   Yeah.  I was --

23 A.   This table of contents?

24 Q.   Yeah.  Have you seen the report that follows that table

25 of contents?

```
 1   A.   The report that follows this table of contents?  I don't
 2   think so.  I don't -- I don't think I've ever seen this table
 3   of contents.
 4   Q.   How long did you and Special Agent Atkins work together
 5   on this investigation?
 6   A.   Probably for -- up until September of 2017 and
 7   thereafter, but --
 8   Q.   So about five months or so?
 9   A.   No.  It would have been about two months.
10   Q.   Okay.
11   A.   Before we -- I continued to investigate.
12   Q.   So are you saying that he didn't share the information
13   that he was gathering in the course of this joint
14   investigation?
15   A.   From this table of contents?  Did he share this table of
16   contents?  Is that what you're asking me?
17   Q.   No.  No.  I didn't want to give you six inches' worth of
18   paper.
19   A.   Okay.  Have I seen all the reports that he --
20             THE COURT:  Hold on.  Let him finish the question.
21             THE WITNESS:  Okay.
22             THE COURT:  Now ask the question.
23   BY MR. STRIANSE:
24   Q.   I'm trying to make it as convenient as possible for you.
25   A.   Okay.
```

1   Q.    Did he share the reports of his interviews, for example?

2   A.    He should have, yes.

3   Q.    Okay.  So you -- you probably have the things that are

4   memorialized in that table of contents?

5   A.    I'm sure I do.

6   Q.    Okay.  Now, you told the jury earlier this afternoon in

7   your direct examination that you met with Jordan Norris in

8   August of 2017; is that right?

9   A.    Yes.

10  Q.    Okay.  And that would have been about ten months removed

11  from the November 5, 2016 incident; is that correct?

12  A.    Yes.

13  Q.    And he provided you with some photographs of injuries

14  that he claimed that he sustained as a result of the events

15  of November 5, 2016; is that right?

16  A.    Yes.

17  Q.    And then you've identified one of those photos for the

18  jury in your direct examination?

19  A.    Yes.

20  Q.    Now, in your investigation of the case, were you aware

21  that Jordan Norris on the evening of November 5, 2016, was

22  transported from the Cheatham County Jail in Ashland City to

23  the Centennial Ashland City Medical Center?

24  A.    Yes.

25  Q.    And in the course of your investigation, you and Special

1  Agent Atkins with the TBI got those medical records from
2  Centennial; is that right?
3  A.   Yes, we did.
4  Q.   And have you read those records?
5  A.   I believe I have, yes.
6  Q.   And those records disclose that Mr. Norris had no damage
7  to his skin anywhere on his body?
8  A.   I did see that.  And what -- can I further elaborate?
9  In interviews of other witnesses, they've told us that --
10 Q.   Well, now, generally --
11 A.   Generally, when someone's tased --
12 Q.   I don't want to hear about other witnesses have said.
13           THE COURT:  You can't talk about what others say.
14           THE WITNESS:  I can't talk in summary?
15           THE COURT:  Can't talk about what others say.
16           THE WITNESS:  Yes.  There were no injuries noted
17 on the medical from -- from that night.
18 BY MR. STRIANSE:
19 Q.   Let me show you an excerpt of this -- you can look at
20 the whole report if you want to.
21           Did you have these medical records as part of your
22 FBI file?
23 A.   Yes.
24 Q.   Okay.
25 A.   Yes.

```
 1   Q.   So it would have been -- I don't know if you still use
 2   the 1A.
 3              Is there a 1A file that contains the medical
 4   records?
 5   A.   I'm sure they're attached to something, but I have seen
 6   them from Centennial from that night, yes.
 7   Q.   And you would have shared them with the United States
 8   attorney?
 9   A.   I believe I would have, yes.  I believe I have my copy
10   with me.
11   Q.   Let me show you an excerpt of this medical record and
12   see if you can identify it.  And if you can, I'll put a tag
13   on it.
14   A.   Sure.  (Reviews document.)  Yes, I have seen this.
15              MR. STRIANSE:  May I put a tag on that?  And our
16   next number would be 6?
17              COURT DEPUTY:  5.
18              MR. STRIANSE:  5.
19              May I approach the witness?
20              THE COURT:  The court officer. . .
21   BY MR. STRIANSE:
22   Q.   Let me show you what's been marked for identification as
23   Defendants' Exhibit 5.
24              What is that?
25   A.   It looks like --
```

```
 1              THE COURT:  Do you have another copy?
 2              MR. STRIANSE:  Your Honor, I don't.  I'm sorry.
 3              THE COURT:  Okay.  Go ahead.
 4              MR. STRIANSE:  I do have another copy.
 5              THE COURT:  Does the government need one?
 6              MR. STRIANSE:  I think I may have an extra for the
 7    government as well.
 8              MS. MYERS:  We do not have a copy, Your Honor.
 9    But -- thank you.
10    BY MR. STRIANSE:
11    Q.    What is that?
12    A.    It looks like it is a -- one page of a series of
13    documents provided by -- because it says "page 3 of 8" --
14    provided by a medical facility with Jordan Norris's name on
15    it.
16    Q.    And these were records that you and Special Agent Atkins
17    gathered; is that right?
18    A.    Yes.
19    Q.    That became part of your file in his file?
20    A.    Yes.
21              MR. STRIANSE:  Your Honor, we would offer
22    Defendant's 5 as evidence.
23              THE COURT:  Any objection?
24              MS. MYERS:  Your Honor, I do object to the hearsay
25    in these.  These are not statements that she has authored;
```

these are offered for the truth of the matter asserted and
they should be excluded as hearsay.

I understand if he's questioning about them and
her knowledge of them.  But they should not be admitted as an
exhibit on the grounds of hearsay.

THE COURT:  Okay.

MR. STRIANSE:  Your Honor, these are records that
the agents went out and gathered pursuant to presumably an
administrative subpoena.  She's identified the record.  She
has -- it is what it purports to be.  There's no suggestion
that it's not the official business record of the medical
center, Centennial Hospital Ashland City.

THE COURT:  All right.  Ms. Myers, you get the
last word here.

MS. MYERS:  Yes.  Well, Your Honor, I mean, we
don't have someone here to authenticate.  It's one piece of
the record, I might add.  It's not the entire record.  We
don't have someone in here who can authenticate the hearsay
statements that are made in these or who authored these or
who examined them, someone that I can cross-examine about the
contents of this document.  And, in addition to that, it's
being offered for the truth of the matter asserted, regarding
the injuries.

THE COURT:  All right.  Overruled.  They're
admitted.

          (Whereupon Defense Exhibit 5 was received in
evidence.)
BY MR. STRIANSE:
Q.    And if you need the entire record, I'm happy to give it
to you and offer it.
          Do you need that?
A.    I don't believe I do.  I recognize this is part of those
records.
Q.    Take a look at the upper, left-hand corner of this
record.
          And, for the record, I'm putting it on the
overhead projector.
          This deals with patient Jordan Norris, correct?
A.    Yes.
Q.    And the date is November 5, 2016; is that correct?
A.    That's correct.
Q.    And you were here in the courtroom this morning and
heard Mr. Montgomery testify; is that right?
A.    I did.
Q.    And he talked about the plan to take Jordan Norris from
the Cheatham County Jail to the Centennial Medical Center; is
that right?
A.    Yes.
Q.    As the first step in his process of ultimately going to
the Middle Tennessee Mental Health Institute, correct?

```
1   A.   Yes.   Uh-huh.
2   Q.   And that they needed to do a physical exam of him there;
3   is that right?
4   A.   Yes.
5   Q.   Take a look at the bottom of this list of diagnoses.
6            Do you see where it has "Skin"?
7   A.   Yes.
8   Q.   It says "Atraumatic," correct?
9   A.   Yes.
10  Q.   Meaning no trauma to the skin?  Do you see that?
11  A.   I'm not sure what "atraumatic" means.
12  Q.   Okay.  It says "no rash."
13           Do you see that?
14  A.   I do.
15  Q.   And do you see "color normal"?
16  A.   I see "color nl."  I don't know what "nl" means.
17           MR. STRIANSE:  Your Honor, we would offer
18  Defendant's 5 if I haven't done that already.
19           THE COURT:  It's in evidence.
20  BY MR. STRIANSE:
21  Q.   Let me ask you another question about these reports that
22  you've identified that were authored by Mr. Bryant that
23  you've identified as being deficient in certain respects.
24           Correct?
25  A.   Yes.
```

1  Q.    Or that could have been done in a better way, I guess is

2  what you're saying?

3  A.    I think they're lacking the details that would have been

4  required in those reports.

5  Q.    You were in the courtroom this morning when I

6  cross-examined Mr. Montgomery; is that right?

7  A.    Yes.

8  Q.    Do you remember Defendants' Exhibit 3 that I'm showing

9  you right now on the overhead?

10 A.    Yes.

11 Q.    Take a look at it again just to reorient yourself to

12 what this is.  This is his use of force report from

13 10:35 p.m. when he applied the Taser to Jordan Norris; is

14 that right?

15 A.    Yes.

16 Q.    And I'm going to -- since it's one sentence, I'll go

17 ahead and read it.  (As read):

18              While moving inmate Norris from booking

19              restraint chair to jail transport vehicle, inmate

20              Norris became very aggressive and did not comply

21              with lawful commands, period.  I dry -- I think he

22              meant drive, d-r-i-v-e -- stun tased him in the

23              calf for approximately one second to get him in

24              the vehicle.

25              Is that what it says?

1  A.    Yes.

2  Q.    Now, you heard his testimony this morning?

3  A.    Yes.

4  Q.    He did not include in the report that at that point in

5  time Mr. Norris was fully shackled?  He didn't say anything

6  about that and --

7  A.    No.

8  Q.    -- that his hands were cuffed, correct?

9  A.    Yes.

10 Q.    That there were shckles on his ankles?

11 A.    Yes.

12 Q.    And that he was further inveigled by a belly chain

13 around his waist?

14 A.    Yes.

15 Q.    Now, if you were doing a critique of Cpl. Montgomery,

16 would you give him the same failing grade in the way that he

17 drafted that report?

18 A.    I agree that he doesn't include that detail.  The

19 difference that I feel with this one is there's a one-second

20 tase versus six tases with the last one being 11 seconds.

21 Q.    But the reader doesn't know the physical state of Jordan

22 Norris as described in the narrative?

23 A.    No.

24 Q.    And that might be critical information if someone was

25 going to be reviewing the reasonableness of Montgomery's use

1  of force?

2  A.   Yes.

3  Q.   But, again, nobody had any trouble finding this report

4  for Montgomery?

5  A.   No.  And I believe there was an attached report to it

6  that gave more detail.

7  Q.   The attached report is what?  The actual use of force

8  report?

9  A.   I believe so, yes.

10 Q.   You've seen that one, haven't you?

11 A.   I believe I have.  And I understand he didn't include

12 the detail about the handcuffs either.

13 Q.   Yeah.  He didn't -- and both reports are devoid of any

14 mention of handcuffs, shackles, belly chain?

15 A.   Yes.

16          MR. STRIANSE:  Your Honor, may I have one moment?

17          THE COURT:  Sure.

18 BY MR. STRIANSE:

19 Q.   Just one other question.  When you -- you played those

20 clips of Mark Bryant's interview; is that right?

