```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE MIDDLE DISTRICT OF TENNESSEE
 2                        AT NASHVILLE

 3      UNITED STATES OF AMERICA,      )
                                       )
 4                  Plaintiff,         )
                                       )
 5      v.                             )    Case No.
                                       )    3:18-cr-00144
 6      MARK BRYANT,                   )
                                       )
 7                  Defendant.         )

 8

 9    - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

10   BEFORE THE HONORABLE WAVERLY D. CRENSHAW, JR., DISTRICT JUDGE

11                            TRANSCRIPT

12                               OF

13                           PROCEEDINGS

14                        January 9, 2020

15                        Trial Volume 3

16    - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

17

18

19              APPEARANCES ON THE FOLLOWING PAGE

20

21

22

      PREPARED BY:
23                  LISE S. MATTHEWS, RMR, CRR, CRC
                        Official Court Reporter
24                      801 Broadway, Room A839
                          Nashville, TN 37203
25                  lise_matthews@tnmd.uscourts.gov
```

1  APPEARANCES:

2       For the Plaintiff:   Peter J. Strianse
                             Tune, Entrekin & White, P.C.
3                            315 Deaderick Street
                             Suite 1700
4                            Nashville, Tennessee 37238

5

       For the Defendant:   Sara E. Myers
6                            U.S. Attorney's Office
                             (Nashville Office)
7                            Middle District of Tennessee
                             110 Ninth Avenue, S
8                            Suite A961
                             Nashville, Tennessee 37203-3870
9

                             Michael J. Songer
10                           U.S. Department of Justice
                             Criminal Division
11                           950 Pennsylvania Avenue, N.W.
                             Washington, DC 20530

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      **I N D E X**

2      Thursday, January 9, 2020

3

4      INDEX OF WITNESSES

5
       WITNESSES:                                              PAGE
6

7      CAITLIN MARRIOTT
            DIRECT EXAMINATION BY MS. MYERS                      6
8           CROSS-EXAMINATION BY MR. STRIANSE                   25
            REDIRECT EXAMINATION BY MS. MYERS                   37
9
       DWAYNE JONES
10          DIRECT EXAMINATION BY MR. STRIANSE                  50
            CROSS-EXAMINATION BY MS. MYERS                      58
11          REDIRECT EXAMINATION BY MR. STRIANSE                63

12     JAMES MARTIN BARNUM III
            DIRECT EXAMINATION BY MR. STRIANSE                  64
13          CROSS-EXAMINATION BY MS. MYERS                      70
            REDIRECT EXAMINATION BY MR. STRIANSE                71
14
       HAMILTON SMALL
15          DIRECT EXAMINATION BY MR. STRIANSE                  72
            CROSS-EXAMINATION BY MS. MYERS                      81
16          REDIRECT EXAMINATION BY MR. STRIANSE                83

17     JEFFREY KEY
            DIRECT EXAMINATION BY MR. STRIANSE                  86
18          CROSS-EXAMINATION BY MS. MYERS                     102
            REDIRECT EXAMINATION BY MR. STRIANSE               103
19
       REBECCA LYNN BURNEY
20          DIRECT EXAMINATION BY MR. STRIANSE                 105
            CROSS-EXAMINATION BY MS. MYERS                     117
21          REDIRECT EXAMINATION BY MR. STRIANSE               120

22     MARK MITCHELL BRYANT
            DIRECT EXAMINATION BY MR. STRIANSE                 130
23          CROSS-EXAMINATION BY MR. SONGER                    181
            REDIRECT EXAMINATION BY MR. STRIANSE               233

24

25

1                          EXHIBITS

2                                    MARKED    RECEIVED   WITH-
   PLAINTIFF'S EXHIBIT               FOR I.D.  IN EVD.    DRAWN
3
   8    Photograph of Jordan Norris in    16        16
4          restraint chair

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    The above-styled cause came on to be heard on

2  January 9, 2020, before the Honorable Waverly D. Crenshaw,

3  Jr., District Judge, when the following proceedings were had,

4  to-wit:

5

6    THE COURT:  All right.  Be seated.  Good morning.

7    MS. MYERS:  Good morning.

8    THE COURT:  Is the government ready for the jury?

9    MS. MYERS:  We are, Your Honor.

10    THE COURT:  Mr. Strianse, are you ready for the

11  jury?

12    MR. STRIANSE:  Yes, Your Honor.

13    THE COURT:  All right.  Bring them in.

14    (Jury present.)

15    THE COURT:  All right.  Be seated.  Good morning.

16  And let me thank each of you for being here on time and at

17  the right time.

18    So we're ready for the government to call your

19  next witness.

20    MS. MYERS:  The United States calls Caitlin

21  Marriott.

22

23    CAITLIN MARRIOTT,

24  called as a witness by Plaintiff, was duly sworn and

25  testified as follows:

```
 1              COURT DEPUTY:  Please be seated.
 2              Please be sure to speak into the microphone.
 3    State your full name and spell your last name.
 4              THE WITNESS:  Caitlin Marriott, M-a-r-r-i-o-t-t.
 5
 6                        DIRECT EXAMINATION
 7    BY MS. MYERS:
 8    Q.   Good morning, Ms. Marriott.
 9    A.   Good morning.
10    Q.   Could you please let us know, what was your name on
11    November 5th of 2016?
12    A.   Caitlin Johnson.
13    Q.   And did you get married after that date?
14    A.   I did.
15    Q.   And to whom did you get married?
16    A.   Joshua Marriott.
17    Q.   And what is your occupation?
18    A.   I'm a correctional officer.
19    Q.   And where are you a correctional officer?
20    A.   Cheatham County Sheriff's Office.
21    Q.   And what is your title there?
22    A.   I'm a sergeant.
23    Q.   And where were you employed on Saturday, November 5th of
24    2016?
25    A.   Cheatham County Sheriff's Department.
```

1  Q.   What did your job entail at that time?

2  A.   I was just a correctional officer at that time.  I would

3  book in people and make sure inmates were doing what they

4  were supposed to be doing.

5  Q.   Did you receive Taser training as part of your job?

6  A.   I did.

7  Q.   And when was that Taser training, approximately?

8  A.   I want to say a month or so after I got hired.

9  Q.   And when did you get hired?

10  A.   In September.

11  Q.   Of 2016?

12  A.   Yes.

13  Q.   And who trained you on how to use a Taser?

14  A.   Gary Ola.

15  Q.   Did you learn the maximum amount of time you would be

16  allowed to tase someone?

17  A.   Yes.

18  Q.   And what are those limits?

19  A.   Five seconds for three bursts.

20  Q.   Did you see anyone get tased as part of your training?

21  A.   I did.

22  Q.   What did you think about that?

23  A.   I didn't want to have it done to me.

24  Q.   So you didn't volunteer?

25  A.   I did not volunteer that day.

1  Q.   Do you remember who got tased when you saw it in the
2  training?
3  A.   I don't remember.
4  Q.   Do you remember their reaction to being tased?
5  A.   Yelling.  And, like, it was in -- painful.
6  Q.   And so at the time of your training, you said you had
7  worked there maybe a month or two?
8  A.   Correct.
9  Q.   And when did you first encounter Jordan Norris?
10 A.   I want to say it was the Friday before the incident
11 actually occurred.
12 Q.   Was that a couple days?
13 A.   A couple days, yes.
14 Q.   Okay.  And where was he at that time?
15 A.   He was in booking.  We were booking him on the charges
16 that he had gotten brought in on.
17 Q.   Did you have any issues with Jordan Norris on the day
18 that he was brought into the jail?
19 A.   No, not that I recall.
20 Q.   And what shift were you working on November 5th?
21 A.   Second shift.  That was from 2:00 p.m. to 10:00 p.m.
22 Q.   And what were you doing during the evening of
23 November 5th while you worked at the jail?
24 A.   I was working in booking.
25 Q.   And what did your job entail while you worked in

1  booking?

2  A.    Booking in inmates that got arrested, watching the

3  cameras, and doing female security checks.

4  Q.    And did you interact with Jordan Norris that night?

5  A.    I did.

6  Q.    And where was Jordan at that time?

7  A.    He was in Cell 4.

8  Q.    Is that in booking?

9  A.    It is in booking.

10  Q.    And where were you in relation to Cell 4?

11  A.    In the booking office.  That's where we stay and book

12  people.  Like, to be on the computer and look at cameras.

13  Q.    And so were you looking at cameras that night?

14  A.    Yes.

15  Q.    And were there any cameras around where Jordan was?

16  A.    There are.

17  Q.    And how about the cell door to Cell Number 4 where

18  Jordan was?  What does that look like?

19  A.    It is a metal -- like, a solid door with a glass --

20  little bit of glass.

21  Q.    Could you see through it very well?

22  A.    No.

23  Q.    Did you know exactly what was going on in the cell?

24  A.    You could hear yelling.  That's it.

25  Q.    And were there other people in the cell with him?

1   A.   There were.

2   Q.   And could you tell what Norris was doing at that time?

3   A.   You could hear him -- what it sounded like banging his

4   head against the cell door.

5   Q.   And could you see him banging his head against the cell

6   door?

7   A.   I don't remember if I could see it.

8   Q.   And can you describe what happened after you realized

9   that he was banging his head on the cell door?

10  A.   I had asked Cpl. Bryant, FTO Marriott, Jeff Key to go

11  try to calm him down and see if we could get him to calm down

12  at all.

13          I also asked for Daniel Bratton to come up from

14  the sally port to help.

15  Q.   So how many people were there to come to assist you?

16  A.   Four.

17  Q.   And what did they do when they got there?

18  A.   They tried to pull him out of the cell, but Bratton

19  deployed his Taser.

20  Q.   And did that work?

21  A.   No.

22  Q.   And why didn't it work?

23  A.   He was just -- he kept screaming and fighting everybody.

24  Q.   And you mentioned earlier your relationship to Josh

25  Marriott; is that right?

```
 1  A.    Yes.
 2  Q.    When did you all get married?
 3  A.    In May of 2018.
 4  Q.    And at that time what was the status of your
 5  relationship?
 6  A.    Just friends, coworker.
 7  Q.    And how about with Jeff Key?
 8  A.    Friends.
 9  Q.    And how about with the defendant?
10  A.    Friends.
11  Q.    And were you all pretty close friends?
12  A.    Yes.
13  Q.    And, in fact, did your husband-to-be actually room with
14  the defendant?
15  A.    He did.
16  Q.    And would you all socialize outside of work?
17  A.    We did.
18  Q.    And how about -- so you mentioned four people came; is
19  that right?
20  A.    Correct.
21  Q.    So what did Marriott, Key, and the defendant do when
22  they got there to help with Jordan Norris?
23  A.    They tried to talk him down, tried to talk -- make sure
24  that he was okay, tried to just -- tried to calm him down,
25  and he was not calming down.
```

1  Q.    Was Officer Bratton there in the beginning?

2  A.    I can't remember when he got there, to be honest.

3  Q.    Where does Officer Bratton usually work?

4  A.    In the sally port.

5  Q.    So not in booking?

6  A.    Not in booking, no.

7  Q.    And ultimately how did they get Jordan Norris out of the

8  cell?

9  A.    They basically just pulled him out of the cell and asked

10 for the restraint chair.

11 Q.    Do you remember who brought the restraint chair?

12 A.    I want to say it was me.  They asked me to get it out of

13 the vehicle sally port.  That's where we stored it.

14 Q.    And you mentioned that Officer Bratton tased; is that

15 right?

16 A.    Correct.

17 Q.    So when Officer Bratton tased Jordan, did you actually

18 see the tase?

19 A.    I didn't.  I could hear it.

20 Q.    What does that sound like?

21 A.    It sounds just like a ticking sound over and over again.

22 Q.    Is it fairly loud?

23 A.    It is.

24 Q.    Do you know approximately how long the tase was?

25 A.    I don't remember if it was -- I mean, I know it was five

```
 1   seconds, but I don't know if it was the full five seconds.
 2   It wasn't a long time.
 3   Q.    Did any of the other officers get tased in that
 4   process --
 5   A.    They --
 6   Q.    -- of removing Jordan?
 7   A.    Jeff Key got tased during that process.
 8   Q.    Did they have any reaction to that?
 9   A.    He screamed.
10   Q.    Now, you mentioned the restraint chair was there in
11   booking as well.
12             And where did you get it from?
13   A.    The vehicle sally port.
14   Q.    Did anyone tell you to get the restraint chair?
15   A.    Someone told me.  I don't know who.  They were all -- it
16   was a bunch of yelling.  So I don't know who actually said,
17   "Get the restraint chair."
18   Q.    And what was the restraint chair for?
19   A.    If someone is combative or harming themselves or others,
20   we put them in the chair.
21   Q.    So who all was actually physically moving Norris to the
22   chair from the cell?
23   A.    Bratton, Marriott, and Bryant.
24   Q.    And where were you when all of this was happening?
25   A.    I want to say a couple feet away.
```

1  Q.    Could you see everything pretty well?

2  A.    I could.

3  Q.    And do you remember anyone else tasing Jordan Norris

4  while the officers were getting him into the chair?

5  A.    Not getting him into the chair, no.

6  Q.    And -- around what time was that?

7  A.    6:00-ish, I guess.  Almost 7:00.

8  Q.    In the evening?

9  A.    In the evening, yeah.  Sorry.

10  Q.   And approximately how long, then, was Jordan in the

11  restraint chair?

12  A.   A couple of hours.

13  Q.   And was he secured?

14  A.   He was.

15  Q.   And did he eventually have another issue later?

16  A.   He did.

17  Q.   And do you remember about what time he started to have

18  another issue?

19  A.   Around 8:00 or 9:00.  I'm not sure -- the times all -- I

20  mean, kind of go together now.

21  Q.   So a fairly significant amount of time --

22  A.   Correct.

23  Q.   -- passed?

24        And did you notice anything about the restraints

25  about an hour or so later?

A.   His right arm was coming loose, and he was trying to get
it out, his right arm.

Q.   Was it completely out or partially out?

A.   Partially out.

Q.   Could he hit anyone with the arm partially out?

A.   Not that I recall, no.

Q.   Were his legs still restrained?

A.   Yes.

Q.   And his shoulders?

A.   Yes.

Q.   Was the lap belt still secure around his lap?

A.   It was.

Q.   And was he also surrounded by those three officers?

A.   He was.

Q.   Was he posing a threat to anyone at that time that you
saw him?

A.   I would say not at that time.

Q.   And so then what happened?

A.   Mark Bryant then asked me for the Taser, because I had
the Taser, and I handed him the Taser.

Q.   And where did you get it from?

A.   It was on my hip from the holster.

Q.   And I'm going to show you an exhibit.  So there's a
binder in front of you.

A.   Okay.

1  Q.   Could you please turn to Tab 8.

2       And do you recognize that document?

3  A.   I do.

4  Q.   Okay.  And what is it?

5  A.   It's the picture of Jordan in the chair with Josh

6  Marriott holding his jaw, Jeff Key holding his arm, and Mark

7  pointing the Taser on Jordan.

8       MS. MYERS:  I would ask that Exhibit 8 be moved

9  into evidence.

10      MR. STRIANSE:  No objection.

11      THE COURT:  Admitted.

12      (Whereupon, Plaintiff Exhibit 8 was marked for

13      identification and received in evidence.)

14      MS. MYERS:  May I publish it to the jury?

15      THE COURT:  Yes.

16 BY MS. MYERS:

17 Q.   All right.  So you mentioned that Josh Marriott is the

18 one behind Jordan Norris --

19 A.   Correct.

20 Q.   -- is that right?

21      And again, he's holding his jaw?

22      And what was he doing in that picture?

23 A.   He's trying to restrain -- he was head butting at that

24 time.

25 Q.   And what's that over his face?

| | |
|---|---|
| 1 | A.   It's a spit mask because he was trying to spit on us. |
| 2 | Q.   Was he able to after the mask was over his face? |
| 3 | A.   No. |
| 4 | Q.   And then you mentioned someone holding his arm there on |
| 5 | the bottom left? |
| 6 | A.   That's Jeff Key. |
| 7 | Q.   Okay.  And then how about down in front of him? |
| 8 | A.   Mark Bryant. |
| 9 | Q.   And can you tell if there's anything in the defendant's |
| 10 | hand? |
| 11 | A.   No.  Oh, on Mark's?  Yes.  The Taser is in his hand. |
| 12 | Q.   Okay.  And is that the Taser that you gave the |
| 13 | defendant? |
| 14 | A.   Correct. |
| 15 | Q.   Okay.  And where are you?  So in relation to this |
| 16 | picture. |
| 17 | A.   Off to the side.  Like, I'm right behind, say, Josh. |
| 18 | Q.   Okay.  So to the right? |
| 19 | A.   Yes. |
| 20 | Q.   Outside of this picture? |
| 21 | A.   Uh-huh. |
| 22 | Q.   Okay.  And you can take that down.  Thank you. |
| 23 |         And so, in that posture in Exhibit 8, who tased |
| 24 | Jordan Norris at this time? |
| 25 | A.   Mark Bryant. |

1  Q.   And how many times do you remember him tasing Jordan in
2  that posture?
3  A.   I don't remember.
4  Q.   Was it more than once?
5  A.   I can't -- I can't remember up there how many times he
6  tased him there.
7  Q.   Was it a significant amount of time?
8  A.   I'm sure it was.
9  Q.   Now, did the defendant say anything to Jordan Norris
10 while he was tasing him?
11 A.   He did.
12 Q.   What do you remember him saying?
13 A.   That he would tase him until the batteries run out.
14 Q.   Was that an appropriate comment based on your own
15 training?
16 A.   I would say no.
17 Q.   I'm sorry.  Could you repeat that?
18 A.   No.
19 Q.   And again, where were you while the tasing was
20 occurring?
21 A.   Right off to the side of all of it happening.  I could
22 see everything.
23 Q.   You could see everything?
24 A.   Correct.
25 Q.   Was there anyone else who had your vantage point?

1   A.   No.  Not that I'm aware of.

2   Q.   And so the tasing that you remember that the defendant

3   did at that around 8:00 period, do you remember it being

4   longer than five seconds?

5   A.   I do.

6   Q.   How long did it feel like the defendant tased him?

7   A.   Forever.

8   Q.   And under those circumstances that we just saw in that

9   photograph, was there any reason for the defendant to tase

10   Jordan for any length of time?

11   A.   No.

12   Q.   Now, following the tasings that night, did you interact

13   with Jordan for the rest of your shift?

14   A.   Not that I'm aware of, no.

15   Q.   So you didn't see him later that night?

16   A.   No.

17   Q.   And were there any other issues that you were aware of

18   related to Jordan for the rest of your shift?

19   A.   No.

20   Q.   And, again, what time did your shift end?

21   A.   10:00.

22   Q.   And did you leave at that time?

23   A.   I left right at 10:00.

24   Q.   Now, have you seen the video of the tasings that

25   occurred --

```
 1  A.    I have.
 2  Q.    -- at this time?
 3            And at this time I would like to pull up
 4  Exhibit 11.
 5            Okay.  Is this the video that you recognize?
 6  A.    Yes.
 7  Q.    Okay.  I'll ask that it be played.
 8            (Exhibit 11 played.)
 9            MS. MYERS:  Stop it.
10            THE COURT:  No.  Let it play until the end,
11  please.  Let it play until the end.
12            MS. MYERS:  Okay.
13  Q.    Now, how did witnessing this incident make you feel?
14  A.    I cried all the way home.
15            MR. STRIANSE:  Object to the relevance.
16            THE COURT:  Sustained.
17  BY MS. MYERS:
18  Q.    When you got home that night, what were you thinking
19  about?
20            MR. STRIANSE:  Same objection.
21            THE COURT:  Sustained.
22  BY MS. MYERS:
23  Q.    Based on what you saw that night from your vantage
24  point, was there any justification for what you saw?
25  A.    No.
```

1  Q.   And why not?

2  A.   Because you're not allowed to tase someone for that

3  long.

4  Q.   Did you want to ask the defendant to stop tasing Jordan?

5  A.   Yes.

6  Q.   Did you feel like you could ask him?

7  A.   No.  Because he was my boss.

8  Q.   And with the defendant as your boss, did he talk to you

9  about it later?

10 A.   No.

11 Q.   Did he talk to you about writing a report?

12 A.   He said I didn't need to do one.

13 Q.   I'm sorry?

14 A.   He said that I did not need to do a report.

15 Q.   Did you ask anyone else if you should write a report?

16 A.   Jeff, Josh Marriott.

17 Q.   And what did he tell you?

18 A.   No.

19 Q.   Had the defendant ever told you not to write a report

20 before?

21 A.   Not that I'm aware of.

22 Q.   Now, did the administration ever ask you to write a

23 report later?

24 A.   Later.  On a different date, they did.

25 Q.   How much later was that?

1  A.    Months later.

2  Q.    And was that after these events became public?

3  A.    Yes.

4  Q.    And what events did that report relate to?

5  A.    The report that I wrote were in events to what I

6  remembered about the Daniel tasing, Daniel Bratton tasing.

7  Q.    So the 6:55, close to 7:00 p.m. incident?

8  A.    Correct.

9  Q.    Did you write anything about the defendant's tasings

10  while Jordan was in the chair?

11  A.    No.

12  Q.    And why not?

13  A.    Because I didn't want to get my story mixed up, because

14  it was all just still fresh and, like, jumbled up.

15  Q.    Several months later?

16  A.    Several months later.

17  Q.    Would it have been hard for you to write about that?

18  A.    Yes.

19  Q.    Why?

20  A.    Because it was very stressful for me.

21  Q.    Do you still think about that?

22  A.    Yes.  Every time I have to test the Tasers.

23  Q.    And that night -- sorry.

24        After that night, did you ever interact with

25  Jordan Norris again?

1  A.    I did.

2  Q.    About how long after?

3  A.    I want to say it was a Wednesday.  So a couple days

4  after that incident.

5  Q.    Did he have any injuries?

6  A.    He did.

7  Q.    Did he show those injuries to you?

8  A.    Yes.  It was on his leg where he had been tased.

9  Q.    And what did those Taser injuries look like to you?

10  A.    To me, it looked like raw hamburger meat, his knee did.

11  Q.    Was anything covering it?

12  A.    No.

13  Q.    Any medication that you could see?

14  A.    Not that I could see.

15  Q.    Now, you're still a corrections officer?

16  A.    Correct.

17  Q.    And are you still around Tasers as part of your job?

18  A.    I am.

19  Q.    After that night, were you able to carry a Taser?

20  A.    I didn't carry a Taser for a long time after that.

21  Q.    And why not?

22  A.    I didn't want to have to, one, give it away; or, two,

23  tase anyone.

24  Q.    And you mentioned you couldn't be around your fellow

25  officers while they tested the Tasers?

```
 1   A.    Correct.
 2   Q.    Why was that?
 3   A.    Because it would take me back to the incident that we
 4   just watched.
 5   Q.    Just the sound?
 6   A.    Just the sound of it.
 7   Q.    So how do you feel about all of that in light of your
 8   experience with Jordan Norris carrying --
 9              THE COURT:  All right.  Let the lawyers approach.
10              (Bench conference outside the hearing of the
11              jury.)
12              THE COURT:  I think it's totally inappropriate for
13   you to ask about her feelings to induce the jury to make a
14   decision on her feelings or that her feelings are at all
15   relevant here.
16              So I'll instruct you not to ask her any more
17   questions about her feelings or any other witness's feelings.
18   Feelings don't have anything to do with this.  They need to
19   testify about their personal perception of what they saw and
20   what they did.
21              Understood?
22              MS. MYERS:  Absolute --
23              THE COURT:  Understood?
24              MS. MYERS:  Yes, Your Honor.
25              THE COURT:  All right.  Go ahead.  Proceed.
```

1          MS. MYERS:  Thank you.

2          (Jury present.)

3  BY MS. MYERS:

4  Q.    In your current position, do you see it as a duty of

5  yours to prevent harm from coming to inmates?

6  A.    I do.

7  Q.    And how do you view your use of a Taser now?

8  A.    We normally don't use them on my shift.  I carry one,

9  the corporal carries one.  And they know not to use it,

10  unless it's the last thing we have on our belt to use.

11          MS. MYERS:  Thank you.

12          THE WITNESS:  You're welcome.

13          THE COURT:  All right.  Cross-examination.

14

15                    CROSS-EXAMINATION

16  BY MR. STRIANSE:

17  Q.    Good morning, Ms. Marriott.

18  A.    Good morning.

19  Q.    You indicated in your direct examination that -- I guess

20  it was in July of 2017, this matter became public in the

21  media; is that right?

22  A.    Correct.

23  Q.    And once it became public, there was an investigation

24  that was started by the Tennessee Bureau of Investigation and

25  then the FBI; is that right?

```
 1  A.    Correct.
 2  Q.    And pursuant to that investigation, I think you -- you
 3  and other members of the Cheatham County Sheriff's Office
 4  were asked to submit to interviews; is that right?
 5  A.    Correct.
 6  Q.    And do you remember appearing at the Cheatham County
 7  district attorney's office on August the 3rd of 2017?
 8  A.    I don't remember the date.
 9  Q.    Okay.  In advance of your testimony this morning, did
10  you have a chance to review that typed, written statement
11  that you gave on August 3rd, 2017?
12  A.    No.
13  Q.    Okay.  I'm going to ask you some questions about it.  I
14  have a copy of it if you need it at any point to refresh your
15  recollection.
16  A.    Okay.
17  Q.    I assume you appeared voluntarily there at the DA's
18  office in Cheatham County on August 3rd, 2017; is that right?
19  A.    I think we got told we had to go.
20  Q.    Okay.  Well, did you feel coerced or compelled to go
21  over to the DA's office and speak to them?
22  A.    No.
23  Q.    Okay.  Do you feel like you answered all the questions
24  that Special Agent Joy Wright of the FBI and the special
25  agent with the TBI, Mr. Atkins, asked you that day?
```

1  A.   Yes.

2  Q.   Okay.  Now, I realize that we are years removed from the

3  incident here today.  In fact, we're well over three years

4  removed from the incident.

5           When you presented yourself at the DA's office in

6  August of '17, we were roughly nine months or so removed from

7  it; is that right?

8  A.   Correct.

9  Q.   So it was closer in time?

10  A.   Uh-huh.

11  Q.   Now, you talked about the report that you put together

12  in July of 2017, which was a relatively short report; is that

13  right?

14  A.   Yes.

15  Q.   And I think you said that, because of the passage of

16  time, you wanted to keep it short because you didn't want to

17  in any way misstate anything that happened that night?

18  A.   Correct.

19  Q.   Okay.  But you were able to give the agents a lot of

20  information on August the 3rd, 2017; is that right?

21  A.   I assume so.  I mean, I don't remember what all was

22  said.

23  Q.   Okay.  Well, I think you remember your typewritten

24  statement was two and a half pages, single spaced.

25           So much more information than the report that you

1  were requested to do; is that right?

2  A.    I assume so.

3  Q.    You're going to need to speak up just a little bit.

4  A.    I assume so.

5  Q.    Okay.  And again, if you need to look at this to refresh

6  your recollection, just let me know.

7          You talked about in your direct examination this

8  morning that you did interact with Jordan Norris on the

9  Friday, which would have been December the 4th of 2016, in

10  booking; is that right?

11  A.    November.  Would have been November.

12  Q.    November?

13  A.    When he got booked in.

14  Q.    November 4th of 2016.

15          And I think you told the jury that you had no

16  issues with him?

17  A.    Correct.

18  Q.    Okay.  Do you remember in your typewritten -- it wasn't

19  a sworn statement, but it was a truthful statement that you

20  said that you did interact with him the day before, and that

21  "He was real snappy when talking to me"?

22  A.    I mean, snappy -- I mean -- that's because he's getting

23  booked in on charges.  That's how they all talk.

24  Q.    Well, you said they had no issues with him, but --

25  A.    I mean, that's not really an --

1          THE COURT:  Hold on.  You let her finish,

2    Mr. Strianse.  And, Ms. Marriott, you allow him to finish.

3    Y'all can't talk over each other.

4          So where are we?

5    BY MR. STRIANSE:

6    Q.   Go ahead.

7    A.   That's not really an issue.  We deal with that on a

8    daily basis.  So once -- I mean, that's still calm.

9    Q.   Then you told the investigating agents that two or three

10   hours after the shift started that Jordan Norris began

11   banging his head; do you remember that?

12   A.   On that Friday?

13   Q.   No, no.  On Saturday, November 5.

14   A.   Correct.

15   Q.   And then you told them that you were walking over to the

16   cell to get Norris calmed down; is that right?

17   A.   Yes.

18   Q.   And you told the investigators there was no way to get

19   him calmed down?

20   A.   Correct.

21   Q.   You told the investigators that Mr. Norris was trying to

22   fight other inmates in Cell 4; is that right?

23   A.   Correct.

24   Q.   Do you remember which inmates he was trying to fight

25   with or assault?

1  A.    I don't remember.

2  Q.    Do you remember a local inmate by the name of Colin

3  Hefner [phonetic]?

4  A.    I don't remember that name.

5  Q.    You don't remember who was in Cell 4 with him; is that

6  right?

7  A.    Correct.

8  Q.    And then you talked about your husband now, FTO Marriott

9  at the time; Cpl. Bryant; and Officer Key had to extract him

10 from Cell 4; is that right?

11 A.    Correct.

12 Q.    And place him in the chair.

13       And you were referring to the restraint chair; is

14 that right?

15 A.    Correct.

16 Q.    You told the investigators that you remembered CO Daniel

17 Bratton tasing Norris; is that right?

18 A.    Correct.

19 Q.    And that the other officers got tased as well; is that

20 right?

21 A.    Correct.

22 Q.    And you told the investigators that Mr. Norris was

23 fighting with the correctional officers the whole time.

24       Do you remember that?

25 A.    Correct.

1  Q.   And then you told the investigators that Mr. Norris --
2  and these are your words -- "was fighting bad," correct?
3  A.   Correct.
4  Q.   That he was flailing, kicking, trying to spit, and
5  cursing?
6  A.   Correct.
7  Q.   You said that at the chair, Mr. Norris was still
8  fighting; is that correct?
9  A.   Correct.
10 Q.   And we saw on the video this morning, Government's
11 Exhibit 11, your husband, Mr. Marriott, is the one behind
12 him; is that right?
13 A.   Correct.
14 Q.   And he is applying pressure with his hands under
15 Mr. Norris's chin; is that right?
16 A.   That's correct.
17 Q.   And that was to keep Mr. Norris from head butting the
18 other officers?
19 A.   Correct.
20 Q.   And I think it was your husband that put the spit mask
21 over him?  Or was that Key?
22 A.   That was Key.
23 Q.   Okay.  And then you told the investigators that
24 Mr. Norris was -- while he was in the chair, was fighting,
25 trying to get his arm out; is that right?

1    A.    That's right.

2    Q.    And that Jeff was trying to hold his arm; is that

3    correct?

4    A.    That's correct.

5    Q.    That would be Correctional Officer Jeff Key?

6    A.    Correct.

7    Q.    Do you remember that?

8          And Mr. Norris was saying that he wanted to be

9    tased; is that right?

10   A.    That's -- yes.

11   Q.    And that he wasn't feeling it?

12   A.    Correct.

13   Q.    You said he was not screaming out in pain?

14   A.    Correct.

15   Q.    He was saying that he wanted to blow his head off?

16   A.    That's correct.

17   Q.    And he was telling the correctional officers to shoot

18   him, correct?

19   A.    Correct.

20   Q.    And that he wanted to die?

21   A.    That's correct.

22   Q.    And you said that, while he was in the restraint chair,

23   Mr. Norris, that he was still combative?

24   A.    Yes.

25   Q.    And you said that you all were checking on him every

1  15 minutes; is that right?

2  A.    That's correct.

3  Q.    You were asked some questions this morning about your

4  training, correct?

