IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF TENNESSSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| v. | ) | CR. NO.   3:18-CR-144 |
| | ) | **Chief Judge Crenshaw** |
| | ) | |
| MARK BRYANT | ) | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through Donald Q. Cochran, United States Attorney for the Middle District of Tennessee, Assistant U.S. Attorney Sara Beth Myers, and Civil Rights Division Trial Attorney Michael J. Songer, hereby files this sentencing memorandum. Sentencing is scheduled for Friday, November 20, 2020.

## I.   FACTUAL BACKGROUND

On January 10, 2020, after a four-day trial, a federal jury in the Middle District of Tennessee convicted the defendant, supervisory corrections officer Mark Bryant, of two counts of violating 18 U.S.C. § 242 by using a Taser to repeatedly assault a restrained 18-year-old detainee named Jordan Norris. The jury acquitted Bryant of two counts of falsifying reports about the assaults, in violation of 18 U.S.C. § 1519, and of one count of knowingly making false statements to the FBI, in violation of 18 U.S.C. § 1001.

The charges stemmed from the defendant's actions on the evening of November 5, 2016, when he twice assaulted Norris with a Taser while Norris was restrained and surrounded by multiple officers inside the Cheatham County Jail. According to a subordinate officer who

1

witnessed the incident, the defendant's assaults caused wounds that made Norris' skin look like "raw hamburger meat." Tr. Jan. 9, 2020 at 23. During the first assault, Bryant taunted Norris by saying "you don't like it, do you? I'll keep going until I run out of batteries." Tr. Jan. 7 at 63-64; Jan. 8 at 150, 161.

### A. The Defendant Was Trained on the Risks of Misusing Tasers

The defendant had been trained and certified on the proper use of Tasers prior to his assaults on Norris. Sergeant Gary Ola, the jail's longtime Taser trainer, taught the defendant the permissible limits on using Tasers and the serious injuries and related health issues that could result from exceeding those limits. Ola explained that the Taser model the defendant used was designed to cut off automatically after five seconds. Tr. Jan. 8 at 230. While it was possible for officers to override the cut-off by continuing to hold down the Taser's trigger, *see* id., Ola trained the defendant to never tase a person for more than five seconds at a time and to not use more than three five-second Taser cycles during an incident, as doing so risked cardiac injuries or even death. Tr. Jan. 8 at 236-40. Moreover, Ola taught defendant Bryant and other officers to use a Taser only when they faced a threat that they could not safely resolve by using lower levels of force. Ola emphasized that Tasers would rarely be necessary inside a secure jail facility, particularly where multiple officers were available to control an inmate. *Id*. at 235-36, 242. During defendant Bryant's training, Sergeant Ola also instructed officers not to tase a person who was already handcuffed––a point so important that he emphasized it "every time" he trained officers. *Id*. at 242.

As part of the Taser certification training, Sergeant Ola asked officers to volunteer to be exposed to a Taser for five seconds or less so they would understand the amount of pain a Taser

2

inflicts. Defendant Bryant did not volunteer. Tr. Jan. 9 at 232. He testified that he already knew Tasers were painful because, earlier in his career, he had been exposed to a Taser while training at the Tennessee Department of Corrections. Tr. Jan. 9 at 232.

### B. Count One – the 8:00 p.m. Assault

On the night of November 5, 2016, defendant Bryant worked as the supervisor in charge of the second shift (2:00–10:00 p.m.) at the Cheatham County Jail. At approximately 6:55 p.m. that evening, the defendant noticed that a recently-admitted detainee––Jordan Norris––was banging his head against the wall in his cell. Defendant Bryant believed Norris was experiencing some type of crisis, which he attributed to possible substance abuse. Tr. Jan. 9 at 228-29. The defendant, along with corrections officers Josh Marriott, Daniel Bratton, and Jeff Key, removed Norris from his cell and placed him in a restraint chair––a heavy metal chair with straps across his waist, shoulders, legs, and both wrists––where he could not harm himself or others. Tr. Jan. 7 at 52. As Norris resisted being placed in the chair, corrections officer Daniel Bratton stunned him with a Taser multiple times in order to effect his secure transfer to the restraint chair. Each of Officer Bratton's tases lasted five seconds or less, as required by the jail's policy. Tr. Jan. 8 at 13-15.

