# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Case No. 3:18-cr-00144 |
| ) | Chief Judge Crenshaw |
| MARK BRYANT ) | |

## MOTION FOR BOND PENDING APPEAL
## AND INCORPORATED MEMORANDUM OF LAW

**COMES NOW** the Defendant, **Mark Bryant**, by and through his undersigned counsel, and pursuant to 18 U.S.C. §§ 3143(b) and 3148, respectfully requests that this Honorable Court enter an Order granting bond pending Mr. Bryant's appeal to the United States Court of Appeals for the Sixth Circuit.

### Introduction

The Defendant, Mark Bryant, through undersigned counsel, respectfully moves this Court, pursuant to 18 U.S.C. §§ 3143(b) and 3148, for bond pending his appeal to the United States Court of Appeals for the Sixth Circuit. Section 3143(b) states that the Court "shall" order the release of a defendant on bond pending appeal if he is able to make two showings: (1) that he is not likely to flee or pose a danger to the community; and (2) that the appeal is not taken for delay and raises at least one "substantial question of law or fact likely to result in reversal or an order for a new trial." *United States v. Pollard,* 778 F.2d 1177, 1181 (6th Cir. 1985) (quoting 18 U.S.C. § 3143(b)(2)). A "substantial question of law or fact" is a "close question or one that very well could be decided either way" or that "raises a substantial doubt (not merely a fair doubt) as to the outcome of its resolution." *United States v. Valera-Elizondo*, 761 F.2d 1020, 1025 (5th Cir. 1985).

A "substantial question" does *not* require a finding that the court erred or that it will be reversed: "Judges do not knowingly [err] or deliberately misconstrue applicable precedent. Thus,

it would have been capricious of Congress to have conditioned bail only on the willingness of a ... judge to certify his or her own error." *Id*. at 1022-23. Rather, the court must only conclude that the appeal raises a "substantial question" that, *if granted*, would result in a new trial or a sentence without further imprisonment. *Id.* at 1024. If the Court agrees that Mr. Bryant has made the required evidentiary showing, "the statute establishes a right to liberty that is not simply discretionary but mandatory." *United States v. Abuhamra,* 389 F.3d 309, 319 (2d Cir. 2004). As demonstrated in the following Memorandum, Mr. Bryant satisfies both prongs of Section 3143(b).

## Background

On November 5, 2016, Mark Bryant was a Correctional Officer/Corporal/Shift Supervisor at the Cheatham County Jail in Ashland City, Tennessee. The Cheatham County Jail was built 40 years ago to house 120 inmates. In 2016, it routinely housed 150 or more. On that night, there were six Correctional Officers to safeguard the security of those 150 inmates as well as themselves. The job of these six Officers was to preserve some semblance of internal order and some measure of discipline in the facility. As of Saturday, November 5, Mark Bryant had worked at the jail for approximately 14 months. A hard worker and responsible officer, he rose through the ranks quickly. He was hired on August 20, 2015 and promptly named the Field Training Officer in October 2015. By November 2015, he was supervising his first shift; by June 2016, he was elevated to Corporal/Shift Supervisor.

On November 5, 2016, Mr. Bryant was working as a Corporal/Shift Supervisor for the second shift between the hours of 2:00 p.m. and 10:00 p.m. Second shift in a local jail on a Saturday night is extremely busy, punctuated by the booking of new arrestees being transported to the facility. At approximately 6:45 p.m., Cpl. Bryant was at his desk in the Booking Office
2

