IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF TENNESSSEE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| v. | ) | CR. NO. 3:18-CR-144 |
| | ) | |
| | ) | |
| MARK BRYANT | ) | |

## UNITED STATES' RESPONSE TO THE DEFENDANT'S MOTION FOR BOND

The United States of America, by and through Donald Q. Cochran, United States Attorney for the Middle District of Tennessee, Assistant U.S. Attorney Sara Beth Myers, and Civil Rights Division Trial Attorney Michael J. Songer, hereby files this response in opposition to the defendant's motion for bond pending appeal, Doc. 142. The Court should deny the defendant's motion because he fails to demonstrate that his forthcoming appeal will raise a substantial question of law and fact. Indeed, the defendant's motion does not identify any legal issue related to his conviction. The sole argument he raises to support his bond request is that there was insufficient evidence to support the jury's finding that he acted "willfully" when he assaulted a pretrial detainee with a Taser. Bryant cannot carry his "heavy burden" for such a claim, as the Government presented substantial evidence of Bryant's willfulness, most of which the defendant's motion fails to even acknowledge. Accordingly, the defendant's motion raises no substantial question and should be denied.

1

## I. FACTUAL AND PROCEDURAL BACKGROUND

After a four-day trial, a federal jury in the Middle District of Tennessee convicted the defendant, supervisory corrections officer Mark Bryant, of two counts of violating 18 U.S.C. § 242 by assaulting a restrained 18-year-old detainee with a Taser. The Court allowed Bryant to remain free on bond until his sentencing hearing on November 20, 2020. At that hearing, the Court sentenced Bryant to five years in prison and ordered him to report to the Federal Bureau of Prisons by February 22, 2021. Doc. 132. The Court subsequently granted the defendant's motion to delay his reporting date until April 22, 2021. Doc. 144.

The defendant's convictions stem from his actions on the evening of November 5, 2016, when he twice assaulted a teenage detainee named Jordan Norris with a Taser while Norris was restrained and surrounded by multiple officers inside the Cheatham County Jail. During the first assault, Bryant tased the victim four times in quick succession—for a total of 50 seconds—while the victim was tied down in a restraint chair and surrounded by three officers. One of the officers who witnessed the first assault testified that it caused wounds on Norris' skin that looked like "raw hamburger meat." Tr. Jan. 9, 2020 at 23. Two hours later, Bryant tased Norris for 11 more seconds while he was sitting in a chair, surrounded by seven officers, and restrained with handcuffs and leg shackles.

The jury unanimously found that the defendant's conduct violated each element necessary for a conviction under 18 U.S.C. § 242, including that the defendant acted "willfully" when he violated Norris' Fourteenth Amendment right to be free from unreasonable force that amounts to punishment. This element required the government to prove that he knew it was wrong to use more force than was reasonable under the circumstances, but did so anyway. *See infra* at 9. To

prove the defendant's willfulness at trial, the government introduced four categories of evidence: (1) the jail's policies and training relating to how officers were permitted to use Tasers; (2) the perceptions of other officers on the scene, who recognized that Bryant's tasings were unnecessary and excessive based on their training and experience as law enforcement officers; (3) audio and video recordings that showed Norris was not a threat and that captured Bryant taunting him during the assault; and (4) evidence that Bryant tried to cover up both assaults by writing false reports, pressuring witnesses not to report what happened, and lying to the FBI.

### A. The defendant violated the standards in the jail's policies and Taser training.

The Government introduced evidence showing that Bryant ignored the standards in CCSO's policies and Taser training. Prior to the assault, Bryant had completed a Taser certification training course that prescribed the limits for using Tasers inside the jail. Sergeant Gary Ola, the jail's longtime Taser trainer, testified at trial that he taught the defendant the limits on using Tasers and warned that serious injuries could result from exceeding those limits. Ola explained that the Taser model the defendant used was designed to cut off automatically after five seconds. Tr. Jan. 8 at 230. While it was possible for officers to override the cut-off by continuing to hold down the Taser's trigger, *see id.*, Ola trained the defendant to never tase a person for more than five seconds at a time or use more than three five-second Taser cycles on a subject at one time. Tr. Jan. 8 at 236-40. Ola emphasized during this training that exceeding these limits may cause cardiac injuries or even death. *Id*. Moreover, Ola taught Bryant and other officers to use a Taser only when they faced a threat that they could not safely resolve by using lower levels of force. Ola emphasized that Tasers would rarely be necessary inside a secure jail facility, particularly where multiple officers were available to control an inmate. *Id.* at 235-36,