21 A.   Yes.

22 Q.   And you interviewed -- you've interviewed him on August

23 the 2nd of 2017 --

24 A.   Yes.

25 Q.   -- roughly ten months or so after the event; is that

1  right?
2  A.    Yes.
3  Q.    And when you interviewed him, did you ask him if he had
4  seen the video from November 5, 2016, before you asked him
5  those questions?
6  A.    I don't know if I asked him if he had seen the video.
7  He indicated he heard himself on the video, so I assumed he
8  had seen it.
9  Q.    You're talking about when it was in the media?
10 A.    Yes.
11 Q.    Okay.  And the media was more interested in showing what
12 was going on at 8:00 p.m., correct?
13 A.    The video that was shown in the media was the 8:00 p.m.
14 incident, yes.
15 Q.    Because that's the one that you saw?
16 A.    That's the one that I saw.
17 Q.    So he had not seen the 10:25 video, the 10:00 25-minute
18 video, for ten months or so?
19 A.    I can't speak to what he had seen.
20 Q.    Okay.  You didn't ask him whether he had had a chance to
21 review the video?
22 A.    No.
23 Q.    And when you interviewed him, he wasn't working from any
24 notes or anything, was he?
25 A.    No.

```
 1  Q.   So this was based on his memory of the event?
 2  A.   Yes.
 3            MR. STRIANSE:  Those are my questions.
 4            THE COURT:  All right.  Redirect.
 5
 6                     REDIRECT EXAMINATION
 7  BY MS. MYERS:
 8  Q.   So, Special Agent Wright, you were just shown Defense
 9  Exhibit Number 5, the medical record.
10  A.   Yes.
11  Q.   And do you have any medical training?
12  A.   No.
13  Q.   Are you able to understand all the information in that
14  report?
15  A.   No.
16  Q.   Or interpret what someone else wrote?
17  A.   No.
18  Q.   Now, that night -- you heard the defense attorney
19  mention that this was a mental health facility; is that
20  correct?
21            MR. STRIANSE:  No, I didn't say that.  I said it
22  was the Centennial Medical Center for a physical evaluation.
23            THE COURT:  All right.  Rephrase your question.
24  BY MS. MYERS:
25  Q.   So do you know why he was being evaluated, Jordan
```

1 Norris, that night?

2 A.    I don't know.

3 Q.    Do you know where he was ultimately sent?

4 A.    Yes.  Middle Tennessee Mental Health.

5 Q.    And did he receive an evaluation there?

6 A.    I believe he did.

7 Q.    And what kind of evaluation was that?

8 A.    I believe it's a -- I don't know specifics, but I -- or

9 what -- what constitutes a mental health evaluation and what

10 kind of things they do before, but I know that that's -- he

11 got an evaluation at Middle Tennessee Mental Health.

12 Q.    And based on the injuries that you saw from the

13 November 5th, 2016, tasings that you described earlier, where

14 were those Taser burns located on Jordan Norris?

15 A.    The burns were the same spot of the scars that I saw.

16 Q.    Physically on his body, where were the scars that you

17 saw?

18 A.    The scars that I saw were on his legs and some scars on

19 his abdomen.

20 Q.    Would those be areas that would be usually concealed by

21 clothing?

22 A.    Yes.

23 Q.    And do you know if they undressed Jordan completely when

24 they did their evaluation?

25 A.    No.

```
1    Q.    Do you have any other information about this
2    examination?
3    A.    I have no information about the examination.
4    Q.    Do you know how long from this investigation that you
5    did it takes for Taser burns to show up?
6    A.    Based on my investigation --
7    Q.    Yes.
8    A.    -- I learned that a Taser --
9              MR. STRIANSE:  Based upon hearsay, Your Honor.
10             THE COURT:  Okay.  Can you set more of a
11   foundation, establish --
12             MS. MYERS:  Yes.
13   Q.    So, over the course of the investigation, you've
14   interviewed numerous people?
15   A.    Yes.
16   Q.    You've reviewed several documents and reports?
17   A.    Yes.
18   Q.    You know the locations -- right? -- where the Tasers
19   were being held?
20   A.    I do.
21   Q.    Is that from video?
22   A.    It's from video.
23   Q.    You've actually seen it?
24   A.    Yes.
25   Q.    And have you actually seen Jordan's injuries yourself?
```

```
1   A.    Yes.  I've seen scars.
2   Q.    And in fact you actually received photographs from
3   Jordan Norris as well, correct?
4   A.    Yes, I did.
5   Q.    And that's one of the photographs that we just discussed
6   with the two large wounds that you saw?
7   A.    Yes.
8   Q.    And, again, when were those taken?  From that
9   photograph.
10  A.    Those were taken 11 days after the tasing incident.
11  Eleven.
12  Q.    And you mentioned that those were consistent with the
13  distance between the prongs on a Taser?
14  A.    Yes, they were.
15  Q.    And were they consistent with where he was tased based
16  on your viewing of the video and your discussion with other
17  people?
18  A.    Yes.
19  Q.    And so, given that, do you think it takes time for some
20  of those wounds to show up?
21  A.    Yes, it takes time --
22             MR. STRIANSE:  Your Honor --
23             THE WITNESS:  -- for those wounds to show up.
24             (Overlapping speech.)
25             THE COURT:  Sustained.
```

1          (Reporter interruption for clarification.)

2          THE COURT:  Sustained.  She has no foundation to

3  opine.

4  BY MS. MYERS:

5  Q.    And so you were also shown again Government's Exhibit

6  Number 25.

7          Can we please pull that up again?

8  A.    Yes.

9  Q.    All right.  And this -- as we've discussed before, is

10  this the report that the defendant wrote for this

11  approximately 7:00 p.m. incident?

12  A.    Yes.

13  Q.    Could you please enlarge the narrative again.

14  A.    And --

15  Q.    And Mr. Strianse walked you through this big chunk at

16  the very beginning.

17          Whose behavior is that describing in the incident

18  report?

19  A.    Jordan Norris's.

20  Q.    And is it describing tases that the defendant did or

21  that someone else did?

22  A.    No.  It's describing the tases that Daniel Bratton did.

23  Q.    And based on your investigation in this case, was there

24  any issue in terms of policy violation with Daniel Bratton's

25  tases?

```
 1    A.    No.
 2    Q.    And does the majority of this report, in fact, discuss
 3    Daniel Bratton's tases?
 4    A.    Yes.
 5                MR. STRIANSE:  Your Honor, this is all leading.  I
 6    realize it's redirect.
 7                THE COURT:  Yeah.  Don't lead.
 8    BY MS. MYERS:
 9    Q.    And even if this report were a full summary, just for
10    the sake of argument, from 7:00 p.m. until 10:20 p.m., is
11    there still information, important information that is
12    missing?
13                THE COURT:  Again, don't lead.  Don't -- don't
14    lead.  You need to reask your question.
15    BY MS. MYERS:
16    Q.    Is there any information that is missing out of this
17    report, even if it is a summary?
18    A.    Yes.  There is information about how many times he tased
19    him, how long those tases were for.
20    Q.    And you have the benefit in this investigation of
21    viewing his previous reports, the defendant's previous
22    reports that he drafted; is that right?
23    A.    Yes.
24                MS. MYERS:  You can take that down.
25    Q.    And some of those have already been admitted as exhibits
```

1    in this case.

2            Were there in fact Taser reports that the

3    defendant --

4            MR. STRIANSE:  Your Honor, object to this line of

5    questioning.  That will be for the jury to decide on his

6    draftsmanship of the reports.

7            THE COURT:  Well, let's let her get the question

8    out.

9            Ask your question.

10   BY MS. MYERS:

11   Q.   So, based on your review of the previous reports of the

12   tasings done by the defendant in this case, are the reports

13   at issue here, the 7:00 and the 10:20 p.m. reports, different

14   in any way?

15   A.   Yes.  In previous reports that Mr. Bryant had written,

16   he did put that information in the reports.  He did say how

17   long he tased for and he did say how many times.

18   Q.   And does the FBI rely on people telling the truth in

19   investigations?

20   A.   Absolutely.

21           MS. MYERS:  No further questions.

22           THE COURT:  All right.  You can step down.

23                      (Witness excused.)

24           THE COURT:  All right.  This is a good time for

25   our afternoon break.  We'll try to come back about 3:05.

1      (Recess.)

2      (Jury not present.)

3      THE COURT:  All right.  Be seated.

4      Are we ready for the jury?  The government?

5      MR. SONGER:  We are, Your Honor.

6      THE COURT:  Mr. Strianse?

7      MR. STRIANSE:  Yes, sir.

8      (Jury present.)

9      THE COURT:  All right.  Be seated.

10     Call your next witness.

11     MR. SONGER:  The United States calls Gary Ola.

12     COURT DEPUTY:  Please raise your right hand.

13

14                    GARY OLA,

15  called as a witness by Plaintiff, was duly sworn and

16  testified as follows:

17

18     COURT DEPUTY:  Please be seated.

19     Please be sure to speak into the microphone.

20  State your full name and spell your last name.

21     THE WITNESS:  Gary Ola, O-l-a.

22

23                 DIRECT EXAMINATION

24  BY MR. SONGER:

25  Q.   Good afternoon, Mr. Ola.

1   A.    Okay.

2   Q.    I want you to think about November of 2016.

3         Were you working at the Cheatham County Sheriff's

4   Office?

5   A.    I was.

6   Q.    What was your position there?

7   A.    I was a sergeant on patrol.

8   Q.    How long did you work with the sheriff's office?

9   A.    I had been there since September of '99.

10  Q.    And do you have any other experience in law enforcement

11  before that?

12  A.    Yeah.  I started as a reserve in 1994 and went full time

13  in 1995 in Hickman County.

14  Q.    Where are you from?

15  A.    Hickman County.  I was born in Louisiana, but I moved

16  when -- after my parents separated, I moved to Tennessee

17  about -- when I was about seven.  But I've been here ever

18  since.

19  Q.    And what were your responsibilities when you were

20  working at the Cheatham County Sheriff's Office as a

21  sergeant?

22  A.    I had seven guys under me.  Strictly patrol.  Serving

23  papers, answering 911 calls, working wrecks.  Just whatever

24  needed to be done as far as patrol sergeant.

25  Q.    Were you also the officer in charge of Taser training at

1  the sheriff's office?

2  A.    I was, yes, sir.

3  Q.    How long were you the Taser trainer at the sheriff's

4  office?

5  A.    From 2006 until 2018.

6  Q.    Twelve years?

7  A.    Yes, sir.

8  Q.    Which officers did you train?

9  A.    Everybody that toted a Taser that worked for Cheatham

10  County Sheriff's Department.

11  Q.    Did you train all the officers who worked on patrol and

12  in the jail?

13  A.    Yes, sir.

14  Q.    How did you learn how to become a Taser trainer?

15  A.    I started looking into it in 2004, got the sheriff at

16  that time, Sheriff John Holdridger, in 2006 to come aboard,

17  and we actually got six in 2006.  Worked our way from there,

18  but I had actually went to Gatlinburg, Tennessee, for my

19  first training.  It was a two-day training in Gatlinburg,

20  Tennessee, where I was trained by master instructors from

21  Taser International how to teach other students.

22  Q.    Did you also have to attend refresher trainings over the

23  years as well?

24  A.    Yes, sir, every two years.

25  Q.    And, now, are you familiar with the policies and

1  procedures governing Tasers that were in place at the
2  Cheatham County Sheriff's Office back in November of 2016?
3  A.   Yes, sir.
4  Q.   All right.  Sir, I'm going to ask you if you could, in
5  the binder that's right in front of you, turn to the very
6  first tab, Exhibit Number 1.
7        Is that the use of force policy that was in place
8  back in November 2016?
9  A.   Yes, sir.
10 Q.   And this has already been admitted.
11       Can we please bring it up, Ms. Aroner.
12       And if you could, please, sir, look at the second
13 page, paragraph that's numbered 4.5.
14 A.   Yes, sir.
15 Q.   And the first sentence in that paragraph says (as read):
16           When deploying electronic immobilization
17           devices, Tasers, it shall be deployed consistent
18           with department-approved training.
19           Did I read that correctly?
20 A.   Yes, sir.
21 Q.   Was that the requirement at the Cheatham County
22 Sheriff's Office back in 2016, that officers --
23 A.   It is.
24 Q.   -- had to use the Taser in accordance with their
25 training?

```
1   A.   Yes.
2   Q.   And the second sentence says (as read):
3            Only the minimum number of bursts and the
4            minimum duration reasonably necessary to achieve
5            the desired effect (temporarily immobilizing the
6            individual) shall be administered.
7            Was that also the policy at the time?
8   A.   Yes, it was.
9   Q.   To use the minimum number and length of tases that were
10  necessary?
11  A.   Correct.
12  Q.   Now, in addition to those principles, were officers
13  required to use judgment and common sense when they used a
14  Taser?
15  A.   Sure.
16  Q.   All right.  Now, so -- is this policy given to all
17  officers?
18  A.   It is.
19           MR. SONGER:  We can take it down.  Thank you.
20  BY MR. SONGER:
21  Q.   Now, are all officers at the jail able to carry Tasers?
22  A.   Once they've completed the training, yes.
23  Q.   Do they have to complete the training and certification
24  first?
25  A.   Yes.
```

1  Q.    And did that training provide additional specific

2  guidance to officers?