5  A.    Correct.

6  Q.    And you were trained by Sgt. Gary Ola?

7  A.    Correct.

8  Q.    You were not in the same class that Mark Bryant was in

9  for training; is that correct?

10 A.    Not that I -- I don't remember who was in my training.

11 Q.    And you told the investigators that Gary Ola did not

12 cover this type of scenario that you all experienced with

13 Jordan Norris in training?

14 A.    I -- I don't remember.  I've been through a lot of

15 training since that day.

16 Q.    Okay.  Well, my question is, did you not tell the

17 investigators the -- Joy Wright with the FBI and Mr. Atkins

18 with the TBI that that was a scenario that no one had ever

19 discussed and you didn't get any instruction from Mr. Ola

20 about it?

21 A.    Correct.

22 Q.    Okay.  Had you -- had you -- how many years had you

23 worked at a correctional -- as a correctional officer as of

24 November the 5th, 2016?

25 A.    A couple of weeks.

1   Q.    A couple of weeks.  And you had been -- and you're a
2   sergeant now?
3   A.    Correct.
4   Q.    So what's your total tenure there at the Cheatham County
5   Sheriff's Office?
6   A.    It will be three years in November.
7   Q.    Three years.  In your three years at the jail, had you
8   ever had an experience remotely close to what you all were
9   experiencing on November 5, 2016, with Mr. Norris?
10  A.    No.
11  Q.    You indicated to the investigators that the Taser was
12  used on Mr. Norris when he was in the restraint chair because
13  his arm was out?
14  A.    Correct.
15  Q.    And you said he wasn't tased after his arm was
16  restrained?
17  A.    Correct.
18  Q.    Now, you were dealing with Mr. Norris on that Saturday
19  evening; is that right?
20  A.    Correct.
21  Q.    What was your observation as to whether he was under the
22  influence of any kind of drug?
23  A.    I mean, his pupils were dilated and -- I mean, you could
24  tell he was enraged for some reason all of a sudden.
25  Q.    And you spoke to him, I think you told the prosecutor,

1  on the Wednesday after the incident?

2  A.    Correct.

3  Q.    And did he tell you that he ingested three packs of some

4  sort of a substance?

5  A.    I remember that.  He did, yes.

6  Q.    What was that substance?

7  A.    He said bath salts.

8  Q.    Bath salts.  In your experience as a correctional

9  officer or as a law enforcement officer, what effect does

10 bath salts have on an individual that ingests it?

11 A.    I've never dealt with it before until that night.  So

12 that was the first time.

13 Q.    And you said that Wednesday when you were talking to

14 him, you were trying to engage in a conversation with him and

15 that -- and go ahead and answer that.

16 A.    Yes.

17 Q.    And that during the conversation at times he would sort

18 of turn in a different direction and start having another

19 conversation?

20 A.    Correct.

21 Q.    Did that make you question whether he was in some sort

22 of an altered mental state?

23 A.    It did.

24 Q.    Just a couple more questions.

25        You were asked about why didn't you talk to Mark

1   Bryant about this incident.

2        Do you remember those questions?

3   A.   Yes.

4   Q.   Or question his -- his conduct on that night.

5        And I think you told the jury that it was because

6   he was your boss; is that right?

7   A.   Correct.

8   Q.   Now, you know Mark Bryant, correct?

9   A.   Correct.

10   Q.   You all are friends --

11   A.   Correct.

12   Q.   -- is that right?

13        And you're a very -- and I say this

14   respectfully -- a very strong person, an opinionated person;

15   is that right?

16   A.   I am.

17   Q.   And you have risen through the ranks and now you're a

18   sergeant.  So you -- if you had an issue with Mark Bryant,

19   you're the type of person that is strong willed enough and

20   confident enough to tell him, "Hey, Mark, I've got a problem

21   with what you did"?

22   A.   But I had only known him for a couple weeks prior to

23   that.

24   Q.   Now, you're familiar where the administration is on the

25   second floor?

```
 1  A.    Correct.
 2  Q.    Of the Cheatham County courthouse.  And I think that the
 3  administration office has -- used to have sort of a plastic
 4  receptacle for employees or anyone to put letters, messages,
 5  things like that --
 6  A.    Correct.
 7  Q.    -- is that right?
 8           Where, one, if they had an issue with something
 9  that had happened in the jail, even in an anonymous way, to
10  leave a note and let them know about it; is that right?
11  A.    That's correct.
12  Q.    And did you ever do that?
13  A.    I did not.
14           MR. STRIANSE:  Your Honor, may I have one moment?
15           THE COURT:  Sure.
16           MR. STRIANSE:  Those are my questions.  Thank you.
17           THE COURT:  All right.  Redirect.
18
19                    REDIRECT EXAMINATION
20  BY MS. MYERS:
21  Q.    And, Sgt. Marriott, even though Jordan was suicidal, did
22  the defendant continue to tase him?
23  A.    During all of the -- when he was yelling all that?  Yes,
24  he did.
25  Q.    During the 8:00 p.m. incident with Jordan in the chair?
```

```
 1   A.    Yes.
 2   Q.    And restraint chair aside, is there any circumstance
 3   that justifies tasing someone four times for 50 seconds?
 4   A.    No.
 5   Q.    And why didn't you write a report that night?
 6   A.    Because I was told I didn't need to by Mark Bryant and
 7   Josh Marriott.
 8              MS. MYERS:  No further questions.
 9              THE COURT:  All right.  You can step down.
10                   (Witness excused.)
11              THE COURT:  All right.  Call your next witness.
12              MS. MYERS:  The United States rests its case.
13              THE COURT:  So, ladies and gentlemen, the United
14   States has completed presentation of all their evidence in
15   their case in chief.  I need a moment to talk to the lawyers.
16   So I'm going to excuse you to the jury room.
17              (Jury not present.)
18              THE COURT:  All right.  The jury has been excused.
19              Mr. Strianse, do you have a motion?
20              MR. STRIANSE:  I do, Your Honor.  I just need a
21   moment to get my papers together.
22              Thank you, Your Honor, for giving me that moment.
23              Your Honor, comes now the defendant, Mark Bryant,
24   pursuant to Rule 29 of the Federal Rules of Criminal
25   Procedure and moves for a judgment of acquittal.  And I would
```

1    want to talk specifically about two of the counts in the

2    indictment.

3              I realize what the standard is at this point in

4    time, that the Court is required to draw all inferences in

5    favor of the government at this point, and that I realize

6    that you review claims like this to determine whether,

7    viewing the evidence in a light most favorable to the

8    prosecution, any rational juror, trier of fact, could have

9    found the essential elements of the crimes in the indictment.

10             But I did want to talk about two of the counts.  I

11   realize that Count -- Counts One and Two are really jury

12   issues.  They're going to have to wade through the

13   credibility of the issues and determine the excessive force

14   counts which are alleged in Counts One and Two of the

15   superseding indictment.

16             But I would like to talk about Counts Three and

17   Four, which are the 1519 counts, and I also concede that

18   Count Five, which is the 1001 count, is a fact-bound

19   determination, that they're going to have to make some

20   credibility determinations on.

21             In terms of Counts Three and Four, they relate to

22   Government's Exhibits 25, I believes it's 26 and 27.  These

23   are the reports that were prepared by Mr. Bryant regarding

24   the events of November 5, 2016.

25             The first is the report that is -- so this is

Government's Exhibit 25 -- that has two timestamps on it:
One is Saturday, November 5, 2016, at 1855, which is 6:55,
when these events began at the door of Cell 4 when they were
trying to exact him from Cell 4 and get him into the
restraint chair.

Now, the government takes the position that this
is a sin of omission as it relates to Count Three, that he
did not give enough information, and then they also criticize
him for not dividing this into two separate reports that
would have memorialized the events of the extraction and what
happened after he was placed in the restraint chair and about
an hour later at 8:00 p.m. when there was the tasing
incident.

Your Honor, when -- I think a fair reading of this
report, Government's Exhibit 25, first, temporally, it is
true and correct. It begins at 6:55; it ends at 2122, which
is 9:22. So it fully embraces the time of the events. The
fact that it's not in two separate reports is not legally
significant in any way.

If the Court has it in front of it -- in front of
you right now, you can see the narrative. He does explain
what he did, what the other officers did. He identifies the
officers that were involved in the -- in the caption, Mark
Bryant, Josh Marriott, Jeff Key, Daniel Bratton. This is a
nature of incident use of force report. He appropriately

identifies the officers that were involved in using force:
Himself, Marriott, Key, and Bratton. He tells the reader
that he and deputy Bratton tased Mr. Norris.

Now, Bratton is the one that tased initially
outside the door, and he's the one that tases once the --
that Mr. Norris is in the chair and they're trying to get
control of him.

There was a case that I tried in this courtroom
about a year -- not this courtroom -- this courthouse --
about a year ago, *United States of America v. Angela
Suddarth*. And the Sixth Circuit number is 19-5693. It was a
white collar fraud case. The jury acquitted Ms. Suddarth of
21 out of 22 counts, and we went to the Sixth Circuit on a
perjury counts.

And you may be saying, well, Mr. Strianse, this
isn't a perjury case. But these Section 1519 cases are
really more akin to a 1623 as Ms. Suddarth was charged in, in
making a false statement. Because that's the gravamen of
this offense.

And Judge Thapar writing for the Court made some
observations that I think are particularly relevant to this
situation. He wrote for the Court that context matters in
cases like this. And he wrote (as read):

In perjury cases, district courts should view a
witness's testimony as a whole and his statement

1        should not be taken out of context.

2        And then the Sixth Circuit canvassed the other

3 circuits and cited a case from the Eleventh Circuit, the

4 Third Circuit, the Fifth Circuit, the Eighth Circuit, the

5 Ninth Circuit.  And this -- what the Judge -- what you're

6 going to need to decide at this point is, using that

7 standard, which is a very generous standard to the

8 government, how can a rational juror on this panel conclude

9 beyond a reasonable doubt -- because that's what they're

10 going to have to do, conclude beyond a reasonable doubt --

11 that each essential element of this offense was established

12 given what I characterize, not facetiously, as sort of a

13 metaphysical lie, a perjury, a metaphysical perjury case.

14        A couple of other cases that I wanted to share

15 with the Court.  Sixth Circuit case, *United States v. Eddy*,

16 737 F.2d 564.  It's a Sixth Circuit -- old Sixth Circuit case

17 from 1984.  And it's a perjury case.  But I think it has some

18 parallels here.  If an answer is literally true -- and in

19 Mr. Bryant's case, if the report is literally true, a court

20 may reverse the perjury conviction of a defendant.  And if

21 someone's going to lie, the lie must be willful and the

22 defendant must not believe the statement that he or she is

23 making.

24        So we have a situation here where Government's

25 Exhibit 25 is literally true.  There is nothing in this

1    statement that is untrue.

2         Now, the government will maintain, well, he didn't

3    fully disclose all of his -- his conduct in Government's

4    Exhibit 25.  He's not trying to give a transcript of every

5    event that occurred between 6:55 and 9:22.  This is a summary

6    of that timeline.

7         So, under the *Suddarth* decision, which is very

8    recent, just came out in November of 2019, and the other

9    cases, I think we have a literally true statement by --

10        THE COURT:  I haven't read those, but we'll get

11   those.  I heard you quote from it.  And it said, "and the

12   defendant believes it to be true."

13        I don't have any evidence before me that he

14   believed it to be true.

15        MR. STRIANSE:  Well, at this point in time there's

16   nothing to suggest that he didn't believe it was true.  And I

17   think objectively --

18        THE COURT:  Well, that's the negative.  I need

19   proof -- according to what you just quoted -- that he

20   affirmatively believed it to be true.

21        MR. STRIANSE:  Well, my argument is this:  Based

22   on what you've heard in the government's case in chief, I

23   think you can compare the testimony of the events that

24   happened, take a look at Government's Exhibit 25, and see if

25   that is a substantially true and correct summary of what

1  happened.  It may not have been written the way that the

2  government wanted it to be written.  Perhaps it should have

3  been done in two separate reports, as Special Agent Wright

4  suggested, but it certainly is an accurate summary of what

5  happened.  Again, the government says it didn't have enough

6  detail in it.

7        And I would make the same argument, Your Honor, as

8  to Government's Exhibits -- I think it's 26 and 27 that deal

9  with the events of later in the evening at 10:20 p.m.  Again,

10  he describes what he did in a summary fashion.  There was no

11  intent to impede this investigation in any way.  The

12  government was not impeded in its investigation.  These

13  reports were readily available to the administration at the

14  jail.  They were readily available to the investigators from

15  the TBI and the FBI.

16        Everybody that worked in the jail knew that every

17  one of their movements was being recorded by video.  They

18  knew that the Taser memorialized every use.  That -- and that

19  Taser report was corrected.  So there is no way that anyone

20  could have been impeded by these reports.

21        THE COURT:  All right.  Thank you.

22        All right.  Let's hear from the government.

23        MR. SONGER:  Your Honor, I think it's clear that

24  there's more than enough evidence to allow each of the five

25  counts to go to the jury under the very low bar set out by

Rule 29.  I'm happy to discuss that evidence as much or as
little as would be helpful for the Court.

I understand the defense to not be arguing that
Counts One, Two, or Five are not appropriate jury questions,
so I'll focus just briefly on Counts Three and Four, the two
that Mr. Strianse just raised.

THE COURT:  And I don't know if you've read the
cases, but if you have and can respond, that would be most
helpful.

MR. SONGER:  I have not read those specific cases,
at least not recently, Your Honor.  But I think the law is
clear that false reports under 1519 may be false either
because the person who wrote the report knowingly put false
information in it or because they left out information that
is material, and the evidence that has been presented to the
jury here clearly shows both of those things.

With the 8:00 report or the report that covers --
that the defendant says covers his conduct at 8:00, we
presented the report itself, which does not disclose how many
times he tased the victim, how long any of those tases
lasted, and does not include the circumstances of those
tasings.  It doesn't say the defendant -- the victim was tied
down in a restraint chair.  It doesn't disclose other
officers were also holding parts of the victim's body down.

THE COURT:  And, again, I guess that -- the guts

of Defendant's argument at this point has to do with what the
Sixth Circuit may have directed in terms of the scope of the
review at this point.

      So those cases he cites -- maybe -- maybe it would
be best for us to take a break and let everybody look at
that.  I don't differ with what you're saying, but it's --
but I think we all need to look at the cases so I can decide
do they provide any instruction here for me or not.

      MR. SONGER:  Okay.

      THE COURT:  Okay.

      MR. SONGER:  Of course I'm happy to do that, Your
Honor.

      THE COURT:  So I'm not saying how I'm going to
rule on them at all.  But we're getting those cases now.

      If I deny it, Mr. Strianse, do you have your
witnesses here ready to proceed?

      MR. STRIANSE:  Yes, Your Honor.

      THE COURT:  Okay.

      MR. STRIANSE:  And you're still taking your break
at --

      THE COURT:  Yeah.

      MR. STRIANSE:  Okay.

      THE COURT:  Okay.  And how many witnesses and who
are they?

      And I didn't mean to cut you off, but I appreciate

1  and understand and agree with what you're saying.

2          MR. STRIANSE:  Your Honor, we have six witnesses,

3  and that includes Mr. Bryant.

4          THE COURT:  All right.  And do you have any of

5  them here now?

6          MR. STRIANSE:  Yes, sir, I do.

7          THE COURT:  Okay.  So I'm going to assume, then,

8  Mr. Bryant, that you and your counsel have had enough time to

9  talk about your right to testify or not?

10          THE DEFENDANT:  Yes, Your Honor.

11          THE COURT:  And I understand you want to testify,

12  but what I need to make sure is that you know you have no

13  requirement to testify.

14          THE DEFENDANT:  Yes, Your Honor.

15          THE COURT:  You understand that if you decided not

16  to testify, that would not be held against you.  In fact, I

17  would instruct the jury that you have a constitutional right

18  not to testify and they're not to consider the fact that you

19  didn't testify, if you so choose?

20          THE DEFENDANT:  I understand completely, sir.

21          THE COURT:  And knowing all that, you have

22  consulted with your counsel and made a decision that you

23  think is in your best interest?

24          THE DEFENDANT:  Yes, Your Honor.

25          THE COURT:  Do you need any more time to do that?

1          THE DEFENDANT:  No, sir.

2          THE COURT:  All right.  Thank you.

3          THE DEFENDANT:  Thank you.

4          THE COURT:  Perhaps when we take our 10:00 break,

5    if not the lunch break, I'm going to have my law clerk,

6    Mr. Leahy, contact you all and see where we are on the

7    charge.

8          You should have had a copy of the charge on your

9    desk on the first day of trial.  Did you get a copy?

10         MR. SONGER:  We did, Your Honor.  We've reviewed

11   it.

12         THE COURT:  And, Mr. Strianse, did you get one

13   too?

14         MR. STRIANSE:  Yes, sir, I did.

15         THE COURT:  All right.  And also at the lunch

16   break, if not sooner, you all might just see where we are on

17   the exhibits.  I think we're in pretty good shape.  But it

18   would be good for you to do that.

19         So do you have witnesses in the hallway?

20         MR. STRIANSE:  I do, if you're prepared for me to

21   get started.

22         THE COURT:  Yeah.  I'm going to reserve decision

23   on your motion.  Obviously, I haven't looked at the cases,

24   but you'll renew that at the close of all the proof, and

25   those legal arguments that you're presenting will still be

1   present.

2           So let's see.  The government has rested in front

3   of the jury.

4           So I can bring the jury back in and ask you to

5   call your first witness?

6           MR. STRIANSE:  Yes, sir.

7           THE COURT:  All right.  Bring the jury in.

8           (Jury present.)

9           THE COURT:  All right.  Be seated.

10          So, ladies and gentlemen, you heard that the

11  government has completed its case in chief, that being

12  they've presented all the witnesses and documents in its case

13  in chief.  And now the Court will call upon the defendant,

14  who may, but is not required, to present evidence.

15          So, Mr. Strianse, do you have any witnesses?

16          MR. STRIANSE:  Yes, Your Honor, we do.

17          THE COURT:  All right.  Call your first witness.

18          MR. STRIANSE:  Call Dwayne Jones.

19          COURT DEPUTY:  Please raise your right hand.

20

21                          DWAYNE JONES,

22  called as a witness by Defendant, was duly sworn and

23  testified as follows:

24

25          COURT DEPUTY:  Please be seated.

         1          Please be sure to speak into the microphone and
         2    state and spell your name.
         3          THE WITNESS:  Dwayne Jones, D-w-a-y-n-e,
         4    J-o-n-e-s.
         5
         6                    DIRECT EXAMINATION
         7    BY MR. STRIANSE:
         8    Q.   Good morning, Mr. Jones.
         9    A.   Good morning, sir.
        10    Q.   How are you employed, sir?
        11    A.   I'm a patrolman at Cheatham County.
        12    Q.   And how long have you worked for the Cheatham County
        13    Sheriff's Office?
        14    A.   I've worked for the sheriff's office almost four years
        15    now.
        16    Q.   And did you begin your career in the jail?
        17    A.   Yes, sir.
        18    Q.   And that was at -- as a correctional officer?
        19    A.   Yes, sir.
        20    Q.   And when were you working in the jail as a correctional
        21    officer?
        22    A.   From June 23rd to December -- June 23rd of 2016 to
        23    December 7th, 2017.
        24    Q.   Okay.  In the course of your employment with the
        25    Cheatham County Sheriff's Office, did you come to know a man

1 by the name of Mark Bryant?

2 A.    Yes, sir.

3 Q.    And explain to the jury how you came to know Mr. Bryant.

4 A.    He was a corporal on the shift that I relieved.

5 Q.    You were on the third shift; is that right?

6 A.    Yes, sir.

7 Q.    And did you ever have the occasion to work on the same

8 shift with Mr. Bryant?

9 A.    Every now and again they would have to stay over or

10 something like that.

11 Q.    And you were in the jail from -- what would you say,

12 approximately two years or so?  Is that --

13 A.    Approximately a year and a half.

14 Q.    A year and a half.  Over the course of that year and a

15 half, did you feel like you came to know Mark Bryant?

16 A.    Yes.

17 Q.    I want to direct your attention to November the 5th,

18 2016.  I believe that was a Saturday.

19 A.    Yes, sir.

20 Q.    What shift were you working on that day?

21 A.    Third shift.

22 Q.    And that would be the 10:00 p.m. to --

23 A.    To 6:00 a.m.

24 Q.    -- 6:00 a.m. shift.

25         What was your practice when you would arrive for

1  your third shift employment?
2  A.    Normally I'd try to get there about 30 minutes early,
3  and we would all congregate outside, and once everybody was
4  there, we would all walk in together.
5  Q.    On the night of November 5, 2016, do you remember
6  approximately when you arrived?
7  A.    I don't.
8  Q.    But it was before the shift started?
9  A.    Yes, sir.
10 Q.    When you entered the jail to begin work on November the
11 5th, was there some situation that you encountered when you
12 came into the jail?
13 A.    Yes.  There was a prior incident from the shift before
14 where they were trying to put an individual in the restraint
15 chair.
16 Q.    Okay.  Now, when you arrived, what was going on at
17 around 10:00 with this individual?
18 A.    They were trying to restrain him and put him in the
19 restraint chair because he had just assaulted another inmate.
20 Q.    And this -- this was at around 10:00 p.m.?
21 A.    Yes, sir.
22 Q.    And when you arrived, just tell the jury what you saw
23 when you entered the booking area of the jail.
24 A.    It was several correctional deputies struggling with
25 this individual, trying to get him into the restraint chair.

1 Q.    And did you later learn that this individual that was in

2 the restraint chair was a man known as Jordan Norris?

3 A.    Yes, sir.

4 Q.    Now, you were actually in pretty close proximity to

5 Mr. Norris; is that right?

6 A.    Yes, sir.

7 Q.    What -- tell the jury about your observations of

8 Mr. Norris that night.

9 A.    He wasn't complying with verbal commands.  He was very

10 combative as we were trying to get him in the chair.  At that

11 time I wasn't able to tell if he was on a narcotic or

12 anything like that because I didn't have the training, but he

13 was acting as if -- in a military fashion, as if people were

14 coming to try to harm us and things of that nature, and just

15 trying to move as if he had been in the military.

16 Q.    Now, you talked about feeling like he might be under the

17 influence.

18           Did you get a chance to look at his face at all?

19 A.    Yes.

20 Q.    Did you notice anything about his face that indicated to

21 you that he might be under the influence of drugs?

22 A.    He had a lot of saliva coming out of his mouth.  Since

23 that altercation, I have had training and --

24 Q.    And you really can't go into that at this point.

25 A.    Okay.

1  Q.    But what else did you observe about his face that night?

2  A.    His eyes were -- like, his pupils were dilated.  He had

3  a blank stare.  Like I said, he was just yelling out a lot of

4  military obscenities as if people were actually trying to

5  come and harm us.

6  Q.    And you're talking about military terminology.

7            Do you remember any of the military terminology?

8  A.    Like "We have to flank" or "We have to," you know, "get

9  behind the bunkers so they can't see us," and things like

10  that.

11  Q.    And what were your impressions of hearing things like

12  that coming from Mr. Norris?

13  A.    Well, at that time I didn't know whether he was military

14  or not.  But it wasn't until later that I found out he

15  wasn't.  So -- I -- I -- probably at that point assumed it

16  was, like, PTSD or something like that.

17  Q.    Now, were you in the booking area around Mr. Norris at a

18  time when he was tased?

19  A.    Yes, sir.

20  Q.    And he was tased by Cpl. Mark Bryant; is that right?

21  A.    Yes, sir.

22  Q.    What do you remember about that incident when he was

23  tased?

24  A.    He was being tased because he wasn't being compliant.

25  We were trying to give him verbal commands to put his hands

down so we could restrain him. At one point in time, he had
one foot that was loose. I mean. . .
Q.    And did you see him doing anything with that foot that
was loose?
A.    He had it outstretched so that we couldn't put it
against the bar to get the strap over it.
Q.    Do you remember what precipitated Mark Bryant or caused
Mark Bryant to apply that tase?
A.    The Taser was used to try to make him comply or, you
know, the shock would get him to loosen his limbs or, you
know, just so that we could get that foot secured.
Q.    In your view of the situation, was it necessary for
Cpl. Bryant to use his Taser?
A.    Yes.
Q.    Now, this was sort of the beginning of the third shift;
is that right?
A.    Yes, sir.
Q.    And you worked with Cpl. Montgomery on that shift as
well?
A.    Yes, sir.
Q.    Was there a later incident when Cpl. Montgomery had to
use the Taser on Mr. Norris?
A.    Not that I can recall.
Q.    Do you remember Mr. Norris being taken to a vehicle?
A.    Yes, sir.

1  Q.    That's what I'm asking you about.

2  A.    Okay.

3  Q.    Tell the jury what your observations were at that point.

4  A.    As we were trying to get him into the vehicle, we had

5  half of his body in.  A Taser was used then to get his foot

6  inside the vehicle.  Once inside the vehicle, he started

7  kicking the windows and. . .

8  Q.    Now, was Sgt. Gary Ola there that evening?

9  A.    I can't recollect.

10 Q.    Now, who was it that applied the tase to get Mr. Norris

11 into the patrol car?

12 A.    I believe it was Montgomery.

13 Q.    Montgomery.  And what was your understanding of why

14 Mr. Norris was being placed in the patrol car?

15 A.    Oh, we were taking him -- well, someone was taking him

16 to the hospital for a mental evaluation.

17 Q.    And you felt like he was not complying, getting into the

18 vehicle?

19 A.    He wasn't.

20 Q.    Okay.  Now, how long have you known Mark Bryant?

21 A.    I've known him since I've worked there.

22 Q.    And you worked with him on the same staff for, what,

23 about 18 months or more?

24 A.    Yes, sir.

25 Q.    Okay.  Did you ever observe Mark Bryant interact with

1  inmates?

2  A.   Yes.

3  Q.   What was his style in interacting with inmates?

4  A.   We called him Cpl. Words, because normally he could talk

5  someone down from doing something.

6  Q.   And did you say Cpl. Words, W-o-r-d-s?

7  A.   Yes, sir.  W-o-r-d-s, yes, sir.

8  Q.   Was he known as a hands-on guy?

9  A.   No.

10 Q.   And tell the jury, what would a hands-on guy be?

11 A.   A hands-on guy is one that would probably grab you right

12 away or try to restrain you or handcuff you right away.  Mark

13 was not like that.

14 Q.   So he was not somebody that wanted to have a physical

15 alteration with inmates?

16 A.   No.

17          MS. MYERS:  Objection --

18          THE COURT:  Go ahead.

19          MS. MYERS:  -- improper character evidence.

20          THE COURT:  Overruled.  Go ahead.

21 BY MR. STRIANSE:

22 Q.   What you saw in the booking area, in the interaction

23 between Mr. Bryant and Mr. Norris, did you feel like what

24 Mr. Bryant did was necessary?

25 A.   Yes.

1   Q.   Why was that?

2   A.   Because we were trying to get a combative inmate to

3   comply.  He had already assaulted another inmate, and we did

4   not know at that point what he was capable of doing.

5           MR. STRIANSE:  Thank you, Officer Jones.

6           THE COURT:  All right.  Cross.

7

8                    CROSS-EXAMINATION

9   BY MS. MYERS:

10  Q.   Good morning, Officer Jones.

11  A.   Good morning.

12  Q.   Now, the defendant tased Jordan Norris several times,

13  right?

14  A.   Yes, ma'am.

15  Q.   And at the time of the last tase, that's what I want to

16  focus on, the 11-second tase.

17          You agree that Jordan was not posing any threat

18  for that last 11-second tase?

19  A.   Okay.  Can -- I'm not trying to be funny --

20          MR. STRIANSE:  Your Honor, I object to the form of

21  the question.

22          THE COURT:  Do you want to rephrase it?  Because

23  it -- he talked about two events and you said "the last."

24          MS. MYERS:  Right.

25          THE COURT:  Okay.

BY MS. MYERS:

Q.   The last tase that the defendant administered to Jordan
Norris prior to him getting in the vehicle.

          THE COURT:  Why don't counsel approach.

          (Bench conference outside the hearing of the
          jury.)

          THE COURT:  I said, you may want to just
distinguish it from when they were getting in the vehicle.

          MS. MYERS:  I can do that.

          THE COURT:  Yeah.

          MS. MYERS:  I can clarify that.  Thank you.

          MR. STRIANSE:  I think it's also confusing to ask
a question, "Do you agree."

          THE COURT:  It's cross.  We'll see if he agrees or
not.

          (Jury present.)

BY MS. MYERS:

Q.   So, Officer Jones, just to clarify, you testified about
two different periods of tases, correct?

A.   Yes, ma'am.

Q.   So there was this series of tases that Defendant Bryant
did against Jordan Norris?

A.   Yes, ma'am.

Q.   And there were multiple tases?

A.   Yes, ma'am.

Q.   But then there was one final tase that was done by
Officer Montgomery to get him into the car?

A.   Yes, ma'am.

Q.   So what I'm referring to is the final tase that the
defendant did on Jordan Norris prior to him getting to the
car.

          Do you understand?

A.   I do understand what you're saying.  But I -- I don't
remember, like, a final tase.

Q.   Could we --

A.   I don't -- I don't --

Q.   The defendant tased him multiple times, right?

A.   Yes, ma'am, multiple times.

Q.   And the final time that you saw the defendant tase
Jordan Norris, that was the longest tase, right?

A.   I'm not sure exactly which one was the longest or -- I
didn't count.

Q.   Well, you agree, though, that the longest tase, the last
one, that that tase Jordan was not posing a threat?

A.   I don't think I understand your question.

          THE COURT:  Okay.  Rephrase your question.

          THE WITNESS:  Yes.

BY MS. MYERS:

Q.   Yes.  At that point, Jordan was not in a posture to harm
anyone when the defendant tased him?

1          MR. STRIANSE:  Your Honor, I think that

2    mischaracterizes the evidence.  That's for the jury to

3    decide, whether there was activity in front of that chair.

4          THE COURT:  I'm going to let counsel rephrase the

5    question.

6    BY MS. MYERS:

7    Q.    So for the last tase that you saw the defendant tase

8    Jordan Norris as he was being prepared to be taken to the

9    car --

10   A.    Right.

11   Q.    -- you agree that he wasn't posing a threat at that time

12   to officers?

13   A.    He wasn't fully restrained.  So he still posed a threat.

14   We didn't transport him until he was fully restrained.

15   Q.    I'm going to bring some previous testimony up to you.

16   A.    Yes.

17          THE COURT:  Okay.  I'm unclear why we're showing

18   him that.  Are you trying to --

19          MS. MYERS:  To refresh his recollection, Your

20   Honor.

21          THE COURT:  Okay.  There you go.

22          THE WITNESS:  Thank you.  Now, am I supposed to

23   read the whole thing?

24          THE COURT:  What part do you want him to read?

25          MS. MYERS:  Just one moment.

```
1   Q.   So you remember testifying on May 16th of 2018.  You
2   were under oath that day.  That was for the grand jury.
3   A.   Yes, ma'am.  I remember that day.
4   Q.   And the section that's marked there, referring to the
5   final tase, if you could read that, the marked section.
6   A.   "And you" --
7             THE COURT:  No.  No.  I think you read it to --
8             MS. MYERS:  Just read it silently.
9             THE WITNESS:  Oh.  Oh.  Okay.  (Reviews document.)
10  Okay.
11  BY MS. MYERS:
12  Q.   All right.  So, Officer Jones, I'm going to read that
13  section that I have marked there referring to the final tase.
14            (As read):
15                 And you testified that you don't remember
16            Mr. Norris posing any threat, correct?
17  A.   Right.
18  Q.   Your answer (as read):
19                 No, sir.
20                 Question:  My statement is correct?  You don't
21            remember him posing any threat?
22                 And your answer was, "Yes --
23  A.   Right.
24  Q.   -- "your statement is correct."
25                 Did I read that correctly?
```

1  A.    You did.  And the reason why I probably stated that is

2  because, if you move right above it, your previous question

3  was, was he kicking anyone.