Officers then secured Norris in the restraint chair and left him strapped in for the next hour. During that time, Norris alternated between periods of calm and distress, including moments where he said he wanted to die. Defendant Bryant acknowledged that he believed Norris was suicidal. Tr. Jan. 9 at 229 ("When you say you want to kill yourself, it's pretty apparent.").

Around 8:00 p.m., Norris became agitated in the restraint chair and loosened the strap that secured his right wrist. The rest of his body remained tied down. Defendant Bryant, Officer

3

Josh Marriott, and Officer Jeff Key walked over to the restraint chair and attempted to tighten Norris' loose wrist strap. As Officer Key attempted to tighten the strap, Josh Marriott put a spit mask over Norris' face and held his head back. Tr. Jan. 7 at 56-57. Defendant Bryant kneeled in front of Norris and asked Officer Caitlin Marriott to hand him a Taser. Tr. Jan. 7 at 59; Tr. Jan. 9 at 15.

Defendant Bryant then pointed the Taser at Norris' chest while Norris' legs, waist, shoulders, and left wrist remained strapped into the restraint chair. Officer Josh Marriott continued to hold Norris' head, and Officer Key held Norris' right wrist. Marriott and Key testified that, in this position, Norris posed no threat to the officers' safety and, consequently, there was no justification for tasing him for any amount of time. *See* Tr. Jan. 7 at 61 ("Q. In this posture, do you see any threat that justifies tasing Jordan? A. No. Q. Not for any amount of time at all? A. Right."); Tr. Jan. 9 at 103. Nonetheless, the defendant pushed the Taser against Norris' chest and asked, "Are you ready?"––then activated the Taser in drive stun mode and shot electricity into Norris' body. Contrary to his training, the defendant tased Norris four times in quick succession in the chest and legs for a total of 50 seconds. During this sequence, defendant Bryant overrode the Taser cutoff to keep electricity flowing into Norris for 25 straight seconds without a break––five times longer than the maximum exposure Sergeant Ola had trained the defendant to use. Officer Josh Marriott––defendant Bryant's friend and former roommate–– testified that these lengthy tases "were definitely overdone." Tr. Jan. 7 at 72. During the assault, defendant Bryant taunted Norris by saying "you don't like it, do you? I'll keep going until I run out of batteries." Tr. Jan. 7 at 63-64; Jan. 8 at 150, 161.

4

Officer Caitlin Marriott, who watched the assault from several feet away, testified that she also had completed Sergeant Ola's Taser certification course and understood that "you're not allowed to tase someone for that long." Tr. Jan. 9 at 21. She explained that the incident was so disturbing that she "didn't carry a Taser for a long time after that." Tr. Jan. 9 at 23. Indeed, for months after witnessing the assault, Officer Marriott avoided other officers when they even *tested* Tasers because "just the sound of it" "would take [her] back to the incident." *Id*. at 24. Two days after the assault, Norris showed Caitlin Marriott the wound on his leg where the defendant tased him. She observed that Norris' flesh "looked like raw hamburger meat." Id. at 23.

As part of the jail's subsequent investigation into the incident, Lieutenant JJ Hannah asked Sergeant Ola to pull the logs that automatically record data every time an officer uses a Taser. Tr. Jan. 8 at 248. Sergeant Ola reviewed these logs and determined that defendant Bryant tased Norris four times in quick succession for a total of 50 seconds, including a single tase that lasted for 25 seconds, followed almost immediately by a tase that lasted 15 seconds. Tr. Jan. 8 at 250-51. Ola testified that he had "never seen someone tased that much" during his two decades in law enforcement. *Id*. at 251.