watching the live camera footage from the cells, as he was required to do. It was at this time that he first observed Jordan Norris banging his head on the solid steel door of Cell 4 in the booking area. (Mr. Norris had arrived at the jail on November 3 and was still being held in booking without bond.) The events in Cell 4 caused Cpl. Bryant to leave his Office and proceed to Cell 4 where he asked Mr. Norris to stop banging his head on the door. Mr. Norris refused to comply and Cpl. Bryant unlocked the cell door and respectfully asked Mr. Norris to stop hitting his head and advised him that he was "going to hurt [himself]." Initially, Norris complied and returned to his bunk. No sooner had Cpl. Bryant closed the door to Cell 4 and returned to the Booking Control Room, Mr. Norris was banging his head again on the cell door. At that point, Cpl. Bryant, accompanied by Correctional Officer Jeff Key, return to Cell 4, enter the cell and escort Mr. Norris out of Cell 4. During this extraction, Mr. Norris fought and resisted violently. Correctional Officers (CO) Daniel Bratton and Josh Marriott assisted Officers Bryant and Key as they struggled to control Mr. Norris, who was exhibiting extraordinary strength.

Although the government euphemistically characterized Mr. Norris to the trial jury as "difficult," during the course of both trials in this Court, COs variously described Mr. Norris as "possessed," "out of his mind," "drugged," "aggressive," and, "possessed of extreme, unnatural strength." The video of the initial extraction reveals that four Officers, with an aggregate weight of 1,000 pounds, could not control him, could not cuff him, and fought to place him in a restraint chair. CO Bratton was forced to tase Norris four times to get him into the restraint chair. The video clearly shows Norris actively resisting, stiffening his torso and limbs, and flailing his arms.

Once placed in the restraint chair, at approximately 7:59 p.m., Norris can be seen struggling against the chair. Unfortunately, the chair was old and threadbare. The Velcro restraint devices did not fully engage, and Norris was able to loosen the restraints and physically move

3

the chair across the concrete jail floor. He was combative, actively resisting and spitting at the officers. A spit mask had to be placed over Norris' head as a result of his combative behavior. The video revealed that his right hand worked free as he struggled to remove the mask. While his right arm was unsecured, he was tased again. At 10:20 p.m., when Norris was being readied by COs for transport to the hospital, he continued to fight efforts to restrain him. Norris was taken to the Middle Tennessee Mental Health Institute and diagnosed with a severe major depressive disorder with acute psychotic features accompanied by auditory and visual hallucinations. The psychiatrist from MTMHI, advanced by the Defense at both trials, concluded that Norris was suffering from delirium, was emotional unstable, unpredictable and violent.

Prior to the filing of a civil lawsuit against the Cheatham County Jail, Sheriff Breedlove and the supervisory staff at the Jail were fully supportive of Cpl. Bryant and concluded that the force used by Bryant and other COs was "justified." In fact, Sheriff Breedlove praised his street officers for the investigation and arrest of Jordan Norris.

> Jordan Norris let it be known he was going to kill any Deputy who tried to arrest him. He was armed with stolen weapons. A drug dealer by trade and on the fast track to live the Thug Life. The team, armed with a search warrant, invited themselves into the "House of Norris" on Little Pond Creek with such dynamic quickness.... Great job Cheatham SWAT!! [Ironically, Mr. Norris posted Sheriff's Breedlove's comments to his *Instagram* account.]

However, once the suit was filed and News Channel 5 carried a story with the leaked jail surveillance video, suddenly Cpl. Bryant's conduct was unacceptable and had violated some nonexistent, incoherent taser policy.

At trial, the government insisted that Cpl. Bryant's conduct was contrary to the training he received and the policy of the Cheatham County Sheriff's Office and the Jail that was in place at the time. At the first trial, which resulted in a hung jury, Lt. J.J. Hannah, Jail Administrator,

4

the top supervisor in charge of the jail, testified that "at the time of the [Jordan Norris] incident, we didn't have much of a policy on tasers." Hannah elaborated that "there was a five second rule with [the taser set to] prongs [which would be projected from the taser from a distance into the body of the subject]." However, there was "no time limit with drive stun [the technique used exclusively by the COs in their encounter with Jordan Norris]." Hannah noted that there was no prohibition in the policy to tasing someone who was restrained. Hannah's testimony at the first trial was confirmed by Government Exhibit 1 (offered at both trials) regarding the taser policy contained in "Cheatham County Sheriff's Office General Order," entered February 4, 2015, in effect at the time of the Norris incident which set no drive stun limits and made no mention of a limitation to three, five second bursts. Significantly, the Taser Training Academy Certification Test, offered as Government Exhibit 3, taken by Bryant and all other COs on duty that night contained no questions regarding the limits on the number of stuns to be administered or the duration of stuns.