3

242. During Bryant's training, Ola specifically instructed officers not to tase a person who was already handcuffed—a point so important that he emphasized it "every time" he trained officers. *Id.* at 242.

Other officers who completed the same Taser certification course as Bryant corroborated Ola's testimony. Officer Josh Marriott, who attended the Taser certification course with Bryant, recalled Ola training officers to never tase a person for more than three, five-second bursts, and to only use a Taser when it was necessary to neutralize a threat. Tr. Jan. 8 at 45-47; *see also* Tr. Jan. 9 at 7 (Officer Caitlin Marriott testified that officers were trained to limit Taser use to "five seconds for three bursts."). Lieutenant JJ Hannah, the supervisor in charge of the jail, confirmed that officers were required to follow the Taser limits specified in their training, Tr. Jan. 8 at 108, and that Bryant's tasings were not consistent with the jail's policy that existed at the time of the assault, *id.* at 125. Moreover, multiple officers testified that, other than Bryant's assaults, they had never seen an officer tase an inmate for more than five seconds. See Tr. Jan. 8 at 52-53 (Corporal Montgomery had never seen an officer tase someone for more than five seconds); *id.* at 94-95 (Lieutenant Hannah had never seen an officer use a Taser for more than three or four seconds).

### B. Officers who witnessed the assault believed it was excessive.

The Government presented testimony from multiple officers who witnessed Bryant's assaults in real time and testified that his tases were unnecessary and excessive based on their training and experience as law enforcement officers. The two officers who held Norris down during the first assault, Josh Marriott and Jeff Key, each testified that Norris posed no threat to the officers' safety and, consequently, there was no justification for tasing him for any amount of time.

4

*See* Tr. Jan. 7 at 61 ("Q. In this posture, do you see any threat that justifies tasing Jordan? A. No. Q. Not for any amount of time at all? A. Right."); Tr. Jan. 9 at 103. Nonetheless, the defendant tased Norris four times in quick succession in the chest and legs for a total of 50 seconds. During this sequence, Bryant overrode the Taser cutoff to keep electricity flowing into Norris for 25 straight seconds without a break—five times longer than the maximum exposure Sergeant Ola had trained the defendant to use. Officer Josh Marriott told the jury that these lengthy tases "were definitely overdone." Tr. Jan. 7 at 72.

Officer Caitlin Marriott, who watched the first assault from several feet away, testified bluntly that, "you're not allowed to tase someone for that long." Tr. Jan. 9 at 21. She explained that the incident was so disturbing that she "didn't carry a Taser for a long time after that." Tr. Jan. 9 at 23. Indeed, for months after witnessing the assault, Officer Marriott avoided other officers when they even *tested* Tasers because "just the sound of it" "would take [her] back to the incident." *Id.* at 24.

Multiple officers who witnessed the second assault offered similarly clear denunciations of Bryant's conduct. Surveillance video and Taser records introduced at trial showed that, during the second assault, Bryant tased Norris for 11 seconds while he was handcuffed, shackled, and surrounded by multiple officers. Sergeant Ola, who watched the assault from less than three feet away, testified that Norris was "calm" and "restrained" when Bryant tased him, and that, under the jail's policies and training, there was no justification for Bryant to use his Taser for even one second. Tr. Jan. 8 at 256 ("Q. Do you see any reason to tase him right now? A. No, sir. Q. For any amount of time? A. No, sir." Q. Even one second? A. No, sir."). Ola was "shocked" when Bryant tased Norris for no apparent reason. *Id.* at 261. A jail supervisor who

5

witnessed the assault, Corporal Michael Montgomery, agreed with Ola's assessment. Tr. Jan. 8 at 63 ("Q. Do you see any threat that justifies tasing Jordan right now? A. No. Q. Even for one second? A. No.").