3  A.    Yes.

4  Q.    So what type of -- because -- give us a little bit of

5  background about the training that you taught officers.

6            What topics did you cover?

7  A.    We basically -- it's an eight-hour course.  We go

8  through a PowerPoints presentation first, and then we do

9  hands on with the -- with the gun.

10           Which is basically I show the trainees exactly all

11 parts of the gun, how to change batteries, how to change

12 cartridges, how to turn it on, turn it off, all the legits of

13 the gun itself.

14           And then we actually let the individuals turn it

15 on, turn it off, and do all that.  And then later we do a --

16 another hands on where we take volunteers for volunteer

17 exposures of -- of where an individual will volunteer to take

18 an exposure of the guns.

19           And then, last but not least, there will be a

20 small test and -- at the end of the course, and that would

21 basically be the training.

22 Q.    Okay.  I want to follow-up on a couple of those things.

23           You mentioned that there is a portion of the

24 training where officers can volunteer to get tased?

25 A.    Yes, sir.

1  Q.    How long do you tase officers for during that session?

2  A.    No more than five seconds.  A full ride would be five

3  seconds.

4  Q.    And is there -- do the officers have any options to get

5  out of it if they don't want to take the full ride, as you

6  said?

7  A.    Yes.  There's a code word that they would have to say

8  that we would turn the gun off.

9  Q.    Do you ever tase anybody longer than five seconds?

10 A.    No.

11 Q.    Have you yourself been tased?

12 A.    Yes.

13 Q.    And was that in the drive-stun mode or the prong mode?

14 A.    The prongs.

15 Q.    Have you also been tased in the drive-stun mode?

16 A.    No.

17 Q.    Why not?

18 A.    I wouldn't do it.

19 Q.    Why is that?

20 A.    Leaves a nasty burn.  It hurts.

21 Q.    Now, in your training, do you go over the standards that

22 officers are required to follow when they're assessing

23 whether to tase someone?

24 A.    Yes.

25 Q.    All right.  And you mentioned that at some point during

1    the course you give officers a test, right?

2    A.    Yes.

3    Q.    What's covered on that test?

4    A.    Basically the components of the gun -- more or less of

5    the gun and the training of the gun, specifics of the gun,

6    and dos and don'ts of the gun.  Some of it mixed in this.

7    Basically, the training is from the PowerPoints presentation.

8    I think the test is more of what -- the components and stuff

9    of the gun itself.

10   Q.    The test is how the gun actually works?

11   A.    Yes.

12   Q.    What the components are?

13   A.    Yes.  The cartridges-wise and different things.

14   Battery-wise.  Like I say, the parts of the gun, the

15   components of the gun.  Excuse me.

16   Q.    Does the test cover all the standards for officers to

17   apply to decide whether to use a Taser?

18   A.    Not all, no.

19   Q.    Does it include any of them?

20   A.    Some of them.  I mean, every scenario is different as

21   far as -- I mean, the test is not going to complete every

22   scenario of using of the gun.  I mean, it's going to take

23   some common sense of using -- when and when not to use a gun.

24          I think it mainly goes -- I mean, mainly you would

25   be looking at whether or not to use a gun.  The gun is -- it

1    basically -- on an active or a non-active -- passive or
2    passive-resistant-type individual.  But it's not going to go
3    into every scenario that -- where a gun would have to be or
4    not have to be used.
5    Q.   Is there an opportunity during your training for
6    officers to ask you questions if they're unclear about
7    whether they're allowed to use a Taser?
8    A.   Yes.  Any time during the class, I tell individuals from
9    the front to the back of the class, if you have a question,
10   please ask me.  Stop me.  If I don't got the answer, I'll get
11   the answer.
12   Q.   And when officers finish the class, do they get some
13   certificate or record showing that they did it?
14   A.   Yes.
15   Q.   Would you please turn to Tab 5 in that binder.  Do you
16   recognize what that is?
17   A.   Yes, sir.
18   Q.   And can you tell us briefly, what is that document?
19   A.   That's a Taser certificate.
20   Q.   For which officer?
21   A.   Mark Bryant.
22            MR. SONGER:  Move to admit Exhibit 5.
23            THE COURT:  Any objection?
24            MR. STRIANSE:  No objection.
25            THE COURT:  Admitted.

```
 1                    (Whereupon Plaintiff Exhibit 5 was marked for
 2                    identification and received in evidence.)
 3                    MR. SONGER:  May we publish it?
 4                    THE COURT:  Yes.
 5      BY MR. SONGER:
 6      Q.    What's the date on that training certificate?
 7      A.    October 23rd, 2015.
 8      Q.    Is that the date that Officer Bryant took your training?
 9      A.    Yes.
10      Q.    Is that your signature on the certificate?
11      A.    It is.
12                    MR. SONGER:  And, Ms. Aroner, if we could now
13      please put up Exhibit 4, which has already been admitted, and
14      Exhibit 5, side by side.
15      BY MR. SONGER:
16      Q.    Mr. Ola, do you see the certificate on the left side now
17      that's been marked as Exhibit Number 4 that says "Josh
18      Marriott" on it?
19      A.    Yes, sir.
20      Q.    And the date is also October 23rd, 2015?
21      A.    Yes, sir.
22      Q.    Does that mean that Officer Marriott and Officer Bryant
23      took your training on the same day?
24      A.    They were in the same class, yes, sir.
25      Q.    Does that mean they were given all the same information
```

1   about the standards they should use?

2   A.   Yes, sir.

3   Q.   Do you ever break officers into different groups in your

4   training?

5   A.   No.

6   Q.   You teach everybody the same thing?

7   A.   Yes, sir.

8   Q.   All right.  Thank you.

9            MR. SONGER:  You can take that down.

10  BY MR. SONGER:

11  Q.   Do you remember anybody else who took that training

12  course back in October 23rd, 2015?

13  A.   I had a deputy that was on my team, Monad McMackins

14  [phonetic].  And I distinctly remember that was our newly

15  elected sheriff, Mike Breedlove, took the class for the first

16  time.  That was the first Taser class that Sheriff Breedlove

17  had ever took.

18  Q.   Did the sheriff volunteer to get tased?

19  A.   No, sir.

20  Q.   Did the sheriff say anything to officers during the

21  course?

22  A.   He spoke just for a few minutes on just, you know,

23  being careful and take care -- use these Tasers wisely and

24  something to that extent, very briefly.  That I can remember.

25  Q.   All right.  Now, I think you mentioned that you would

demonstrate to officers in this class physically how to
operate a Taser; is that right?

A.    Yes.

Q.    I would like to walk through that with you.

And with the Court's permission, we'll ask the
court security officer to pass up a demonstrative exhibit.

This is a Taser.  And I'll just tell everyone,
it's been disarmed.  It doesn't have a battery in it.  It
cannot fire.

You can pick that up.  First of all, can you tell
us what model of Taser is that?

A.    This is the X26P that is carried in the Cheatham County
Jail.

Q.    Is that the model of Taser that was carried back in
November of 2016?

A.    Yes, it is.

Q.    Is that the model you would have trained officers on
back in 2015?

A.    Yes.

Q.    Now, do you use that Taser in the course to demonstrate
how to fire a Taser?

A.    Yes.

Q.    Can you show us what you show officers?

A.    Basically go over all components of the gun.  When
teaching someone how to fire it, I would take that and turn

1   it on, show the individual to point it, just like he would

2   his normal Glock or a duty weapon that he's carrying, keep

3   his finger off the trigger.

4           Sometimes we get excited and continue to pull the

5   trigger.  Pull the trigger one time, release it, let it fire

6   its five seconds, reassess the situation and see if you need

7   to pull it again.  If you do, repull and reassess the

8   situation.  Each time reassess the situation over and over to

9   see whether or not this individual needs to be reenergized.

10  Q.    Just want to be real clear on that.

11          How long does the Taser run for if the trigger is

12  pulled once?

13  A.    Five seconds.

14  Q.    And is it possible to keep the Taser going beyond those

15  five seconds?

16  A.    If you continue to hold the trigger, it will fire until

17  the battery goes dead.

18  Q.    And did do you tell officers that in the training?

19  A.    Yes, I do.  I actually point it to the ceiling and hold

20  my finger on the trigger and let it fire for a few minutes,

21  showing it will not quit.

22  Q.    And you tell them specifically to keep their finger off

23  the trigger?

24  A.    Yes, sir, even the road deputies and the corrections

25  officers, that that's a normal thing.  Just like our Glocks

1    when we're training on the field when shooting our weapons,

2    we're always told keep that finger off the -- out of the

3    trigger guard.

4    Q.    And I think you said you do that so they don't get

5    excited?

6    A.    Exactly.  Just like on the firing range.  That you won't

7    automatically or accidentally shoot it.

8    Q.    Do you give that instruction in every training class?

9    A.    Yes, sir.

10    Q.    Including the one that Defendant Bryant took?

11    A.    Yes, sir.

12    Q.    All right.  I'm finished with that.  If we would like to

13    pass it back.  Thank you.

14          Mr. Ola, would you please now turn to Tab Number 2

15    in that exhibit binder.

16          Do you recognize what that is?

17    A.    Yes, sir.

18    Q.    What is it?

19    A.    It's a Taser -- the -- the -- the disc that I -- the

20    disc that we go through.

21    Q.    The slides that you --

22    A.    The slide show, yes, sir.

23    Q.    Taser presentation?

24    A.    Right.

25    Q.    Okay.  And is there a standard set of information you

1  provide in every class?

2  A.   As far as the disc?

3  Q.   As far as, yeah, the slides and the information?

4  A.   Yes.

5  Q.   Okay.

6  A.   This is it.

7  Q.   That's it?

8  A.   Yes.

9  Q.   You give that to all the classes that you train?

10  A.   Yes.

11  Q.   That, again, would include the class that you taught the

12  defendant?

13  A.   Yes.  You can't alter or do anything from this disc.

14  That's issued from -- from Taser International, or now it's

15  called Axon.

16           MR. SONGER:  Move to admit Exhibit 2.

17           THE COURT:  Any objection?

18           MR. STRIANSE:  No.

19           THE COURT:  Admitted.

20           (Whereupon Plaintiff Exhibit 2 was marked for

21           identification and received in evidence.)

22  BY MR. SONGER:

23  Q.   All right.  Mr. Ola, if you would just look over at

24  Tab 3 as well, please.

25  A.   Okay.

1  Q.   What is that document that's --

2  A.   That's a legal --

3  Q.   I'm sorry.  Let me ask the question first, to make sure

4  the court reporter doesn't want to come kill us.

5            What is that document that's been marked as

6  Exhibit 3?

7  A.   It's a legal packet that I hand out in the class.

8  Q.   Do you provide that information in all the classes that

9  you taught?

10  A.   Yes.

11  Q.   Do you --

12  A.   Since the legal packet came out, yes, sir.

13  Q.   Okay.  What's the date on that particular packet on the

14  first page?  At the bottom of the first page.