4  Q.    Right, but --

5             (Overlapping speech.)

6             THE COURT:  Hold on.  Let him finish.

7             THE WITNESS:  A threat -- he threat was still

8  liable because his foot was not restrained.  No, he was not

9  physically kicking anyone.  And that's probably why I

10  answered the question the way that I did, you know.

11  BY MS. MYERS:

12  Q.    Correct.  He was not kicking.  He was not posing a

13  threat during that final tase.

14             And that -- I read that correctly, right?

15  A.    Right.  But that's my interpretation, yes.

16             MS. MYERS:  Thank you.

17             THE WITNESS:  You're welcome.

18             THE COURT:  Anything further?

19             MS. MYERS:  I have no further questions.

20             THE COURT:  All right.  Redirect.

21

22                    REDIRECT EXAMINATION

23  BY MR. STRIANSE:

24  Q.    Even when Mr. Norris was fully restrained, he had to be

25  tased by Cpl. Montgomery; is that right?

```
1   A.   Yes, sir.
2              MR. STRIANSE:  That's all.
3              THE COURT:  All right.  You may step down.
4                    (Witness excused.)
5              THE COURT:  All right.  Call your next witness.
6              MR. STRIANSE:  Your Honor, I think the Court's
7   going to go another 15 minutes?
8              THE COURT:  Yes.
9              MR. STRIANSE:  May I see if --
10             THE COURT:  Sure.
11             MR. STRIANSE:  Call James Barnum.
12
13                    JAMES MARTIN BARNUM III,
14  called as a witness by Defendant, was duly sworn and
15  testified as follows:
16
17             COURT DEPUTY:  Please be seated.
18             Please be sure to speak into the microphone.
19  State your full name and spell your last name.
20             THE WITNESS:  My name is James Martin Barnum III,
21  B-a-r-n-u-m.
22
23                    DIRECT EXAMINATION
24  BY MR. STRIANSE:
25  Q.   Good morning, Mr. Barnum.
```

1  A.    Good morning, sir.

2  Q.    And where do you live?

3  A.    I live in Robertson County.

4  Q.    And how are you currently employed?

5  A.    I am fully employed.  I work at a place called U.S.

6  Roller Works in Nashville.

7  Q.    How long have you held that position?

8  A.    It will be two years next month.

9  Q.    Were you ever employed by the Cheatham County Sheriff's

10 Office?

11 A.    Yes, sir, I was.

12 Q.    And when were you employed by the sheriff's office?

13 A.    It was April of 2014 until February of 2018.

14 Q.    So over that four-year period, what positions did you

15 hold at the Cheatham County Sheriff's Office?

16 A.    I held the rank of corrections officer, field training

17 officer, corporal, and sergeant.

18 Q.    In the course of your employment, did you meet a man by

19 the name of Mark Bryant?

20 A.    Yes, I did, sir.

21 Q.    Explain to the jury how you came to meet Mr. Bryant.

22 A.    During the year 2015, I was corporal on second shift.

23 Mark started towards the end of the summer that year.  I do

24 not remember specific dates.  He started on my shift and he

25 was under my control.

1  Q.    And he was employed at that point in time as a

2  correctional officer?

3  A.    That is correct.

4  Q.    And you were his direct supervisor; is that right?

5  A.    Yes, sir.

6  Q.    And you were holding the role of corporal?

7  A.    Yes, sir.

8  Q.    And tell the jury, what kind of an employee was Mark

9  Bryant when he was under your supervision?

10  A.    Mark was the textbook definition of a perfect employee.

11  He did exactly what was asked of him.  He was on time.  He

12  was always very professional.  He learned policies for our

13  facility fairly quickly.

14  Q.    And give the jury some idea, when you all are working in

15  the jail, how many days would you be together?

16  A.    Well, at the time I -- the corporal and the sergeant

17  would rotate -- both have a day off on the weekend.  And I

18  worked with Mark four days a week at the time.

19  Q.    Did you have any role in training Mark?

20  A.    Yes, I did.

21  Q.    Did you see Mark develop a style over the years that he

22  was under your supervision in dealing with inmates?

23  A.    Mark had his own unique style.  He was very calm, cool,

24  and collected with the inmates.  He was always a very mild-

25  tempered individual.  You -- very seldomly did Mark even

1  raise his voice unless it was just to get everyone's

2  attention.  He was very diligent with getting his job done

3  and doing it correctly.  And he absolutely hated leaving work

4  for the next shift.

5  Q.   Now, before, I think you said he was calm, cool, and

6  collected?

7  A.   Yes, sir.

8  Q.   Okay.  Was Mark the kind of correctional officer that

9  was a hands-on guy?

10          MS. MYERS:  Objection.  Ask to approach, Your

11  Honor.

12          THE COURT:  Sure.

13          (Bench conference outside the hearing of the

14          jury.)

15          MS. MYERS:  Your Honor, there is a motion in

16  limine on this point, I know, regarding the character

17  evidence of the defendant that you held in abeyance.  And I'm

18  feeling --

19          THE COURT:  I'm going to let him testify about

20  reputation as the rule allows.  He's not going to be able to

21  get into specific instances.

22          MS. MYERS:  All right.  Thank you, Your Honor.

23  BY MR. STRIANSE:

24  Q.   Mr. Barnum, I was asking you, is Mark Bryant -- or when

25  he worked under you, was he a hands-on kind of a guy as a

1 correctional officer?

2 A.    Absolutely not.  He was the typical individual that

3 would rather communicate with an individual than ever go

4 hands on with a person.

5 Q.    And you had the opportunity of -- to observe him

6 interact with inmates there at the jail; is that right?

7 A.    Absolutely, sir.  Part of the job as being his

8 supervisor was to observe him when he started, and the first

9 few months of being there, you could tell he was a unique

10 individual, where, if somebody was irate or potentially

11 combative when they first come in the jail, as some people

12 are, he was very good at neutralizing them, calming them

13 down, getting them to settle down and work with us very well,

14 better than most people I've worked with.

15 Q.    How stressful is a job being a correctional officer?

16 A.    It is very stressful.  It is one of the most stressful

17 jobs I've had, and most people I know that have worked in the

18 industry, it's up there as one of the most stressful jobs you

19 can have.

20 Q.    Is that why there's a lot of turnover in the industry?

21 A.    I believe so.

22 Q.    And what engenders the stress in correctional officers?

23 A.    The fear of the unknown is the biggest, I believe.

24 Because you never know what you're going to walk into; you

25 never know how a person is going to treat you.  You could

1  walk into a dorm room with inmates, and they could be
2  smiling, and next thing you know, they could be trying to
3  hurt you.
4  Q.    And I guess correctional officers have a decision to
5  make as to whether they want to intervene in a situation in
6  the jail; is that right?
7  A.    Yeah.
8  Q.    Meaning that if I'm looking at something on a video and
9  I see a disturbance and I'm a correctional officer, I'm
10 supposed to take care of that?
11 A.    Yes, sir.  Absolutely.  If you see something that's out
12 of the normal -- and really, there's nothing normal about
13 jail in itself, but if you see something that's abnormal, you
14 are supposed to investigate and check in with it or refer to
15 your supervisor and have them go check in with you as well.
16 Q.    But a correctional officer who might not want to get
17 involved could just turn their head the other way; is that
18 right?
19 A.    Potentially, yes.
20 Q.    Now, did you receive any sort of Taser training when you
21 were employed at the Cheatham County Sheriff's Office?
22 A.    Yes, sir, I did.
23 Q.    What was your understanding of the Taser policy that was
24 in place as of November 5, 2016, at the jail?
25 A.    It was supposed to be another form of the force

1 continuum that we have.  You know, when you -- you go to

2 communicate with somebody, then, you know, you -- it's just

3 the next step of force to be used.  We don't carry pepper

4 spray in that jail, or we didn't.  And it was meant to be

5 used as a deterrent for potential harm for individuals,

6 themselves, the facility, another person, another officer,

7 any of the such.

8 Q.    Were you aware of any edict back in November of 2016

9 that there were any limitations on the number of applications

10 or the duration of the applications?

11 A.    At that time, not that I recall, sir.

12                MR. STRIANSE:  Your Honor, may I have one moment?

13                THE COURT:  Sure.

14                MR. STRIANSE:  Those are my questions.

15                THE COURT:  All right.  Cross.

16

17                      CROSS-EXAMINATION

18 BY MS. MYERS:

19 Q.    And, Mr. Barnum, you said that you trained the

20 defendant?

21 A.    Yes, ma'am.

22 Q.    And did you train the defendant that officers could use

23 force to punish inmates?

24 A.    No, ma'am.  That's not part of the curriculum there.

25 Q.    How about for retaliating or acting out?

1  A.    Ma'am, that is not part of our curriculum there.

2  Q.    And you did not witness the defendant tase Jordan Norris

3  four times for 50 seconds?

4  A.    Ma'am, I was on vacation that weekend; so I was not part

5  of that situation.

6              MS. MYERS:  Thank you.

7              THE WITNESS:  You're welcome.

8              THE COURT:  Redirect.

9

10                    REDIRECT EXAMINATION

11 BY MR. STRIANSE:

12 Q.    Given your knowledge of Mark Bryant, was he the type of

13 correctional officer that would gratuitously punish an

14 inmate?

15 A.    Absolutely not.

16 Q.    Is he the type of individual that would retaliate

17 against an inmate?

18 A.    No.  Not -- not to my heart's belief at all.

19              MR. STRIANSE:  Thank you.

20              THE COURT:  All right.  You can step down.

21              THE WITNESS:  Thank you.

22                    (Witness excused.)

23              THE COURT:  All right.  Ladies and gentlemen,

24 we're close to 10:00.  Just a few minutes.  So we're going to

25 break now until 10:30, and we'll come back at 10:30 and hear

1     more evidence.  Thanks.

2              (Recess.)

3              (Jury not present.)

4              THE COURT:  All right.  Be seated.

5              Okay.  Are we ready for the jury?

6              MR. STRIANSE:  Yes, sir.

7              THE COURT:  Ready for the jury?

8              MS. MYERS:  Yes, Your Honor.

9              (Jury present.)

10             THE COURT:  All right.  Be seated.

11             Okay.  Call your next witness.

12             MR. STRIANSE:  Dr. Hamilton Small.

13

14                     HAMILTON SMALL,

15    called as a witness by Defendant, was duly sworn and

16    testified as follows:

17

18             COURT DEPUTY:  Please be seated.

19             Please be sure to speak into the microphone.

20    State your full name and spell your last name.

21             THE WITNESS:  Hamilton Small, S-m-a-l-l.

22

23                     DIRECT EXAMINATION

24    BY MR. STRIANSE:

25    Q.   Good morning, Dr. Small.

1  A.    Good morning.

2  Q.    And how are you employed, sir?

3  A.    I'm a psychiatrist at the Middle Tennessee Mental Health

4  Institute in Nashville, Tennessee.

5  Q.    And are you a medical doctor?

6  A.    Yes, I am.

7  Q.    And how long have you held a medical license?

8  A.    Since 2004.

9  Q.    And what is your area of specialty?

10 A.    Psychiatry.

11 Q.    And how long have you practiced as a psychiatrist?

12 A.    Since 2004.

13 Q.    And what is your job at the Middle Tennessee Mental

14 Health Institute?

15 A.    I'm a staff psychiatrist at the Middle Tennessee Mental

16 Health Institute, and in my job I get to admit people, also

17 to evaluate patients, and discharge them.

18         MR. STRIANSE:  Can everybody hear Dr. Small?

19 Q.    Be sure to keep your voice up, Dr. Small, so we can hear

20 you.

21         Where is the Middle Tennessee Mental Health

22 Institute located?

23 A.    It's at 214 Stewarts Ferry -- sorry -- 221 Stewarts

24 Ferry Pike in Donelson, Tennessee.

25 Q.    And tell the jury, what is the Mental -- Middle

1   Tennessee Mental Health Institute?

2   A.   It's the state psychiatric hospital for the Middle

3   Tennessee area.

4   Q.   In your role as a staff psychiatrist at the Middle

5   Tennessee Mental Health Institute, did you come in contact

6   with a patient by the name of Jordan Norris?

7   A.   Yes, I did.

8   Q.   And do you remember when Mr. Norris came in to your care

9   and custody at the Middle Tennessee Mental Health Institute?

10  A.   He was admitted to the Middle Tennessee Mental Health

11  Institute on November the 7th, 2016, at 5:31 a.m.

12  Q.   And upon presenting at the Middle Tennessee Mental

13  Health Institute on November 7, 2016, what were you charged

14  with doing in regard to him?  What was your job in regard to

15  him?

16  A.   My job was the attending psychiatrist evaluate for him

17  for further treatment and stabilization while he was there.

18  Q.   And do you know how he was referred to the Middle

19  Tennessee Mental Health Institute?

20  A.   He was referred to us from Mobile Crisis, who had

21  evaluated him while he was in the Cheatham County Jail.

22  Q.   And did you review any records in advance of conducting

23  an evaluation on Mr. Norris?

24  A.   Yes, I did.  The Mobile Crisis had sent us a referral

25  package regarding his state while he was in the jail.  Also,

1    there was records from the Cheat- -- sorry -- Centennial
2    Medical Center at Cheatham County.
3    Q.    After reviewing those records, did you conduct an
4    evaluation of Mr. Norris?
5    A.    Yes, I did.
6    Q.    And what type of an evaluation was that?
7    A.    It's a psychiatric evaluation to determine his mental
8    state when he presented to our -- when he presented to us,
9    and also to determine what we need to do to further stabilize
10   him and help him get ready for discharge.
11   Q.    And what were your findings in regard to the evaluation
12   that you conducted on Mr. Norris on or about November 7,
13   2016?
14   A.    I should say before -- I should preface this with, when
15   he first came to the hospital, he was evaluated by
16   Dr. Brooks, who is the admitting psychiatrist.
17   Q.    Was that Dr. Brooks, you said?
18   A.    Phillip Brooks --
19   Q.    Okay.
20   A.    -- who was the admitting psychiatrist.  I saw him later
21   in the day.  And these are my findings.
22               THE COURT:  I'm sorry.  Did you say that
23   Dr. Brooks was the --
24               THE WITNESS:  Admitting.
25               THE COURT:  -- acting?

```
1              THE WITNESS:  Admitting.

2              THE COURT:  Okay.  Admitting psychiatrist.  Okay.

3    Thanks.  Sorry.

4    BY MR. STRIANSE:

5    Q.   Before we get into your report -- I know you're looking

6    for it -- when he presented at the -- when Mr. Norris

7    presented at the Middle Tennessee Mental Health Institute,

8    was he given any sort of prescription medication?

9    A.   When he first -- when he presented on the morning of

10   November the 7th, he at that time was agitated, and there --

11   he was agitated and disorganized.  The main thing, he was

12   preoccupied with his belongings.  He wasn't cooperating.

13             So around about 6:25 a.m., he was given Ativan,

14   2 milligrams; Haldol, 5 milligrams; and Benadryl, 50

15   milligrams for the agitation, and that was partially

16   effective for him.

17             I saw him later in the day around --

18   Q.   Before we leave that --

19   A.   Okay.

20   Q.   -- could you tell the jury, what is Ativan?

21   A.   Ativan is a benzodiazepine medication that's used --

22             MS. MYERS:  Objection.  Relevance.

23             THE COURT:  Overruled.

24             Go ahead.

25
```

BY MR. STRIANSE:

Q.   Go ahead, Doctor.

A.   -- that's used for either anxiety or sometimes it can be used for agitation.

Q.   And you also indicated that he was given Haldol; is that right?

A.   That's correct.

Q.   And what is Haldol?

A.   Haldol is an antipsychotic medication that's used mostly for psychosis or aggression.

Q.   And you also indicated that he was given an over-the-counter drug, Benadryl?

A.   Yeah -- yes, he was.

Q.   And what is Benadryl?  I think we all know.

A.   Benadryl is used more in this case for counteracting any side effects that Haldol might give to the patient.

Q.   So he was given these three drugs about what time of the day?

A.   That was about 6:25, about -- probably about an hour after he came to the hospital.

Q.   That would be 6:25 in the morning?

A.   Right.

Q.   And then Dr. Brooks saw him?

A.   Dr. Brooks saw him before he was given this.

Q.   Okay.  And when did you see him?

1    A.    Mine -- record is about 3:00 in the afternoon.

2    Q.    And that's when you conducted your evaluation?

3    A.    Right.

4    Q.    And you were about to tell the jury -- what were your

5    findings?

6    A.    At that time there was -- he was still a bit irritable,

7    but he had some problems maintaining his level of alertness.

8    Meaning, I -- some questions he would answer; other questions

9    he would kind of drift off.

10    Q.    Now, did you make any particular diagnosis of Mr. Norris

11    after you conducted your evaluation?

12    A.    My evaluation, I wrote "Cannabis use disorder, severe."

13    Q.    I'm having trouble hearing you, Doctor.  Forgive me.

14    A.    I wrote "Cannabis use disorder, severe.  Hypnotic --

15    sedative/hypnotic use disorder, severe.  And rule out

16    schizoaffective disorder, bipolar type."  That was the

17    initial diagnosis.

18    Q.    And forgive me.  And I did not really hear what those

19    three diagnoses were.

20          Could you really speak up and -- so I'm able to

21    hear you?

22    A.    All right, sir.

23          First I wrote "Cannabis use disorder, severe.

24    Sedative/hypnotic use disorder, severe.  And rule out

25    schizoaffective disorder, bipolar type."

 1              That was when I first saw him.

 2    Q.    Did you make a diagnosis regarding any sort of

 3    depression?

 4    A.    At that time I wrote -- I wrote a rule-out diagnosis.

 5    Later on we discharge him with major depressive disorder,

 6    severe, with psychotic features.

 7    Q.    So upon discharge you made a diagnosis, and what was

 8    that?

 9    A.    Major depressive disorder, recurrent episode, with

10    psychotic features.

11    Q.    And what does "psychotic features" mean?

12    A.    "Psychotic features" referred to the presence of either

13    hallucinations, delusions, paranoia, those things that

14    consist of altered reality.

15    Q.    And was he reporting to you experiencing auditory

16    hallucinations?

17    A.    That's correct.

18    Q.    And was he also reporting visual hallucinations?

19    A.    Yes, when he came in.

20    Q.    And I think we all know, but why don't you define

21    auditory hallucinations?

22    A.    With auditory hallucinations, patient -- people tend to

23    hear things or voices when nobody else is around.  Sometimes

24    the voices command them to do things that -- they command

25    them to do things.

1            Visual hallucinations are when people see things
2    or they have a distorted perception of what's going on around
3    them.
4    Q.    Now, upon discharge -- what was his date of discharge,
5    by the way?
6    A.    The date of discharge is November the 12th, 2016.
7    Q.    When he was discharged on November 12th, 2016, did you
8    prescribe any medications for him?
9    A.    His discharge medication was Haldol, 5 milligrams, once
10   a day, and Cogentin once a day.
11   Q.    Cogentin?
12   A.    Yeah.
13   Q.    What is Cogentin?
14   A.    Cogentin is a medication that's used similar to Benadryl
15   for decreasing any side effects that the patient might have
16   from Haldol.
17   Q.    And what is Haldol for again?
18   A.    Haldol is for psychosis or agitation.
19   Q.    Was there a prescription drug known as Depakote that was
20   also prescribed?
21   A.    When he came in, he was prescribed Depakote.
22   Q.    And what is Depakote?
23   A.    Depakote is a mood stabilizer.
24            MR. STRIANSE:  May I have one moment, Your Honor.
25            THE COURT:  Yes.

BY MR. STRIANSE:

Q.   In your findings, you used a term "labile"; is that
right --

A.   Yes, I did.

Q.   -- to describe Mr. Norris?

          Explain to the jury what is meant by the term
"labile" and how is it associated with your evaluation of
Mr. Norris?

A.   "Labile" is used to determine -- to define the patient's
behavior -- the patient's behavior.  What it is, it's how
their mood changes pretty quickly.  At some times they aren't
able to maintain a consistent mood.  It's like they can go
from being happy to being sad, from crying to laughing, you
know, from being nice to being pretty belligerent within a
short period of time.

Q.   So "labile" describes abrupt changes in mood?

A.   Yes.

          MR. STRIANSE:  Those are my questions.

          THE COURT:  All right.  Cross.


                    CROSS-EXAMINATION

BY MS. MYERS:

Q.   Good morning, Dr. Small.

A.   Good morning.

Q.   So trauma can alter someone's mental state, correct?

1  A.    One more time?

2  Q.    Trauma can affect someone's mental state?

3  A.    Yes, it can.

4  Q.    And being shocked repeatedly with electricity could

5  alter someone's mental state?

6  A.    I would believe so.

7  Q.    And you were also concerned -- right? -- about damage --

8  potential damage to Jordan Norris's organs?

9  A.    Yes, we did.  I -- the internal medicine doctors

10  evaluated Mr. Jordan, and after we looked through the labs,

11  we realized that his creatinine kinase was elevated, and also

12  his white blood cells were elevated.  We were concerned that

13  this could be an emergency.  So we decided to send him to the

14  hospital for evaluation and treatment.  We sent him to Summit

15  ER.

16  Q.    And those levels you mentioned, those signified an issue

17  with organs potentially?

18  A.    Right.

19  Q.    And cardiac issues as well?

20  A.    They could be some cardiac issues also.

21  Q.    And could being shocked repeatedly cause damage to the

22  heart?

23  A.    It could.

24  Q.    And you didn't examine Jordan Norris on November 5th,

25  2016, did you?

```
1   A.    He wasn't in our facility at that time.

2   Q.    But you knew that he had been tased on that date?

3   A.    The records state that he had been tased.

4              MS. MYERS:  Thank you.

5              THE COURT:  All right.  Redirect.

6

7                    REDIRECT EXAMINATION

8   BY MR. STRIANSE:

9   Q.    Just one question for you, Doctor.  He was in your

10  custody at the Middle Tennessee Mental Health Institute --

11  I'm talking about Mr. Norris -- from November 7th, and then

12  he was released from the Middle Tennessee Mental Health

13  Institute on November 12th; is that right?

14  A.    That's correct.

15  Q.    Was it in that interim four or five days that he was

16  taken to Summit?

17  A.    He was taken to Summit within 24 hours of being in our

18  hospital.

19  Q.    And then returned to your hospital?

20  A.    Then he returned to our hospital.

21  Q.    And then returned to the Cheatham County Jail?

22  A.    That's correct.

23             MR. STRIANSE:  That's all.

24             THE COURT:  All right.  You can step down.

25                    (Witness excused.)
```

1          MR. STRIANSE:  Call Jeff Key.

2          Judge, are we not ready for him?

3          THE COURT:  You're ready for him.

4          MR. STRIANSE:  Only if you're ready for him.

5          THE COURT:  I think I need the lawyers to

6    approach.  Yeah.  Why don't you all. . .

7          (Bench conference outside the hearing of the

8          jury.)

9          THE COURT:  I can't find my copy of the civil

10   lawsuit.  Was he a defendant?

11         MR. SONGER:  He was.

12         MS. MYERS:  Yes.

13         MR. STRIANSE:  He was.

14         THE COURT:  Okay.

15         All right.  Do you all want to talk about that?

16   I'm going to allow him to do a limited cross-examination.

17   But Mr. Key was a defendant in the civil lawsuit that Mr. --

18   the civil lawsuit was resolved.  And the lawsuit arose out of

19   events on November 5th.

20         MR. SONGER:  Your Honor, the only thing I would

21   point out is the government did not call Officer Key, so I

22   don't believe the defense can call a witness just for the

23   purpose of impeaching him.

24         MR. STRIANSE:  I'm not going to ask about the

25   civil lawsuit.

1      THE COURT:  Okay.

2      MS. MYERS:  And we don't plan on asking him.

3      MR. STRIANSE:  That ship has sailed based on your

4  earlier ruling.

5      THE COURT:  Well, but I guess I made clear

6  yesterday, if you wanted to recall Mr. --

7      MR. STRIANSE:  Yes, sir.  Marriott.

8      MS. MYERS:  Marriott.

9      THE COURT:  Yeah.

10      Obviously, you can --

11      MR. STRIANSE:  No, sir.

12      THE COURT:  I want to give you plenty of

13  opportunity to --

14      MR. STRIANSE:  Yes, sir.

15      THE COURT:  I think I've cured it.

16      MR. STRIANSE:  Are we there?

17      THE COURT:  With my cure, or not.

18      All right?

19      MS. MYERS:  Thank you.

20      MR. STRIANSE:  Thank you.

21      (Jury present.)

22      THE COURT:  All right.  Mr. Key.

23

24                    JEFFREY KEY,

25  called as a witness by Defendant, was duly sworn and

1    testified as follows:

2

3              COURT DEPUTY:  Please be seated.

4              Please be sure to speak into the microphone.

5    State your full name and spell your last name.

6              THE WITNESS:  Jeffrey Key, K-e-y.

7

8                        DIRECT EXAMINATION

9    BY MR. STRIANSE:

10   Q.    Good morning, Mr. Key.

11   A.    Good morning, sir.

12   Q.    How are you employed?

13   A.    With the Cheatham County Sheriff's Office.

14   Q.    And how long have you been with the Cheatham County

15   Sheriff's Office?

16   A.    Since March, I think, of 2016.

17   Q.    And what kind of positions have you held at the Cheatham

18   County Sheriff's Department?

19   A.    I worked in the corrections; that's where I started.

20   And then moved to SRO as a school resource officer.  Then I

21   came out as an FTO on patrol, as a field training officer.

22   On nights.  And then got promoted to corporal and then went

23   back to dayshift and gave up my promotion from that.

24   Q.    Okay.  And how long have you been on patrol?

25   A.    Almost three years, I guess, and a couple months.

1  Q.    Now, you worked in the jail; is that right?

2  A.    That's correct.

3  Q.    How long did you work as a correctional officer in the

4  jail?

5  A.    Approximately a year.

6  Q.    Were you working on November 5, 2016?

7  A.    Is that the date of the incident?

8  Q.    Yes, sir.

9  A.    Yes, sir.

10  Q.    And do you know Mark Bryant?

11  A.    I do.

12  Q.    And explain to the jury how you know Mark Bryant.

13  A.    Mark and I met when I was working there.  He was the

14  corporal on the shift as I worked in the jail.

15  Q.    What shift did you work at the Cheatham County Jail?

16  A.    I worked second at that point.

17  Q.    And second is 2:00 p.m. to 10:00 p.m.; is that right?

18  A.    Yes, sir.

19  Q.    And again, I would like to direct your attention to the

20  date of the event, which is Saturday, November 5, 2016, and

21  ask you, did you come in contact with an inmate by the name

22  of Jordan Norris?

23  A.    I did.

24  Q.    And explain to the jury how you came in contact with

25  Mr. Norris.

1  A.   Mr. Norris was brought in on unknown charges, was being

2  housed in a cell, 4, in booking.  There was some kind of

3  commotion going on inside there.  It was -- it was said that

4  he was -- assaulted someone.  It was reported by another

5  inmate.

6            MS. MYERS:  Objection.  Hearsay.

7            THE WITNESS:  And --

8            THE COURT:  Hold on.  Mr. Strianse?

9            MR. STRIANSE:  Your Honor, this is an operative

10 fact that set him in motion doing what he did.

11           THE COURT:  Overruled.

12           THE WITNESS:  So we went to the door.

13 BY MR. STRIANSE:

14 Q.   Who is "we" went to the door?

15 A.   I believe it was Mark and I both at that point.

16 Q.   The door of Cell 4?

17 A.   Yes, sir.  And looked in.  And we could see that he was

18 standing up and was facing another inmate.  Kind of had this

19 angry look on his face.  When we weren't -- opened -- when I

20 opened the door, he went back and he set down on the bench

21 that's inside there.

22           There was two different occasions that we had to

23 address the issue.  The second time was when we decided -- I

24 guess I had made a decision that he needed to be pulled out

25 for his safety and the safety of the other inmates.

1    Q.    Now, let me make sure I'm understanding.

2          You said there were two interactions in Cell 4?

3    A.    Yeah -- well, not necessarily interactions with us.  We

4    talked to him and -- and tried to get him to just calm down

5    and sit down.  At which point he did for a minute, but then

6    started right back up again.

7          THE COURT:  Okay.  Now, you tend -- your voice

8    tends to get lower.

9          THE WITNESS:  I'm sorry.

10         THE COURT:  So pull that microphone up close.

11   Keep your voice up.

12         THE WITNESS:  Okay.

13         THE COURT:  Now.

14   BY MR. STRIANSE:

15   Q.    Was there a decision made to take Mr. Norris out of the

16   cell?

17   A.    There was.

18   Q.    And who made that decision?

19   A.    I did.

20   Q.    And why was it necessary to take him out of Cell 4 at

21   that time?

22   A.    We didn't want any physical altercations to take place

23   or anyone else to get assaulted if -- or to get assaulted or

24   for him to get assaulted.

25   Q.    And describe to the jury how you attempted to get

1  Mr. Norris out of Cell 4.

2  A.   When I walked up to where he was sitting on the bench, I

3  grabbed him by his arm to -- to escort him out.  And he kind

4  of was -- at that point was resisting even getting up off the

5  seat.

6            I put him in what was called an arm bar and tried

7  to lift him up.  At that point, that's when we could tell

8  that -- or I could tell that the young man had some unusual

9  strength for his size and stature.

10 Q.   And describe to the jury what sort of strength you were

11 feeling emanating from Mr. Norris.

12 A.   It's really hard to describe.  It's almost like --

13 unhuman, I guess, really.  I mean, it's -- it's one of those

14 things where I've only encountered it a few times in my

15 career.  And the other times that I've ever encountered it

16 was someone that was on PCP that just wasn't feeling anything

17 and that just had really strong strength.  Like you hear

18 stories about people with adrenaline and they can lift a car

19 off somebody or whatever.  It's -- it's something that's just

20 very unusual that's not -- seldom seen in any man.

21 Q.   So it's clear for the record, how tall are you, sir?

22 A.   Between 6-1 and 6-2.

23 Q.   And how much do you weigh?

24 A.   250.

25 Q.   And how much did you weigh back in November of 2016?

1  A.    Pretty close to the same.

2  Q.    Back in describing what was going on, who was in the

3  cell trying to exact Jordan Norris?

4  A.    It was myself and Mark.  We actually got him outside of

5  the cell door and had him face the wall, at which point we

6  tried to handcuff him.

7           And again, he was resisting there.  We were

8  struggling with this small guy like it was just -- it was

9  kind of mind boggling.  But we were struggling to even get

10 him cuffed at that point.

11          At that point is when I kind of motioned for -- I

12 believe Josh Marriott to pull the chair over closer, and

13 Daniel Bratton came over and had -- he had a Taser at that

14 point.  As we were trying to get him to cuffed, he was still

15 not letting us put his arms behind his back.  So Daniel

16 Bratton at that point drive-stunned him, I think between the

17 shoulder blades or what have you.

18          I actually ended up getting tased -- drive-stunned

19 myself during that altercation because it was just such a

20 struggle.

21          But we finally got him cuffed, and the chair was

22 pulled over, and we had him sit in the chair at that point.

23 Q.    I think you told the jury that you tried to use an arm

24 bar maneuver on Jordan Norris inside of Cell 4; is that

25 right?

1    A.    That's correct.

2    Q.    Was that effective?

3    A.    No.

4    Q.    And just describe to the jury, what is an arm bar?  I

5    think we probably know.

6    A.    It's when you grab them by the wrist and you straighten

7    their arm and you kind of torque their wrist as a pain

8    compliance type technique.