### C. Count Two – the 10:20 p.m. Assault

Two hours later, at approximately 10:20 p.m., officers on the jail's third shift (10:00 p.m. – 6:00 a.m.) transported Norris to the Middle Tennessee Mental Health Institute for evaluation. Tr. Jan. 8 at 76-77. The defendant stayed to help the third shift officers prepare to transport Norris, who had been handcuffed to a metal bar in front of the jail's booking window. *Id*. at 252. Officers removed the handcuffs that held Norris to the bar, then strapped him into a restraint chair and re-secured him with handcuffs and leg shackles. *Id*. at 253. During this process, Norris

5

yelled and struggled against the officers, prompting defendant Bryant to tase Norris several times. After these tases, however, Norris calmed down and allowed officers to fasten his restraints. Tr. Jan. 8 at 60. Norris then sat calmly in the restraint chair for the next minute and a half, still handcuffed and shackled. *Id*. at 60, 254. As Bryant, Ola, and five other officers surrounded Norris and prepared to move him outside to the transport vehicle, defendant Bryant leaned over and tased Norris in the leg for 11 more seconds. Surveillance video showed that Norris appeared calm and cooperative when the defendant tased him. Sergeant Ola, who watched the assault from less than three feet away, testified that Norris was "calm" and "restrained" when Bryant tased him, and that there was no justification for Bryant to use his Taser for any amount of time. Tr. Jan. 8 at 256 ("Q. Do you see any reason to tase him right now? A. No, sir. Q. For any amount of time? A. No, sir." Q. Even one second? A. No, sir."). Ola was "shocked" when defendant Bryant tased Norris for no apparent reason. *Id*. at 261. A jail supervisor who witnessed the assault, Corporal Michael Montgomery, agreed with Ola's assessment. Tr. Jan. 8 at 63 ("Q. Do you see any threat that justifies tasing Jordan right now? A. No. Q. Even for one second? A. No."). Corporal Montgomery––who was not present for the defendant's lengthy assault at 8:00 p.m.––testified that the defendant's unprovoked, 11-second assault at 10:20 p.m. was the longest tasing he had witnessed during his law enforcement career. Tr. Jan. 8 at 72.

When Sergeant Ola met with the FBI several months later as part of the joint state and federal investigation of the incident, he falsely claimed that he was not present for the second incident, when the defendant tased Norris after he was placed in handcuffs and shackles. Tr. Jan. 8 at 263. Ola later acknowledged this claim was false, and testified that he tried to cover up the assault because of "fear" and the "shame" that the defendant had disregarded his training. *Id*. at

6

262 ("Q. Were you ashamed that somebody you trained would do that? A. Yes sir, I am."). Ola further explained that he was ashamed the assault happened on "his watch" and lamented that, "It never should have happened" and that he and the other officers who failed to stop Bryant "let Jordan down." Tr. Jan. 8 at 264. Ola pleaded guilty to two counts of violating 18 U.S.C. § 1001 based on his false statements.

### D. Counts Three and Four – False Reports

The jury acquitted the defendant on two counts of obstructing justice by filing false reports about the assaults, in violation of 18 U.S.C. § 1519. These counts charged that the defendant omitted material information from his reports about the two incidents, including: the number of times he tased Norris; how long each tasing lasted; the fact that Norris was strapped down during the 8:00 p.m. assault; and that Norris was handcuffed, shackled, and surrounded by seven officers during the 10:20 p.m. assault.

At trial, the defendant asserted that he "didn't have that information in [his] mind" when he wrote the reports, Tr. Jan. 9 at 220-21, although he acknowledged writing them shortly after the assaults occurred. *See* Tr. Jan. 9 at 161 (report for the 10:20 p.m. assault was completed at 10:49 p.m.); id. at 164 (report for the 8:00 p.m. assault was completed at 9:48 p.m.). Lieutenant JJ Hannah, the defendant's supervisor who had the responsibility to review officers' uses of force, testified that the defendant's reports omitted critical information that he needed to assess whether the force was appropriate. Tr. Jan. 8 at 127 (The defendant's reports did not give Hannah "any idea" what really happened.). As a result, Hannah did not flag the incidents for further investigation or potential disciplinary action. *Id.* at 152.