Mark Bryant was convicted at a second trial of two counts of use of excessive force/deprivation of rights under color of law. (*Verdict Form*, Docket Entry 104). Mr. Bryant was acquitted of Counts Three (falsifying a document, 18 U.S.C. § 1519), Four (falsifying a document, 18 U.S.C. § 1519) and Five (false statement, 18 U.S.C. § 1001), of the superseding indictment. (Docket Entries 70 & 104). The case was tried twice. The first trial resulted in a hung jury. (Docket Entry 58).

On November 20, 2020, the Court sentenced Mr. Bryant to a term of 60 months in the custody of the U.S. Bureau of Prisons (BOP) followed by a one-year term of supervised release (Docket Entry 132). On December 4, 2020, Mr. Bryant timely filed a Notice of Appeal. (Docket Entry 134). Mr. Bryant has been ordered to surrender to FCI Yazoo City, Mississippi, no later

than 2:00 p.m. on **Monday, February 22, 2021**, for service of his sentence.

## Memorandum

**I.      Flight or Danger**

Mr. Bryant plainly is not likely to flee and does not pose a danger to the community. On June 26, 2018, Mr. Bryant voluntarily surrendered on the indictment and was released on an unsecured appearance bond with conditions. (Docket Entries 8 & 10). Mr. Bryant has been on pretrial release for the past thirty-two months and has faithfully appeared in both federal and State court as directed. *See United States v. Hartery,* 351 F.Supp.2d 14, 15 – 16 (N.D.N.Y. 2005) (granting bond pending appeal, finding that defendant was not a danger or flight risk, despite two prior convictions for violent crimes, in part because convictions were old and "[defendant] has adhered to every condition that has been imposed upon him by Pre-Trial Services"). Indeed, in releasing Mr. Bryant on bond pending his *sentencing,* the Court necessarily determined by clear and convincing evidence that he poses neither a risk of flight nor a danger to the community. *See* 18 U.S.C. § 3143(a). That implicit finding was well founded.

   *A.      Personal Background*

Mark Bryant is a 42-year-old devoted son, brother, and nephew, who enjoys strong family support and has an outstanding work history. Those who truly know him and have had the benefit of observing a lifetime of his conduct and behavior praise his kindness and gentle nature.

> We have known Mark as a baby, little boy, teenager and young adult. We have watched him at work and at play and have seen him make good life choices along the way. He has always had a strong work ethic and could always be depended on.... We have witnessed Mark be kind and gentle with his grandparents, aunts, uncles and parents. [He is] a loyal, gentle giant.

*Letter*, Laughrie & David Tucker, Aunt & Uncle. (Docket Entry 121-1, Page ID# 2134). The

6

Case 3:18-cr-00144   Document 142   Filed 02/17/21   Page 6 of 17 PageID #: 2397

*Revised* PSR discloses that Mr. Bryant's father "suffered a 'psychotic break' during the 1990s."

As his mother has aged, Mr. Bryant has taken a greater role in caring for his father.

> Mark's dad suffers from conditions that make him volatile at times. Mark managed those times with gentleness and patience and understanding.... Mark loves and appreciates his parents.

*Letter*, Joyce Striclyn, Aunt. *Id.* at Page ID# 2135. The PSR also discloses continuous, uninterrupted employment over the past 24 years. PSR ¶¶ 80-84.