      **C.**     **Video shows that Norris was not a threat and that Bryant taunted him.**

The Government further demonstrated Bryant's willfulness by showing the jury audio and video recordings of both assaults. These videos prove that Norris was restrained and surrounded by multiple officers at the time of both assaults—evidence from which a jury could rationally infer that a trained officer would know it was inappropriate to tase him. Moreover, the Government presented evidence that Bryant taunted Norris during the first assault. As Bryant shot electricity into Norris' body, he sneered at Norris, "you don't like it, do you? I'll keep going until I run out of batteries." The Government introduced the surveillance video that captured Bryant's taunt and testimony from officers who heard it. Tr. Jan. 7 at 63-64; Jan. 8 at 150, 161. Indeed, Bryant himself admitted on cross examination that he said "something to that effect" while he tased Norris for 50 seconds. Tr. Jan. 9 at 202.

      **D.**     **Bryant tried to cover up his assaults.**

The Government further highlighted Bryant's willfulness at trial by introducing evidence that he tried to cover up both assaults. Even though Bryant was acquitted on the substantive obstruction charges, Bryant's false reports and other evidence of his concealment of the assaults on Norris were proper for the jury to consider when assessing Bryant's willfulness.

Shortly after the first assault, Bryant urged officers who witnessed it not to file reports about the incident because he "would take care of it"—despite clear policy requiring all officers to submit report when they were involved in a use of force incident. *See* Tr. Jan. 7 at 66 (Officer

6

Josh Marriott testified that he did not submit a required report because "Bryant told me that he would take care of it."); Tr. Jan. 9 at 21 (Bryant told Officer Caitlin Marriott that she "didn't need to do [a report]").

Bryant then submitted his own reports that omitted most of the details that made his tasings criminal. Bryant's reports about the two incidents for which he was convicted omitted all of the following information: the number of times he tased Norris; how long each tasing lasted; the fact that Norris was strapped down during the first assault; and that Norris was handcuffed, shackled, and surrounded by seven officers during the second assault. Bryant told the jury that he "didn't have that information in [his] mind" when he wrote the reports, Tr. Jan. 9 at 220-21, although he acknowledged writing them shortly after the assaults occurred. *See* Tr. Jan. 9 at 161 (report for the 10:20 p.m. assault was completed at 10:49 p.m.); id. at 164 (report for the 8:00 p.m. assault was completed at 9:48 p.m.).

The Government introduced both of Bryant's reports as exhibits at trial, along with testimony from Lieutenant Hannah, who told the jury that the defendant's reports omitted critical information that he needed to assess whether the force was appropriate. Tr. Jan. 8 at 127 (The defendant's reports did not give Hannah "any idea" what really happened.). As a result, Hannah did not flag the incidents for further investigation or potential disciplinary action. *Id.* at 152.

Finally, the Government introduced evidence showing that, when Bryant met with investigators, he falsely claimed that the second assault did not happen. In a voluntary interview with agents for the FBI and Tennessee Bureau of Investigation nine months after the assaults, Bryant described putting restraints on Norris and placing him in a vehicle for transport to a local medical facility on the night of the assaults. When agents asked if Bryant had tased Norris after

7

Case 3:18-cr-00144    Document 146    Filed 02/25/21    Page 7 of 14 PageID #: 2420

securing his restraints to place him in the transport vehicle, Bryant falsely claimed that he never tased Norris after Norris was in handcuffs, leg shackles, and a belly chain. The Government introduced an audio recording of this portion of the interview at trial, along with video and witness testimony showing that the defendant had, in fact, tased Norris for 11 seconds after he was placed in these restraints.