15  A.   11/09.

16  Q.   November 2009?

17  A.   Yes, sir.

18  Q.   So by 2015 you would have been providing --

19  A.   Yes.

20  Q.   -- that packet?

21  A.   Yes.

22            MR. SONGER:  We move to admit Exhibit 3.

23            MR. STRIANSE:  No objection.

24            THE COURT:  Admitted.

25            (Whereupon Plaintiff Exhibit 3 was marked for

1          identification and received in evidence.)
2  BY MR. SONGER:
3  Q.   So, Sgt. Ola, based on your training that you gave to
4  the Cheatham County sheriff's officers, when is it
5  appropriate for an officer to use a Taser?
6  A.   When an individual is actively resisting or when he
7  deems that the threat is necessary and can articulate and
8  show that it had to be used; there was -- there was no
9  other -- other reasonable force or something that he -- that
10 there was nothing else he could do but use that in lieu of
11 deadly force.
12 Q.   When there was a threat that could not be dealt with
13 through some other type of force and the officer did not want
14 to use deadly force, is that the situation?
15 A.   And deadly force wasn't justified.  Yes.
16 Q.   Was it permissible to use a Taser just because someone
17 was not compliant?
18 A.   No.
19 Q.   Was it permissible to use a Taser to punish someone?
20 A.   No.
21 Q.   To retaliate against someone for something they did
22 earlier?
23 A.   No.
24 Q.   Was it permissible to use a Taser on someone who was a
25 threat but then the threat had already been subdued?

A.    No, sir.

Q.    Is the number of officers who are present and available to control a situation relevant to whether it's appropriate to use a Taser?

A.    Yes, sir.

Q.    Is that something you go over in the training?

A.    Yes, sir.

Q.    Including the training that Defendant Bryant took?

A.    Yes, sir.

Q.    What do you say about that in the training?

A.    If there is a number of -- if there is one or two officers -- and I -- and I -- and I kind of say, what's in the jail is a confined area, where you may have -- an individual is not going to be able to get out.

        In the field, like myself out there and other officers, we may have a 25-minute ETA of another officer getting there.  So there's two different situations there, and we go over that.

        But in the jail they've always had an additional -- they can pick up the phone and call -- and have in the past.  They have called and said, "Hey, we need additional help down here to get an individual in a chair" or a restraint or whatever, and they've called, and a lot of us has showed up down there and physically helped.

        You know, in the field, you can't do that.  But --

but the more power you have, as far as you've got seven or
eight people, you couldn't justify why you would be lighting
this guy up with a Taser when you have seven or eight people
there that could physically manhandle him.

So we could -- you know, you've got to be able to
justify why did you tase this individual inside a confined
area.

Q.   Do you say that specifically in the training, that if
there are seven officers there you don't need to be tasing
somebody?

A.   I don't -- I don't say a number.  I just say if there's
enough people there or if you're using a Taser and -- and
it's not working, I mean, you need to start thinking about
something else.  Is there more manpower -- I mean, we go over
a couple different things there.

But, yeah.  I mean, if -- even in the field out
there, if there's enough of us on the scene, we wouldn't be
shooting somebody with a Taser if there's enough to deal with
the situation, or you'd be able to articulate why you did use
it.

Q.   Do you train officers on what the maximum limit is, the
maximum amount of time they would be allowed to tase someone
in any situation?

A.   Yes.

Q.   And what is that limit that you tell officers in

1  training?

2  A.    Three times at 15 seconds.  No more.  In every class.

3  Q.    And when you say three times, 15 seconds, do you mean

4  15 seconds total?

5  A.    No.  That's three times.  Every time you pull the

6  trigger, it's 15 seconds.  That's three shots.

7  Q.    I'm sorry.  So I just want to be clear.  How long is one

8  Taser cycle?

9  A.    Five seconds.

10 Q.    Okay.  So you're saying three times --

11 A.    No, 15 -- 15 total, excuse me.

12          THE COURT:  Hold on.  Now, don't talk over each

13 other.

14          MR. SONGER:  Let me ask the question.

15          THE COURT:  And you slow down.  Pause.  Let him

16 finish.

17          Start over.

18 BY MR. SONGER:

19 Q.    How long is one standard Taser cycle?

20 A.    Five seconds.

21 Q.    How many cycles are officers allowed to use?  What is

22 the maximum number they're allowed to use?

23 A.    Three.

24 Q.    So no more than 15 total seconds?

25 A.    Correct.

1    Q.    You tell officers that in training?

2    A.    Yes, sir.

3    Q.    And you were telling officers that in training back when

4    Defendant Bryant took --

5    A.    Yes, sir.

6    Q.    Do you tell officers what they should do if they're

7    using a Taser and it doesn't seem to be effective?

8    A.    Look for alternate means, yes.

9    Q.    Not keep going with the Taser?

10   A.    No.

11   Q.    And that limit of three times, five seconds each, why is

12   that important?  Do you talk to officers about what could

13   happen if they go beyond that?

14   A.    Yes, sir.  In the legal packet, we talk about it because

15   there's been some case files.

16             MR. STRIANSE:  Your Honor, object to the case

17   files.

18             THE COURT:  Sustained.

19   BY MR. SONGER:

20   Q.    And I'm not asking you about any legal standards

21   necessarily.

22   A.    Okay.

23   Q.    But just practical consequences or consequences for the

24   person that's been tased, do you talk about that with

25   officers?

1  A.    Yes.

2  Q.    And what types of things do you tell them about --

3  A.    That if you -- if you use the Taser too many times, it

4  can be deemed excessive force.  That you could get yourself

5  in trouble.

6  Q.    Do you talk to them about the medical risks from tasing

7  someone for too long?

8  A.    Yes, we do talk about that.

9              MR. SONGER:  Ms. Aroner, if we could please put up

10 Exhibit Number 2, which is those slides that we just looked

11 at.  And page 227.

12 Q.    Mr. Ola, is this one of the slides that you present to

13 officers during your training?

14 A.    Yes, sir.

15 Q.    And this says that several law enforcement groups have

16 established 15 seconds of CEW exposure.

17              And what is CEW?

18 A.    What's --

19 Q.    What is CEW?

20 A.    Conducted electrical weapon.  It's basically -- it

21 stands for a Taser.

22 Q.    Another name for a Taser?

23 A.    Yes, sir.

24 Q.    Fifteen seconds of Taser exposure, multiple applications

25 or continuous, as a significant safety point.

1          That's something that you tell officers in the
2    training?
3    A.    Yes.  It's in the presentation, yes, sir.
4    Q.    All right.  Do you train officers on any situation where
5    it's permissible to tase for more than 15 seconds?
6    A.    No.
7          MR. SONGER:  Ms. Aroner, if we could now please
8    see Slide Number 224.
9    Q.    And the title of this slide is "Physiologic/Metabolic
10   Effects"; is that right?
11   A.    Yes.
12   Q.    And it says that (as read):
13             Tasers may produce effects that could increase
14             the risk of sudden death, including changes in
15             blood chemistry, blood pressure, respiration,
16             heart rate and rhythm.
17          Is all that information things that you train
18   officers on?
19   A.    These are things that could happen, yes.
20   Q.    And the bottom paragraph says (as read):
21             The longer the Taser exposure, the greater the
22             potential effects?
23   A.    Yes.
24   Q.    And the final paragraph is -- or sentence is (as read):
25             Use reasonable efforts to minimize the number

```
 1              and duration of Taser exposures.
 2              Is that right?  Is that all information that you
 3    gave Defendant Bryant?
 4    A.   Yes.
 5              MR. SONGER:  Ms. Aroner, if we could now please
 6    put up Exhibit 3, the 10th page of that exhibit.  It's the
 7    second page of the "Taser Safety Information" portion.
 8    Q.   Mr. Ola, is this part of the information that you hand
 9    out in the trainings?
10    A.   Yes, sir.
11              MR. SONGER:  And, Ms. Aroner, if you would please
12    blow up paragraph number 1.
13    BY MR. SONGER:
14    Q.   The first sentence says (as read):
15                   Most human Taser lab testing has not exceeded
16                   15 seconds of CEW application, and none has
17                   exceeded 45 seconds.
18    A.   That is correct.
19    Q.   All right.  And as someone who goes to these regular
20    trainings about -- and learning about a Taser, learning how
21    to train others about a Taser, is that correct to your
22    understanding, that most even human testing doesn't exceed 15
23    seconds?
24    A.   Yes, sir.
25    Q.   Thank you.
```

1              In your course, do you give officers any

2    instruction about whether they are permitted to tase someone

3    who's already been placed in restraints?

4    A.    Yes, sir.  We don't tase someone that's already in

5    restraints or handcuffed.

6    Q.    What do you say about dealing with people who have

7    already been put in handcuffs?

8    A.    Once someone's in handcuffs, we do not tase, we do not

9    strike.  We do not -- any of that.  We do not spray.

10   Q.    And did you say that in the training that Defendant

11   Bryant took back in 2015?

12   A.    Every training.

13   Q.    Now, did you give any officers any specific instruction

14   about restraint chairs back in this time?

15   A.    I don't recall about a restraint chair, no.

16   Q.    Did the same standards apply when dealing with people in

17   restraint chairs that we already discussed?

18   A.    Yes.

19   Q.    No more than three times of five seconds?

20   A.    Yes, sir.

21   Q.    Only to counter a threat that couldn't be resolved in

22   some other way?

23   A.    Yes.

24   Q.    Use the least amount of force necessary?

25   A.    Yes, sir.

1   Q.   All that applied to people in restraint chairs?

2   A.   Yes, sir.

3   Q.   And that was true back in 2016 and 2015?

4   A.   Yes, sir.

5   Q.   In your training, do you talk to officers about the

6   types of injuries that can result when they use a Taser?

7   A.   Yes, sir.

8   Q.   Do you talk about the drive-stun mode specifically and

9   the types of injuries that can cause?

10  A.   Yes, sir.

11  Q.   What do you tell them?

12  A.   We talk about it for the volunteer exposure that will be

13  coming up about midways of the class, and I basically tell

14  them that, you know, it's -- Taser International does not say

15  anyone has to be exposed to be certified to carry a Taser,

16  not even the instructors.  But if you volunteer to take a

17  dry-stun, it will leave a burn.  I want them to know that up

18  front.

19          Same way with the probes.  I let them know what's

20  going to happen, that I'm going to get two spotters under

21  their arms and I'm going to let them to the floor, and

22  they're going to have two little bee sting marks, and I'm

23  going to let them know everything that's going to happen from

24  get-go to the end of it.  And then they make their decision,

25  and no one has to do it.

1  Q.   How commonly do people volunteer after you tell them
2  that?
3  A.   You would be surprised.  A lot of people will do the
4  probes, but they kind of have a tendency to flare back on the
5  dry stuns.
6  Q.   They don't want to do the drive stuns?
7  A.   Huh-uh.  No, sir.
8  Q.   Do you tell officers how long it takes for injuries from
9  the drive-stun to show up on their body?
10 A.   Yes, sir.  Yeah, I do.
11 Q.   What do you tell them about that?
12 A.   Three to four days.  Sometimes a week.
13 Q.   So if they got drive-stunned, later that night they
14 wouldn't have any injuries that were visible necessarily?
15 A.   They would have a red mark.  A lot of times it will be a
16 red mark, kind of like a flushed skin mark.  And then, as the
17 days go on, it would -- it would get a little worse.
18 Q.   In your line of work, did you see a number of injuries
19 from drive-stuns?
20 A.   I have.
21 Q.   What do they look like?  Can you just describe for us
22 what the wound looks like?
23 A.   It would actually be about that far apart --
24 Q.   I'm sorry.  Just so the record's clear -- you're holding
25 up your hand -- about two inches apart?

A.   About two inches, somewhere in that, yes, sir.  And it
would be -- like I said, it would be sort of red at first, on
the first plight.  And then I've seen it go to a blister.
And then two or three days later it can be up to a nasty
little wound.

Q.   And there are two circular wounds about two inches
apart?

A.   Yes, sir.

Q.   And then do they start to heal after that point?

A.   They have, like, a scab to them, yes.

Q.   So -- but ten or 11 days later, would they have healed
to some extent?

A.   In that ball park.  I have seen one officer that -- that
came to me, it was over 14 or 15 days later, he still had a
real nasty burn.  From five seconds.

        MR. SONGER:  Ms. Aroner, if we could please bring
up what's been admitted as Exhibit Number 39.