9    Q.    That technique, if you were going to look at the force

10   continuum, where does that technique fall in the continuum?

11   A.    It would be after verbal command.

12   Q.    So the -- what is your understanding of the force

13   continuum?

14   A.    Officer presence, and then you give -- you have your

15   verbal commands, and then you -- you can go hands on or you

16   can use your pepper spray, if you have that, or Taser, or all

17   the way up to deadly force.

18   Q.    And would you consider the arm bar more of hard hands or

19   grappling?

20   A.    Yes.

21   Q.    And would that be above the Taser on the continuum?

22   A.    I don't know that it would be above it.  It's probably

23   equal.  But I -- I didn't carry a Taser, so at that point,

24   that was -- and it -- to me, at that point it wasn't

25   warranted for a Taser because it was just simply trying to

1   get him up out of the cell, until he started resisting
2   outside the cell, is when it was necessary.
3   Q.    So I think you were -- were telling us that there were
4   four officers involved in trying to get him under control; is
5   that right?
6   A.    That's correct.
7   Q.    It was you, Cpl. Bryant, Josh Marriott, and Daniel
8   Bratton?
9   A.    Correct.  I believe Josh Marriott was over there with us
10  as well.  I know he was standing close by.  And he was the
11  one, I think, that pulled the chair over closer.  I don't
12  recall if he had his -- he actually -- if there was room in
13  that small area for him to be in there to be able to put
14  hands on at that point or not.
15  Q.    And you all were successful in getting him cuffed?
16  A.    Yes, we were.
17  Q.    And describe to the jury how you cuffed him?
18  A.    In his -- he was cuffed from behind, with his hands
19  behind his back.
20  Q.    And then placed in the chair?
21  A.    Yes, sir.
22  Q.    And for a time, was he under control in that chair?
23  A.    For a short period of time, there was -- it would -- it
24  was one of those things where it would come and go.  Like,
25  his rage would subside, and then it would pick back up and he

1  would start to fight again for whatever reason.

2  Q.   Describe the condition and age of the restraint chair

3  that was being used.

4  A.   I don't know the age of the restraint chair.  I know

5  that they had -- they had had it for quite some time.  It has

6  since been replaced with new ones after that incident,

7  because obviously it was outdated.

8          The -- the -- it wasn't broken in any way; it just

9  has what is, I guess, friction lock for the straps.  And I

10  guess over time those things wear out.  I don't know.

11  Q.   And did you all experience problems with the chair when

12  Mr. Norris was in it at the jail that night?

13  A.   We did.  After we -- okay.  So the way the chair works

14  is, at first there is a -- kind of a slotted hole where he

15  would sit for his hands to be behind his back.  After he --

16  you believe that the subject's calmed down enough, you can

17  take the handcuffs off and move the arm around forward to --

18  to the arms of the chair.  And then there's -- there's nylon

19  straps that go around the wrists and will hold the wrists

20  down at that point.

21  Q.   And was that transition made for Mr. Norris's comfort?

22  A.   Yes, it was.

23  Q.   And explain to the jury what happened after was he

24  transitioned out of the hard metal cuffs behind his back to

25  the restraints that are part of the chair.

```
 1   A.   For a short period of time, he was -- he was calm.  He
 2   was talking really kind of out of his head that didn't make
 3   any much sense at all.
 4   Q.   Do you remember any of the things he was saying?
 5   A.   He was telling us to pull our guns --
 6              MS. MYERS:  Objection.  Hearsay.
 7              MR. STRIANSE:  Your Honor, this, again, are
 8   operative facts.  These are verbal acts that set in context
 9   what the officers were doing.
10              THE COURT:  Okay.  Overruled.
11              THE WITNESS:  He was saying to us to pull our gun
12   out and shoot him.  Obviously, we didn't carry guns.
13   BY MR. STRIANSE:
14   Q.   I didn't hear you.  I'm sorry.
15   A.   He was telling -- he was telling us to pull our gun out
16   and shoot him in the head.  Was making just wild comments
17   like that.  There were several other comments that I don't
18   recall exactly what he said, but it was just -- none of it
19   made sense.
20   Q.   Did he appear to be under the influence of something to
21   you?
22   A.   It's my belief that he was, yes, from my experience.
23   Q.   Anything that you were observing about his appearance or
24   demeanor that gave you that conclusion?
25   A.   His eyes were really -- his pupils were really huge.
```

1  They were kind of blown.  He -- he kind of held them open

2  really wide and just had this kind of crazy look on his face.

3  He would grind his teeth or kind of grit his teeth.  He was

4  sweating profusely.  Even before, you know, just sitting in

5  the chair when he's not moving, he was still sweating.

6        A lot of those things are indicative of -- of

7  being under the influence of some kind of intoxicant or drug.

8  Q.   Explain to the jury what happened after he was taken out

9  of the hard cuffs and his arms were moved to the restraints

10  that are part of the chair.

11  A.   At one point, again, he calmed down.  And then he --

12  when he started to start to struggle again, he started

13  spitting on our -- or towards people.  So we put a spit mask

14  over his face, which is a netting.

15        He would rock back and forth and try to loosen the

16  straps and move the straps around.  He was able to loosen the

17  strap that went around his right wrist significantly to the

18  point to where I had to hold on to his hand to keep him from

19  being able to pull that hand out of that loop at that point.

20  Q.   How far was he able to move his right arm with that

21  loosened cuff?

22  A.   The strap was loose enough that he could reach over and

23  grab the belt that went acrost his waist band.  And he was

24  holding on to that to prevent me from also being able to move

25  his arm back and try to restrap it back down.  So I would say

1  he was able to move it for at least 6 inches.

2  Q.   When his arm was loose like that, did you feel like you

3  had control over Jordan Norris?

4  A.   I was attempting to gain control, but I never -- he

5  never removed it from that strap because I had ahold of his

6  arm.  But it wasn't controlled.  It was -- it was an attempt

7  to gain control.

8  Q.   And what were you physically doing in an effort to gain

9  control over Mr. Norris?

10  A.   I had ahold of his right hand and his right wrist and

11  was just trying to pull it back over and get it back in place

12  to where we could actually cinch the strap back down and

13  friction lock it back down.

14  Q.   And what sort of strength were you experiencing coming

15  from Mr. Norris in trying to neutralize that arm?

16  A.   A lot.  I was using both arms.  Again, I'm a bigger guy

17  and he's a smaller fella.  And I could not get it to move to

18  where I wanted it to move much at all.

19  Q.   Now, did there come a point in time that Cpl. Bryant

20  applied the Taser to Mr. Norris?

21  A.   He did.

22  Q.   And explain to the jury why that was done.  What

23  precipitated that?

24  A.   It -- again, pain compliance technique.  Drive-stunning

25  is strictly for pain compliance.  There was not much effect

1   because he wasn't feeling a whole lot of pain, apparently.

2              I recall him saying, "Give me more of that" or

3   "You could give me more," or something like that.  It

4   wasn't -- it wasn't at the point to where, when he got drive-

5   stunned, that he relinquished his arm and let me do -- you

6   know, restrap it back down.  He still continued to resist.

7   Q.    How were you all able to finally get him under control?

8   A.    It really -- I honestly don't know.  Like, we -- we

9   forced -- forcefully pushed his arm down.  But I think at

10  some point maybe he just got a little tired and kind of gave

11  in.  But there was several different times when he had

12  loosened those straps.

13  Q.    And you were working with Cpl. Bryant and Josh Marriott

14  to try to get him under control; is that right?

15  A.    Correct.

16  Q.    Did you think that the tasing was that -- performed by

17  Cpl. Bryant was necessary to get him, Mr. Norris, under

18  control?

19  A.    It was absolutely justified at that point, yes.

20  Q.    Did you think that Cpl. Bryant was tasing Jordan Norris

21  because he wanted to punish him in any way?

22              MS. MYERS:  Objection.  Speculation.

23              THE COURT:  Overruled.

24              THE WITNESS:  No, sir.

25

BY MR. STRIANSE:

Q.   Do you think he was doing it to be malicious in any way?

A.   No, I don't.

        MS. MYERS:  Same objection.

        THE COURT:  Overruled.

BY MR. STRIANSE:

Q.   Was he doing it to be sadistic in any way?

A.   No.

Q.   Did you think it was necessary?

A.   To drive-stun -- to -- to try to gain control of that arm and utilize that pain compliance technique, absolutely.

Q.   Now, at that point in time, November 5 of 2016, you had not been Taser trained; is that right?

A.   That is correct.

Q.   So were you aware of any particular policies regarding the use of the Taser?

A.   I was not.

Q.   You talked about the danger of someone in a restraint chair having a -- an arm that is not properly secured.

        Explain to the jury, what are some of the dangers if that arm is not properly secured?

A.   You know, if someone has that much strength and they were able to loosen their arm enough to get it out, if he could move that strap, that single strap that was around his arm, he could grab ahold of, you know, someone's groin,

1  someone's throat.  You know, do whatever -- he could get his
2  hands on, he could do damage with it because he did have that
3  strength.
4  Q.   And as you were dealing with him in the moment or
5  moments on the night of November 5, 2016, did you perceive
6  Jordan Norris to be a threat?
7  A.   I did.
8  Q.   Even though he was in this restraint chair to some
9  extent?
10  A.   Right.  Well, the -- if there was -- the threat that I
11  perceived was the loose arm, the loose strap, that he could
12  move back and forth.  And so that's what I focused on at that
13  point, was holding that arm to try to keep him from getting
14  it out, which would make it even harder for us to be able to
15  re-restrain him at that point.  But that would have been my
16  perception of what I perceived to be a threat, would be the
17  right arm.
18  Q.   Do you have any idea how long you and Bryant and
19  Marriott had to struggle with Jordan Norris to finally get
20  that arm under control?
21  A.   I don't, sir.  It took some time, but I don't know how
22  much time it was.
23  Q.   Was that a pretty intense and stressful situation?
24  A.   It was.
25  Q.   How long did you work with Mark Bryant in the jail?

```
 1  A.    I'd say probably maybe eight months, nine months.
 2  Q.    You all were on the same shift?
 3  A.    Yes, sir.
 4  Q.    Did you see Mark Bryant interact with inmates at the
 5  jail?
 6  A.    Yes, I did.
 7  Q.    And how would you describe his style in dealing with
 8  inmates?
 9  A.    He was the type of person that always believed in trying
10  to talk someone down.  His -- actually, his whole saying was
11  "Use your words, not your hands, first."
12  Q.    Did you perceive him to be a hands-on kind of
13  correctional officer?
14  A.    You mean as far as physically, whenever someone
15  resisted?
16  Q.    Yeah.
17  A.    Only if it was necessary.
18  Q.    You know, the phrase "going hands on" was -- what does
19  that mean to you?
20  A.    "Going hands on" to me is when you actually have to put
21  your hands on someone to forcefully do -- make them do what
22  you're commanding them to do.
23  Q.    And would that have been Mark Bryant's style, to go
24  hands on?
25  A.    If he had to.
```

1  Q.   But not his first option?

2  A.   No.

3  Q.   At that time, November 5, 2016, what tools were

4  available to correctional officers to deal with combative

5  inmates?

6  A.   Simply the Taser and handcuffs.

7  Q.   Did you feel as a correctional officer that you had

8  sufficient tools to deal with inmates that became combative

9  and explosive and unpredictable?

10 A.   No.

11            MR. STRIANSE:  Those are my questions.

12            THE COURT:  All right.  Cross.

13

14                    CROSS-EXAMINATION

15 BY MS. MYERS:

16 Q.   Good morning, Officer Key.

17 A.   Good morning, ma'am.

18 Q.   So you mentioned that the defendant would tell people,

19 "Use your words first"; is that right?

20 A.   That's correct.

21 Q.   And you heard the defendant use his words on the night

22 of November 5th --

23 A.   That's correct.

24 Q.   -- with Jordan Norris?

25 A.   Uh-huh.

```
 1   Q.   In fact, you heard him say, "I'll keep doing it until I
 2   run out of batteries"?
 3   A.   That was a comment that was made -- I don't know if it
 4   was exact verbatim, but something along those lines, yes.
 5   Q.   Is that appropriate?
 6   A.   No, it was not.
 7   Q.   And while the defendant was tasing Jordan, you kept
 8   ahold of his arm?
 9   A.   I did.
10   Q.   And he never hit anyone?
11   A.   No.
12   Q.   And he never kicked anyone?
13   A.   No.
14   Q.   And you agree there was no justification for the
15   defendant tasing Jordan Norris for 25 seconds in a row?
16   A.   That's correct.
17   Q.   And you agree there was no justification for the
18   defendant tasing Jordan Norris four times for 50 seconds?
19   A.   That's correct.
20             MS. MYERS:  Thank you.
21             THE COURT:  Redirect.
22
23                     REDIRECT EXAMINATION
24   BY MR. STRIANSE:
25   Q.   Officer Key, I want to make sure you understood the last
```

1  question that you heard from the prosecutor.

2           Could that question be read back to him?  Judge?

3           THE COURT:  Yes.  The court reporter will do that.

4           (Whereupon the previously mentioned question was

5           read back by the reporter.)

6           THE WITNESS:  I do understand the question.

7  BY MR. STRIANSE:

8  Q.   Okay.  And what was your response?

9  A.   It's against policy.

10 Q.   Now, you were not trained on the policy at that point in

11 time?

12 A.   No, I wasn't.

13 Q.   Okay.  Are you talking about the policy that was

14 implemented after July 31, 2017?

15 A.   I'm not sure when that policy was implemented, but that

16 is -- as far as I know, that's been Taser's policy.  That's

17 what they recommended, a maximum of three five-second bursts.

18 Q.   Okay.  And when did you receive your Taser training?

19 A.   Once I went to patrol.

20           MR. STRIANSE:  Thank you.

21           THE COURT:  All right.  You can step down.

22           THE WITNESS:  Thank you, sir.

23                (Witness excused.)

24           THE COURT:  All right.  Call your next witness.

25           MR. STRIANSE:  Your Honor, may I check on one

```
 1  witness?
 2            THE COURT:  Sure.
 3            MR. STRIANSE:  Call Rebecca Burney.
 4                  REBECCA LYNN BURNEY,
 5  called as a witness by Plaintiff, was duly sworn and
 6  testified as follows:
 7
 8            COURT DEPUTY:  Please be seated.
 9            Please be sure to speak into the microphone.
10  State your full name and spell your last name.
11            THE WITNESS:  Rebecca Lynn Burney, B-u-r-n-e-y.
12
13                  DIRECT EXAMINATION
14  BY MR. STRIANSE:
15  Q.   Good morning, Ms. Burney.
16  A.   Good morning.
17  Q.   And where do you live, ma'am?
18  A.   Clarksville, Tennessee.
19  Q.   And how are you currently employed?
20  A.   G4S.
21  Q.   And what do you do for them?
22  A.   I'm a lieutenant for a security company.
23  Q.   Okay.  And do you know the defendant Mark Bryant?
24  A.   I do.
25  Q.   And how do you know Mark Bryant?
```

1    A.    We used to work together.

2    Q.    At the Cheatham County Sheriff's Office?

3    A.    Yes.

4    Q.    How long did you work at the Cheatham County Sheriff's

5    Office?

6    A.    Close to two years.

7    Q.    And what was your role there at the Cheatham County

8    Sheriff's Office?

9    A.    The field training officer.

10   Q.    And how long did you hold that position?

11   A.    About seven months.

12   Q.    And what were your duties as a field training officer at

13   the sheriff's department?

14   A.    To train the new deputies that came in to run -- to work

15   the jail.

16   Q.    So you worked as a correctional officer?

17   A.    Yes.

18   Q.    I'd like to direct your attention to November the 5th,

19   2016.

20          And were you working as a correctional officer at

21   the jail then?

22   A.    Yes.

23   Q.    And what shift were you working on November 5, 2016?

24   A.    Third shift.

25   Q.    Third shift begins at 10:00 p.m.?

1    A.    Yes.

2    Q.    Can you tell the jury what you experienced when you came

3    to work on Saturday night, November 5th, 2016?  Was there an

4    incident going on?

5    A.    There was.  When I walked into the booking office, we

6    had a young gentleman in the restraint chair.  He was

7    yelling, screaming, saying that people had guns at him, that

8    we were trying to kill him, and all kinds of -- he was just

9    on a rampage.

10   Q.    And what was being done with him at 10:00 or so on that

11   Saturday night?

12   A.    When I first came in, he was just in the restraint chair

13   and facing the wall.  Just going crazy.

14   Q.    And was it your understanding that there was a plan to

15   take him to the hospital that evening?

16   A.    There was.

17   Q.    And did you interact with Jordan Norris when he was in

18   the restraint chair in the booking area?

19   A.    I did.

20   Q.    And explain to the jury what you observed about Jordan

21   Norris that night.

22   A.    He was frantic.  His eyes were wide open, like -- they

23   were just wide.  Like he was on something.  I asked him

24   multiple times, what -- you know, what was going on, what

25   were you on?

1           At one point in time he stated that he was

2   drinking liquid dragon.  I asked him what that was.  He said

3   it was liquid acid.  I thought he was doing some kind of

4   episode from, like, PTSD because he kept saying guns were at

5   him, pointed -- then come to find out he was only 18.  So I

6   knew that was impossible, that he wasn't in the military and

7   having an episode.

8   Q.    And did you say PTSD?  I'm sorry.  I didn't hear you.

9   A.    Yeah.  Because he was frantic.  You know how, when

10  people are in the military and they go through war or trauma,

11  they talk about guns and explosives and people trying to

12  shoot them and kill them?  So that's what my thought, my

13  first impression was.

14          So I checked his booking card, and found out he

15  was only 18.  And that's when I was, like, what's really

16  going on?  And he told me that he was drinking liquid dragon.

17  I was like, well, what is that?  Never heard of that before.

18          Every time I would get him to calm down, some of

19  the inmates would get him to go back -- you know, "Oh, don't

20  let them get you.  You better keep going."  So it would hype

21  him back up.

22  Q.    So inmates were yelling things at him?

23  A.    Yes.

24  Q.    Trying to agitate the situation?

25  A.    Yes.

Q.   Now, we have seen video of what was going on in the
booking area at around 10:20 or so.  And we see a woman that
is really kneeling in front of Jordan Norris in the -- while
he's in the restraint chair.

          Was that you?

A.   Yes, it was.

Q.   And tell the jury what you were doing in trying to
communicate with Jordan Norris?

A.   I know at one point I was trying to get him to calm down
so we could take his cuffs off to -- to literally get him out
of the chair to help him to the car.  He was not going.  He
almost hurt my wrist.  I had to yank it away.

          And then, when I was kneeling down, we were
undoing his feet or putting shackles on his feet, and -- and
they were loose.  So he could have hurt me at some point,
because he was trying to kick.

          So we were trying to get his feet back into the
restraint chair because we were trying to take him out to get
him help.  And he just was not at all complying with us, no
matter how much we tried.

Q.   Forgive me, I'm sorry.  Was that the time that Mark
Bryant tased him?

A.   Yes.

Q.   When his feet were loose?

A.   Uh-huh.  Yes.

1  Q.    And you felt like you were going to be kicked?

2  A.    Oh, yeah.  I mean, my head -- I mean, I was close to his

3  feet with my face.  So when he tased him, it was kind of,

4  hey, hold on.

5  Q.    Did you feel like Mr. Norris was properly restrained and

6  under control at that moment when you felt like you were

7  about to be kicked?

8  A.    No.  His -- like I said, his feet were not completely

9  restrained because we had tried to take them out to shackle

10  them.

11  Q.    Did you ever work with Mark Bryant at the jail?

12  A.    I did.

13  Q.    And did you observe him interact with inmates at the

14  jail?

15  A.    I did.

16  Q.    And what were your observations on how he would interact

17  with inmates?

18  A.    He was fair, compassionate.  He was a good officer.

19  Q.    Did you think that the tase that he applied in the

20  incident that you just described where you felt like you were

21  about to be kicked was an appropriate use of force?

22  A.    I do.

23  Q.    Do you think that he applied that -- that Taser to

24  Mr. Norris at that time to punish him in any way?

25  A.    No.  He seen me about to get kicked, and he was trying

1  to prevent that from happening.

2  Q.    Do you think he was trying to retaliate against

3  Mr. Norris at that time?

4              MS. MYERS:  Objection.  Speculation.

5              THE WITNESS:  No.

6              THE COURT:  Overruled.

7  BY MR. STRIANSE:

8  Q.    Did you think he was doing it to be sadistic in any way?

9  A.    No.  That's not Mark at all.

10  Q.    Did there come a point in time that he was actually

11  taken from the jail on November 5th?

12  A.    There was.

13  Q.    And did he return to the jail at a later date?

14  A.    Later on that -- I guess it would be morning of the 6th

15  because he came back still when I was working.

16  Q.    And did you have any further interaction with Jordan

17  Norris after he returned to the jail?

18  A.    I did.

19  Q.    And when was that?

20  A.    The night of the 6th.

21  Q.    Anything significant happen that you observed with

22  Jordan Norris after he was returned to the jail?

23  A.    Yes.  There was some -- an issue that happened that

24  night with him.

25  Q.    And what night are we talking about?

```
1   A.    November the 6th.
2   Q.    And what do you remember about that incident?
3   A.    We were waiting for the mental health -- the -- to have
4   a bed for him.  And --
5              MS. MYERS:  Objection.  May we approach?
6              THE COURT:  Sure.
7              (Bench conference outside the hearing of the
8              jury.)
9              THE COURT:  So where are we going with this?
10             MR. STRIANSE:  She's going to describe another
11  incident with Mr. Norris on or about November 6th or so,
12  after he was returned from the hospital but before he was
13  taken to Middle Tennessee Mental Health, where he was
14  aggressive and combative again.
15             THE COURT:  And what's she going to say?
16             MR. STRIANSE:  I think --
17             THE COURT:  Was he tased?
18             MR. STRIANSE:  No, he was not tased.
19             THE COURT:  So he continued to be aggressive --
20             MR. STRIANSE:  Yes.
21             THE COURT:  -- and combative?
22             MR. STRIANSE:  Yes, sir.
23             MS. MYERS:  The problem I have is relevance, Your
24  Honor.  This is the day after all of this happened.  I think
25  it could be extremely confusing to the jury.  We've been
```

talking about November 5th. That's when the charges are in
this case. And this behavior is entirely separate. And I'm
not aware of where we're going with that. But I think it is
very misleading.

THE COURT: I'm going to permit it because both
the government and the defense have talked about and alluded
to whether he had some mental issues and those mental issues
would continue to evidence themself both on November 5th,
6th, 7th, and you've heard from the psychiatrist.

But she doesn't need to -- I'm going to allow it a
little bit. I didn't mean to allow as much of what she said,
you know, in terms of Jordan Norris's comments. So let's not
get back into that, that far down.

MS. MYERS: And mental health is also cumulative,
Your Honor. I mean, we've been talking about his mental
health --

THE COURT: But you opened the door. You both are
saying he may have had some mental issues. So it's helpful
to the jury to hear it.

MR. STRIANSE: Judge, can I ask you a scheduling
question?

THE COURT: Yeah, I was going to do that, too.

MR. STRIANSE: Mr. Bryant is my next witness.

THE COURT: How long is he going to go?

MR. STRIANSE: He's going to be long. So I didn't

```
 1   know.
 2                THE COURT:  What does the word "long" mean?
 3                MR. STRIANSE:  I think he'll probably be, you
 4   know, an hour on direct.
 5                THE COURT:  That's what I thought.
 6                MR. STRIANSE:  And I know the government had a
 7   pretty long cross for him the first time.
 8                THE COURT:  Okay.
 9                MR. STRIANSE:  Would it make sense once we're done
10   with Mr. Burney to maybe take our lunch?
11                THE COURT:  Right.  What do you anticipate for
12   rebuttal based on what you heard so far?
13                MS. MYERS:  It depends on, you know, the
14   culmination of the testimony.  We don't anticipate calling a
15   rebuttal witness right now, but that may vary --
16                THE COURT:  Who would that be?
17                MS. MYERS:  Perhaps Sheriff Breedlove.
18                THE COURT:  Oh, wow.  All right.
19                Well, we're still making good progress here.  I
20   agree -- I think it would be easy for the jury to hear the
21   direct and the cross and -- but we'll come back and start,
22   you know, promptly at 1:00.  Even -- even starting at 1:00,
23   we should be able to complete all of the proof today and --
24   so that leaves us with closing and charge tomorrow.
25   That's -- that's pretty good.
```

```
 1              MR. STRIANSE:  Thank you.
 2              MS. MYERS:  Thank you.
 3              (Jury present.)
 4  BY MR. STRIANSE:
 5  Q.   You were about to describe the incident with Jordan
 6  Norris after he was returned from the hospital but before he
 7  went to the Middle Tennessee Mental Health Institute,
 8  correct?
 9  A.    Yes.
10  Q.    Tell the jury about that.
11  A.    That night, it was me and three other officers.
12              THE COURT:  Now, you need to talk into the
13  microphone --
14              THE WITNESS:  Okay.
15              THE COURT:  -- consistently.
16              THE WITNESS:  That night it was me and three other
17  officers.  I had an officer call me from booking, where
18  Jordan was at.  He was in a cell with two other inmates.  All
19  three were on --
20              THE COURT:  I'm sorry.  Now you need to go slower
21  for the court reporter.  Speak up and speak slowly.
22              THE WITNESS:  Okay.  So all three of them that
23  were in the cell with Jordan, him and two other inmates, they
24  were all on suicide watch.  So we had extra eyes on them.
25              Officer Shaffer called up, saying I needed to get
```

to booking due to Jordan Norris being aggressive to the other
two inmates that were on suicide watch. So, by the time I
got up there, he had put hands on one of them. So at that
time I knew he had to come out of that cell because he is
causing conflict with the other two inmates that are on
suicide watch with him.

So, weird coincidence, the phone rang and it was
mental health saying, "We're ready for him," which was good
for us because I didn't want to put him in anything --
anywhere else, like the restraint chair, because I knew how
hard it was to get him in there the first time.

So, when that happened, I said, "Hey, Jordan, you
remember we've been talking. We're going to get you the help
that you need. They called; they're ready for you."

So he acted like he was agreeing with me. So I
went and got his shoes. I had the shackles, the handcuffs.
I said, "All right, I need you to put your shoes on."

So as I'm holding the handcuffs and the shackles,
my other officer's holding the door, well, Jordan tries to
come out and yank the shackles and handcuffs from me. So we
had to shut the door. I knew, between me and another
officer, we were going to need help. So we had to get some
of the road deputies in to help us put him in handcuffs and
shackles. It took six of us to literally get him in
handcuffs and shackles, and we tried everything to get him to

1   calm down, to go -- to cooperate, and he just -- he put up a
2   fight.  He was aggressive.  And he ended up busting one of
3   the inmate's teeth out.  He was just not going.  He was very
4   combative with us.
5            MR. STRIANSE:  Thank you.
6            THE COURT:  All right.  Cross.
7
8                    CROSS-EXAMINATION
9   BY MS. MYERS:
10  Q.   Good morning, Ms. Burney.
11  A.   Good morning.
12  Q.   Now, the incident that you just described, that was
13  November 6th?
14  A.   Yes.
15  Q.   Of 2016?
16  A.   Uh-huh.
17  Q.   Okay.  Just to be clear.
18  A.   Yes.
19  Q.   And Jordan Norris wasn't tased on November 6th?
20  A.   No.
21  Q.   And you're friends with the defendant?
22  A.   Yes, I'm friends with him.  But I haven't seen him or
23  hung out with him in over a year.
24  Q.   But you were very close at the time?
25  A.   I mean, we hung out on occasion, but we -- we're not the

1  best of friends.  He's not my bestie, no.

2  Q.   Well, he helped you move into your new place, though,

3  right?

4  A.   He had a truck.  And, like I said, he's a good guy.

5  Q.   And you witnessed the defendant tasing Jordan multiple

6  times the night of November 5th?

7  A.   Yes.

8  Q.   And I want to talk about the last time that you saw the

9  defendant tase Jordan Norris, right before he was transported

10 out to the car, okay?

11 A.   Uh-huh.

12 Q.   So, in referring to the last tase, you were right in

13 front of him at that time; is that right?

14 A.   Yes.

15 Q.   And you didn't feel like you were in danger at that

16 time?

17 A.   His legs were loose and he was kicking.

18 Q.   Well, you didn't feel like you were in danger, though,

19 like he was about to harm you at that time?

20 A.   Again, his legs were loose and he was kicking.  It was

21 possible that he could have kicked me in the face.  So. . .

22 Q.   You're saying it's possible.  But you didn't feel like

23 you were in danger?

24 A.   I did.  That's -- I mean, yeah.

25           MS. MYERS:  Your Honor, I would like to have this

1  to refresh her recollection.

2         THE COURT:  You need to explain to the record what

3  is "this."

4         MS. MYERS:  I will.

5  Q.  This is grand jury testimony.

6         You testified under oath on May 16 of 2018; is

7  that right?

8  A.  Yes.

9  Q.  I'll give you a moment to look that over.

10  A.  (Reviews document.)

11  Q.  And so in the marked section --

12         THE COURT:  I'm sorry.  Have you had enough -- see

13  if she's had enough time to read it.

14  BY MS. MYERS:

15  Q.  Ms. Burney, are you ready?

16  A.  I'm ready.

17  Q.  All right.  Ms. Burney, so I want you to go to the

18  marked section referring to that last tase we just discussed.

19  "Okay" was the question.  (As read):

20             But you were right in front of him?

21         Your answer:  Yes.

22             And you didn't feel like you were in danger at

23             that time?

24         Your response:  No.

25             Did I read that correctly?

1  A.    You did.

2  Q.    Thank you.

3  A.    But the video that you showed, I didn't see him kicking

4  me when I answered that -- like, that question.  It's okay.

5             THE COURT:  All right.  Redirect.

6

7                     REDIRECT EXAMINATION

8  BY MR. STRIANSE:

9  Q.    Do you remember when you appeared before the federal

10 grand jury across the hall?

11 A.    The very first time or the second time?

12 Q.    Either time.

13 A.    To some degree, yes.

14 Q.    Let me see if I have the date.

15            Do you remember appearing May 16th of 2018?

16 A.    I remember being here, yes.

17 Q.    And I've got a copy of the transcript if you want to

18 take a look at the date.

19 A.    I would.

20 Q.    So that -- and this event happened on --

21            THE COURT:  You do want to take a look at --

22            THE WITNESS:  I do.

23            THE COURT:  She does want to look at it.

24            MR. STRIANSE:  For the record, I'm handing you

25 your grand jury testimony that was taken on May 16th, 2018.

1          THE WITNESS:  Okay.

2    BY MR. STRIANSE:

3    Q.    And the event that we've been talking about is

4    November 5 of 2016; is that right?

5    A.    Yes.

6    Q.    When you appeared before the federal grand jury in May

7    of 2018, had you reviewed the video of the event prior to

8    your testimony?

9    A.    No.

10   Q.    Did that have some impact on how you answered questions

11   in the grand jury?

12   A.    It did.

13   Q.    In what way?

14   A.    Because when I seen the video -- I mean, it's been a

15   long time.  I mean, I do remember key points of that night

16   because my life could have been hurt.  Like I said, my hand

17   almost got broken.  I could have got kicked in the face.  But

18   it's time.  It's 2020.  So, from 2016 to now, I mean, I

19   don't -- I just -- you know, it's a lot to -- seeing it

20   again.

21   Q.    And at what point in the process was your hand grabbed

22   by Mr. Norris?

23   A.    When we were -- when I was unhandcuffing him, he grabbed

24   my hand.  You could even see in the video, I'm yanking it

25   away, and that's when he got tased again.  And when he got

1    tased again, he let my hand go, and I was able to get it free

2    before it got hurt.