7

### E. Count Five – False Statement to the FBI

The jury also acquitted the defendant of Count Five, which charged him with making a materially false statement to the FBI. In a voluntary interview with agents for the FBI and Tennessee Bureau of Investigation in August 2017, the defendant claimed that he never tased Norris after he was placed in handcuffs, leg shackles, and a belly chain. The Government introduced an audio recording of this portion of the interview at trial, along with video and witness testimony showing that the defendant had, in fact, tased Norris for 11 seconds after he was placed in these restraints. The defendant did not dispute these facts at trial, but claimed that his false statement reflected "how I remembered it at the time." Tr. Jan. 9 at 228. FBI Special Agent Joy Wright testified that the defendant's false statement impacted the federal investigation, as she was not aware of the 11-second tasing at the time of the interview and therefore did not ask the defendant important questions to assess whether the force constituted a crime. Tr. Jan. 8 at 183.

## II. PRESENTENCE REPORT

The United States Probation Office for the Middle District of Tennessee computed the defendant's advisory range under the U.S. Sentencing Guidelines. Pursuant to U.S.S.G. § 2H1.1, which cross references § 2A2.2, the base offense level for Counts One and Two is 14. Because Defendant Bryant was working as a law enforcement officer at the time of his assault and therefore acted under color of law, the Probation Office applied a 6-level upward adjustment according to § 2H1.1(b)(1). The Probation Office also applied a 2-level upward adjustment because the victim was restrained at the time of the defendant's assault, *see* § 3A1.3, a 3-level adjustment based on Norris' suffering bodily injury, *see* § 2A2.2(b)(3)(A), and a 4-level adjustment because the defendant used a dangerous weapon, *see* § 2A2.2(b)(2)(B).

Based on this analysis, the Presentence Report calculated the defendant's total offense level for each count of conviction to be 29. *See* PSR at ¶ 55. The calculations are shown below.

| 2A2.2 | Base Offense Level for Count 1 (§ 242) | 14 |
| 2H1.1(b) | Committed Under Color of Law | + 6 |
| 3A1.3 | Victim Physically Restrained | + 2 |
| 2A2.2(b)(3)(A) | Victim Suffered Bodily Injury | +3 |
| 2A2.2(b)(2)(B) | Dangerous Weapon Used | +4 |
| | TOTAL OFFENSE LEVEL | 29 |

Because the defendant was convicted of two counts for assaulting Norris on separate occasions, the Presentence Report then applied a multiple count adjustment pursuant to 3D1.4, resulting in a total offense level of 31. *See* PSR ¶ 60. Defendant Bryant is in Criminal History Category I, resulting in a recommended Guidelines range of 108-135 months. In this instance, Title 18, United States Code, § 242 carries a maximum statutory penalty of 10 years' imprisonment, not more than three years of supervised release, a fine of not more than $250,000, and a mandatory assessment fee of $100.

### A. Application of the Adjustment for Obstruction of Justice

In addition to the adjustments described above, the United States asks the Court to apply a 2-level upward adjustment for the defendant obstructing the investigation and prosecution of this case. Specifically, the defendant falsely told the FBI that, during the 10:20 p.m. incident, he did not use his Taser after Norris was placed in handcuffs and leg shackles and omitted all material details of this tasing from his incident report. *See* U.S.S.G. § 3C1.1 (2-level adjustment applies where the "defendant willfully obstructed or impeded, or attempted to obstruct or impede, the

9

administration of justice with respect to the investigation [or] prosecution . . ." of the underlying offense). A federal grand jury indicted defendant Bryant for violating 18 U.S.C. § 1001 based on his false statement to the FBI and for violating § 1519 for omitting material information from his report. Although the defendant was acquitted of these counts at trial, the Court may consider the underlying conduct at sentencing. *See, e.g.*, *United States v. Watts*, 519 U.S. 148, 154 (1997) ("[A] sentencing court may consider conduct of which a defendant has been acquitted.").