> After graduation, Mark joined the workforce and became independent. He set goals and was not afraid to work hard to reach those goals. At a very young age, Mark purchased a home. He became a very productive member of society.

*Letter*, Lisa S. Tucker, Family Friend. *Id.* at Page ID# 2140. His work ethic and devotion to his parents is a theme that is repeated by those who truly know him.

> He works every day and has since he was in high school. He is self-sufficient and strives to be both a good man and a good citizen. He is also devoted to his parents and helps them when he is needed.

*Letter*, Lynn Spain, Family Friend, *Id.* at Page ID# 2142. Mr. Bryant has also been active in his community.

> [Mark Bryant] helped me at Clarksville Academy when I got my first head coaching job in 2010. I was in need of many things and Mark was a huge help with mowing the field and setting things up on game night when I couldn't. We were neighbors for many years. He was great to my two boys and my late wife. My wife (Marisa) passed away in 2011 with Ovarian Cancer. We had some issues at my house that made it difficult for my wife to get around. Mark came over and fixed the steps, the kitchen, and the deck with new steps over a period of a few months and never asked for a penny.

*Letter*, Todd Hood, Head Football Coach, Rossview High School. *Id.* at Page ID# 2141.

Mr. Bryant testified consistently at both trials that he had no intent to violate the law or

any jail policy in his interaction with Jordan Norris. As the Corporal/Shift Commander responsible for his fellow officers and the other 149 inmates crammed into the old, decaying facility, he was focused on the safety of everyone in the jail. His fellow Correctional Officers recognized and appreciated his management style and his overriding concern to protect inmates and staff.

> I met Mark Bryant in the Fall of 2015, shortly after starting a nursing position at the Cheatham County Jail. I quickly developed a professional relationship with Mark. He became a (sic) not only a friend to me but a support system within the jail. A woman in a place of position and in health care can be very difficult in the correctional environment and having Correctional Officers with you that you can trust is a valuable asset. I could count on Mark to not only be there to protect my personal safety while interacting with my patients, but also to ensure that I was able to carry out my duties as their only nurse in a timely efficient manner.... I also counted on Mark to be my eyes and ears when I was not within the facility, if there was a health concern [with an inmate].... I have seen Mark in not only professional situations but also personal be the mediator, using his words to help diffuse a difficult situation of disagreement, the voice of reason in so many situations.

*Letter*, Jessica Treicler, LPN & Former Co-Worker at the Cheatham County Jail. *Id.* at Page ID# 2138.

> When Mark started at the jail, I had only been there for about a month or two. I was new to corrections and wasn't experienced on handling situations with inmates, but whenever I needed any help or had any questions Mark would always help me. He always said using your words helped a lot more than going hands on.... [H]e treated me with respect, that most females in that line of work didn't get.

*Letter*, Ms. Harley Durham, Former Co-Worker at the Cheatham County Jail. *Id.* at Page ID# 2146. Given Mr. Bryant's former position as a Correctional Officer, he is much more susceptible to abuse in prison.

The Court is aware that Mr. Bryant still faces a separate, successive State prosecution for

8

this identical conduct.

### B. The Nature of the Conviction

The fact that Mr. Bryant has been convicted of use of excessive force/deprivation of rights under color of law is not a bar to granting his release. See, e.g., *United States v. Henson*, 663 F.Supp. 112 (W.D. KY. 1987) (granting motion for bond pending appeal to defendant convicted of conspiracy to commit mail fraud); *United States v. Rittweger*, Case No. 02 Cr. 122 (JGK) (S.D.N.Y. Nov. 30, 2005), *2005 U.S. Dist. LEXIS 31283*, at \*\*10-13 (granting motion for bond pending appeal to two of three defendants convicted of defrauding investors in a Ponzi scheme); *United States v. Kaplan*, Case No. 02 Cr. 883 (DAB) (S.D.N.Y. Nov. 22, 2005), *2005 U.S. Dist. LEXIS 29478* (granting bond pending appeal to defendant convicted of seven counts of conspiracy, mail fraud, health care fraud, false statements, and witness tampering). *See also United States v. Shellef*, 507 F.3d 82, 96 (2d Cir. 2007) (noting that the Second Circuit had ordered the defendants released on bond pending appeal); *United States v. Doyle*, 130 F.3d 523, 533 (2d Cir. 1997) (noting that both defendants had been allowed to remain free on bond pending appeal). *United States v. Quarshie*, Case No. 04 Cr. 1148-5 (RWS) (S.D.N.Y. Jan. 16, 2007), *2007 U.S. Dist. LEXIS 5457*, at \*2 (noting that the defendant, convicted of conspiracy to commit money laundering, had remained free on bond pending sentencing).