## II. Legal Analysis

Under the Bail Reform Act, 18 U.S.C. § 3143(b), there is a "presumption against release pending appeal." *United States v. Chilingirian*, 280 F.3d 704, 709 (6th Cir. 2002). Bond is appropriate pending appeal only where a defendant demonstrates that (1) he is not likely to flee or pose a danger upon release *and* (2) the appeal is not for purpose of delay and raises a substantial question of law or fact that, if resolved in the defendant's favor, is likely to result in a reversal of his conviction or a sentence shorter than the duration of the appeal process. *Id.*; *see also* 18 U.S.C. § 3143(b)(1)(B). A question is "substantial" only if it is a "close question" that "is so integral to the merits of the conviction that it is more probable than not that reversal or a new trial will occur if the question is decided in the defendant's favor." *United States v. Pollard*, 778 F.2d 1177, 1182 (6th Cir. 1985). While the defendant is not required to prove reversible error, he has the burden to raise a question difficult enough that it "could go either way." *Id.* at 1182.

Bryant's bond motion fails to raise a substantial question. The motion does not raise any question of law. Rather, Bryant grounds his request entirely on the contention that the Government failed to prove that he acted "willfully" during his assaults, an essential element of

8

both of his § 242 convictions.[1]  "A defendant claiming insufficiency of the evidence bears a very heavy burden" on appeal, *United States v. Callahan*, 801 F.3d 606, 616 (6th Cir. 2015), as appellate courts consider the evidence in the light most favorable to the prosecution and assess whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (citing *United States v. Eaton*, 784 F.3d 298, 304 (6th Cir. 2015)).  Indeed, Bryant's counsel acknowledged as much when he focused his Rule 29 argument at trial on the obstruction counts and explained that the § 242 counts (on which Bryant was convicted) "are really jury issues" that require the jury to "wade through [] credibility."  Tr. Jan. 9 at 39.

Bryant's attempt to second-guess the jury's credibility determinations on appeal does not raise a close question, as the Government presented more than enough evidence for a jury to rationally conclude that he acted willfully.  A law enforcement officer acts willfully "and thus runs afoul of § 242" when he "specifically intends to use more force than is reasonable under the circumstances."  *United States v. Couch*, 1995 WL 369318, at *4 (6th Cir. Jun. 20, 1995).  While the government must prove that the defendant acted with knowledge that his conduct was unlawful, the defendant "need not be aware of the specific law or the rule his conduct is violating."  *United States v. Reichert*, 747 F.3d 445, 451-52 (6th Cir. 2014).

As detailed above, the jury heard extensive evidence that Bryant intended to use more force than was reasonable under the circumstances.  Bryant's motion fails to address most of this evidence.  For example, Bryant fails to acknowledge that the jury reviewed video of the assaults

---

[1] To win relief, Bryant must raise a substantial question about both counts on which he was convicted.  *See Morison v. United States*, 486 U.S. 1306, 1306-07 (1988) (The Bail Reform Act requires a defendant to show a likelihood of reversal "with respect to all the counts for which imprisonment was imposed.").

9

showing that the victim was restrained and surrounded at the time of Bryant's assaults. The video supports a rational inference that no trained law enforcement officer would believe it was reasonable to shoot electricity into the retrained detainee's body for an extended period of time. Moreover, the video captured Bryant taunting the victim by saying that he would keep his Taser "going until I run out of batteries"—clear evidence in the defendant's own words that he intended to inflict pain, not achieve a legitimate law enforcement objective.

Bryant likewise fails to address testimony from officers on the scene—who received the same training as Bryant and witnessed his assaults from point blank range—who recognized that the tasings were grossly excessive. Indeed, Officer Josh Marriott, Sergeant Ola, and Corporal Montgomery each testified that there was no threat that justified tasing Norris for even *one second* while he was restrained and surrounded, let alone for 50 seconds. Nor does the defendant address evidence that he attempted to cover up the assaults. At trial, the Government argued that Bryant's willfulness was apparent from the fact that he urged other officers not to file reports and then submitted his own reports that omitted nearly all of the incriminating facts and later lied about the assaults to the FBI. It is well-established that such efforts to conceal criminal activity are highly probative of a defendant's mental state. *See, e.g.*, *United States v. Davis*, 490 F.3d 541, 549 (6th Cir. 2007).