Q.   Do the marks in that picture appear to you to be
consistent with drive-stun tasing?

A.   It does.

Q.   How does that compare to most wounds you've seen?  Is it
better? worse?

A.   That's a pretty nasty one.

Q.   Thank you.

        Sgt. Ola, do you talk about how to document using

1  a Taser in your course?

2  A.    Yes, sir.

3  Q.    What documentation did the Cheatham County Sheriff's

4  Office require back in 2016 when officers used a Taser?

5  A.    Required the use of force along with your regular

6  report.

7  Q.    Were officers required to document every time they used

8  a Taser?

9  A.    Yes, sir.  In the report it would have to reflect every

10  time the trigger was pulled, justifying every trigger pull,

11  how long the trigger was pulled.  Some -- some individuals

12  actually document where the trigger -- where they were shot.

13  I've had officers even take pictures of it and turn all that

14  in to their supervisors.

15  Q.    At a minimum, though, were officers required to document

16  each trigger pull and the why they pulled the trigger each

17  time?

18  A.    Yes, sir.

19  Q.    Is that something you went over in the training?

20  A.    Yes.

21  Q.    Is there any exception to that policy?

22  A.    No.

23  Q.    Now, sir, are you familiar with incidents that happened

24  on November 5th, 2016, involving an inmate named Jordan

25  Norris?

1  A.    Yes.
2  Q.    Were you working -- were you on duty that night in the
3  Cheatham County Sheriff's Office?
4  A.    Yes, sir.
5  Q.    Were you in the jail or were you out on the road?
6  A.    No.  I was out on the road.  I've never worked in the
7  jail.
8  Q.    At some point did you get called into the jail that
9  night?
10 A.    I did.
11 Q.    Do you remember about what time you arrived?
12 A.    I want to say it was later into the night or later that
13 evening.
14 Q.    Now, when you arrived, did any of the officers there
15 tell you that a Jordan Norris had been tased earlier that
16 night?
17 A.    No.
18 Q.    At some point did you find out that Jordan had been
19 tased earlier that night?
20 A.    Later.
21 Q.    And how did you find out?
22 A.    I think Mike Montgomery had told me or -- I'm not real
23 sure.  I -- I think he's the one first spoke to me about it,
24 about something.  I'm not sure.
25 Q.    At some point were you asked to help gather any

1  information to help investigate what had happened to Jordan
2  earlier?
3  A.   Oh, now -- you're speaking when JJ -- JJ called.  JJ had
4  asked me to pull some stuff -- is that -- as far as the
5  cameras and stuff?
6  Q.   Well, I'm asking you, did someone come to you at some
7  point and ask you to pull information?
8  A.   Yes.  JJ -- Lt. JJ Hannah did.
9  Q.   And who is Lt. Hannah?
10 A.   He's the jail -- the correction officer lieutenant.
11 Q.   That was some time after the incident happened?
12 A.   Yes.
13 Q.   And did he ask you to pull Taser logs?
14 A.   Yes, he did.
15 Q.   And what is a Taser log?
16 A.   It is a log of everything that that gun has did.
17 Q.   Is it generated automatically every time the Taser is
18 fired?
19 A.   Yes, automatically.
20 Q.   And does it record how long the Taser is discharged for?
21 A.   Yes.
22 Q.   Okay.  And the time that it's discharged?
23 A.   Yes.
24 Q.   All right.  Would you please turn to Tab Number 36 in
25 that binder.

1  A.   Okay.

2  Q.   Okay.  Do you recognize that?

3  A.   I do.

4  Q.   And what is it?

5  A.   It's a Taser log.

6  Q.   Is it a Taser log for a Taser at the Cheatham County

7  Sheriff's Office?

8  A.   Yes.

9  Q.   Does that appear to be one of the records that you

10  pulled for Lt. Hannah?

11  A.   Yes.

12        MR. SONGER:  The government moves to admit

13  Government's Exhibit 36.

14        MR. STRIANSE:  No objection.

15        THE COURT:  Admitted.

16        (Whereupon Plaintiff Exhibit 36 was marked for

17            identification and received in evidence.)

18        MR. SONGER:  May we publish it for the jury?

19        THE COURT:  Yes.

20        MR. SONGER:  Ms. Aroner, if you would, please,

21  bring up the first page and enlarge the top portion.

22  Q.   And, Mr. Ola, if I could have you look at the first page

23  here.

24        You can see the Taser model is X26P, right?

25  A.   Yes.

1   Q.   And there's a serial number right above that.

2        Does each Taser have an individual serial number?

3   A.   Yes, sir, on the very top.

4   Q.   And so you know exactly which Taser that was by looking

5   at the number?

6   A.   It would link it back to that Taser, yes.

7   Q.   And the number for this log is X12002342, correct?

8   A.   Yes.

9   Q.   Now, if you would please turn to the -- it's the 33rd

10  page of those logs.  It's -- I think they're in date order.

11  It's November 5th, 2016.  And if it's easier, I think

12  Ms. Aroner has brought it up on the screen.  We can pull it

13  up for you.

14       And if we look at the tases that start at 1959 or

15  7:59 p.m. and the several below that, does this log show four

16  tases that happened at approximately 8:00 p.m. on

17  November 5th, 2016?

18  A.   Yes.

19  Q.   Okay.  And the fourth column over that contains the

20  numbers, what -- what information is that showing?

21  A.   The duration of the Taser.

22  Q.   How long the Taser was actually used for?

23  A.   Yes, being fired.

24  Q.   And what are the times for the four tases that happened

25  just back to back at 8:00 p.m.?

1  A.  Five, five, 25, and 15.

2  Q.  So a total of 50 seconds?

3  A.  Yes.

4  Q.  In about a minute and-a-half?

5  A.  Right.  Yes.

6  Q.  Thank you.  We can take that down.

7       Before you saw that log, did you know that someone

8  had been tased for 50 seconds --

9  A.  I did not.

10 Q.  -- back to back?

11 A.  I did not.

12 Q.  What was your reaction when you saw that?

13 A.  Shocked.

14 Q.  Why were you shocked?

15 A.  I've never seen someone tased that much.  That many.

16 Q.  And that's for your entire two decades in law

17 enforcement?

18 A.  Yes, sir.

19 Q.  Have you ever even heard about somebody being tased that

20 long?

21 A.  There was one case that come out years ago at one of our

22 trainings where a SWAT team -- we all talked about -- but it

23 was something way out there.  But, no, not relative -- daily

24 or nothing, no.

25 Q.  Nothing else that you've heard about that's even close?

A.    No, sir.

Q.    Okay.  So, turning back to what you did this night, November 5th, 2016.

      When you got to the jail, what was happening when you arrived?

A.    When I got to the jail, I came in, and I remember seeing several around Jordan Norris in a restraint chair there in front of the booking window.

Q.    Was Jordan Norris cuffed to the booking window?

A.    I believe he was cuffed to the bar.

      MR. SONGER:  Ms. Aroner, can we show Exhibit 17, which has already been admitted.

Q.    Do you recognize this scene?

A.    Yes.

Q.    Is that Jordan Norris?

A.    It is.

Q.    Is that how he was cuffed to the booking window when you got there?

A.    Yes, sir.

Q.    And so, from this position, what did officers do next with Mr. Norris?

      Thank you.

A.    I think they continued to put chains and shackles and stuff on him and -- and put him in that restraint chair.

Q.    Did he have to be uncuffed from that booking bar?

1 A.    Yeah.  At one point you had to, yes.

2 Q.    And then they were trying to resecure him in the chair?

3 A.    Yes.

4 Q.    Why were they trying to do that?

5 A.    He was going for an evaluation or -- to the hospital

6 or -- or somewhere there.

7 Q.    He was going to be taken to the hospital for an

8 evaluation?

9 A.    Yes.

10 Q.    And when officers uncuffed Jordan and got him secured to

11 take him out to the hospital, did he struggle at first?

12 A.    Yes, a little bit.  Yes.

13 Q.    And was he tased during that process?

14 A.    At one point, yes.

15 Q.    And what was Jordan doing then when he was tased?

16 A.    He postured some, and they were -- something they were

17 doing with his feet on his -- on his right leg.

18 Q.    But eventually were officers able to get him secured?

19 A.    Yes.

20 Q.    And if we could please bring up Exhibit 21.  This has

21 previously been admitted.

22          And ask Ms. Aroner to play the clip starting at

23 5 minutes and 5 seconds until 6 minutes and 27 seconds.

24          (Exhibit 21 played.)

25

BY MR. SONGER:

Q.   And leave it up for a moment.

          Mr. Ola, we just watched a clip that was about a
minute and 20 seconds.

          During that clip is Jordan still struggling and
fighting and all?

A.   No.

Q.   Has he calmed down at this point?

A.   Appears to be, yes.

Q.   And how is he restrained right now?

A.   He has handcuffs, arm restraints, I believe, and he
has -- he should have overshackled -- handcuffs on his feet.

Q.   Shackles on his feet, handcuffs on his hands?

A.   And he may have a belly chain on.  I'm not sure if they
put one on or not.  Or the -- the -- the belts are about to
be put on, if you could see them, across his thighs there,
that would go across his waist or his legs there.

Q.   Does he also have a strap around his legs?

A.   He should, yes.

Q.   And is he strapped into the chair?  Is he belted into
the chair around his waist?

A.   Yes.

Q.   Can we show Exhibit 19.

          Now, is this an accurate picture of the restraints
that he was in?

1   A.    Yes.

2   Q.    Can you tell there that there's a belly chain that

3   connects to his handcuffs from behind?

4   A.    I believe, yes.

5   Q.    You can also see the leg shackles and the handcuffs?

6   A.    Yes.

7   Q.    And the strap over his legs?

8   A.    Yes, sir.

9   Q.    Bring back up 21, please.  Okay.

10          Now, this is the scene we were just looking at.

11  We're going to use the laser pointer.

12          If you could tell us, where are you standing in

13  this picture?  Is this --

14  A.    That's me right there.

15  Q.    That's you right on the right?

16  A.    That's me.

17  Q.    And who is the person in the seat?

18  A.    That is Jordan.

19  Q.    So you're standing right next to Jordan?

20  A.    Yes, sir.

21  Q.    And who is the officer leaning over Jordan?

22  A.    Mark Bryant.

23  Q.    And how many officers are surrounding Jordan right now?

24  A.    There is -- see, there's five -- five or six of us, and

25  then Mike McBryant -- Mark Montgomery is standing over in the

1  doorway.  Six of us around him.

2  Q.    Six right around him plus a seventh officer a few feet

3  away?

4  A.    Yeah.  There's a female standing in the back, Ms. King.

5  Q.    Now, at this point is Jordan ready to be moved outside

6  so he can be taken to the hospital?

7  A.    Yes.

8  Q.    He's restrained?

9  A.    Yes, sir.

10 Q.    He's calm?

11 A.    Yes, sir.

12 Q.    Do you see any reason to tase him right now?

13 A.    No, sir.

14 Q.    For any amount of time?

15 A.    No, sir.

16 Q.    Even one second?

17 A.    No, sir.

18        MR. SONGER:  Ms. Aroner, if you would please play

19 the next clip, which will be from 6 minutes, 27 seconds, on

20 Exhibit 21, until six minutes and 54 seconds.

21        (Exhibit 21 played.)

22 BY MR. SONGER:

23 Q.    Who was the officer who just tased Jordan in that

24 sequence?

25 A.    Mark Bryant.

1    Q.    How long did that tasing last?

2    A.    About 11 seconds.

3    Q.    Did that violate your training and policies that existed

4    at the time?

5    A.    Yes, sir.

6    Q.    Why is that?

7    A.    Because he was completely handcuffed and subdued.  I

8    mean, he was restrained.

9    Q.    Did he hold the trigger down longer than five seconds?

10   A.    Yes, sir.

11   Q.    More than twice as long, right?

12   A.    Yes, sir.

13   Q.    And there were seven officers around him?

14   A.    Yes, sir.

15   Q.    And he wasn't a threat?

16   A.    No, sir.

17   Q.    All right.

18          Leaving aside your training and your policy, just

19   in your personal experience and your common sense, did you

20   see any reason to tase him there?