3    Q.    And this was third shift on November 5, 2016?

4    A.    It was.

5    Q.    Roughly 10:25 or so p.m.?

6    A.    Yes.

7                MR. STRIANSE:  That's all.

8                MS. MYERS:  Your Honor --

9                THE COURT:  Why don't you approach.

10               MS. MYERS:  Thank you.

11               (Bench conference outside the hearing of the

12               jury.)

13               MS. MYERS:  Your Honor, Ms. Burney just made a

14   false statement.  Mr. Strianse had elicited testimony that

15   she had not seen that video.  It's in the grand jury

16   transcript on page 25 that the video was shown to her right

17   before she made that statement.  I would like an opportunity

18   to ask and clarify that she did, in fact, see the video.

19               THE COURT:  Well, she stated it here as well.

20   That was my impression from her testimony, that she saw the

21   video before she testified.

22               MS. MYERS:  He, when he came up on redirect, asked

23   her if she had seen the video before she testified.  And the

24   implication is that at the time that she made that statement

25   that she was not in danger at the time, that she had not seen

```
 1   the video.  And the video had been showed to her right before
 2   she made that statement.
 3                  THE COURT:  And she testified to that.
 4                  MS. MYERS:  I don't believe she did.
 5                  THE COURT:  Okay.  (As read):
 6                      You appeared before the federal grand jury in
 7                  May of 2018.  Had you reviewed the video of the --
 8                  prior to your testimony?
 9                      No.
10                  MR. STRIANSE:  It was prior to her testimony.
11                  MS. MYERS:  That's right.
12                  THE COURT:  Did she -- did that have some -- I'm
13   not following you.
14                  MS. MYERS:  But then he goes on to ask her about
15   her -- the statements that she made, leaving the
16   impression --
17                  THE COURT:  What statement?
18                  MS. MYERS:  The statement that she made about not
19   being in danger at the time, when she was in front of him.
20   He asked her about that.  And it leaves the impression at the
21   time she made this statement she had not seen the video, and
22   she had seen the video just prior to making those statements.
23   So her memory of that period was completely refreshed.  She
24   had seen it and she agreed that --
25                  THE COURT:  In your examination.  Are you talking
```

1   about your examination?

2           MS. MYERS:  No.  In the grand jury.

3           THE COURT:  I'm talking about what happened here.

4   That's why I'm trying to follow you.

5           MS. MYERS:  No.

6           THE COURT:  What testimony has she given here that

7   she needs to clarify?

8           MS. MYERS:  I didn't reference the video that she

9   was --

10          THE COURT:  She said it in one of your answers.

11   To answer you.

12          Go ahead.

13          MS. MYERS:  In the very last one.

14          THE COURT:  Yeah.

15          MS. MYERS:  She had not seen the video.

16          THE COURT:  I'm talking about you want to clarify

17   something.

18          MS. MYERS:  I do.

19          THE COURT:  What is it?

20          MS. MYERS:  I want to clarify, at the time she

21   made the statement --

22          THE COURT:  What statement?

23          MS. MYERS:  -- that she did not feel she was in

24   danger.

25          THE COURT:  Where?  In the grand jury?

1          MS. MYERS:  Correct.  That I had to impeach her

2   with.  Because she said here that she felt she was in danger.

3   In the grand jury, she said she was not in danger.

4          THE COURT:  But you did that.

5          MS. MYERS:  Yes.  But then on redirect he came up

6   and he has -- basically, what he stated is that it was before

7   she saw the video that she made the statements.  She hadn't

8   reviewed the video again.  She reviewed the video right

9   before she made this statement.

10         THE COURT:  To the grand jury?

11         MS. MYERS:  Correct.

12         THE COURT:  (As read):

13             Do you remember when you appeared before the

14             grand jury?

15         She said no.  (As read):

16             Do you remember appearing on the 16th?

17             I remember being there, being handed a copy of

18             it.

19         And we're all focused now.  (As read):

20             For the record, I'm handing you the grand jury

21             testimony taken on May the 16th, 2018.

22         MS. MYERS:  That's correct.

23         THE COURT:  Is that the first time or the second

24   time?

25         MS. MYERS:  She only testified in the grand jury

```
 1  one time.
 2          THE COURT:  Good.  (As read):
 3              And the event that we've been talking about is
 4          November 5th; is that right?
 5              Yes.
 6              When you appeared -- November 5th, '16; is that
 7          right?
 8              Yes.
 9              When you appeared before the grand jury in May
10          of 2018, had you reviewed the video of the event
11          prior to your testimony?
12              No.
13          MS. MYERS:  No.  And I just want to emphasize -- I
14  want to make sure that's clear, that she did review the video
15  in the grand jury right before she made that statement.  We
16  didn't ask her about it without her viewing the video.
17          THE COURT:  (As read):
18              When you appeared before the grand jury in May
19          of 2018, had you reviewed the video and did you
20          have --
21          She said no.
22              So you want to say that that's wrong, that she had
23  reviewed it?
24          MS. MYERS:  She had reviewed the video right
25  before she made that statement.
```

```
1              THE COURT:  But then she says -- then we go on and
2    it says (as read):
3                   Did that have impact on how you answered the
4              question in the grand jury?
5                   It did.
6                   And why is that?
7                   Because, when I seen the video -- I mean, it's
8              been a long time.  I mean, I do remember key
9              points of that night because my life could have
10             been hurt.  Like I said, my hand almost got
11             broken.  I could have gotten -- I could have got
12             kicked in the face.  It's 2020.  So from 2016 to
13             now -- I mean, I don't -- I just -- you know, it's
14             a lot to -- seeing it again -- seeing it again.
15                  Why is it -- and at what point in the process
16             was your hand grabbed by Mr. Norris?
17             So she starts off saying because what -- what --
18   "Because, when I seen the video."
19             MS. MYERS:  You know, it's just really unclear all
20   the way around.
21             THE COURT:  That's what juries do.  They clarify
22   the things --
23             MS. MYERS:  Right.  Right.  I understand.
24             THE COURT:  Okay.
25             MS. MYERS:  And I think, hearing all of that
```

1  again, I'll leave it alone.

2          THE COURT:  I think so.

3          MS. MYERS:  All right.  Thank you.

4          THE COURT:  And I'm sorry.  Mr. -- Strianse.

5          MS. MYERS:  Mr. Strianse.

6          THE COURT:  Have you had redirect?

7          MR. STRIANSE:  Yes.

8          THE COURT:  Okay.  Good.

9          (Jury present.)

10         THE COURT:  All right.

11         Ms. Burney, you're excused.

12         THE WITNESS:  Thank you.

13                  (Witness excused.)

14         THE COURT:  All right.  Ladies and gentlemen, it's

15  a little bit earlier than I anticipated, but I do anticipate

16  that we're going to complete all the proof today, and I -- I

17  believe we'll do that easily.  And I anticipate then -- and

18  by "all the proof," I mean any rebuttal proof that the

19  government may choose to present.  So I think you're going to

20  get all the evidence presented before you today.

21         And right now, I'm -- I'm -- I'm also anticipating

22  we'll do closing in the morning and then I'll charge you.

23  And I think before noon you'll have the case and ready to

24  start your deliberations.  So I say all that to justify a

25  15-minute-early -- earlier lunch.  But we'll come back and

```
 1   start promptly at 1:00.  Thank you.
 2              (Lunch recess.)
 3              (Jury not present.)
 4              THE COURT:  All right.  Be seated.
 5              Are we ready to proceed?  From the government?
 6              MR. STRIANSE:  Yes.
 7              THE COURT:  Oh.  From the government?
 8              MR. SONGER:  Yes, Your Honor.
 9              MR. STRIANSE:  Yes, Your Honor.
10              THE COURT:  Okay.
11              (Jury present.)
12              THE COURT:  All right.  Be seated.
13              Call your next witness.
14              MR. STRIANSE:  Call Mark Bryant.
15
16                   MARK MITCHELL BRYANT,
17   called as a witness by Defendant, was duly sworn and
18   testified as follows:
19
20              COURT DEPUTY:  Please be seated.
21              Please be sure to speak into the microphone.
22   State your full name and spell your last name.
23              THE WITNESS:  Mark Mitchell Bryant, B-r-y-a-n-t.
24
25
```

                         DIRECT EXAMINATION

BY MR. STRIANSE:

Q.   Good afternoon, Mr. Bryant.

A.   Good afternoon.

Q.   How old are you, sir?

A.   Forty-one.

Q.   And where did you grow up?

A.   Clarksville, Tennessee.

Q.   And you lived in Clarksville your whole life?

A.   My whole life, yes, sir.

Q.   How far did you go in school?

A.   I graduated high school in 1996.

Q.   Did there come a point in time that you went to work for
the Cheatham County Sheriff's Office?

A.   Yes, sir.  August of 2015.

Q.   And you were hired on that date?

A.   Yes, sir.

Q.   And what was your position at the Cheatham County
Sheriff's Office?

A.   Correctional officer.

Q.   Tell the jury a little bit about the training that you
received when you were first hired at the Cheatham County
Sheriff's Office.

A.   I was walked through the facility with a training
officer the first day, then one day with another deputy, and

1  then I was on my own.

2  Q.    So sort of on-the-job training?

3  A.    Absolutely.

4  Q.    Did you receive any Taser training in your employment at

5  the Cheatham County Sheriff's Office?

6  A.    Yes, sir.

7  Q.    And I think you told us you started in August?

8  A.    That's right.

9  Q.    When did you receive the Taser training?

10 A.    October of '15.

11 Q.    And who taught the Taser training course?

12 A.    Gary Ola.

13 Q.    And Mr. Ola testified yesterday in connection with this

14 case; is that right?

15 A.    That's right.

16 Q.    Do you remember much about taking that course?

17 A.    Yeah, sure.  It was a morning before I had to work shift

18 that -- later that day.  So we started around 8:00 and maybe

19 went until noon.  I was sworn in after that.  Went and got

20 some food and then went to work on shift.

21 Q.    And this was October 23rd of 2015?

22 A.    That's right.

23 Q.    And you were actually being sworn in as a correctional

24 officer that same day?

25 A.    That's right.

1    Q.    Do you remember how many hours the course lasted?

2    A.    Three or four.

3    Q.    Three or four hours?

4    A.    Yes, sir.

5    Q.    And what do you remember about the components of the

6    course that was taught by Sgt. --

7    A.    I remember watching some videos, going over a test,

8    taking a test, and then a lot of volunteers being tased by

9    the prongs, deployable prongs.

10   Q.    After taking that course, what was your understanding

11   about the policy that existed at the Cheatham County

12   Sheriff's Office regarding the use of the Taser?

13   A.    Always the least amount of force necessary.

14   Q.    Were you aware of any limit on the number of times that

15   the device could be applied?

16   A.    No.  That wasn't anything that I remember from the

17   training.

18   Q.    How about the duration of any of the tases?

19   A.    No, there was nothing mentioned specifically about that

20   that I remember.

21   Q.    And you're familiar with the general orders that have

22   been offered by the government as exhibits in this case; is

23   that right?

24   A.    Yes, sir.

25   Q.    Is there anything in the four corners of those documents

1  that spell out a limit on the number of applications?

2  A.    No, sir.

3  Q.    Or the duration of the application?

4  A.    No, sir.

5  Q.    At the time that you were employed at the jail, what

6  shift did you work?

7  A.    Second shift, 2:00 p.m. until 10:00 p.m.

8  Q.    And you began as a correctional officer; is that right?

9  A.    Yes, sir.

10  Q.    And tell the jury a little bit about your employment

11  trajectory there at the jail.

12  A.    I was hired in August of '15.  Two months later I was

13  appointed to FTO, which is a training officer for all of the

14  staff.  And then June of '16, I was interviewed and promoted

15  to corporal, assistant shift supervisor.

16  Q.    Did you like your job at the Cheatham County Jail?

17  A.    I did, very much.

18  Q.    And how did you interact with the other officers there

19  at the jail?

20  A.    We got along well.  They became very close to me.  I

21  would even call them family.

22  Q.    And how about the administration?  How did you get along

23  with them?

24  A.    It was more business with the administration.  They

25  weren't really in the trenches with us, so to speak.

1  Q.   They were upstairs in the administrative offices?
2  A.   Yeah, yeah.
3  Q.   Is that right?
4  A.   Sure.
5  Q.   And how about your interaction with the inmates at the
6  Cheatham County Jail?
7  A.   Give respect and get respect.  That was the -- that was
8  what I was taught in life in general.  So it worked well in
9  the jail, too.
10  Q.   And what was your style in interacting with inmates at
11  the jail?
12  A.   It was always, let's talk about it.  If we've got a
13  disagreement, we're going to come to an agreement.  And
14  generally that's how it always was concluded, with an
15  agreement between me and a staff member or me and an inmate,
16  me and administration.  It was always the easiest path to
17  talk it out.
18  Q.   And you worked there for a total of how many years in
19  the jail?
20  A.   Two.
21  Q.   And what was your salary at the jail or your hourly
22  wage?
23  A.   I think I made $13 to start, and when I made corporal,
24  it was 14.
25  Q.   Okay.  And describe the jail for us, the physical plant.

1  A.    It was a much older building.  I think I remember it was
2  built in '78 as an addition to the courthouse, and most of
3  the equipment and doors, security devices, were as old as the
4  building.
5  Q.    And the jail was designed to hold how many inmates?
6  A.    About 120.
7  Q.    And that -- and you arrive at that number by going
8  through mentally the dorms that were in the jail?
9  A.    Yes, sir.
10 Q.    Although it was designed to hold 120, how many inmates
11 would it typically hold?
12 A.    Regularly 150-plus.
13 Q.    I want to direct your attention to Saturday,
14 November 5th, 2016.
15 A.    Yes, sir.
16 Q.    Were you working at the jail that day?
17 A.    Yes, sir.
18 Q.    And which shift were you working that day?
19 A.    Second shift.
20 Q.    And what rank were you at that point in time?
21 A.    Corporal.
22 Q.    Do you have any idea how many inmates were in the jail
23 on the evening of November 5, 2016?
24 A.    Not an exact number, but it would have certainly been
25 150 or more.

Q.   And you had how many correctional officers working on the second shift?

A.   A total of six.

Q.   Did you come into contact with an inmate by the name of Jordan Norris --

A.   Yes, sir.

Q.   -- on Saturday night?

A.   Yes, sir.

Q.   And if you would, tell the jury about what time it was that you came in contact with him and how you came in contact with him.

A.   It was shortly after dinner.  We were sitting in the booking area watching the cameras and saw that he was being aggressive towards another inmate, went and spoke to him. Came back to the booking office, continued to view the tape. He was still being aggressive.  There was some talk about him banging his head; I don't remember that.  But if he was trying to hurt somebody or hurt himself, we would have definitely intervened.

Q.   And was that a typical job duty, to watch the surveillance cameras?

A.   Yes, sir.

Q.   And would the surveillance cameras give you a picture of what was actually going on inside the cell?

A.   Yes, sir.

1 Q.   And which cell was Jordan Norris in?

2 A.   Cell 4.

3 Q.   And to give a little bit more detail, you say that you

4 saw something on the video screen that captured your

5 attention?

6 A.   Yes, sir.

7 Q.   And you went to Cell 4?

8 A.   Yes, sir.

9 Q.   Did you go inside Cell 4?

10 A.   I did eventually.

11 Q.   And tell the jury what you saw when you were inside

12 Cell 4.

13 A.   When I got the door open -- I think Jeff Key opened the

14 door.  I was right behind him.  And there was Jordan Norris

15 and another inmate.  They were standing pretty much nose to

16 nose, looked like there was fixing to be a fight that was

17 going to happen.

18         When we entered the cell, Mr. Norris went and sat

19 down and wouldn't come talk to us.  We wanted to come talk to

20 him and find out what was going on.

21 Q.   So how did you try to resolve that situation?

22 A.   When he wouldn't come to us, we went in and we brought

23 him out, and he resisted us immediately.

24 Q.   Now, we saw some video this week of this interaction

25 that you and Deputy Key had at about 6:58 or so p.m.?

1  A.   Yes, sir.

2  Q.   Is that what you're describing?

3  A.   Yes, sir.

4  Q.   Okay.  Tell the jury what you were experiencing when you

5  were interacting with Mr. Norris outside of Cell 4.

6  A.   Well, when we got him out the door, he was fighting us

7  to the door and then we got to the door.  We turned him

8  around facing the wall to get his hands cuffed up because our

9  plan was to get him into the restraint chair so we could end

10 the aggressive behavior or the self-harm behavior.  And he

11 just wasn't willing to work with us.  And he -- he tossed us

12 around a little bit.

13 Q.   We got to see the video of this event.

14          You seemed to lose your balance at some point?

15 A.   Yes, sir.

16 Q.   And why was that?

17 A.   Because Mr. Norris was very strong and very determined.

18 Q.   Okay.  Now, so it's clear for the record, how tall are

19 you?

20 A.   I'm 6'2".

21 Q.   And how much do you weigh?

22 A.   About 300 pounds.

23 Q.   And did you weigh approximately the same amount back in

24 November of 2016?

25 A.   Yes, sir.

1   Q.    And it's your testimony that he was able to affect your
2   balance in your dealings with him?
3   A.    Unfortunately, yes.
4   Q.    So describe for the jury what you all did outside of the
5   Cell 4 door to try to get him under control.
6   A.    We were able to hold him in place for a little while
7   until some backup came.  Josh Marriott came and helped.
8   Daniel Bratton came and helped.  And after a few brief tases
9   by Daniel Bratton, we were able to secure his other hand
10  behind his back and get him cuffed up completely so we can
11  move him over to the chair.
12  Q.    So outside of that Cell 4 door, you had four
13  correctional officers that were dealing with Jordan Norris;
14  is that right?
15  A.    That's right.
16  Q.    And you -- you've described your size and weight,
17  correct?
18  A.    Yes, sir.
19  Q.    And we've seen the size and weight of the other three
20  individuals this week; is that right?
21  A.    Yes, sir.
22  Q.    So roughly about a thousand pounds of men were dealing
23  with him; is that right?
24  A.    A thousand pounds plus.
25  Q.    Were you able to get Jordan Norris into the restraint

1   chair?

2   A.   Eventually, yes, sir.

3   Q.   And describe how you all did that.

4   A.   We walked him over there, and I was behind him.  I had

5   my hands on his shoulders.  We got him to sit down into the

6   chair.  He straightened out, and Mr. Bratton tased him in the

7   abdomen and he complied with us for that moment to sit down.

8   Q.   And I believe Bratton had four tases; is that right?

9   A.   That's right.

10  Q.   And his fourth tase was when -- administered when

11  Mr. Norris was in the chair; is that right?

12  A.   While we were trying to get him in the chair.

13  Q.   And that resulted in him sitting in the chair?

14  A.   That's right.

15  Q.   Once he was in the chair, what's the protocol for

16  cuffing an individual?  Once you had Jordan Norris in the

17  chair, what was the protocol for --

18  A.   Well, we had to get all the other straps on him.

19  There's a lap belt, shoulder straps, feet.  Each ankle had

20  its own individual strap and a strap going across there.  But

21  to start as combative as he was being, his hands were kept

22  behind him while he was being strapped in so he couldn't

23  fight us.

24  Q.   Approximately how long was he in the chair with his arms

25  cuffed behind him and strapped in the chair?

1   A.   About 15 minutes.

2   Q.   And what happened after 15 minutes?

3   A.   He had calmed down, and we went and talked to him.  And

4   he said he was going to comply with our orders, which turned

5   out not to be exactly true.  But as far as getting his hands

6   from behind to the front, over a period of about ten minutes,

7   with some negotiating, some agreement come to, we finally got

8   him into those straps completely.

9   Q.   When you started dealing with Jordan Norris inside of

10  Cell 4 and getting him out of Cell 4, what were your

11  observations of how he was acting?  How did he appear to you?

12  A.   He was just wild.  He had a wild look on his -- on his

13  face.  He was yelling incoherent things that didn't make any

14  sense, weren't related to anything that we were saying to

15  him.  It's like he didn't know who we were or what we were or

16  where we were.

17  Q.   Did he appear to be under the influence of something?

18  A.   Yes.

19  Q.   Now, back to where you were in the timeline.

20           You all made the decision to get him out of the

21  cuffs, correct?

22  A.   Yes.

23  Q.   And move his arms around to the front of the chair?

24  A.   Yes, sir.

25  Q.   And tell the jury what happened after his arms were

1  moved to the front of the chair.

2  A.    It was okay for a little while.  He was calm.  He wasn't

3  causing much of a trouble other than, you know, just yelling,

4  being loud, being disruptive.  But then he started fighting

5  the chair and loosening up the straps, and eventually he got

6  one of his hands almost completely free, the right hand.

7  Q.    Tell the jury a little bit about this restraint chair.

8            How old of a chair was it?

9  A.    I understood it to be as old as the facility.  I didn't

10  know that to be a fact.  I never saw a stamp or anything, a

11  manufacturing date, but the new chair that replaced it

12  shortly after was very different and much easier to use and

13  impossible to break out of.

14  Q.    Were there problems with the straps on the old chair

15  that you all -- you all were using that night?

16  A.    Yes, sir.  The Velcro was deteriorated.  The nylon

17  straps themselves weren't cut through or anything, but they

18  were frayed.  The metal clasp that held those in place were

19  ineffective.  If you -- if you tugged on them, you were going

20  to be able to pull out, you know, some amount.  Mr. Norris

21  was able to pull out quite a bit.

22  Q.    And about what time are we talking about that he is in

23  the chair?

24  A.    From approximately 7:00 to after 10:00, total.

25  Q.    When is it that you have this second incident with

1  Mr. Norris while he is in the chair?

2  A.   When it's discovered that he's pulled one of his hands

3  loose of the -- of the chair, the strap had come completely

4  loose.  It was about a foot away from where it should have

5  been.  And he was able to reach up to his face.  He was able

6  to reach over to the other straps, and he could have gotten

7  himself out if he was allowed to keep working on it.

8  Q.   And how about the straps?  Were they on the -- on the

9  shoulders, were they remaining in place?

10  A.   No.  They were down around his biceps.  They should have

11  been coming across his shoulders.

12  Q.   Now, did there come a point in time when he's in the

13  chair at around 8:00 or so that you felt the need to have to

14  apply the Taser to him?

15  A.   Yes.

16  Q.   Tell the jury what was going on with Mr. Norris that in

17  your mind necessitated the need to use the Taser.

18  A.   He was fighting with Deputy Key.  Deputy Key was trying

19  to get his hand back in place, and he wasn't -- he wasn't

20  going to allow it, "he" being Mr. Norris.

21          And the only tool -- the only training I had was

22  with a Taser for pain compliance to get that -- get that

23  situation remedied.

24  Q.   What is your understanding of the force continuum that

25  correctional officers use in dealing with inmates?

A.    Voice commands would be first, and then something called soft hand, empty soft hand, escort techniques.  Then you would have pepper spray, Taser.  And then hard hand techniques, which include grappling, striking, pressure points.

Q.    We saw Officer Marriott applying pressure points with his hands under the chin of Mr. Norris when he was in the restraint chair; is that right?

A.    Yes, sir.

Q.    And what -- where does that fall on the force continuum?

A.    That's right above lethal.

Q.    Right below lethal?

A.    Well, yeah, right below lethal.

Q.    But above the Taser?

A.    Right.

Q.    And Officer Key testified this morning about an arm bar maneuver, a pain compliance maneuver that he had performed on Mr. Norris?

A.    Yes, sir.

Q.    Where does that fall in the continuum?

A.    In the same hard hand.

Q.    Now, you tased Mr. Norris in that 8:00 interval four times?

A.    Yes, sir.

Q.    And that was over a seven-minute period?

1  A.    I'm not sure about how long, but, yeah, that sounds

2  about right.  It seemed a lot longer.

3  Q.    And explain to the jury why you felt it was necessary to

4  apply those four tases to Mr. Norris.

5  A.    Because he wasn't complying with our commands to get his

6  arm back to where it needed to be.

7  Q.    Were you tasing Mr. Norris to punish him in any way?

8  A.    No, sir.

9  Q.    Were you tasing him to be malicious towards him in any

10  way?

11  A.    No, sir.

12  Q.    Were you trying to be sadistic with him at that point in

13  time?

14  A.    No, sir.

15  Q.    When you were applying the Taser, did you think that you

16  were within the policy of the Cheatham County Sheriff's

17  Office?

18  A.    Yes, I did.

19  Q.    And what did you understand that policy to be?

20  A.    Least amount of force necessary.

21  Q.    Now, after the events of 8:00, what next happened with

22  Mr. Norris?

23  A.    There was no more events that required any hands-on

24  activities.  We -- well, other than checking his vitals.  We

25  continued to do our checks.  We gave him water.  He was

1  pretty wore out.  We were all pretty wore out from the
2  altercation we had.  And we just kept on checking on those
3  straps, making sure that he wasn't pulling back out.
4  Q.   Was this 8:00 interaction that you had with him
5  stressful to you?
6  A.   Yes, sir.
7  Q.   Could you perceive that it was stressful to your
8  colleagues?
9  A.   Yes, sir.
10  Q.   At any point in the evening did Officer Marriott,
11  Officer Key, Officer Bratton say anything to you about the
12  four tases that you had applied during that 8:00 interval?
13  A.   No, sir.
14  Q.   No one told you that they thought it was inappropriate
15  in any way?
16  A.   No, sir.
17  Q.   Back on this 8:00 interval, the four tases, were you
18  talking to Jordan Norris --
19  A.   Yes, I was giving him commands.
20  Q.   -- at that point in time?
21       Tell the jury what type of verbal commands you
22  were giving him.
23  A.   I was just asking him to comply with my orders.  I was
24  giving him an order to put his arm where we wanted it to be
25  so it could be tied down properly.  And he was not willing to

1  comply at all.

2  Q.   Now, before you applied that first tase in this 8:00

3  interval, did you warn him and let him know that you were

4  going to tase him if he didn't comply?

5  A.   Yes, I did.

6  Q.   And then, before the other tases in that 8:00 interval,

7  were you still talking to him?

8  A.   Yes.  I was continuously asking him to do what I said.

9  Q.   Much has been made of a statement that's been attributed

10  to you about "We can do this until the batteries run out."

11  A.   Yes, sir.

12  Q.   And this would have been in this 8:00 interval; is that

13  right?

14  A.   That's right.

15  Q.   And do you recall making that statement?

16  A.   I don't remember saying it, but I've heard it since

17  then.  And all I can say is a reaction to something that he

18  had said, that Jeff told me that he -- that he said that he

19  wanted more, something to that effect.

20  Q.   What was your intent in making a statement like that?

21  A.   To convince him that he didn't want to do that anymore.

22  I understood that the Taser hurts.  And I understood that it

23  was hurting him.  But he didn't seem to mind.

24  Q.   Were you angry when you made that statement?

25  A.   No, sir.

1   Q.    What was your intent in saying that?

2   A.    Just to reason with him, to get him to comply with my

3   commands.

4   Q.    Thinking that if he knew that you all were committed to

5   trying to get him under control that he might comply?

6   A.    Yes, sir.

7   Q.    Now, you said that there was a restraint chair log that

8   was set up after 8:00; is that right?

9   A.    Actually, we probably would have started that when we

10  put him in the chair at about 7:00 p.m.

11  Q.    About 7:00?

12  A.    Yes, sir.

13  Q.    And you were still making entries in it after the

14  8:00 --

15  A.    All the way through shift, yes, sir.

16  Q.    -- is that right?

17  A.    Yes, sir.

18  Q.    Did there come a point in time that you contacted the

19  mobile crisis unit?

20  A.    Yes, sir.

21  Q.    And what is the mobile crisis unit?

22  A.    It's -- I guess it's a state agency that comes to jails

23  to evaluate people that have suicidal ideations, and

24  Mr. Norris had said he wanted to die, he wanted to kill

25  himself.  He wanted to kill others.  So it's standard

1   procedure to call and let the nurse know and to call mobile
2   crisis to get someone there to evaluate him.
3   Q.    And did you actually make that call?
4   A.    Yes, sir.
5   Q.    You personally did that?
6   A.    Yes, sir.
7   Q.    And did mobile crisis come to the Cheatham County Jail?
8   A.    Yes, they did.
9   Q.    Later on in the evening was there a discussion about
10  taking Jordan Norris for a mental health evaluation?
11  A.    There wasn't any discussion.  It was standard protocol
12  to get him medically evaluated before he could go to the
13  mental health -- Middle Tennessee Mental Health Institute.
14  Q.    What was the purpose in sending him for the medical
15  evaluation in advance of the Middle Tennessee Mental Health
16  appointment?
17  A.    Middle Tennessee wouldn't accept anyone without that
18  medical evaluation.
19  Q.    And that's their standard protocol; is that right?
20  A.    That's right.
21  Q.    So did there come a point in time that arrangements were
22  made to try to take Jordan Norris to the Centennial Ashland
23  City Medical Center?
24  A.    Yes, sir.
25  Q.    Do you remember about what time that was?

A.   I made that call around 9:00, I guess, and, you know, we
had to get the car pulled up, get the staff ready, because
we're going to be losing a person to make that drive over
there.  And it took a little while.

          Then we decided to wait until third shift got
there to have more hands to make that move.

Q.   And what -- what physical state was Jordan Norris in in
terms of restraint at about 9:00 when you all made that
decision?

A.   He was still fully restrained in the -- in the restraint
chair.

Q.   And describe for the jury what you mean by "fully
restrained."

A.   We had been keeping a good eye on him.  He hadn't gotten
loose with anything.  He hadn't been really acting too
aggressively in the chair, wasn't fighting it as much.  So we
weren't really having to deal with him at all.

Q.   And describe the restraints that he had at about 9:00 or
so?

A.   Both wrists were in a soft cuff restraint that would --
had a strap that went to a hard plastic chair, same with his
legs.  And then, like, a seatbelt and then two shoulder
belts, and then another belt that came across his ankles over
the top of the cuffs.

Q.   What was the plan to get him out of the restraint chair

1    and into the vehicle?

2    A.    We were going to isolate one hand at a time on a bar

3    that was connected to the booking counter.  So loosen one

4    cuff, put a set of handcuffs on it, connect it to the bar,

5    and then so on.

6    Q.    How did that plan work out?

7    A.    It seemed to be a good plan in theory, but then when we

8    started putting it into practice, it didn't work.

9    Q.    And why -- go ahead.  I'm sorry.

10   A.    He started fighting us when we started loosening up the

11   straps.  Like, he was -- he was ready to go.  He had gotten

12   his second wind.  He was ready to fight again.

13   Q.    So what did the alternate plan become when he was revved

14   up again and fighting?

15   A.    Keep him in the chair and roll him out to the car, and

16   then transfer him from the chair directly into the car

17   without having to take the risk of walking him out in

18   handcuffs, shackles, where he could still possibly flail in

19   some way, hurt somebody or hurt himself.

20   Q.    Were there any additional restraints that were placed on

21   him?

22   A.    Yeah.  The standard for transporting an inmate, you have

23   to have a belly chain, handcuffs, and shackles.

24   Q.    And that's even with a cooperative inmate?

25   A.    Yes.

1 Q.   And the standard again is belly chain and --

2 A.   Handcuffs.

3 Q.   And shackles?

4 A.   That's right.

5 Q.   And those shackles would be on the ankles?

6 A.   That's right.

7 Q.   And that's obvious to keep a person from escaping or

8 running off, that sort of thing?

9 A.   That's right.

10 Q.   So when was it in this process that the belly chain was

11 added and the shackles were added?

12 A.   While we were at the bar, after we determined that we

13 were not going to be able to walk him out of there, the belly

14 chain's already on him.  He's not -- he's not able to move

15 his hands very far away from his body.  And we felt like he

16 was secure enough to move.

17 Q.   Now, there was another event with him at about

18 10:20 p.m. in the booking area; is that right?

19 A.   That's right.

20 Q.   And at this point in time he would have been cuffed,

21 correct?