The § 3C1.1 adjustment applies here because defendant Bryant provided "a materially false statement to a law enforcement officer that significantly obstructed or impeded the official investigation or prosecution of the instant offense." *See* § 3C1.1, Application Note 4(G). FBI Special Agent Joy Wright testified that Bryant's false statement impeded the federal investigation because, at the time of the interview, she was not "aware he had tased someone when he was in handcuffs." Tr. Jan. 8 at 183. Special Agent Wright therefore did not ask defendant Bryant any questions to assess his potential justification for the tasing and determine whether he had acted willfully––an essential element of any 18 U.S.C. § 242 violation. Section 3C1.1 applies to false statements that prevent federal officials from pursuing such material information. *See United States v. Nelson*, 54 F.3d 1540, 1544 (10th Cir. 1995) (false statement about the existence of a bank account in a mail fraud case warranted a § 3C1.1 adjustment because it "prevent[ed] the probation officer from following leads.").

Defendant Bryant's false statement to the FBI was part of a pattern of concealment that started when he failed to disclose in his incident report that he tased a handcuffed and shackled detainee. Contrary to the reports he filed in the other incidents where he used a Taser, *see* Tr. Jan. 8 at 112-118, the defendant's report about the 10:20 p.m. incident did not disclose how long he

10

tased Jordan Norris and omitted that Norris was handcuffed, shackled, and surrounded. Id. at 128. The defendant's supervisor at the jail, Lieutenant Hannah, testified that––like Special Agent Wright––he did not know that defendant Bryant had tased a handcuffed and shackled detainee and therefore did not investigate the incident. *Id*. at 139, 152. Defendant Bryant's false statement was an especially potent obstacle to the federal prosecution in this case, where assessing whether Bryant acted willfully was the key component of the Government's investigation and a central focus of both of defendant Bryant's trials. By preventing the FBI from asking important questions to assess his willfulness during his only interview with federal authorities, defendant Bryant's false statement obstructed and impeded the investigation and prosecution of his 10:20 p.m. assault.

In its addendum to the Revised PSR, the Probation Office indicated that Bryant's false statement may not have impeded the investigation because "[o]ther evidence, namely videographic evidence and eyewitness accounts, overwhelmingly contradicted the lie." Addendum at 2. While it is correct that federal investigators eventually developed overwhelming evidence of Bryant's *actions*, Bryant's mental state during the assault remained a sharply disputed issue at trial––a dispute that could have been resolved if Bryant had not lied during his FBI interview.

The Probation Office concluded that application of the obstruction adjustment "requires Court resolution at the time of sentencing." Addendum at 2. If the Court applies the adjustment, Probation noted that the defendant's total offense level would increase by two levels, to level 33, yielding a recommended Guidelines range of 135-168 months.

## III. SENTENCING RECOMMENDATION

11

The Government recommends that this Court impose a 10-year (120 month) sentence, which is below the low-end of the range recommended by the U.S. Sentencing Guidelines if § 3C1.1 applies or slightly below the midpoint of the Guidelines range if the adjustment does not apply. When fashioning an appropriate sentence for a defendant, a court must first consider the applicable guidelines range under 18 U.S.C. § 3553(a)(4). Although the sentencing guidelines are advisory, they are the "starting point and the initial benchmark" for federal sentencing. *Gall v. United States*, 552 U.S. 38, 49 (2007). Once a court has determined the appropriate sentencing range, it should then consider that range in light of the other relevant factors specified by 18 U.S.C. § 3553(a). *Id*.

Section 3553 requires the court to consider the need for the sentence imposed to accomplish certain purposes, including to: (1) reflect the seriousness of the offense; (2) promote respect for the law; (3) provide just punishment for the offense; (4) afford adequate deterrence to criminal conduct; (5) protect the public from further crimes of the defendant; and (6) provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. § 3553(a)(2). Section 3553(a) also requires the court to consider the nature and circumstances of the offense and the history and characteristics of the defendant, and then impose a sentence sufficient to comply with these purposes.

These factors support a 10-year sentence, which is as close to the recommended Guidelines range as 18 U.S.C. § 242 allows (or near the midpoint of the Guidelines range if 3C1.1 does not apply).