Although Mr. Bryant certainly believes that his legal positions articulated in this motion are correct, the standard for bond pending appeal is markedly lower than that. The question is not whether Mr. Bryant is right on the law, but whether the legal issues in his case are substantial ones that, *if* resolved in Mr. Bryant's favor, would warrant an acquittal or new trial. Mr. Bryant's appeal will raise.... relatively novel applications of federal criminal law and a debatable jury communication issue, which are "substantial."

9

**II.     The Substantial Appellate Issue**

This case raises a substantial issue on appeal. For purposes of granting bond pending appeal, Mr. Bryant need only show that one or more issues that would affect the conviction are "close question[s] or one[s] that very well could be decided either way." *Valera-Elizondo,* 761 F.2d at 1025.

*The Government Failed to Prove the Essential Element of "Willfulness."*

The evidence at Mr. Bryant's second trial failed to show that he acted "willfully" in depriving someone else of a right secured and protected by the Constitution and laws of the United States.[1] To convict under 18 U.S.C. § 242, the government must prove that the defendant acted under color of state law; that the defendant deprived the victim of a right that is secured by the Constitution or laws of the United States; that the defendant acted willfully; and, that the defendant's conduct resulted in bodily injury or that the defendant used a dangerous weapon. (Jury Instructions, Docket Entry 106, Page ID# 1126-27). Although the government introduced evidence that Bryant, assisted by other correctional officers, tased combative inmate Jordan Norris, the question is whether Bryant's conduct was willful. "The word 'willful' has many meanings and must be construed in light of its statutory context." *United States v. Jain*, 93 F.3d 436, 440 (8th Cir. 1996). In a criminal statute, willfulness requires a defendant to have acted with knowledge that his conduct was unlawful. *Dixon v. United States¸* 548 U.S. 1, 5 (2006). In this context, "willfulness is proved by evidence that a defendant acted voluntarily with knowledge that his conduct was unlawful, even if he did not know the specific statute violated." *United States v. Kelly*, 368 F.App'x 194, 198 (2d Cir. 2010). As noted in the Court's instructions, the jury was required to find "whether the defendant knew, through training or experience, that his

---

[1] This issue came into sharper focus as counsel prepares Mr. Bryant's brief to the United States Court of Appeals for the Sixth Circuit.

10

actions were unlawful and whether he knew that they violated department policy or his own training." *Id.* at Page ID# 1133.

Recognizing the high level of deference the jury verdict deserves, the government did not meet its burden. The testimony of defense-turned-government witness, J.J. Hannah, the 20-year Jail Administrator for the Cheatham County Sheriff's Office, tells a different story and casts more than a reasonable doubt on whether Bryant's interactions with Inmate Norris violated any training or policy and were, therefore, willful.

> **[Peter Strianse] Q.** Do you remember being interviewed by the TBI and the FBI on August 4th of 2017?
>
> **[J.J. Hannah] A.** I don't know the exact date, but, yes, sir, I remember being - -

(Docket Entry 114, Page ID# 1417).