Without addressing the video, witness testimony, or concealment efforts, the defendant's motion takes aim at a single category of willfulness evidence: the evidence showing that Bryant's assaults violated his policies and training. *See* Doc. 142 at 16 (arguing that the Government failed to prove willfulness because "there was no policy in effect at the time of the Norris tasing episode. Bryant cannot willfully fail to follow a taser policy if the evidence only showed that there [sic] no

10

policy"). This argument fails to raise a substantial question, as it does not obviate the other evidence of willfulness, from which a jury could rationally find the defendant guilty.

Regardless, even here Bryant ignores relevant policy evidence that was introduced at trial. While Bryant now asserts that "there was no policy in effect at the time of the Norris tasing episode," at trial the Government introduced the jail's use of force policy (trial exhibit 1) and Taser policy (trial exhibit 41). These policies explicitly required officers to use the least amount of force necessary under the circumstances. They further instructed officers to use Tasers in accordance with their Taser training—a point Bryant acknowledged on cross examination. *See* Tr. Jan. 9 at 183. Bryant likewise ignores the significant evidence about his Taser training, including several hundred pages of training material and lengthy testimony from Sergeant Ola about the specific training that Bryant received. The jury also heard testimony from officers who took the same training as Bryant, who confirmed that Bryant violated his training in several key respects.

The only support Bryant offers for his claim is testimony from jail supervisor JJ Hannah that the jail's then-existing Taser policy was "vague" and didn't specifically limit how long officers could tase an inmate. Doc. 142 at 12-15. Bryant argues that Hannah's testimony "casts more than reasonable doubt" on whether Bryant "violated any training or policy." Doc. 142 at 11.

This argument is a red herring for two reasons. First, the lack of a specific time limit on using Tasers in the policy itself is irrelevant because, as Lieutenant Hannah testified, Bryant's assaults violated the policy's requirement to use the least amount of force necessary. Tr. Jan. 8 at 126 ("Q. Based on what you saw in your review on the video, did you see any justification for

11

tasing Jordan like that? A. No, sir."). Moreover, the policy simply established general principles—and instructed officers to follow the specifics taught in their training. Tr. Jan. 8 at 107-08. The jury heard overwhelming evidence that Bryant was trained to never tase an inmate for more than five seconds at a time. Second, Bryant's argument applies the wrong standard. The relevant question at trial—and for evaluating whether a substantial question exists on appeal—is whether Bryant willfully used more force than was reasonable under the circumstances, not whether he violated the express terms of a policy. As the Court instructed the jury, "it is possible for a government employee to violate the Constitution without violating a specific policy." Tr. Jan. 10 at 71. Indeed, Bryant acknowledged this principle on cross examination. *See* Tr. Jan. 9 at ("Q. Is there anything in the policy that says that officers seeing a person lying on the ground cannot run up and kick them in the face? A. No, there's nothing like that. Q. If you saw an inmate lying on the ground, would you run up and kick them in the face? A. No sir.").

Here, the jury heard extensive evidence that Bryant violated the jail's policies and training guidelines—and this evidence constituted only a small part of the evidence from which the jury could rationally conclude that he acted willfully. Accordingly, Bryant failed to raise a substantial question of law or fact and his motion for bond should be denied.

Respectfully Submitted,

DONALD Q. COCHRAN
UNITED STATES ATTORNEY

*s/ Sara Beth Myers*
SARA BETH MYERS
Assistant United States Attorney
110 9th Avenue South
Nashville, TN 37203
615-736-5151 phone
Sara.E.Myers@usdoj.gov

PAMELA S. KARLAN
PRINCIPAL DEPUTY ASSISTANT ATTORNEY
GENERAL

*s/ Michael J. Songer*
MICHAEL J. SONGER
Attorney
Civil Rights Division, Criminal Section
U.S. Department of Justice
950 Pennsylvania Ave. NW
Washington, DC 20530
202-305-3204 phone
202-514-6588 fax
Michael.Songer@usdoj.gov

13

## CERTIFICATE OF SERVICE

I hereby certify that on February 25, 2021, I filed the foregoing via the electronic case filing system, thereby giving notice to all registered parties.

Respectfully submitted,

*/s/ Michael J. Songer*
Michael J. Songer
Attorney
Civil Rights Division