21   A.    No, sir.

22   Q.    Okay.  Now, if we could please bring back up Exhibit

23   Number 36.  That's the Taser logs.  And go to page 33 again.

24   And if we could start at sequence Number 967, which is at

25   10:35 p.m., and the tases beyond that.

1          This portion of the log shows a series of tases

2     that occurred at -- between it looks like 10:25 p.m. and

3     10:27 p.m., in that time frame roughly; is that right?

4     A.   Yes, sir.

5     Q.   Is that roughly when you remember this happening?

6     A.   Yes, sir.

7     Q.   And if you would look at the first five tases there

8     listed from the top, the ones that occurred from lines 967 to

9     971, from 10:25 p.m. until just after 10:26 p.m.

10          Do you see those?

11    A.   Yes, sir.

12    Q.   And the lengths of those tases were 12, 5, 5, 8, and 6

13    seconds, right?

14    A.   Yes.

15    Q.   Are those the tases that happened while Jordan was

16    struggling earlier with officers before you got him

17    restrained?

18    A.   Yes.

19    Q.   And then you can see there's a gap of a minute and 40

20    seconds between line 971 and 972.

21          So then, a minute and 40 seconds later, there's

22    another tase that lasted 11 seconds; is that right?

23    A.   Yes.

24    Q.   Is that the final tase that we just watched on video?

25    A.   Yes.

1  Q.    Thank you.  Now, if we can please bring up Exhibit
2  Number 26.  And if you could just blow up the top half of the
3  report.  Okay.
4            Mr. Ola, this is an incident report.  Do you
5  recognize this as the type of incident report that officers
6  filed?
7  A.    In the -- in the jail, yes.
8  Q.    And it says the location is booking and the time is
9  10:20 p.m., right?
10 A.    Yes.
11 Q.    That's about when this happened?
12 A.    Yes.
13 Q.    And the officer who filed this report is Bryant?
14 A.    Yes.
15 Q.    Now, we just looked at the video.
16            How many officers were surrounding Jordan when he
17 was tased?
18 A.    Six to seven.
19 Q.    How many are listed as being involved on this report?
20 A.    Two.
21 Q.    And how many times did Mark Bryant tase Jordan?
22 A.    While I was there?
23 Q.    While you were there in that sequence that we just
24 watched and looked at the logs.
25 A.    Several.

1  Q.  Is a number of times listed in this report?
2  A.  No.
3  Q.  And the last tase lasted 11 seconds, correct?
4  A.  Yes, sir.
5  Q.  Is that specified in the report?
6  A.  It is not.
7  Q.  Are the times for any of those tases specified in the
8  report?
9  A.  No.
10 Q.  Does the report say that Jordan was handcuffed when he
11 was tased for 11 seconds?
12 A.  No.
13 Q.  Does it say he was shackled?
14 A.  No.
15 Q.  Does it say he was strapped into a restraint chair?
16 A.  No, sir.
17 Q.  Now, the report does say that (as read):
18          Inmate Norris did not comply with commands and
19          I tased him multiple times.
20          Do you see that?
21 A.  Yes, sir.
22 Q.  Now, based on what you saw, is that accurate with
23 respect to that 11-second tase when Jordan was in handcuffs,
24 the one we just watched?
25 A.  No, sir.

1 Q.   Does this report give you any idea what actually
2 happened during that incident?
3 A.   No.
4 Q.   Mr. Ola --
5         We can take this down, Ms. Aroner.  Thank you.
6         -- during Defendant Bryant's last 11-second tase
7 while Jordan was in handcuffs, where were you standing?
8 A.   It would have been to the right -- well, to the left of
9 Jordan Norris, just across from -- in front of the booking
10 window.
11 Q.   How far away were you?
12 A.   Feet.  I mean, foot.  Very little.
13 Q.   Pretty close?
14 A.   Yes.
15 Q.   Were you carrying a Taser that night?
16 A.   I was.
17 Q.   If you had seen something that would require Jordan to
18 be tased, would you have used your Taser?
19 A.   If need be, yes.
20 Q.   All right.  Did you see anything?
21 A.   No.
22 Q.   So how did you feel when Defendant Bryant started tasing
23 him for that last 11-second tase while he was handcuffed?
24 A.   Shocked.
25 Q.   Why were you shocked?

1  A.   Shouldn't have happened.

2  Q.   Now, did you try to stop Defendant Bryant while he was

3  tasing him?

4  A.   At the time, no.

5  Q.   And why not?

6  A.   It happened so quick, I don't think anybody could have

7  stopped it.  I don't think anybody was -- was ready for it.

8  I mean, we were all looking down.  I mean, Jordan postured,

9  and next thing we know, he was being tased.

10 Q.   Now, after the incident was resolved and Jordan went off

11 to the hospital that night, did you report Defendant Bryant

12 for his conduct?

13 A.   I did not.

14 Q.   And why didn't you do that?

15 A.   Fear.  Shame.  I -- I -- I just -- I didn't.  And I was

16 wrong.

17 Q.   You trained the defendant, right?

18 A.   I did.

19 Q.   Were you ashamed that somebody that you trained would do

20 that?

21 A.   Yes, sir, I am.

22 Q.   Now, at some point later did you meet with the FBI to

23 talk about what happened that night?

24 A.   I did.

25 Q.   And in the first couple of meetings with them, did you

1  tell them everything that you saw happen?
2  A.    No.
3  Q.    What did you tell them?
4  A.    Untruthful stuff, that I wasn't -- that I didn't see it;
5  I wasn't there.
6  Q.    You told them you had walked away and didn't see --
7  A.    I did.
8  Q.    -- the defendant tase him in handcuffs, right?
9  A.    Yes.
10 Q.    Why did you tell the FBI that?
11 A.    Again, afraid, fear.
12 Q.    Were you ashamed?
13 A.    I am.
14 Q.    Should this incident have happened?
15 A.    Never should have happened.
16 Q.    Are you ashamed it happened on your watch?
17 A.    I do.
18 Q.    Now, were you charged with any crimes as a result of
19 those false statements that you made to the FBI?
20 A.    Yes, sir.
21 Q.    And were those felonies?
22 A.    Yes, sir.
23 Q.    Did you plead guilty?
24 A.    Yes, sir.
25 Q.    Why did you plead guilty?

```
1   A.    Because I'm guilty.
2   Q.    Did you agree to cooperate with the government as part
3   of that guilty plea?
4   A.    I did.
5   Q.    And are you hoping that at some point the government
6   would ask the Court to give you a reduced sentence?
7   A.    I hope.  But I haven't been promised anything.
8   Q.    Have you been promised anything at all?
9   A.    No, sir.
10  Q.    As part of your agreement, are you required to
11  absolutely tell the truth?
12  A.    Yes, sir.
13  Q.    Thinking back about this night now, how do you feel
14  about what you did when it happened?
15  A.     I wish we could all redo it over again.  It's -- it
16  should have never happened.  And I think every supervisor
17  that was there, including myself, we let Jordan down.  This
18  should have never happened.  This should have never went --
19  never went down the way it did.  And nobody reported it,
20  including myself.
21              MR. SONGER:  Nothing further at this time.
22              THE COURT:  All right.  Let the lawyers approach.
23              (Bench conference outside the hearing of the
24              jury.)
25              MR. SONGER:  Do you want Ms. Myers here too?
```

```
 1              THE COURT:  No.  The jury has told me they want to
 2  leave at 4:30, around 4:30.  So I need to know how long is
 3  your cross going to be?
 4              MR. STRIANSE:  I'll be no longer than that.
 5              THE COURT:  Then do you think you'll go 30
 6  minutes?
 7              MR. STRIANSE:  Maybe not even.
 8              THE COURT:  Not even.  So we can get his direct
 9  done?
10              MR. STRIANSE:  We can get his cross done.
11              THE COURT:  And then his redirect.
12              MR. STRIANSE:  Yeah.
13              THE COURT:  Let's go forward.
14              MR. STRIANSE:  If I've miscalculated, you'll let
15  me know.
16              THE COURT:  You'll let me know.
17              (Jury present.)
18              THE COURT:  All right.  We'll have cross.
19              MR. STRIANSE:  Thank you, Judge.
20                        CROSS-EXAMINATION
21  BY MR. STRIANSE:
22  Q.   Good afternoon, Sgt. Ola.
23  A.   Hello, sir.
24  Q.   I want to ask you about sort of a timeline on this.
25              The events that you testified about just getting
```

1  done at the end of your direct examination occurred on
2  November 5 of 2016; is that right?
3  A.    I believe so, yes, sir.
4  Q.    And if any of these dates are wrong, you just -- you
5  just tell me, okay?
6           I think it was on July 21st or so of 2017 that
7  this all became public in the media; is that right?
8  A.    I -- I'm not sure on the dates, but somewhere along
9  there, yes, sir.
10 Q.    And we just saw the Taser log report that you
11 identified.
12          Do you remember seeing that on the screen?
13 A.    Yes, sir.
14 Q.    And it looks like you access that report on July 27th of
15 2017; is that right?
16 A.    I've -- whatever day I pulled it off.  Like I say, I'm
17 not sure on the dates.
18 Q.    Did you see it on the screen when they had it up here a
19 moment ago?
20 A.    Yes, sir.
21 Q.    Does that sound about right?
22 A.    About -- maybe -- yeah.
23 Q.    And does that sound about the time that Lt. JJ Hannah
24 asked you to pull the Taser logs?
25 A.    Could be, yes.

Q.   And then you voluntarily met with the investigators from the TBI and the FBI at the district attorney's office in Cheatham County; is that right?

A.   Yes.

Q.   And that would have been around August the 3rd of 2017, correct?

A.   Yes, sir.

Q.   And it was at that meeting that the government later alleged that you had lied to the agents; is that right?

A.   Yes, sir.

Q.   Okay.  You entered a plea of guilty in this Court, I think.

        That alleged lie was in Count One of your indictment.

        Do you remember that?

A.   Yes, sir.

Q.   You've seen a copy of your interview that day, August the 3rd, 2017, have you not?

A.   Yes, sir.

Q.   And that was one of those typewritten interviews; is that correct?

A.   Yes, sir.

Q.   Where you presented yourself to the district attorney's office, correct?

A.   Yes.

1   Q.   Answered all of their questions?

2   A.   Yes.

3   Q.   And I believe they were recording you with a tape

4   recorder or something like that?

5   A.   Yes, sir.

6   Q.   And then I think the tape was given to a stenographer or

7   a typist or someone that typed up your typewritten statement;

8   does that sound correct?

9   A.   I believe so.

10  Q.   And for the life of me, Sgt. Ola, I've looked at it, and

11  frankly can't see where you lied to anybody on August the

12  3rd, 2017.

13          Do you remember that statement?  Do you remember

14  that -- your typewritten statement that you gave to the

15  investigators on August 3, 2017?

16  A.   I remember talking to them and signing something, yes,

17  sir.

18  Q.   Okay.  Now, in making your decision to -- to enter a

19  plea of guilty, did you review that statement that formed the

20  basis of Count One where the government said you lied?

21          Do you understand my question?

22  A.   Not really, sir.

23  Q.   Well, you came in front of Judge Crenshaw at some point

24  and entered a plea of guilty; is that right?

25  A.   Yes, sir.

1 Q.   One of the charges arises out of this alleged false
2 statement that you gave at the DA's office in Cheatham County
3 on August the 3rd of 2017.
4        You understand that?
5 A.   Yes, sir.
6 Q.   My very straightforward question is, did you review your
7 statement before you came in front of Judge Crenshaw and pled
8 guilty?
9 A.   With my attorney, yes, sir.
10 Q.   Okay.  Good.
11        Has it been a long time since you've seen it?
12 A.   It's been a while since I looked at it.
13 Q.   Would it refresh your recollection to take a look at it?
14 A.   No, sir.
15 Q.   Okay.  You think you remember your statement?
16 A.   Yes, sir.
17 Q.   Okay.  If for any reason you need to look at it, just
18 stop me and tell me, okay?
19        Now, do you remember telling the investigators
20 that you were aware of the tasing incident in November?
21 A.   Yes, sir.
22 Q.   Okay.  And that you were called to the jail because they
23 needed someone for assistance with a male inmate that needed
24 to go to the emergency room; is that right?
25 A.   Yes.