22 A.   Well, during the whole process of getting him cuffed, he

23 was fighting us the whole way.  So there was ten, 15 minutes

24 worth of fighting with him to get these on him that

25 eventually really didn't end up being necessary for getting

1    him out to the car.

2    Q.    And he would have had the belly chain on and the

3    shackles?

4    A.    Yes.

5    Q.    And this is when he was in the restraint chair --

6    A.    Yes.

7    Q.    -- correct?

8            Now, there was an incident with him when he was in

9    the restraint chair and had those other restraints on him; is

10   that right?

11   A.    Yes, sir.

12   Q.    And there was a series of tases where I think you tased

13   him six times; is that right?

14   A.    Yeah.  Throughout that whole process of us attempting to

15   get him belly chained, shackled, and handcuffed and stood up

16   to walk out, when he was fighting us, that's when we had to

17   change our plan to roll him out in the chair.  And during

18   that process he was not complying with commands and fighting

19   us and flailing.  And, yes, I tased him.

20   Q.    And why did you tase him?

21   A.    Because he was fighting us.

22   Q.    To gain control of him?

23   A.    Yes.

24   Q.    There's also been a lot made of an 11-second tase, which

25   was the last tase that you gave him in the booking area; is

1  that right?

2  A.    Yes, sir.

3  Q.    And this is before he was taken to the car later; is

4  that right?

5  A.    Yes, sir.

6  Q.    Describe exactly as you remember it what was going on at

7  that time of that last tase.

8  A.    Officers were standing around him.  We had pretty much

9  secured his top half.  Rebecca Burney and I were down at his

10  knees.  The straps that we had taken off, like, for instance,

11  the cuffs that were -- were on the ankles weren't on his

12  ankles, so we were getting those laid up on his lap so it

13  wasn't dragging on the ground.  And during that process, he

14  made a quick movement and I reacted and tased him again.

15  Q.    Where did you see this quick movement coming from?

16  A.    His legs.

17  Q.    And why did you tase him?

18  A.    Because I was right there.  Mr. -- Ms. Burney was right

19  there, and I wasn't going to have him kicking her in the face

20  or hurting me or hurting himself any further by fighting with

21  those restraints.  Those shackles aren't easy on the joints.

22  Q.    Were you concerned that Correctional Officer Burney was

23  in some danger at that point in time?

24  A.    Yes, sir.

25  Q.    After this incident, Mr. Norris was taken out to the

1  vehicle; is that right?

2  A.    Yes, sir.

3  Q.    And he was still fully restrained?

4  A.    Yes, sir.

5  Q.    And the reports indicate that there was a seventh tase

6  that was done by Cpl. Montgomery; is that right?

7  A.    Yes, sir.

8  Q.    Were you present when that happened?

9  A.    Yes, sir.

10 Q.    Tell the jury what you saw.

11 A.    Myself and Deputy Burney were standing next to the car,

12 getting Mr. Jordan Norris out of the chair, standing him up

13 to get him into the car.  He did not want to get in the car.

14 He bucked and kind of just wedged himself in the door.  And

15 Sgt. Ola told Cpl. Montgomery to hit him on the leg to make

16 him move his leg and get in the car.

17 Q.    And they were able to get him in the car; is that right?

18 A.    Yes.  Yes.

19 Q.    Now, you did a couple of reports; is that right?

20 A.    Yes, sir.

21 Q.    Of the activities that you had engaged in that evening;

22 is that right?

23 A.    Yes, sir.

24 Q.    And what was the policy at the jail for preparing

25 reports that memorialized your activities on a shift?

A.    Any time there was a use of force, you had to write a
report about it and include as much information as you could.
It had to be factual.  There's no opinions or guesses.  You
have to only include facts.  And sometimes, when you're
keeping it concise like that, you don't get all the details,
but you got the details of where you are, what time it is,
and who's involved.

Q.    I'm going to show you what's been received as evidence
as Government's Exhibit 25, I believe.

      And you're familiar with this.  This is an
incident use of force report; is that right?

A.    Yes, sir.

Q.    And do you have the book there in front of you?

A.    Yes, sir.

Q.    I'm going to put it up on the screen, for the record, so
that the jury can see it again.

      Is this the incident report that you prepared on
November 5, 2016?

A.    Yes, sir.

Q.    And before we go through it in some detail, generally
what events were you trying to describe to the reader in this
report?

A.    All the events that happened between 1855 and 2122.

Q.    You've been here in the courtroom, of course, and heard
all the testimony from the other witnesses.

1    A.    Yes, sir.

2    Q.    I think Ms. Wright with the FBI testified yesterday

3    about you had some discussion with her about it might have

4    been better to put this in two separate reports?

5    A.    That's right.

6    Q.    Was there any requirement or policy at the Cheatham

7    County Jail that would have dictated you had to put it in two

8    reports?

9    A.    No, sir.

10    Q.    Let's take a more close look at this report.

11          You've got the date correct; is that right?

12    A.    Yes, sir.

13    Q.    The day and the time?

14    A.    Yes, sir.

15    Q.    And 1855 is 6:55; is that right?

16    A.    6:55 p.m.

17    Q.    And why did you use that as the starting point for this

18    report?

19    A.    Because that's when the disturbance started.

20    Q.    And if we would -- if you could, why don't we have you

21    read it sentence by sentence.

22    A.    Certainly.

23    Q.    Starting with the first sentence in the narrative.

24    A.    (As read):

25          While watching cameras in the booking office, I

1           saw that inmate Norris had an aggressive posture

2           toward another inmate in Cell 4.

3  Q.    Stop right there.

4           Does that accurately describe in your own words

5  what you saw at approximately 6:55?

6  A.    Yes, sir.

7  Q.    And before we go on with the narrative, take a look at

8  the box that says "Inmates Involved."

9           Do you see that?

10 A.    Yes, sir.

11 Q.    Does that accurately describe the inmates that were

12 involved in this altercation in Cell 4?

13 A.    Yes, sir.

14 Q.    We have Jordan Norris.

15           And who is Colin Hefner?

16 A.    He was another detainee.

17 Q.    And then you identify yourself, Josh Marriott, Jeff Key,

18 and Daniel Bratton as the officers involved?

19 A.    That's right.

20 Q.    And this is a use of force incident report; is that

21 right?

22 A.    That's right.

23 Q.    Why did you identify those four individuals?

24 A.    Those four were the individuals that had used force on

25 Mr. Norris that evening.

1  Q.   We know about the force that you've just described.  We
2  saw Marriott's force on the video.  We've heard Jeff Key's
3  testimony and saw him on the video.  And we've heard
4  Bratton's testimony and seen him on the video; is that right?
5  A.   That is right.
6  Q.   All of those individuals were using force?
7  A.   That's correct.
8  Q.   If you would, read the second sentence.
9  A.   (As read):
10             Deputy Key and I responded to the cell, and
11          inmate Norris was threatening inmate Hefner with
12          physical violence upon our entry of the cell.
13  Q.   Is -- in your view, is that an accurate description of
14  what you saw and were responding to in Cell 4?
15  A.   Yes, sir.
16  Q.   Go ahead and read the next sentence.
17  A.   (As read):
18             I instructed inmate Norris to step out of the
19          cell --
20  Q.   Let's stop right there.
21          Did you do that?
22  A.   Yes.
23  Q.   Does that accurately describe your interaction with
24  Norris in the cell?
25  A.   Yes.

1   Q.   Go ahead.

2   A.   (As read):

3               He went back to the bunk in his cell.

4   Q.   Stop right there.

5            Was that accurate?

6   A.   Yes.

7   Q.   And you heard Officer Key testify this morning; is that

8   right?

9   A.   Yes.

10   Q.   And he told the jury about his observations within

11   Cell 4?

12   A.   Yes.

13   Q.   Go to the next sentence.

14   A.   (As read):

15               I told inmate Norris to come out -- to come

16           with me again; he did not comply.

17   Q.   Is that accurate?

18   A.   Yes.

19   Q.   Go ahead.

20   A.   (As read):

21               Deputy Key and I escorted him out of the cell

22           and placed him against the wall outside the cell

23           and instructed him to put his hands behind his

24           back.

25   Q.   Is that accurate?

```
 1   A.   Yes, sir.
 2   Q.   What's the next sentence?
 3   A.   He resisted.
 4   Q.   Stop right there.  Did we see that when we saw the video
 5   here in open court this week?
 6   A.   Yes, sir.
 7   Q.   Okay.  Go to the next sentence.
 8   A.   (As read):
 9                    FTO Marriott arrived.
10   Q.   And was that accurate?
11   A.   Yes.
12   Q.   Did we see that in the video?
13   A.   Yes.
14   Q.   Go ahead.
15   A.   (As read):
16                    We forced him to comply with joint locks and
17               drive-stun Taser applied by Deputy Bratton upon
18               his arrival.
19   Q.   Stop right there.
20               You used the phrase "upon his arrival" in
21   reference to Bratton?
22   A.   Yes.
23   Q.   What were you trying to convey to the reader about
24   Bratton's involvement in tasing?
25   A.   That when he arrived, he pulled a Taser and used it to
```

1  help us get the situation under control.

2  Q.  And is that consistent with the video that we all saw

3  here in open court?

4  A.  Yes, sir.

5  Q.  Go to the next sentence.

6  A.  (As read):

7          We then placed him in the restraint chair with

8          handcuffs still applied.

9  Q.  Stop right there.

10          And is that accurately stated by you?

11  A.  Yes.

12  Q.  Is it consistent with the video that we saw?

13  A.  Yes, sir.

14  Q.  Go to the next sentence.

15  A.  (As read):

16          Inmate Norris resisted --

17  Q.  Stop right there.

18          Is that accurate?

19  A.  Yes, sir.

20  Q.  Could we see that in the video?

21  A.  Yes, sir.

22  Q.  Go to the next sentence.

23  A.  (As read):

24          Pressure points and additional drive-stun Taser

25          applications were utilized to achieve compliance.

1  Q.   Stop right there.

2       Who was applying the pressure points?

3  A.   Deputy Marriott.

4  Q.   And who was doing the drive-stun Taser applications?

5  A.   Deputy Bratton did initially, and then I did at the 8:00

6  timeframe.

7  Q.   Read the next short sentence.

8  A.   (As read):

9            Deputy Bratton and I tased.

10 Q.   What was your intent in writing "Deputy Bratton and I

11 tased"?

12 A.   To let the reader of this narrative know that Deputy

13 Bratton tased Mr. Norris and I tased Mr. Norris.

14 Q.   Were you trying to suggest to anyone that Bratton was

15 involved in the 8:00 p.m. tasing?

16 A.   No, I wasn't.

17 Q.   Do you think that you could have perhaps drafted that a

18 little bit more artfully?

19 A.   Certainly.

20 Q.   And read the next sentence.

21 A.   (As read):

22            Deputy Key and FTO Marriott applied pressure

23         point techniques.

24 Q.   And is that in the right sequence?

25 A.   That. . .

1  Q.   It may be.  I'm not suggesting it's not.  I'm just

2  asking --

3  A.   Yeah.  It's -- Deputy Key used it when we were doing the

4  extraction and during the 8:00 struggle, and FTO Marriott

5  only during the 8:00.

6  Q.   Pick up with the sentence "After approximately."

7  A.   (As read):

8           After approximately 15 minutes in the chair, I

9           moved his hands to the soft restraints.  Inmate

10          Norris then stated that he wanted to hurt others

11          and hurt himself.  Mobile crisis and Nurse

12          Joshua -- which is not right; it's Nurse

13          Jessica -- were notified, and mobile crisis

14          arrived at 2122.

15 Q.   And 2122 is 9:22?

16 A.   p.m.

17 Q.   p.m.

18          What was your intent in punctuating this narrative

19 with 9:22?

20 A.   To be an encompassing narrative of the whole -- the

21 whole timeframe between 1855 and 2122.

22 Q.   And you actually authored this at 2148, which is

23 9:48 p.m., on November 5?

24 A.   I was authoring it probably most of the time during the

25 time frame, but I wasn't able to complete it until 2148.

1    That's when I finished it, printed it, and signed it.

2    Q.   This sentence back up in the narrative, "I moved his

3    hands to the soft restraints.  Inmate Norris" -- and then

4    period.  That sentence.  "I moved his hands to the soft

5    restraints."

6             That's not chronologically in the right place in

7    the paragraph, is it?

8    A.   No, sir.

9    Q.   Do you remember why you put it towards the end of the

10   paragraph?

11   A.   I don't.  I just didn't remember the sequence of events.

12   It was very chaotic.

13   Q.   Was this a pretty stressful situation for you

14   personally?

15   A.   Yes, sir.

16   Q.   As you sat at your computer and finished this thing at

17   9:48, could you remember exactly the number of times that you

18   had tased --

19   A.   I had no idea.

20   Q.   -- Mr. Norris?

21            Did you remember the amount of time in seconds

22   that each one of those tases would be?

23   A.   I had no idea.

24   Q.   Did you put this report together with the intent to

25   mislead anyone at the jail?

1  A.   No, sir.

2  Q.   Did you do it with the intent to impede any future

3  investigation if anybody was ever to review this situation?

4  A.   No, sir.

5       MR. STRIANSE:  May I see Exhibit 26?  I misplaced

6  my copy.

7  Q.   If you could turn to that in the book, Mr. Bryant.

8       Thank you.

9       Mr. Bryant, let me show you what's been received

10  as evidence as Government's Exhibit 26.

11      This is another incident report for a use of

12  force; is that right?

13  A.   Yes, sir.

14  Q.   And what's it dated?

15  A.   11/5/2016.

16  Q.   And the time?

17  A.   2220 or 10:20 p.m.

18  Q.   And what is the purpose of this report, 11/5/16 at

19  10:20?

20  A.   This is the incident at 10:20 when we were attempting to

21  move Mr. Norris from booking to the transport vehicle to get

22  his medical evaluation.

23  Q.   And it is a use of force incident report, correct?

24  A.   Yes, sir.

25  Q.   I notice that you are mentioned?

1  A.    Yes, sir.

2  Q.    Is that because you applied force?

3  A.    Yes.

4  Q.    And that were the tases that we talked about earlier?

5  A.    Yes, sir.

6  Q.    I think that at the 10:20 incident, you told us that

7  there were six tases applied by you, correct?

8  A.    That's right.

9  Q.    And then Steven Montgomery, who was the third shift

10 corporal.  Is that right?

11 A.    Yes, sir.

12 Q.    Why did you put him in the caption?

13 A.    Because he had also used a Taser.

14 Q.    And that was when they were trying to get Mr. Norris

15 into the police car --

16 A.    Into the patrol car, yes, sir.

17 Q.    -- for transport?

18 A.    Yes, sir.

19 Q.    It's a very short narrative.  Go ahead and read that.

20 A.    (As read):

21              While moving inmate Norris from booking

22          restraint chair to jail transport vehicle, inmate

23          Norris did not comply with commands, and I

24          drive-stun tased him multiple times to gain

25          compliance.

1   Q.   Now, this was prepared by you at 2249, which is 10:49;
2   is that right?
3   A.   Yes, sir.
4   Q.   So this is almost an hour after your shift is over; is
5   that right?
6   A.   Approximately.
7   Q.   Why did you use the more general description "multiple
8   times"?
9   A.   Because I didn't know how many times I had tased him.
10  Q.   And why was it that you didn't know the exact number?
11  A.   Again, it was another chaotic moment that counting my
12  tases wasn't really important to me at the time.
13  Q.   Now, you put Cpl. Montgomery's name in the caption as
14  somebody that used force; is that right?
15  A.   Yes, sir.
16  Q.   But you failed to mention him in the narrative; is that
17  right?
18  A.   That's right.
19  Q.   And why was that?
20  A.   I don't know.  I had already put him as an officer
21  involved, and I didn't have any reason to --
22  Q.   You weren't covering for Cpl. Montgomery?
23  A.   No.
24  Q.   You just forgot to put more detail about him in the
25  narrative section?

1  A.   You know, I don't know if I forgot or if I just didn't
2  know 'em.  I didn't know the details.  I guess I would have
3  known, in hindsight, you know, after the ability to review
4  tape and see all the reports, that I knew that he tased for
5  one -- one tasing for one second, according to him.
6  Q.   And I think you were physically present when he applied
7  that tase?
8  A.   Yes.
9  Q.   Okay.
10 A.   And what he said is accurate.
11 Q.   And you realize that all of your activities are being
12 recorded by video in the jail; is that right?
13 A.   Everywhere you go.
14 Q.   When you put this report together an hour after your
15 shift, did you intend to mislead anybody at the jail about
16 what happened that night?
17 A.   No, sir.
18 Q.   Did you intend to impede any future investigation if
19 anybody should ever review this?
20 A.   No.
21 Q.   Or obstruct it in any way?
22 A.   No, sir.
23 Q.   In fact, you met with the jail administration about this
24 incident; is that right?
25 A.   Yes, sir.

1   Q.   Do you remember when that was?

2   A.   It was the next week.  I was off Sunday and Monday.  So

3   it may have been Tuesday or Wednesday.  I don't know for

4   sure.

5   Q.   And did you go upstairs to the second floor?

6   A.   That's right.

7   Q.   And did you meet with jail administrator JJ Hannah?

8   A.   That's right.

9   Q.   And tell the jury about that.

10         Why did you go upstairs to talk to him?

11  A.   Well, they had called me to come up and talk to 'em

12  about something.  I didn't know what it was until I got up

13  there.  And they showed me some video, asked me to justify my

14  actions.  I told them that Mr. Norris was wild and fighting

15  us nonstop and we didn't have any choice in the matter but to

16  use the tools that we had to get him under control.

17  Q.   So, within a week or so, the people at the jail, the

18  administration, had access to the video?

19  A.   Yes.  They were showing it to me.

20  Q.   And that caused them to have you come upstairs?

21  A.   That's right.

22  Q.   As a result of that meeting that you had with Hannah,

23  what did the jail tell you?

24  A.   That they were going to conduct an internal

25  investigation.

1  Q.    And did they conduct any such investigation?

2  A.    Yes.

3  Q.    Did you check with Jail Administrator Hannah at a later

4  date?

5  A.    Yes, I did.

6  Q.    And when was that?

7  A.    We -- I was having a meeting with the sheriff and JJ on

8  an unrelated matter, and at the conclusion of that matter, I

9  asked about it.

10  Q.    When was that exactly?

11  A.    First week of February of 2017.

12  Q.    And what did Lt. Hannah tell you?

13  A.    They told me that after they had reviewed all the

14  information that they thought that it was justified and that

15  I did what I needed to do to control the situation.

16  Q.    Did JJ Hannah and the other people that you met with --

17  who were the other people?

18  A.    It was just Sheriff Breedlove and JJ.

19  Q.    Did you meet with Whitt and Isherwood at any point in

20  time?

21  A.    Yeah.    That's the second time I met with JJ Hannah, when

22  we were first -- when they first showed me the video.

23  Q.    Did the jail administration seem to be conversant about

24  what had happened?

25  A.    No.

1  Q.   Did they seem to -- had they looked at the video at all?

2  A.   Yes.

3  Q.   Okay.  That's what I meant.

4         So they weren't operating in the blind, is what

5  I'm suggesting?

6  A.   Oh, no.

7  Q.   And then they heard your version of the events?

8  A.   Yes.

9  Q.   Okay.  And they obviously had these reports that you had

10 turned in; is that right?

11 A.   Yes.

12 Q.   Did they say that they were -- to you that there were

13 any deficiencies that they saw in Government's Exhibit 25 or

14 26 in your memorialization of these events of November 5 of

15 2016?

16 A.   No, sir.

17 Q.   You were not disciplined in any way by the jail?

18 A.   Not at all.

19 Q.   And then you really never heard anything about this

20 incident until the summertime; is that right?

21 A.   That's right.

22 Q.   Did there come a point in time in July of 2017 where

23 there was some media attention?

24 A.   Yes, sir.

25 Q.   As a result of that media attention, what happened to

1   your employment status?

2   A.   I was put on administrative leave pending further

3   investigation.

4   Q.   And that was a paid administrative leave?

5   A.   That's right.

6   Q.   And you were in that status for how long?

7   A.   Until September 6th.

8   Q.   Did there come a point in time that you saw a new policy

9   that had been implemented by Sheriff Breedlove in the wake of

10  the media attention?

11  A.   Yeah, it was some time after I was terminated.

12            MR. STRIANSE:   May I see Defendant's -- I think

13  it's 5, the letter.  I'll give you yours back.

14  Q.   Mr. Bryant, I'm going to show you what's been received

15  as evidence as Defendant's Exhibit 4 and see if you recognize

16  it.

17  A.   I do.

18  Q.   Defendant's Exhibit 4 is a letter from Sheriff Michael

19  Breedlove dated July 30, 2017; is that right?

20  A.   Yes, sir.

21  Q.   And this is while you were on administrative leave?

22  A.   Two days after I was put on leave.

23  Q.   And explain to the jury the circumstances under which

24  you came in possession of this letter.

25  A.   After I was terminated on September 6th and Deputy

1    Marriott was reinstated, Deputy Key was reinstated, they both

2    got copies of this and they alerted -- alerted me

3    immediately.  And I asked if I could have a copy.  And I met

4    with Josh at the gym that he goes to in Ashland City across

5    from the courthouse, and he gave it to me.

6    Q.    Take a look at the letter in the second paragraph.  The

7    sheriff writes that there are a few changes that will take

8    place effective this date.

9    A.    Yes, sir.

10   Q.    This is about a week after this was on the local CBS

11   affiliate, Channel 5; is that right?

12   A.    That sounds right.

13   Q.    Where some of the video that we've seen this week in

14   court was on Channel 5 news; is that right?

15   A.    That's correct.

16   Q.    And what were these few changes that are recited?  You

17   don't have to read them, but were there now some changes to

18   the number of tases?

19   A.    Yeah.  They defined durations and applications

20   specifically with three times, five seconds.

21   Q.    Prior to this letter on July 30, 2017, in the wake of

22   the media attention, had you ever been given anything in

23   writing that said no more than three applications, no more

24   than five seconds each?

25   A.    I don't remember anything in writing or verbally.

1    Q.    And these are characterized as changes; is that right?

2    A.    Yes, sir.

3    Q.    When you would -- I think you had used a Taser maybe a

4    couple of times before this incident?

5    A.    Yeah, I believe so.

6    Q.    When you would use the Taser and when you used the Taser

7    in this Jordan Norris series of events, did you feel like you

8    were in compliance with whatever policy that was or was not

9    in existence at the time at the jail?

10   A.    Yes, sir, I was.

11   Q.    Did you have a good-faith belief that you were complying

12   with whatever policy that was?

13   A.    Yes.

14   Q.    And the policy, as you understood it, dealt with a

15   minimum amount of force; is that right?

16   A.    That's right.

17   Q.    But it was also tied to the necessity of the situation;

18   is that right?

19   A.    Yes, sir.

20   Q.    What you did that we saw on the video, did you believe

21   in good faith that that was necessary to protect yourself?

22   A.    Yes, sir.

23   Q.    Did you feel it was necessary to protect your

24   colleagues?

25   A.    Yes, sir.

1  Q.   Did you apply this Taser when you were angry?

2  A.   No, sir.

3  Q.   Did you apply it because you wanted to be sadistic to

4  Mr. Norris?

5  A.   No, sir.

6  Q.   I assume you didn't know Mr. Norris?

7  A.   No, I didn't.

8  Q.   Mr. Norris was another inmate in the jail?

9  A.   Yes, he was.

10 Q.   Now, when you were sitting at your desk at 6:45 or so on

11 that Saturday evening, was there anybody else in the office

12 with you?

13 A.   Yeah.  I believe Josh and Caitlin were there with me.

14 Q.   And you're looking at the video --

15 A.   Yes.

16 Q.   -- is that right?

17          And you see an incident there?

18 A.   Yes.

19 Q.   I assume if you wanted to, you could have just said,

20 "Well, I've got a couple hours left on this shift; I'm just

21 going to ignore it"?

22 A.   No, that's not an option.

23 Q.   Why is it not an option?

24 A.   Because my job is to make sure that everyone is safe, no

25 one gets hurt, no one dies, no one escapes.  That's -- it

1  wasn't an option just to sit back and watch.

2  Q.   So you didn't walk by the Cell 4 door just to taunt

3  Jordan Norris; is that right?

4  A.   No.

5  Q.   You were responding and reacting to a situation he had

6  created?

7  A.   Yes.

8  Q.   Do you remember how many other inmates were in Cell 4?

9  A.   I want to say six or seven.

10 Q.   And did you have a responsibility to those other five or

11 six inmates that were in the cell?

12 A.   I had a responsibility to everyone in the building.

13 Q.   And what is your number one priority as a correctional

14 officer?

15 A.   That no one dies and no one escapes.

16         MR. STRIANSE:  May I have one moment, Your Honor?

17         THE COURT:  Sure.

18 BY MR. STRIANSE:

19 Q.   Just one other area I want to cover with you,

20 Mr. Bryant.

21         You've seen a copy of the indictment in this case?

22 A.   Yes, sir.

23 Q.   And you realize what you're charged with?

24 A.   I do.

25 Q.   And I'm not going to read it to you, but I'm going to

1   ask you some questions.

2         In Count One, you are charged with trying to

3   violate the civil rights of Jordan Norris by using excessive

4   force.

5   A.   That's the way I understand it, yes, sir.

6   Q.   Were you trying to use excessive force against Jordan

7   Norris?

8   A.   No, sir.

9         MR. SONGER:  Your Honor, could we approach?

10        THE COURT:  Sure.

11        (Bench conference outside the hearing of the

12        jury.)

13        MR. SONGER:  I don't think it's appropriate just

14   to walk through and have the witness give --

15        THE COURT:  I'm sorry?

16        MR. SONGER:  I don't think it's appropriate for

17   them just to walk through and have the witness give legal

18   conclusions about each point in the indictment.

19        MR. STRIANSE:  It's a denial.

20        THE COURT:  One at a time.

21        Anything else?

22        MR. SONGER:  No.  That's all.

23        MR. STRIANSE:  I think every case I've ever tried

24   as a criminal defense lawyer I've had my client deny the

25   allegations.

```
1            THE COURT:  I see your point.  Intent is an issue
2  here.  So I think it's certainly relevant.  Overruled.
3            (Jury present.)
4  BY MR. STRIANSE:
5  Q.   Mr. Bryant, did you set about to willfully deprive
6  Jordan Norris of his right to be free from excessive force --
7  A.   No.
8  Q.   -- on November 5, 2016?
9  A.   That was not my intention.
10 Q.   You're also charged with the same thing in Count Two
11 that would relate to a different event.
12            Do you deny that as well?
13 A.   That's right.
14 Q.   We've just gone through these two reports where you've
15 been charged with trying to obstruct or impede an
16 investigation.
17            Was it your intent to violate the law by putting
18 together those two reports that we just went through on the
19 night of November 5, 2016?
20 A.   No, sir.
21 Q.   You're charged in Count Five with making a false
22 statement to the FBI.
23            Do you remember that charge?
24 A.   Yes, I do.
25 Q.   The basis of that charge is that you were interviewed by
```

1  the TBI and the FBI back in August of 2017; is that right?

2  A.   Yes, sir.  About ten months after the incident.

3  Q.   About ten months after the incident.

4        And you were asked a question about whether you

5  tased Jordan Norris when he was restrained?

6  A.   Yes.

7  Q.   And do you remember what you told the officers at that

8  interview?

9  A.   I said something to the effect, "Not while he had a

10  belly chain."

11  Q.   And you told us it was ten months after the event; is

12  that right?

13  A.   That's right.

14  Q.   Now, had you seen any video before you met with

15  Ms. Wright and Mr. Atkins with the TBI?

16  A.   No.  I didn't get an opportunity to review any videos or

17  reports or anything pertaining to it.

18  Q.   And you appeared at the office of the district attorney

19  in Cheatham County voluntarily; is that right?

20  A.   Yes, sir.

21  Q.   You didn't have a lawyer with you?

22  A.   No, sir.

23  Q.   You didn't invoke your right against self-incrimination?

24  A.   No, sir.

25  Q.   They called; you went right down there?

1  A.   Yes, sir.

2  Q.   And they recorded your interview; is that right?

3  A.   Yes, sir.

4  Q.   Did you intend to lie to Special Agent Wright?

5  A.   Not at all.

6  Q.   What happened?  Why was it that you didn't recall that

7  he had the belly chain on him for that 11-second tase in the

8  10:20 interval?

9  A.   I simply didn't remember.

10            MR. STRIANSE:  Those are my questions.

11            THE COURT:  All right.  Cross.

12

13                      CROSS-EXAMINATION

14 BY MR. SONGER:

15 Q.   Good afternoon, Mr. Bryant.

16 A.   Good afternoon.

17 Q.   I have a number of questions for you today.  I'm going

18 to do my best to make those questions as short and concise

19 and clear as possible.

20 A.   Thank you.

21 Q.   As it moves along, if there's anything you don't

22 understand, will you let me know?

23 A.   Sure.

24 Q.   All right.  Thank you.

25            To start out, I would like to ask some questions

1  about your experience as a corrections officer.

2  A.    Okay.

3  Q.    Now, before you worked at Cheatham County, you worked

4  for the State, for the Tennessee Department of Corrections;

5  is that right?

6  A.    That's right.

7  Q.    And before you started at the State, you had to go to an

8  academy to be trained about how to be a corrections officer?

9  A.    Yeah.  It was a four-week course.

10 Q.    Four weeks?

11 A.    Yes, sir.

12 Q.    And that included instruction on use of force, the

13 standards for using force?

14 A.    Yes, sir.

15 Q.    It also covered using Tasers, right?

16 A.    A different type, but similar, sure.

17 Q.    Sure.  And you were hired by Cheatham County in August

18 2015; is that right?

19 A.    That's right.

20 Q.    And when you were hired there, did you get a copy of

21 Cheatham County's use of force policies?

22 A.    I did.  I got it on a thumb drive that I was instructed

23 to review during my free time.

24 Q.    It probably had all the policies and procedures of the

25 sheriff's office on it?

1    A.    Yeah, I do believe so.

2    Q.    You signed, acknowledged that you had received those

3    policies?

4    A.    Yeah, I think I did have to sign some kind of

5    acknowledgment of receiving that thumb drive.

6    Q.    And you acknowledged that you were going to have to

7    follow those policies and procedures, right?

8    A.    Yes, sir.

9    Q.    And those policies also mentioned Tasers, correct?

10   A.    Yes, sir.

11   Q.    And the sheriff's office policy that you got, it

12   explicitly told officers to use Tasers in accordance with the

13   training that they received, right?

14   A.    I believe that's something that is in the policy, yes.

15   Q.    And at least by the end of your time at Cheatham County,

16   you told us that you had become a supervisor; is that right?

17   A.    That's right.

18   Q.    There were times that you supervised the entire shift?

19   You were in charge of the entire jail?

20   A.    Yes, sir.

21   Q.    Now, is part of your job as a supervisor to make sure

22   that the officers under you are following those policies and

23   procedures?

24   A.    Yes, sir.

25   Q.    Is part of your job to make sure that the rights of the

1  people in the jail get protected during your shift?

2  A.    Yes, sir.

3  Q.    So I assume you're familiar with the jail's policies and

4  procedures as they relate to using force?

5  A.    Yes, sir.

6  Q.    Including the policies and standards for when it was

7  appropriate to use Tasers?

8  A.    Yes, sir.

9  Q.    All right.  So I would like to go over just some of the

10 basics, foundational stuff.  I think you said on your direct

11 that you agree that it's important that officers always use

12 the least amount of force that's necessary to deal with a

13 situation?

14 A.    Yes, sir.

15 Q.    That's basically the guiding principle in law

16 enforcement, right?