### A. A 10-year Sentence Reflects the Seriousness of the Offense

12

First, the severity of the defendant's multiple, violent offenses warrants a significant period of incarceration. The defendant––a 300-pound former wrestler––twice used a dangerous weapon to assault a 160-pound, teenage detainee who was restrained, appeared to be suffering a mental or physical health crisis, and was surrounded by multiple officers inside a secure correctional facility. As demonstrated by the surveillance videos and testimony from the defendant's fellow officers, Jordan Norris did not pose a threat when the defendant shot electricity into his body––and intentionally kept the electricity flowing for an extended time period, even as the defendant knew that his conduct could cause serious injury. Multiple officers on the scene testified that there was no justification for the defendant to tase Norris *for even one second* at the time of the assaults. Yet the defendant admitted on cross examination that he intentionally overrode his Taser's automatic 5-second cutoff and kept Norris in pain for a total of 50 seconds during the first assault and 11 seconds during the second assault––far longer than his policies and training permitted. The defendant willfully ignored warnings from his training that excessive tasing would burn the skin and could cause cardiac injury or death.

The defendant used electric shock to punish Norris for earlier behavior that had angered or annoyed him. At 8:00 p.m., the defendant punished Norris after he was loud, disruptive, and tried to loosen the straps in his restraint chair. The defendant made it clear that he was not using force to effect compliance, but was instead intent on punishing Norris. As proof of this intent, the defendant taunted Norris during the 8:00 p.m. assault, telling him "you don't like it, do you? I'll keep going until I run out of batteries."

Two hours later, the defendant punished Norris again after Norris struggled against the officers who tried to transport him for a mental health evaluation. Although Norris eventually

13

calmed down and was secured in handcuffs and shackles, the defendant punished Norris by leaning down and tasing him for 11 more seconds, while Norris sat calmly waiting to go to the hospital. The defendant committed these assaults despite knowing that his victim was already in a state of severe crisis. Tr. Jan. 9 at 232 ("Q. You sent electricity into his body for 97 seconds after you knew he was suicidal? A. Yes, sir.").

The defendant's conduct is particularly egregious because of his role as a supervisory law enforcement officer entrusted with the safety of the detainees in the jail and responsible for the conduct of the officers working under his command. Consequently, the defendant's crimes not only injured Norris, they set a dangerous example for more junior officers on-scene, and risked eroding public trust in law enforcement. For those reasons, crimes committed by law enforcement officers are often considered more serious at sentencing than comparable crimes committed by other defendants. *See United States v. McQueen*, 727 F.3d 1144, 1157 (11th Cir. 2013) (reversing a below-Guidelines sentence in an excessive force case as "a clear error of judgment" because such a crime is a "particularly serious offense"). Indeed, "[a] defendant's status as a law enforcement officer is often times more akin to an aggravating as opposed to a mitigating sentencing factor, as criminal conduct by a police officer constitutes an abuse of a public position." *United States v. Thames*, 214 F.3d 608, 614 (5th Cir. 2000) (affirming sentence in pre-*Booker* case); *see also United States v. LaVallee*, 439 F.3d 670, 708 (10th Cir. 2006) ("[I]n many instances, committing a crime while acting under color of law will result in a higher sentence – as it did in this case – rather than a lower sentence.").

Here, the defendant further compounded the harm of his assaults by putting other officers in the difficult position of confronting excessive force used by their supervisor and, in some cases,

14

their friend. Officers Josh Marriott and Daniel Bratton each testified that they failed to file mandatory reports about the 8:00 p.m. assault because the defendant instructed them that he would "take care of it." Tr. Jan. 7 at 92. Sergeant Ola admitted that he lied to the FBI because of "fear" and his "shame" that the defendant had disregarded his training so blatantly. Ola stated that he "feared retaliation" if he reported defendant Bryant's crimes. Ola Plea Agreement ¶ 8. And Caitlin Marriott stopped carrying a Taser and avoided being around officers when they tested Tasers because "just the sound of it" would trigger painful memories of the assault. Tr. Jan. 9 at 24. A 10-year sentence is therefore necessary to recognize the seriousness of Defendant Bryant's conduct.