\* \* \*

> **Q.** Do you remember telling them that Mark [Bryant] gave his side of the story and justified his actions?
>
> **A.** I don't specifically remember that, no, sir. It's been a long time ago.
>
> **Q.** And that since Mr. Norris was not fully restrained and he was threatening and evidencing this unusual strength, that you didn't see any malicious intent in what Mark Bryant had done?
>
> **A.** I think that there were - - I do remember somewhat that, but I think there were - - we were talking about two different things there.
>
> **Q.** Well, what are the two things we're talking about?
>
> **A.** I think this was well after we knew about the incident, when we spoke with the TBI and the FBI.
>
> **Q.** Well, after you knew about the incident where you had the benefit of looking at all the video; is that right?

11

> **A.** Yes, sir.
>
> **Q.** Now, do you remember telling the FBI and the TBI that you were satisfied with Mark Bryant's explanation of what had happened?
>
> **A.** I don't specifically remember that, no, sir.

*Id.* at Page ID# 1417-18.

\* \* \*

> **Q.** Well, maybe you remember this: Do you remember being asked questions about the Taser policy that was in effect on November 5, 2016?
>
> **A.** I do remember being asked about that, yes, sir.
>
> **Q.** And you've testified in connection with another hearing in this case; is that right?
>
> **A.** I don't - - what hearing are you talking about?
>
> **Q.** February of 2019. Do you remember - -
>
> **A.** Oh, yes, sir.
>
> **Q.** And you were asked some specific questions about the Taser policy; is that right?
>
> **A.** Yes, sir.
>
> **Q.** And do you remember saying that at that time in November of 2016 that you all didn't have much of a Taser policy at that time?
>
> **A.** I do remember saying that, yes, sir.
>
> **Q.** And that it was a vague policy?
>
> **A.** That was my opinion, yes, sir.
>
> **Q.** And that the only five-second rule dealt with when those prongs are shot out of the device and actually attach to somebody's body?
>
> **A.** I do remember saying that, yes, sir.

12

> **Q.** And that there was absolutely no time limit on this so-called drive-stun or contact use of the Taser?
>
> **A.** I think I would have said that I didn't know of the time limit. I'm not the Taser instructor, so I couldn't definitely give you a definite answer.
>
> **Q.** Do you remember telling Ms. Wright [FBI] and Mr. Atkins [TBI] that back in November of 2016 that there was never any discussion about time limits on drive-stuns?
>
> **A.** I told them I didn't remember any discussions on it.

*Id.* at Page ID# 1419-20.

*   *   *

> **Q.** So, by that point in time you certainly had seen all of the video that was associated with this incident?
>
> **A.** Should have, yes, sir.
>
> **Q.** Because there were six or seven of your officers that were directly involved in it?
>
> **A.** There was quite a few of them, yes, sir.
>
> **Q.** So you had the full benefit of seeing all of that, and you told Ms. Wright and Mr. Atkins that it was justified?
>
> **A.** I don't remember telling them that. But I think at the time I thought - - I was under the - - that I thought it was justified.

*Id.* at Page ID# 1420.

*   *   *

> **Q.** Now, the policy of the Cheatham County Sheriff's Office with regard to tasing changed abruptly in July of 2017 [after the filing of a civil lawsuit]; is that right?
>
> **A.** The core - - the core policy stayed the same. There was just more of a clarification and update.

*Id.* at Page ID# 1422.

13

* * *

> **Q.** And this was the first statement issued by the sheriff regarding the number and duration and time of tases; is that right?
>
> **A.** By the sheriff, as far as I know, yes, sir.

*Id.* at Page ID# 1427.

* * *

> **Q.** Those documents that you identified in no way specify three administrations of the Taser, five seconds each, correct?
>
> **A.** No, sir.
>
> **Q.** And this is the first time it was ever codified or put in writing by the Cheatham County Sheriff's Department; is that right?
>
> **A.** At least by the sheriff, I know, yes, sir.

*Id.* at Page ID# 1427-28.