1  Q.   You told them when you got to the jail, "The officers
2  were attempting to put him" -- and that's a reference to
3  Mr. Norris, right?
4  A.   Yes, sir.
5  Q.   -- "in a chair we had at that time"?
6  A.   Yes, sir.
7  Q.   You told the FBI and the TBI at that time that Jordan
8  Norris was yelling and screaming, correct?
9  A.   Yes, sir.
10 Q.   All of that's true, isn't it?
11 A.   Not -- no.
12 Q.   I'm sorry?
13 A.   No.
14 Q.   So that was -- that was not truthful, that he was
15 yelling and screaming?
16 A.   No.
17 Q.   And then you said that he was not strapped?
18 A.   Not completely, no.
19 Q.   Okay.  He was cursing and yelling?
20 A.   No, sir.
21 Q.   "I hear the Taser.  I believe it to have been Mark" --
22 and that would be a reference to Mark Bryant, correct?
23 A.   Yes.
24 Q.   -- "on his leg"; is that right?
25 A.   Yes.

1  Q.    And then you told the investigators, "I come over and
2  push the male down" -- I guess that's Mr. Norris, correct?
3  A.    Yes.
4  Q.    -- "on the left shoulder.  He gets strapped down and I
5  walk away"; is that right?
6  A.    Yes, sir.
7  Q.    Now, had you looked at all the -- the videos before you
8  entered your plea?
9  A.    No.
10 Q.    At some point in time, didn't you walk away in the
11 booking area?
12 A.    Not that I can remember.
13 Q.    Okay.  But that's what they said you lied about?
14 A.    Yes, sir.
15 Q.    Okay.  And then you said that you heard the Taser again.
16 (As read):
17                I don't remember if any of the chair was
18          strapped.  He was kicking and yelling.
19          Now, was that an accurate statement?
20 A.    No, sir.
21 Q.    Okay.  (As read):
22                I think he was yelling something about "kill
23          me" or something?
24 A.    He did yell out a couple times that night, yes, sir.
25 Q.    (As read):

1          The chair was in front of the booking window
2          with the back toward the cells.
3          Correct?
4  A.    Yes.
5  Q.    (As read):
6          I heard at least two tases.
7          Is that right?
8  A.    No, sir.
9  Q.    Okay.  When you were sitting there in the district
10 attorney's office, were you purposefully trying to lie to the
11 agents, or were you trying to remember what had happened way
12 back in November?
13 A.    Both.
14 Q.    Okay.  I mean, did you go -- did you drive over there
15 voluntarily on August the 3rd of 2017 with the intent to
16 deceive either Ms. Wright with the FBI or Mr. Atkins with the
17 TBI?
18 A.    No, sir.
19 Q.    Okay.  You said (as read):
20          Neither of these tases concerned me at the time
21          because the guy was wild.
22          You had heard how Jordan Norris had been acting
23 that night beginning at about 6:58 or so on November the 5th,
24 2016, had you not?
25 A.    No.

Q.    Okay.  You didn't hear the story about the problems that
the officers had with extracting him from the cell?

A.    Later.

Q.    Later you heard that?

A.    Yeah.

Q.    Okay.  So that night you would have heard about -- about
the conduct of Jordan Norris on the evening of November 5th,
2016?

A.    But not of the tases and stuff, no.

Q.    Okay.  Well, did anybody tell you that at 6:58 there was
a disturbance at Cell 4 and that four very large officers,
Mark Bryant, Daniel Bratton, Josh Marriott, Jeff Key, about a
thousand pounds of men, were wrestling, trying to control
somebody about my size?

A.    I don't recall that.

Q.    You don't -- you never learned about that?

A.    I don't recall being told that, no.

Q.    Okay.  Back on your statement.  You say that you "didn't
witness the extraction of the cell or anything."

      And that's a reference to what I just described;
is that right?

A.    Yes, sir.

Q.    Okay.  (As read):

              After he, Jordan Norris, was strapped in, he
              was rolled out to the car and transported to the

```
 1              ER.
 2              Is that right?
 3    A.   Yes, sir.
 4    Q.   And then you told the investigators (as read):
 5              He fought a little, but was able to get him in
 6              the car?
 7    A.   Yes.
 8    Q.   Okay.  Now, you had told the jury that a person that is
 9    restrained really should never be tased; is that right?
10    A.   Yes.
11    Q.   Do you remember the difficulty that Cpl. Montgomery was
12    having trying to get Mr. Norris into the patrol car?
13    A.   Yes, sir.
14    Q.   Do you remember giving Cpl. Montgomery some advice that
15    it was all right to tase Jordan Norris, even though he was
16    cuffed, even though he had the leg shackles on, and even
17    though he had the belly chain, because they simply could not
18    get him into the patrol car?
19    A.   I advised him to touch him on his calf, where he would
20    bend his leg, yes.
21    Q.   Yes, sir --
22    A.   That would be the only reason for a drive-stun, to a
23    pressure point.
24    Q.   And you recommended about a one-second stun --
25    A.   Or less.
```

1  Q.    -- to get him in?

2  A.    Yes.

3  Q.    So, obviously, there are exceptions even for inmates

4  that might otherwise seem to be sufficiently restrained?

5  A.    Very few, yes.

6  Q.    And the one with Montgomery is one of those few

7  exceptions?

8  A.    Well, I mean, that would be the only reason.

9  Q.    Right.  And I'm just crediting the advice that you gave

10 to Montgomery that night.  You said (as read):

11             Even though he's fully inveigled, you can go

12             ahead and tase him or you're not going to get him

13             in that back seat of that patrol car?

14 A.    Well, I didn't want to hurt him.

15 Q.    Right.

16 A.    We didn't want to hurt him physically.

17 Q.    So, based on what you told the agents on August the 3rd,

18 what we just went through together, you felt like you had

19 intentionally lied to the government in some way?

20 A.    I felt like I gave them a false statement.

21 Q.    Okay.  Now --

22 A.    Of -- of issues -- of things -- events that happened

23 that night.

24 Q.    And you said that could have been a combination of maybe

25 not remembering everything as clearly as you should have?

1  A.   Yes, sir.

2  Q.   And you may have conflated some of the things that the

3  officers had told you about his conduct prior that evening

4  with what you actually did?

5  A.   I don't remember officers telling me a bunch of stuff of

6  what happened that night.

7  Q.   Okay.  Did they tell you they were having trouble

8  controlling him that night?

9  A.   A lot of stuff later --

10 Q.   Right.

11 A.   -- but not that night.

12 Q.   Okay.  Was it later before you went on August the 3rd to

13 talk to the district attorney -- or I should say the TBI and

14 the FBI at the district attorney's office?

15 A.   I'm sure it would have been, but. . .

16 Q.   And then there was alleged against you a second lie; is

17 that right?

18 A.   Yes, sir.

19 Q.   And that was Count Two, that you entered a plea of

20 guilty to; is that right?

21 A.   Yes, sir.

22 Q.   And that is a lie where they allege that you made a

23 false statement to Joy Wright with the FBI; is that correct?

24 A.   Yes, sir.

25 Q.   And that happened right here in this building; is that

1    right?

2    A.    Yes.

3    Q.    And that's where the government claims that you told

4    Ms. Wright that you didn't see the correctional officer tase

5    Jordan Norris in cuffs; is that right?

6    A.    Yes.

7    Q.    Did you know what they were referring to, which incident

8    they were referring to?

9    A.    Yes, sir, they showed it to me.

10   Q.    And which incident was it?

11   A.    It's -- well, it was the one of the leg.

12   Q.    The one of the leg.

13         Not the one with Mr. Montgomery; is that right?

14   A.    No, sir.

15   Q.    Now, do you remember, when you were being interviewed --

16   I think that was on May the 1st of 2018 here in this

17   building, you were being interviewed maybe up at the U.S.

18   Attorney's office.

19         Does that sound right?

20   A.    Yes, sir.

21   Q.    Were you scheduled to appear before the grand jury that

22   day?

23   A.    I was.

24   Q.    So were you down on this floor or were you up on the

25   ninth floor?

```
1    A.    I was upstairs.
2    Q.    Okay.  And do you remember, after you allegedly made
3    this false statement, that you corrected it?
4    A.    I don't recall exactly the whole thing.  I was briefly
5    talking, and then I was told to get up and, you know, to go
6    talk to an attorney.  I needed to leave.
7    Q.    But, I mean, you didn't call back two weeks later to
8    correct it; you corrected it right there in the moment,
9    didn't you?
10   A.    Perhaps, yes, sir.
11   Q.    Ms. Wright prepared a report of her interaction with you
12   on May the 1st of 2018 and -- and says (as read):
13               Upon further questioning, Ola then stated that
14          he had heard tases when he first came into booking
15          and that Mark Bryant tased Norris.
16          So within that same interview that they claim you
17   lied, you corrected it immediately.
18   A.    I don't recall, sir.
19   Q.    Well, would it refresh your recollection to read
20   Ms. Wright's report of the events of May 1st, 2018?
21               MR. SONGER:  Object to that, Your Honor.  This is
22   not the witness's statement.  It wouldn't refresh his
23   recollection.
24               MR. STRIANSE:  You can use anything to refresh
25   someone's recollection.
```

1          THE COURT:  Since it allegedly refers to something
2    he told Ms. Wright, it might refresh.  Overruled.
3    BY MR. STRIANSE:
4    Q.    Would you like to take a look at it?
5    A.    I guess, sir.
6    Q.    If you would -- you could read anything you want, but
7    take a look at page 3 of the FBI memorandum of your
8    interview, the highlighted section, and read it to yourself.
9    A.    Okay.
10   Q.    Does that refresh your recollection?
11   A.    Yes, sir.
12   Q.    Is that the sequence of events as you remember them on
13   May 1st, 2018?
14   A.    Yes, sir.
15   Q.    That there was some reluctance on your part to give the
16   whole story but, quote, upon further questioning, you gave
17   the whole story?
18   A.    Yes, sir.
19   Q.    And they rewarded your candor by indicting you a couple
20   of months later or maybe a month later?
21   A.    About --
22   Q.    You got indicted in June; is that right?
23   A.    I believe so, yes, sir.
24   Q.    I just had a few more questions for you, Sgt. Ola.
25              You indicated that a consideration as to whether

1  you -- to use a Taser -- which is what?  An intermediate
2  level of force? -- is the number of officers that are
3  available; is that right?
4  A.   Yes.
5  Q.   All right.  Now, when Cpl. Montgomery was placing --
6  trying to place Mr. Norris into the patrol car to take him to
7  the Centennial Ashland City Medical Center, there were a
8  number of officers there and available; is that right?
9  A.   Yes, sir.
10 Q.   Probably five or six officers, correct?
11 A.   Probably.
12 Q.   But even though you all had that show of force and the
13 ability to apply force with all of those bodies, it was still
14 necessary to tase him in your estimation; is that right?
15 A.   Sir, it was -- it's hard to get an individual that's got
16 that many chains and stuff on them in the back seat of a
17 small patrol car.  You would have to jerk him across the
18 seats and do more harm than just touch him on the leg where
19 he would bend them.  He was posturing straight to where we
20 couldn't get -- we would hit his head on the door or
21 something.  I mean, it would have been doing --
22 Q.   Right.
23 A.   It --
24 Q.   And I'm certainly not being critical at all.
25 A.   I'm just saying, it meant -- we had the manpower, but it