17 A.    Yes, sir.

18 Q.    It's always true?

19 A.    Yes, sir.

20 Q.    Okay.  And so you knew that it was wrong to use more

21 force than the minimum necessary to deal with the situation?

22 A.    The least amount of force necessary was the -- the

23 policy that we all followed.

24 Q.    And you knew if you went more than that that you could

25 get in trouble?

1   A.    Sure.

2   Q.    Now, you said on your direct that you didn't think there

3   was anything spelled out explicitly in your policy that

4   limited how long an officer could use a Taser for, right?

5   A.    There --

6   Q.    Do you remember saying that?

7   A.    There was nothing about applications or durations in the

8   policy.

9   Q.    There was nothing that said exactly how many seconds an

10   officer could keep the trigger held down to tase someone,

11   right?

12   A.    That is correct.

13   Q.    Now, do you still remember the policy that was in place

14   back in 2016?

15   A.    I don't remember it, but I have it right in front of me.

16   Q.    Okay.  Is there anything in that policy that spells out

17   and says an officer cannot run up if they see an inmate lying

18   on the ground and kick them in the face?

19   A.    I don't see how that's relevant.

20   Q.    Is there anything in your policy that says officers

21   cannot do that, sir?

22   A.    I don't see how that's relevant.

23   Q.    That's not for your decide.

24          Is there anything in the policy that says that

25   officers seeing a person lying on the ground cannot run up

1  and kick them in the face?

2  A.    No, there's nothing like that.

3  Q.    If you saw an inmate lying on the ground, would you run

4  up and kick them in the face?

5  A.    No, sir.

6  Q.    Of course you wouldn't.  Because that would be more

7  force than is necessary, right?

8  A.    Absolutely.

9  Q.    So even though it's not in your policy, you would never

10 do that?

11 A.    That's right.

12 Q.    Right.  Because it violates the obvious principle that

13 it's more force than necessary?

14 A.    Yes.

15 Q.    So you acknowledge that some things that are not spelled

16 out exactly in the policy are still obviously wrong, right?

17 A.    That particular that you're talking about, sure, that is

18 absolutely wrong, to just kick someone while they're laying

19 down.

20 Q.    Sure.  You're familiar with that concept?

21 A.    Yeah.

22 Q.    Now, did you also know that officers were never allowed

23 to use force to punish an inmate?

24 A.    Sure.

25 Q.    Did you know that officers were never allowed to use

1   force to retaliate against an inmate for acting out earlier?
2   A.   Absolutely not.
3   Q.   Did you know that you could not use force of any kind
4   just to take out your frustrations on an inmate who had been
5   difficult?
6   A.   That is correct.
7   Q.   Even if an inmate had made you mad by doing something
8   earlier?
9   A.   I wasn't mad.  But if someone did get mad, sure, that
10  wouldn't be permissible.
11  Q.   But you knew that if you did get mad, that wouldn't be a
12  reason to use force on somebody?
13  A.   If you were prone to getting mad, you're in the wrong
14  business.
15  Q.   And you would agree that you can't use force on someone
16  who is no longer a threat?
17  A.   Sure.
18  Q.   So you understood all those core principles back in
19  2016, right?
20  A.   Yes, sir.
21  Q.   Those are pretty much common sense; do you agree with
22  that?
23  A.   Yeah.
24  Q.   I suspect that was the law of the land at both of the
25  agencies where you worked, right?

1  A.    Yeah, least amount of force necessary.

2  Q.    Sure.  Now, when you went to the Cheatham County Jail,

3  you got also some specialized training about Tasers, correct?

4  A.    I did.

5  Q.    You took a course -- I think you talked about it a

6  little bit on your direct exam -- that was taught by Sgt.

7  Gary Ola?

8  A.    Yes.

9  Q.    And you knew that you were obligated to follow the

10  standards that Sgt. Ola taught you?

11  A.    Yes.

12  Q.    You took that training, I believe, in October of 2015?

13  A.    Yes.

14  Q.    Okay.  So that's about one year before your encounter

15  with Jordan Norris?

16  A.    Yes.  A little over a year.

17  Q.    So at the time that you interacted with Jordan Norris,

18  you had received all of those standards from Sgt. Ola?

19  A.    A year prior, yes.

20  Q.    And you were in the same training class as one of your

21  friends, Josh Marriott, right?

22  A.    I believe so, yes.

23  Q.    And he's a friend of yours, isn't he?

24  A.    Yes.

25  Q.    You guys were trained on the exact same standards by

1  Sgt. Ola?

2  A.    Yes.

3  Q.    And you heard Officer Marriott testify about that

4  training earlier this week, right?

5  A.    Yes.

6  Q.    You heard him say that he was taught in the training

7  that officers could never use more than three five-second

8  bursts of a Taser?

9  A.    Yeah.  That's something that he remembers but I don't.

10 Q.    And you knew you were required to follow what you were

11 taught in the training?

12 A.    Yes.

13 Q.    You also knew that you were required to be able to

14 justify every time you tased someone, correct?

15 A.    Yes, sir.

16 Q.    And you knew that that justification had -- had to be

17 for the time that the Taser was used, right?  In other words,

18 you couldn't use a Taser because something had happened

19 earlier that might have justified it?

20 A.    No.

21 Q.    It had to be justified at the time?

22 A.    Yes.

23 Q.    You understood that, right?

24 A.    Yes.

25 Q.    You understood that it's wrong to use a Taser if someone

1  had been struggling or fighting but then they had been

2  subdued already?

3  A.    Unless they started acting against commands again.

4  Q.    But if the person had already been subdued, you

5  recognize that you could no longer use a Taser?

6  A.    Yes.  After we had him completely restrained in the

7  chair, 100 percent, he wasn't tased.

8  Q.    I'm just asking if you understood the concept that once

9  an inmate was subdued, then you had to stop using a Taser.

10         Did you understand that concept?

11  A.    Once an inmate was no longer any type of threat and was

12  complying with all commands, absolutely.

13  Q.    Okay.  Now, I'm going to switch gears and ask you a few

14  questions about Jordan.

15  A.    Yes, sir.

16  Q.    Jordan Norris.

17  A.    Yes, sir.

18  Q.    You remember him, right?

19  A.    Mr. Norris, yes, sir.

20  Q.    He was 18 years old when you encountered him?

21  A.    That sounds right.

22  Q.    He was about five-foot-nine?

23  A.    That sounds right.

24  Q.    He weighed maybe 160 pounds?

25  A.    Yes, sir.

1  Q.    I think you told the FBI when you met with them that you
2  were about twice Jordan's size?
3  A.    Approximately.
4  Q.    And you actually used to be a wrestler yourself, right?
5  A.    High school.  One year.
6  Q.    All right.  So now I would like to talk through your
7  encounter with Jordan that night, November 5th, 2016.
8  A.    Yes, sir.
9  Q.    You told us a little bit about how you saw something
10  going on on a monitor that caused you to have to pull Jordan
11  out of his cell, along with some other officers?
12  A.    Yes, sir.
13  Q.    That was around 7:00 or so at night?
14  A.    Yes, sir.
15  Q.    You heard talk that Jordan was maybe banging his head on
16  the wall?
17  A.    Yeah, there was talk about that, that I didn't realize
18  at the time, or I did.  I don't remember.
19  Q.    Okay.  And you and some others officers pulled him out
20  of the cell and got him into a restraint chair eventually; is
21  that right?
22  A.    Yes.
23  Q.    And when he was in the restraint chair at first, his
24  hands were cuffed behind his back?
25  A.    Yes.

1  Q.   But then after maybe 15 minutes or so, you said you

2  uncuffed his hands, correct?

3  A.   Yes.  After talking with him and observing him for a few

4  minutes, that he was going to be calm, yes.

5  Q.   And after you uncuffed his hands, both his hands were

6  free?

7  A.   Yes.

8  Q.   And then you secured both of his hands to the restraint

9  chair, to those soft restraints that you strapped over?

10  A.   Eventually, after some negotiating.  He had discussed

11  wanting a cigarette and he wanted some water, which we were

12  happy to give him.  But he thought we were going to let him

13  go outside to smoke a cigarette.  He was a little deluded at

14  the time.

15  Q.   Sure.  You were able to talk to him and work with him

16  and get his hands secured, right?

17  A.   Yeah.  Eventually Mr. Bratton had come back from a

18  break, I think, and during that process I told him to pull

19  out his Taser, take off his cartridge, and be prepared to use

20  it if Mr. Jordan didn't comply.

21  Q.   Right.  And no officer actually did have to tase him to

22  get his hands in, right?

23  A.   No.  No, we did not.

24  Q.   And that's when both his hands were free from the

25  restraint chair?

1   A.   That's right.

2   Q.   And then, after that, Jordan stayed in the restraint

3   chair for -- what?  Maybe an hour or so?  Is that what you

4   said?

5   A.   About 40 minutes, I think.

6   Q.   And he was fairly calm during most of that time?

7   A.   I would call it less disruptive.

8   Q.   Okay.  Did you have to come back and deal with him any

9   more over the next --

10  A.   Oh, yeah, we were steadily checking those -- we have to

11  fill out the restraint.  We have to check the restraints.  We

12  have to check his fingers to make sure that there's good

13  circulation.  Talk to him.  Ask him how he's feeling.  The

14  whole point of the chair is to get someone to calm down and

15  be able to go back to their bunk or to their cell and rejoin

16  the population.

17  Q.   Sure.  And that's what you did over the next 40 minutes

18  or so.

19           But there was no more serious incidents, nothing

20  where you had to use force on him, right?

21  A.   Not that I remember, no.

22  Q.   And then you told us about how at 8:00 you had to engage

23  with him again, right?

24  A.   Yes.

25  Q.   And I think you told us because he had gotten his right

1 arm at least partly loose from the chair?

2 A.   That's right.

3        MR. SONGER:  Ms. Aroner, if we could please bring

4 up Exhibit Number 11, Government's Exhibit 11.  And if we can

5 pull up about two minutes and 40 seconds and keep it there

6 for just a moment.

7 Q.   Is this the scene around 8:00, or so, when you had to go

8 back over and deal with Mr. Norris?

9 A.   Yes.

10 Q.   Okay.  And just to be really clear, this is Jordan

11 sitting in the chair, right?

12 A.   Yes.

13 Q.   And you're kneeling right in front of him?

14 A.   Yes.

15 Q.   This is Officer Marriott who is standing behind Jordan

16 holding his head?

17 A.   Yes.

18 Q.   And that's Officer Key over in the side?

19 A.   Yes.

20 Q.   Okay.  And it looks like Officer Key has both of his

21 hands on Jordan's arm and you're holding his arm, too, right?

22 A.   He's either working on the straps or holding the hand.

23 I would assume it would be a combination of both.  And I'm

24 not sure what I'm holding onto over there, but I'm trying to

25 assist him.

1           MR. SONGER:  Ms. Aroner, would you play the next
2   portion of this video, stopping it at 3 minutes and 3
3   seconds.
4           (Exhibit 11 played.)
5           THE WITNESS:  Are you asking for my commentary
6   right now?
7   BY MR. SONGER:
8   Q.   I'll ask you a question when the video stops.
9   A.   Yes, sir.
10  Q.   Okay.  We just watched a 23-second clip of that video.
11          You were kneeling in front of Jordan the whole
12  time, right?
13  A.   Yes, sir.
14  Q.   Is that correct?
15          And during those 23 seconds, Jordan didn't try
16  hitting any of you guys, correct?
17  A.   No.  I was just talking to him.
18  Q.   Right.
19  A.   Asking him to get his arm up where I needed it to be.
20  Q.   Okay.  He didn't kick -- he didn't kick you, correct?
21  A.   He didn't kick me, not that I felt, no.
22  Q.   No.  He didn't move much at all, did he?
23  A.   Right then, no.
24  Q.   No.  Okay.
25          But you told Officer Caitlin Marriott to bring you

1   a Taser, right?  We saw her come in off the side of the
2   screen?
3   A.   Yes.
4   Q.   And then you stuck the Taser in Jordan's chest?
5   A.   Yes.
6   Q.   When you stuck the Taser in his chest, he didn't kick
7   you at that point, did he?
8   A.   No, sir.
9   Q.   He didn't move his arm at that point?
10  A.   No.
11  Q.   And Officer Marriott's still holding his head all the
12  way back --
13  A.   Yes.
14  Q.   -- right?
15           Now, there's a spit mask on his head right now,
16  too, correct?
17  A.   Yes.
18  Q.   That means that he can't spit on the officers, right?
19  A.   Can't project it.
20  Q.   Can't project.
21           Officer Marriott has control of his head.
22           He can't head butt you from that position, can he?
23  A.   He could if he was determined enough.
24  Q.   Did he head butt you?
25  A.   No.

1  Q.   All right.  His left arm is strapped into the restraint
2  chair, right?
3  A.   Yes.  Left arm.
4  Q.   And his left hand?
5  A.   Yes.
6  Q.   Okay.  And Officer Key is still holding his right hand?
7  A.   He is holding either his hand or working on the straps.
8  Q.   All right, sir.
9       And there's still a strap over his legs?
10 A.   Yes.
11 Q.   All right.  In that posture, Jordan's -- he's obviously
12 not capable of running away from you guys, right?
13 A.   Running, no.
14 Q.   And he doesn't attack you, right?
15 A.   No, he didn't.
16 Q.   Okay.  And he's not hurting himself, correct?
17 A.   Yeah, actually he was hurting himself.  He was fighting
18 against the restraints so hard he did have some marks on his
19 wrists afterward and asked me for ice.
20       MR. SONGER:  Okay.  Let's play the next portion of
21 the video until 3 minutes and 31 seconds, please.
22       (Exhibit 11 played.)
23 BY MR. SONGER:
24 Q.   Now, you testified a moment ago that the reason you
25 tased Jordan right now at 8:00 is that you were concerned

1  about his arm being loose, right?

2  A.   Yes.

3  Q.   And during that clip we just watched, Officer Key kept

4  both hands on Jordan's arm the entire time; is that right?

5  A.   I can't say that both hands were on it the entire time.

6  Mr. Key was working on those straps.

7  Q.   Did you see Officer Key's hands come off that arm during

8  that video?

9  A.   They didn't move much, and that's because Mr. Jordan

10  didn't want his arm to move.

11  Q.   His arm didn't move much at all during that tasing,

12  correct?

13  A.   No.

14  Q.   And Officer Marriott kept Jordan's head held back during

15  the entire time you tased him, right?

16  A.   Yes, but it was still a possibility --

17  Q.   And Jordan --

18  A.   -- that at any time he could have butt forward and

19  gotten loose of Deputy Marriott.

20  Q.   My question is, did Officer Marriott keep control of his

21  head the entire time you were tasing him?

22  A.   I believe so.

23  Q.   Did Jordan kick you at all during the entire time you

24  were tasing him?

25  A.   Yeah.  He tried to move his legs up and down.  He just

1 didn't have much range of motion.

2 Q. Right. He didn't actually kick you, correct?

3 A. His knees were beating up against my chest from time to

4 time, yes.

5 Q. Okay.

6 You didn't flinch; it didn't hurt you, obviously,

7 right?

8 A. No. He didn't have enough motion for it to injure me.

9 Q. Okay. At this point his arm is still down by his side

10 with Officer Key holding it, right?

11 A. Yes.

12 MR. SONGER: Play the next portion of the video,

13 please, until 4 minutes and 9 seconds.

14 (Exhibit 11 played.)

15 BY MR. SONGER:

16 Q. We just watched two more tases in that video, right?

17 A. Yes, I think so.

18 Q. One for five second and then one for 25 seconds?

19 A. Approximately.

20 Q. So 30 more seconds on top of the five seconds you did

21 before?

22 A. Approximately.

23 Q. So now we're up to 35 seconds that you've tased him in

24 this chair?

25 A. 35 seconds of trigger pull.

1  Q.    Correct.  And in that last tase, you tased him 25
2  seconds straight through, right?
3  A.    I had the trigger pulled for 25 seconds.  I wasn't
4  getting good contact.
5  Q.    But you tased him continuously.  You did not at any
6  point during those 25 seconds pull the Taser off of him?
7  A.    I moved it.
8  Q.    You did not pull the Taser off of him at any point
9  during those 25 seconds?
10  A.    To move it, yes, I did.
11  Q.    You did?
12  A.    Yes.
13  Q.    Do you remember testifying under oath in a prior
14  proceeding back in February 7th of last year of 2019?
15  A.    I don't remember it clearly.
16  Q.    Do you remember that that happened?
17  A.    Yeah.
18  Q.    That you came into a courtroom and testified?
19  A.    Yes, I do.
20  Q.    And you know that you were under oath when you gave that
21  testimony, right?
22  A.    Yes.
23  Q.    Okay.  And even sworn in, just like you were today?
24  A.    Yes.
25  Q.    There was a court reporter taking down everything you

1  said, just like today?

2  A.    Yes.

3  Q.    I was there; your attorney was there?

4  A.    Yes, sir.

5  Q.    All right.  Do you remember being asked during that

6  testimony (as read):

7              My question is whether you took the Taser off

8              of him to give Jordan a chance to comply without

9              being tased during those 25 seconds?

10             And answering, "I don't believe I did."

11 A.    Yeah, I didn't stop to ask him if he was going to comply

12 in between that trigger pull, no.

13 Q.    Do you remember testifying to that?

14 A.    Something to that effect, sure.

15 Q.    Okay.  And it's correct that you never took the Taser

16 off of him to give him a chance to comply?

17 A.    The Taser was coming off and on him the whole time

18 because he was struggling with me.

19 Q.    All right.  Now, during those 25 seconds Officer Key

20 kept both hands on his arm, again the entire time, right?

21 A.    Yeah.  He was fighting with him the whole time though.

22 You could see him moving around.

23 Q.    Officer Key kept two hands on his arm the entire time;

24 is that correct?

25 A.    Either on his arm or on the straps working on that arm.

1  Q.    And in fact, Jordan never hit anybody with his arm
2  during the entire 25 seconds, correct?
3  A.    No.
4  Q.    Officer Marriott kept Jordan's head held back the entire
5  25 seconds, right?
6  A.    Yes.  They both did an excellent job making sure nobody
7  got hurt.
8  Q.    Right.  Jordan's left hand, left arm is still strapped
9  into the chair the entire 25 seconds?
10 A.    Yes, sir.
11 Q.    All right.  And on direct I believe you testified -- I
12 wrote it down -- that your approach to dealing with inmates
13 and interacting with them was to give respect and get
14 respect.
15 A.    Yes.
16 Q.    Do you remember saying that?
17 A.    Yes.
18 Q.    Now, during that 25 seconds that you were tasing Jordan,
19 you said, "I'll keep going until I run out of batteries,"
20 right?
21 A.    Something to that effect, yes, sir.
22 Q.    Yeah.  You also said, "You don't like it, do you?"
23 A.    Something to that effect, yes, sir.
24        MR. SONGER:  All right.  Ms. Aroner, would you
25 please play the next clip of the video until 4 minutes and 26

1    seconds.
2            (Exhibit 11 played.)
3    BY MR. SONGER:
4    Q.    You just tased him for 15 more seconds, correct?
5    A.    Yes, sir.
6    Q.    So now we're up to 50 seconds that you tased Jordan in
7    the chair?
8    A.    Fifty seconds of the trigger being pulled, yes, sir.
9    Q.    All right.  And, again, you didn't stop in the middle to
10   see if Jordan would comply without being tased, right?
11   A.    I was speaking with Jeff Key, asking him if he had
12   gotten control of the hand, and he said no.
13   Q.    You didn't stop tasing Jordan in the middle to see if
14   Jordan would comply, did you?
15   A.    I was checking with Jeff Key to see if Mr. Norris --
16   Q.    I'm sorry.  My question is, did you stop tasing him at
17   any point during that 15 seconds to see if Jordan would
18   comply?
19   A.    Yes.  I checked with Deputy Key to see if Mr. Norris was
20   complying with our orders.
21   Q.    Your testimony to the jury is that you stopped tasing
22   him --
23   A.    No.  No.
24   Q.    -- in the middle of that?
25   A.    Not stopped tasing, but I stopped and spoke with

1  Mr. Key.

2  Q.   Okay.  And I'm not asking if you spoke with Mr. Key.

3  I'm asking if at any point during those 15 seconds you

4  stopped tasing Jordan to see if he would comply without

5  having to continue being tased?

6  A.   I don't think you understand that I was checking with

7  Mr. Key to see if we had gained compliance.

8  Q.   Sir, all I'm asking is whether you stopped the Taser or

9  not before the 15 seconds.

10  A.   No, I didn't.

11  Q.   Thank you.  Now, so we're at 50 seconds total.

12          During every one of those 50 seconds, did Officer

13  Marriott keep Jordan's head held back?

14  A.   He was struggling with him.

15  Q.   Was Jordan able to head butt officers --

16  A.   No.

17  Q.   -- at all during those 50 seconds?

18  A.   No, sir.

19  Q.   Did Jordan -- was Jordan able to hit officers with

20  either hand at any point during those 50 seconds?

21  A.   No.

22  Q.   Now, you knew how a Taser functioned, right?  You had

23  been through the training?

24  A.   Yes, sir.

25  Q.   You knew that if you squeezed the trigger once, it would

1  automatically stop after five seconds?

2  A.    Yes, sir.  Just like if you pulled the trigger of a

3  semiautomatic firearm.

4  Q.    But you knew that you could keep it going longer than

5  five seconds if you kept the trigger pulled down?

6  A.    Yes, I did.

7  Q.    So you did this intentionally.

8        You held the trigger down for 25 seconds and then

9  15 more seconds, right?

10 A.    Yes.

11       MR. SONGER:  Okay.  Thank you, Ms. Aroner.  We can

12 take that down.

13 Q.    Now I would like to talk to you about what happened a

14 couple hours later that night at 10:30.

15       You remember that incident, right?

16 A.    Yes.

17 Q.    This is when you and many other officers were preparing

18 to take Jordan to the hospital, correct?

19 A.    Yes, for a medical evaluation.

20 Q.    Right.  And you gave us a pretty detailed description

21 about how you had to uncuff him from one place and then get

22 him secured in the restraint chair -- right? -- so he could

23 be moved in the chair outside and put in a car and taken to

24 the hospital?

25 A.    Well, initially the plan was to stand him up and walk

1  him out, and that plan didn't -- didn't work out.  So we
2  changed our plan to keep him in the chair, yes.
3  Q.  Right.  And you talked about how there was -- there was
4  a struggle to get him in the chair, right?
5  A.  Yeah.  After we decided that our plan wasn't going to
6  work, there was a long struggle.
7  Q.  And you tased him six times during that part of the
8  night, right?
9  A.  That is correct.
10        MR. SONGER:  Okay.  Now, Ms. Aroner, if we could
11  put up Exhibit Number 36.
12  Q.  This is a Taser log, correct?  You're familiar with how
13  this document works?
14  A.  I am.
15  Q.  You know this is information that's automatically
16  generated by the Taser when it's used?
17  A.  That's the way I understand it, yes, sir.
18  Q.  And you've seen us look at this document earlier this
19  week, too?
20  A.  Yeah.  Should I go ahead and turn to that?
21  Q.  Sure.  It's Exhibit 36.  And if you could turn to
22  page 33.
23        And at this time, around 10:20 p.m., when you were
24  in the jail, you were the only officer that tased Jordan
25  during that sequence, right?

1  A.    The 10:20 to about 10:30 timeframe, yes, I was the one
2  that had a Taser.  The other Taser was in the back.
3  Q.    Right.
4         So, Ms. Aroner, if you could blow up the section
5  starting at Sequence Number 967, which is 10:25 p.m., and
6  capture the tases below that as well.
7         The records of these tases, as you can see,
8  10:25 p.m. through almost 10:28 p.m., you were the officer
9  who did each one of these tases, right?
10 A.    The --
11 Q.    These are the six times that you tased Jordan?
12 A.    Line number 967 through 972, yes, sir.
13 Q.    Correct.  Okay.  And the fourth column over shows how
14 long the Taser was discharged for, right?
15 A.    Trigger pull, yes.
16 Q.    Yes.  And just reading down, the tases that you did
17 lasted 12, 5, 5, 8, 6, and 11 seconds, right?
18 A.    Yes, sir.
19 Q.    Okay.  And I apologize for trying to do math, but I
20 think if we add those together, 12 plus five and five is 22,
21 plus 8 is 30, plus 6 is 36, plus 11 is 47.
22        So now there are 47 seconds that you tased Jordan,
23 right?
24 A.    Forty-seven seconds of trigger pull, yes, sir.
25 Q.    Yes.  And if you look at the times of those tases, it

1  looks like the first five were pretty close together, and
2  then there's about a minute-and-40-second break before the
3  final one; is that right?
4  A.    Yes.  That looks accurate.
5  Q.    Right.  And then the final one after that minute-and-40-
6  second break is for 11 seconds, right?
7  A.    Yes, sir.
8          MR. SONGER:  Okay.  Ms. Aroner, if you would
9  please bring up Exhibit Number 21.  And play the clip
10 starting at 5 minutes and 5 seconds, and stop at 6 minutes
11 and 27 seconds.
12         (Exhibit 21 played.)
13 BY MR. SONGER:
14 Q.    Okay.  Now, that minute-and-25-second clip we just
15 watched, that's basically the gap between the fifth tase and
16 the final one, the final 11-second one -- right? -- that's
17 shown on the Taser logs?
18 A.    That looks accurate.
19 Q.    Yep.  Now, during that time, you can see Jordan there.
20         He's -- he's not fighting with anyone, is he?
21 A.    Not at that moment in time, no.
22 Q.    And he's in handcuffs at this point?
23 A.    I believe so.
24 Q.    Is there's a belly chain that connects to his handcuffs?
25 A.    I believe there is.

1  Q.   You described that on direct about how that connects so
2  he can barely move his arms, right?
3  A.   That's right.
4  Q.   He also has leg shackles on, correct?
5  A.   That's right.
6  Q.   There's also a belt around his legs in addition to the
7  leg shackles?
8  A.   Yes.
9  Q.   Okay.  And there's a belt that holds him into the
10 restraint chair as well?
11 A.   Yeah, very much like a seatbelt.
12 Q.   Yep.  So he has all those restraints on at this point;
13 that's right?
14 A.   Yes, sir.
15 Q.   And there are seven officers surrounding him; is that
16 correct?
17 A.   Yes, sir.
18       MR. SONGER:  All right.  Ms. Aroner, would you
19 please play the next portion of the video, stopping it at
20 6 minutes and 54 seconds.
21       (Video played.)
22 BY MR. SONGER:
23 Q.   You just tased him for 11 seconds, correct?
24 A.   Yes, sir.
25 Q.   All right.  I would now like to talk about --

1          We can take that down.  Thank you.

2          Now I would like to talk about reporting

3    requirements at the jail.

4          You of course knew that when you used a Taser,

5    you're required to document that in a report, right?

6    A.   Yes, sir.

7    Q.   And you would agree that it's important to document the

8    key facts about an incident, right?

9    A.   Only facts.

10   Q.   Only facts, but it's also important to make sure that

11   the important facts are documented, right?

12   A.   If you have those facts, they need to be there, yes.

13   Q.   Sure.  The report is the jail's official record of what

14   happened in an incident, right?

15   A.   Yes.

16   Q.   Reports are sometimes used to support charges against

17   inmates?

18   A.   Yes.

19   Q.   They're sometimes used to help defend officers in civil

20   lawsuits?

21   A.   Yes.

22   Q.   They can help officers look back and remember what

23   happened in an incident?

24   A.   Yes.

25   Q.   And they're critical to allowing supervisors to review

```
 1  incidents to make sure that policy is followed, right?
 2  A.   Yes, I agree with that.
 3  Q.   And you knew all that back in 2016, correct?
 4  A.   Yes, I did.
 5  Q.   All right.  Now, in your direct testimony a moment ago,
 6  I believe you said that before this incident with Jordan you
 7  had used a Taser a couple of times.
 8            Do you remember saying that?
 9  A.   Yes.
10  Q.   All right.  Let's look at the reports that you filed
11  those two other times.
12  A.   Sure.
13            MR. SONGER:  If we could please put up --
14            THE COURT:  Let counsel approach, please.
15            (Bench conference outside the hearing of the
16            jury.)
17            THE COURT:  I hate to interrupt, but they've been
18  sitting almost 100 minutes now.  How much more do you --
19            MR. SONGER:  There's a little bit.  So if you
20  would like to take a break, I would defer to your wisdom.
21            THE COURT:  I don't want to take a break.  But I
22  know how hard it is for them to -- sounds like you've got at
23  least another 30 minutes.
24            MR. SONGER:  I think 30 minutes is a pretty good
25  estimate.
```

```
 1              THE COURT:  Okay.
 2              MR. SONGER:  If you -- I'm not -- I'm not angry if
 3   you want to take a break.
 4              THE COURT:  I think this is a good time for them.
 5   They'll be more attentive.  Okay.
 6              (Jury present.)
 7              THE COURT:  All right.  Ladies and gentlemen,
 8   we're going to take our afternoon break.  And -- and come
 9   back right at 3:00.
10              (Recess.)
11              THE COURT:  All right.  Bring in the jury.
12              (Jury present.)
13              THE COURT:  All right.  Be seated.
14              Okay.  You can resume the examination.
15              MR. SONGER:  Thank you, Your Honor.
16   Q.   Mr. Bryant, when we left off we were talking about how
17   important it was to write accurate, truthful reports.
18              Do you remember that?
19   A.   Yes, sir.
20   Q.   And you mentioned that there were a couple of times
21   before the incident with Jordan Norris that you had used a
22   Taser and had to write reports about it?
23   A.   That's correct.
24   Q.   So I would like to now look at those reports that you
25   wrote before the night that you tased Jordan Norris.
```

1          So if we could first please bring up Exhibit
2    Number 30.  And you can turn to that in the binder in front
3    of you.
4          The date of this report is June 1st, 2016, right?
5    A.   Yes, sir.
6    Q.   This is an incident that you were involved in that
7    involved an inmate named Joseph Francis?
8    A.   Yes, sir.
9    Q.   And you used a Taser in this incident, right?
10   A.   Yes, sir.
11   Q.   And June 1st, 2016, this is about five months before the
12   night that we've been talking about with Jordan Norris,
13   right?
14   A.   Correct.
15   Q.   And when you wrote your report for this incident, the
16   narrative that you wrote up, it indicated that you had to use
17   a Taser one time, one burst, right?
18   A.   If you would give me time to read it.
19   Q.   Sure.  Please take as much time as you like.
20   A.   Thank you.  (Reviews document.)
21          Yes, one application for five seconds.
22   Q.   Right.  It indicates you used one application, correct?
23   A.   Yes.
24   Q.   It indicates that that application lasted approximately
25   five seconds?

1  A.    Yes, sir.

2  Q.    Your report also indicated what part of the inmate's

3  body you had to tase, right?

4  A.    Yes, the shoulder blades.

5  Q.    And you described your justification for that

6  five-second tasing, right?

7  A.    Yes.

8  Q.    Okay.  Now, if we would please put up Exhibit Number 31.

9              This is an incident report that you filed after an

10 incident with an inmate named Demario Driver; is that right?

11 A.    Yes, sir.

12 Q.    And the date on this report is June 29th, 2016?

13 A.    That is correct.

14 Q.    So this is just a little over four months before your

15 incident with Jordan Norris?

16 A.    Yes, sir.

17 Q.    And this is also a Taser incident, right, where you used

18 a Taser?

19 A.    Again, if you would give me time to read it, please.

20 Q.    Sure.

21 A.    (Reviews document.)

22              Yes.  It was a Taser incident.

23 Q.    You were the officer that used the Taser?

24 A.    That is correct.

25 Q.    And the report you wrote indicates that you used a Taser

1  two separate times, right?

2  A.   Yes.  Two five-second bursts.

3  Q.   And the report spells out that each time you used it, it

4  lasted five seconds?