### B. A 10-year Sentence is Necessary to Promote Respect for the Rule of Law and Just Punishment for the Offense

A ten-year sentence is also necessary to promote respect for the law and to provide just punishment for the offense. While in this instance 18 U.S.C. § 242 caps the defendant's sentence below the guidelines range, a further deviation from the sentencing guidelines would send the message that the abuse of individuals in custody is not deserving of the sanction that Congress and the Sentencing Commission have deemed to be just punishment based on the federal courts' collective sentencing expertise accumulated over the decades. *See, e.g.*, *United States v. Strange*, 370 F. Supp. 2d 644, 651 (D.N.D. 2005) ("'When people who are supposed to enforce our law . . . end up violating someone's constitutional rights, it is a very serious thing in a community. . . .' The range of imprisonment suggested by the sentencing guidelines both reflects and furthers these considerations."). Here, a further-below Guidelines sentence (or a sentence near the low end of the Guidelines range, if 3C1.1 does not apply) for a supervisory law enforcement officer who has

15

abused his power would fail to promote respect for the law because it would be interpreted as a statement that the justice system applies a more lenient standard to law enforcement officers than it does to others.

### C. A 10-year Sentence is Necessary to Provide Deterrence

A significant period of incarceration is likewise necessary to provide specific deterrence, as the defendant has not acknowledged the seriousness of his crimes or demonstrated remorse. On the night of the assaults, the defendant taunted Norris while he tased him and then tried to cover it up by instructing officers under his command not to file mandatory reports about the incident. When the defendant met with the FBI nine months later, he expressed no remorse for his actions. Rather, he blamed Norris for the first assault and falsely claimed that the second assault––when he tased Norris for 11 seconds after he was handcuffed and shackled––never happened. Nor did the defendant express any remorse for his actions at trial. Instead, he claimed that he was merely "responding and reacting to a situation [Norris] had created." Tr. Jan. 9 at 177. A sentence as close as possible to the guidelines range is therefore necessary to ensure that Defendant Bryant recognizes the harm he inflicted and to deter him from engaging in other abuses in the future.

Nor would a lower sentence afford adequate deterrence of future similar conduct by other law enforcement officers. *C.f. McQueen*, 727 F.3d at 1158 (noting, in the context of a prison beating case, that "[t]he need for the criminal law to deter seems especially compelling here"). Rather, a sentence further below the defendant's guidelines would send the opposite signal––that the abuse of individuals in official custody is not deserving of serious sanction and the law does not apply with equal force to law enforcement officers.

### V. CONCLUSION

16

For the foregoing reasons, the United States respectfully asks the Court to sentence Defendant Bryant to 10 years in prison—a sentence that is below the recommended Guidelines range but is the maximum authorized by statute in this instance. Such a sentence is sufficient but not greater than necessary to account for the severity of the defendant's conduct and accomplish the interests that Section 3553 prescribes.

Respectfully Submitted,

DONALD Q. COCHRAN
UNITED STATES ATTORNEY

*s/ Sara Beth Myers*_____
SARA BETH MYERS
Assistant United States Attorney
110 9th Avenue South
Nashville, TN 37203
615-736-5151 phone
Sara.E.Myers@usdoj.gov

ERIC S. DREIBAND
ASSISTANT ATTORNEY GENERAL

*s/ Michael J. Songer*_____
MICHAEL J. SONGER
Attorney
Civil Rights Division, Criminal Section
U.S. Department of Justice
950 Pennsylvania Ave. NW
Washington, DC 20530
202-305-3204 phone
202-514-6588 fax
Michael.Songer@usdoj.gov

17

## **CERTIFICATE OF SERVICE**

I hereby certify that on November 3, 2020, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system, which will send a Notice of Electronic Filing to the following Defense Counsel: Peter Strianse, 315 Deaderick Street, Suite 1700, Nashville, TN.

*s/ Sara Beth Myers*
Sara Beth Myers
Assistant United States Attorney