* * *

> **Q.** That in your understanding of the policy - - and this is before we had the edict of July the 30th, 2017 - - there was this sort of general idea that if you were going to shot the prongs at somebody, well, that would be a five-second application, correct?
>
> **A.** Yes, sir.
>
> **Q.** But you were very clear that there was never any sort of limitation on the drive-stun or the contact Taser?
>
> **A.** I think I would have said I don't remember there being anything. But yes, sir.

*Id.* at Page ID# 1428.

* * *

> **Q.** Do you remember being asked, was there any specific number or duration of tases that was prescribed by the policy at that time? Meaning, November 5, 2016. Do you remember that question?

14

> **A.** I do, yes, sir.
>
> **Q.** And do you remember saying, "No, sir, not in the policy"?
> **A.** I do, yes, sir.
>
> **Q.** Was there anything in the policy about not tasing an individual who was restrained? Do you remember that question?
>
> **A.** I do, yes, sir.
>
> **Q.** Do you remember answering, "no, sir, it wasn't in the policy"?
>
> **A.** I do, yes, sir.
>
> **Q.** Do you remember being asked that question how did you characterize the old policy to the TBI and the FBI that was in effect at the time? Do you remember that?
>
> **A.** I believe that's where I - -
>
> **Q.** "I had made a statement to the TBI and FBI that the Taser policy wasn't very strong at the time of the incident"?
>
> **A.** I do remember that, yes, sir.
>
> **Q.** And do you remember being asked the question that you all didn't have much of a policy at that time?
>
> **A.** I'm sorry. That's confusing me. That part is.
>
> **Q.** Yeah. Do you remember being asked at a prior hearing in connection with this matter, this question, that "You all didn't have much of a policy at that time?"
>
> **A.** I do remember making that statement, yes, sir.

*Id.* at Page ID# 1428-29.

Mr. Bryant's case then turns on whether the government presented sufficient evidence that Bryant acted willfully in tasing Norris. This is not an ordinary excessive force case where willfulness can be inferred from a well-trained officer purposefully, with the specific intent to harm, blatantly disregards a clearly articulated "department policy for his own training." (Docket

Entry 106, Page ID# 1133). Instead, the government proved that there was no policy in effect at the time of the Norris tasing episode. Bryant cannot willfully fail to follow a taser policy if the evidence only showed that there no policy. It is not sufficient "that [Mr. Bryant] had a generally bad purpose" in applying more force than was necessary to protect himself and other correctional officers from Norris' continuing assaultive behavior. *Screws v. United States*, 325 U.S. 91, 107, 65 S.Ct. 1031, 1038, 89 L.Ed. 1495 (1945). Under these unusual circumstances, and given the government's failure to produce any supporting evidence, there is no reasonable inference that Bryant acted willfully.

**Conclusion**

Based on the foregoing, Defendant Bryant's Motion for Release Pending Appeal should be granted.

Respectfully submitted,

TUNE, ENTREKIN & WHITE, P.C.
315 Deaderick Street, Suite 1700
Nashville, TN 37238
(615) 244-2770
pstrianse@tewlawfirm.com

S/ Peter J. Strianse
PETER J. STRIANSE
Attorney for Defendant-Appellant
Mark Bryant

**CERTIFICATE OF SERVICE**

  I hereby certify that a true and correct copy of the foregoing has been sent via the Court's electronic filing system unless not registered and, in that event deposited in the United States mail, postage prepaid, to:

    Sara Beth Myers
    Assistant United States Attorney
    Middle District of Tennessee
    110 Ninth Avenue South, Suite A-961
    Nashville, TN 37203-3870

    Michael J. Songer
    Attorney
    Civil Rights Division, Criminal Section
    U.S. Department of Justice
    950 Pennsylvania Ave. N.W.
    Washington, D.C. 20530

this 17th day of February, 2021.

            S/ Peter J. Strianse
            PETER J. STRIANSE