1  would have done more harm to hurt him than touch him on the
2  leg where he would bend his calf.
3  Q.   So my only point is, sometimes even having a lot of
4  manpower is not the safest way to deal with someone?
5  A.   Not always, but. . .
6  Q.   When you were looking at the training materials a few
7  moments ago on your direct examination, those things that you
8  called the slides or the panels -- and I think we were on,
9  like, page 227, page 267.  I know that you trained thoroughly
10 when -- when you were there at the sheriff's department, but
11 you certainly didn't read 2- or 300 pages' worth of material
12 to the group; is that right?
13 A.   No, sir.
14 Q.   Okay.  You had a limited amount of time to conduct this
15 training?
16 A.   Yes, sir.
17 Q.   Sometimes it was an eight-hour session if y'all didn't
18 eat; maybe it would be a six-hour session?
19 A.   It's according to how big the class was, yes, sir.
20 Q.   If there was a graduation or something, it might be even
21 a little bit less than six hours; is that right?
22 A.   We wouldn't because of a graduation, no, sir.
23 Q.   Excuse me.  Go ahead.
24 A.   We would make sure that every slide on that PowerPoint,
25 we would go through and hit the highlights and everything

1  would be showed, yes, sir.  If anybody didn't understand it,
2  we would stop.  We didn't divert from the presentation and --
3  and the training for any other reason.
4  Q.   And there was a big part of the training that was
5  devoted to the demonstration; is that right?
6  A.   The last part of it, yes, sir.
7  Q.   And then another large segment would be the test; is
8  that right?
9  A.   The last of it would be the test, yes.
10 Q.   Because I think you had a goal of making sure that all
11 of the candidates passed that test?
12 A.   Well, it's just like, in the instructor's class we do it
13 openly, where one person reads the question -- I mean, it
14 wasn't really a pass or fail.  I mean, we did it as a class,
15 as a whole.
16 Q.   Now, you told the jury about this no more than three
17 applications of the Taser and no more than five seconds per
18 application; is that right?
19 A.   Yeah.  Every -- every trigger pull is five seconds.
20 Q.   And I don't think we need to pull it out.
21       But you identified Government's Exhibit Number 1,
22 which are -- is the general order and the policy -- Taser
23 policy at the Cheatham County Sheriff's Office?
24 A.   Yes, sir.
25 Q.   And then there's another attachment to it, a general

1  order that I think was marked Number 41; is that right?

2  A.   I believe so.  Yes, sir.

3  Q.   And I think you would agree with me, within the four

4  corners of both of those documents there's no written

5  material that indicates this five seconds, three

6  applications, correct?

7  A.   I believe it does, sir, because it says, "Stay within

8  the guidelines of your training."

9  Q.   Okay.

10 A.   I believe it does.

11 Q.   All right.

12 A.   The scope of your training, which is three second --

13 three five-second bursts of the Taser.  I believe it does say

14 that, just not in the writing itself.  I believe it says,

15 "Stay within the scope of your training."

16 Q.   But in terms of a written directive being given to the

17 employees, the officers there at the Cheatham County

18 Sheriff's Office, that wasn't done until Sheriff Breedlove

19 came out with his new policy on July 31, 2017; is that right?

20 A.   Correct.

21 Q.   Now, have you seen a copy of that letter that Sheriff

22 Breedlove put out on July 31?

23 A.   Yes.

24           MR. STRIANSE:  May he be shown a copy of that?

25 It's been received as evidence.  I think it's maybe

1  Defendant's 4 or 5.

2  Q.    Sgt. Ola, you're going to be handed a copy of -- can you

3  flip it over so we can be clear for the record -- flip it

4  over.  Tell me what number is on that blue tab.

5  A.    At the top?

6  Q.    No.  Not the case number.  Where it says "Exhibit

7  Number."

8  A.    Oh, Number 4.

9  Q.    Thank you.  I'm going to put it on the screen and just

10  ask you a couple of quick questions, and then I think we'll

11  be done.  If you would, take a look at the second paragraph

12  and let's identify it.

13         This is -- I think you said Exhibit 4?

14  A.    Yes, sir.

15  Q.    It's dated July 30, 2017.  Correct?

16  A.    Yes, sir.

17  Q.    And it's from Sheriff Mike Breedlove?

18  A.    Yes, sir.

19  Q.    And in the second paragraph he says (as read):

20              There are a few changes that will take place

21         effective this date.

22              Is that correct?

23  A.    Yes, sir.

24  Q.    And this is where it's finally put in writing that,

25  Number 2, "The Taser or dry" -- it should be "drive,"

1  shouldn't it?

2  A.    Drive-stun.

3  Q.    Like d-r-i-v-e?

4  A.    Right.

5  Q.    -- "-stun will not be deployed for more than five

6  seconds."

7         And then, in Number 3, "The Taser dry-stun" --

8  again, drive -- "will not be deployed more than three times

9  on any combative individual unless unique circumstances

10  happen and the officer articulates" -- should be "articulates

11  why."

12         Correct?

13  A.    Yes, sir.

14  Q.    So these were the new changes effective July 30, 2017?

15  A.    Yes, that he sent out.  Yes.

16  Q.    And just one other question for you, Sgt. Ola.

17         When you would finish your training sessions, you

18  would not give a copy of that big thick exhibit that's in

19  that book about the training slides and all those other

20  things to each of the candidates, did you?

21  A.    No, sir.  That -- I mean, they could have access to it.

22  I did give a copy of that disc to their training coordinator,

23  who at that time I believe was Dave Isherwood, for his

24  in-services.  And he's welcome to get -- I think I had an

25  extra copy that I would give him that he could go over

1   things.
2           But, no, sir, I would not give it to the
3   individual students.
4           MR. STRIANSE:  Thank you.
5           Your Honor, may I have one moment?
6           THE COURT:  Sure.
7           MR. STRIANSE:  Those are my questions.  Thank you.
8           THE COURT:  All right.  Redirect.
9           MR. SONGER:  Thank you.  I have just a few
10  questions.
11
12                  REDIRECT EXAMINATION
13  BY MR. SONGER:
14  Q.   Mr. Ola, Mr. Strianse just asked you about that memo
15  that was issued about the five-second, three-time limit?
16  A.   Right.
17  Q.   Was that rule always in place in your training?
18  A.   It was.
19  Q.   Was that something you always told officers in training?
20  A.   Yes, sir.
21  Q.   Including the training that Defendant Bryant went to?
22  A.   Yes, sir.
23  Q.   And then, after Defendant Bryant tased Jordan repeatedly
24  on November 5th, 2016, did you then go ahead and also issue a
25  memo to make it even more clear?

1   A.   Yes, sir.  Sheriff Breedlove did.

2   Q.   Because people were upset about what happened?

3   A.   Yes, sir.

4   Q.   I also want to make sure the timing is clear because you

5   were asked a number of questions about statements you made to

6   federal agents as part of the investigation of this case.

7              Do you remember those?

8   A.   Yes.

9   Q.   And the night that you were at the jail at around 10:20,

10  10:30 p.m. on November 5th, 2016, Defendant Bryant tased

11  Jordan several times, right?

12  A.   Yes.

13  Q.   And we talked through that.

14             And you said that the first group of those tases

15  was when Jordan was struggling, right?

16  A.   Right.

17  Q.   And did you think those tases were generally okay?

18  A.   He wasn't completely strapped then.

19  Q.   Right.  And then there was a break and then there was a

20  final tase where he was tased again for 11 seconds, right?

21  A.   Yes, sir.

22  Q.   That's the one where Jordan was in handcuffs and

23  shackles and just sitting there waiting to go to the

24  hospital, right?

25  A.   Yes, sir.

```
1   Q.    And you said that's the tase -- that's the one that
2   shocked you?
3   A.    Yes, sir.
4   Q.    Now, when you met with the FBI, as you just told defense
5   counsel, you told them about some of Defendant Bryant's tases
6   that night, right?
7   A.    Yes.
8   Q.    The first ones you had seen?
9   A.    Yes.
10  Q.    When he wasn't -- when Jordan wasn't restrained yet?
11  A.    Yes.
12  Q.    Did you tell the FBI about that last tase, the one that
13  shocked you when he was in handcuffs?
14  A.    I did not.
15  Q.    That's the one where you said you had walked away and
16  you didn't see it?
17  A.    Yes, sir.
18  Q.    Because that's the one you were ashamed of?
19  A.    Yes, sir.
20  Q.    You were also asked about that quick stun that Officer
21  Montgomery used later that night?
22  A.    Yes.
23  Q.    When Jordan was being put into the car?
24  A.    Yes.
25  Q.    And were you standing next to Officer Montgomery when he
```

1    did that?

2    A.    I was just behind him.

3    Q.    And did you suggest that he would do that?

4    A.    I did.

5    Q.    And what was Jordan doing at the time that you suggested

6    that Officer Montgomery tase him?

7    A.    He was stiffening his legs and he was, like, leaning

8    against the top of the hood -- the top of the roof of the

9    patrol car and wouldn't bend his legs, kind of like he was --

10   he was posturing real stiff.

11          And the two officers was holding him, and I was

12   just afraid they were going to hurt him trying to get him in.

13   And the other way, like I say, would have been to go around

14   the other side and drag him across the seats, and he was

15   completely shackled from the feet all the way up.  And I just

16   thought it would be demorn [phonetic].

17          And I told Montgomery -- actually, I thought

18   Jordan would bend his legs once I said to touch him, but he

19   didn't.

20   Q.    So he braced -- he was braced against the car?

21   A.    Yes, sir, he was bracing.

22   Q.    Was he out of the restraint chair?

23   A.    Yes.

24   Q.    And what did you tell Officer Montgomery to do?

25   A.    Touch him on the calf of his leg.

```
1   Q.    Just touch him?
2   A.    Just touch him.
3   Q.    And how long did that touching last?
4   A.    Could have -- less than seconds.  I mean, just --
5   Q.    Less than a second?
6   A.    Yes.
7   Q.    Okay.  Now, you were also standing right next to
8   Defendant Bryant when he tased Jordan in the chair for 11
9   seconds, right?
10  A.    Yes.  Across from him.
11  Q.    All right.  Did you tell Defendant Bryant to tase Jordan
12  while he was sitting there in handcuffs and shackles?
13  A.    No, sir.
14  Q.    Why not?
15  A.    Because there was no need in it.
16              MR. SONGER:  Thank you.
17              THE COURT:  All right.  You are free to go.
18              THE WITNESS:  Okay.
19                   (Witness excused.)
20              THE COURT:  So, ladies and gentlemen, we're going
21  to end today, just about on time at 4:30.
22              So let me just remind you, you can't talk about
23  the case, even to your family that's going to want to know
24  what you did all day here in federal court.  You just can't
25  talk to them about it.  You can't do any research or read
```

anything if there's anything to read about the case.  And if
anyone tries to talk to you between now and 8:30 tomorrow
morning, you're going to let me know.

Now, you've heard a lot of witnesses.  And I know
you may have a temptation to start drawing some conclusions
about what you've heard, and that would be entirely
inappropriate.  The reason is the case is not over, and there
are additional witnesses to come that are as important as the
witnesses you've already heard.

Also, you've not -- you don't know the law in the
case.  So you don't know what to apply to the facts.  So it
would be inappropriate to draw any conclusions.  So put the
case out of your mind.  Don't think about it.  We're going to
start at 8:30.  I appreciate you all being willing to do
that.  We'll take our first break at 10:00, and then we'll
come back at 10:30.  And then we'll break again at 12:00 and
come back at 1:00.

So travel safe, and I'll see you in the morning.
Take care.

(Court adjourned.)

1   REPORTER'S CERTIFICATE

2

3          I, Lise S. Matthews, Official Court Reporter for

4   the United States District Court for the Middle District of

5   Tennessee, with offices at Nashville, do hereby certify:

6          That I reported on the Stenograph machine the

7   proceedings held in open court on January 8, 2020, in the

8   matter of UNITED STATES OF AMERICA v. MARK BRYANT, Case No.

9   3:18-cr-00144; that said proceedings in connection with the

10  hearing were reduced to typewritten form by me; and that the

11  foregoing transcript (pages 1 through 291) is a true and

12  accurate record of said proceedings.

13         This the ^ day of September, 2020.

14

15                              /s/ Lise S. Matthews
                                LISE S. MATTHEWS, RMR, CRR, CRC
16                              Official Court Reporter

17

18

19

20

21

22

23

24

25