5  A.   Yes, sir.

6  Q.   Now, none -- you were the only officer who used a Taser

7  in this incident, right?

8  A.   That's correct.

9  Q.   Okay.  But on the "Officers Involved" section of the

10  report, you listed the two other officers that were involved:

11  Roger Temple and Kevin Meyers, right?

12  A.   Yes.

13  Q.   Even though they didn't use a Taser in this incident; is

14  that right?

15  A.   They were hands on with inmate Driver during the

16  incident, yes.

17  Q.   Did those officers use a Taser in this incident?

18  A.   No.

19  Q.   Did you list them on the report?

20  A.   I did.

21  Q.   And does the report describe separately the

22  justification of why you had to use the Taser each of those

23  two times?

24  A.   Yes.  Due to his noncompliance.

25  Q.   All right.

1           Okay.  If we can now pull up Exhibit Number 34.

2           And again, sir, please take as long as you would

3    like to read this.  But my first question is, isn't this an

4    incident report that you filed in July of 2017?

5    A.    Yes, it is.

6    Q.    So that's about eight months after your encounter with

7    Jordan Norris, right?

8    A.    Yes, sir.

9    Q.    Is this also an incident where you used a Taser?

10   A.    That's right.

11   Q.    And the report you wrote for this incident indicates

12   that you had to pull the trigger one time; is that right?

13   A.    Yes.  In the abdomen.

14   Q.    Okay.  And you also reported this time that that tase

15   lasted five seconds?

16   A.    That's correct.

17   Q.    And, as you alluded to, you reported what part of the

18   body you had to tase?

19   A.    Yes, I did.

20   Q.    And you explained the justification for the five

21   seconds, right?

22   A.    Noncompliance.

23   Q.    All right.  Were you the only officer who used a Taser

24   in this incident?

25   A.    I am.

1  Q.    But you listed three other officers on the report:
2  Temple, Palmer, and Walker, right?
3  A.    Yes, I did.
4  Q.    None of those officers used a Taser?
5  A.    That is correct.
6  Q.    But you put them in the report?
7  A.    They were also hands on with the inmates.
8  Q.    All right.  Now let's look at the reports that you filed
9  the night of the Jordan Norris incident.
10            If we could first please bring up Exhibit 25.  And
11  if you could blow it up.  Thank you.
12            Now, I think you explained a little bit ago that
13  this was the only report that you filed about what happened
14  on second shift between 2:00 and 10:00 p.m.?
15  A.    That's right.
16  Q.    So this covered, you said, two different incidents that
17  you were involved in where Jordan was tased?
18  A.    It was a continuation of the beginning to the end.
19  Q.    Okay.  It covered an incident at 7:00, right?
20  A.    Yes.
21  Q.    It also covered an incident at 8:00?
22  A.    Yes.
23  Q.    All right.  And the incident at 8:00 is where you tased
24  Jordan four times?
25  A.    That's correct.

1   Q.    And those tases lasted a total of 50 seconds?

2   A.    There was 50 seconds of trigger pull, yes, sir.

3   Q.    That's the video we watched earlier?

4   A.    That's right.

5   Q.    Okay.  Does this report say that you tased four times?

6   A.    No, it doesn't.

7   Q.    Does it give any information about how many times you

8   tased?

9   A.    No, sir, it doesn't.

10  Q.    Does it say how long any of your tases lasted?

11  A.    No, sir, it doesn't.

12  Q.    No.  Does it say that you had to tase for 25 seconds in

13  one trigger pull?

14  A.    No, sir.

15  Q.    Okay.  And that tase is -- that is five normal Taser

16  cycles, correct?

17  A.    Five single trigger pulls, yes.

18  Q.    The standard cycle is five seconds?

19  A.    That's right.

20  Q.    So the 25-second tase that you did was five times as

21  long?

22  A.    Approximately.

23  Q.    And you didn't disclose that in the report?

24  A.    No, sir.

25  Q.    Okay.  The 15-second tase, that's equal to three

1  standard trigger pulls all in one, right?

2  A.   Yes, sir.

3  Q.   You didn't put that information in the report?

4  A.   That's right.

5  Q.   Okay.  You also wrote, if you look about three-fourths

6  of the way down the report, the sentence, "Deputy Bratton and

7  I tased."

8             I know you've seen us talk about that a lot this

9  week.

10 A.   That's right.

11 Q.   And Deputy Bratton tased Jordan at 7:00, right?

12 A.   Approximately.

13 Q.   You tased Jordan at 8:00?

14 A.   Approximately.

15 Q.   When you tased Jordan four times, 50 seconds, Deputy

16 Bratton wasn't even around, right?

17 A.   No, he wasn't there during that.

18 Q.   All right.  Now, the policy of the Cheatham County

19 Sheriff's Office that existed at the time of this incident

20 required that officers provide the justification for each

21 individual burst of a Taser, right?

22 A.   Yes.

23            MR. SONGER:  And, Ms. Aroner, if we could bring up

24 Exhibit 41.  And if we could go to paragraph 8.3.  It's on

25 the third page of the policy.

1  Q.    The policy says that (as read):

2              As with any application of force, multiple

3              applications or bursts of the Taser in any mode is

4              a separate application of force within the overall

5              force incident and justification for each must be

6              clearly articulated.

7              That was the policy, right?

8  A.    Yes, sir.

9  Q.    In fact, the justification for each burst of the Taser

10  is in bold and underlined in your policy, right?

11  A.    Yes, I see that.

12  Q.    And you did not put separate justifications for each of

13  your tases in your report about what happened at 8:00?

14  A.    I didn't remember all the details.

15  Q.    But it's true that you didn't justify any of those

16  individual four; just Tasers, right?

17  A.    If I would have reported anything that was inaccurate,

18  that would have been wrong.

19  Q.    I don't disagree with that.

20              But it's true that you did not include separate

21  justifications for each Taser pull, right?

22  A.    I didn't have that information in my mind.

23  Q.    You -- so the night that you wrote this report -- which

24  you wrote this -- what did you tell us -- about an hour and a

25  half after the tases?

A.   Yeah, something like that.

Q.   Okay.  At that point you didn't have that information in your mind?  You didn't know why you had just tased a person for 50 seconds?

A.   I didn't know how long or how many.  I knew why I was doing what I was doing.

Q.   But you didn't put those justifications in your report, right?

A.   I would have to go back and look at it.

Q.   We can show it to you again.

A.   Yeah.  I'm pretty sure I mentioned noncompliance.

Q.   Did you separately justify each of the four tases?

A.   No.  But I didn't --

Q.   Okay.

A.   -- elaborate on how many there were any way.

Q.   Now --

         Ms. Aroner, if we can take that down.  Thank you.

         We just talked through a moment ago how Jordan was tased at 7:00 by Officer Bratton.

         And you were involved in that; you used hands-on force, right?

A.   Yes, I was there.

Q.   And then 8:00, after he had been calm for 40 minutes or so --

A.   Approximately.

1  Q.   -- you had to tase him four additional times, right?

2  A.   That's right.

3  Q.   And in your direct exam you said that there was no

4  policy or practice that would -- at that time that required

5  you to submit separate reports -- separate reports for

6  separate use of force incidents.

7          Do you remember saying that a few -- maybe an hour

8  ago?

9  A.   Yes, I do.

10  Q.   Okay.  Well, do you remember being interviewed by the

11  TBI and the FBI about what happened that night?

12  A.   Of course.

13  Q.   And that interview was only about nine months after this

14  incident, right?

15  A.   Nine or ten, yes.

16  Q.   Nine or ten.  At that point you weren't prepared for a

17  trial, you hadn't met with a lawyer, right?

18  A.   No, I wasn't prepared to answer any questions other than

19  what was on my memory.

20  Q.   And what you said in that interview only nine months

21  after this happened was that you knew that you should have

22  done separate reports for both incidents but you only did

23  one?

24  A.   That's because I thought I only had the information from

25  the 7:00 incident on that 1855 report as they were discussing

1  it with me.

2  Q.   That's correct, that you said in that interview that you

3  knew you were supposed to do two separate reports?

4  A.   Before I knew what my report had, yes.  I thought I

5  didn't have enough information.

6  Q.   Okay.  Now let's bring up Exhibit 26.  Again, if you

7  need time to read that, you can take it.  But this is the

8  report that you filed about the incident at 10:30 that night

9  with Jordan, right?

10  A.   2220.

11  Q.   Right.  The six tases that we talked about before he was

12  taken outside and moved to the hospital?

13  A.   Yes, sir.

14  Q.   Now, we just saw on the video a moment ago that there

15  were seven officers surrounding Jordan when you tased him,

16  right?

17  A.   Yes.

18  Q.   And on your report you only listed two officers,

19  yourself and Officer Montgomery, right?

20  A.   Yes.

21  Q.   So you tased him six times.

22        Your report doesn't say he was tased six times,

23  right?

24  A.   No.  It says "multiple times."

25  Q.   And the report doesn't say how long any of those tases

1  lasted, right?

2  A.    No.  Because I didn't know.

3  Q.    And in fact that last tase that we looked at lasted for

4  11 seconds, correct?

5  A.    I didn't know it at the time, but I do know that now.

6  Q.    You would agree that you tased him for 11 seconds?

7  A.    Yes.

8  Q.    And you knew at the time that you weren't just doing a

9  five-second cycle; that you were holding the trigger down to

10  keep it going?

11  A.    I didn't know for each individual cycle.  Some of them

12  were five seconds.  One was six.  One was eight.  One was 11.

13  One was 12.

14  Q.    Sure.

15  A.    I didn't know that at the time, no.

16  Q.    But you knew you had tased for longer than five seconds,

17  right?

18  A.    Yes, on some of them.

19  Q.    Okay.  And none of that information's in the report?

20  A.    I didn't know how many times or how long they were.

21  Q.    Does the report say how many seconds you tased for any

22  of them?

23  A.    No.

24  Q.    Does the report say that during the 11-second tase

25  Jordan was in leg shackles?

1  A.    No.

2  Q.    Does it say that he was in handcuffs or connected to a

3  belly chain?

4  A.    In my report nor Mr. Montgomery's report did he say that

5  any of that equipment was applied to the -- Mr. Norris.

6  Q.    Does your report say that Jordan was in handcuffs and a

7  belly chain?

8  A.    No.

9  Q.    Okay.  Now, several months later -- we've mentioned this

10  a couple of times.

11        You were interviewed by the FBI, right?  Do you

12  remember that?

13  A.    Yeah, TBI and the FBI together.

14  Q.    Right.  And that was a voluntary interview.

15        We can take this down.  Thank you.

16        And I think you said that shortly before this

17  interview there had been some media attention about the

18  incidents with Jordan and the jail, right?

19  A.    Yes.

20  Q.    So you knew that's what the FBI wanted to talk to you

21  about?

22  A.    Yes.

23  Q.    You knew going in there that they wanted to talk to you

24  about the tasing with Jordan that night?

25  A.    Yes.

1   Q.    You were expecting to talk to them about those events?

2   A.    I was told that by Chief Deputy Binkley at Cheatham

3   County Sheriff's Office.

4   Q.    Sure.  And during that interview, you talked with the

5   FBI about all of your encounters with Jordan that night, sort

6   of the whole arc of the night, right?

7   A.    Yes.

8   Q.    And in respect to this incident, you've described to the

9   agents that -- sort of what you told us earlier today, that

10  Jordan had been -- was disruptive for a while in booking, and

11  so he was handcuffed to the bar in booking, and then you guys

12  came up with the idea to get him secured in the restraint

13  chair so you could wheel him outside and get him in the car

14  and take him to the hospital, right?

15  A.    He was connected to the bar so we could make that

16  transition.  He wasn't just sitting there connected to the

17  bar.

18  Q.    Right.  That wasn't my implication.

19  A.    I'm sorry.

20  Q.    I was just -- it's correct that you sort of talked the

21  FBI through that whole process?

22  A.    Yes.

23  Q.    And you told them about how, when you uncuffed him from

24  the bar, there was a struggle and then you got him into the

25  chair and you got handcuffs on him, correct?

1  A.    And the belly chain on, yes.

2  Q.    Yeah.  And you got the belly chain.  And you explained

3  earlier that the belly chain is important because it keeps

4  his arms from being able to move much at all, right?

5  A.    Yes.

6  Q.    So you knew that you had put on handcuffs and belly

7  chain, which really limited the movement of his arms.

8          And you put leg shackles on him, right?

9  A.    Yes.  But he wasn't connected to the chair.

10 Q.    Right.  And then you took him outside.  And eventually

11 he was able to get in the car and take him to the hospital,

12 right?

13 A.    Eventually, yes, sir.

14 Q.    Okay.  And you sort of talked through that with the FBI

15 step by step?  You remember doing that?

16 A.    Yes.

17 Q.    Then, during that conversation, one of the agents who

18 was interviewing you asked you point blank, was there any use

19 of force done during this transition from the jail to the

20 car.  Do you remember being asked that?

21 A.    Yeah, from leaving the booking area to going to the car.

22 Q.    Right.  You remember being asked that?

23 A.    Vaguely.

24 Q.    Okay.

25          And, Ms. Aroner, why don't we play that question

1    and your answer.  It's Exhibit Number 38.

2              (Audio played of Exhibit Number 38.)

3    BY MR. SONGER:

4    Q.    You told the FBI that after you got the belly chain on,

5    the thing that really limited his movement, there was no more

6    use of force, correct?

7    A.    That's how I remembered it at the time, yes, sir.

8    Q.    And that tasing was actually the only time in your

9    entire career that you've ever tased someone who was already

10   in a belly chain, right?

11   A.    I believe so.

12   Q.    Only time.

13             Okay.  I want to step back to when you first

14   encountered Jordan on this night, on November 5th, 2016.

15             You -- it sounds like you pretty quickly realized

16   there was something off about him; is that fair to say?

17   A.    Yes, sir.

18   Q.    He was banging his head on the wall?

19   A.    Yeah.  Like I said, I don't remember the banging the

20   head.  I remember the aggressive posturing toward the other

21   inmate.

22   Q.    Was it obvious to you that he was disturbed?

23   A.    It was obvious to me that he wanted to fight with

24   somebody, and we weren't going to allow that to happen.

25   Q.    He appeared to be on some type of substances?

1 A.    Yes.  His eyes appeared to be fixed and dilated, like he

2 had been using methamphetamine, in my experience.

3 Q.    Right.  And he told you he wanted to die, right?

4 A.    Yeah.  That's why I called the mobile crisis, to get the

5 suicide prevention team there.

6 Q.    Right.  You thought he might be suicidal?

7 A.    When somebody says they want to kill themselves, I have

8 no choice in the matter.  That's just standard practice.

9 Q.    Sure.  And you figured all that out pretty quickly after

10 dealing with him, right?

11 A.    Well, when you say you want to kill yourself, it's

12 pretty apparent.

13 Q.    I'm just saying, it didn't take long after you guys

14 first encountered him for you to realize he was pretty messed

15 up?

16 A.    He was not obeying our commands.  He didn't seem to know

17 where he was or what he was doing.

18 Q.    Okay.

19 A.    So, yes, I would say that he -- how did you say it

20 again?

21 Q.    Well, let me just ask it this way:  You and some other

22 officers pulled him out of the cell at 7:00 and you struggled

23 with him for a while, correct?

24 A.    Yes, sir.

25 Q.    By that point you realized that he was pretty messed up?

1  A.   Well, I realized that he was extremely strong and
2  extremely angry.  Yeah.  Messed up?  I don't know if I would
3  have characterized it that way.
4  Q.   No, that's fair.
5            He had told you he wanted to die?
6  A.   Yes.
7  Q.   Okay.  And you were concerned enough that you contacted
8  the mobile crisis unit, right?
9  A.   Yes.
10 Q.   And then an hour later you tased him four times for 50
11 seconds, right?
12 A.   No.
13 Q.   Yes.  At 8:00, you tased him four times for 50 seconds?
14 Is that not true?
15 A.   Yeah, but he didn't start with the suicidal ideations
16 closer to 8:30, 9:00.
17 Q.   Then at 10:30, you tased him six more times for another
18 47 seconds?
19 A.   That's correct.
20 Q.   So after you knew he was suicidal, you shot electricity
21 into his body for 97 seconds?
22 A.   I don't see how the two are related.
23 Q.   My question is, after you knew he was suicidal, you shot
24 electricity into his body for 97 seconds.
25            That's true, correct?

A.   That didn't have anything to do with my decision to use
the Taser to make him comply with my commands.

Q.   I didn't ask you about the reasons for your decision.

     I asked you, is it true that after you knew he was
suicidal, you shot electricity into his body for 97 seconds?

A.   I did not shoot electricity into his body for 97 seconds
after I knew that he was suicidal because he was suicidal.

Q.   Do you remember testifying under oath, as we discussed
earlier this afternoon --

A.   Sure.

Q.   -- back in February of 2019?

A.   Yes, sir.

Q.   Do you remember being asked during that testimony, "You
sent electricity into his body for 97 seconds after you knew
he was suicidal?"

     Do you remember being asked that?

A.   No, I don't.

     MR. SONGER:  Your Honor, may I approach and show
the witness his testimony?

     THE COURT:  Sure.

BY MR. SONGER:

Q.   Okay.  I've just handed you a copy of your testimony
from February 7th, 2019.  Do you have that in front of you?

A.   Yes, sir, I see where you're --

Q.   I'm sorry.  Sir, let me ask the question.

```
 1                   On page 64, you were asked (as read):
 2                        You tased him for -- you tased him -- you sent
 3                        electricity into his body for 97 seconds after you
 4                        knew he was suicidal?
 5                        Answer:  Yes, sir.
 6                   Did I read that correctly?
 7      A.    Yes.  That's what it says.
 8      Q.    Thank you.
 9                   And you knew what a Taser felt like, right?
10      A.    Yes.
11      Q.    You knew that it hurt?  You told us that on direct?
12      A.    Yes.
13      Q.    In fact, when you worked at the Tennessee Department of
14      Corrections, you had been tased yourself, right?
15      A.    Yes.
16      Q.    And it hurt, right?
17      A.    Yes, it does.
18      Q.    And then when you came over to Cheatham County and you
19      took Sgt. Ola's training, you had an opportunity to volunteer
20      to be tased again, right?
21      A.    That's right.
22      Q.    And you turned that down, didn't you?
23      A.    Yes, I did.
24                  MR. SONGER:  Nothing further.
25                  THE COURT:  All right.  Redirect.
```

```
 1          MR. STRIANSE:  Thank you, Your Honor.  Just a few
 2   questions.
 3
 4                   REDIRECT EXAMINATION
 5   BY MR. STRIANSE:
 6   Q.   Mr. Bryant, I know we've diagramed and dissected
 7   Government's Exhibit 25.  There's just one other thing I want
 8   to ask you.  We've got it back up on the screen for the
 9   record.
10          And again, this is your report that memorializes
11   what you did between 6:55 and 2122, which is 9:22 p.m.; is
12   that right?
13   A.   Yes, sir.
14   Q.   You were asked by the government in cross-examination
15   about failing to document each one of your tases; is that
16   right?
17   A.   Yes, sir.
18   Q.   And you sort of quickly agreed with that premise; is
19   that right?
20   A.   Yes, sir.
21   Q.   Now, at the 8:00 p.m. interval, you gave four tases; is
22   that right?
23   A.   Yes, sir.
24   Q.   Take a look at the body of your narrative.  There are at
25   least six justifications for using the Taser contained in
```

1  that paragraph, are there not?

2  A.    I would have to go back through and count.

3  Q.    Yeah.  Take a look at the first sentence, second line

4  (as read):

5              Aggressive posture towards another inmate.

6         Do you see that?

7  A.    Yes, sir.

8  Q.    Do you see "threatening an inmate" in line 3 --

9  A.    Yes, sir.

10  Q.    -- "with physical violence"?  That's two.

11         You instructed inmate Norris to step out of the

12  cell.  He went back to his cell -- to the bunk.

13         That's four, is it not?

14  A.    Yes.

15  Q.    (As read):

16              I told him -- inmate Norris -- to come with me

17              again.  He did not comply.

18         That's a fifth justification; is that right?

19  A.    Yes, sir.

20  Q.    Then if you go down two more lines (as read):

21              Deputy Key and I escorted him out of the cell,

22              placed him against the wall outside the cell.  I

23              instructed him to put his hands behind his back.

24              He resisted.

25              Is that six?

1  A.   Yes, sir.

2  Q.   Then go down a couple more lines.

3           "Inmate Norris resisted"; is that right?

4  A.   Yes, sir.

5  Q.   That's seven.  For four tases; is that right?

6  A.   Yes, sir.

7  Q.   Do you feel like that you provided your justifications

8  in the body of that narrative?

9  A.   Absolutely.

10 Q.   Were you trying to keep any information from your

11 superiors or anybody else?

12 A.   No, sir.

13 Q.   You were shown these old reports --

14 A.   Yes, sir.

15 Q.   -- that predated the report -- this report that you did

16 on November 5, 2016; is that right?

17 A.   Yes, sir.

18 Q.   Why were those reports a little bit more precise in the

19 use of the Taser?

20 A.   The first one was one application.  So that's pretty

21 simple to articulate.

22          And the second one was two applications, I

23 believe.  So also not near the scope of this chaotic moment

24 where I had no idea how many times or how long each time I

25 used the Taser.  So I wouldn't have been able to articulate

1  it.
2  Q.    And by the time you prepared this report, which was
3  2148, 9:48 p.m., you had been dealing with Jordan Norris for
4  about three hours plus at that point; is that right?
5  A.    Amongst other things, booking in people, medication,
6  yeah.  It was very busy.
7  Q.    And you still weren't done dealing with him because
8  you -- as you were writing this one, you didn't realize what
9  was going to happen in booking as he was taken to the
10 vehicle; is that right?
11 A.    No.  I didn't know it was going to happen the way it
12 did.  But I knew I was going to stay there and make sure that
13 it got done.
14 Q.    And you neglected to tell the FBI when you voluntarily
15 appeared for that interview at the DA's office that you did
16 tase Jordan Norris when he was in that belly chain?
17 A.    Yes.
18 Q.    Now, you also forgot to tell them that Cpl. Montgomery,
19 the head of the third shift, also tased Jordan Norris; is
20 that right?
21 A.    Yes.
22           MR. SONGER:  Objection --
23 BY MR. STRIANSE:
24 Q.    When he was in a belly chain?
25           MR. SONGER:  Your Honor, can we have a little less

1  leading?  I know it's redirect.

2          THE COURT:  I couldn't hear you.

3          MR. SONGER:  Object to the leading.  I know it's

4  redirect, but he's just testifying.

5          THE COURT:  All right.

6          Sustained.  Don't lead.

7          MR. STRIANSE:  Those are my questions.  Thank you.

8          THE WITNESS:  Thank you.

9          THE COURT:  All right.  You can step down.

10          THE WITNESS:  Thank you.

11                  (Witness excused.)

12          THE COURT:  Call your next witness.

13          MR. STRIANSE:  Your Honor, the defendant rests.

14          THE COURT:  Does the government have rebuttal

15  proof?

16          MR. SONGER:  We do not, Your Honor.

17          THE COURT:  All right.

18          So, ladies and gentlemen of the jury, you have

19  heard all the evidence in this case.  The next thing we'll do

20  is you'll hear closing arguments, where the lawyers will

21  attempt to interpret and summarize and put their position

22  regarding the evidence.  After that, I'm going to charge you,

23  and I'll give you the law that's applicable to the case.

24          Right now the charge is 76 pages; so it's going to

25  take the better part of an hour.  You'll get your own copy of

the charge, and you can write on it and highlight it and do
as you please with it to help you go through it.

So at this point, you are excused for the day.
We'll start back at 9:00 with closing.

Now, again, remember -- I know you haven't
forgotten, but I need to tell you.  Don't talk about the
case.  I know your family's got to be wondering what you've
been doing in federal court.  But still tell them you can't
talk about the case.

Don't do any research.  If there is anything in
the media or whatnot about the case, then do not read that.
If you inadvertently see something, don't read it.  Ignore
it.

And, finally, if anyone tries to talk to you about
the case, then you need to let me know first thing in the
morning.

So I'll see you in the morning.  And travel safe.
Thank you.

(Jury dismissed.)

THE COURT:  All right.  The jury's excused.  You
can be seated.

Mr. Strianse, do you have a motion?

MR. STRIANSE:  Yes, Your Honor.  I want to renew
for the record my earlier Rule 29 motion.  And I'll rely on
all of the arguments that I made.

1          THE COURT:  All right.

2          Okay.  I'm going to deny that and let the jury

3   make a determination.  If necessary we can have posttrial

4   motions.

5          Now, have you all gotten a chance to look at the

6   charge?

7          MR. SONGER:  We have, Your Honor.

8          THE COURT:  All right.  Does the government have

9   any objections to the charge?

10          MR. SONGER:  Just one moment.

11          THE COURT:  All right.  I'll go to Mr. Strianse.

12          Do you have any objections to the charge?

13          MR. STRIANSE:  Your Honor, I have no objections to

14   the charge.

15          THE COURT:  You've had a chance to look at it?

16          MR. STRIANSE:  Yes, sir.  We went over it with the

17   clerk earlier.

18          THE COURT:  Well, you can still object.

19          MR. SONGER:  Yes, Your Honor.  We had a chance to

20   review it with the defense with the clerk, and I think we're

21   in agreement on the charge.  At least one exception from the

22   government's perspective, which is page 61, the instruction

23   regarding character and reputation evidence of the defendant.

24          THE COURT:  Okay.

25          MR. SONGER:  We -- our position is the instruction

1  is not necessary.  I don't believe it's from the Sixth
2  Circuit model, and I don't believe there's anything special
3  or notable about the character evidence that was presented
4  here that warrants calling special attention to it other than
5  just all of the evidence that the jury's been exhibited.
6          THE COURT:  So you want it deleted?
7          MR. SONGER:  We would ask to delete it.  I don't
8  think there's any reason to call special attention to
9  character evidence in particular.
10         MR. STRIANSE:  Well, the Sixth Circuit doesn't
11 think it's special attention.  It's the Sixth Circuit
12 pattern.  And you gave it last time we tried this case.
13         THE COURT:  Okay.
14         MR. STRIANSE:  Because I suggested it to you.
15         THE COURT:  All right.  He says it is the pattern,
16 Mr. Songer.
17         All right.  I'm going to leave it.  I don't --
18 anything else from the government?
19         MR. SONGER:  We have no other objections to the
20 instructions.
21         THE COURT:  Any objection to the verdict form?
22         MR. STRIANSE:  No, Your Honor.
23         MR. SONGER:  Not from the government, Your Honor.
24         THE COURT:  All right.  So we'll prepare the
25 charge.  You'll have the final version of it on your desk in

1 the morning.  And we'll make copies for the jury.

2     Anything else?

3     MR. SONGER:  Your Honor, the -- one other matter

4 we would like to take up is how much time you're planning to

5 allot for closing arguments tomorrow.

6     THE COURT:  At the pretrial conference, didn't I

7 say 30 minutes?

8     MR. SONGER:  You indicated you would revisit it

9 based on the evidence.

10     THE COURT:  But I said 30?  I just want to --

11     MR. SONGER:  Yes.  That's correct, Your Honor.

12 You said 30, but you invited us to discuss it again after the

13 evidence.

14     THE COURT:  So let's do it.  Let's discuss it.

15     MR. SONGER:  We would respectfully but very much

16 enthusiastically ask the Court to give us more time.  There

17 are -- as the Court knows, I believe we had 45 minutes in the

18 first trial.  There's an additional count in this trial that

19 was not present then, and there were more witnesses called.

20 And I believe that the complexity of the issues and evidence

21 does not allow us to explain in 30 minutes how the evidence

22 has been presented fits with the legal elements.  I think it

23 would be in everyone's interest if we could have just an

24 extra 30 minutes.

25     And we've been here all week.  I'm sure we

1  could --

2              THE COURT:  An hour?

3              MR. SONGER:  I'm sure we could do it in an hour.

4              THE COURT:  Oh, no.  I'm not doing an hour.

5  Sorry.  I thought you were asking for 40 minutes.  Now you're

6  gone from 40 to 60.  Right?

7              MR. SONGER:  I believe we --

8              THE COURT:  We started at 40.

9              MR. SONGER:  I was asking for an hour --

10             THE COURT:  I believe we had 45 minutes; now it's

11 gone to a hour.

12             MR. SONGER:  I believe we had 45 last time, and I

13 was suggesting that the trial is even more complex and longer

14 this time.  But at a minimum, we would request 45, Your

15 Honor.

16             THE COURT:  All right.  Now you're back to 45.  Is

17 that your final number?

18             MR. SONGER:  At a minimum, we would be greatly

19 appreciative.

20             THE COURT:  All right.  Let's hear from

21 Mr. Strianse.

22             MR. STRIANSE:  Your Honor, I don't have any

23 objection to whatever limit you want to set on the closing

24 argument.

25             THE COURT:  Do you want more than 30 minutes?

1          MR. STRIANSE:  I don't need more than 30 minutes.

2          THE COURT:  All right.  Then let's go with 40

3    minutes for closings.

4          All right.  What else?  Anything else to take up?

5          MR. SONGER:  Nothing else, Your Honor.  But we

6    really would request at least 45 minutes.  The government has

7    the burden, and we have to explain to the jury how the

8    evidence -- how we carried that burden.  We really would

9    appreciate 45 minutes.

10         THE COURT:  Okay.  I'm with going to stick with

11   40.

12         Now, have you all looked at the exhibits?  Have we

13   reviewed the exhibits to make sure --

14         MR. STRIANSE:  I'm going to do that.

15         THE COURT:  You're going to do that before you

16   leave?

17         MR. STRIANSE:  Yes, sir.

18         THE COURT:  You're going to do that before you

19   leave.

20         Do we have the videos?  You have the videos.

21         And you -- oh, I noticed sometime the video had

22   sound and sometime it didn't, and in the prior trial it

23   looked like we had videos with sound and with -- so do these

24   videos have sound?

25         MR. SONGER:  Your Honor, they're the same videos

1 that were introduced in the prior trial.  I can explain it to

2 you if you --

3     THE COURT:  If you answer my question, do these

4 videos have sound?

5     MR. SONGER:  You're correct that part of the

6 videos have sound and part do not.

7     THE COURT:  Okay.

8     MR. SONGER:  The overhead surveillance videos from

9 the jail by themselves wouldn't have any sound.  What we did

10 was combine that video with the video from the Taser itself.

11 There's a little camera on it, and that has sound on it.  And

12 it is synced up into one video, and that's what we've been

13 showing in court.

14     THE COURT:  So I gather you -- the parties have --

15 it's in evidence.  So I just wanted to make sure I just

16 noticed that discrepancy.

17     MR. SONGER:  There's no problem with them.

18     THE COURT:  All right.  Anything else?

19     MR. SONGER:  No, Your Honor.

20     THE COURT:  So we're ready for -- we'll start at

21 9:00 and -- with closing and then probably take a break and

22 then I'll do the charge.

23     All right.  Thank you.

24     (Court adjourned.)

25

1    REPORTER'S CERTIFICATE

2

3          I, Lise S. Matthews, Official Court Reporter for

4    the United States District Court for the Middle District of

5    Tennessee, with offices at Nashville, do hereby certify:

6          That I reported on the Stenograph machine the

7    proceedings held in open court on January 9, 2020, in the

8    matter of UNITED STATES OF AMERICA v. MARK BRYANT, Case No.

9    3:18-cr-00144; that said proceedings in connection with the

10   hearing were reduced to typewritten form by me; and that the

11   foregoing transcript (pages 1 through 244) is a true and

12   accurate record of said proceedings.

13         This the ^ day of September, 2020.

14

15                              /s/ Lise S. Matthews
                                LISE S. MATTHEWS, RMR, CRR, CRC
16                              Official Court Reporter

17

18

19

20

21

22

23

24

25